IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

SMART PATH CONNECTIONS, LLC.,   (   CAUSE NO. 2:22-CV-296-JRG
                                (
          Plaintiff,            (
                                (
vs.                             (
                                (
NOKIA CORPORATION,              (
et al.,                         )   MARSHALL, TEXAS
                                (   APRIL 2, 2024
          Defendants.          )   8:30 A.M.
_____

VOLUME 2

_____

TRIAL ON THE MERITS


BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
 1                    A P P E A R A N C E S

 2          FOR THE PLAINTIFF:    CARTER ARNETT, PLLC
                                  8150 N. CENTRAL EXPRESSWAY
 3                                SUITE 500
                                  DALLAS, TEXAS  75206
 4                                (214) 550-2112
                                  BY: MR. JOSHUA BENNETT
 5                                    MR. BRADLEY LIDDLE
                                      MS. LINDA STAHL
 6                                    MR. MICHAEL POMEROY
                                      MS. ALEXIS RITZER
 7
                                  DEANS STEPP LAW, LLP
 8                                325 N. ST. PAUL, SUITE 1500
                                  DALLAS, TEXAS  75201-3891
 9                                (214) 550-8172
                                  BY:  MR. SCOTT BREEDLOVE
10
            FOR THE DEFENDANTS:   ALSTON & BIRD, LLP - ATLANTA
11                                ONE ATLANTIC CENTER
                                  1201 WEST PEACHTREE STREET NW
12                                #4900
                                  ATLANTA, GEORGIA  30309-3424
13                                (404) 881-7000
                                  BY:  MR. JOHN HAYNES
14                                     MR. DAVID FRIST

15                                ALSTON & BIRD, LLP - RALEIGH
                                  555 FAYETTEVILLE St., STE. 600
16                                RALEIGH, NORTH CAROLINA  27601
                                  (919) 862-2270
17                                BY:  MS. DARLENA SUBASHI

18                                ALSTON & BIRD LLP - WASHINGTON
                                  THE ATLANTIC BUILDING
19                                950 F STREET, NW
                                  WASHINGTON, DC 20004
20                                (202) 239-3933
                                  BY:  MR. THOMAS DAVISON
21
                                  THE DACUS FIRM, PC
22                                821 ESE LOOP 323, SUITE 430
                                  TYLER, TEXAS  75701
23                                (903) 705-1117
                                  BY:  MR. DERON DACUS
24

25
```

1           OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                  100 E. HOUSTON STREET
2                                 MARSHALL, TEXAS  75670
                                  (903) 923-8546
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| JEREMY PITCOCK | |
|     Direct By MR. LIDDLE | 288 |
|     Cross By MR. DACUS | 299 |
| JEFFREY VALLEY | |
|     Direct By MR. BENNETT | 321 |
|     Cross By MR. HAYNES | 347 |
|     Redirect By MR. BENNETT | 401 |
|     Recross By MR. HAYNES | 405 |
| JEFFREY JAKAB | |
|     BY VIDEO DEPOSITION | 408 |
| MUSTAPHA AISSAOUI | |
|     BY VIDEO DEPOSITION | 418 |
| ALFRED NORTHAFT | |
|     BY VIDEO DEPOSITION | 422 |
| RICARDO VALERDI, PH.D. | |
|     Direct By MR. POMEROY | 427 |
|     Cross By MR. HAYNES | 506 |
|     Redirect By MR. POMEROY | 549 |
|     Recross By MR. HAYNES | 559 |
| PHILLIPPE BERGEON | |
|     BY VIDEO DEPOSITION | 565 |
| DR. ERIC COLE, PH.D. | |
|     Direct By MR. LIDDLE | 571 |

1          THE COURT:  Be seated, please.

2      Are the parties prepared to read into the record those

3  items from the list of pre-admitted exhibits used during

4  yesterday's portion of the trial?

5          MR. BENNETT:  Yes, Your Honor, we are.

6          THE COURT:  All right.  Let me ask you to go to the

7  podium and offer that rendition into the record, please.

8          MR. BENNETT:  For Plaintiffs, PX 8, JX 1, JX 2, JX

9  3, PX 25-1, PX 25-2, PX 25-3, PX 25-4, PX 25-5.

10          THE COURT:  All right.  Any objection to that

11  rendition from the Defendants?

12          MS. BEATON:  No, Your Honor.

13          THE COURT:  Does Defendant have a similar rendition

14  to offer?

15          MS. BEATON:  Yes, Your Honor.

16          THE COURT:  Please proceed to do so.

17          MS. BEATON:  Good morning.  Erin Beaton on behalf of

18  Defendant Nokia.

19          THE COURT:  Good morning.

20          MS. BEATON:  Good morning.  Yesterday, April 1st,

21  2024, Defendant used DX 7c as in Charlie, DX 23, DX 36, and DX

22  37a as in alpha.

23          THE COURT:  All right.  Does Plaintiff have any

24  objection to that rendition from defendant?

25          MR. BENNETT:  No, Your Honor.

1                THE COURT:  Thank you, counsel.

2        Is there anything else we need to cover, counsel, before

3    I bring in the jury and we proceed with the next Plaintiff's

4    witness?

5                MR. BENNETT:  Not for Plaintiff.

6                MR. DACUS:  No, Your Honor.

7                THE COURT:  All right.  Let's bring in the jury,

8    please.

9                (Whereupon, the jury entered the courtroom.)

10                THE COURT:  Welcome back, ladies and gentlemen.

11    Please have a seat.

12        All right.  We'll continue with the Plaintiff's case in

13    chief.

14        Plaintiff, call your next witness.

15                MR. BENNETT:  Your Honor, Smart Path calls Jeremy

16    Pitcock.  Mr. Liddle will be handling the examination.

17                THE COURT:  All right.  Mr. Pitcock, if you'll come

18    forward and be sworn, please.

19                (Whereupon, the oath was administered by the Clerk.)

20                THE COURT:  Please have a seat on the witness stand.

21        Mr. Liddle, you may proceed with direct examination when

22    you're ready.

23                MR. LIDDLE:  Thank you, Your Honor.

24

25

288

1                            JEREMY PITCOCK,

2     having been first duly sworn, testified under oath as follows:

3                          DIRECT EXAMINATION

4     BY MR. LIDDLE:

5     Q.    Good morning, Mr. Pitcock.

6     A.    Good morning.

7     Q.    Please introduce yourself to the jury.

8     A.    My name is Jeremy Pitcock.  I'm the manager of Smart Path

9     Communications -- Connections, sorry.  And I serve as the

10    manager in that company.

11    Q.    Okay.  And can you please describe your educational

12    background?

13    A.    So I have a Bachelor's in science in physics from the

14    Massachusetts Institute of Technology, or MIT.  I also have a

15    law degree from the University of Pennsylvania.

16    Q.    And what did you do after law school?

17    A.    So after law school, I became an attorney in 1999.  I

18    also became registered as a patent agent in the United States

19    Patent and Trademark Office in 2001, which means I can help

20    inventors get patents in the Patent and Trademark Office.

21    Q.    Okay.  Let's talk a little bit about Smart Path.  When

22    was this company formed?

23    A.    Smart Path was formed in 2020, July 15th, 2020.

24    Q.    Okay.  And what was the purpose of forming Smart Path?

25    A.    So Smart Path was formed because Orckit IP had been

1    unsuccessful in trying to license its patents, and so Smart

2    Path was formed in order to license and enforce those patents.

3    Q.   And how did you come to meet the Orckit group?

4    A.   So a networking executive that I had worked with before

5    in the past from a company called 3Com introduced me to Mr.

6    Tamir and others at Orckit.

7    Q.   Okay.  So you acquired these patents from Orckit.

8    A.   Yes.

9    Q.   And what are the details of that acquisition of the Smart

10   Path patents?

11   A.   So Orckit IP transferred the patents to my company, and

12   in return they get 42 percent of all the revenues that are

13   generated.

14   Q.   Okay.  So they get 42 percent.  Is that your testimony?

15   A.   Yes.

16   Q.   Okay.  But did you pay any money up front to Orckit to

17   obtain the patents?

18   A.   No, I did not.

19   Q.   Okay.  Does this provide Orckit any other benefits?

20   A.   Yes.  So my company is responsible for paying the cost of

21   the licensing campaign.

22   Q.   Okay.  And why is this so beneficial to Orckit?

23   A.   It takes substantial revenue to license and enforce

24   patents against a company like Nokia.

25   Q.   And, Mr. Pitcock, what was your preparation and

1    decision-making process on whether to acquire these patents

2    from Orckit?

3    A.   So in speaking to Mr. Tamir, I found out about the

4    background and history of Orckit, how they were in the

5    telecommunications space and publicly-traded company, so their

6    story of invention basically made sense to me.

7         I looked at their history of research and development, I

8    looked another the patents and the prosecution histories,

9    which is the back and forth between the inventor and the

10   Patent and Trademark Office when you're acquiring a patent,

11   and then I looked at basic financial information in the router

12   and switch market.

13   Q.   Okay.  And just to kind of reset, what are the patents

14   asserted in this case?

15   A.   So there are three patents asserted in this case.  They

16   all relate to networking technology.

17   Q.   Okay.  And do you have any understanding of previous

18   attempts to license Nokia to the Smart Path patents?

19   A.   I do.

20   Q.   And what were those?

21   A.   So in 2017, Orckit IP sent a letter to Nokia offering to

22   license the entire portfolio.

23        MR. DACUS:  Your Honor, I apologize for

24   interrupting, but I need to object.  There's a lack of

25   personal knowledge, foundation -- there's a lack of

1    foundation, lack of personal knowledge, talking about letter

2    in 2017 that he did not author and he was not a recipient on.

3            THE COURT:  All right.  I'll sustain the objection.

4        But, counsel, if you can lay a foundation, you can

5    revisit the topic.

6            MR. LIDDLE:  Absolutely.

7    Q.    (BY MR. LIDDLE)  Mr. Pitcock, when you acquired the

8    patents from Orckit, did you review any materials?

9    A.    I did.

10   Q.    And what did those materials consist of?

11   A.    So, as I mentioned before, I looked at the patents and

12   prosecution history.  I also looked at background materials

13   involving the patents, including the letter that was sent to

14   Nokia.

15   Q.    Okay.  So you reviewed a notice letter from Orckit IP to

16   Nokia in 2017.

17   A.    I did.

18   Q.    Okay.

19           MR. LIDDLE:  Your Honor, I'd like to move forward

20   with examination.

21           THE COURT:  Ask your question.  We'll see if we get

22   another objection.

23           MR. LIDDLE:  Okay.

24   Q.    (BY MR. LIDDLE)  All right.  Let me re-ask my question.

25   What is your understanding of previous attempts to license

1    Nokia to the Smart Path patents?

2    A.    So my understanding is Orckit IP sent a letter to Nokia.

3              THE COURT:  Just a minute, Mr. Pitcock.

4              MR. DACUS:  Your Honor, we have the same objection.

5    There's no foundation.  He has no personal knowledge.  This is

6    a letter on which he was not an author nor a recipient.

7              THE COURT:  I understand, but I'm going to overrule

8    the objection.  I think there's an adequate foundation that's

9    been laid.  I'll permit the witness to answer the question.

10        Go ahead and finish the answer, Mr. Pitcock.

11             THE WITNESS:  Yes, Your Honor.

12        So I saw a letter which specifically identified the three

13   patents-in-suit to Nokia offering to license them to those

14   patents, along with the others in their portfolio.

15   Q.    (BY MR. LIDDLE)  Okay.  And what we have up here on the

16   screen, does this look like the letter that you reviewed when

17   you acquired the patents?

18   A.    Yes, it is.

19   Q.    Okay.  And can you remind me what the date of this letter

20   is?

21   A.    It's dated November [sic] 27th, 2017.

22   Q.    Now, to your knowledge, did Nokia ever respond to Orckit

23   when they sent this letter?

24   A.    To my knowledge, they never responded.

25   Q.    Okay.  So Orckit sent the letter in 2017, but to your

1    knowledge there was no response.

2    A.    That's correct.

3    Q.    Okay.  So since 2017 when Nokia received the letter, they

4    never wrote back and said, we don't infringe?

5    A.    That's right.

6    Q.    And since then, they never wrote back and said, these

7    patents are invalid?

8    A.    That's correct.

9    Q.    So did Smart Path ever attempt to contact Nokia prior to

10   filing this lawsuit?

11   A.    We did not.

12   Q.    Okay.  And why not?

13   A.    In my experience in licensing, which has spanned many

14   years, when a company like Nokia doesn't respond to a

15   licensing letter, the only way they will take you seriously is

16   if you file a lawsuit.

17   Q.    Okay.  And tell me again, what is your understanding of

18   what the patents cover?

19   A.    So the patents cover improvements to --

20           MR. DACUS:  Your Honor, I object.  This is a

21   violation of Defendant's MIL No. 5.  Happy to approach.

22           THE COURT:  Approach the bench, counsel.

23           (The following was had outside the hearing of the

24           jury.)

25           THE COURT:  Defendant's MIL No. 5?

 1                MR. DACUS:  Yes, Your Honor.  I'm happy to explain

 2     my objection.

 3                THE COURT:  I understand your objection.

 4          What's your response, Mr. Liddle?

 5                MR. LIDDLE:  I'm asking for a high-level explanation

 6     of what the asserted patents cover, and that's what the MIL

 7     specifically says.  It says it will not prohibit --

 8                THE COURT:  I see the MIL order.

 9          Well, the problem is you may be asking a high-level

10     question.  I'm concerned you're going to get a low-level

11     answer.  The only thing I know to do is let you proceed with

12     your question.

13          And if this gets too granular and gets below a high

14     level, Mr. Dacus, raise your objection again and I'll rule on

15     it.

16                MR. DACUS:  Thank you, Your Honor.

17                MR. LIDDLE:  Thank you, Your Honor.

18                THE COURT:  Okay.

19                (The following was had in the presence and hearing

20                of the jury.)

21                THE COURT:  Let's proceed, please.  Restate your

22     question, counsel.

23                MR. LIDDLE:  Yes, Your Honor.

24     Q.   (BY MR. LIDDLE)  So, Mr. Pitcock, what is your high-level

25     understanding of what the patents cover?

1  A.    So the patents cover at a high level networking

2  technology, which is essentially the backbone for digital

3  communications here in the United States.

4  Q.    Okay.  And are you familiar with networking technology?

5  A.    I am.

6  Q.    And how are you familiar with networking technology?

7  A.    So I have worked with networking companies for over two

8  decades as an attorney.  I've worked with 3Com JDS Uniphase,

9  Intel, a small company called Bay Networks which was later

10  acquired by JDS Uniphase, in networking technology.

11  Q.    And why is networking technology important and something

12  that Smart Path wants to help license?

13  A.    So networking technology is used for almost all the

14  digital communications between people in the United States and

15  companies in the United States.  These patents generally are

16  optimizations of that network, and there's an incredible

17  amount of data.

18      As you can see in this exhibit, you know, we are

19  currently at 120 zettabytes a year, and I know that is sort of

20  like saying a bajillion.  So a zettabyte is a trillion

21  gigabytes.  You know, your average computer has, you know, a

22  hundred to a thousand gigabytes of storage.  This is a

23  trillion.

24      If you think of a song on the internet, it's about 4

25  gigabytes in length for a four-minute song.  This would be 250

1  billion songs, and it would take 2 million years to play them.

2  Q.   And, Mr. Pitcock, before acquiring the Smart Path patents

3  from Orckit, did you review Orckit's record of innovation?

4  A.   I did.

5  Q.   And are you familiar with Orckit's research and

6  development efforts?

7  A.   I am.

8  Q.   Okay.  And can you give us a little summary of their

9  research and development efforts?

10  A.   So Orckit was involved in various standard-setting

11  organizations, in particular IEEE, which is the Institute for

12  Electronics and Electrical Engineering.  They described it

13  earlier as basically trying to make sure that everything works

14  together in the network.  That's why you create these

15  standards.  They were contributors to that particular

16  organization.

17      They were called out as a particular innovator in one of

18  the articles in 2005, and they spent over $200 million in

19  research and development in the relevant time frame on

20  networking technology.

21  Q.   Now, is it common in network technology industry for

22  companies to use specialists like you to help license their

23  IP?

24  A.   Yes, it's extremely common.

25  Q.   In fact, does Nokia do this?

297

1  A.   Yes, they do.  They have -- there are several companies

2  with Nokia intellectual property that are set up to license

3  and enforce patents.

4  Q.   Okay.  And how is it that Smart Path is able to protect

5  the patents created by another company?

6  A.   So patents are property rights.  You've seen this graphic

7  before, but it's basically like a piece of land or a house.

8  They can be transferred from one company to another, and now

9  we own the title to the patents from Orckit IP.

10  Q.   So why do you think it's important to protect the

11  innovations of companies like Orckit?

12  A.   So the U.S. patent system is critical to companies here

13  remaining competitive.  So many of the incredible inventions

14  like the telephone that are made here are used all around the

15  world.  We have to be able to use inventions made abroad here

16  to remain competitive.  The U.S. Patent Office facilitates

17  this.

18      When a company like Orckit creates a patent that

19  everybody needs to use, they file it in the USPTO and then all

20  the companies here have the ability to use the knowledge from

21  that patent.  But the law requires that when companies use

22  these patents, that they pay a reasonable royalty.

23      THE COURT:  Let me interrupt the witness.

24      The Court will instruct the jury on what the law

25  requires.  The witnesses and counsel are not going to offer

 1    instructions to the jury on what the law requires in this

 2    context.

 3        The question I think has been fully answered.  I'm going

 4    to instruct the witness to keep his answers within the scope

 5    of the questions asked, and let's move on to the next

 6    question.

 7            MR. LIDDLE:  Yes, Your Honor.

 8    Q.   (BY MR. LIDDLE)  And so why is Smart Path maintaining

 9    this lawsuit?

10    A.   We're maintaining this lawsuit because we think Nokia

11    should follow the law of the United States.

12    Q.   And what do the patent laws say about using an invention

13    without authorization?

14            MR. DACUS:  Your Honor, I'll object as asking for a

15    legal conclusion.

16            THE COURT:  Well, with that premise, I will sustain

17    the objection.

18            MR. LIDDLE:  Okay.

19    Q.   (BY MR. LIDDLE)  In the United States, is there any --is

20    there anything that compensates companies when someone else is

21    using their technology?

22    A.   Yes, a reasonable royalty.

23    Q.   Okay.

24            MR. LIDDLE:  No further questions.  Pass the

25    witness.

```
 1              THE COURT:  All right.  Cross examination by the
 2   Defendant?
 3              MR. DACUS:  Yes, Your Honor.  Thank you.
 4         If we may have a moment to pass out binders.
 5              THE COURT:  You may distribute witness binders.
 6                  (Pause in proceedings.)
 7              THE COURT:  All right, counsel.  Proceed with cross
 8   examination.
 9              MR. DACUS:  Thank you, Your Honor.
10                      CROSS EXAMINATION
11   BY MR. DACUS:
12   Q.   Good morning, Mr. Pitcock.
13   A.   Good morning, Mr. Dacus.
14   Q.   I think you put up a slide there that said you live in
15   New Jersey right outside of New York City.  Correct?
16   A.   That's correct.
17   Q.   So welcome to Marshall.
18   A.   Thank you.  It's good to be back.
19   Q.   I'd like to ask you a few questions about your testimony
20   if that's okay.
21   A.   Of course.
22   Q.   I think you said you've been a lawyer there in New York
23   for going on 25 years now.  Correct?
24   A.   It's over 20 years, yes.
25   Q.   And you're here as the representative for Smart Path.
```

1    Correct?

2    A.    That's correct.

3    Q.    You own 100 percent of Smart Path.  Correct?

4    A.    I do.

5    Q.    And there are no employees of Smart Path.  Correct?

6    A.    That's right.

7    Q.    So although you said you're the manager, there's really

8    no one to manage.  Smart Path is 100 percent owned by you.

9    Correct?

10   A.    Well, I disagree there's no one to manage, but I agree

11   it's a hundred percent owned by me.

12   Q.    Well, you manage lawsuits.  Correct?

13   A.    I manage licensing, yes.

14   Q.    Okay.  Including lawsuits.  Correct?

15   A.    That's right.

16   Q.    Now, in fact, I think you told us previously in your

17   deposition that your law firm really doesn't do any legal work

18   anymore.  Correct?

19   A.    It does --

20          MR. LIDDLE:  Objection, Your Honor.  It

21   mischaracterizes the testimony.  It's not a law firm.  I'm not

22   sure why it's relevant.

23          THE COURT:  I'll permit the question.

24          THE WITNESS:  I'm sorry.  Would you --

25          THE COURT:  Go ahead.

```
 1              THE WITNESS:  I'm sorry, Your Honor.
 2              THE COURT:  That's all right.  Go ahead.
 3              THE WITNESS:  Would you mind repeating the question?
 4   Q.   (BY MR. DACUS)  Not at all.  You have a law firm called
 5   Pitcock Law Group.  Correct?
 6   A.   I do.
 7   Q.   That law firm doesn't do any legal work is what you told
 8   us previously.  Is that correct?
 9   A.   It does little legal work, and most of it is done by my
10   wife.
11   Q.   You spend your time managing limited liability companies
12   like Smart Path.  Correct?
13   A.   I do.
14   Q.   And the business model of Smart Path, LLC, is to acquire
15   patents that you didn't invent and then attempt to make money
16   on those, including through lawsuits.  Correct?
17   A.   Yes.
18   Q.   That's what you do for a living.  Fair?
19   A.   Yes.
20   Q.   And what you get in return, the reason you do it, is you
21   want a percentage of what a jury might award in a lawsuit.
22   Correct?
23   A.   That's correct.
24   Q.   And you're here to try to collect 10 to 15 percent of
25   anything that this jury might award.  True?
```

1    A.    That's correct.

2    Q.    Now, I'd like to ask a few questions about the history of

3    these patents.  Is that okay?

4    A.    Of course.

5    Q.    All right.  First thing I want to do is I want to make

6    sure that we understand the difference between

7    Orckit-Corrigent and Orckit IP.  Okay?

8    A.    All right.

9              MR. DACUS:  Ms. Brunson, may I have the document

10    camera, please?

11    Q.    (BY MR. DACUS)  This is one of your slides that you just

12    showed the jury.  And do you see there where you said to the

13    jury Orckit receives 42 percent of revenues?  Do you see that?

14    A.    I do.

15    Q.    And that -- I wrote in the word IP.  Do you see that?

16    A.    I assume that's your writing, yes.

17    Q.    Okay.  So let's be clear here.  Orckit-Corrigent was the

18    operating company that was in the modem business in the '90s.

19    Correct?

20    A.    Yes.

21    Q.    And then it's the business that Mr. Tamir said attempted

22    to reinvent itself from scratch in 2000.  Correct?

23    A.    Yes.

24    Q.    And then ultimately was unsuccessful and went bankrupt.

25    Fair?

1    A.    Ultimately it did, yes.

2    Q.    Okay.  Now, that's -- that's different from Orckit IP.

3    Correct?

4    A.    Yes.

5    Q.    Orckit IP is the company that Mr. Tamir formed in order

6    to buy the patents out of bankruptcy.  Correct?

7    A.    I don't know that he formed it, but it was formed for

8    that purpose.

9    Q.    Okay.  You heard him say yesterday that he formed Orckit

10   IP, he attempted to get the patents out of the bankruptcy, but

11   then the bankruptcy trustee said, no, you can't do that;

12   that's self-dealing because you were an officer, and you need

13   someone else to run Orckit IP.

14        You remember that testimony yesterday?

15            MR. LIDDLE:  Objection, Your Honor; misstates the

16   testimony.

17            THE COURT:  He's entitled to offer the question as

18   he thinks is accurate, counsel.  I'm going to overrule the

19   objection that it's mischaracterizing.  If the witness

20   disagrees with the question, he's free to disagree with it in

21   his answer.

22            MR. LIDDLE:  Thank you, Your Honor.

23            THE COURT:  So overruled.

24            THE WITNESS:  I'm sorry --

25            THE COURT:  Restate the question.

304

1           MR. DACUS:  I'd be happy to, Your Honor.  Thank you.

2    Q.   (BY MR. DACUS)  Orckit IP is the company that Mr. Tamir

3    originally formed for the purpose of trying to get these

4    patents out of the bankruptcy, and then the bankruptcy

5    liquidator said, no, you can't do that because that's

6    self-dealing because you were an officer of the company.

7    Correct?

8    A.   I don't remember that as being his testimony.

9    Q.   Okay.  And you remember that Mr. Tamir said that he got

10   someone else to take over Orckit IP while Mr. Tamir was still

11   funding the purchase of those patents.  You remember that.

12   Correct?

13   A.   Generally speaking, yes.

14   Q.   Okay.  You and I can agree that Orckit IP and

15   Orckit-Corrigent are two different entities.  Correct?

16   A.   Absolutely.

17   Q.   And Orckit IP is owned solely by a gentleman by the name

18   of Yehuda Binder.  Correct?

19   A.   I don't know.

20   Q.   You know who Mr. Binder is.  Correct?

21   A.   I do.

22   Q.   With respect to this Orckit receives 42 percent of

23   revenues, it's actually Orckit IP that receives those

24   revenues.  Correct?

25   A.   Yes.

1             MR. LIDDLE:  Objection; asked and answered.

2             THE COURT:  Sustained.

3    Q.   (BY MR. DACUS)  So be the clear, Orckit-Corrigent the

4    company, the investors of Orckit-Corrigent, do not receive any

5    revenues from these lawsuits or licensing.  Correct?

6    A.   I don't know.

7             THE COURT:  Approach the bench, counsel.

8             (The following was had outside the hearing of the

9             jury.)

10             THE COURT:  What's the relevance of this, Mr. Dacus?

11   We are not going to get into litigation funding --

12             MR. DACUS:  No, sir.

13             THE COURT:  -- and financing.

14             MR. DACUS:  Absolutely not.  Your Honor, they've

15   left the impression that these monies are going back to the

16   Orckit-Corrigent and those folks when, in fact, they're going

17   to this one entity Orckit IP which is Mr. Binder and Mr.

18   Tamir.

19      So we -- this goes to the bias of Mr. Tamir.  He

20   testified yesterday, we don't think he testified completely

21   and accurately, and that's the purpose of this questioning.

22   It's to eventually show he is getting more than he testified

23   to.

24             THE COURT:  Well, all right.  As to Mr. Tamir, I

25   think there is relevance as to his interest and perhaps level

1    of bias, but this is going to get too far afield if we're not

2    very strategic and targeted on what you do.

3              MR. DACUS:  Understood.

4              THE COURT:  If you want to try this -- try to tie

5    this to Mr. Tamir, do so and let's move on, but we're not

6    going to dwell on this any longer.

7              MR. DACUS:  Understood.

8              THE COURT:  Okay?

9              MR. DACUS:  Yes, sir.

10             (The following was had in the presence and hearing

11             of the jury.)

12             THE COURT:  Let's proceed.

13             MR. DACUS:  Thank you, Your Honor.

14   Q.   (BY MR. DACUS)  You were here yesterday, sir, when Mr.

15   Tamir said he acquired the residual from the bankruptcy court.

16   Correct?

17   A.   I was.

18   Q.   That in short terms and to be fair means he's going to

19   get money from any licensing or lawsuits.  Correct?

20   A.   That was my understanding of his testimony, yes.

21   Q.   That's what that residual is.  Correct?

22   A.   I believe so, yes.

23   Q.   And I think he said he's going to get -- he has the

24   chance to get $4 million in order to obtain everything he

25   asked for in this case.  Correct?

1    A.    I know that he wasn't completely sure about the math, but

2    I'm assuming you've got it calculated correctly.  He ends up

3    with 10 percent, I believe.

4    Q.    But you know, sir, that he's actually -- has the

5    potential to receive more than what he testified to.  Correct?

6            MR. LIDDLE:  Objection; relevance.

7            THE COURT:  Overruled.

8            THE WITNESS:  I actually don't know.

9    Q.    (BY MR. DACUS)  You know, sir, that he and Mr. Binder,

10    who he put up as the front man for Orckit IP, they have a

11    handshake deal on the side where Mr. Tamir is actually going

12    to get money over and above what he testified to this jury

13    about.  Correct?

14    A.    I don't know what handshake deal they have.

15    Q.    You don't deny that they have one, do you, sir?

16    A.    I don't know one way or the other.

17    Q.    Have you -- you know Mr. Binder's deposition was taken in

18    this case?

19            MR. LIDDLE:  Objection; relevance.

20            THE COURT:  I think we need to move on.  These are

21    questions that could have been asked of Mr. Tamir yesterday

22    and they weren't.  This is all about his interest in the

23    outcome of the case.  He's off the witness stand and to my

24    knowledge is not due to be called back.

25            We need to move on, counsel.

1          MR. DACUS:  Thank you, Your Honor.

2     Q.   (BY MR. DACUS)  Now, you understand, sir, that

3     Orckit-Corrigent was in the DSL or modem business at one point

4     in time.  Correct?

5     A.   At one point in time, yes.

6     Q.   And then when that business started to decline in 2000,

7     they attempted to reinvent themselves.  Correct?

8     A.   Yes.

9     Q.   And you know because you said you've been in the

10    networking business for many years that, by the year 2000,

11    routers had been made by U.S. companies for the better part of

12    a decade.  Correct?

13    A.   I actually don't know that.  I started working as an

14    attorney in 1999, so I would not have been aware of what had

15    happened in the previous decade.

16    Q.   So do you know the company Cisco, C-I-S-C-O?

17    A.   Yes, I'm familiar with that company.

18    Q.   Are you old enough to know that that was one of the

19    preeminent, if not the most preeminent, technology companies

20    in the country as of 2000?

21    A.   I know that they're a preeminent company now.  I don't

22    know what their status was in 2000.  I know that they were

23    involved in various technologies because of other litigations.

24    Q.   Did you know that they had been making routers in the

25    United States for over a decade at that point?

```
1    A.   I am not aware of their history in that detail, no.

2    Q.   You never worked at Orckit-Corrigent.  Correct?

3    A.   I did not.

4    Q.   You had no relationship with Orckit-Corrigent while it

5    was an operating company.  Correct?

6    A.   I did not.

7    Q.   You didn't talk with any of the inventors on these

8    patents before you filed this lawsuit, did you, sir?

9    A.   I'm not sure, but I don't think so.

10   Q.   You don't know why -- how or why any of the alleged

11   inventions in these patents were conceived, do you?

12   A.   I would disagree with that.

13   Q.   You have a notebook in front of you, sir.

14   A.   Sure.

15   Q.   And one of them is your deposition.  And if you would

16   turn to page 163, let me know when you're there.

17   A.   I'm sorry.  This binder, the depositions' binder?

18   Q.   Yes, sir.

19   A.   Okay.

20   Q.   You remember you gave a deposition under oath in this

21   case.  Correct?

22   A.   I did.

23   Q.   Can you look at page 163, lines 3 through 5, please?  Let

24   me know when you've had a chance to read that.

25   A.   I see that, yes.
```

1    Q.   Does that remind you, sir, that under oath you said you

2    do not have an understanding of how the alleged inventions of

3    these patents were conceived?

4    A.   It does.  I thought your question was broader than that.

5    Q.   You know that inventors often have notes or notebooks

6    when they create inventions.  Correct?

7    A.   Depends on the company.

8    Q.   You've not looked at any notes or notebooks related to

9    these particular inventions.  Correct?

10   A.   I don't recall looking at many notebooks.

11   Q.   And it's true, sir, that the inventors on these patents

12   will not receive any monies from licensing or this lawsuit.

13   Correct?

14           MR. LIDDLE:  Objection, relevance.

15           THE COURT:  Sustained.

16   Q.   (BY MR. DACUS)  You were here, sir, yesterday when Mr.

17   Tamir said to this jury that Orckit-Corrigent was sort of his

18   life's work and his baby.  Correct?

19   A.   Yes.

20   Q.   And you remember that he said to this jury that he didn't

21   form Orckit IP and buy these patents just for money.  That's

22   what he said.  Right?

23   A.   I believe that's what he said.

24   Q.   And he said he -- at least what he told the jury was that

25   he was doing this to get justice for Orckit-Corrigent.  You

 1    remember that?

 2    A.   Yes.

 3    Q.   So it's true, sir, that neither Orckit-Corrigent nor the

 4    inventors at Orckit-Corrigent are going to get one penny from

 5    this lawsuit.  Correct?

 6              MR. LIDDLE:  Objection; relevance.

 7              THE COURT:  I'll overrule the objection.

 8              THE WITNESS:  I don't know how the money from Orckit

 9    IP is being distributed.

10    Q.   (BY MR. DACUS)  You certainly know that Smart Path hasn't

11    agreed to give the inventors or Orckit-Corrigent one penny,

12    have you, sir?

13    A.   I don't think Orckit-Corrigent exists.  But, no, we

14    haven't agreed to give anybody money that falls into those

15    categories.

16    Q.   You know the ownership of Orckit IP is completely

17    separate from what the ownership of Orckit-Corrigent was.

18    Correct?

19    A.   I don't.

20    Q.   You've participated in trial proceedings before.

21    Correct?

22    A.   I have.

23    Q.   You heard the Judge tell the jury that they need to

24    exercise and use their common sense in this case.  Correct?

25    In his preliminary instructions.

1    A.   I'm sure that there's something along those lines, yes.

2    Q.   I mean, you agree the jury should use their common sense.

3    Correct?

4    A.   Of course.

5    Q.   So I want to make sure I and the jury understand the

6    facts regarding Orckit before we switch to just Smart Path.

7    Okay?  Is that fair?

8    A.   Sure.

9    Q.   Okay.  Now, post 2000, at the time that Orckit's

10   attempting to reinvent themselves, they tried to sell products

11   using their technology.  Correct?

12   A.   I really don't have any knowledge of what they were doing

13   at that time.

14   Q.   So do you --

15         MR. LIDDLE:  Your Honor, can we approach?

16         THE COURT:  Approach the bench.

17         (The following was had outside the hearing of the

18         jury.)

19         MR. LIDDLE:  Your Honor, I don't know what we're

20   doing.  Izhak Tamir already testified all these questions.

21   He's already left the witness stand.  He doesn't have any

22   knowledge of what Orckit-Corrigent was doing in the year 2000.

23         THE COURT:  I think we've beaten this horse enough,

24   Mr. Dacus, unless you can convince me there's something here

25   that's relevant that's not been covered.

313

```
 1              MR. DACUS:  It's a new topic, Your Honor.

 2              THE COURT:  It doesn't sound like a new topic.

 3              MR. DACUS:  It may not have, but it will very

 4      quickly.

 5              THE COURT:  Well, if you want to examine this

 6      witness about Smart Path that he controls and owns, I think

 7      that's relevant.  What's happened in the past with Orckit and

 8      Orckit-Corrigent, those are questions Mr. Tamir should have

 9      been asked yesterday.

10          By the way, Mr. Liddle, where is Mr. Tamir?  No one asked

11      for him to be excused yesterday.  I hope he's not on his way

12      back to Israel.

13              MR. LIDDLE:  No, Your Honor.  He's still here.

14              THE COURT:  Is he going to be recalled in a rebuttal

15      case?

16              MR. LIDDLE:  I don't think so.

17              THE COURT:  Okay.  Well, I just want to be clear

18      that you need to have him excused, which I'm happy to do, but

19      you need to have him excused before he leaves the area.

20              MR. LIDDLE:  Yes, Your Honor.

21              THE COURT:  All right.  Let's move on, Mr. Dacus.

22              MR. DACUS:  Thank you, Your Honor.

23              (The following was had in the presence and hearing

24              of the jury.)

25              THE COURT:  Let's proceed.
```

```
 1            MR. DACUS:  Thank you, Your Honor.

 2   Q.  (BY MR. DACUS)  When Smart Path, the company that is you,

 3   acquired the patents from Orckit IP, you didn't pay any money.

 4   Correct?

 5   A.  That's correct.

 6   Q.  What Smart Path and you did agree to do and promised to

 7   do is bring a lawsuit within a certain period of time.

 8   Correct?

 9   A.  Yes.

10   Q.  And Smart Path was a company that was formed in 2020 at

11   the time that you acquired these Orckit IP patents.  Correct?

12   A.  Well, it was formed before we acquired them, I believe,

13   but, yes, roughly contemporaneously.

14   Q.  When you say before, you mean in the hours or days

15   before.  Correct?

16   A.  I don't know the exact timeline, but it was before.

17   Q.  Smart Path, to be clear, sir, has no employees.  Right?

18   A.  No.  Other than myself, there's no one who works at Smart

19   Path.

20   Q.  Smart Path does not sell a product.  Correct?

21   A.  They do not.

22   Q.  Has never made a product.  Correct?

23   A.  That's correct.

24   Q.  Doesn't perform any research and development activities.

25   Correct?
```

315

1    A.    No.

2    Q.    Smart Path has an office in Plano, Texas.  Correct?

3    A.    Yes.

4    Q.    And you've never been there.  Correct?

5    A.    That's incorrect.

6    Q.    Well, as of the time that we took your deposition just a

7    few months ago, you had never been to that office.  Correct?

8    A.    I actually didn't recall, but I had been there before and

9    I have been there since.

10   Q.    So you've been there a couple of times.  Correct?

11   A.    A few times, yes.

12   Q.    So to make sure we understand, you heard the Judge tell

13   the jury that one thing they should do in assessing witnesses

14   is determine whether or not they have a financial interest in

15   the case.  Correct?

16   A.    Yes.

17   Q.    And so what we know is you're here attempting to get 10

18   to 15 percent of whatever the jury might award.  Correct?

19   A.    That's right.

20   Q.    And then Orckit IP is getting 42 percent.  Correct?

21   A.    That's right.

22   Q.    Some portion of which Mr. Tamir is getting.  Fair?

23   A.    That's fair.

24   Q.    So between you and Orckit IP, that's somewhere between 52

25   and 57 percent of what this jury is being asked to award.

1   Correct?

2   A.   That sounds right.

3   Q.   The Orckit-Corrigent inventors, creditors, investors, are

4   getting zero.  Fair?

5   A.   I don't know.

6        MR. DACUS:  May I have the document camera, Ms.

7   Brunson?  Thank you.

8   Q.   (BY MR. DACUS)  You told the jury a minute ago--I'm not

9   sure if you showed them this slide or not--that you believed

10  and part of your research that Orckit-Corrigent had received

11  awards.  Do you remember telling them that, sir?

12  A.   I know -- yes, generally speaking.

13  Q.   Were you intending to leave the jury with the impression

14  that these awards that you were talking about related to their

15  business after 2000 when they were reinventing themselves or

16  before when they were a modem company?

17  A.   What I recall saying was that they were a contributor in

18  the networking router space.

19  Q.   So let's be -- does it sound fair to be very clear with

20  the jury about what these awards related to, sir?

21  A.   Absolutely.

22  Q.   Okay.  When it -- the third bullet point says, named top

23  innovator in 2005 by IEEE Spectrum.  You know that that award

24  in 2005 related to work in 1993 and 1996 when they were a

25  modem company.  Correct?

1    A.   I did, which was why we didn't show this slide.

2    Q.   Okay.  So just so the record's clear and the jury's

3    clear, these awards you're talking about relate to the time

4    period when Orckit-Corrigent was a modem company.  That is a

5    true statement.  Correct?

6    A.   That award certainly does.  I don't know about all of

7    their awards.

8    Q.   And when it says Orckit was recognized as a leading

9    contributor to the IEEE, that's a standard-setting body

10   related to their modem business.  Correct?

11   A.   That's not my understanding.

12   Q.   You know, sir, here that the standards at issue here are

13   from another body called IETF.  Correct?

14   A.   I disagree with that.

15   Q.   You don't know that?

16   A.   There are numerous standard-setting organizations.  The

17   IEEE is one of them.  The IETF is another.

18   Q.   You would agree, sir, that when you were saying to the

19   jury that contributions were made to the IEEE, those

20   contributions were made related to the modem business.

21   Correct?

22   A.   That's not my understanding.

23   Q.   Okay.

24             MR. DACUS:  Mr. Carrillo, can you pull up PX 5,

25   please?

1    Q.    (BY MR. DACUS)   You remember referencing this letter

2    February of 2017 to Nokia, sir?

3    A.    I do.

4    Q.    You understand, sir, that this letter only specifically

5    references the '508 Patent.  Correct?  You see that right

6    there?

7    A.    This page does, but I believe there are more pages to the

8    letter that reference the other patents.

9    Q.    The only --

10          MR. DACUS:  Can you show the second page of this?

11   Q.    (BY MR. DACUS)   Do you see this letter is signed by Mr.

12   Ibrahim Hallaj?

13   A.    I do.

14   Q.    It was written on behalf of Orckit IP.  Correct?

15   A.    It was.

16   Q.    And if we go back to the first page, you know that this

17   '508 Patent that was referenced in this letter is not part of

18   this lawsuit.  Correct?

19   A.    I do.

20   Q.    And you know that the products that were identified in

21   this letter, these switches, are not part of this lawsuit.

22   Correct?

23   A.    I actually don't know the full extent of the switches

24   involved, but I'll take your word for it.

25   Q.    You don't have any evidence to present to this jury that

1    the products identified in Plaintiff's Exhibit 5 are products

2    that are accused in this case, do you, sir?

3    A.    I don't know.

4    Q.    Indeed, sir, do you know that the products identified in

5    Plaintiff's Exhibit 5 are actually not even Nokia products?

6    A.    I don't know -- I don't know.

7              MR. DACUS:  You can take that down, Mr. Carrillo.

8    Q.    (BY MR. DACUS)  Let me ask you this, Mr. Pitcock.  You

9    know that this jury is here to answer the question about

10   whether or not Nokia infringes this patent.  Correct?

11   A.    That's right.

12   Q.    And you, sir, have not offered any evidence and done any

13   analysis to determine infringement.  Correct?

14   A.    I'm not offering any evidence of infringement to the

15   jury.

16   Q.    Okay.  You, sir, know that this jury's here to answer the

17   question of invalidity of these three patents.  Correct?

18   A.    I do.

19   Q.    You're not offering any testimony to this jury on the

20   topic of invalidity, are you, sir?

21   A.    I'm not.

22   Q.    And if they were to get to it, the jury's going to answer

23   the question of what a reasonable royalty or damages are.

24   Correct?

25   A.    Absolutely.

1    Q.   And you're not here to offer any testimony on the amount

2    of the reasonable royalty, are you, sir?

3    A.   I am not.

4    Q.   So as to those three questions, you've not testified or

5    offered any evidence to this jury on those three questions.

6    Correct?

7    A.   Nothing for the jury to consider, that's correct.

8         MR. DACUS:  That's all I have, Your Honor.  I pass

9    the witness.

10        THE COURT:  Is there redirect?

11        MR. LIDDLE:  No further questions, Your Honor.

12        THE COURT:  All right.  You may step down,

13   Mr. Pitcock.

14      Plaintiff, call your next witness.

15        MR. BENNETT:  Plaintiff calls Mr. Valley.

16        THE COURT:  All right.  If you'll come forward and

17   be sworn, please.

18        (Whereupon, the oath was administered by the Clerk.)

19        THE COURT:  Please have a seat on the witness stand.

20        MR. BENNETT:  Your Honor, may I approach with a

21   notebook?

22        THE COURT:  You may.

23      All right.  You may proceed with direct examination,

24   counsel.

25        MR. BENNETT:  Thank you, Your Honor.

1                           JEFFREY VALLEY,

2    having been duly sworn, testified under oath as follows:

3                        DIRECT EXAMINATION

4    BY MR. BENNETT:

5    Q.   Good morning, Mr. Valley.  Please introduce yourself.

6    A.   My name is Jeffrey Valley.

7    Q.   You're the VP of IP networks for North America of Nokia.

8    Right?

9    A.   I am.

10   Q.   But your internal title is portfolio solutioning

11   specialist.  Right?

12   A.   We have a job catalog in Nokia that identifies roles, so

13   that is an internal entry in my job catalog, yes.

14   Q.   Okay.  Tell us what a portfolio solutioning specialist

15   does.

16   A.   My job is specifically related to presales business

17   development, so it's managing the -- the IP business as -- as

18   it's customer facing, making sure that we're making good

19   decisions in -- in deals.  I handle the regional product

20   management functions in my organization as well, and I also

21   handle tendering, so responding to customer RFPs, RFIs, that

22   sort of thing.

23   Q.   And for the jury's benefit, an RFP is a request for

24   proposal?

25   A.   That is correct.

1    Q.   And that is where another business will elicit offers

2    or -- or requests for services or equipment or things from

3    another business.

4    A.   That's correct.

5    Q.   And so Nokia will often receive a request for proposal

6    from a potential customer.  Right?

7    A.   Yes.

8    Q.   And then you'll help put in the pieces that fill in the

9    particulars that the potential customer or customers is

10   requesting?

11   A.   I have a team of people that work for me that answer

12   those RFPs, yes.

13   Q.   And some of those RFPs deal with networking.  Right?

14   A.   My scope is the networking business, so the only Nokia's

15   RFPs that my team would answer are specific to the networking

16   business, yes.

17   Q.   And upon receiving an RFP from a customer, potential

18   customer, you or your team will make a recommendation about

19   how to build out a network.

20   A.   It's possible that that would be contained in an

21   executive summary as an example.  Normally RFPs are

22   point-by-point responses where we're answering yes or no to

23   specific technologies.

24   Q.   Answering yes or no to specific technology.  Help us

25   understand what that means, please, Mr. Valley.

1    A.   So a request for proposal or a request for information

2    will typically have a list of standards, for example, or

3    functionalities, and we will go through and check yes or no,

4    or, you know, sometimes give a forward-looking date of when a

5    feature may be supported, just in the interest of helping a

6    customer understand the difference between multiple responses

7    that they'll get from different vendors.

8    Q.   All right.  And the decision about what features a

9    customer may implement can happen in a couple of ways.  One

10   could be it's customer driven, the customer tells you what

11   they want.  Right?

12   A.   That is the way -- that's a primary way.

13   Q.   All right.  And then the other is Nokia can approach the

14   customer and tell them what Nokia thinks should be used.

15   A.   No, I disagree with the characterization.

16   Q.   There are sometimes when Nokia observes or sees what a

17   customer uses and then will provide feedback or information to

18   the customer's product manager about what Nokia would

19   recommend the customer use.

20   A.   Certainly in conversations with customers, we have very

21   fluid conversations about the state of the technology

22   improvements that could be made.  So, yes, I agree with that.

23   Q.   And part of the services that network -- Nokia provides

24   is network integration?

25   A.   Network integration is a service that is provided by

1    Nokia, yes.

2    Q.    And Nokia can also assist in configuring networks?

3    A.    As a service, yes.

4    Q.    And I believe you said you're -- if I heard you

5    correctly, that you're with the Regional Business Center.  Is

6    that right?

7    A.    Yes.  So we have an internal organization called a

8    Regional Business Center.  And under that, there's an

9    organization called the IP Business Center, and the IP

10   Business Center in our organization is responsible for the

11   tasks that we've already outlined.

12   Q.    And your organization with the Regional Business Center

13   has network integration engineers who deliver services to

14   customers?

15   A.    Network integration engineers for the accused products do

16   not work for me, but they are in the RBC, so it's an adjacent

17   organization.

18   Q.    And the network integration engineers are the ones who

19   may configure some of the products at issue in this case.

20   Right?

21   A.    Yes, they can do that.

22   Q.    Now, kind of talking about those products generally,

23   these routers that are at issue in the case, the accused

24   products in the case, allow for multiple functionalities.

25   Right?

1    A.    Yes, sir.

2    Q.    And those multiple functionalities are described in

3    product manuals.

4    A.    They are.

5    Q.    These product manuals discuss all of the different ways

6    that a product can be configured.

7    A.    They do.

8    Q.    And in creating a product manual, Nokia looks for the

9    offerings or the services or the features that it thinks its

10   customers will want to use.  Right?

11   A.    No, I have to disagree with the phrasing of the question.

12   Q.    Okay.  When Nokia's going to write a manual, it wants to

13   write a manual that will be helpful to customers?

14   A.    Correct.

15   Q.    Okay.  And in providing instruction to a customer about

16   how best to use the features that each product provides.

17   A.    About how to use the feature.

18   Q.    Is that right?

19   A.    You said best use the feature.  I'm saying that it's how

20   to use the feature.  A manual shows them how to use the

21   feature.  It doesn't necessarily make a recommendation about

22   how to do it best.  There's a -- you know, an engineering

23   process involved there.

24   Q.    All right.  And if there is a feature on a product that

25   is configurable within the product, the product manual will

1    tell the user how to configure that feature.

2    A.    Yes.

3                MR. BENNETT:  I'd like to just go to, Mr. Jarrett,

4    Plaintiff's Exhibit 1-1, please.

5    Q.    (BY MR. BENNETT)  I'm just going to show you a couple of

6    pages from the overhead.

7                MR. BENNETT:  Thank you.

8    Q.    (BY MR. BENNETT)  Now, I'm not showing -- let me back up.

9    These manuals can be pretty lengthy.  Right?

10   A.    They absolutely can.

11   Q.    I've seen manuals as long as 2,000 pages.

12   A.    That's reasonable.

13   Q.    All right.  So I'm not going to put the whole 2,000-page

14   manual up on the elmo just to give the jury an understanding

15   of what we're talking about.

16   A.    And I thank you for that.

17   Q.    Okay.  This is the front cover or one of the first pages

18   of this particular manual, which has been marked Plaintiff's

19   Exhibit 1-1.  Do you recognize it?

20   A.    I do.

21   Q.    All right.  And the particular products that we see here,

22   the 7450, the 7750, those are some of the products that are at

23   issue in this case.  Right?

24   A.    That is correct.

25   Q.    And the manual or other manuals like this one would

327

1    instruct users on how to use the features that each product

2    offers.  Right?

3    A.    That those specific products offer, correct.

4    Q.    And including some of the features that are at issue in

5    this case.

6    A.    Yes.

7    Q.    And Nokia intends to offer -- or provides these manuals

8    for the intended use of Nokia's customers.

9    A.    Yes, and employees and anybody else that's interested.

10           MR. BENNETT:  Your Honor, at this time we may need

11   to seal the courtroom because I'm going to use a configuration

12   file.

13           THE COURT:  All right.  Based on counsel's request

14   to protect confidential information, I'll order the courtroom

15   sealed and I'll direct that all persons present who are not

16   subject to the protective order in this case should excuse

17   themselves and remain outside the courtroom until it's

18   reopened and unsealed.

19                    (Courtroom sealed.)

20

21

22

23

24

25

334

1

2

3

4

5

6

7

8

9

10

11

12

13                    (Courtroom unsealed.)

14          THE COURT:  All right, counsel.  Continue, please.

15          MR. BENNETT:  Thank you, Your Honor.

16      Let's try it this time.  Mr. Jarrett, Plaintiff's Exhibit

17   8, please.

18   Q.  (BY MR. BENNETT)  All right.  You were here in the

19   courtroom yesterday when this document was discussed.

20   Correct, Mr. Valley?

21   A.   Yes, sir.

22   Q.   This is the purchase agreement between Nokia Siemens

23   Networks and Corrigent Systems, Limited.  Do you remember

24   that?

25   A.   Yes, sir.

```
 1              MR. BENNETT:  Mr. Jarrett, if you'd turn to page

 2    1856 of the document -- or page 38, perhaps of the PDF.  All

 3    right.  Zoom in, if you would, please, under the signatures

 4    and the dates there.

 5    Q.   (BY MR. BENNETT)  So this is a document that Nokia

 6    executed in August of 2009 with Corrigent Systems.  Right?

 7    A.   It looks so, yes.

 8    Q.   All right.  And under this document Nokia Siemens would

 9    purchase products licensed in an attachment, which we'll look

10    at in a second, and resell them in India.  Right?  Or install

11    them in India.

12    A.   I don't know.  I can't answer that.

13              MR. BENNETT:  Okay.  Let's just look at the next

14    page, Mr. Jarrett.

15    Q.   (BY MR. BENNETT)  Attachment 1 on prices, you were here

16    when Mr. Tamir testified that many of the products sold under

17    this contract included the CM-4000 family.

18              MR. BENNETT:  So, Mr. Jarrett, if you'd highlight

19    line 7.3.

20    Q.   (BY MR. BENNETT)  You heard the testimony?

21    A.   I heard the testimony yesterday, yes.

22              THE COURT:  Mr. Bennett, can you slow down a bit?

23              MR. BENNETT:  Sure.

24              THE COURT:  Please do.

25              MR. BENNETT:  Thank you.
```

```
1    Q.   (BY MR. BENNETT)  All right.  And so Nokia was in
2    possession of CM-4000 series products at least sometime around
3    the time of this contract in 2009.  Right?
4    A.   I can assume so.
5    Q.   Okay.  And you also heard Mr. Tamir's testimony and
6    watched as we discussed documents about marking.
7             MR. BENNETT:  You can take that down, Mr. Jarrett.
8    Thank you.
9    Q.   (BY MR. BENNETT)  As we discussed his marking program and
10   the documents that showed marking at least by 2009.  Right?
11   A.   I recall the testimony.
12   Q.   All right.  In fact, he talked about how his marking
13   program had extended back in the early 2000s.  Do you remember
14   that testimony, too?
15   A.   I recall his testimony.
16   Q.   And so Nokia was buying product from Orckit-Corrigent in
17   2009 around about the same time as those documents we looked
18   at.  Right?
19   A.   Yeah, I agree.  I agree.
20   Q.   And so Nokia would have been in possession of those same
21   products about the same time as those marking documents.
22   A.   I don't think I can agree with exactly that, no.
23   Q.   Do you know one way or the other?  Let me ask it this
24   way.  Can you tell this jury that you know under oath that
25   Nokia didn't possess the products at least around 2009 about
```

1    the same time of those marking documents?

2    A.    No, sir.  But I understand that this was a resell

3    agreement and that means it could have simply been passed

4    through.  Any work that Nokia did with the document, I can't

5    answer.

6         MR. BENNETT:  Your Honor, I object as

7    non-responsive.

8         THE COURT:  The witness answered the question when

9    he said, no, sir.  I'll retain that portion of the answer as

10   responsive.  The remainder of the answer goes beyond the

11   question, is non-responsive, and I'll strike that.

12   Q.    (BY MR. BENNETT)  And it is the case, Mr. Valley, that

13   you have no evidence to contradict Mr. Tamir's testimony that

14   Orckit-Corrigent markets CM-4000 products the entire time that

15   they were in service.

16   A.    I have no idea.

17   Q.    And you also have no evidence that the CM-401x was ever

18   sold in the United States?

19   A.    I have no evidence personally.

20   Q.    Was ever offered for sale in the United States?

21   A.    I have no evidence.

22   Q.    Or was ever imported into the United States?

23   A.    I also have no evidence.

24        MR. BENNETT:  Mr. Jarrett, will you please bring

25   back Plaintiff's Exhibit 5?

1    Q.    (BY MR. BENNETT)  You also have no evidence, Mr. Valley,

2    to contradict anything we just heard about Plaintiff's Exhibit

3    5, namely, that after Orckit IP offered a license to Nokia for

4    some patent, that Nokia never responded.

5    A.    No, that is correct that Nokia never responded, to my

6    knowledge.

7    Q.    And you don't dispute that listed within the schedules

8    attached to that letter are the patents-at-issue in this case.

9    A.    I don't dispute that, no.

10   Q.    All right.  I'm going to shift topics now.  We keep

11   hearing about standard-settings bodies.  You're familiar with

12   those in your line of work.  Right?

13   A.    I am.

14   Q.    We've heard about the IETF.  Are you familiar with that

15   group?

16   A.    Yes, sir.

17   Q.    Who is the IETF?

18   A.    IETF is the Internet Engineering Task Force.

19   Q.    And what's the purpose of the IETF?

20   A.    The IETF is in charge of standardization.  It issues

21   standardization drafts and then standardization RFCs which are

22   followed in this industry.

23   Q.    All right.  Now, we've heard some assertions made during

24   the course of this case by your side that Orckit-Corrigent

25   didn't participate in the IETF.  You've heard those

1    assertions.

2    A.   I don't recall exactly, but -- I don't recall.

3    Q.   Well, Mr. Dacus about 10 minutes ago stood at this podium

4    and asked Mr. Pitcock several questions about whether

5    Orckit-Corrigent was participating with IETF or IEEE.  Do you

6    remember that?

7    A.   I remember the context, yes.

8    Q.   Okay.  Are you familiar with the documents that the IETF

9    generates?

10   A.   Yes.

11   Q.   And would you have been reviewing those documents, the

12   papers and the standards that the IETF generates, as early as

13   2012?

14   A.   Yes.

15   Q.   As early as 2011?

16   A.   Yes.

17   Q.   Did you know that Orckit-Corrigent submitted several

18   submissions to the IETF during that time period?

19   A.   I didn't, no.

20   Q.   Despite the assertions that your side has made to the

21   contrary.  Did you know that?

22   A.   Again, I don't recall that.

23   Q.   Why don't you pull up the -- the white binder that's in

24   front of you.  There's some tabs.

25   A.   Yes.

```
 1   Q.   One of the tabs should be called Memo 1/4/12?

 2   A.   Okay.  I have it.

 3   Q.   All right.  And would you just briefly review the first

 4   page there and let me know when you're ready to talk about it?

 5   A.   Okay.  I've reviewed it.

 6   Q.   All right.  The title -- or the working group that

 7   created this is the MPLS working group.  Right?

 8   A.   That's correct.

 9   Q.   All right.  MPLS, that has to do with networking.  Right?

10   A.   It does.

11   Q.   And this is from the IETF.  Right?

12   A.   This is an IETF document, yes.

13   Q.   Who are the -- at the very top of the page, please read

14   the names that you see, the first three lines.

15   A.   DCon, DRam, Orckit-Corrigent.

16   Q.   And can you please identify the title of the document

17   that's bolded in the middle of the page?

18   A.   Yes.  MPLS-TP Linear Protection Applicability to MSPW and

19   then the document name.

20   Q.   Now, I've got a Bachelor of Arts degree, but I don't

21   think -- does that -- as you read that, that doesn't strike me

22   as modem language.  It -- does it?

23   A.   No, this is not related to modems.

24   Q.   Should have another tab that's labeled Memo 5/31/11.

25   Please turn there.  Are you there?
```

1    A.    Yes.

2    Q.    All right.  This is another draft from the MPLS working

3    group.  Right?

4    A.    It is.

5    Q.    All right.  And it's -- the title of this paper is SD

6    Detection and Protection Triggering MPLS-TP.  Do you see that?

7    A.    I do.

8    Q.    And could you please identify the first three lines in

9    the top right-hand corner of that document.

10   A.    Yes.  Again, DRam DCon, Orckit-Corrigent.

11          THE COURT:  Counsel, are you intending to show this

12   on the monitor?  Or are you intending to talk about it without

13   anybody in the room being able to see it except you and the

14   witness?

15          MR. BENNETT:  I'm happy to publish it, Your Honor.

16   I'm just impeaching the assertion.

17          THE COURT:  All right.  Mr. Haynes?

18          MR. HAYNES:  Your Honor, this is not an exhibit in

19   this case.  It's not been pre-admitted, and I don't think he

20   should be publishing it.

21          THE COURT:  If it's used for impeachment, it doesn't

22   have to be a pre-admitted exhibit, but the -- counsel is going

23   to need to clarify exactly what he's intending to do here.

24          MR. BENNETT:  I'm just intending to clarify the

25   record on this one particular issue.  I'm not intending to

1    submit them to the jury.

2              THE COURT:  Are you attempting to impeach the

3    witness?

4              MR. BENNETT:  Yes.

5              THE COURT:  All right.  Then I'll overrule the

6    objection as to the document not being pre-admitted and you

7    can continue with that effort.

8              MR. BENNETT:  Thank you, Your Honor.

9    Q.   (BY MR. BENNETT)  So I'll repeat one more time, the top

10   right-hand corner, who you see?

11   A.   DRam --

12             THE COURT:  Just a minute.

13             MR. HAYNES:  Your Honor, may I approach?

14             THE COURT:  Approach the bench.

15             (The following was had outside the hearing of the

16             jury.)

17             MR. HAYNES:  Your Honor, he asked this witness if he

18   was aware of them submitting proposals to IETF.  He said he

19   didn't know.  This is not impeachment.  He's not impeaching.

20   He said he doesn't know.  Now he's showing documents he's

21   never seen before --

22             THE COURT:  He hasn't been shown anything yet.  He's

23   been asking questions about something nobody can see.

24        What are you doing here, Mr. Bennett?

25             MR. BENNETT:  I'm impeaching the assertion that

1    Orckit-Corrigent wasn't participating or submitting standards

2    to the IETF.  That assertion's made several times in this

3    proceeding.  I will publish them.  I have no problem doing

4    that.  But I am impeaching the assertion that Nokia has made

5    only maybe 15 minutes ago that this -- that what we're seeing,

6    we shouldn't be seeing.

7              THE COURT:  Well --

8              MR. BENNETT:  Or will see.

9              THE COURT:  I have no problem with you impeaching

10   the witness with any prior inconsistent statement.  And since

11   he's corporate rep for Nokia, any prior inconsistent statement

12   of Nokia is adequate to form the basis of impeachment.  But

13   once you refresh his recollection, you need to ask him the

14   question, not publish the material.

15             MR. BENNETT:  Okay.

16             THE COURT:  And if he answers the question

17   consistent with the prior statement that's contrary to the

18   document, then you can ask for leave to publish it to the jury

19   to show that it's an inconsistent answer.

20             MR. BENNETT:  Understood.

21             THE COURT:  Now, I don't have this document in front

22   of me, so I'm not sure I'm going to know whether his answer is

23   consistent or inconsistent, but I'll let you continue with

24   your efforts to impeach him.

25             MR. BENNETT:  Okay.

```
 1                THE COURT:  All right?

 2                MR. BENNETT:  Thank you.

 3                MR. HAYNES:  Thank you, Your Honor.

 4                THE COURT:  All right.

 5                (The following was had in the presence and hearing

 6                of the jury.)

 7                THE COURT:  Let's proceed.

 8   Q.   (BY MR. BENNETT)  All right.  Looking at this last memo,

 9   which is February 13, 2012, let me ask it this way.  Is what

10   you see in this last document, top right-hand corner, is it

11   consistent with the assertion that's been made by your side

12   that Orckit-Corrigent didn't participate in the IETF?

13   A.   It is not consistent, no.

14   Q.   And does Nokia stand by its assertion, its previous

15   assertion, that Orckit-Corrigent didn't participate in the

16   IETF given what you see here?

17   A.   Again, looking at this document, it appears to me as if

18   they did participate.

19                MR. BENNETT:  Your Honor, I object as

20   non-responsive.

21                THE COURT:  I think it was responsive.  Overruled.

22   He said they did participate.

23                MR. BENNETT:  Okay.

24   Q.   (BY MR. BENNETT)  Let me ask maybe a slightly different

25   question, the question I thought I asked.  Does Nokia stand
```

1   behind the statement it has made several times during this

2   proceeding, after seeing this, that Orckit-Corrigent did not

3   participate in the IETF?

4   A.   I don't know what to say.  I can't -- it appears as if

5   they have.

6           THE COURT:  It appears as if who has?

7           THE WITNESS:  It appears as if Orckit-Corrigent

8   participated, submitted documents to IETF.

9           THE COURT:  And in light of that appearance, does

10  Nokia maintain its position that they didn't?

11          THE WITNESS:  No, sir.

12          THE COURT:  Okay.  Let's move on.

13          MR. BENNETT:  I'll pass, Your Honor.

14          THE COURT:  All right.  Cross examination.

15      I'll tell you what, Mr. Haynes.  This is going to be a

16  lengthy cross examination as I understand it.  We've been in

17  the courtroom since 8:30.  We're going to take about a

18  10-minute recess, we'll come back, then we'll move to cross

19  examination of Mr. Valley.

20      Ladies and gentlemen of the jury, you may simply close

21  and leave your notebooks in your chairs, if you like.  Follow

22  all my instructions about your conduct, including not to

23  discuss the case with each other, and we'll be back shortly to

24  continue with this witness.

25          The jury's excused for recess.

1            (Whereupon, the jury left the courtroom.)

2            THE COURT:  Court stands in recess.

3                    (Brief recess.)

4            THE COURT:  Be seated, please.

5        Counsel, before I bring the jury in and we proceed with

6    cross examination, which, given that Mr. Valley is Nokia's

7    corporate representative at this trial, will need to be in the

8    form of a non-leading direct, but, nonetheless, I think

9    counsel understands that.

10       We met this morning in chambers with regard to certain

11   overnight disputes.  I carried one of those which came in

12   early this morning regarding slides 42, 48, and 72.  The

13   objection had to do with the application of an order entered

14   by Judge Payne through the pretrial process with regard to

15   striking certain provisions and paragraphs regarding Doctor

16   Valerdi's slides and his report.

17       And I've considered the slides that have been offered,

18   I've considered the objections and the discussion that we had

19   in chambers.  I told you this morning I'd carry this after

20   I -- until I have the chance to review the impact and the

21   application of Judge Payne's order more thoroughly.

22       I've done that, and I'm going to overrule the objections

23   to these slides.  I think they're permissible.  I think

24   they're outside the scope of what Judge Payne struck.  So

25   that's the ruling on those.

347

```
 1            All right.  Let's bring in the jury, please.

 2                  (Whereupon, the jury entered the courtroom.)

 3                  THE COURT:  Please be seated.

 4            All right.  We'll proceed with cross examination of Mr.

 5      Valley by Defendant Nokia.

 6            You may proceed, Mr. Haynes.

 7                           CROSS EXAMINATION

 8      BY MR. HAYNES:

 9      Q.    Good afternoon, Mr. Valley.

10      A.    Good morning.

11      Q.    Actually good morning.

12            Right before we broke, you were asked some questions

13      about some documents relating to the IETF.  Do you recall

14      that?

15      A.    I do.

16      Q.    And there were some statements made about Nokia's

17      positions relating to the IETF.  Do you recall that?

18      A.    I do.

19      Q.    Were you here when Mr. Dacus talked about how Orckit was

20      a latecomer to the routing business?

21      A.    Yes, I was.

22      Q.    Do you recall that the three patents in this case were

23      all invented and filed prior to 2005?

24      A.    I do recall that, yes.

25      Q.    And have you looked at some of the IETF standards that
```

1    are at issue in this case with relation to Nokia's products?

2    A.    I'm not sure I understand the question.

3    Q.    For example, did you look at one of the IETF standards,

4    RFC 4875?

5    A.    Oh, of course, yes.

6    Q.    And do you recall what the date was when RFC 4875 came

7    about?

8    A.    In the 2000s.

9    Q.    The early 2000s?

10   A.    The early 2000s, yes.

11   Q.    Now, the documents that you were showed, what was the

12   earliest date of those documents that involved Orckit and

13   IETF?

14   A.    I believe it was 2011.

15   Q.    Okay.  Now, I want to back up and just learn a little bit

16   more about you.

17   A.    Okay.

18   Q.    Can you just tell the jury where you live?

19   A.    I live in just outside of Atlanta, Georgia.

20   Q.    And do you live there with your family?

21   A.    I live with my wife.  We have three grown children.

22   Q.    And where did you go to college?

23   A.    I went to Heriot-Watt University in Edinburgh, Scotland.

24   Q.    And did you get a degree from there?

25   A.    I did, a master of science degree.

1    Q.    Okay.  And for about how long have you been working in

2    the industry of computer networking?

3    A.    Over 15 years with this product line.  Probably 20 years

4    total since 1996.

5    Q.    Okay.  And what was the first job that you held in the

6    computer networking area?

7    A.    The first job with a manufacturer was with Cabletron

8    Systems in late 1990s.

9    Q.    What types of products did Cabletron sell?

10   A.    Cabletron was in the business of selling hubs, ethernet

11   hubs, ethernet switches, some various other layer 2

12   technologies that were applicable at the time.  And while I

13   was there, they acquired a Silicon Valley start-up that made

14   routers.

15   Q.    And at some point did that company Cabletron split up

16   into other companies?

17   A.    It did.

18   Q.    And did you end up working for one of the companies that

19   got split off?

20   A.    I did.  They split up into four companies, and one of

21   those spin-offs was named Riverstone Networks, and my

22   employment transferred to Riverstone Networks.

23   Q.    Okay.  And what kind of products did you work on at

24   Riverstone?

25   A.    Metro ethernet routers.

1    Q.    Okay.  And at some point did Riverstone get acquired?

2    A.    Yes, sir.  Riverstone Networks' assets were acquired by

3    Lucent Technologies.  That was in 2006.

4    Q.    And when it was acquired by Lucent Technologies, did you

5    keep working for Lucent Technologies?

6    A.    I was offered employment as were I think almost all of

7    the Riverstone employees with Lucent Technologies at that

8    time.

9    Q.    And what kind of products were you working on when you

10   were at Lucent Technologies?

11   A.    The same products.  Lucent kept the organization that I

12   was in in a dedicated organization to support metro ethernet

13   routing because they didn't have a talent -- they didn't have

14   their own talent base.

15   Q.    Okay.  And at some point in time did Lucent Technologies

16   merge with a company called Alcatel?

17   A.    Yes.  Alcatel and Lucent merged, I believe, in 2007.

18   Q.    Okay.  And that company called Alcatel Lucent?

19   A.    Creatively they called it Alcatel Lucent, yes.

20   Q.    After that merger happened, what kind of products were

21   you working on?

22   A.    So when that merger happened, I was almost immediately

23   introduced to Alcatel's IP organization, and I had -- I made

24   several contacts there, and I was offered to move on to that

25   team in 2007.

1    Q.    Okay.  So what role did you hold at Alcatel Lucent?

2    A.    At Alcatel Lucent, I held a network architecture

3    principal consulting engineer role at the beginning in 2007.

4    Q.    Okay.  And what products were you working on at Alcatel

5    Lucent?

6    A.    The 7X50 routing family.

7    Q.    Okay.  Is that the same 7X50 routing family that has been

8    accused of infringement in this case?

9    A.    It is.

10   Q.    Did you stay in the same role at Alcatel Lucent the whole

11   time you were there or did you take on different

12   responsibilities?

13   A.    I stayed in that role until around 2010.  In 2010 I was

14   offered a role leading a piece of the organization as a -- as

15   a director.

16   Q.    Okay.  And what was your role -- what were your

17   responsibilities as a director in that organization?

18   A.    Business development, presales technical support.  I was

19   responsible specifically for selling these products or

20   supporting the sale of these products toward mobile network

21   operators--AT&T, Verizon, T-Mobile, Sprint at the time--as

22   well as -- and then eventually shortly thereafter to the cable

23   network operators--Comcast, Cox, Charter, Brighthouse.

24   Q.    And at some point in time did Nokia acquire Alcatel

25   Lucent?

1    A.    Nokia acquired Alcatel Lucent, yes, sir, in 2016.

2    Q.    And did you remain with Nokia after that acquisition?

3    A.    I did.

4    Q.    And what were your job responsibilities at Nokia after it

5    acquired Alcatel?

6    A.    With that acquisition, my responsibilities and the

7    function of my organization did not change.

8    Q.    Okay.  Can you -- and what was your title when you first

9    started out at Nokia?

10   A.    At Nokia, I was a senior director, I believe it was, of

11   IP consulting engineering.  Every time there's a

12   reorganization, there's a name change so it gets hard to keep

13   track of.  But I believe I was senior director of consulting

14   engineering, IP consulting engineering.

15   Q.    Okay.  And for about how long were you in that role at

16   Nokia?

17   A.    I stayed in that role until 2018.

18   Q.    Okay.  And what role did you take on in 2018?

19   A.    In 2018 I was asked to take over that same responsibility

20   but for all customers in North America.

21   Q.    Okay.  And at what point did you get promoted to the vice

22   president of IP networks for North America?

23   A.    I became a Nokia executive, it was after COVID.  I'd have

24   to look up the exact date, 2021, 2022, in that time frame.

25   Q.    And what products are you responsible for at Nokia as the

1    vice president of IP networks?

2    A.   I'm responsible for all of the products in the IP

3    networks business unit.  That includes the 7X50s, the routers

4    and switches in the portfolio, as well as some of the software

5    that supports those hardware products.

6    Q.   Now, Mr. Valley, you're here as Nokia's corporate

7    representative.  Is that right?

8    A.   Yes, sir.

9    Q.   And what do you understand your role to be as a corporate

10   representative?

11   A.   I'm representing Nokia in the case.

12   Q.   And you understand that you are here because Nokia has

13   been accused of patent infringement.

14           MR. BENNETT:  Objection; leading.

15           THE COURT:  Restate the question, counsel.

16   Q.   (BY MR. HAYNES)  Mr. Valley, why are you here?

17   A.   I'm here to speak for Nokia in response to this lawsuit

18   that was filed.

19   Q.   Now, does Nokia as a company take allegations of patent

20   infringement seriously?

21   A.   Very seriously, yes, sir.

22   Q.   And are you aware that Smart Path has alleged in this

23   case that Nokia is willfully infringing Smart Path's patents?

24           MR. BENNETT:  Objection; leading, foundation.

25           THE COURT:  He's the corporate representative.  He

354

1    can certainly set forth what the company's position is.

2    Overruled.

3              THE WITNESS:  I am aware of the accusation, yes,

4    sir.

5    Q.    (BY MR. HAYNES)  And does Nokia have a position on

6    whether it is infringing Smart Path's patents in this case?

7    A.    Yes, sir.  Nokia's position is that we are not infringing

8    on these patents.

9    Q.    And do you have any reason to believe based on your

10   personal knowledge that Nokia is infringing any of the patents

11   in this case?

12   A.    I have no personal knowledge that leads me to believe

13   that, no, sir.

14   Q.    And prior to learning about this lawsuit, had you ever

15   heard of Smart Path Communications?

16   A.    No, I have not.

17   Q.    And are you aware of anybody from Smart Path contacting

18   Nokia and offering them a license to the patents that have

19   been asserted in this case?

20   A.    My understanding is that we were not contacted by Smart

21   Path prior to the lawsuit being filed.

22   Q.    Okay.  What about Orckit IP?  And I'm drawing a

23   distinction there between Orckit-Corrigent.  We saw a letter

24   we'll talk about it, but Orckit IP.  Had you ever heard

25   about Orckit IP before this lawsuit was filed?

```
 1    A.   No, sir, I had never heard of Orckit IP.

 2    Q.   And did Orckit IP ever contact Nokia and offer them a

 3    license?

 4    A.   I understand that there was a letter sent from Orckit IP

 5    to Nokia, but I don't believe that it -- I don't believe it

 6    offered a license in the letter specifically for these

 7    patents.

 8    Q.   Okay.  Let's take a look at that letter.

 9              MR. HAYNES:  If we could bring up PX 5.

10              THE WITNESS:  Okay.  I have it.

11    Q.   (BY MR. HAYNES)  And you were shown this letter by Mr.

12    Bennett earlier.  Correct?

13    A.   Yes.

14    Q.   And there was some discussion about this letter, and I

15    want to direct your attention to the second paragraph there

16    where it says, Orckit IP's patent portfolio includes U.S.

17    Patent No. 7,773,508.  The '508 Patent.  Do you see that?

18    A.   I do.

19    Q.   Is that patent asserted in this case?

20    A.   That patent is not asserted in this case.

21    Q.   Now, there's also a long list of products that are listed

22    here that are described as Alcatel Lucent switches and

23    routers.  Do you see those?

24    A.   I do.

25    Q.   It's a series of OmniSwitch products?
```

```
1    A.    Yes.

2    Q.    Do you know who the these products are?

3    A.    Yes.  Those are ethernet switch products that are sold by

4    or owned by another company, Alcatel Lucent Enterprise.

5    Q.    Are these OmniSwitch products products that Nokia was

6    making or selling at the time of this letter?

7    A.    At the time of this letter, no.  Well, at the time of

8    this letter, we may have been engaged in reselling.  There are

9    often situations where we will resell a product to fit a

10   customer solution.  So that may have been happening, but they

11   were -- they would have been resold; they would not have been

12   Nokia products.

13   Q.    Okay.  So were these Nokia products at the time of this

14   letter?

15   A.    No, sir.

16   Q.    And are you aware of whether or not Nokia investigated

17   the '508 Patent or these products when this letter came in?

18             MR. BENNETT:  Objection; relevance, foundation.

19             THE COURT:  Overruled.

20             THE WITNESS:  It's my understanding that the letter

21   was received by legal and it was investigated.  To what

22   extent, I don't know.

23   Q.    (BY MR. HAYNES)  Now, are you aware of what Nokia

24   concluded with respect to whether or not this letter required

25   some action?
```

```
 1    A.    My understanding is that Nokia concluded that no action

 2    was required.

 3    Q.    And what's your understanding as to why they reached that

 4    conclusion?

 5    A.    First of all, there was no assertion of infringement --

 6              MR. BENNETT:  Objection; foundation, hearsay.

 7              THE COURT:  He's here as Nokia's corporate

 8    representative.  He's being asked what Nokia's view of this

 9    letter was.  He can testify as to that.  He doesn't have to

10    have received the letter himself and read it himself.  He's

11    here speaking for the corporation.

12         Overruled.

13    Q.    (BY MR. HAYNES)  Would you like me to repeat the

14    question, sir?

15    A.    No, I think I got it.  The -- in reading the text of this

16    letter, Corrigent -- Orckit IP does not say that Nokia is

17    infringing on a patent.  It's an offer -- it says you

18    shoulDConsider licensing this, and then it goes on to list

19    these products which are not ours.  So I think a reasonable

20    person woulDConclude that there was really nothing to do.

21              THE COURT:  Well, you're certainly here to speak for

22    the corporation.  But to offer opinions about what a

23    reasonable person would have concluded, that goes beyond the

24    question asked, Mr. Valley.

25         You need to limit your answers to the question that's
```

1    asked and to state the positions of the company here you're

2    here to represent.  But offering your own ideas about what a

3    reasonable person might conclude or not, that's beyond the

4    scope of what you're here for.  You understand that?

5            THE WITNESS:  Yes, sir.  I apologize, Your Honor.

6            THE COURT:  All right.  Let's continue.

7            MR. HAYNES:  Okay.  We can bring that down.

8    Q.   (BY MR. HAYNES)  I'd like to talk a little bit now about

9    Nokia and who that company is.  Is that all right with you?

10   A.   Yes, sir.

11   Q.   Where is Nokia located?

12   A.   Nokia is an international corporation, so we have

13   operations in -- I think it's hundreds of countries.

14   Q.   Okay.  Do you have any offices in Texas?

15   A.   Our U.S. headquarters is located in Dallas, Texas, in the

16   Cypress Waters development.

17   Q.   Okay.  About how many people does Nokia employ in Texas?

18   A.   So I don't have corporate-wide HR data available to me.

19   I did check a listing of employees in that office, and it was

20   over -- the list that I saw was over 1700.

21       We also have a large number of employees that are now

22   working from home virtually, so they're not assigned to an

23   office.

24       So, in total, I'm comfortable saying there are thousands

25   of Nokia employees in Texas.

1    Q.    And for about how long has Nokia been in business?

2    A.    Nokia's been in business for a long time, since the

3    1800s.

4    Q.    And has the business that Nokia has been in changed over

5    time?

6    A.    It has.  They've been in -- Nokia has been involved in

7    many different types of business.

8    Q.    And what was the focus of Nokia's business in the 1990s

9    and 2000s?

10    A.    So in the 1990s and early 2000s, Nokia the name and the

11    brand really rose to prominence because we were a large

12    manufacturer of cellular phones.  In fact, we still hear about

13    it in almost every meeting.

14    Q.    Does Nokia still make cell phones?

15    A.    Nokia no longer manufactures cell phones.

16    Q.    And what kind of products does Nokia make today?

17    A.    Nokia is in the business of making telecommunications,

18    data networks products and softwares that supports that

19    industry and -- and adjacent industries.

20    Q.    Give me some examples of the types of products you're

21    talking about.

22    A.    IP routers, IP switches, mobile telephone network devices

23    that support the mobile network infrastructure.  There are

24    software applications that support those -- those products.

25    You know, in our organization, for example, we have products

1    that prevent distributed denial of service attacks on internet

2    devices.  Network security.

3         So it's all in the idea -- or in the realm of

4    telecommunications and -- and networking.

5    Q.   Okay.  Does Nokia engage in any research and development

6    activities?

7    A.   Nokia invests very heavily in research and development.

8    Q.   And has Nokia ever won any awards for its innovations?

9    A.   Awards, yeah.  Nokia, through the Bell Labs organization

10   within Nokia, has won -- at last count, I believe it was 10

11   Nobel prizes.

12   Q.   And you were here for the opening?

13   A.   I was here for the opening yesterday, yes, sir.

14   Q.   Did you see Mr. Dacus put up that slide and it had a

15   bunch of pictures of different devices on it.  I think we saw

16   a picture of the telephone and -- and a transistor.  Do you

17   recall that?

18   A.   I do, yes.

19   Q.   Are those examples of things that Nokia has invented?

20   A.   Those were examples of things that Nokia has invented or

21   Nokia has contributed to the invention of, yes.

22   Q.   Okay.  Does Nokia itself obtain patents for its

23   innovations?

24   A.   We do file patents, yes.

25   Q.   About how many patents does Nokia currently have in its

361

1    portfolio?

2    A.    The last report that I read from that organization listed

3    it at over 20,000 patent families.

4    Q.    And does Nokia as a company respect the U.S. patent

5    system?

6    A.    Absolutely.

7    Q.    And why is that?

8    A.    Our belief is that the U.S. patent system is critical to

9    enabling innovation to occur.

10   Q.    Now, as part of your role in Nokia, do you engage in

11   licensing of Nokia's patent portfolio?

12   A.    No, I do not.

13   Q.    Does Nokia have a patent portfolio licensing program?

14   A.    Nokia has an organization that is responsible for patent

15   licensing, yes.

16   Q.    And are you aware of whether or not Nokia has licensed

17   its own portfolio to other companies in the industry?

18   A.    We have.  We actively do.

19   Q.    What about the other way around?  Does Nokia ever take

20   licenses in order to use other people's technology?

21   A.    Yes.  If there's a technology that we would like to use

22   in our product or were considering using in our product, we

23   will absolutely license another inventor's technology.

24   Q.    Now, does Nokia often take licenses for technology that

25   it doesn't use in its products?

1    A.    No.  I'm sure it happens from time to time that we're

2    considering something, so, therefore, a license is requested,

3    but sometimes those plans wouldn't come to fruition.  But in

4    general, we would not take a license for something that we

5    didn't intend to use.

6    Q.    Do you think it would be fair for Nokia to be forced to

7    pay for technology that it's not using?

8    A.    No, sir, I don't believe it would be fair for anybody to

9    pay for technology that they're not using.

10   Q.    Okay.  Now I want to talk a little bit about the

11   technology itself.  So I'm going to use some acronyms.  If you

12   would, help me go slow and we'll try our best to get through

13   some of these acronyms.  Is that all right with you?

14   A.    Sure, of course.

15   Q.    Your title says -- has IP networks in it.  What does that

16   refer to?

17   A.    IP networks are the -- an IP network is today the

18   foundation of most communication, most protocols, or most

19   devices that we use utilize IP.  So as a result, if you're a

20   large service provider or a large enterprise, you'll have

21   devices that are speaking in that language IP, which is,

22   incidentally, the protocol that is predominantly used on the

23   internet.

24   Q.    Now, I think you said when you worked at Cabletron, you

25   sold devices called hubs.  Do you recall that?

```
 1    A.    Yes, sir.

 2    Q.    What's a hub?

 3    A.    A hub in -- in that context is -- is a device, an

 4    ethernet device, that -- it functions as a multiport repeater,

 5    meaning that when it receives a packet, a piece of data, it

 6    checks to make sure it's valid and then it forwards it to all

 7    other ports that exist on that device.  It -- receive and then

 8    repeat out every port.

 9    Q.    Okay.  Does Nokia make and sell hubs?

10    A.    No, we do not.

11    Q.    Why not?

12    A.    In probably around the 1990s, the technology behind hubs

13    went out of favor and in favor of switches which, unlike a

14    multiport repeater, is a multiport bridge where 802.1(d)

15    bridging is occurring on every port.  It's a more -- a switch

16    is more advanced.  So there's no customer demand any longer

17    for hubs.

18              THE COURT:  Mr. Valley, try to slow down as you give

19    these answers.  Again, it's important for the jury to be able

20    to follow your testimony.  Okay?

21              THE WITNESS:  Yes, Your Honor.  Thank you.

22              THE COURT:  Thank you.

23         Go ahead, counsel.

24    Q.    (BY MR. HAYNES)  Okay.  I want to focus now on the Nokia

25    routers and switches that are part of its product portfolio.
```

1    Okay?

2    A.    Okay.

3    Q.    Now, with respect to those products, do Nokia's customers

4    choose which options anDConfigurations that they want to

5    deploy in their networks?

6    A.    They do.

7    Q.    And do all of Nokia's customers use all the same

8    configurations for those products?

9    A.    No, they do not.  They're very different.

10   Q.    Is it even possible for a customer to use all of the

11   features of a particular router in their networks?

12   A.    No, sir, it is not.

13   Q.    And why is that?

14   A.    Many of the options are competing options, so to speak.

15   If you were to -- you would pick a routing protocol in a

16   particular scenario.  So you wouldn't enable multibillion

17   routing protocols, you would pick a tunneling technology.  So

18   you wouldn't pick multiple tunneling technologies at the same

19   time.  So it just -- it doesn't make sense.  It would be

20   chaotic to turn all of the features on.

21   Q.    So is it fair to say there are alternative configurations

22   and your customers can choose one or the other?

23   A.    That's correct.

24          MR. BENNETT:  Objection; leading.

25          THE COURT:  Sustained.

365

```
1              MR. HAYNES:  I'll move on.
2         Can we get Exhibit 19a?
3    Q.    (BY MR. HAYNES)  Mr. Valley, are you familiar with the
4    document that's Exhibit 19a or JX 19a?
5    A.    Yes, I am.
6    Q.    And what is this?
7    A.    This is a marketing document that is produced by IP
8    networks marketing.  It's an IP routing portfolio poster that
9    shows the -- the products in that portfolio.
10   Q.    Are any of these products hubs?
11   A.    No, sir.
12   Q.    Now, do all of these products have the same hardware and
13   software on them?
14   A.    No.  There are -- there are different hardware variants
15   anDConfigurations and there are different pieces of software
16   which would be loaded and different software options.
17   Q.    Okay.  When you're talking to your customers, what
18   differentiates one of these products, you know, the ones on
19   the right versus the big ones on the upper left?
20   A.    So the differentiating features are functionality in
21   terms of what use cases or applications a product can be used
22   for; the scale, so how many services could be enabled, for
23   example, how many routes could be learned by the route table,
24   as well as the overall capacity.  Some are much larger than
25   others on the page, so -- and this is often a customer
```

1    discussion like how big does it need to be.

2    Q.   Okay.  Let's focus on the upper left.  There's products

3    labeled 7950 extensible routing system.  What's the use case

4    for this line of products?

5    A.   So the 7950 XRS is a core routing product.  It was

6    introduced to be an IP core product.  So this is sitting

7    somewhere in the center of the network where there's a very

8    large volume of traffic being forwarded.

9    Q.   Okay.  Let's go over to the next one.  There's a label

10   for 7750.  What's the use case for the 7750 service routers?

11   A.   So the 7750 service router is really the -- what I

12   woulDConsider the bread and butter of the portfolio.

13   This -- these products use the network silicon that we

14   designed that is Nokia specific network silicon.

15        So it has very advanced features, very advanced quality

16   of service, and it has a very long list of features, like

17   subscriber management, business services, the ability to do

18   VPNs in support of business services.  So this is a very

19   important product in the portfolio.

20   Q.   You mentioned Nokia silicon.  What is that?

21   A.   So for any of these types of products, there is -- there

22   is silicon, there's a hardware, a computer chip, that is --

23   that is actually responsible for forwarding the traffic.  And

24   remember we're talking about extremely high volumes of traffic

25   forwarding.  So that silicon has to work at very high speeds.

1    It's specialized.

2        So as a result, we design our own silicon in order to

3    perform that function for these products.

4    Q.   Okay.  Let's move on to the next one, the Nokia 7250

5    interconnect router.  What's the use case for that?

6    A.   So the 7250 IXR is -- first of all, it uses different

7    silicon.  It uses merchant silicon, which is silicon that is

8    available from another vendor.  And the application,

9    therefore, is that it has less advanced services, so we

10   typically use it for aggregation of traffic where there is a

11   large volume of traffic coming from the access network and

12   traffic needs to be aggregated toward a 7750 as an example.

13   That's a use case.

14       There's also a use case for this product in mobile back

15   call.  That's the transportation of data from a cellular tower

16   that you may see here on the side of the road back to a

17   central location so that that traffic can be shuttled to and

18   from the internet.  So that's an application for this type of

19   product as well.

20   Q.   Is the 7250 interconnect router representative of the

21   features and functionalities of the other products in this

22   portfolio?

23   A.   No, I would not agree.  I don't think that's true.

24   Q.   And why is that?

25   A.   Again, the 7250 uses merchant silicon so, as a result,

1    there are other vendors in the routing space that would use

2    the same silicon.  So, therefore, the differentiation is more

3    limited.  You know, we can't go to a customer and -- and claim

4    features of the hardware that are unique to us.  So that is

5    one of the reasons why it's not representative.

6         And the -- the software support on this product has

7    different combination of features, so it would be really hard

8    to say that it's representative of the rest of the portfolio.

9    Q.   Now, in your role at Nokia, do you personally interact

10   with your customers regarding the various products we just

11   talked about?

12   A.   I do engage with customers directly, yes.

13   Q.   And what has been your experience in talking to customers

14   regarding whether or not they like Nokia's products?

15   A.   Overall, the -- the experience that customers have with

16   the products in this portfolio are very strong.  We are

17   well-known for our product quality, just like we were

18   well-known for our product quality in cell phones, so we

19   consistently hear that from customers.

20   Q.   Now, once Nokia sells a router or switch to its

21   customers, who is responsible for determining the

22   configuration of those products in the customer network?

23   A.   Ultimately the customer is responsible for determining

24   how they want the product to be configured.

25   Q.   Is it possible for Nokia's customers to just turn off

1    certain features in these routers and never use them?

2    A.    It's actually kind of the opposite.  The product comes

3    without a configuration, so it would do almost nothing.  You

4    have to log in and put a configuration in so that it begins

5    doing what you want, what the customer wants.

6    Q.    So you say you have to log in and put in a configuration.

7    How does that work?

8    A.    Yeah.  So initially somebody woulDConnect to the device

9    and give it an IP address, give it very basic information so

10    that you can connect to it either directly from a workstation,

11    you know, directly from one IP address to another, and log

12    into the device in the same way that you would log into your

13    router if you wanted to change a configuration at home.

14         There are also network management systems that are very

15    popular.  But in order for those network management systems to

16    be able to talk to the router and give it a configuration, it

17    has to be able to access it, so it needs to get an IP address

18    somehow.

19    Q.    So does Nokia know exactly how all of its customers have

20    configured their specific networks when they deploy them?

21    A.    All of its customers?  No.

22    Q.    Do you have any insight into how customers configure

23    their network?

24    A.    There are various ways that we get insight when we need

25    it.

1    Q.    Okay.  Can you explain some of those ways?

2    A.    Yeah, sure.  Through the technical support process, it's

3    very common for a customer to call and report a problem, and

4    as part of analyzing that problem or trying to gather

5    information, we will ask a customer to send us files from that

6    product that include the state of the router.

7         I think we looked at some of those files earlier that

8    include the state of the router.  The configuration of the

9    router would be included in those files.  And that information

10   has -- you know, has information that we could then use for

11   that purpose.

12        There are -- you know, as I mentioned, I have a team that

13   is responsible for the doing business development functions

14   and advanced presales consulting engineering functions with

15   customers.  And so they also routinely have conversations with

16   customers.

17        We have relationships with our customers that are more

18   than transactional.  So there may -- there are conversations

19   that occur, there is information that gets exchanged when

20   they're bouncing ideas off of each other, for example.  So

21   that's a way that we're able to collect some information.

22   Q.    Are you aware of the feature in Nokia's products referred

23   to as P2MP LSP?

24   A.    Yes, I am.

25   Q.    And what does P2MP LSP stand for?

1    A.    P2MP is point-to-multipoint.  LSP is label switch path.

2    So point-to-multipoint label switch path.

3    Q.    And are you aware that that feature is -- has been

4    accused as part of Smart Path's allegations of infringement in

5    this case?

6    A.    I am aware, yes.

7    Q.    Now, we heard a little bit about standardizations when

8    Mr. Bennett was questioning you.  Is Nokia's implementation of

9    this P2MP LSP feature something that is standardized?

10   A.    It is -- it is a standardized feature, set of features,

11   yes, sir.

12   Q.    Okay.  And what standards body creates those standards?

13   A.    Those standards come from the IETF, the Internet

14   Engineering Task Force.

15   Q.    And for the Nokia routers that have the capability to use

16   that P2MP feature, do they implement it in accordance with

17   those standards?

18           MR. BENNETT:  Objection; leading.

19           THE COURT:  Sustained.

20   Q.    (BY MR. HAYNES)  Do Nokia's products comply with the RFC

21   4875 IETF standard?

22           MR. BENNETT:  Objection; foundation.

23           THE COURT:  Overruled.

24           THE WITNESS:  There are certain products in the

25   portfolio -- the portfolio is made up of different product

1  families and then different product variants within those

2  families.  There are some products in the portfolio but not

3  all that support RFC 4875.

4  Q.  (BY MR. HAYNES)  Okay.  What is RFC 4875?

5  A.  RFC 4875 is an IETF document that discusses the

6  utilization of RSVP-TE, the reservation protocol traffic

7  engineering, for point-to-multipoint LSPs.

8  Q.  Okay.

9        MR. HAYNES:  Let's pull up JX 27c.

10  Q.  (BY MR. HAYNES)  Are you familiar with this document?

11  A.  I am.

12  Q.  And what do you understand this document to be?

13  A.  This is an MPLS guide for the 7X50 series routers.

14  Q.  Does this document relate to how Nokia implements

15  point-to-multipoint or P2MP LSPs?

16  A.  Yes, it does.

17  Q.  And so is this -- if a customer wanted to look at

18  information about how Nokia implements point-to-multipoint

19  LSPs in the products that support it, could they look at this

20  document?

21  A.  This is the first document that I suspect they would look

22  at.  That's what I would do.

23  Q.  Okay.

24        MR. HAYNES:  Let's turn to page 330 of this

25  document.

1    Q.    (BY MR. HAYNES)  Do you see here there's a heading that

2    says 4.32, Resource Reservation Protocol-Traffic Engineering,

3    RSVP-TE?

4    A.    Yes, I see it.

5    Q.    And at a high level, what is that referring to?

6    A.    So this is a listing of the standards that are supported

7    by the 7X50 series products--that's the document family that

8    we are looking at or that's the router family that we're

9    looking at--specific to RSVP-TE.

10   Q.    Okay.  I want to direct your attention about five lines

11   down, there's an entry for RFC 3209.  Do you see that?

12   A.    I do.

13   Q.    And what is RFC 3209?

14   A.    RFC 3209 is a standard that discusses how the protocol

15   RSVP-TE can be applied to label switch path tunnels.

16   Q.    Okay.  And do Nokia's 7X50 routers implement the RFC 3209

17   standard?

18   A.    The products that are listed for this guide, the 7750,

19   7450, they support this standard, yes.

20   Q.    Okay.  And then if we go further down the list and maybe

21   start from the bottom, come up three, there is an entry for

22   RFC 4875?

23   A.    I see it, yes.

24   Q.    And does that entry indicate whether or not the specific

25   products in this manual implement RFC -- or implement

 1   point-to-multipoint tunnels in accordance with the RFC 4875

 2   standard?

 3   A.   It indicates that they do.

 4   Q.   Okay.  You mentioned this concept before of an LSP or a

 5   label switch path.  What is that?

 6   A.   A label switch path is a type of tunnel.  It's a

 7   uni-directional tunnel that gets created in the network in

 8   order to forward traffic efficiently to its destination.

 9   Q.   So when we talk about point-to-multipoint tunnels, or

10   LSPs, what does that refer to?

11   A.   So this is an LSP.  But instead of being point-to-

12   multi -- point-to-point, which is the common -- it was the

13   initial application for LSPs, it's point-to-multipoint.  So

14   there would be an entry point, let's say, but then multiple

15   exit points of that LSP.

16   Q.   Okay.  What would you use something like

17   point-to-multipoint LSPs for?

18   A.   The common application that was considered for

19   point-to-multipoint LSPs was for the delivery of multicast

20   video.  And you may understand that to be the distribution of

21   live TV channels, so that -- over an IP network like over a

22   residential network going to a subscriber's home.  So that

23   would be a use -- that would be an applicable use case for the

24   idea of P2MP.

25   Q.   Is the point-to-multipoint LSP feature the only way that

```
1    you can distribute multicast video?

2    A.   No, it's not.

3              MR. HAYNES:  Let's turn to JX 10d.

4    Q.   (BY MR. HAYNES)  Are you familiar with this document?

5    A.   I am.

6    Q.   And what do you understand it to be?

7    A.   This document is the ACG, or the advanceDConfiguration

8    guide.  This is, again, in the -- in our documentation

9    distribution.  ACG is a little different than a manual in that

10   it provides more detailed instructions on configuring products

11   around a specific use case.

12   Q.   Okay.  I want to direct your attention to page 1,694 of

13   this guide.

14   A.   Yes.

15   Q.   There is an illustration there figure 365 labeled P2MP

16   example topology.  What is shown there?

17   A.   So this is a network -- this is a network topology.  This

18   is representative of what a network doing P2MP would look

19   like.

20   Q.   Okay.  Now, you mentioned before that P2MP is

21   point-to-multipoint.  Right?

22   A.   Correct.

23   Q.   What's the point in this figure?

24   A.   So in this diagram, the point is beginning with PE 1 on

25   the top of this diagram that is adjacent to the multicast
```

```
 1    source.

 2    Q.   Okay.  And then that's going to multipoint.  What are the

 3    multipoints in this illustration?

 4    A.   So the multipoints in this illustration are the

 5    multicast -- or the PE-6 and PE-7, which are adjacent to

 6    multicast client 1 and multicast client 2.

 7    Q.   Now, how many point-to-multipoint LSPs are shown in this

 8    illustration?

 9    A.   One.

10    Q.   And how many tunnels are shown in this illustration?

11    A.   One tunnel.

12    Q.   Now, I see that when it branches, there's two different

13    paths.

14    A.   Uh-huh.

15    Q.   Are those paths tunnels?

16    A.   No.  The paths are paths, and the tunnel is the LSP

17    itself, the point-to-multipoint LSP itself.

18    Q.   Now, you mentioned before that not all of Nokia's routers

19    support point-to-multipoint LSPs.  Do you recall that?

20    A.   I do.

21    Q.   Which of Nokia's router products do not support

22    point-to-multipoint LSPs?

23    A.   So point-to-multipoint LSPs specifically with -- based on

24    RFC 4875 using RSVP would not be supported on the 7705 nor the

25    7250.  Yeah.
```

1    Q.   Okay.  So these point-to-multipoint tunnels that we are

2    looking at from that RFC 4875 standard, I can't use those on

3    Nokia's 7705 or 7250s.  Is that right?

4    A.   Can't use it on the 7250s, neither the 7210s --

5    Q.   Okay.

6    A.   -- in addition.

7    Q.   Just so I got the complete list, the products that don't

8    support point-to-multipoint LSPs under RFC 4875, is that the

9    7250, the 7210, and the 7705?

10   A.   That's correct.

11   Q.   Okay.

12        MR. HAYNES:  Can you bring up JX 29?

13   Q.   (BY MR. HAYNES)  What do you recognize JX 29 to be?

14   A.   This is an MPLS guide as well.  This is for the 7705

15   service aggregation router, or the 7705 SAR.

16   Q.   Okay.  Let me direct you to page 589 of this document.

17   A.   Okay.

18   Q.   There's a heading there, RSVP-TE and FRR.  Does this tell

19   me -- this section tell me anything about what RFC standards

20   are implemented by the 7705 product?

21   A.   It does.

22   Q.   And does this indicate one way or the other whether the

23   7705 product supports those point-to-multipoint LSPs that we

24   were talking about for RFC 4875?

25   A.   So this tells us that RFC 4875 which would support

1    point-to-multipoint tunnels using RSVP-TE are not supported on

2    the 7705.

3    Q.    With respect to Nokia's customers today, is

4    point-to-multipoint LSP, using RSVP, is that something that is

5    a popular feature today?

6    A.    Today?  No, sir.

7    Q.    And why is that?

8    A.    It's -- this was a -- this was a protocol that, you know,

9    had a moment in time in terms of popularity, and it's -- it's

10   just not there today.  The distribution of multicast traffic

11   in this way, distributing live TV simultaneously to multiple

12   subscribers from a service provider, has effectively -- with

13   streaming, it's kind of fallen out of favor.

14   Q.    So if I'm streaming Netflix, would I ever use a

15   point-to-multipoint LSP?

16            MR. BENNETT:  Objection; calls for speculation.

17            THE COURT:  Sustained.

18   Q.    (BY MR. HAYNES)  You mentioned streaming services.

19   A.    Yes.

20   Q.    Is Netflix an example of a streaming services you're

21   talking about?

22            MR. BENNETT:  Objection, leading.

23            MR. HAYNES:  I can rephrase, Your Honor.

24            THE COURT:  Please do.

25   Q.    (BY MR. HAYNES)  Can you give me some examples of

1    streaming services that you were referring to?

2    A.    Yes.  Streaming services would be -- examples would be

3    Netflix, Hulu, Disney.  I'm sure there are others that I'm

4    forgetting at the moment, but there -- Amazon Prime.  So

5    services that deliver video over the internet instead of from

6    a service -- directly from a service provider.

7    Q.    And are those services multicast services of the type you

8    described earlier?

9    A.    No, they're unicast.  So when you receive traffic that

10   way, you're -- the cloud provider that's providing the

11   streaming service sends a copy of the video for -- to every

12   subscriber.  It's not replicated in the network which is how

13   multicast works.

14   Q.    Okay.  As part of your role as the corporate

15   representative in this case, did you conduct an investigation

16   to try to figure out how many of Nokia's customers to Nokia's

17   knowledge are actually using point-to-multipoint LSPs under

18   4875?

19   A.    Yes, I do.

20   Q.    And what did you conclude based on your investigation?

21   A.    The conclusion is that we do not have customers in North

22   America that are using point-to-multipoint LSPs.

23   Q.    And what did you do to reach that conclusion?

24   A.    Two things.  I consulted with members of my team that are

25   also working with customers but that spend more time in the

1    details with customers than I do to get their feedback.

2        I was also given access to a technical support database,

3    the 4LS database.  And from that database, I ran a search

4    command to look through the configuration file portion of

5    those technical support documents to verify that P2MP was not

6    configured to -- based on what I could see.

7    Q.   Okay.  So as far as you are aware -- or are you aware of

8    any of Nokia's customers in the United States that are

9    currently using this point-to-multipoint LSP feature that

10   we've been talking about?

11   A.   I am not aware of any customer that is actively using it

12   in the United States.

13   Q.   Okay.  Let's switch gears a little bit.  Are you aware

14   that one of the patents that is asserted in this case involves

15   something called a TDM interface?

16   A.   Yes, I am.

17   Q.   Are you familiar with the concept of a TDM interface as

18   it pertains to Nokia's products?

19   A.   Yes, I am.

20   Q.   And what do you understand a TDM interface to be?

21   A.   So TDM is -- is a type of circuit that predates ethernet

22   before ethernet was widely used in metro areas.  People would

23   obtain an internet connection using like a T1 or a T3 and,

24   running a specific protocol like PPP as an example, a data

25   service could be provided over a TDM circuit.

1    Q.    Okay.  Do all of Nokia's routers and switches have a TDM

2    interface on them?

3    A.    No, they do not.

4    Q.    Which Nokia products do not have a TDM interface?

5    A.    So TDM interfaces -- I'm just trying to picture through

6    the portfolio in my head.  TDM interfaces would not be on the

7    7950s.  They would not be on most of the variants of the 7250.

8    I think there may be one exception to that.  They would also

9    not be on most of the variants of the 7210s.

10   Q.    Why is there no TDM interface on the 7950 product?

11   A.    The 7950 is ethernet only.

12   Q.    Why don't you need a TDM interface if you're ethernet

13   only?

14   A.    So there is -- in modern, you know, network design, the

15   conversation is almost always around ethernet.  Ethernet is an

16   efficient way to transport this type of communication and

17   data.  It's very high volume.  So there's really no customer

18   demand for TDM interfaces at that volume and at that speed.

19   Q.    Okay.

20          MR. HAYNES:  If we could, let's look at JX 21.

21   Q.    (BY MR. HAYNES)  Are you familiar with this document?

22   A.    Yes, I am.

23   Q.    What do you understand it to be?

24   A.    This is software release notes specifically for release

25   19-7R1.  Software release notes is a document that we release

1    that accompanies a new software release, and it enables

2    customers to understand what's in the software, if there are

3    any caveats.  It's really a -- if you are going to use this

4    software release, this is the information that you need to

5    know type of document.

6    Q.    Okay.  I want to direct your attention to page 81.  Do

7    you see a heading there that says Unsupported Features?

8    A.    Yes, I see it.

9    Q.    Then below that, there's a sub-heading 6.1 that says

10   hardware.  Do you see that?

11   A.    I see that as well, yes.

12   Q.    And there is a table below it, table 10, that says

13   unsupported hardware features.  Do you see that?

14   A.    I do.

15   Q.    Okay.  What does that table illustrate?

16   A.    So this table illustrates which hardware features are not

17   supported on these various variants of the product portfolio.

18   So the products are on the top, the interface types are on the

19   left, and the box shows which are -- the X shows which are not

20   supported.

21   Q.    Okay.  Does this chart tell me anything regarding which

22   of Nokia's products support or do not support TDM interfaces?

23   A.    It does.

24   Q.    Okay.  Where would I find that information in this chart?

25   A.    So on the line that says channelized and TDM interfaces,

383

1    we can see here that those are not supported on the 7950; on

2    the 7750 SR-A4 and A8; on the 7750 SR-1e, 2e, 3e; on the 7750

3    SR-1, nor are any of -- nor on any of the more modern

4    products, the most recently released products, which are the

5    SR-1, S2, S7s, and 14s.

6    Q.   Are you familiar with something called a serial

7    interface?

8    A.   Yes, I'm familiar with serial interfaces.

9    Q.   What's a serial interface in the context of --

10   A.   A serial interface is a low-speed interface that can be

11   used for data as well.

12   Q.   Okay.  Do Nokia's routers and switches support the use of

13   serial interface -- interfaces to transport traffic over the

14   network?

15   A.   I believe in the 7705 family, there is a -- there is a

16   line card that supports serial interfaces, yes.

17   Q.   Okay.  What about Nokia's products other than the 7705

18   with that long line card?  Do any of those other products

19   support serial interfaces for use of transporting traffic over

20   the network?

21   A.   For the use of transporting data over the network, I

22   don't believe any other products have a serial interface for

23   that purpose.

24   Q.   Now, in the opening you heard Mr. Dacus talk about layers

25   and some discussion of layer 2 and layer 3.  Do you recall

384

1    that?

2    A.    I do.

3    Q.    Do you have an understanding based on your experience in

4    the computer networking business what the layer 2 and layer 3

5    refer to?

6    A.    I do, yes.

7    Q.    And what do you understand those references to be to?

8    A.    So there's a model that is used in the -- in using end

9    data networking called the OSI model.  And the model

10   is -- it's really just designed to make it easier for a

11   network engineer to visualize where communication -- specific

12   types of communication are happening in the protocol stack.

13         And, you know, another significant advantage of it is

14   that it makes it easier to troubleshoot.  If something is

15   misbehaving, you can pretty quickly identify which layer is

16   misbehaving and then that tells you which device to look at.

17   Q.    So in Nokia's products, does it use the OSI model to

18   conceptualize the connections between different products at

19   different layers?

20   A.    We and everybody else in this industry does, yes.

21         MR. BENNETT:  Objection, Your Honor; non-responsive.

22   Move to strike.

23         THE COURT:  Overruled.

24   Q.    (BY MR. HAYNES)  Can you give me an example of a protocol

25   that would be considered a layer 2 protocol under the OSI

1    model?

2    A.    Sure.  Ethernet is a layer 2 protocol.  Frame relay, ATM,

3    those are examples of layer 2 protocols.

4    Q.    Okay.  Are you familiar a Nokia term called triple play

5    services delivery architecture?

6    A.    I am familiar with it, yes.

7    Q.    And you understand that that architecture is something

8    that Smart Path has accused of infringement in this case?

9    A.    I understand that, yes.

10   Q.    At a high level, what is that triple play services

11   delivery architecture used for?

12   A.    Triple play services delivery architecture is an

13   architecture--you could think of it as a blueprint--so that a

14   service provider could offer a combination of three services.

15   Those services are almost certainly voice, video, and data to

16   residential subscribers over an IP service.

17   Q.    Is the -- does the triple in triple play refer to voice,

18   video, and data?

19   A.    It does.

20             MR. BENNETT:  Objection; leading.

21             THE COURT:  Sustained.

22   Q.    (BY MR. HAYNES)  What does triple refer to, sir?

23   A.    Triple play in this context is the delivery of voice,

24   video, and data to residential subscribers.

25   Q.    Now, these days if you talk about Nokia's customers that

1    are using Nokia routers, do you have any understanding as to

2    about how many of those routers would actually be useful or

3    being used by any customer in a triple play services delivery

4    architecture?

5    A.    If I understand correctly regarding the products that are

6    being sold, the install base, I would say -- to the install

7    base, I would say it's less than 20 percent.

8    Q.    And you consider triple play to be a popular feature with

9    your customers these days?

10   A.    These days it is not particularly popular, no.

11   Q.    And why is that?

12   A.    Again, the network, the technology changes a lot over

13   time.  When you think about voice, video, and data being

14   delivered to a residential home, what tends to be popular

15   these days is the delivery of a high-speed data circuit for

16   internet access.  But the delivery of voice has also fallen

17   out of favor because, you know, people are using mobile

18   phones, cell phones, and many of them have, therefore,

19   abandoned using a dedicated phone line in their home because

20   they have a mobile phone.  So that is not a super popular

21   service anymore.

22        The same concept is true for video delivery.  There are

23   still people that subscribe to those types of services, but

24   many people are doing this cutting-the-cord thing and they're

25   choosing to stream their video delivery over the internet

1    instead of purchasing that as a service from their service

2    provider.

3        So it's not something that we are regularly and very

4    popularly engaging with customers about like we would have

5    years and years ago when this architecture was drafted.

6            MR. HAYNES:  If we could turn now to JX 46a.

7    Q.    (BY MR. HAYNES)  Are you familiar with this document?

8    A.    I am.

9    Q.    And what do you understand this document to be?

10   A.    This is, again, in the document library that is released

11   with the software releases.  This is the triple play service

12   delivery architecture guide, which is specific to the 7450,

13   7750, and virtualized service router.

14   Q.    Okay.

15           MR. HAYNES:  If we could, let's turn to page 41 of

16   this document.

17   Q.    (BY MR. HAYNES)  Do you see there's a figure there

18   labeled Nokia's Triple Play Service Delivery Architecture?  Do

19   you see that?

20   A.    Yes, I see it.

21   Q.    What is illustrated in this figure?

22   A.    This is a characterization of the architecture, the

23   network that would be -- that a customer could build in order

24   to deliver that type of triple play service to the end

25   customers.

1    Q.    And do you see there are a couple of different boxes in

2    the center labeled BSA?  What are BSAs?

3    A.    I do.  BSA is a broadband service aggregator.

4    Q.    Okay.  And what does a BSA do?

5    A.    So the BSA is responsible for carrying traffic from the

6    access devices--and it looks like those may be DSL devices in

7    this diagram--from subscriber homes.  That traffic gets

8    aggregated by the BSA toward the rest of the network.

9    Q.    What types of product are these boxes labeled BSA?

10   A.    These are routers.  These are 7450 ESSs.

11          MR. HAYNES:  Take that down.  Actually bring the

12   figure back up, please.

13   Q.    (BY MR. HAYNES)  I forgot to ask you, in the lower right

14   there, there's a label BSR.  Do you see that?

15   A.    I do.

16   Q.    And what's a BSR?

17   A.    BSR is the broadband service router in this architecture.

18   Q.    Okay.  What does the BSR do in this architecture?

19   A.    So the BSR is the layer 3 gateway for those subscribers

20   that are off to -- to the far left.

21   Q.    Okay.

22          MR. HAYNES:  If you will bring down the

23   highlighting, please.

24   Q.    (BY MR. HAYNES)  Okay.  In this figure there's a big red

25   circle and some -- a label there that says secure VPLS

1    infrastructure.  What is that?

2    A.   So those -- the BSAs and the BSRs in this context would

3    be using a service called VPLS, which is a layer 2

4    point-to-multipoint service.  And the -- and that's -- that is

5    the way that data from a subscriber on the left side is

6    received by the BSA and then forwarded to -- directly to the

7    BSR so that the BSR can act as the layer 3 gateway for those

8    homes.

9         So it's the -- it's the -- the red lettering and the

10   circle show us where the VPL -- the boundary, I'll say, of the

11   VPLS infrastructure.

12   Q.   Does that red circle indicate connections between the

13   BSAs and the BSR?

14   A.   No, that's not my -- that's not my reading of this -- of

15   this diagram.

16   Q.   So why is it that the circle and that label are in red

17   and everything else in this picture is in black and white?

18   A.   So VPLS is an important feature.  It -- it provides a

19   certain extent of security, which is what is labeled here, to

20   prevent traffic from moving from one layer 2 instance to

21   another layer 2 instance, for example.  So that's important.

22        And I think it's highlighted this way just to talk to --

23   to customers about the -- the innovation that's there and so

24   that they can see the -- the boundary.

25   Q.   Now, if the red circle isn't the connections, is there

1    something else in this figure that shows the actual

2    connections between the BSAs and the BSRs?

3    A.    Yes.  The dotted lines show the connections between the

4    BSAs and the BSR.

5    Q.    Okay.  Is that what we've highlighted here --

6    A.    That's what's now -- what's now highlighted in blue, yes.

7              THE COURT:  Let me make sure both of you-all

8    understand.  You need to talk one at a time.  Make sure he

9    finishes the question before you answer it, Mr. Valley, and

10   he'll make sure that you've finished your answer before he

11   asks the next question.  But it's important for clarity in the

12   record that you speak one at a time.  All right?

13             MR. HAYNES:  Thank you, Your Honor.

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  All right.  Let's go forward on that

16   basis.

17   Q.    (BY MR. HAYNES)  Okay, Mr. Valley.  So what we see in

18   -- can you just explain again the dashed lines that we see

19   here, what are those?  I didn't actually mark the dashes, but

20   the things near where I drew those marks.

21   A.    The dashes are illustrating the connections of the VPLS

22   service which are directly from the BSAs to the BSRs.

23   Q.    Now, these VPLS connections that are indicated by the

24   dash lines, at what layer are those connections?

25   A.    The VPLS is a layer 2 protocol.

1    Q.   Okay.  Now, does this illustration show a layer 2 ring

2    network?

3            MR. BENNETT:  Objection; leading.

4            THE COURT:  Rephrase your question, counsel.

5    Q.   (BY MR. HAYNES)  Are there any ring networks shown

6    anywhere in this figure?

7    A.   There's nothing in this document that leads me to

8    conclude that there is a ring in -- in this diagram.

9    Q.   What about the red circle?

10   A.   Again, my reading of the red circle is that it's -- it's

11   -- the red circle means exactly what the text in red means.

12   It says the red circle is showing the boundary of the secure

13   VPLS infrastructure.

14   Q.   And how would you characterize the type of network that

15   is formed by those VPLS connections?

16   A.   The VPLS connections are a point-to-point or

17   point-to-multipoint service between the BSA and each of the

18   BSRs.

19   Q.   Okay.  I want to direct you now to some text that shows

20   up below this figure.  I think it's actually the very bottom

21   of the page, rolling over to the next page, starting with "The

22   connectivity."  Okay.  Yeah, this is it.

23            So I'm reading from page 42, and there's a statement

24   there where it says, "One of the advantages of using VPLS for

25   this application is that VPLS instances can be automatically

1    established over both hub and spoke and ring topologies

2    providing sub-50 ms resilience."

3        Do you see that?

4    A.    I do, yes.

5    Q.    What do you understand that to be describing?

6    A.    So when you're deploying a VPLS service, you'll have

7    devices that are participating in that service in order to

8    provide the service to customers that are attached to it.

9    This is saying that in order for 50-millisecond resilience to

10   be maintained, which is important.  Right?  If there's some

11   sort of failure, it's important for the end customer for the

12   service to be able to recover very quickly.

13       So this is simply saying that you can use either topology

14   type, a hub-and-spoke topology or a ring topology, in order to

15   still achieve that 50-millisecond resilience.

16   Q.    Okay.  Let's go to the next sentence.  Do you see there

17   it says, "Regardless of the fiber plant layout, VPLS enables a

18   full mesh to be created between BSA and BSR nodes, ensuring

19   efficient traffic distribution and resilience to node or fiber

20   failure."

21       Do you see that?

22   A.    I do.

23   Q.    What do you understand that to be describing?

24   A.    So VPLS -- if we were to go through the standard, which I

25   don't think we have time to do now, but VPLS requires that a

1   full mesh be created between the participants of that service.

2   And what this is simply saying is it doesn't matter how the

3   fiber is laid out, could be in a ring, could be

4   point-to-point, could be some other topology.  VPLS enables

5   that mesh to be created over the topology type ensuring that

6   traffic distribution -- ensuring that traffic gets to where it

7   needs to be, but that also that that resilience that was

8   mentioned in the previous sentence is also maintained.

9   Q.   Okay.  At what layer of the OSI model is this fiber

10  layout?

11  A.   A fiber layout is layer 1, or layer 0.  It's -- it's

12  the -- the physical fiber that is being used by one of the

13  higher layer protocols.

14  Q.   Okay.  Is there a layer 2 network that is created between

15  these BSAs and BSRs?

16  A.   The VPLS service is layer 2, but there is -- but the

17  communication path is happening, you know, between the BSA and

18  BSR is point-to-point at a higher level.

19  Q.   Okay.  What does it mean when it says the VPLS enables a

20  full mesh?

21  A.   So this is a requirement in the VPLS standards.  There

22  have been evolutions to VPLS standards to make this

23  requirement easier to achieve like in larger networks.  But

24  VPLS requires that the nodes that are participating for that

25  particular service be in a full mesh so that they have

1    reachability in this case between the BSA and the two BSRs.

2    Q.    In the Nokia triple play architecture, are those layer 2

3    VPLS connections in a layer 2 ring network?

4    A.    No, they're not.

5            MR. HAYNES:  Now, if we can go back to the figure

6    again.

7    Q.    (BY MR. HAYNES)  Now, we were talking -- we've been

8    talking about the VPLS connections that are these dotted

9    lines.  These BSAs that are over here on the left, do they

10   have visibility to the network structure of the networks that

11   are on the right side of the BSRs here?

12   A.    No, they do not.

13   Q.    And why is that?

14   A.    So the VPLS in this -- you know, according to the guide

15   if somebody were following the blueprint, the VPLS would begin

16   at that one BSA where traffic is coming in to -- to the secure

17   VPLS infrastructure, and it would terminate.  That service

18   would then terminate into the BSR, which is the boundary of

19   the secure VPLS infrastructure.

20       So that's all that the BSA can do is forward that traffic

21   inside the VPLS service directly to the BSR, and that's it.

22   That's where the service ends.  The BSR would have to then do

23   something else with it based on what it knows.

24   Q.    So is it possible for those BSAs to create a path that

25   goes through the BSR out into the internet?

1    A.    Not in this example, no, sir.

2    Q.    Now, in the text we looked at earlier, there was a

3    reference to hub-and-spoke topologies.  Do you recall that?

4    A.    Yes.

5    Q.    And what's a hub-and-spoke topology?

6    A.    So a hub-and-spoke topology is a network design

7    consideration that says if I have multiple remote sites, let's

8    say, and they're correcting back to one central site, the

9    remote spikes would be spokes and they would all be connecting

10   back to that central -- to that central site.  And the central

11   site we would call a hub in that scenario.

12   Q.    Now, is that central site that you just referred to as a

13   hub, is that a hub device of the type you were talking about

14   that you sold at Cabletron?

15   A.    No.  No, sir.

16   Q.    What's the difference?

17   A.    A hub device, a device that's an ethernet hub, has a very

18   specific functionality which is a repeater, you know, a device

19   that is repeating ethernet traffic out.  Whatever port it

20   receives it on, it repeats it to all the other ports.  This is

21   not that kind of device.  This is a router running an advanced

22   VPLS service.  So it's not the same type of -- it's simply not

23   the same thing.

24          MR. HAYNES:  Can we bring up PX 13?

25   Q.    (BY MR. HAYNES)  Are you familiar with this document?

1    A.   I have reviewed this document, yes.

2              MR. HAYNES:  And, Your Honor, I apologize.  I'm

3    almost done, but this last document is a customer document.

4    So I need to ask to seal the courtroom.

5              THE COURT:  All right.  Based on counsel's request

6    to protect confidential information, I'll order the courtroom

7    sealed at this time.  I'll direct that all persons not subject

8    to the protective order in this case exit the courtroom until

9    it's reopened and unsealed.

10        And, counsel, let me know when we've reached that point.

11             MR. HAYNES:  Thank you, Your Honor.

12                       (Courtroom sealed.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4

 5

 6

 7                        (Courtroom unsealed.)

 8   Q.   (BY MR. HAYNES)  Mr. Valley, we were talking about figure

 9   1 that illustrated the triple play architecture.  Do you

10   recall that?

11   A.   Yes, sir.

12   Q.   What type of product in Nokia's portfolio are the BSRs?

13   A.   The BSRs are typically 7750s, so they're routers.

14   Q.   No further questions for you.

15           MR. HAYNES:  I'll pass the witness, Your Honor.

16           THE WITNESS:  Thank you.

17           THE COURT:  All right.  Is there redirect?

18           MR. BENNETT:  There is.

19           THE COURT:  Let's proceed with redirect by the

20   Plaintiff.

21       Proceed when you're ready, Mr. Bennett.

22           MR. BENNETT:  Thank you, Your Honor.

23                        REDIRECT EXAMINATION

24   BY MR. BENNETT:

25   Q.   We talked for a long time about a lot of devices and a
```

1    lot of manuals and a lot of paper, but I want to back up maybe

2    a couple of steps and talk about just the boxes themselves,

3    not the paper that goes with them.  Okay?

4    A.    Okay.

5    Q.    All right.  In all of these boxes -- well, the 7450,

6    those kinds of accused products that we discussed, each of

7    them contain what's called source code.  Right?  Or run source

8    code.

9    A.    No, I can't agree with that.

10   Q.    Okay.  Well, the services that these routers provide,

11   part of them are based on software.  Right?

12   A.    That's correct.

13   Q.    And part of that software is made up of source code.

14   Right?

15   A.    Source code is a component of software development, yes.

16   Q.    Okay.  And the source code largely determines what

17   functions the software will perform.  Right?

18   A.    I cannot agree with that, either.

19   Q.    What part of that do you disagree with?

20   A.    So the source code is the programming that is available

21   when then executed -- compiled and executed and loaded into

22   the software is available to be configured.  So the -- what

23   the product will do is based on the configuration of the

24   product, not the source code that may happen to be -- may

25   happen to have been used to compile the software.

1  Q.   Can you configure a router product like the accused

2  products we've been discussing without source code?

3  A.   You don't -- you don't use source code in order to

4  configure a router.

5  Q.   You may not use source code to configure a router.  My

6  question is more along the lines of the functions the router

7  performs.  The router -- the functions that -- the software

8  and its functions are accomplished through source code.

9  Right?

10 A.   I cannot agree with the statement, no, sir.

11 Q.   Okay.  Well, let's try it this way.  The source code

12 within the software or that -- that dictates which functions

13 the software will perform is made up of certain calls or

14 functions.  Right?

15 A.   So source code, yeah, is -- is written in a programming

16 language that -- that, yes, it would have functions, it would

17 have calls, it would have -- it would have other attributes of

18 software development which are not my expertise.

19 Q.   And that's my next question.  That's not your expertise,

20 is it, sir?

21 A.   Source code and software engineering, software

22 programming, is not my expertise, no, sir.

23 Q.   And you have not looked at any of Nokia's source code in

24 this case, have you?

25 A.   I -- no, I don't review source code as -- in this case or

1    as part of my job.

2    Q.   And so if the source code that's used or that comes with

3    or that Nokia's products avail itself of, however you want to

4    phrase it, if that source code contains functions that

5    infringe on the patents, you wouldn't know that.

6    A.   The contents of the source code, I do not know.  That is

7    correct.

8    Q.   Right.  And so if that source code led to functions or

9    the performance of certain functions that infringe on these

10   patents, you wouldn't know that.  Right?

11   A.   I'll restate.  I do not have visibility into the source

12   code as part of my job.

13        MR. BENNETT:  Your Honor, move to strike as

14   non-responsive.

15        THE COURT:  Sustained.

16        You need to answer the question if you know the answer.

17        Either state it again or move on.

18        MR. BENNETT:  I'll state it again one last time.

19   Q.   (BY MR. BENNETT)  Mr. Valley, if the source code within

20   these products performed functions that infringed on my

21   client's patents, you wouldn't know that.  Right?

22   A.   I would not know that.  That's correct.

23   Q.   Mr. Valley, do you agree or disagree with this statement:

24   A router can be a hub?  You talked a lot about hubs with Mr.

25   Haynes.  I'm just going to ask you that:  agree or disagree, a

1    router may be a hub.

2    A.    I disagree.

3    Q.    Okay.  You're a Nokia employee.  We've established that.

4    Right?

5    A.    Yes, sir.

6    Q.    And Nokia pays your salary?

7    A.    Yes, sir.

8    Q.    And you've worked for Nokia for how long?

9    A.    Since the acquisition of Alcatel Lucent in 2016.

10   Q.    And Nokia has not designated you as an expert in this

11   case, have they?

12   A.    They -- my understanding is they have not.

13   Q.    But we will hear from experts in this case, won't we?

14   A.    My understanding is that is correct, yes.

15              MR. BENNETT:  I'll pass, Your Honor.

16              THE COURT:  All right.  Is there additional cross

17   examination?

18              MR. HAYNES:  Yes, Your Honor, very briefly.

19              THE COURT:  All right.  Proceed.

20                        RECROSS EXAMINATION

21   BY MR. HAYNES:

22   Q.    Mr. Valley, there were a whole lot of questions there

23   about source code.  Do you recall that?

24   A.    I do.

25   Q.    Are you familiar with the functionality of Nokia's

1    products as it's provided to its customers?

2    A.    100 percent.

3    Q.    And if that functionality available on those products was

4    doing something, you would be aware of that, wouldn't you?

5         MR. BENNETT:  Objection; leading; calls for

6    speculation.

7         THE COURT:  I'll sustain as to leading.  I don't see

8    that it calls for speculation.  He was asking what he would or

9    wouldn't know personally.

10   Rephrase the question, Mr. Haynes.

11   Q.    (BY MR. HAYNES)  Mr. Valley, based on your personal

12   knowledge, is Nokia in the practice of putting in features

13   into its source code that are not actual features in the

14   products?

15   A.    No, no, sir.  There may be situations where a feature

16   existed at one time or a feature is in development but not yet

17   ready to be released where that -- that type of scenario may

18   exist, but to my knowledge, the development team spends their

19   time on coding features that would then be used in customer

20   applications.  That's --

21        MR. BENNETT:  Objection.  Apologize.  I object to

22   the non-responsive portion of the answer after "But".

23        THE COURT:  I'll consider whatever your objection

24   was as not timely.  All right.  Next question.

25   Q.    (BY MR. HAYNES)  Mr. Valley, are you at a high level

1    aware of the features that have been accused of infringement

2    in this case?

3    A.   Yes, I am.

4    Q.   And are those features that are implemented -- well, are

5    those features implemented in accordance with any industry

6    standards?

7              MR. BENNETT:  Objection, Your Honor, calls for an

8    expert conclusion.

9              THE COURT:  Sustained.

10   Q.   (BY MR. HAYNES)  I'll finish with this, Mr. Valley.  Are

11   you aware of any reason personally or as Nokia's corporate

12   representative to believe that Nokia has at any point

13   infringed on any patent owned by Smart Path?

14   A.   I am not aware.

15             MR. HAYNES:  Thank you, Your Honor.  Pass the

16   witness.

17             THE COURT:  All right.  Further direct?

18             MR. BENNETT:  No, Your Honor.

19             THE COURT:  Then you may step down, Mr. Valley.

20             THE WITNESS:  Thank you.

21             THE COURT:  You're welcome.

22        Plaintiff, call your next witness.

23             MR. BENNETT:  Your Honor, we have --

24             THE COURT:  Do I understand we have some witnesses

25   by deposition?

```
 1              MR. BENNETT:  That's correct, Your Honor.

 2              THE COURT:  All right.  Identify your deposition

 3    witnesses.

 4              MR. BENNETT:  We will play the video deposition of

 5    Jeffrey Jakab.

 6              THE COURT:  And identify Mr. Jakab's position, if

 7    you will.

 8              MR. BENNETT:  He is a vice president within Nokia.

 9              THE COURT:  And do you have allocations of the time

10    between the parties that you can tell me about?

11              MR. BENNETT:  Yes.  Mr. Jakab's deposition has a

12    total run time of 14 minutes, 18 seconds with 11 minutes, 57

13    seconds allotted to Plaintiff and 2 minutes, 30 seconds

14    allotted to Defendant.

15              THE COURT:  All right.  Proceed with this witness by

16    deposition.

17              MR. BENNETT:  Thank you, Your Honor.

18                           JEFFREY JAKAB

19                        BY VIDEO DEPOSITION

20    Q.   You started in 1998 with Nokia designing software?

21    A.   That's correct.

22    Q.   And then after that eight-year stint as a product line

23    manager, what was your next title?

24    A.   Then I became director of the hardware PLM team, and then

25    I took over ownership of -- of multiple products.
```

1    Q.    Okay.  Which products did you take over ownership for as

2    a hardware PLM?

3    A.    So with all of the products within the IP product

4    portfolio of Nokia, so this included at the time 7950 XRS,

5    7750 SR, 7450 ESS, the 7705 SAR, 7210 SAS.  Those were our

6    products at the time.

7    Q.    Okay.  And what's your title now?

8    A.    Now I am the VP of the Hardware Program Management Team.

9    Q.    And then after being a product line manager, did you

10   maintain -- so whenever that ended, I guess around 2015 until

11   now, do you still have responsibilities and interactions with

12   customers?

13   A.    I do, yes.

14   Q.    How has that changed or how is it different from what it

15   was when you were a product line manager, if at all?

16   A.    The scope of what I do now is much more -- is much

17   broader.  So previously where I would have been generally just

18   talking about a single product, I now have that ownership

19   across the product portfolio, so I'll do that same

20   conversation across multiple products across multiple

21   architectures.

22   Q.    Just off the top of your head, can you think of any

23   specific customers where that's been something that Nokia has

24   done--let me be more specific--where Nokia has gone in

25   anDConfigured a multiple router solution for a customer?

1    A.    So that is a standard mode of operations for us.

2    Customers will typically ask for help when it comes to

3    configuring items.  I think any -- any of our -- any of our

4    major customers, I think that's a typical question that they

5    would ask and we would support them on.

6    Q.    What are the typical services that Nokia would provide

7    when configuring a router?

8    A.    So this would generally -- well, when we go into -- so

9    let's say we start with just going into a lab environment

10   where a customer would do, like, a proof of concept test or

11   just an evaluation of our product.  We would provide a

12   standard set of configurations to help get them started around

13   testing, if there was a particular set of features it is that

14   they wanted to validate; that could also include a lab setup

15   in either our facility or sending someone from Nokia to their

16   facility to help them set up a platform, get it initially

17   configured.

18        There's options to help with them to run through test

19   cases, or, again, just validate performance around specific

20   configurations.  Those are fairly typical things.  But it can

21   extend to a number of customer-specific asks beyond that as

22   well.

23   Q.    When testing is provided at a Nokia facility for a U.S.

24   customer, what -- what facility would Nokia use?

25   A.    So depending on the customer, we have a new product

1    introduction lab that is in our office here -- well,

2    previously in Mountain View, now it's in Sunnyvale.  We also

3    have a number of other lab locations within the continental

4    U.S. that can be used.  It really depends on the network scope

5    of what it is they want to validate or what specifically they

6    want to validate in combination with where we have the right

7    pieces of equipment available at any given time.

8    Q.    So if a customer wanted to set up a network with a 7750

9    service router and see how that might perform with other nodes

10   in a network, you know, some kind of proof of concept

11   involving a 7750 router, they could make arrangements with

12   Nokia and the NPI team to see how that might work for them?

13   A.    That is correct.

14   Q.    Off the top of your head, in the last five years can you

15   think of any customers who've used Nokia's NPI facilities to

16   test a proof of concept on a, say, 7750 service router?

17   A.    So just to give you a rough idea as to how many customers

18   that would be, we typically do have sometimes one or two

19   customers every week, different customers, that would do

20   exactly that.

21   Q.    When -- just focusing on that, the former part, the

22   software, when Nokia makes changes to software and issues a

23   release notice to the software, how does -- how are those

24   updates or changes to the software disseminated or given to

25   customers for implementation?

1    A.    So the nature of how things are disseminated would

2    primarily revolve first around the release notice.  So the

3    release notice is the primary vehicle we use to communicate

4    updates to the field on a particular release.  There may also

5    be, again, customer conversations or emails or conversations

6    that someone within the organization has with a customer, in

7    addition to the release notice, to provide some context around

8    updates or changes or things that are new.

9    Q.    Under what circumstances would Nokia push the update

10   to -- again, using one example, a router -- looking at a

11   router and a router's OS, under what circumstances would Nokia

12   push that kind of update to a router?

13   A.    That is always the case.  It is always a push.

14   Q.    Nokia, in addition to the hardware that it sells, it also

15   serves -- sells maintenance services to customers.

16   A.    That is correct.

17   Q.    In terms of the prices reflected in the -- in the GLP and

18   the discounts offered, are there -- is there like a percentage

19   limit that Nokia establishes?  Like, you mentioned 5 percent.

20   But would it give a 25 percent discount?

21   A.    So 25 percent or beyond, I would say, is a fairly common

22   discount in practice.

23   Q.    Is there a percentage where -- at which Nokia says, No

24   way, not approving that?

25   A.    Anything below a 30 percent profit margin is generally

1    very difficult to approve.  That is -- you know, at that

2    level, we're not -- we're not effectively banking anything.

3    So for the Americas, you know, generally we try to focus on

4    having a margin, I would say, of 50 to 60 percent, higher if

5    we can get it, but that's only a guideline.  Right?  It will

6    really -- it really will vary deal by deal.

7    Q.   Right.  So at least a guideline is to shoot for 50 to 60

8    percent profit margin?

9    A.   Yes.

10   Q.   Would product data sheets be viewed as a means of

11   marketing?

12   A.   Yes.

13   Q.   And you help create those, too.  Right?

14   A.   Yes.

15   Q.   And in the next paragraph, it reads, "The" -- on page 2

16   of Exhibit 16:  "The fact is, when the pandemic struck, we

17   began to rely on IP networks to some degree or other for how

18   we live, work, and play.  Online applications and services

19   such as remote learning, e-medicine, video conversation,

20   online grocery shopping, and video streaming caused this

21   deluge in network traffic, but they brought an additional

22   challenge of new traffic and usage patterns.  Service

23   providers were forced to adapt since any tolerance for low or

24   variable service quality all but disappeared."

25        Do you remember writing that passage?

1    A.    I think that particular set of lines would have come from

2    someone in the marketing team.

3    Q.    Okay.  But in any event, what's in that paragraph is

4    true.  Right?

5    A.    Yes.

6    Q.    And there was a greater need after the pandemic to make

7    sure that internet service providers, like the AT&Ts and the

8    Verizons of the world, that their networks ran more

9    efficiently.  Right?

10   A.    I don't think that anything has changed, really, prior or

11   post-pandemic.  We still build to the same reliability

12   standards before and after.  I think, you know, the paragraph

13   there really just is aiming to cover just a difference of

14   focus, that's all, from before to after the pandemic.

15   Q.    Well, we know that one thing changed--right?--and that's

16   the amount of traffic on a network.  That changed.  Right?

17   A.    Well, the growth rate, I think, again, has been fairly

18   constant irrespective of the pandemic.  What the pandemic

19   really triggered was, again, a usage change in terms of, you

20   know, how -- how networks were prioritized.  Right?  Because,

21   you know, prior to the pandemic, there was a lot more focus on

22   building business services-capable networks as opposed to

23   during the pandemic all of the sudden residential services

24   really took a big uptick in terms of importance because

25   everyone that used to be in the office before now ended up

1    working from home.

2         So it triggered some fairly dramatic growth differences

3    in residential networks compared to business.  But, overall,

4    growth remains, again, relatively constant over the long-term.

5    Q.    Growth remains constant, but traffic, that has grown

6    according to -- at least according to Exhibit 16.  Right?

7    A.    Correct.

8    Q.    And you agree with that statement in Exhibit 16.

9    Correct?

10   A.    Yes.

11   Q.    Given all your experience within Nokia of, you know,

12   focusing on what features to market to consumers -- or

13   customers--excuse me--in connection with the products we've

14   been discussing, the ones listed in Exhibit 5, for example,

15   how would reliability, stability, network resiliency, rank

16   among the key features that customers expect?

17   A.    So for a service provider, those are essential.

18   Q.    All right.  And then for customers that aren't

19   necessarily service providers, how would they rank?

20   A.    It's still the same.

21   Q.    You mentioned a concept, I think, of interoperability.

22   Right?  That that function can be there and it's just a

23   question of bringing it out in between the various products.

24   Is interoperability something that Nokia places on a value on?

25   A.    I would say so, yes.  Interoperability is important for

1    us.  I think we pride ourselves on being standards compliant.

2    So as long as it's, you know, an IEEE or IETF standard that's

3    published and we -- we're going into an environment where one

4    of our competitors may already have that capability, and a

5    customer is pushing us to do that in order to go and secure,

6    you know, a portion of their network, then it is something

7    that we would take a look at over time.

8    Q.   If you were to rank, you know, interoperability and

9    reliability, where do you think -- of those two, which would

10   come out ahead--reliability or interoperability?

11   A.   Reliability would be more important.

12   Q.   And looking at this, and based on your experience, I

13   mean, is there any way to sort of back out one of those six

14   features depicted here and say, Well, this one has more value

15   than that one, or anything like that?

16   A.   Again, I think part of our value proposition is our

17   ability to go and put all of these things together.  I don't

18   think any one of our customers would go and make an investment

19   decision in Nokia just based on one of these things in

20   isolation.  It's really all things in combination that they'll

21   use, again, to make an investment decision in us.

22   Q.   This is, more or less, a list of benefits that the 7750

23   service router offers to Nokia customers.  Right?

24   A.   That is correct.

25   Q.   I mean, there's lots of things that you can differentiate

417

1    a 7750 router.  I mean, it could be, you know, you use a

2    different kind of aluminum than your competition does.  How

3    did you know or why did you pay attention to these specific

4    ones as opposed to something else that may just be irrelevant?

5    A.    I think the ones that we highlight here, these are some

6    of the key things that customers look for when, again, they

7    look to make a big investment in a next-generation network.

8    Q.    And you know that, based on all your years of experience

9    in working with Nokia's customers, that that's what they look

10   for.  Right?

11   A.    Yes.

12   Q.    Like in Exhibit 18 where there's benefits and features

13   touted, in Exhibit 21, Nokia touted the benefits and features

14   that it thinks is a value-add and that it thinks customers

15   will think is a value-add.

16   A.    That is correct.

17   Q.    And your group helps provide the substance that is in

18   Exhibit 21.  Right?

19   A.    That is correct.

20           THE COURT:  Does that complete this witness by

21   deposition?

22           MR. BENNETT:  Yes, Your Honor.

23           THE COURT:  Call your next witness by deposition.

24           MR. BENNETT:  We call Mustapha Aissaoui.  He's a

25   product line manager for Nokia.  Total running time is 4

418

1    minutes, 39 seconds, with 4 minutes, 18 seconds charged to

2    Plaintiff and 21 seconds charged to the Defendant.

3            THE COURT:  Proceed with this witness by deposition,

4    please.

5                        MUSTAPHA AISSAOUI

6                      BY VIDEO DEPOSITION

7    Q.   Have you ever heard of Corrigent Systems, Limited?

8    A.   No.

9    Q.   And so your testimony is you have no knowledge of the

10   '010 Patent.

11   A.   Correct.

12   Q.   Have you ever conducted an infringement analysis of the

13   '010 Patent?

14   A.   No.

15   Q.   Do you have any knowledge of the '580 Patent or its

16   contents?

17   A.   No.

18   Q.   Do you have any knowledge of the accused functions with

19   respect to the '580 Patent and Nokia's networking equipment?

20   A.   No.

21   Q.   Have you ever done any kind of infringement analysis of

22   the '580 Patent?

23   A.   No.

24   Q.   Do you understand what the accused products are in this

25   case?

1    A.   I believe I do, yeah.

2    Q.   And what are those?

3    A.   So I understand that these are the routers that we work

4    on, and so, basically, a number of these router platforms.

5    Q.   And what is your role in the development or design of

6    these accused products?

7    A.   So I'm a product line manager, and my job is to basically

8    bring customer requirements and basically translate them to

9    our development team so that they develop the -- the

10   corresponding features.

11   Q.   And do you have any factual basis or contention that the

12   accused instrumentalities do not infringe the '010 Patent?

13   A.   No.

14   Q.   Do you have any factual basis of the accused

15   instrumentalities do not infringe the '580 Patent?

16   A.   No.

17   Q.   What does VLL stand for?

18   A.   It's -- it's, again, a standard word used in IETF

19   standards, and it -- it's -- it refers to virtual leased line.

20   Q.   Okay.  And what does that mean?

21   A.   It's really the equivalent of a point-to-point service,

22   as we described earlier.

23   Q.   What is ipipe?  What does that mean?

24   A.   So this is the Nokia terminology for an IP VLL.

25   Q.   So are you aware of any customers that use the ipipe VLL?

420

1    A.   Not off the top of my head.  I mean, again, it's a

2    possibility.  These are all features that can be configured

3    and enabled so it's certainly a possibility.

4    Q.   I know it's configured.  But when the router is sold,

5    does it have the capability to do the things within this

6    document?

7    A.   So the -- so the code has -- has the features, but,

8    again, as I said, it's not all configured.  You need to

9    configure that.

10   Q.   And so you testified earlier that there were customer

11   teams -- that -- when the equipment was sold to customers.

12   Do you think they have any involvement in the configuration?

13   A.   I'm not aware of that.

14   Q.   Is it your understanding that the customer teams and the

15   -- from Nokia and the customer representatives work together

16   to design the configuration?

17   A.   It's a possibility.

18   Q.   And you're not a lawyer.  Correct?

19   A.   Yes.

20   Q.   And you're here today to offer testimony about the

21   factual basis for how Nokia's routers and switches operate

22   with respect to the accused instrumentalities for the '010,

23   which could include VLL, specifically apipe, ipipe, fpipe, or

24   cpipe.  Correct?

25   A.   Correct.

1    Q.   And you also testified earlier that you do not have any

2    factual basis or contention that the accused instrumentalities

3    do not infringe the '580 Patent.  Do you remember testifying

4    to that?

5    A.   Yes.

6    Q.   And you're here today to offer testimony about the

7    factual basis for how the 7X series of Nokia products operate

8    with respect to RSVP signaled point-to-multipoint LSPs.  Is

9    that correct?

10   A.   Correct.

11   Q.   And you have -- do you have any opinions regarding

12   whether Nokia's products infringe or do not infringe the '010

13   Patent?  Is that correct?

14   A.   I don't have any opinion.

15   Q.   And do you have any opinion that the Nokia products

16   infringe or do not infringe, directly or indirectly, the '580

17   Patent?  Is that correct?

18   A.   Yes.  I don't.

19              THE COURT:  Does that complete this witness by

20   deposition?

21              MR. BENNETT:  Yes, Your Honor.

22              THE COURT:  Call your next deposition witness,

23   please.

24              MR. BENNETT:  We call Alfred Nothaft, senior

25   director of product management for the IP division; total run

1    time of 4 minutes, 21 seconds, 3 minutes 42 seconds allotted

2    to Plaintiff; 38 seconds allotted to Defendant.

3                THE COURT:  Senior direct product management at

4    Nokia.  Correct?

5                MR. BENNETT:  Yes, Your Honor.

6                THE COURT:  Proceed with this witness by deposition.

7                            ALFRED NORTHAFT

8                         BY VIDEO DEPOSITION

9    Q.   And you testified you're the senior director of product

10   management at Nokia?

11   A.   I am.

12   Q.   And what products do you manage?

13   A.   I manage the software, the SR-OS for the 77 -- 7750, the

14   7950, the 7450, the 7250, and I'm also very familiar with the

15   7210 and the 7705.

16   Q.   Now, you threw out a term.  It was the SR-OS.

17   A.   Yes.  That's the name of our software.

18   Q.   Okay.  And is that an operating system?

19   A.   It is.

20   Q.   And 'SR' stands for 'service router'.  Is that correct?

21   A.   That's correct.

22   Q.   Okay.  So what is a service router?

23   A.   A service router is a product that we -- we brought to

24   market originally back in 2003.  It was focused on providing

25   layer 2/layer 3 VPN services, core routing broadbrand

1   services, and so forth.

2   Q.   What are your day-to-day responsibilities as the -- as

3   the director of product management?

4   A.   I look over the -- the introduction of new feature

5   functionality into the -- into the SR-OS software and, as a

6   result, the products thereunder.

7   Q.   And how often do you interact with customers?

8   A.   It varies.  Often they will go to our facility in

9   Sunnyvale, and we have an executive briefing center there,

10  and we'll typically host a customer there.  And I'll typically

11  travel there every two to three weeks or so.  There might be

12  other meetings in between.

13  Q.   And what's the purpose of your interactions with the

14  customers?

15  A.   Typically it's to talk about current development of the

16  features, new functionalities that we may be coming up with,

17  new types of cards, et cetera.

18  Q.   And is the 7705 service aggregation router something that

19  you're familiar with?

20  A.   I am.

21  Q.   Is that one of the products that you manage?

22  A.   Yes, through SR-OS, yes.

23  Q.   Okay.  And what does release 21.4.R mean?

24  A.   That would designate that it was the annual release of

25  SR-OS for this platform released in 2000 -- or 2021 in the

1    -- April.  And it's the first maintenance release.

2    Q.    Do all of the routers that you manage use the SR-OS?

3    A.    Yes.

4    Q.    Do they all use the same version of the SR-OS?

5    A.    They are -- they all use a derivative of SR-OS.  Some

6    routers are smaller, and this is one of them.

7    Q.    Do all routers have a host table?

8    A.    As far as I know.

9    Q.    And that would include the accused routers in this case?

10   A.    All of the SR-OS devices would maintain a table of

11   directly attached hosts or addresses.

12   Q.    Do you know anything about the source code that's on the

13   accused instrumentalities?

14   A.    I guess the actual development of these -- of these

15   features where, I think in the case of OSPF, was 20-plus years

16   ago; for LFI, I think it was over 18 years ago.  So I'm not

17   aware of any developers from that period, but I am aware of

18   the actual features, and I can certainly answer specific

19   questions that you might have in -- in those regards.

20   Q.    I guess what I'm asking is do you have knowledge of the

21   source code that supports those features?

22   A.    I don't have immediate knowledge of -- of the source

23   code, if -- if that's the question.

24   Q.    Have you ever read the claims of the '599?

25   A.    I have not.

1              THE COURT:  Does that complete this witness by

2     deposition?

3              MR. BENNETT:  It does, Your Honor.

4              THE COURT:  All right.  Ladies and gentlemen of the

5     jury, we're going to break for lunch at this time.  When we

6     come back after lunch, we'll proceed with the Plaintiff's

7     remaining case in chief, and I expect to be a live witness to

8     start us off after lunch.

9          Take your notebooks, if you will, to the jury room over

10    the lunch break.  Please remember to follow all my

11    instructions, including not to discuss the case among

12    yourselves or with anyone else.  We will attempt to reconvene

13    close to about 12:45.

14         With that, ladies and gentlemen, you're excused for

15    lunch.

16              (Whereupon, the jury left the courtroom.)

17              THE COURT:  All right, counsel.  Now that the jury's

18    left, let me update you.  As of right now, Plaintiff has used

19    2 hours, 35 minutes, and 39 seconds of designated trial time,

20    and Defendant has used 2 hours, 47 minutes, and 7 seconds of

21    designated trial time.

22         As I told the jury, we'll attempt to reconvene around

23    12:45.

24         Is there anything else we need to take up before we

25    recess for lunch?

1           Anything from Plaintiff, Mr. Bennett?

2               MR. BENNETT:  One issue.  Yesterday as we were

3    ending the first day of trial, I forgot to ask the Court to

4    excuse Mr. Tamir.  He's still here in Marshall.  We do not

5    have any intent to recall him at trial.

6               THE COURT:  You're asking me to excuse him at this

7    time?

8               MR. BENNETT:  Yes.

9               THE COURT:  All right.  I assume there's no

10   objection from the Defendant?

11              MR. DACUS:  No objection, Your Honor.

12              THE COURT:  Mr. Tamir is excused.

13              MR. BENNETT:  Thank you, Your Honor.

14              THE COURT:  Anything from Defendant before we recess

15   for lunch?

16              MR. DACUS:  No, Your Honor.

17              THE COURT:  We stand in recess.

18                        (Lunch recess.)

19              THE COURT:  Be seated, please.

20          Is Plaintiff prepared to continue with its case in

21   chief?

22              MR. BENNETT:  Yes, Your Honor.

23              THE COURT:  All right.  Let's bring in the jury,

24   please.

25                   (Whereupon, the jury entered the courtroom.)

1          THE COURT:  Welcome back from lunch, members of the

2     jury.  Please have a seat.

3         Let's go off the record for just a second.

4                   (Discussion off the record.)

5          THE COURT:  All right.  Let's go back on the record.

6         Plaintiff, are you prepared to call your next witness?

7          MR. BENNETT:  Yes, Your Honor.  We call Dr. Ricardo

8     Valerdi.

9          THE COURT:  All right.  Doctor Valerdi, if you'll

10    come forward and be sworn, please.

11               (Whereupon, the oath was administered by the Clerk.)

12         THE COURT:  Please come around, have a seat on the

13    witness stand, sir.

14         MR. POMEROY:  Your Honor, may I approach to pass the

15    witness --

16         THE COURT:  You may.

17                  (Pause in proceedings.)

18         THE COURT:  All right.  Mr. Pomeroy, you may proceed

19    with direct examination.

20               RICARDO VALERDI, Ph.D.,

21    having been duly sworn, testified under oath as follows:

22               DIRECT EXAMINATION

23    BY MR. POMEROY:

24    Q.   Good afternoon, Doctor Valerdi.  Could you please

25    introduce yourself to the jury?

1    A.    Yes.  My name is Ricardo Valerdi.  I am an engineering

2    professor at the University of Arizona.  I live in Tucson,

3    Arizona, where I have three kids, ages 16, 14, and 12, and

4    been married for 18 years.

5    Q.    And can you please describe your educational background?

6    A.    Yeah.  I have a Bachelor of Science in electrical

7    engineering from the University of San Diego, Master's of

8    Science and System Architecture and Engineering from the

9    University of Southern California, and a Ph.D. in industrial

10   and systems engineering, also from USC.

11   Q.    Now, Doctor Valerdi, before we get into your analysis,

12   can you briefly summarize the conclusions you reached in this

13   case?

14   A.    Yes.  So my conclusions are that Nokia's IP service

15   routers infringe on the '580, '599, and '010 Patents.

16   Q.    Now, you stated you work at the University of Arizona.

17   What is your exact title at the University of Arizona?

18   A.    I'm a professor and head of the Department of Systems and

19   Industrial Engineering where I've been for 12 years.

20        THE COURT:  Counsel, could you pull the microphone a

21   little closer or speak up or both, please?

22   Q.    (BY MR. POMEROY)  And in your role teaching in the

23   University of Arizona, do you teach any classes related to

24   technology with the asserted patents?

25   A.    Yes.  I teach courses in product development and also

1    teach my students how to write software.

2    Q.    In addition to your work as a professor, have you written

3    any articles related to computer networks?

4    A.    Yes, I have.  So I put together the slides to show you

5    just some examples.  You've heard IEEE a lot, the Institute of

6    Electrical and Electronics Engineers, so I published in one of

7    their software publications, which is a peer-reviewed magazine

8    called *IEEE Software.*  So I've written about software

9    development.

10        I've written also and presented research at conferences

11   related to networks and computer networks and the

12   communication use of those networks.

13   Q.    So have you made research contributions to the field of

14   computer networks?

15   A.    Yes.  In addition to my publications, I also took a

16   sabbatical a few years ago and taught at West Point in New

17   York and worked with the Army on a variety of projects that

18   had to do with communications between soldiers in dense urban

19   environments.

20        So this is where they may have to operate in a city where

21   there's a lot of buildings.  Soldiers need to be in constant

22   communication with each other and with the forward operating

23   base.  And so we did a lot of research about how to make those

24   networks more resilient and reliable for the war fighter.

25   Q.    Besides your work as a professor currently, do you have

1    any other professional commitments?

2    A.   Yes.  So part of my sabbatical I mentioned was at West

3    Point.  The other part was working at Space X in Los Angeles

4    on the Falcon 9 rocket.

5         And I also prior to getting my doctorate, I worked at the

6    Aerospace Corporation, which is a federally-funded research

7    and development center at the Los Angeles Air Force base, also

8    deals with space systems and rockets.

9         And before I went to graduate school, my first job right

10   out of college was as a systems engineer at Motorola, which is

11   a communications company, and they use the technologies that

12   are relevant to this case.

13   Q.   Now, you're here today as an expert.  Have large

14   companies retained you as an expert in the field of computer

15   networks?

16   A.   Yes.  I've served as an expert on cases before, most

17   recently on a case for John Deere and a case for the U.S.

18   Navy.  Both had to do with software and source code, which is

19   what I'm here to talk to you about today.

20   Q.   Now, you spoke briefly about your work at Motorola.

21   During your time at Motorola, did you ever contribute to

22   designing and developing commercial routers?

23   A.   Yes.  So over 20 years ago as a starting engineer right

24   out of college, I worked for Motorola's wireless

25   communications division.  And as part of that job, we would

1    design and implement both the wired network and the wireless

2    network for public safety agencies.

3         Our biggest client was the Los Angeles Police Department.

4    So you could think of a communications network encompassing

5    both all of the radios that are out in the field, the antennas

6    that speak to those radios, and all the back-end

7    communications that talk to the 9-1-1 system and the dispatch

8    center.  And this is what we would build for clients like the

9    LAPD.

10   Q.   Now, beyond your professional commitments, do you have

11   any charitable contributions related to math and science --

12   A.   Yes.  So I'm a massive sports fan, and I love the book

13   *Moneyball,* and I watch as many baseball games as I can.  So

14   last week was very busy for me with opening day.

15        And what I did is I merged that passion with sports with

16   my desire to get more kids interested in science, technology,

17   engineering, and math, and I developed a program called the

18   Science of Baseball, which uses baseball to teach geometry,

19   physics, statistics, all of the things that elementary and

20   middle school students need to learn anyway.

21        So we've partnered with the Texas Rangers on a program in

22   west Dallas and also developed the spin-off related program

23   with the Dallas Mavericks on the Science of Basketball

24   teaching kids about free throw percentages and the

25   aerodynamics of the basketball.

1    So these are programs that I'm very passionate about.

2    They've sort of become my pet project.  But over half a

3    million students around the U.S. have used these kinds of

4    programs to make math and science more fun and hands-on.

5         MR. POMEROY:  Your Honor, at this time Plaintiffs

6    tender Doctor Ricardo Valerdi as an expert in both computer

7    networks and the subject matter of the asserted patents?

8         THE COURT:  Is there objection?

9         MR. HAYNES:  No objection.

10         THE COURT:  Without objection, the Court will

11   recognize this witness as an expert in those designated

12   fields.

13        Please continue, counsel.

14   Q.   (BY MR. POMEROY)  Now, Doctor Valerdi, could you please

15   explain what your task was in this case?

16   A.   Yeah.  My task was to compare the claims of the patents,

17   the three that you've heard a lot about, the '580, '599, and

18   '010, to Nokia's IP service routers.

19        And the key for me as an expert in software and computer

20   networks was to use my knowledge as an engineer, as an

21   academic, but also as a person of ordinary skill to determine

22   whether Nokia's products practice what's written in these

23   patents and specifically what's written in the claims of the

24   patents.

25   Q.   Now, you spoke about the claims.  What are the claims of

1    the patent?

2    A.    The claims are the numbered paragraphs that are at the

3    end of the patents, and we're going to talk about some very

4    specific ones.  You may have heard some of them already

5    referenced in the past day-and-a-half.  But I'm going to dive

6    into those details because they describe the actual

7    functionality or the actual process that is of interest in

8    each of the patents.

9    Q.    How did you assess the meaning of the claims that you

10   analyzed?

11   A.    Yeah.  The meaning is critical here, because in some

12   cases the Court provides construction of how we should define

13   certain terms in the patents, and that claim construction is

14   actually in your binder.  I will be referring to it when it is

15   relevant.

16        In cases where the Court did not provide a definition, I

17   used the plain and ordinary meaning of that term as a person

18   of ordinary skill in the art.

19   Q.    Now, Doctor Valerdi, what is a person of ordinary skill

20   in the art in this case?

21   A.    In this case, a person of ordinary skill in the art would

22   be somebody with a Bachelor's degree in electrical engineering

23   or related field, and at least two to three years of

24   experience working in practice.

25   Q.    Okay.  So you mentioned the accused products.  What

1    exactly are the accused products in this case?

2    A.   The accused products broadly are the Nokia's IP service

3    routers.  Some of them are shown here:  the 7250 on the left,

4    the 7210 on the bottom left, the 7750 on the top right, the

5    7705 shown on the bottom right.  And then there are two other

6    families not shown here.  But this is the best illustration to

7    try to fit as many of the products on one page.

8    Q.   Now, how did you determine all of these products

9    infringe?

10   A.   I arrived at that by looking at technical manuals of each

11   of these products, by examining the deposition testimony of

12   Nokia employees, their engineers, and managers; and also

13   looking at the source code, which you've heard a lot about

14   already, but I'm going to dive into those details.

15   Q.   Now, Doctor Valerdi, I see a couple of boxes of -- that

16   are labeled restricteDConfidential source code.  Is that all

17   the source code that you reviewed in this case?

18   A.   No.  I reviewed a lot of it.  I think there are three

19   boxes over there.  Those are just the files that we requested

20   to be printed, but that's probably less than one percent of

21   the total source code that I reviewed.  There is a ton of it,

22   probably fill most of this courtroom with boxes if we brought

23   the printouts.

24   Q.   Now, in addition to the manuals and the code that you

25   analyzed, did you look at anything else?

1  A.   Yeah.  As part of the process of analyzing the source

2  code, there was also some configuration files or also referred

3  to as test files that were provided by Nokia which are

4  examples of how their customers configure or program their

5  routers.  And so I also analyzed that in order to determine if

6  there was infringement.

7  Q.   Now, are these files you just described the same type of

8  files that were discussed earlier with Mr. Valley?

9  A.   Yes, precisely the same ones.

10  Q.   So, to summarize, you looked at the manual and other

11  documentation for every product accused in this case.

12  A.   That's correct.

13  Q.   Did all of the documentation for each product show

14  similar features of infringement?

15  A.   Yes.

16  Q.   And did what the manuals show align with your source code

17  that you -- strike that.

18      And did the manuals align with the source code?

19  A.   Yes.

20  Q.   Sir, are you going to be walking through every single

21  product that is accused today individually?

22  A.   No, I'm not.

23  Q.   Why is that?

24  A.   Well, because of what you just asked me--all the products

25  work the same way in terms of the accused functionality.

1    Q.   Now, we've been talking about routers.  If someone was to

2    want to purchase a router from Nokia, what's the smallest

3    thing that they could purchase?

4    A.   Well, they would purchase the box.  I like to call these

5    pizza boxes because they are sort of that size.  But as you

6    can see from the figure, some of them are much larger than a

7    pizza box.  But you would essentially as a customer of Nokia

8    purchase the box that you see here in this picture or examples

9    you see here.

10        But what you're actually buying is the hardware that is

11   inside that box and the software that is installed on that

12   memory.  So you're essentially buying both things--hardware

13   and software.

14   Q.   And what is the smallest component of the router that can

15   infringe?

16   A.   It's the router itself which contains both hardware and

17   software.

18   Q.   Let's first turn to the '580 Patent.  Doctor Valerdi,

19   what are you showing here?

20   A.   So this is the top of the cover page of the '580 Patent.

21   It has the full patent number, 7,463,580, on the top right; it

22   has the date in which it was issued, December 9th, 2008.  Then

23   on the left side, it has the name of the patent which is

24   Resource Sharing Among Network Tunnels, and then it lists the

25   inventors.

1       So every patent has a format like this.  You are going to

2    be seeing this a couple of more times.

3    Q.    Can you describe to the ladies and gentlemen of the jury

4    what the '580 Patent is about?

5    A.    Yeah.  The '580 Patent is efficient sharing of resources.

6    You've heard a lot about information moving through networks

7    and the efficiency of that being very important.  So a way to

8    kind of describe this in very practical terms is traffic on a

9    highway.

10       So say you're trying to get from point A to point B, but

11   it's during rush hour or maybe there's an accident up ahead

12   and so there's a congested road.  Essentially what the '580

13   Patent allows traffic in a network to do now is to take a

14   little detour and take an access road instead.  But it has to

15   be smart enough to know whether those access roads are

16   available, whether it's beneficial to take that access road

17   relative to the main road.  And so it needs a lot more

18   intelligence and processing power in order to make that

19   determination.

20   Q.    Now, with the technology disclosed in the '580 Patent,

21   would that be used on small networks?

22   A.    No, that would not.  The technology here is designed for

23   large networks.  I'm talking about communications between

24   buildings, between cities, between countries.  It's really for

25   large-scale, large-volume amounts of communication between

1    computers and between people using those computers.

2    Q.   What are some of the benefits of the invention of the

3    '580 Patent?

4    A.   It's really about efficiency.  It's about being able to

5    scale and put more users on that network and be able to handle

6    that traffic in a way that's intelligent.

7    Q.   And what were some of the challenges that the '580 Patent

8    solved?

9    A.   Well, essentially before, there was resource sharing of

10   paths that was available before the '580 Patent, but it was

11   limited to only if you had the same origin point and the same

12   destination.  But as a result of the '580 Patent, that opened

13   up a whole new series of possibilities, new access roads, new

14   HOV lanes, new alternatives for that traffic to move through

15   the network in a more intelligent way.

16   Q.   So is the '580 Patent important to computer networks?

17   A.   Absolutely it's critical basically because not all

18   traffic should be treated the same.  If you put an emergency

19   call in or you call 9-1-1, you want that to be handled

20   immediately, and you want somebody's Netflix download to be

21   deprioritized.

22   Q.   Doctor Valerdi, what are you showing here?

23   A.   So this is an example of a figure that's contained in the

24   '580 Patent.  Every patent has a series of figures and it also

25   has a written specification.  Those all appear before the

1   actual numbered claims.  So figures often are really helpful

2   in understanding what it is the invention actually is trying

3   to solve.

4       Here -- let me just point to you first to the yellow arc

5   on the top.  That illustrates that there is a certain shared

6   resource that is possible between two communication links.

7   And that really describes the prior art.

8       As I mentioned before, if you have the same origin and

9   the same destination, you were able to share a resource well

10  before the '580 Patent.  But the invention that's taught by

11  the '580 Patent opens up a whole new spectrum of options, and

12  that's illustrated by all the other nodes and the green lines

13  that are in this diagram.

14      I'm going to dive into the details of what that means in

15  words, but I just wanted to show you more routes, more

16  options, lead to the ability for a network to handle more

17  traffic.

18  Q.   Now let's turn to the first claim.  Which Nokia products

19  did you analyze for the '580 Patent?

20  A.   The Nokia products that I mentioned earlier that most all

21  of them start with 7, the IP service routers, all have

22  software code that is residing inside that has all the rules

23  and instructions about how the router will operate.

24      There were three versions of software that I looked at.

25  There was the TMOS, there is the TMOS CSA, and the TMOS SAS.

1    And all of those three versions of software worked exactly the

2    same in terms of the accused features that I'm going to talk

3    about today.

4    Q.    Doctor Valerdi, what are you showing here?

5    A.    So in order to talk about this claim, claim 8 of the '580

6    Patent, rather than reading the entire contents of the claim,

7    what I've done is I chunked it into pieces, A, B, C, and D.

8    And so we're going to go one at a time.  I'm going to come

9    back to this table so that we can keep track.

10        So this will serve as our roadmap for the discussion.

11   I'm going to start with element A, which begins with "A

12   network element."

13   Q.    Do the accused products have a network element comprising

14   a network interface?

15   A.    Yes, they do.

16   Q.    And does this network element communicate with other

17   elements in a communication network?

18   A.    Yes, they do.  And let me just explain the format of the

19   slide since this is a format you're going to be seeing over

20   and over.

21        On the very top, you see is the actual claim element from

22   the '580 Patent.  But anything below that is information that

23   I'm providing that supports the opinion that this claim

24   element is met and that the product infringes.

25        So just to be extra clear, in the case where I have a

1     Nokia technical manual or Nokia source code, I've added the

2     Nokia logo.  Okay?  So in this case because this claim element

3     requires having a network element and corresponding interface

4     to a network, I've highlighted the claim element part in

5     green, and then the supporting evidence is also in green.  So

6     it should be very easy for you to match word for word or

7     concept to concept.

8         So on the left side, you'll see this is a snapshot of

9     Nokia's 7750 service router.  That's one of the accused

10    products.  I've highlighted the term IP network, which

11    confirms that this is a network element that's connected to an

12    internet protocol network.

13        And on the right side is another screenshot, again

14    connecting the claim language, which is this router is a fully

15    programmable network processor, and it also calls out the

16    software operating system, which is the Nokia service router

17    operating system, also known as SR-OS for the 7750.

18    Q.   And is the 7750 one of the accused products in this case?

19    A.   Yes.

20    Q.   So what is your conclusion about claim element 8A of the

21    '580 Patent?

22    A.   So my conclusion here is that this claim element is met

23    and this product infringes.  So we're going to put a checkmark

24    next to that claim element just to keep track of the ones that

25    we've talked about so far.

1    Q.   So what's the next limitation that you analyzed?

2    A.   So limitation B starts with, "A processor."  And we're

3    going to unpack that in the next few slides.

4    Q.   Do the accused products contain a processor?

5    A.   Yes.  So, again, a screenshot from Nokia's own technical

6    documentation that emphasizes the fact that this is a network

7    processor.

8    Q.   Now, I see the document says a fully programmable network

9    processor.  What does programmable mean?

10   A.   So that means that you can install software into that

11   network processor so that it will execute specific commands

12   that you've preprogrammed.

13   Q.   And when you refer to the software, are you referring to

14   the source code that you analyzed?

15   A.   Yeah.  And I should clarify that because I think those

16   terms are used interchangeably.  Source code, I'm going to be

17   showing some of that in my slides.  Source code is the actual

18   instructions that a computer programmer writes that they want

19   those steps to be followed in a very specific order.

20        Once that source code is complete and tested and the

21   programmer is satisfied that it's ready to go, then it gets

22   installed onto a computer or, in this case, a network

23   processor.  And so that's what we call software.

24        So the software itself is what -- what is executed and

25   runs all these commands that have already been pre-determined

1    by a computer programmer well in advance.

2    Q.    So let's move on to the next portion of claim element 8B.

3    Do the accused Nokia products have processors that are

4    arranged to accept a notification distributed over a

5    communication via the network interface?

6    A.    Yes, they do.

7    Q.    And how do you know that?

8    A.    I know that because the Nokia IP service routers use an

9    RSVP protocol which sends notifications and then receives

10   notifications.  So the first part of that handshake of

11   send/receive are the path messages.

12         And you'll see here the excerpt from Nokia's technical

13   manuals, they refer to the path messages containing signaling

14   information.  And those signals are the ones that are being

15   sent through the network interface and distributed to other

16   components in the network.

17   Q.    Now, the claim element also has a resource sharing group.

18   What is a resource sharing group?

19   A.    So the second part of the notification is the receipt of

20   an acknowledgment.  And I've highlighted here from Nokia's

21   technical manuals the RESV, which is also another type of

22   message that contains information about a resource-sharing

23   group.  So this is sort of the part two of the send/receive

24   handshake, and this is the -- the notification that's

25   mentioned in the patent language.

444

1           MR. POMEROY:  Your Honor, at this time we'll be

2    getting into the confidential source code, so I'd ask to seal

3    the courtroom.

4           THE COURT:  All right.  Based on counsel's request

5    and to protect confidential information, I'll order the

6    courtroom and the record sealed at this time.

7        Those present in the courtroom who are not subject to the

8    protective order in this case should exit the courtroom and

9    remain outside until it's reopened and unsealed.

10                      (Courtroom sealed.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                    (Courtroom unsealed.)

 4          THE COURT:  Having done that, ladies and gentlemen

 5  of the jury, I'm going to ask you simply to leave your

 6  notebooks in your chairs, follow all the instructions I've

 7  given you about your behavior and your conduct as jurors, and

 8  we'll be back shortly to continue with the direct examination

 9  of the witness.

10      The jury's excused for recess.

11              (Whereupon, the jury left the courtroom.)

12              THE COURT:  All right.  The Court stands in recess.

13                      (Brief recess.)

14              THE COURT:  Be seated, please.

15      Are you prepared to continue with your direct

16  examination, Mr. Pomeroy?

17              MR. POMEROY:  Yes, Your Honor.

18              THE COURT:  All right.  Let's bring in the jury.

19              (Whereupon, the jury entered the courtroom.)

20              THE COURT:  Please be seated.

21      All right, counsel.  You may continue with your direct

22  examination of Doctor Valerdi.

23              MR. POMEROY:  Thank you, Your Honor.

24      Mr. Jarrett, could you return to the slides?

25  Q.   (BY MR. POMEROY)  Now, Doctor Valerdi, we left off with
```

1    your conclusion for claim 2 of the '010 Patent.  What is your

2    conclusion with respect to claim 2 of the '010 Patent?

3    A.    My conclusion is that both the required dependent claim

4    element and claim element A are met.  So we put green

5    checkmarks next to them because they infringe by Nokia's

6    products.

7    Q.    So we look at one more claim of the '010 Patent.  What is

8    that claim?

9    A.    This is claim 3.

10   Q.    And is claim 3 a dependent claim?

11   A.    Yes, it also is a dependent claim because it depends on

12   claim 2.

13   Q.    So in order to infringe claim 3, does both claim 1 and

14   claim 2 have to infringe?

15   A.    Yes.

16            THE COURT:  Counsel, before we recessed, I unsealed

17   the courtroom.  Are you going to go back into confidential

18   information?

19            MR. POMEROY:  Very briefly, and I will let you know,

20   Your Honor.

21            THE COURT:  All right.  Let me know.  I just didn't

22   want you to accidentally cover something confidential in the

23   open record.

24            MR. POMEROY:  Understood, Your Honor.

25            THE COURT:  All right.

496

1    Q.    (BY MR. POMEROY)  Doctor Valerdi, what does claim 3 of

2    the '010 Patent require?

3    A.    This is -- claim element A requires one of a variety of

4    protocols being used, which I will elaborate.

5    Q.    And what are you showing here?

6    A.    The language of the claim element suggests -- it states

7    that it could be any of these layer 2 protocols.  That's what

8    the "from a group of protocols consisting of" mean.  So there

9    are a variety of protocols mentioned in Nokia's technical

10   documentation.

11   Q.    Now, I see here you underline in orange ethernet pipe.

12   Is the ethernet pipe the ethernet protocol that's highlighted?

13   A.    Yes.

14   Q.    And is the apipe referring to the ATM protocol?

15   A.    Yes.

16   Q.    And is the frame relay or fpipe referring to the frame

17   relay protocol?

18   A.    Yes.

19   Q.    And then I see it states point-to-point or PPP.  Is that

20   referring to a point-to-point protocol?

21   A.    Yes.

22          MR. POMEROY:  Your Honor, I promise it's brief.  I

23   need to seal the courtroom.

24          THE COURT:  All right.  Based on that request and to

25   protect the confidential information, I'll order the courtroom

1    sealed, which will seal this portion of the record.

2         I'll direct that all persons not subject to the

3    protective order that's been entered in this case to excuse

4    themselves and remain outside the courtroom until it's

5    reopened and unsealed.

6                        (Courtroom sealed.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                    (Courtroom unsealed.)

6          THE COURT:  All right, counsel.  We are unsealed.

7     Please continue.

8  Q.   (BY MR. POMEROY)  Doctor Valerdi, are you finished with

9  your infringement analysis with respect to the accused Nokia

10  products compared to the asserted patents?

11  A.   Yes.

12  Q.   Okay.  So let's just reset.  Besides that analysis with

13  respect to the Nokia products, were you asked to do anything

14  else in this case as your role as an expert?

15  A.   Yes.

16  Q.   So what was your task with respect to the

17  Orckit-Corrigent routers?

18  A.   I was asked to also look back retrospectively at some of

19  the Orckit-Corrigent routers to see if they practiced any of

20  the teachings of the patents-at-issue in this case.

21  Q.   Now, Doctor Valerdi, the case is Smart Path v. Nokia.

22  Why did you analyze the Orckit patent or the Orckit products?

23  A.   Because the inventors of the patents worked for Orckit,

24  Orckit-Corrigent, and the products that I was asked to

25  evaluate were made by that same company.

1    Q.   Now, does this analysis have anything to do with your

2    infringement analysis as applied to Nokia's products?

3    A.   No.

4    Q.   Were you here when Mr. Tamir testified yesterday about

5    certain Orckit-Corrigent products?

6    A.   Yes.

7    Q.   And what is your understanding of these products?

8    A.   That they were sold out of Israel and the -- there was

9    two families of products, the CM-100 and the CM-4000.  I think

10   he was shown a physical box of the CM-4000, and my

11   understanding is that the CM-4000 family were sufficiently

12   marked with the patents that are at issue in this case.

13   Q.   Now let's start with the CM-4000 series of products.  Did

14   you analyze the CM-4000 products to see if they embodied the

15   asserted patents?

16   A.   No.

17   Q.   And why did you not do that?

18   A.   Because they were adequately marked as shown by this

19   label.

20   Q.   And is this the same label that you were showing?

21   A.   Yes.

22   Q.   And on the bottom right, we see the '580 Patent?

23   A.   That's right.

24   Q.   And if you look at the second-to-most bottom row on the

25   left, you see the '010 Patent at the very left?

1    A.    Yes.

2    Q.    And then very next to that on the right, you have the

3    '599 Patent?

4    A.    Correct.

5    Q.    Do you recall Mr. Tamir's testimony with respect to the

6    CM-100 product?

7    A.    Yes.

8    Q.    And what were you asked to do with respect to the CM-100

9    product?

10   A.    I was asked to determine whether the CM-100 product

11   practiced any of the teachings of the three patents-at-issue.

12   Q.    Now, what documentation did you use to analyze the CM-100

13   products?

14   A.    I was provided with a manual of the CM-100, which I'm

15   showing here, dated March 2009.

16   Q.    Did you review any source code for these products?

17   A.    No.

18   Q.    Why not?

19   A.    It wasn't made available.

20   Q.    Now, let's just turn to your analysis of the CM-100 with

21   respect to the '580 Patent.  What did you look at with respect

22   to CM-100 for the '580 Patent?

23   A.    I looked at some of the elements of claim 15.

24   Q.    And did you analyze all the claims in the '580 Patent?

25   A.    No.

1    Q.   And what are you showing here?

2    A.   What I'm showing here is that the CM-100 describes a more

3    limited functionality than what is taught in the '580 Patent.

4    I've underlined a couple of key sentences, such as the

5    end-to-end technology.  That is a more constrained and limited

6    functionality than what is taught in the '580 Patent.  And

7    also the way that the resource reservation done is not exactly

8    the same as is described in the '580 Patent.

9    Q.   Now, Doctor Valerdi, do you recall the '580 Patent's

10   limitations having two tunnels that traverse different routes?

11   A.   Yes.

12   Q.   Does anything in here show two tunnels traversing

13   different routes?

14   A.   No.

15   Q.   So what's your conclusion with respect to the CM-100

16   embodying the '580 Patent?

17   A.   That it does not practice element B or element C of claim

18   15, I think it was.

19   Q.   And would this analysis for claim 15 apply to all of the

20   other claims?

21   A.   Yes, they do.

22   Q.   Now let's turn to the '599 Patent as applied to your

23   analysis of the CM-100 product.  Did you look at all of the

24   claims of the '599 Patent with respect to your analysis of the

25   CM-100 product?

1    A.    No.

2    Q.    And what are you showing here?

3    A.    I'm showing an excerpt from the CM-100 manual that

4    describes how the cost is utilized within this CM-100 OSPF

5    algorithm, which is the open shortest path first, and I've

6    underlined some of the key sentences from that page.

7    Q.    Now, I recall the '599 Patent had a lot of talk about a

8    host table.  Do you see a host table here?

9    A.    No, there's no mention of any host table.

10   Q.    And even if there was a host table, do you see any host

11   table that stores an entry that has both an address and a

12   metric?

13   A.    No, I don't see those, either.

14   Q.    So what was your conclusion with respect to the CM-100

15   embodying the '599 Patent?

16   A.    That it does not practice elements B or D of the specific

17   claim of the '599 Patent.

18   Q.    Now, the last claim that we've spoken about, the '010

19   Patent, did you analyze the CM-100 product against the '010

20   Patent?

21   A.    Yes.

22   Q.    So what were the results of your analysis?

23   A.    That there was no practice of the embodiment of the -- or

24   the teachings of the '010 Patent.  I've underlined a couple of

25   key terms that I found in the manual.

1    Q.    So I see here it says TDM ports.  The claim requires a

2    TDM interface with respect to the native interfaces.  Did you

3    find that the network port comprising ethernet port and that

4    one or more of the native interfaces comprise at least one of

5    the TDM interface?

6    A.    There's mention of TDM ports but not a TDM interface in

7    the CM-100.

8    Q.    So what was your conclusion with respect to if the CM-100

9    embodied the '010 Patent?

10   A.    It does not because it has to meet all the claims, and

11   just the fact that it does not meet claim element I of claim 1

12   means that it does not practice the teachings of this patent.

13   Q.    Now, I just want to turn back to your infringement

14   analysis of Nokia's accused products.

15        Could you summarize your conclusion with respect to your

16   analysis of the '580 Patent as applied to the Nokia accused

17   products?

18   A.    My opinion is that the six families of accused products

19   infringe the '580 Patent.

20   Q.    And with respect to the '599 Patent, could you please

21   provide a summary of your findings of your analysis of the

22   Nokia accused products?

23   A.    My opinion is that the six families of Nokia's IP service

24   routers infringe the '599 Patent.

25   Q.    And with respect to the '010 Patent, could you please

1    just describe your findings of your analysis as applied to the

2    Nokia's accused products?

3    A.    My opinion is that the six families of IP service routers

4    made by Nokia infringe the '010 Patent.

5              MR. POMEROY:  Your Honor, I pass the witness.

6              THE COURT:  All right.  Cross examination by the

7    Defendant.  If you have binders to distribute, counsel, let's

8    do that now.

9                    (Pause in proceedings.)

10             MR. HAYNES:  May I proceed, Your Honor?

11             THE COURT:  As soon as your co-counsel gets seated.

12       All right.  Let's proceed with cross examination.

13             MR. HAYNES:  Thank you, Your Honor.

14                    CROSS EXAMINATION

15   BY MR. HAYNES:

16   Q.    Good afternoon, Mr. Valerdi -- or Doctor Valerdi.  Sorry.

17   A.    Good afternoon.

18   Q.    I want to pick up right where you ended on this subject

19   of patent marking.

20        You were in the courtroom when Mr. Tamir testified.

21   Correct?

22   A.    Yes.

23   Q.    And you did not hear Mr. Tamir identify a single CM-401x

24   product that was marked with a patent label.  Correct?

25   A.    I remember him being asked about it, and if I remember

506

1    correctly, that's the device that you-all showed him.

2    Q.    That's -- I showed him an example of that device, but I

3    also asked him that, "Mr. Tamir, you did not identify any

4    evidence showing that a CM-401x product had been marked."

5         Do you recall that his answer was, "I have no evidence of

6    that"?

7    A.    I remember him saying that, yes.

8    Q.    Okay.  Now, you talked a little bit today about the

9    CM-100 product.  Correct?

10   A.    Yes.

11   Q.    And that product was sold in the United States beginning

12   in 2004, and the sales kept going all the way to I believe it

13   was 2011.  Does that sound right to you?

14   A.    That sounds right.

15   Q.    And if I heard your testimony right here today, you said

16   that the CM-100 product line did not practice any of the three

17   patents-in-suit.  Correct?

18   A.    That's correct.

19   Q.    And you understand -- well, you were in the courtroom and

20   you heard Plaintiff's counsel talk about how innovative the

21   features of the three patents-in-suit are and how important

22   they were to the entire industry.  You recall that testimony

23   generally?

24   A.    Yes.

25   Q.    You understand that Orckit did not put those features

1    into its own biggest selling product.  Correct?

2    A.   I don't know if it was their biggest selling product, but

3    I see your point about the features.  I don't think they put

4    them in there.

5    Q.   Now, we also walked through one of the manuals for that

6    CM-100 product.  I want to bring up a couple of pictures from

7    that.

8           MR. HAYNES:  If we could look at PX 30-2 on page 25.

9    If we could just bring that figure up at the top here.

10          THE WITNESS:  That's not in the binder?

11   Q.   (BY MR. HAYNES)  Your counsel used it so it might be in

12   the binder that they used.

13        I haven't asked the question yet, but I'm about to.

14        Sir, this came out of that CM-100 manual that you

15   analyzed.  Correct?

16   A.   Yes.

17   Q.   And what this is describing is actually a triple play

18   service that was offered by Orckit.  Right?

19   A.   Yes, I see that on the right side.

20   Q.   And if we look at this figure, this figure kind of looks

21   similar to the figures that we've been seeing from the patent

22   and even the figure we saw in Nokia's product.  Right?

23   A.   I don't know what similarity you're pointing to, but if

24   you want to be more specific, I can comment on that.

25   Q.   I can try to.  You see on the left here, there's a CM-100

508

1    PTS, and on the right there's a CM-100 PTS?  Do you see that?

2    A.    Yes.

3    Q.    You understand those are edge devices or edge routers?

4    A.    Yes.

5    Q.    Okay.  And you look on the left there, that CM-100 is

6    connected to a TDM network and an ethernet network and a voice

7    network.  Do you see that?

8    A.    Yes.

9    Q.    You understand that those are client edge devices?

10   A.    Yes, that's fair.

11   Q.    You understand on the right of that CM-100 router, I've

12   got an ethernet connection.  Do you see that?

13   A.    Yes.

14   Q.    Now, so we're going to talk about similarities.  What I

15   just described I believe was every single element that you

16   pointed to in the figure of Nokia's patent.

17   A.    If you can be more specific about which patent?

18   Q.    Well, for the triple play, the patent that you accused of

19   infringing the -- the patent for which you have accused the

20   triple play feature in Nokia's products.

21             THE COURT:  Mr. Haynes, could you slow down some?

22             MR. HAYNES:  I will do so, Your Honor.  Thank you.

23             THE COURT:  Thank you.  Please do.

24   Q.    (BY MR. HAYNES)  Actually let me try this again.  Let's

25   talk about the '010 Patent, the patent that requires a hub.

509

```
 1    Okay?

 2    A.   Okay.

 3    Q.   All right.  Now, for the '010 Patent, that requires edge

 4    devices and a hub.  Right?

 5    A.   Yes.

 6    Q.   And under your definition of a hub, a hub is any device

 7    that connects two other devices.  Is that right?

 8    A.   Yes, I said something like that.  I didn't quantify it as

 9    two, but I can get behind that.

10    Q.   Okay.  So let me see if I can identify the hubs in this

11    figure if I were to apply your definition of that term.  Okay?

12    So under your definition, this would be a hub?

13    A.   Yes.

14    Q.   And this would be a hub?

15    A.   Yes.

16    Q.   And this would be a hub?

17    A.   Yes.

18    Q.   And this would be a hub?

19    A.   Yes.

20    Q.   And, in fact, if I look above these boxes on the TDM

21    network at the top there, I can go out -- those would actually

22    be connected to client devices on the outside, the top up

23    here.  Do you agree with that?

24    A.   Yes, I agree with that.

25    Q.   Okay.  So if these are connected to other devices that
```

1    are connected in the network, this would also be a hub.

2    Right?

3    A.    It depends on what role it plays in the network.  So if

4    you've added a bunch of other connections, then yes, it's

5    acting as a hub.

6    Q.    Okay.  And if I put -- if this device here, the layer 2,

7    layer 3 MSE, that's also going to be connected to some other

8    devices on the left over there.  Right?

9    A.    Presumably, yes.

10   Q.    And if I use your definition of a hub, this is a hub,

11   too.  Right?

12   A.    It could be.

13   Q.    Okay.  I can keep going, but I'll stop there.

14        So everything that I drew a red circle on this figure

15   under your definition would satisfy the meaning of a hub under

16   the '010 Patent.  Is that fair?

17   A.    I think that's fair, what you've drawn so far, yes.

18   Q.    Okay.  Sorry for my handwriting.  It's really bad.

19   A.    I can read it.

20        THE COURT:  All right.  We've got better things to

21   do than talk about your handwriting.  Let's move on.

22        MR. HAYNES:  Apologies, Your Honor.

23        We can take that exhibit down.

24   Q.    (BY MR. HAYNES)  Now, you heard Mr. Dacus in his opening

25   statement talk to the jury about how in patent infringement

1    cases, the details matter.  Right?

2    A.    Yes.

3    Q.    And you agree with that.  Right?

4    A.    Absolutely.

5    Q.    The words of the claims, they matter.  Right?

6    A.    Yes.

7    Q.    And to infringe a patent claim, when you did your

8    analysis, you needed to make sure that every single element of

9    the claim was present in the devices you were accusing of

10   infringement.  Correct?

11   A.    That's correct.

12   Q.    And if even one thing was missing, that would mean no

13   infringement.  Correct?

14   A.    For that claim, correct.

15   Q.    Okay.

16         MR. HAYNES:  Let's look at ID 2176, one of the

17   slides that you used, I believe.

18         Do you recall this slide generally when you were talking

19   about whether or not Nokia's products satisfied the limitation

20   requiring a hub?

21   A.    Yes.

22   Q.    Okay.  And what you identified as a hub is the green box

23   on the right side here above the Nokia diagram.  Is that

24   right?

25   A.    Yes.

1    Q.    Okay.  That box is actually a router.  Correct?

2    A.    It's labeled as a router, but it's operating as a hub and

3    a router.

4    Q.    But when Nokia sells that box, it is sold as a router.

5    Correct?

6    A.    I agree with that.

7    Q.    And your theory is not that this router is a hub device;

8    your theory is that it is operating as a hub.  Is that fair?

9    A.    That's fair, and I can explain further if you'd like.

10    Q.    Now, I don't want to draw a bunch of circles again, but

11    you would agree with me that I could, if I wanted to, under

12    your definition draw a circle around every one of these

13    devices and they would be hubs, too, as you used that term.

14    Correct?

15    A.    No.

16    Q.    Well, you would at least agree with me that under your

17    definition of hub, this would be a hub.  Correct?

18    A.    I would say that is also operating as a hub, yes.

19    Q.    Okay.  And under your definition of a hub, every single

20    Nokia router that it sells is also a hub, in your view.

21    Correct?

22    A.    No, because the hub has to be a role that that device is

23    playing in the network.  So if it was an edge device like the

24    customer edge that you suggested you might draw a circle

25    around, that is not a hub.  But if, instead of a customer edge

1    device, it was a Nokia router, it's only connected to one

2    element, one other element in the network, that is not

3    operating as a hub.

4    Q.   But you didn't perform an analysis to determine how each

5    one of Nokia's routers is actually being used out in the

6    customer networks.  Right?

7    A.   Wrong.

8    Q.   Is it your belief that every single one of Nokia's

9    routers that is being used in any customer network is a hub?

10   A.   I looked at configuration files that would suggest that

11   many of them, at least the configuration files that I looked

12   at of routers, are also operating as hubs.

13   Q.   Okay.  Fair to say that all of the routers that you

14   allege to infringe in this case satisfy your definition of

15   hubs.  Correct?

16   A.   Yes, they do.  I've also seen Nokia manuals that refer to

17   routers as hubs, and I can show you that if you'd like.

18         MR. HAYNES:  Move to strike as non-responsive, Your

19   Honor.

20         THE COURT:  When the witness says, yes, they do,

21   that's responsive.

22      When he goes further and says, I've also seen Nokia

23   manuals that refer to routers as hubs, that's non-responsive

24   and I'll sustain the objection as to that remaining or latter

25   portion of the answer and strike it.

514

```
1        Doctor, if he wants you to explain something further,

2   he'll ask you for it.  You don't need to volunteer.  You have

3   additional support for your comments.  And Mr. Pomeroy has an

4   opportunity to come back up later and he may want you to

5   explain further, but he'll make that decision.  You don't need

6   to offer that spontaneously.

7        Just limit your answers to the questions asked, please.

8            THE WITNESS:  Understood, Your Honor.

9            THE COURT:  All right.  Let's proceed.

10  Q.  (BY MR. HAYNES)  Now, Doctor Valerdi, you understand that

11  hub network devices were well-known long before the Smart

12  Path -- sorry.  Let me try that again.

13       You know that hub network devices were known long before

14  Orckit-Corrigent filed for the three patents that are accused

15  of -- asserted in this case.  Correct?

16  A.  Yes.

17  Q.  And I think you said on your direct testimony that the

18  Court did not construe that word 'hub' in this case.  Correct?

19  A.  That's correct.

20  Q.  And so the definition of hub that you should have applied

21  in this case is the definition to a person of ordinary skill

22  in the art at that time, the plain meaning of the term.

23  Correct?

24  A.  That's correct.

25  Q.  And that's what you attempted to do.  Correct?  You
```

515

1    attempted to apply the plain meaning of the term 'hub' as a

2    person of ordinary skill in the art would have understood it

3    at the time of the invention.  Correct?

4    A.    Yes.

5    Q.    Now, you know, sir, at the time of the alleged inventions

6    here, a hub device and a router were understood to be very

7    different things.  Correct?

8    A.    Yes, and I agree with that.

9    Q.    Now, you're currently the department head of the systems

10   and industrial engineering at the University of Arizona?

11   A.    Yes.

12   Q.    And you -- do you teach classes on computer networks

13   there?

14   A.    Product development, which includes computer networks,

15   yes.

16   Q.    Okay.  Are you aware that one of the textbooks that are

17   used at the University of Arizona to teach computer networking

18   is a book by a Mr. Kurose and Mr. Ross titled, *Computer*

19   *Networking: A Top-down Approach?*

20   A.    I'm not aware of that class.

21   Q.    You're familiar with that book, though, aren't you?

22   A.    No.

23   Q.    You didn't look at that book in your consideration of the

24   materials in this case?

25   A.    Not that specific book, no.

```
 1              MR. HAYNES:  Let me bring up --
 2    Q.   (BY MR. HAYNES)  Actually in your binder you have a
 3    printout from the University of Arizona College of
 4    Engineering, Electrical and Computer Engineering.
 5    A.   I see it.
 6    Q.   Were you able to find that?  I want you to take a look at
 7    that.  Does that refresh your memory as to what books are used
 8    to teach computer networking at the University of Arizona?
 9    A.   Yes.
10    Q.   Okay.  You see there that there's a book authored by Mr.
11    Kurose and Mr. Ross?
12    A.   Could you point me to the page?
13    Q.   Sure.  It's on the very first page under references.
14    Well, let me back up.  You see there's a course, Fundamentals
15    of Computer Networks, that's being taught.  Correct?
16    A.   Oh, yeah, I see on the top of the second page, yes.
17    Q.   Yeah.  And if you go down, there's a section that says,
18    Course text, and then it has some references.  And the very
19    last book that's listed there is entitled *Computer Networking:*
20    *A Top-down Approach,* Seventh Edition, Kurose and K. Ross,
21    2017.  Do you see that?
22    A.   Yes.
23    Q.   Okay.  So you understand that that is a textbook that the
24    University of Arizona uses to teach its students computer
25    networking.  Correct?
```

1    A.    Correct.

2    Q.    And you would agree with me that is the kind of text that

3    people in the industry would deem to be reliable?

4    A.    Yes.

5    Q.    Okay.

6            MR. HAYNES:  Can we bring up DX 14?

7    Q.    (BY MR. HAYNES)  This is the front cover of the book we

8    were just talking about.  Correct, sir?

9    A.    That's correct.

10   Q.    Now, I want to direct your attention inside this book to

11   page 470.

12           MR. HAYNES:  And then if we can bring and highlight

13   the paragraph that begins, "By the late 1990s."  Do you see

14   there where it states, "By the late 1990s most companies and

15   universities had replaced their LANs with ethernet

16   installations using a hub-based star topology.  In such an

17   installation, the host (and routers) are directly connected to

18   a hub with twisted-pair copper wire."

19        Do you see that?

20   A.    Yes.

21   Q.    Then it goes on in the next sentence to state, "A hub is

22   a physical-layer device that acts on individual bits rather

23   than frames."

24        Do you see that?

25   A.    Yes.

518

1    Q.   And you agree with me that that definition of hub is an

2    accurate definition.  Correct?

3    A.   Yes, I would agree with it.

4    Q.   Okay.  Now, the next sentence goes on and describes what

5    that hub device does.  It states, "When a bit, representing a

6    zero or a one, arrives from one interface, the hub simply

7    recreates the bit, boosts its energy strength, and transmits

8    the bit on to all other interfaces."

9         Do you see that?

10   A.   Yes.

11   Q.   And you would agree with me that that is an accurate

12   description of what a hub device actually does.  Correct?

13   A.   Yes.  I agree with everything you've read from this book.

14   Q.   All right.  Bear with me.  I'm almost done.

15        The next sentence says, "Thus, ethernet with a hub-based

16   star topology is also a broadcast LAN--whenever a hub receives

17   a bit from one of its interfaces, it sends a copy out on all

18   of its other interfaces."

19        Do you see that?

20   A.   Yes.

21   Q.   Okay.

22        MR. HAYNES:  Now we can back out.  I want to go to a

23   couple of paragraphs down on the same page.  Just the very

24   bottom where it says, "In the early 2000s."

25   Q.   (BY MR. HAYNES)  Do you see there it says, "In the early

1    2000s, ethernet experienced yet another major evolutionary

2    change.  Ethernet installations continued to use a star

3    topology, but the hub at the center was replaced with a

4    switch."

5         Do you see that?

6    A.   Yes.

7    Q.   And you understand that to be describing that in the

8    early 2000s, the computer networking world was moving away

9    from hub devices and moving towards smarter devices like

10   switches and routers.  Correct?

11   A.   Yes.

12   Q.   Let's look at the next sentence.  It says, "We'll be

13   examining switched ethernet in depth later in this chapter.

14   For now, we only mention that a switch is not only

15   collision-less, but is also a bona fide store-and-forward

16   packet switch."

17        So that is an accurate description of a switch network

18   device.  Correct?

19   A.   That's correct.

20   Q.   Then the book goes on, and it says, "But unlike routers,

21   which operate up through layer 3, a switch operates only up

22   through layer 2."

23        Do you see that?

24   A.   Yes.

25   Q.   And that sentence is distinguishing a router from a

1    switch.  Correct?

2    A.   That's correct.

3    Q.   And you understand that this textbook is talking about

4    three different kinds of network devices.  Correct?

5    A.   Yes.

6    Q.   Now, let me ask you this.  In the early 2000s when the

7    hubs were getting pulled out of computer networks, would the

8    definitions that we just read have been understood by a person

9    of ordinary skill in the art at that time?

10   A.   I believe they would.  These definitions have not

11   changed.

12          MR. HAYNES:  Now, if we could go back to the JX 01,

13   which is a copy of the '010 Patent.  And if we could go to the

14   next page to figure 1 and just blow it up, please.

15   Q.   (BY MR. HAYNES)  Do you recognize this, sir, as figure 1

16   of the '010 Patent?

17   A.   Yes.

18   Q.   And you see on the right there, it says network device

19   (hub)?

20   A.   Yes.

21   Q.   So you understand when the claims are referring to a hub,

22   they are referring to a hub network device.  Correct?

23   A.   Yes.

24          MR. HAYNES:  If we could bring up claim 1 of the

25   '010 Patent, please, Mr. Carrillo.

1    Q.    (BY MR. HAYNES)  Now, one of the things that I took away

2    from your testimony on direct examination was that one of the

3    things that claim 1 requires, in addition to having a hub, is

4    it needs to have an edge device that is configured to receive

5    multiple different layer 2 protocols.  Is that fair?

6    A.    Yes.

7    Q.    And you understand that in modern computer networks,

8    ethernet is king.  Right?

9    A.    Yes, I do.

10   Q.    The old layer 2 networks, ATM, TDM, that is old news.

11   Right?

12   A.    To some extent it's not a moneymaker anymore.

13   Q.    Networks have moved away from those old layer 2 networks.

14   Now they're coming into the ethernet world because everybody

15   is doing IP.  Fair enough?

16   A.    Yes, with exceptions there's some legacy systems out

17   there that may still practice that.  But the newer networks, I

18   would agree with you.

19   Q.    Right.  So there may be some old legacy networks out

20   there that can't afford to throw away, they've been out there

21   since the '90s, so they may still be out there.  But if I'm

22   selling new equipment, I'm not installing ATM networks, am I?

23   A.    From this day forward, probably not.

24   Q.    Go back five years.  Still not doing it.  Right?

25   A.    Unlikely, yes.

1    Q.    Go back 10 years.  Still not doing it.  Right?

2    A.    I wouldn't go that far.

3    Q.    All right.  Give me five.  I'll take that, sir.

4          Okay.  For routers that Nokia has sold in the last five

5    years, you would agree if that's a new customer network, it's

6    not likely to have ATM or TDM in it.  Right?

7    A.    I'm thinking about your question because if it's in

8    relation to claim 1, what matters is whether it's compatible

9    to those other protocols.  So could you just clarify whether

10   you were just asking it in isolation or in relation to claim

11   1?

12   Q.    Let me try asking it this way see if this helps.  Okay?

13         If I sell a bunch of routers to AT&T, and that network is

14   only ethernet, there is not a single device in the network

15   that I have sold them or that it is connected to that is

16   anything other than ethernet, you would agree with me that

17   those routers are not configured to satisfy the elements of

18   claim 1.  Correct?

19   A.    No.

20   Q.    Okay.  So you would still say that in that all-ethernet

21   network, those routers that aren't doing any protocol

22   conversion whatsoever, those would still infringe in your

23   view.  It's a yes or no, sir.

24   A.    If they have a source code that I examined that's the

25   basis of my reference, then, yes, they would infringe.

1    Q.   All right.  Okay.  I'd like to switch patents on you now

2    and talk a little bit about the '599 Patent.  Is that okay,

3    sir?

4    A.   Yes.

5              MR. HAYNES:  Could we bring up the '599 Patent?

6    Q.   (BY MR. HAYNES)  Now, the title of the '599 Patent is

7    Layer 3 Network Routing with RPR Layer 2 Visibility.  Do you

8    see that?

9    A.   Yes.

10   Q.   I didn't hear you in your direct testimony talk very much

11   about the title of this patent or this notion of visibility.

12   Is that fair?

13   A.   No, I did mention that.

14   Q.   Okay.  Let me see if I can get a little more detail on

15   it.

16              MR. HAYNES:  If we can go to the next figure

17   2 -- sorry, figure 1 of this patent?

18   Q.   (BY MR. HAYNES)  Now, when we talk about the layer 2 ring

19   network in the '010 Patent, that is comprised of the routers

20   we see that are connected together with these lines here.

21   Correct?

22   A.   That's correct.

23   Q.   And you understand that in this layer 2 ring network,

24   there is a layer 2 connection that connects each of these

25   routers together in this ring.  Correct?

1    A.    Yes.

2    Q.    That's what makes it a layer 2 ring network.  Right?

3    A.    Correct.

4    Q.    Now, the patent itself talks about a problem that the

5    inventors perceived in the industry.  Do you recall that?

6    A.    Yes.

7    Q.    And that problem was I had these routers, the layer 2

8    routers in this ring, but those routers did not have

9    visibility to this external network over here and the ways in

10   which they could route things from the layer 2 network to the

11   layer 3 network.  Is that fair?

12   A.    Yes.

13   Q.    And, in particular, in the ring structure of this patent,

14   there were three different connection points out to the

15   external network.  Right?

16   A.    Yes.

17   Q.    And the patent describes each of these connection points

18   as egress nodes.  Correct?

19   A.    That's correct.

20   Q.    And what egress node refers to is that is the node of a

21   ring network where traffic can actually exit that ring and get

22   outside to a different network.  Right?

23   A.    Correct.

24   Q.    And the problem that the '010 Patent was trying to solve

25   was that if I wanted to send something from this node over

1    here, I didn't have enough information about how to route over

2    on these links so that I knew what my best path was.  And so I

3    couldn't tell whether I should go like this or like this or

4    even like this.  Right?  That was the problem.

5    A.   Agreed.

6    Q.   And that was because these nodes that were not connected

7    as egress nodes in the ring, these guys, had no visibility to

8    the structure or the route cost of these external links.

9    Right?

10   A.   That's correct.

11   Q.   And that's what the title of the patent is talking about

12   when it talks about visibility.  Right?

13   A.   Yes.

14   Q.   And, in particular, what this patent was about was when

15   I'm in a ring network, I need to figure out the easiest path

16   to get out of the network, I need to know which egress node to

17   use.

18            MR. POMEROY:  Your Honor, may we approach?

19            THE COURT:  Approach the bench.

20            (The following was had outside the hearing of the

21            jury.)

22            THE COURT:  What is it, counsel?

23            MR. POMEROY:  Your Honor, I believe this is

24   violating Court MIL 18.  He's attempting to use the

25   specification for non-infringement.

526

```
 1                THE COURT:  All right.  What's your response, Mr.
 2     Haynes?
 3                MR. HAYNES:  Your Honor, I'm describing the problem
 4     that existed in the prior art.  It's background.  This
 5     description that I'm doing is in the background of the
 6     specification of this patent.
 7                THE COURT:  I'm going to overrule your objection at
 8     this time, Mr. Pomeroy, but if this ceases to be background
 9     and transitions into improper comparison, I'll certainly
10     sustain a similar objection in the future.  Okay?
11                MR. POMEROY:  Understood, Your Honor.
12                THE COURT:  All right.
13                (The following was had in the presence and hearing
14                of the jury.)
15                THE COURT:  Let's continue.
16     Q.   (BY MR. HAYNES)  So, Doctor Valerdi, you would agree with
17     me that the problem that the patent was identifying was that
18     in one of these nodes that is not an egress node of the layer
19     2 ring network, I don't know the best path out over to this
20     external network.  Right?
21     A.   Yes.
22                MR. HAYNES:  Can we bring up claim 59?
23     Q.   (BY MR. HAYNES)  This is the claim that's been asserted
24     in this case.  Correct?
25     A.   That's correct.
```

```
1            MR. HAYNES:  And would it be possible to put claim
2    59 on the left side and that figure on the right?
3            MR. POMEROY:  Your Honor, may we approach?  I object
4    for the same reasons illustrated before.
5            THE COURT:  I can't hear you, counsel.
6            MR. POMEROY:  Your Honor, may we approach?  The
7    objection that I raised before.
8            THE COURT:  Well, I recall the objection you raised
9    before.
10       Why are we still in the area of background here, Mr.
11   Haynes?  Why are we not moving to a direct comparison if
12   you're going to put these side by side?
13           MR. HAYNES:  Your Honor, my intention is to show
14   using the claim language and use an example in the embodiment
15   to illustrate so the jury can understand when it refers to
16   these terms, what an example of that would look like.
17       I'm not going to suggest that is the only way that you
18   could do it, but that is an example.  That's the example
19   that's given in the patent for how this works.
20           THE COURT:  Well, I'll allow it with the following
21   clarification for the benefit of the jury:  Patent
22   specifications typically, ladies and gentlemen, contain within
23   them something called a preferred embodiment.  It's a
24   suggested way to do what the patent covers.  That's not the
25   only way, and the patent claims are not limited to the
```

1    embodiment set forth in the specification; it's just an

2    illustration.

3         So I'm going to permit Mr. Haynes to show you that

4    embodiment compared to the claim language for purposes of

5    illustrating things, but I want you to understand that in no

6    way limits or hinders the application of the claims to things

7    that are not that particular example or embodiment.  All

8    right?

9         So we'll proceed on that basis.  But I need to warn you,

10   Mr. Haynes, you're not permitted to get into a direct

11   comparison that indicates that infringement could be or might

12   be limited to a particular embodiment.  Understood?

13                MR. HAYNES:  Understood, Your Honor.

14                THE COURT:  All right.

15   Q.   (BY MR. HAYNES)  Doctor Valerdi, what I'm going to do is

16   actually I hope a lot simpler than that.  So what I want to

17   do, just as an example, identify what the various elements of

18   this claim look like in the example figure.  Okay?

19   A.   Okay.

20   Q.   So we've got, again, this claim language of layer 2 ring

21   network.  Right?  Do you see that, sir?

22   A.   Yes.

23   Q.   And an example of such a thing is the ring network shown

24   in figure 1 on the right side that we just talked about.

25   Right?

1    A.    Yes.

2    Q.    And then we've got an external layer 3 network.  An

3    example of that would be the external network that we talked

4    before out here.  Correct?

5    A.    Correct.

6    Q.    And then we talk about in nodes of said ring network, you

7    understand that's referring to the nodes of the layer 2 ring

8    network.  Correct?

9    A.    Yes.

10   Q.    And then down here at the bottom, you're defining paths

11   from said nodes and those have to go through egress nodes.

12   Correct?

13   A.    Correct.

14   Q.    And the egress nodes here are the things -- in this

15   example are the connection points between the layer 2 ring and

16   the external network, so these nodes that are connected to the

17   external network.  Correct?

18   A.    Correct.

19   Q.    You would not characterize in this example nodes 16 or

20   node 20 -- I believe that's node 18--node 18 or node 20 as

21   egress nodes.  Correct?

22   A.    That's correct.  I agree.

23           MR. HAYNES:  Okay.  If we could bring up ID 2116-01.

24   Q.    (BY MR. HAYNES)  Now, you used this slide in your direct

25   testimony to illustrate your opinions on infringement.

1    Correct?

2    A.    Correct.

3    Q.    And this is a figure out of one of Nokia's documents that

4    shows an example triple play surface delivery architecture.

5    Correct?

6    A.    Correct.

7    Q.    And what you contend is the layer 2 ring network is the

8    network that is comprised of the BSAs here and this BSR here.

9    Correct?

10   A.    Yes.

11   Q.    And what you contend to be the layer 3 network, you've

12   shown in this blue square on the right.  Correct?

13   A.    That's right.

14   Q.    And you would agree with me, sir, that these BSA nodes

15   are not connected to the external network.  Correct?

16   A.    Yes, I agree.

17   Q.    And you would also agree with me, sir, that these BSA

18   nodes do not have visibility beyond the BSR node.  Correct?

19   A.    Correct.

20   Q.    And as a result of that, these BSA nodes cannot define

21   paths that go beyond the BSR.  Correct?

22   A.    I'm reflecting on your question because there is a lot of

23   source code running through my mind right now, and there is

24   inter and intra variables, there's shared paths, there's a lot

25   of information moving.  So I'm not sure I can answer

1  definitively the way you've asked it.

2  Q.   Okay.  As you sit here today, you cannot tell me that

3  these BSA nodes can define a path through the BSR node out to

4  the external network.  Correct?

5  A.   I'm a little unsure on the path designation because

6  there's information coming in from the layer 3 node through

7  the egress to those BSAs that you're asking about.

8       So I will just qualify my answer to say there is

9  definitely information moving and there are paths.  In terms

10  of where that communication stops and ends is really an answer

11  that can be provided by the source code.

12  Q.   We talked about -- well, you've heard testimony at least

13  about these dashed lines that go from the BSA to the BSR.

14  A.   Yes.

15  Q.   Correct?

16       And you understand that those dashed lines represent

17  layer 2 BPLS connections.  Correct?

18  A.   Yes.

19  Q.   Okay.  And you also understand that those connections at

20  layer 2, these BPLS connections, start at the BSA and then are

21  terminated at the BSR.  Correct?

22  A.   I've seen that kind of language, yes.

23  Q.   Okay.  And you also in your direct testimony talked about

24  the concept of OSPF and OSPF routing.  Do you recall that

25  generally?

1    A.    Yes.

2    Q.    Now, these BSAs, if they were using OSPF routing, they

3    would only define paths at most from the BSA to the BSR.

4    Correct?

5    A.    In that limited example, yes.

6          MR. HAYNES:    Can we bring up ID 2020-01?

7    Q.    (BY MR. HAYNES)    This is another one of the

8    demonstratives you used in your direct testimony.    Correct,

9    sir?

10   A.    Yes.

11   Q.    And you used this to show the seven layers of the OSI

12   model that we've heard some testimony about.    Correct?

13   A.    Correct.

14   Q.    Now, when we talk about layer 2 ring network, what that

15   means is that the transported data in that ring network is

16   being done at this layer, layer 2.    Right?

17   A.    That's correct.

18   Q.    And you would agree with me that when I talk about a ring

19   network in the concept of computer networking, I can have

20   different layers.    I can have a ring network at layer 3, for

21   example.

22   A.    Yes, I think you can.

23   Q.    Yeah.    I can also have a ring at layer 1, for example.

24   A.    Yeah, I agree with that.

25   Q.    Yeah.    And layer 1, as we talked about, is the physical

1    layer.  Correct?

2    A.   That's correct.

3    Q.   And if I'm talking about a physical wireDConnection, the

4    physical layer, you can think of that as actually the wire.

5    Right?

6    A.   That's correct.

7    Q.   If you're talking about wires, you're talking about layer

8    1.  Right?

9    A.   That's correct.

10   Q.   And some of these computer networks, the wires that we

11   use are called fibers.  Right?

12   A.   That's one option, correct.

13   Q.   Okay.  Now, what I want to do is go to another one of the

14   slides you used.

15          MR. HAYNES:  ID 2117.

16   Q.   (BY MR. HAYNES)  Do you recall testifying about this

17   document?

18   A.   Yes.

19   Q.   And I believe the substance of your testimony was that

20   you believed that the figure we just looked at had a layer 2

21   ring network because this document references a ring topology.

22   Do you recall that testimony generally?

23   A.   Yes, that was one of the reasons I cited.

24   Q.   Right.  But you understand that the ring topology that is

25   being described here is the fiber plant layout.  Correct?

1    A.   The text that you've underlined which says regardless of

2    the fiber plant layout seems to suggest that the fiber plant

3    layout is one example of that ring network.  It doesn't

4    suggest that it's only limited to a fiber plant layout.

5    Q.   Well, let's actually look at the prior sentence.  We see

6    there that the examples that are actually being given of a

7    fiber plant layout are a hub-and-spoke or a ring topology.

8    Right?

9    A.   Yes, I see those.

10   Q.   And those in this example, it's talking about an

11   advantage of using VPLS for this application is that VPLS

12   instances can be established over those different fiber plant

13   layouts.  Correct?

14   A.   That's fair, yes.

15   Q.   And you agree with me that it is possible to have a fiber

16   layout that is in a ring at layer 1 and a layer 2 network that

17   is not in a ring.  Correct?

18   A.    I think that's possible, but that's not what the diagram

19   is showing.  So it's inconsistent with the drawing.

20   Q.   That's just not how you interpret this document.  Fair?

21   A.   Well, but the -- the interpretation comes from what's

22   written in -- at the center of that ring topology drawing,

23   which says VPLS, and virtual private LAN service is a layer 2

24   protocol.  So it's hard to separate.  I mean, they're the same

25   color, they're in the same part of the figure.  I can't

1  separate those two things.

2  Q.    Now, you mentioned VPLS, and you said that's layer 2.

3  Right?

4  A.    Correct.

5  Q.    And you see here where it says, VPLS enables a full mesh

6  to be created between BSA and BSR nodes.  Do you see that?

7  A.    Yeah, that's kind of confusing to me.  I see it.

8  Q.    And you understand that a full mesh connection is not a

9  ring connection.  Correct?

10  A.    I absolutely agree with that, yes.

11  Q.    And you understand that when this document is talking

12  about the connections between the BSAs and the BSR, it

13  describes those VPLS connections, the layer 2 connections, as

14  mesh connections.  Right?

15  A.    I struggle with that association because the diagram that

16  is referenced is figure 2, is not a mesh network, so I don't

17  see how the text matches the diagram.

18  Q.    Okay.

19        MR. HAYNES:  Can I bring up DDX 4.2?

20  Q.    (BY MR. HAYNES)  Doctor Valerdi, you would agree with me

21  that "a ring network is a local area network in which devices

22  (nodes) are connected in a closed loop, or ring."  Correct?

23  A.    Yes.

24  Q.    Okay.

25        MR. HAYNES:  Let's go to the next slide.

1    Q.   (BY MR. HAYNES)  And you would agree with me that "A mesh

2    network is a communications network having two or more paths

3    to any node."  Correct?

4    A.   Mostly.

5    Q.   You have in front of you your expert report, sir?

6    A.   Yes, I do.

7    Q.   Can you just look at your expert report on page 17,

8    paragraph 44H?

9    A.   Which tab?

10   Q.   It should be in a binder by itself.

11   A.   I see depositions and I see cross binder.

12        MR. HAYNES:  Your Honor, may I approach?

13        THE COURT:  You may.

14   So are you referring to the expert's opening report?

15        MR. HAYNES:  Yes, Your Honor.

16        THE WITNESS:  I think these are identical.

17   Q.   (BY MR. HAYNES)  Probably.

18   A.   Okay.

19   Q.   I only need one page.  See if there's a page 17 in there,

20   if you don't mind, sir?

21   A.   Which tab?

22   Q.   Your opening report.

23   A.   Yes.

24   Q.   Okay.  If you would just read on page 17 to yourself,

25   paragraph 44H.

1    A.    I've read it.

2    Q.    Does that refresh your recollection that a mesh network

3    is a communications network having two or more paths to any

4    node?

5    A.    Yes.

6    Q.    Okay.

7            MR. HAYNES:  Now, if we could, let's bring up the

8    next demonstrative, DDX 4.4.

9    Q.    (BY MR. HAYNES)  Okay.  Now, a ring network is a local

10   area network in which devices are connected in a closed loop

11   or ring.  That's a definition you agree with.  Right?

12   A.    Yes.

13   Q.    But a mesh network is a communication network having two

14   or more paths to any node.  Correct?

15   A.    Yes.

16   Q.    Now, it's your interpretation that this red line here is

17   actually a physical connection of some sort.  Is that right?

18   A.    Yes.

19   Q.    Okay.  You understand that Mr. Valley doesn't agree with

20   you on that?

21   A.    Yes, I do.

22   Q.    Okay.  But even if Mr. Valley did agree with you that

23   that was actually a physical connection, even if that was the

24   case, I would still have a connection here and a connection

25   here and a connection here.  Correct?

1    A.    Yes.

2    Q.    And that would be a mesh network, wouldn't it, sir, under

3    the definition that you just agreed to?

4    A.    No.    There are some paths missing.    The top BSA is not

5    directly connected to the BSA that's at the bottom of the

6    oval, and the other missing connection is the bottom BSA is

7    not connected to the BSA on the top right in a direct manner,

8    violating the definition of a mesh network.

9    Q.    That would also not be a closed loop or ring, would it?

10    A.    By nature of the limited arrows or lines that you've

11    drawn, I don't know if you were done or if you wanted to stop

12    there intentionally.    You've drawn a hub-and-spoke network.

13    Q.    Fair enough.

14          Certainly the connections shown in this illustration are

15    not a closed loop or ring.    Correct?

16    A.    Can you clarify, are you referring to your drawings or

17    what's originally in the figure?

18    Q.    I'll make it easy and just highlight what everybody in

19    the case -- you contend it's the ring, Mr. Valley contended

20    it's the connections in between --

21          THE COURT:    Let's don't tell him what another

22    witness is going to say.    You know, we're going to examine

23    that witness in the future.    Let's take them one at a time.

24    Q.    (BY MR. HAYNES)    Let me just ask you this question, sir.

25    If the connections between the BSA and the BSR are the ones

539

1    that I just drew there, you would agree with me that that is

2    not a ring network.  Correct?

3    A.   Just to clarify, only the connections you've drawn;

4    nothing else?

5    Q.   Correct, sir?

6    A.   I would agree that is a hub-and-spoke network.

7    Q.   Okay.  Now, I want you to assume for my next question

8    that those connections are still there and that those are

9    layer 2 connections.  Are you with me so far?

10   A.   Yes.

11   Q.   Under that assumption, you would agree with me that the

12   connections between the BSA and the BSR would be a layer 2

13   hub-and-spoke connection.  Correct?

14   A.   Yes.

15   Q.   Now, if I add this connection around the outside and I

16   tell you that that red circle is fiber, what I've illustrated

17   here would still be a layer 2 mesh network.  Correct?

18   A.   That's one of the networks you've shown, yes.

19   Q.   I've also shown a layer 1 ring network that's connected

20   by fiber.  Correct?

21   A.   I partially agree with that.

22   Q.   Okay.  You agree with me that a fiber connection is a

23   layer 1 connection.  Correct?

24   A.   Yes.

25   Q.   Okay.  Now, you understand that the claims for the '599

1    Patent that we've been talking about require that there be a

2    layer 2 ring network.  Correct?

3    A.    Yes.

4    Q.    And you understand that it's certainly possible for

5    Nokia's customers to configure the routers that Nokia sells in

6    networks that are not layer 2 ring networks.  Correct?

7    A.    I agree.

8    Q.    And you did not attempt any analysis to determine how

9    many of the routers that Nokia sells have ever been configured

10   in what you contend to be a layer 2 ring network.  Correct?

11   A.    Incorrect.

12   Q.    How many of Nokia's routers have been configured into a

13   layer 2 ring network?

14   A.    I can't tell you exactly because I did not do an

15   exhaustive search, but I can tell you from the configuration

16   files that I analyzed, there was a lot of configuration

17   information there.  And so that really would be where

18   the -- where I would be able to answer that definitively,

19   through those configuration files.

20   Q.    So, sir, what you've accused of infringement in this case

21   is the particular configuration, this triple play service

22   delivery architecture.  Correct?

23   A.    Yes.

24   Q.    And you were here for Mr. Valley's testimony.  Correct?

25   A.    Yes.

1    Q.   And you heard Mr. Valley testify that that particular

2    architecture, the triple play architecture, maybe accounts for

3    less than 20 percent of the Nokia routers that are sold?

4    A.   I don't remember exactly the 20 percent, but I remember

5    him answering questions about triple play.

6    Q.   Okay.  You have no reason to disagree with Mr. Valley's

7    testimony regarding the extent to which any of Nokia's

8    customers have used the triple play architecture.

9    A.   I have no reason to question his testimony.

10   Q.   Okay.  Let's move on to the third patent, the '580

11   Patent.

12           MR. HAYNES:  If we could bring that up, Mr.

13   Carrillo.  It's JX 2.

14   Q.   (BY MR. HAYNES)  Doctor Valerdi, you recognize this as

15   the '580 Patent that you believe is infringed by Nokia's

16   router products?

17   A.   Yes.

18   Q.   And you understand that this patent is about resource

19   sharing among network tunnels.  Correct?

20   A.   That's correct.

21   Q.   This patent is not about resource sharing among paths of

22   the same tunnel.  Correct?

23   A.   I'm thinking about your question because you've

24   distinguished path and tunnels.

25   Q.   Well, let me -- let's put the claims up and maybe that

1     will help you.

2              MR. HAYNES:  Can we look at claim 8?

3     Q.  (BY MR. HAYNES)  Doctor Valerdi, you understand that in

4     order to infringe this claim, there must be resource sharing

5     among first and second tunnels.  Correct?

6     A.  Yes.

7     Q.  So there has to be two tunnels that I'm sharing resources

8     between.  Correct?

9     A.  Yes.

10    Q.  And you understand that prior to this patent, there were

11    IETF standards that allowed resource sharing between two paths

12    of the same tunnel.  Correct?

13    A.  Correct.

14    Q.  And so what the -- this patent was supposed to have added

15    was the notion that I could have two independent tunnels with

16    different end points that could share resources.  Correct?

17    A.  Correct.

18    Q.  And you talked a little bit in your direct testimony

19    about a protocol called shared explicit.  Do you recall that?

20    A.  Yes.

21    Q.  And that's one of the things that you used to illustrate

22    your testimony that you thought Nokia's products were sharing

23    resources between two different tunnels.  Right?

24    A.  That's correct.

25    Q.  But you know, sir, that the shared explicit message,

543

1    something that existed long before this patent.  Right?

2    A.   Maybe that type of message did, but there's a lot more to

3    that story in terms of its functionality.

4    Q.   Right.  And, for example, the patent itself recognizes

5    that there was an IETF standard called 3209 that used shared

6    explicit messages to share resources between two paths of the

7    same tunnel.  Correct?

8    A.   That's correct.

9    Q.   And you also know, sir, that before the invention of this

10   patent, there was an IETF standard that was known in the art

11   called 4875.  Correct?

12   A.   Yes.

13   Q.   And that IETF RFC 4875 standard is something called

14   point-to-multipoint label switch paths.  Right?

15   A.   Correct.

16   Q.   And the standard that told you how to create and define

17   point-to-multipoint label switch paths existed before the '580

18   Patent was filed.  Correct?

19   A.   That's correct.

20            MR. HAYNES:  If we could bring up ID 2308.

21   Q.   (BY MR. HAYNES)  And this is one of the examples that you

22   gave from a Nokia document to illustrate your belief that

23   Nokia shares resources between two different tunnels.

24   Correct?

25   A.   Correct.

1    Q.   And what you've accused here is an example of a

2    point-to-multipoint label switch path.  Correct?

3    A.   This is one example, yes.

4    Q.   Yes.  And you understand that in Nokia's products, the

5    way that they implement point-to-multipoint label switch paths

6    is using RFC 4875.  Correct?

7    A.   That's correct.

8    Q.   And you understand that -- well, you were here for Mr.

9    Valley's testimony who explained that a point-to-multipoint

10   label switch path is one tunnel.  Correct?

11   A.   I don't remember that specific statement, but I'll go

12   with that.

13   Q.   Yeah.  You would agree with that a point-to-multipoint

14   LSP is a tunnel.  Right?

15   A.   Yes.

16   Q.   One tunnel.  Correct?

17   A.   Correct.

18   Q.   Okay.  So what I'm seeing here when I've created this

19   point-to-multipoint LSP, I'm looking at one tunnel.  Correct?

20   A.   Well, this particular figure doesn't show one tunnel; it

21   shows two tunnels.

22   Q.   Okay.  And it's your belief that the two tunnels are what

23   you've drawn here in green and yellow.  Right?

24   A.   Well, to be clear, those arrows that exist in the diagram

25   are Nokia's -- part of Nokia's drawing.  All I've done is

1    added colors to those arrows.

2    Q.   Okay.  And you understand that the point-to-multipoint

3    tunnel that is in Nokia's products and that existed before the

4    '580 Patent had different end points.  Right?

5    A.   Yes, I do.

6    Q.   Okay.  So the notion of having a point-to-multipoint

7    tunnel with different end points is not something that Orckit

8    is claiming to invent or that you've claiming is new to the

9    '580 Patent.  Right?

10   A.   That's correct.

11   Q.   Okay.  Now, in your infringement analysis when you were

12   trying to determine whether or not Nokia's products infringed

13   the '580 Patent, the thing that you pointed to as having two

14   tunnels was a point-to-multipoint LSP.  Correct?

15   A.   As an example, I did.

16   Q.   Yes.  And you actually identified it in support of your

17   opinions on infringement the RFC 4875 standard.  Correct?

18   A.   I don't think I mentioned that standard during my direct.

19            MR. HAYNES:  If you could bring up -- let's bring up

20   ID 2138-02.

21   Q.   (BY MR. HAYNES)  Do you see that, sir?

22   A.   Yeah.  I see it in the paper, but I didn't actually say

23   that standard name in my direct.

24   Q.   You actually didn't mention the point-to-multipoint LSP

25   that you're pointing to for infringement was the RFC 4875

1   standard.  Right?

2   A.   I was making a different point on this slide.

3   Q.   But you agree with me that what you're accusing of

4   infringement in Nokia's products is implementing the

5   point-to-multipoint RSVP LSP standard RFC 4875.  Correct?

6   A.   I agree that part of it is implemented.  Part of the

7   implementation is based on that standard.

8   Q.   And we also looked -- you pointed to some different

9   messages that were sent back and forth, and there was a

10  diagram with a notification going one way and an RESV message

11  going the other.  Do you recall that?

12  A.   Correct.

13  Q.   And you understand that the messages that you pointed to

14  are specified by either the RFC 3209 standard or the 4875

15  standard.  Right?

16  A.   I agree that the messages themselves are specified by

17  those documents, but the way the messages are used is quite

18  unique and different.

19  Q.   Is it your testimony that what was new about the '580

20  Patent was using the technology that was already specified in

21  some new way?

22  A.   I'm not sure if I would describe the RFC as a technology.

23  It's a standard.  And the way somebody chooses to implement

24  that standard might -- will differ.  So the technology to me

25  is more about the implementation of an idea as opposed to the

1    standard by itself.

2    Q.    You understand that in computer networks, one company's

3    routers need to interact with another company's routers?

4    A.    Yes.

5    Q.    And that's one of the reasons they use standards so they

6    can interoperate with each other?

7    A.    Yes.

8    Q.    And you're not suggesting to this jury that there's

9    something in Nokia's source code that changes the way they

10   implement the RFC standard such that it can't interoperate.

11   Right?

12   A.    Your question was much broader about interoperability,

13   but our discussion prior was very specific about how a

14   specific type of message is used within products.  I think

15   those are two very different things.

16   Q.    And the way -- the messages that you pointed to, what

17   they were being used for was to create a point-to-multipoint

18   LSP using RFC 4875.  Correct, sir?

19   A.    Part of the implementation is based on that standard, I

20   agree.

21              MR. HAYNES:  Pass the witness, Your Honor.

22              THE COURT:  All right.  Redirect by the Plaintiff?

23        Proceed when you're ready, Mr. Pomeroy.

24              MR. POMEROY:  Thank you, Your Honor.

25              THE COURT:  Make sure we hear you.

1                    MR. POMEROY:  Thank you, Your Honor.

2          Mr. Jarrett, could you please pull up JX 01?  Would you

3    go to claim 1 for me?  It's at the back.  Stop there, and

4    could you blow up claim 1 for me?

5                         REDIRECT EXAMINATION

6    BY MR. POMEROY:

7    Q.    While that's being taken care of, I want to ask you a few

8    questions, Doctor Valerdi.

9          In your direct examination, you presented a lot of

10   evidence.  Was some of that evidence source code?

11   A.    Yes, I relied on source code.

12   Q.    How much source code did you review?

13   A.    Millions of files which translate to probably billions of

14   lines of code.

15   Q.    And did you present source code in your analysis today?

16   A.    Yes.

17   Q.    Did you present a lot of source code today?

18   A.    No.

19   Q.    And why is that?

20   A.    Well, because of the sheer volume of it, it's more

21   efficient to just grab excerpts that relate to the accused

22   patents and the accused claims, so I did the prefiltering in

23   advance.

24   Q.    Now, is it -- was every aspect of your infringement

25   analysis across all three patents dependent upon the source

1    code you analyzed?

2            MR. HAYNES:  Objection; leading.

3            THE COURT:  Restate the question, counsel.

4    Q.  (BY MR. POMEROY)  You depended on -- why did you analyze

5    the source code?

6    A.  Because it shows how the product is actually programmed

7    to work.  It's -- that's the nice thing about source code.  It

8    either shows that it does something or it doesn't do

9    something.  So it's very -- it's the ground truth.

10   Q.  Do you recall when Mr. Valley said he hasn't seen any of

11   the source code?

12   A.  Yes, I remember him saying that.

13   Q.  And do you recall Mr. Haynes showing you a bunch of

14   figures?

15   A.  Yes, he showed me figures.

16   Q.  Did Mr. Haynes show you a single line of source code?

17   A.  No.

18   Q.  Did Mr. Haynes ask you a single question about your

19   source code analysis?

20   A.  I don't believe he directly asked me about source code.

21   Q.  Now, I want to first turn to the '010 Patent.

22       Now, has this term 'hub' been construed by the Court?

23   A.  No.

24   Q.  Now, the term 'hub' is not, if you look at the claim,

25   just in isolation.  Is that correct?

1    A.    Correct.

2    Q.    Are there other limitations that are required to meet the

3    hub limitation?

4    A.    Yes.  All the words that are after hub.

5    Q.    Does the hub need a plurality of ports?

6    A.    Yes.

7    Q.    Does the hub need to be able to be configured to receive

8    and transmit data frames?

9    A.    Yes.

10   Q.    Does the hub need to be able to receive and transmit

11   those data frames in accordance with a packet-oriented layer 2

12   protocol?

13   A.    Yes.

14   Q.    Now, you were shown a definition of a hub.  Did

15   that -- seeing that definition change any of your analysis

16   here today?

17   A.    No.

18   Q.    And why is that?

19   A.    Because the distinction was being made between what a

20   device that is only a hub is defined as, whereas the point I

21   was trying to make was different, is that a router is also

22   acting as a hub.

23   Q.    Did the '599 Patent itself -- excuse me.

24        Did the '010 Patent itself provide context to your

25   understanding of what a hub is?

1    A.   Yes.

2              MR. HAYNES:  Objection, leading.

3              THE COURT:  I'll allow the question, but you need to

4    refrain from leading, counsel.

5              MR. POMEROY:  Mr. Jarrett, could you please turn to

6    JX 2, please?  My apologies.  JX 3.  Could you go to the claim

7    59, please?

8    Q.   (BY MR. POMEROY)  Now, my first question is, what does

9    that first limitation require?

10   A.   A lot of things.  Layer 2 and layer 3 networks, to begin

11   with.

12   Q.   Are the first four words 'a computer software product'?

13   A.   Yes.

14   Q.   What is a computer software product?

15   A.   It's a device that has memory, a processor, and software

16   that runs inside of those hardware components.

17   Q.   Is there any hardware component within that first portion

18   of the first limitation?

19   A.   Yes.  A computer readable medium.

20   Q.   Understood.

21        I want to talk about this layer 2 ring network.

22             MR. POMEROY:  Mr. Jarrett, could you please go to

23   the direct deck and slide 97?  Could you go one slide further,

24   please?  Thank you.

25   Q.   (BY MR. POMEROY)  Do you recall being shown this today?

```
 1   A.   Yes.

 2   Q.   Do you recall questions being asked regarding a ring

 3   network and layer 1?

 4   A.   Yes.

 5   Q.   If a ring network is at layer 1, is layer 2 also a ring

 6   network?

 7   A.   Yes, it can be.

 8   Q.   And why is that?

 9   A.   Because if you remember from the seven layers of the

10   protocol stack, one of them is the network layer, one of them

11   is a data layer, and the other one is the physical layer.  So

12   it's possible to have networks that can be described in more

13   than one of those layers.

14        MR. POMEROY:  Your Honor, at this time I'd like to

15   seal the courtroom.

16        THE COURT:  All right.  Based on counsel's request

17   and to protect confidential information, I'll order the

18   courtroom sealed.

19      I'll direct all persons present who are not subject to

20   the protective order in this case exit the courtroom and

21   remain outside until it's reopened and unsealed.

22                   (Courtroom sealed.)

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11                      (Courtroom unsealed.)

12          MR. POMEROY:  Mr. Jarrett, during that, could you

13   make the call admission control larger for me, just the last

14   limitation of that claim 8?

15          THE COURT:  All right.  The courtroom is unsealed.

16      Let's continue.

17   Q.   (BY MR. POMEROY)  Doctor Valerdi, do you recall being

18   asked questions about an RFC 4875?

19   A.   Yes.

20   Q.   And I was taking notes and I remember you saying

21   something about what you -- your infringement analysis was not

22   based solely on RFC 4875.

23          MR. HAYNES:  Objection; leading.

24          THE COURT:  Restate your question, counsel, in a

25   non-leading form.

1    Q.    (BY MR. POMEROY)   Was your infringement analysis based on

2    RFC 4875?

3    A.    No.

4    Q.    What was your infringement analysis based upon?

5    A.    The source code, the technical manuals that Nokia

6    provided of their products, my review of depositions of Nokia

7    employees, and the configuration files of Nokia's routers.

8    Q.    Do you recall that the claim term 'call admission

9    control'?

10   A.    Yes.

11   Q.    Do you recall the identical SGI values that are required

12   by the claim construction call admission control?

13   A.    Yes.

14   Q.    Did Mr. Haynes ask you anything about a call admission

15   control with respect to RFC 4875?

16   A.    I don't think so.

17   Q.    For this claim term, did you point to anything other than

18   source code?

19   A.    I don't think so.  I think the majority of my analysis

20   for this claim term was based on source code.

21          MR. POMEROY:  Your Honor, I pass the witness.

22          THE COURT:  All right.  Is there additional cross

23   examination?

24          MR. HAYNES:  Briefly, Your Honor.

25          THE COURT:  We'll see.

```
 1                MR. HAYNES:  I'll do my very best.

 2                THE COURT:  Let's proceed.

 3                     RECROSS EXAMINATION

 4   BY MR. HAYNES:

 5   Q.   Doctor Valerdi, I think I just heard you testify that you

 6   reviewed billions of lines of source code, and if you were to

 7   print them out they would have filled this whole courtroom.

 8   Is that right?

 9   A.   They would fill a large part of the courtroom.  I don't

10   know if it would fill the whole thing, but it would be very

11   noticeable.

12   Q.   Okay.  And in the boxes over there, that's really the

13   code that was printed that you sort of focused on.  Right?

14   A.   That's correct.

15   Q.   Your review of all the other code that Nokia made

16   available to you happened on one day between 9:00 a.m. and

17   5:00 p.m.  Right?

18   A.   No.

19   Q.   How many times did you review Nokia source code in

20   connection with this case, Doctor Valerdi?

21   A.   I probably spent hundreds of hours reviewing source code.

22   Q.   Doctor Valerdi, I'm asking not about the code you printed

23   in the box, but about your review of the source code computer

24   where the totality of the source code relevant to this case

25   was made available to you.
```

1          Your review of that computer, sir, was one day.  Right?

2     A.   My trip to Atlanta to your offices where the source code

3     computer was provided was one business day, at which point I

4     identified specific files and excerpts of those files that I

5     wanted to be printed for further review.  And so that was in I

6     think October of 2023.  We're already in April.  So between my

7     visit in October to the time that I submitted my expert

8     report, which is probably in December, I spent a lot of time

9     looking at source code.  And I already knew what I needed to

10    focus on, so it wasn't just a random search; it was a focused

11    analysis.

12    Q.   I think I heard you testify in response to questions from

13    your counsel that you did not base your infringement opinions

14    on the RFC 4875 standard.  Is that right?

15    A.   That's correct.

16    Q.   Sir, I'd ask you to look at your expert report you have

17    in front of you in appendix B-1.

18         And, sir, you understand that in connection with your

19    work in this case, you prepared a written report in advance of

20    coming here that summarized your opinions on infringement.

21    Correct?

22    A.   Yes.  I haven't found where you wanted me to look.

23    Q.   I'll direct you in just a minute.

24         The report you have in front of you is that summary of

25    your written analysis that set forth your infringement

```
1   opinions in this case.  Correct?

2   A.   Correct.

3   Q.   Is it your testimony that in that report you did not rely

4   on RFC 4875 to support your opinions of infringement?

5   A.   I think the way I understood the question was whether the

6   RFC standard was the only thing I relied on.

7   Q.   If that's the way you understood it, I apologize.  Let me

8   rephrase it.

9        You may have relied on other stuff, but you absolutely

10  relied on the RFC 4875 standard to support your opinions on

11  infringement.  Correct?

12  A.   I'd have to look at my report again.  It's been several

13  months, so if you want to point me to a specific paragraph,

14  I'm happy to look at it.

15  Q.   So as you sit here today, your testimony is you don't

16  know whether you relied on that standard or not?

17  A.   Not quite.  My testimony is I remember looking at that

18  standard.  It's an important reference, but the actual

19  infringement analysis is not supported only by a standard;

20  it's really about what the code in those boxes do and what the

21  manuals that Nokia provides do.  That's really what's relevant

22  to me for infringement.

23  Q.   Right.  But Nokia's products implement that standard.

24  You understand that.  Correct?

25  A.   Yes, I do.
```

Q.   You understand Nokia's documents explicitly state that

they're implementing that standard.  Right?

A.   That's fair, yes.

Q.   Okay.  Switch gears.  And this is a little out of

context.  I apologize.

     We talked about OSPF routing protocol.  Do you recall

that?

A.   Yes.

Q.   That OSPF routing protocol is a layer 3 protocol.

Correct?

A.   That's right.

Q.   OSPF routing protocol is not a layer 2 routing protocol.

Correct?

A.   I'm unsure.  I'll have to look at my report again.  But

if you're representing that, I'll play along.

Q.   I'm just asking for your opinion, sir.  If you don't

know, it's fine for you to say you don't know.

     Do you know as you sit here today whether OSPF is a layer

2 routing protocol?

A.   I don't remember that detail specifically.

Q.   I just have a couple of more questions, but it is about

the source code slide that you were asked about.

     Could we seal the courtroom, please, Your Honor?

          THE COURT:  All right.  Based on counsel's request,

I'll order the courtroom sealed.  I'll direct that all persons

1    present who are not subject to the protective order in this

2    case exit the courtroom and remain outside until it's reopened

3    and unsealed.

4                          (Courtroom sealed.)

1              (Courtroom unsealed.)

2          THE COURT:  And with that you may step down, Doctor

3    Valerdi.

4       Am I correct, Mr. Bennett, your next witness is another

5    deposition witness?

6          MR. BENNETT:  That's correct, Your Honor.

7          THE COURT:  All right.

8          MR. BENNETT:  We call Phillipe Bergeon, who was the

9    product line manager of IP networks for Nokia.  Total run time

10   is 6 minutes, 32 seconds, with 4 minutes, 37 seconds

11   attributed to Plaintiff and 1 minute, 55 seconds attributed to

12   Defendant.

13         THE COURT:  All right.  Proceed with this witness by

14   deposition, please.

15                    PHILIPPE BERGEON

16                   BY VIDEO DEPOSITION

17   Q.   Can you briefly describe when you first started working

18   for Alcatel Lucent?

19   A.   Yes.  So I actually started to work for Alcatel, that

20   then get merged into a -- with Lucent.  I came -- I became

21   Lucent and then I became Nokia.

22   Q.   Can you explain to the jury what IP products are?

23   A.   Yes.  So IP products -- IP routers, when we say IP

24   product, it's the IP division within Nokia.  And so those

25   products are the IP router that Nokia sells to service

1    providers around the world, so AT&T.  Yeah, the highest-end

2    type of operator which you can find in North America and

3    elsewhere.

4         And so -- so I start on that product line.  There is --

5    there is various different products depending on where that

6    router is positioned within the operator network, whether it's

7    in the core network or the edge network.  We have smaller

8    router and larger router.

9    Q.   And these IP routers, are you aware if Nokia refers to

10   these as service routers?

11   A.   Yes.

12   Q.   Have you ever reviewed any of the source code that runs

13   on the Nokia IP routers?

14   A.   No.  Like, actually, product managers do not have access

15   to the source code.

16   Q.   I guess, how would one obtain how the router is

17   configured?

18   A.   Well, the only people who knows how the router is

19   configured is the customer.  And the customer knows how the

20   router is configured.

21   Q.   And Nokia doesn't know how the customer configures its

22   router?

23   A.   No.  We build features, we build features, and the

24   customer can use any of the features that we -- any or none

25   of the features that we provide.

1    Q.   I'm just trying to, I guess, understand how each of these

2    70- -- 7000 series routers differs from each other.  Like,

3    what is the difference for each subset of the series of

4    routers?

5    A.   Okay.  So the 7210 is much smaller, so it's a much

6    smaller system, and it's used for much -- like, mostly more at

7    the edge of the network.  So when you don't need -- it's a

8    capacity.  Right?  Okay.  Let me -- the bigger the router, the

9    more capacity there is to -- to switch traffic.  So the

10   smaller routers have smaller capacity.  So that's -- the 7210

11   is basically the smallest capacity in terms of how much

12   traffic it can forward and receive.  So -- so it also ends up

13   being the smallest system.

14   Q.   And what is the -- the 7250 series routers?

15   A.   So the 7250 is part of this main SR-s family.

16   Q.   Is it --

17   A.   Prior to --

18   Q.   Is it similar to the 7210 series, or is it different in

19   any substantial way?

20   A.   So it is -- the 7250 is closer to the -- well, it's --

21   it's an edge system, so it has -- it has less capacity than

22   the main 7750.  So that's -- the biggest difference between

23   the 7250 and the 7750 is the network processor that is on the

24   7250.  So the network processor, we use Nokia network

25   processor or merchant silicon.  So 7250 uses the merchant

1    silicon.  That would be the biggest difference.

2    Q.   And what is the difference between the 7450 series of

3    routers versus the 7250 series of routers?

4    A.   So it would be whether we use the merchant silicon or the

5    Nokia silicon.

6    Q.   Does the source code implemented in the router control

7    how a given IP packet is sent across a network?

8    A.   So -- so the source code -- is the source code -- like,

9    the source code -- the source code defines all of the protocol

10   and features that we support.  Depending which feature is

11   enabled by the customer, cause by default nothing is enabled,

12   then -- then something specific happens for the particular

13   packet.

14   Q.   Well, I guess before providing its routers to customers,

15   whether through sales or other means, does Nokia test the

16   functionalities provided on those routers?

17   A.   So Nokia engineering team develop and test features, in

18   general.

19   Q.   And do you know why this document was created?

20   A.   This is a configuration guide, so -- so we have with the

21   user guide for the features that we have.

22   Q.   Okay.  So this is for a customer?  This is presented to a

23   customer?

24   A.   So -- so eventually, yes, our user guide are available to

25   download and -- on our support website.  The customer can

1    download that, the guide.

2    Q.   And I think it was stated earlier that the features are

3    -- are the features kept based off customer demands?

4    A.   The features are developed based on customer-end demand.

5    They're not removed based on the customer demand.

6             THE COURT:  Does that complete this witness by

7    deposition?

8             MR. BENNETT:  Yes, it does, Your Honor.

9             THE COURT:  All right.  Mr. Bennett, you and

10   Mr. Haynes approach the bench for a moment, please.

11            MR. BENNETT:  Yes, Your Honor.

12            (The following was had outside the hearing of the

13             jury.)

14            THE COURT:  My intention is to proceed with Doctor

15   Cole, but probably get a portion of his direct on the record

16   this afternoon and then finish up with him tomorrow.  I assume

17   you have Mr. Dell as your final witness.

18            MR. BENNETT:  That's right, Your Honor.

19            THE COURT:  Do you know how long you expect him to

20   be on?

21            MR. BENNETT:  So we have a couple of short depos

22   or -- I don't know how short they are, but we have a couple

23   of video depos before Mr. Dell and then Mr. Dell, but we will

24   -- we anticipate resting tomorrow.

25            THE COURT:  I understand that.  Is Mr. Dell going to

1    be on the stand an hour or five hours or something in between?

2              MR. BENNETT:  Roughly an hour; a little more than an

3    hour.

4              THE COURT:  Okay.  I'm trying to determine how late

5    to go.

6              MR. BENNETT:  Okay.

7              THE COURT:  And I'm not going to put you both on the

8    spot and ask whether you're going to use every minute of your

9    designated time or give some back, but I want to try to get as

10   much time off today as we can.

11       All right.  We'll start with Doctor Cole, but I don't

12   expect to finish his direct before we break for the day.

13             MR. BENNETT:  Understood.

14             THE COURT:  Okay.  Thank you, gentlemen.

15             MR. DACUS:  Thank you, Your Honor.

16             (The following was had in the presence and hearing

17             of the jury.)

18             THE COURT:  Plaintiff, call your next witness,

19   please.

20             MR. BENNETT:  Your Honor, Smart Path calls Dr. Eric

21   Cole.

22             THE COURT:  All right.  Doctor Cole, if you'll come

23   forward and be sworn by our Courtroom Deputy, please.

24             (Whereupon, the oath was administered by the Clerk.)

25             THE COURT:  Please come around, have a seat on the

1    witness stand, sir.

2         Are there binders to distribute, counsel?  If there are,

3    let's do that now.

4         Do you have one for the Court?

5              MR. BENNETT:  Oh, yeah.  Sorry.  Apologies.

6              THE COURT:  All right.  Mr. Liddle, you may proceed

7    with direct examination.

8              MR. LIDDLE:  Thank you, Your Honor.

9                        DR. ERIC COLE, PH.D.,

10   having been first duly sworn, testified under oath as follows:

11                       DIRECT EXAMINATION

12   BY MR. LIDDLE:

13   Q.   Good afternoon, Doctor Cole.

14   A.   Good afternoon.

15   Q.   Can you please introduce yourself to the jury?

16   A.   I'm Eric Cole.  I am from Ashburn, Virginia, which is

17   just outside of Washington, D.C.  I specialize in networking,

18   cybersecurity, and computers.  And I have three wonderful

19   Children.  Jack is 24, Anra is 21, and Abby is 18.

20   Q.   Doctor Cole, where are you from?

21   A.   Originally from New York, so you might hear a little bit

22   of a New York accent, but I've been in Virginia for 30 years

23   because I relocated after college to work for the government.

24   Q.   And can you please describe your educational background?

25   A.   I have a Bachelor's and Master's degree in computer

1    science with a minor in business, and I have my doctorate in

2    cybersecurity from Pace University.

3    Q.    Okay.  And can you describe a few things on this slide,

4    like what is this 'hall of fame' line here?

5    A.    I've been working in technology, networking, and

6    cybersecurity for 30 years, and I've done a lot of work both

7    in the United States and internationally, and there's the

8    European Infosec organization that's the largest organization

9    in the world, and once a year based on nomination they pick

10   somebody to be nominated into the hall of fame, and six years

11   ago I received that honor.

12   Q.    And Doctor Cole, what is this CSIS?

13   A.    So for the last four presidents I've been asked at

14   various times to brief the white house and provide information

15   on policy to protect the United States.  For the 44th

16   president, there was actually a commission that was created

17   and I was one of the commissioners that worked for eight

18   months on putting together a report and a strategy to help

19   protect the United States from cyber attacks.

20             THE COURT:  Doctor Cole, would you slow down,

21   please?  Speak a little slower, please, sir.

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  Thank you very much.

24        Let's continue.

25   Q.    (BY MR. LIDDLE)  Doctor Cole, can you please describe

1    your employment history?

2    A.    I started off working at the CIA, the Central

3    Intelligence Agency in Langley, Virginia, and I spent

4    approximately six years a professional hacker, understanding

5    how to exploit and break into various systems.  And my

6    specialty is on exploiting vulnerabilities and securing

7    nuclear reactors.

8    Q.    Okay.  And where else did you work?

9    A.    I also worked at a company called TSGI.  It was one of

10   the companies I founded.  And we were acquired by Lockheed

11   Martin.  And normally when a company is acquired the

12   executives take the payout, but because of the importance of

13   networking, technology, and cyber, I was asked by the

14   president to stay on as a senior fellow.  And I was the

15   technical representative for all acquisitions, so whenever we

16   were going to acquire new technology, license intellectual

17   property, I was the technical representative to apportion and

18   determine what the value of that technology was so we can know

19   what to pay or what a fair value was to license our own

20   technology to third parties.

21   Q.    And Doctor Cole, do you do any consulting work?

22   A.    Yes, I also -- after Lockheed I worked at McAfee and

23   played a similar role where I identified gaps in their

24   technology and provided technical apportionment to acquire new

25   licenses.

1      After McAfee was acquired by Intel, for the last 10 years

2   I've been running my own company, Secure Anchor Consulting,

3   where I perform expert witness services.  I also sit and

4   advise a board of directors on technology, and I also help our

5   companies acquire and license new technology.

6   Q.   Okay.  And Doctor Cole, have you won any awards or got

7   any certifications in this field?

8   A.   Yes, I hold a few certifications.  One of those is CISSP,

9   which stands for Certified Information Systems Security

10  Professional.  I've had that certification in the mid '90s.

11  There's also a series of certifications in technology called

12  GIAC, which is Global Information Assurance Center.  I

13  actually don't hold those certifications because I developed

14  and created the exams, so it would be a conflict of interest

15  for me to take my own exam.

16  Q.   And Doctor Cole, do you do anything in your community in

17  the scope of your expertise?

18  A.   Yes.  I'm very big in getting individuals into

19  technology.  Also, because I have two daughters, a special

20  place in my heart is to help get women into technology and

21  cybersecurity, so I advise many of the local high schools.

22  For example, Riverside High School near me, I sponsor both

23  financially and with time their cyber defense team.

24      I also sponsor Purdue's cyber defense team.  I've been

25  doing that for seven years.  And it's sort of a special

1    privilege because this year my daughter is a freshman at

2    Purdue, so I get to work with her.  I don't think she's

3    thrilled that I'm an advisor, but that's still great.

4        And I also am one of the representatives for United

5    States Air Force.  I help build out their cyber defense

6    program.  I was one of the few civilians to be awarded cyber

7    air wings.  And I also voluntarily, without pay, advised their

8    cyber defense team.

9            THE COURT:  I'm going to ask you again, Doctor Cole,

10   please slow down.  It's been a long day, we've heard a lot of

11   testimony, and it's important for the jury to grasp and

12   understand what you're saying, and it will help if you'll slow

13   down the speed of your speech.  Okay?

14           THE WITNESS:  Yes, Your Honor.

15           THE COURT:  Thank you.

16       Let's continue.

17   Q.   (BY MR. LIDDLE)  Now, Doctor Cole, in your consulting

18   experience have you ever been retained by companies?

19   A.   Yes.  I work with a wide range of companies, many of the

20   Fortune 500 companies.  This is just a small selection.  I've

21   worked with Xerox, Microsoft, PBS, Gartner, John Deere, just

22   as a representative sample of the companies that I work with.

23       I typically on my consulting role work with 15 to 20

24   national and international organizations a year on helping

25   them build out and develop their technology portfolio, help

1    them license their own intellectual property, and then find

2    gaps in their technology and find new technology they should

3    license.

4    Q.    And finally, Doctor Cole, have you authored any

5    publications?

6    A.    Yes.  I've written seven books.  One of my top selling

7    books is the *Network Security Bible*.  That's one of the books

8    that are used in many colleges around the world that teach

9    core networking principles and cybersecurity.  My most recent

10   book is focused more on helping organizations and the general

11   public on securing their infrastructure.  That was *Cyber*

12   *Crisis*.  And that was a great honor and privilege because

13   after seven books I finally had a *Wall Street Journal* best

14   seller.

15          MR. LIDDLE:  Your Honor, at this time I'd like to

16   tender Dr. Eric Cole as an expert in the field of computer

17   networking and patent technical valuation.

18          THE COURT:  Is there objection?

19          MR. FRIST:  No objection.

20          THE COURT:  Without objection, the Court will

21   recognize this witness as an expert in those designated

22   fields.

23          MR. LIDDLE:  Thank you, Your Honor.

24          THE COURT:  Let's continue, counsel.

25   Q.    (BY MR. LIDDLE)  All right.  Doctor Cole, what was your

1    assignment in this case?

2    A.    My assignment in this case was to analyze the technology

3    related to the '580, the '599, and the '010 Patent; to

4    understand the value that those patents contributed to Nokia's

5    products; and then in working with other experts like Doctor

6    Valerdi, come up with an actual number or percent of value

7    that each of those three patents provide to Nokia's products.

8    Q.    Doctor Cole, have you performed this type of task before

9    in other cases?

10   A.    Yes, I've performed this expert role of doing technical

11   apportionment in over eight other legal cases, many which I

12   testified at trial.  And as I mentioned earlier, I also

13   performed this for the last 18 years at Lockheed Martin,

14   McAfee, and many of our Fortune 500 clients.

15   Q.    Doctor Cole, in forming your opinions in this case, what

16   type of evidence did you rely on?

17   A.    As we talked about, there were a lot of private sensitive

18   documents that were presented by both sides, so I looked at

19   over 10,000 pages of documents.  Those are all listed in the

20   appendix of my report.  I also based it on my knowledge and

21   expertise of having performed this for over 15 years for many

22   companies.  I also worked closely with Doctor Valerdi on

23   understanding his opinions on infringement.  And I also looked

24   at deposition transcripts and other documents.

25   Q.    Now, Doctor Cole, I don't want to embarrass you, but do

1    you remember being deposed in this case?

2    A.    Yes, I do.

3    Q.    Okay.  Do you remember being asked if you'd spoken to

4    Doctor Valerdi in that deposition?

5    A.    Yes, I do.

6    Q.    And when you answered that the first time, what did you

7    say?

8    A.    I believe the first time it was the beginning of the

9    deposition and I didn't remember correctly, and I think I said

10   something that I don't remember or I don't believe that I did.

11   And I was just a little confused because I was working on many

12   cases at the same time.

13   Q.    Okay.  But you, in fact, worked with Doctor Valerdi in

14   this case.  Right?

15   A.    Yes, I did.  And as we got later in the deposition and we

16   started getting into the evidence, I remembered that all the

17   infringement analysis was based on Doctor Valerdi, and I

18   actually corrected myself later in the deposition.

19   Q.    And have you known Doctor Valerdi for several years?

20   A.    Yes.  I have actually worked with Doctor Valerdi on other

21   cases.  I believe it goes back probably five years, so we've

22   worked on many cases together, including this one.

23   Q.    Okay.  And did you provide your own infringement opinion

24   in this case?

25   A.    No, I did not.  I was not asked to do any infringement

578

1    analysis for that.  I relied on Doctor Valerdi.

2    Q.   And do you agree with Doctor Valerdi's opinion on

3    infringement?

4    A.   Yes, I do.

5    Q.   Okay.  Let's talk about the accused products of this

6    case.

7         What documentation for Nokia's products did you look at?

8    A.   I looked at Nokia's product specification sheets.  I

9    believe you've seen several of those over the course of the

10   last two days.  These are Nokia's own documents where they

11   specify the features, their products, and what they represent

12   to their customers.

13   Q.   And what do you mean by 'features'?

14   A.   So all of these routers have core features or software

15   functionality that they provide.  So they have a list of the

16   core features, and these features is what Nokia decided is

17   important.  It's what Nokia actually put on their documents

18   and it's what Nokia advertises and pushes to all their

19   customers.

20   Q.   Now, Doctor Valerdi--I mean Doctor Cole--are you going to

21   be telling the jury about each and every Nokia infringing

22   product?

23   A.   My apportionment is based on all of the products, but

24   we're going to use just the 7250 as a representative sample.

25   Q.   And why did you choose the 7250 as a representative

1    product?

2    A.   For several reasons.  One, this was one of the products

3    that their engineers talked about and referenced in their

4    deposition.  It's also one of their primary core products that

5    they represent to customers and sell a lot of.  So I felt that

6    it was a good representative sample of their overall product

7    line.

8    Q.   Doctor Cole, we've heard a lot about Orckit-Corrigent in

9    this case.  Did you research Orckit in your analysis?

10              MR. FRIST:  Your Honor, I'm going to object to this

11   slide as leading.

12              THE COURT:  Overruled.

13              THE WITNESS:  Yes, I did.

14   Q.   (BY MR. LIDDLE)  And what did you find when you

15   researched Orckit-Corrigent?

16   A.   I found that in the 1990 period they were one of the

17   pioneers in this space.  They helped develop a lot of the core

18   technology, a lot of the core standards, and their patents

19   represented a lot of innovation during the 1990s.

20   Q.   And on the third bullet point, what is meant by the IEEE

21   standard?

22   A.   The IEEE stands for the Institute of Electrical and

23   Engineers, and it is one of the leading providers in this

24   space, so they'll get together, thought leaders that will go

25   in and create standards so different products from different

1    vendors can interoperate.

2    Q.    And have you heard of the IETF standards?

3    A.    Yes.  The IETF is the Internet Engineering Task Force.

4    This is the group that regulates all of the standards for the

5    internet, such as internet protocol and many of the other

6    protocols that the backbone of the internet uses.

7    Q.    And what did you conclude about Orckit's involvement in

8    these standards?

9    A.    That Orckit was actively involved in these standards.

10   This is an example of one of the IETF standards, and you can

11   see that two of the employees from Orckit are the lead authors

12   of the standard.  So Orckit not only pioneered but they also

13   contributed and gave back to the community by creating and

14   writing these standards.

15   Q.    Okay.  Doctor Cole, let's talk about your analysis in

16   this case.

17         What do these numbers represent?

18   A.    These numbers represent my final apportionment.  So we

19   wanted to put these up front.  But over the next several

20   minutes I'm going to go through the detailed analysis that I

21   performed to show you how I came up with these numbers.  But

22   after my detailed analysis, I can concluded that for the '580

23   Patent, it -- the patents-in-suit contribute 5.48--sorry--for

24   Nokia's products, the '580 Patent contributes 5.48 percent to

25   Nokia's products; for the '599 Patent, it contributes 5.48

1    percent to Nokia's products; and for the '010 Patent, the

2    technical value added is 4.58 percent for Nokia's products.

3    Q.    And Doctor Cole, would you consider this -- these numbers

4    to be improvement numbers?

5    A.    Yes, these are improvement or value added that the

6    patents add to Nokia's products.

7    Q.    Okay.  And in order to quantify this improvement, what

8    Nokia infringing products did you look at?

9    A.    I looked at the six product lines that were referenced

10   several times about the last few days, so I essentially looked

11   at all of Nokia's infringing products.  I recently realized

12   that the features are the same across all those products, so I

13   used the 7250 router as a baseline for my analysis.

14   Q.    And so what documents did you look at for your analysis?

15   A.    I looked at all of Nokia's documentation that they

16   presented in this case, I looked at Nokia's products tech

17   sheets where they go in and list all of the different

18   features, and I also looked at the deposition transcripts, and

19   just before I came on you heard one of the deposition

20   transcripts where Nokia's own engineers says the features are

21   the same across all the products; the difference in the

22   products are capacity and CPU, it's not the features.

23   Q.    Okay.  Can you explain what's going on here on the

24   right-hand side of this slide?

25   A.    On the right-hand side is where I'm starting to show you

1    the general process that I use for technical apportionment.

2    So as you heard from Doctor Valerdi, the smallest saleable

3    unit is the actual router.  So we start in the top with the

4    Nokia 7250, which is a hundred percent, that's the totality of

5    functionality, and based on Nokia's own documentation, the

6    first way they break up their routers is into hardware and

7    software, which you see on the left-hand side.  So the first

8    step in my technical apportionment is I take the router and I

9    break it down into a hardware percent and a software percent.

10   Q.   Doctor Cole, why is it broken down into 75 percent

11   hardware and 25 percent software?

12   A.   The reason for that is hardware, such as a CPU, silicon,

13   cards, and chips, have a hard cost of manufacturing.  You

14   actually have to produce those physical components and put

15   them together into the box.  Even though the software

16   contributes significant value, because the software can be

17   replicated at lower cost I used a very conservative value of

18   25 percent for the software and 75 percent for the hardware.

19   Q.   Doctor Cole, let's talk about the software features.  How

20   many are there?

21   A.   There are nine software features across all of Nokia's

22   products.

23   Q.   Doctor Cole, does this slide represent some of the

24   software features in this case?

25   A.   Yes.  Because each of the features have a lot of

1    components, I had to spread it across three slides.  If you

2    look at the three slides, if you look at the bold, such as

3    network protocols or services, those are the core features.

4    And if we go across, there's actually nine of those core

5    features that Nokia has identified in their own product

6    specification.

7    Q.    Now, Doctor Cole, please explain what process we are

8    going to undertake to place a value on the Smart Path patents.

9    A.    So I'm going to use a four-step process where we take the

10   product or the routers as a totality of a hundred percent, and

11   we technically apportion it down to a specific number.  And I

12   -- just want to remind you, this is the same process that I've

13   used at Lockheed Martin, that I used at McAfee, and I've used

14   with our various clients over the last 15 years.

15   Q.    Okay.  So please tell the jury what the first step in the

16   process is.

17   A.    The first step is we take the smallest saleable unit,

18   which is a router, and that router represents a hundred

19   percent of the overall product.

20   Q.    Okay.  And what is the next step?

21   A.    The next step is we start to break it down into its core

22   components.  And based on Nokia's own documentation, the first

23   way they break up their product is at the hardware and

24   software, and all of the infringing components are in the

25   software, so then we take the software features as 25 percent.

1   Q.   And then what is the next step, Doctor Cole?

2   A.   The next step is, for each of the features I then worked

3   with Doctor Valerdi to determine which components of each

4   feature infringe.  And the reason why you see an X is because

5   the infringing features are different for each of the

6   products--sorry--for each of the patents.  So as we go through

7   each patent, that number is going to be slightly different

8   because there's different features for different patents.

9   Q.   So let's talk about those infringing features.  What are

10  the infringing features for the '580 and '599 Patents?

11  A.   Out of the nine total features, working with Doctor

12  Valerdi, there were four infringing features for '580 and

13  '599, and that is network protocols, quality of service

14  traffic management, platform, and services.

15  Q.   And then, Doctor Cole, what are the infringing features

16  for the '010 Patent?

17  A.   For the '010 Patent it was three of the nine features,

18  and those three features are network protocols, quality of

19  service and traffic management, and platform.

20  Q.   Now, there's a next step in the analysis.  Is there a

21  next step in the analysis, Doctor Cole?

22  A.   Yes, there is.

23  Q.   Okay.  And what is that?

24  A.   So as you saw in those earlier slides, each feature has a

25  series of components associated with that feature, so once I

1    determined by working with Doctor Valerdi that a feature

2    infringed, I then had to go in and determine which components

3    of each feature infringed the patents.  And, once again,

4    because those are different per patent, that's why you see an

5    X there.  And as we go into each patent, I can give you the

6    specific numbers.

7    Q.   Very good.

8         Doctor Cole, what is the first patent we're going to

9    start with to do this analysis?

10   A.   The first patent we're going to start with is the '580

11   Patent.

12   Q.   Now, Doctor Cole, how do you know the '580 Patent is

13   infringed by Nokia?

14   A.   The way I know that the '580 Patent infringes is because

15   of talking with Doctor Valerdi, looking at his report, and

16   sitting in on his testimony this morning.

17   Q.   And Doctor Cole, just to review, does this slide

18   represent the Nokia accused products that infringe the '580

19   Patent?

20   A.   Yes, it does.  It represents the six families, and the

21   features are the same across all of these products.

22   Q.   Doctor Cole, what are the benefits of the '580 Patent?

23   A.   The benefits are these routers are the backbone of the

24   internet.  So there's large amounts of traffic going across,

25   so it allows for resources to be shared.  So you can actually

1    have a very high level of service, because as you can imagine,

2    if you're either watching video, making phone calls, or

3    surfing the web, if there's any sort of delays, that's not

4    going to be acceptable, so this allows an administrator to be

5    able to set up various resources, share them to be able to

6    optimize traffic and optimize performance across the backbone

7    of the internet.

8    Q.   All right.  Doctor Cole, let's go through the analysis of

9    the '580 Patent.

10        So, again, what is the first step of your apportionment?

11   A.   The first step is to take the actual router and break it

12   down into hardware and software, and this percent is the same

13   for all three patents where 75 is given to hardware and 25 is

14   given to software.

15   Q.   And then remind the jury, Doctor Cole, what is the second

16   step in your apportionment analysis?

17   A.   The second step is to take the nine features and

18   determine which of those nine features infringe.  And in this

19   case for the '580 Patent, it is services, network protocols,

20   platform, and quality of service and traffic management.  And

21   because these are all represented equally in Nokia's

22   documentation, I assigned each of these features an equal

23   11.11 percent.

24   Q.   Doctor Cole, what is the third step in your apportionment

25   analysis?

1    A.    The third step is to take each of the features, look at

2    the individual components, and determine which components of

3    that feature infringe.

4        So if we start with services, in this case you can see

5    that there are nine components to that feature, and three of

6    those nine components infringe.  And then we would take those

7    three and that would be 33.33 percent, which is three of nine,

8    so then we assign the infringing components of services to be

9    33.33 percent.

10   Q.    Okay.  And are we going to do this for each of the four

11   infringing features here?

12   A.    Yes.  Each of the four infringing features have different

13   components, but this general process of picking the components

14   and doing the math is going to be similar for each of those

15   four.

16   Q.    So what is the next infringing feature?

17   A.    The next infringing feature is network protocols.  This

18   also has nine components.  There is also three of the nine

19   infringe, so that gives us a value of 33.33 percent for

20   infringing components for network protocols.

21   Q.    And Doctor Cole, we're going the flip through here to

22   platform.  Is it the same process?

23   A.    Same general process.  In this case there is eight

24   components, and five of the eight components infringe, so that

25   would give us 62.5 percent of infringing components for

1    platform.

2    Q.    Okay.  And I want to point something out here.  So the

3    number 8 on the platform, do you see that?

4    A.    Yes, I do.

5    Q.    And what is that?

6    A.    That's accounting records.

7    Q.    And is that a software feature?

8    A.    No, that's not.  So really that shouldn't be counted, but

9    I wanted to be very fair to Nokia and be very conservative, so

10   because they listed it I still counted it, even though it

11   technically wasn't a software feature.

12   Q.    Okay.  Doctor Cole, let's go to the last infringing

13   feature for the '580 Patent.  What is this?

14   A.    So this is quality of service and traffic management.

15   There are seven features--sorry--seven components for this

16   feature, and five of those seven components infringe.  So if

17   we do the math, five out of seven is 71.43 percent of

18   infringing components for quality of service and traffic

19   management.

20   Q.    Okay.  And so let's try to -- let's try to -- let me go

21   back one.

22        So now we have -- what do we have here?  What's the

23   summary of this?

24   A.    So the summary is we have the four features and then we

25   have the percent of components for each feature.  So now I

1    need to go in and take each feature and multiply it by a

2    component and add all four of those numbers together.

3    Q.    Okay.  And you prepared some slides here that show this

4    in animation form.

5    A.    That is correct.

6    Q.    Okay.  So can you please describe the math as it's

7    popping up?

8    A.    So as I said, each of the features are represented

9    equally by Nokia, so each one of those are one of nine or

10   11.11 percent, so I have to take services, which is 11.11

11   percent, multiply it by the infringing component, 33.33

12   percent, and arrive at 3.6 percent.  I then add that to

13   network protocols times its infringing component, which is 3.6

14   percent, add that to platform, 11.11 percent with its

15   infringing component 62.5 to get 6.9 percent, and then add

16   that to quality of service, multiplying that by its infringing

17   component to get 7.8 percent.  And when I add up those four

18   values, it equals 21.9 percent.

19   Q.    Doctor Cole, what's the next step in your apportionment

20   analysis?

21   A.    The next step is, if you remember, these features are

22   under software, and software's only 25 percent, so I then have

23   to take that number 21.9 percent, multiply it by 25 percent

24   for software, to arrive at a final value of the infringing

25   technology at 5.48 percent.

1   Q.   So, Doctor Cole, what is your conclusion on the value of

2   the '580 Patent with respect to Nokia?

3   A.   My opinion is the final infringing value of the '580

4   Patent is 5.48 percent.

5             THE COURT:  Let me interrupt at this point.

6        Ladies and gentlemen, I expect this direct examination to

7   go on for some time, and we're about 20 minutes until 6:00.

8   This is as good a place as any to break for the day, so we're

9   going to do that.  We'll take up the direct examination of

10  Doctor Cole tomorrow morning anDContinue it then.

11       As you leave the jury room--the courtroom, rather--in a

12  few minutes, take your juror notebooks with you, please, and

13  leave them on the table in the jury room.  Please remember to

14  follow all my instructions about your conduct as jurors,

15  including, as you might expect me to remind you, not to

16  discuss the case with anyone in any way, including the eight

17  of yourselves.

18       Let me commend you for being prompt this morning.  We

19  were able to get a good start at 8:30, and I'm going to ask

20  that we do the same thing tomorrow.  So please check the

21  weather and make your arrangements so that you can be here

22  ready to start at 8:30 in the morning.

23       Have a good evening, ladies and gentlemen.  With that,

24  you're excused until tomorrow morning.

25             (Whereupon, the jury left the courtroom.)

1          THE COURT:  Doctor Cole, you can step down.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  When you come back in the morning, speak

4    just like you were.  You slowed down well.

5          THE WITNESS:  I won't have my morning coffee so I

6    won't be caffeinated.

7          THE COURT:  All right.  Please be seated.

8       Counsel, for your information, we've used a total of

9    7 hours, 36 minutes, and 11 seconds of designated trial time

10   today.  As of right now, the Plaintiff has remaining 5 hours,

11   36 minutes, and 52 seconds of trial time; Defendant has 4

12   hours, 5 -- excuse me.  That's not the right number.  The

13   Defendant has remaining 7 hours and 55 minutes of designated

14   trial time, and the Plaintiff has 6 hours and 24 minutes of

15   remaining trial time.  I read the wrong column.  Plaintiff has

16   6 hours and 24 minutes remaining; Defendant has 7 hours and 55

17   minutes remaining.

18      Also I've reviewed the previously submitted proposal from

19   the parties regarding the final jury instructions and the

20   verdict form.  I'm persuaded that a renewed effort in that

21   regard will benefit the Court.  Consequently, I'm ordering the

22   parties to meet anDConfer and to jointly work together and

23   submit a jointly proposed and a newly jointly proposed final

24   jury instruction and verdict form by 6:00 p.m. tomorrow.  That

25   should be delivered to court by email transferring those

1    documents in Word format to my staff.  You can send them to

2    Mr. Tatum's email address and he'll disseminate them in

3    chambers for me.  But I think the Court will benefit from a

4    renewed effort in that regard.  Clearly there are some things

5    that have been dropped and narrowed, and there is greater

6    clarity now than there was when the earlier submissions in

7    this regard were submitted.  So please send those to us by

8    6:00 p.m. tomorrow in Word format.

9        We'll begin again tomorrow at 8:30.  I'll be in chambers

10   by 7:30 if I need to meet with you regarding any overnight

11   disputes that not been able to be resolved through the meet

12   anDConfer process.  My staff and I will expect a snapshot

13   update by email at 10:00 p.m.--not 2:00 a.m., 10:00 p.m.--and

14   let me know where you are.  That is not a signal to stop

15   working for the evening.  You are to continue to meet

16   anDConfer, but that gives me some idea of where you are on

17   overnight disputes.

18       Again, you're to continue your efforts to meet, anDConfer

19   and if there are surviving disputes that haven't been able to

20   be resolved overnight, I will meet with you before the jury

21   comes in tomorrow and hear your positions out and give you

22   guidance on those surviving disputes.  I don't enjoy getting

23   up early enough to get here in time to do that well before the

24   jury comes in.  I do that to maximize your designated trial

25   time and to save you time so that you don't have issues that

1    have to be brought up while you're on the clock in the

2    courtroom.  So take advantage of that, if necessary.  It would

3    be my continued hope it won't be necessary.  So far you've

4    done a good job in keeping to a workable number the overnight

5    disputes that we've had to take up each morning.  I hope and

6    trust that that will continue.

7         But that's the process, and I'll look for an accurate

8    snapshot update of where you are on that by 10:00 p.m. this

9    evening.

10        Now, with that, are there questions from either side

11   before we recess for the day?

12        Anything from the Plaintiff, Mr. Bennett?

13             MR. BENNETT:  No questions, but as required by the

14   Court's order, we are announcing that we will likely rest

15   tomorrow.

16             THE COURT:  I anticipate that you will rest after

17   Mr. Dell testifies.

18             MR. BENNETT:  That is correct.

19             THE COURT:  All right.  Anything from the Defendant,

20   Mr. Dacus?

21             MR. DACUS:  No, Your Honor.  Thank you.

22             THE COURT:  All right, counsel.  I will see you in

23   the morning.

24        Until then we stand in recess.

25             (The proceedings were concluded at 5:47 p.m.)

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2      CORRECT TRANSCRIPT FROM THE RECORD OF

3      PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4      I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5      FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6      COURT AND THE JUDICIAL CONFERENCE OF THE

7      UNITED STATES.

8

9      S/Shawn McRoberts              04/02/2024

10     _____DATE_____
       SHAWN McROBERTS, RMR, CRR
11     FEDERAL OFFICIAL COURT REPORTER

12          .

13

14

15

16

17

18

19

20

21

22

23

24

25