```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
                           MARSHALL DIVISION

SMART PATH CONNECTIONS, LLC.,   (  CAUSE NO. 2:22-CV-296-JRG
                                )
          Plaintiff,            (
                                )
vs.                             (
                                )
NOKIA CORPORATION,              (
et al.,                         )  MARSHALL, TEXAS
                                (  APRIL 3, 2024
          Defendants.          )  8:30 A.M.
_____


                           VOLUME 3

_____

                      TRIAL ON THE MERITS


                BEFORE THE HONORABLE RODNEY GILSTRAP
                 UNITED STATES CHIEF DISTRICT JUDGE
                          and a jury
_____
```

```
                   SHAWN McROBERTS, RMR, CRR
                    100 E. HOUSTON STREET
                    MARSHALL, TEXAS  75670
                       (903) 923-8546
               shawn_mcroberts@txed.uscourts.gov
```

```
 1                    A P P E A R A N C E S

 2        FOR THE PLAINTIFF:    CARTER ARNETT, PLLC
                                8150 N. CENTRAL EXPRESSWAY
 3                              SUITE 500
                                DALLAS, TEXAS  75206
 4                              (214) 550-2112
                                BY: MR. JOSHUA BENNETT
 5                                  MR. BRADLEY LIDDLE
                                    MS. LINDA STAHL
 6                                  MR. MICHAEL POMEROY
                                    MS. ALEXIS RITZER
 7
                                DEANS STEPP LAW, LLP
 8                              325 N. ST. PAUL, SUITE 1500
                                DALLAS, TEXAS  75201-3891
 9                              (214) 550-8172
                                BY:  MR. SCOTT BREEDLOVE
10
          FOR THE DEFENDANTS:   ALSTON & BIRD, LLP - ATLANTA
11                              ONE ATLANTIC CENTER
                                1201 WEST PEACHTREE STREET NW
12                              #4900
                                ATLANTA, GEORGIA  30309-3424
13                              (404) 881-7000
                                BY:  MR. JOHN HAYNES
14                                   MR. DAVID FRIST

15                              ALSTON & BIRD, LLP - RALEIGH
                                555 FAYETTEVILLE St., STE. 600
16                              RALEIGH, NORTH CAROLINA  27601
                                (919) 862-2270
17                              BY:  MS. DARLENA SUBASHI

18                              ALSTON & BIRD LLP - WASHINGTON
                                THE ATLANTIC BUILDING
19                              950 F STREET, NW
                                WASHINGTON, DC 20004
20                              (202) 239-3933
                                BY:  MR. THOMAS DAVISON
21
                                THE DACUS FIRM, PC
22                              821 ESE LOOP 323, SUITE 430
                                TYLER, TEXAS  75701
23                              (903) 705-1117
                                BY:  MR. DERON DACUS
24

25
```

```
 1          OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                  100 E. HOUSTON STREET
 2                                MARSHALL, TEXAS  75670
                                  (903) 923-8546
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| ERIC COLE, PH.D. | |
| Direct By MR. LIDDLE | 599 |
| Cross By MR. FRIST | 610 |
| Redirect By MR. LIDDLE | 636 |
| Recross By MR. FRIST | 640 |
| HERVE DESEVEAUX | |
| BY VIDEO DEPOSITION | 643 |
| DHREN PATEL | |
| BY VIDEO DEPOSITION | 653 |
| STEPHEN DELL | |
| Direct By MS. STAHL | 668 |
| Redirect By MR. DACUS | 709 |
| Redirect By MS. STAHL | 751 |
| Recross By MR. DACUS | 757 |
| KEVIN JEFFAY, PH.D. | |
| Direct By MR. FRIST | 760 |
| Cross By MR. BREEDLOVE | 898 |
| Redirect By MR. FRIST | 924 |

1           THE COURT:  Be seated, please.

2       Counsel, are the parties prepared to read into the record

3    those items from the list of pre-admitted exhibits used during

4    yesterday's portion of the trial?

5           MR. BENNETT:  Unfortunately, no, Your Honor.

6    There's a few lingering disputes.  We expect to have them

7    resolved soon, but we're not quite there yet.

8           THE COURT:  Well, I know you've been working on it

9    at least is a minutes or so this morning since we broke in our

10   chambers meeting.  Could you give me some idea of what soon

11   is?  Soon another two or three minutes or soon another 30 or

12   40 minutes.

13          MR. BENNETT:  Certainly by the morning break we

14   could do it.

15          THE COURT:  What's the reason why we're not prepared

16   to do this?  It's not like you-all don't understand this is

17   coming every morning.

18          MR. BENNETT:  Sure.  Part of the reason was, and

19   I'll take responsibility for it, we got the list a little bit

20   over late to the Defendant.  Some of it is a miscommunication

21   between the parties.  They challenged some exhibits that were

22   clearly on the record.  We addressed that, so we narrowed the

23   disputes.

24       They just need to verify by looking at the demonstratives

25   that we've identified was discussed at trial.  So it shouldn't

1    take too long, but I can't promise two or three minutes.

2            THE COURT:  What's your view, Mr. Deane?

3            MR. DEANE:  Thank you, Your Honor.  So what we're

4    just trying to do is the parties are just trying to line up

5    the exhibits that were displayed on slides during trial.  They

6    were not announced into the record.  And so for purposes of

7    appeal, we need to make sure that whatever was flashed up on

8    the screen or whatever was used substantively during the trial

9    ultimately ends up as part of the record.

10       And so what we kind of have is a long list of just next

11   slide, next slide, and then no identification of the actual

12   exhibit that was being used as part of any slide or any

13   discussion, and then a list of exhibits that seek to be

14   entered into the record with no identification of those.

15       And so we're trying to resolve that issue, Your Honor.

16           THE COURT:  All right.  Well, we'll return to this

17   at the morning recess.  Hopefully this is an anomaly that

18   won't repeat itself otherwise during the trial.

19       Is there anything else that needs to be raised with the

20   Court before I bring in the jury and we continue with the

21   evidence?

22           MR. BENNETT:  Not for Plaintiff, Your Honor.

23           MR. DACUS:  No, Your Honor.  Thank you.

24           THE COURT:  All right.  And we ended yesterday with

25   Doctor Cole being examined.

1     Doctor Cole, you're in the courtroom somewhere?  Why

2 don't you return to the witness stand, sir, and I'll remind

3 you you remain under oath.

4     While he's getting situated on the witness stand, let's

5 bring in the jury, please, Mr. Barnett.

6     Mr. Liddle, if you'd like to go to the podium, you

7 certainly may.

8          MR. LIDDLE:  Thank you, Your Honor.

9          (Whereupon, the jury entered the courtroom.)

10          THE COURT:  Welcome back, members of the jury.  Hope

11 you had a good night.  Please have a seat.

12     As you'll recall, we ended the day yesterday with

13 Dr. Eric Cole on the witness stand being examined by the

14 Plaintiff represented by Mr. Liddle.  And we're going to

15 continue with the direct examination of Doctor Cole at this

16 time.

17     Mr. Liddle, you may continue.

18          MR. LIDDLE:  Thank you, Your Honor.

19                    ERIC COLE, Ph.D.,

20 having been previously sworn, testified further as follows:

21               DIRECT EXAMINATION continued

22 BY MR. LIDDLE:

23 Q.   Doctor Cole, good morning.

24 A.   Good morning.

25 Q.   All right.  When we broke yesterday, we were going

1    through your apportionment analysis.  Can you explain your

2    task again in this case just so we can refresh what we're

3    doing?

4    A.   Yes.  My task in this case was to look at the patents,

5    look at the value, and do technical apportionment or come up

6    with a percent of the value the patents contribute to Nokia's

7    patents.

8         And essentially I am the second of three experts.  So the

9    first expert, Doctor Valerdi, he did infringement.  I then

10   took his infringement analysis, performing technical

11   apportionment and coming up with percents.

12        And then I'm going to hand that off to the third expert,

13   Mr. Dell, who's going to testify later today who's then going

14   to take that and calculate actual damages.

15   Q.   And, Doctor Cole, can you go over the steps here that I

16   have on slide 26, please?

17   A.    Yes.  We went through one patent yesterday, so we're

18   going to repeat this four-step process for the two additional

19   patents.  And just to refresh, this is the same process that I

20   used at Lockheed Martin, at McAfee, and other Fortune 100

21   companies to evaluate technology in patents.

22        So we start with what we call the smallest saleable unit

23   which in this case is the actual router.  So that starts at a

24   hundred percent.  We then, based on Nokia's own documentation

25   and deposition testimony, we then broke it down into hardware

1    and software with software getting 25 percent.

2         Then we took software and, based on Nokia's

3    documentation, there's nine features.  We then determined

4    which of those features infringe, and I did that based on

5    working with Doctor Valerdi.

6         Then for each of the features, I then looked at the

7    components and determined which components infringe.  And then

8    we basically multiply those numbers together to come up with a

9    final value.

10   Q.   Thank you, Doctor Cole.

11            MR. LIDDLE:  Mr. Jarrett, can you go to slide 39 for

12   me, please?

13   Q.   (BY MR. LIDDLE)  And so we're not going to go through the

14   '580 Patent again, but what is your overall opinion on the

15   value of the '580 Patent with respect to Nokia's use of that

16   patent?

17   A.   So this is where we finished yesterday where the final

18   infringing value of the '580 Patent is 5.48 percent.

19   Q.   Doctor Cole, what's the next patent we're going to look

20   at?

21   A.   The next patent is the '599 Patent.

22   Q.   And, Doctor Cole, how do you know that the '599 Patent is

23   infringed?

24   A.   Based on Doctor Valerdi's analysis.  So I spoke with

25   Doctor Valerdi, I read his infringement report, and I was in

1    court yesterday when he gave his testimony.

2    Q.   Doctor Cole, what is this slide showing?

3    A.   This is a summary of what Doctor Valerdi found, that the

4    Nokia's products infringe the '599 Patent, and there are six

5    main families that infringe.  And just as a refresher, because

6    we have limited time, I'm not going to go and do the technical

7    apportionment for every single router.  We used the 7250 as a

8    representative sample, and as confirmed from deposition

9    testimony yesterday, Nokia's own engineers confirm the

10   features are the same across all these different products.

11   Q.   Doctor Cole, what are the technical benefits of the '599

12   Patent?

13   A.   So these are the routers that are backbone of internet.

14   So there is large amounts of traffic, and optimization and

15   performance and speed are critical.  So the '599 focuses on

16   virtual tunnels and routing paths to be able to optimize the

17   use of the bandwidth, try to minimize the infrastructure so

18   instead of going through a large number of routers, if there's

19   a route that can use less routers, that can add to efficiency

20   and overall minimize congestion and increase speed and

21   efficiency.

22   Q.   All right, Doctor Cole.  With respect to the '599 Patent,

23   what was the first step in your apportionment analysis?

24   A.   The first step was to take the representative product,

25   which is the 7250 Nokia router, and that represents 100

603

1    percent.  Based on Nokia's own documentation, the first thing

2    they do is break down that router into hardware and software.

3        So based on the analysis from yesterday where hardware

4    has hard costs in terms of silicon and CPU and network

5    interface cards, we gave that 75 percent.  And then the

6    software is where a lot of the -- well, all the infringing

7    technology is, so we gave that a very conservative 25 percent.

8    Q.    Doctor Cole, what's the next step in the analysis?

9    A.    We then looked at Nokia's own documentation, and they

10   take the software and they break it down into nine features.

11   So those are the nine features listed; then working with

12   Doctor Valerdi, determined that for the '599 Patent, four of

13   those nine features infringe.

14       And because all nine are listed equally and have equal

15   importance to Nokia, I gave each one of them an equal value of

16   11.11 percent.

17   Q.    Doctor Cole, what are the infringing features shown on

18   this slide?

19   A.    Services, network protocols, platform, and quality of

20   service--that's QoS--and traffic management.

21   Q.    Doctor Cole, what was the next step in your analysis?

22   A.    I took each feature, and I went back to Nokia's

23   documentation and looked at the components that are included

24   in that feature, and then I determined which of those

25   components infringe for that feature.

1        So, for example, with services, there are nine

2   components.  And if we go through and look at all of those,

3   three of the nine infringe.  So that would give us a value of

4   33.33 percent for infringing components for services.

5   Q.   And, Doctor Cole, what's the next set of infringing

6   components?

7   A.   We then take the next feature, which is network

8   protocols.  This also has nine features, and three of those

9   features--in this case, flexible algorithms, MPLS label edge

10  routing, and label 2 multicast--those infringe.  So if we do

11  the math, three of nine, that's 33.33 percent for infringing

12  components for network protocols.

13  Q.   Now, was this the same process for the next two

14  infringing features?

15  A.   Yes.  The number of components are different, but the

16  same analysis was performed.

17  Q.   Okay.  Well, let's step through that.

18  A.   So then if we look at platform, platform has eight

19  components for that feature.  And if we go in and look, five

20  of those eight infringe.  So if we do the math, five out of

21  eight, that's 62.5 percent infringing components for platform.

22       And then for quality of service and traffic management,

23  there are seven components for that feature, and five of the

24  seven infringe.  And this gives us a value of 71.43 percent

25  for quality of service and traffic management.

1    Q.   Doctor Cole, please explain the calculation for the '599

2    Patent.

3    A.   So then we have to take the value for each service and

4    multiply it by the infringing component.  So for services, we

5    take 11.11 percent, multiply it by 33.33 percent, and get 3.6

6    percent.  We add that to network protocols, which is 11.11

7    percent, times 33.33 percent to arrive at 3.6 percent.  We add

8    that to platform, which is 11.11 percent, times 62.5 percent,

9    which is 6.9 percent.  And then finally add in quality of

10   service, QoS, and traffic management, which is 11.11 percent

11   times 71.43 percent, which is 7.8 percent.  And then if we add

12   all four of those together, we get an initial value of 21.9

13   percent.

14   Q.   And then, Doctor Cole, what was the next step?

15   A.   The next step is all of these features are under

16   software, and software was allocated 25 percent.  So we then

17   take that 21.9 percent, multiply it by the 25 percent for

18   software, and arrive at a final value of the '599 infringing

19   technology of 5.48 percent.

20   Q.   Doctor Cole, what is your opinion on the value of the

21   '580 Patent for Nokia's use of the '580 Patent?

22   A.   The final infringing value, or the contribution that the

23   patents make to Nokia's products, is 5.48 percent.

24        THE COURT:  Let me interrupt.  Counsel, you said the

25   '580 Patent.  This says the '599 Patent.

606

1          MR. LIDDLE:  Your Honor, I apologize.  I meant the

2    '599 Patent.  Do you mind if I restate my question for the

3    record?

4          THE COURT:  No.  I just don't want any unnecessary

5    confusion.

6          MR. LIDDLE:  Thank you, Your Honor.  I apologize.

7    Q.   (BY MR. LIDDLE)  Doctor Cole, let me do that again.  I

8    apologize.  What is your value -- final infringing value of

9    the '599 Patent with respect to Nokia's use of that patent?

10   A.   For the '599 Patent, the final infringing value or the

11   percent contribution that the '599 Patent adds to Nokia's

12   products is 5.48 percent.

13   Q.   Thank you, Doctor Cole.

14        What's the next patent we're going to look at?

15   A.   The next patent and final patent is the '010 Patent.

16   Q.   And, Doctor Cole, same question:  How do you know that

17   the '010 Patent is infringed?

18   A.   This was based on Doctor Valerdi's analysis.  So I spoke

19   with Doctor Valerdi, I looked at his infringement report, and

20   I also sat in on his testimony yesterday.

21   Q.   And are these representative of the Nokia's accused

22   products that infringe the '010 Patent?

23   A.   Yes.  It is my understanding these are the six families

24   of accused products, Nokia's accused products.  And because

25   they all have similar features, we use the 7250 as a

 1    representative sample.

 2    Q.   Doctor Cole, can you please explain the benefits of the

 3    '010 Patent?

 4    A.   So this allows bridges or communication between different

 5    layer 2 protocols.  So now if you have systems that are

 6    speaking essentially a different language or a different

 7    protocol, this allows for a cost-effective way for these

 8    devices to be able to connect to the network without having to

 9    make any significant changes to the overall protocol, which

10    allows for easier setup, easier integration, and greater

11    scalability.

12    Q.   Doctor Cole, let's step through this.  What was the first

13    step of your technical apportionment of the '010 Patent?

14    A.   The first step is we take the smallest saleable unit

15    which is the product or the router, and in this case we use

16    the Nokia 7250 router as a representative sample, but the same

17    analysis and the same features would apply to all of those six

18    families that we saw in the previous slide.

19         So we start with a hundred percent.  And based on Nokia's

20    own documentation and how Nokia presents their features, they

21    initially break their routers down into hardware and software.

22    So we allocate 75 percent for hardware and 25 percent for

23    software.

24    Q.   Doctor Cole, please identify the infringing features of

25    the '010 Patent.

1  A.   So of the nine features that are listed in Nokia's

2  documentation, by working with Doctor Valerdi, three of those

3  nine features infringe, which are network protocols, platform,

4  quality of service, and traffic management.  And for the same

5  reasons, because all nine features are treated equally by

6  Nokia, each one of them was allocated 11.11 percent.

7  Q.   And, Doctor Cole, please explain the infringing

8  components for each feature.

9  A.   Then we take each feature.  We start with network

10  protocols, and there are nine components.  And once again,

11  these are the components that are listed in Nokia's own

12  documentation.  So these are Nokia's representation of their

13  products.  And three of those nine components for network

14  protocols infringe, which would give us an infringing

15  component value of 33.33 percent.

16  Q.   Doctor Cole, what are the infringing components of

17  platform?

18  A.   Platform has eight components.  Five of those eight

19  components infringe, so that would give us a value of 62.5

20  percent for infringing components.

21  Q.   And, Doctor Cole, what about the last infringing feature?

22  A.   The last infringing feature is QoS, or quality of

23  service, and traffic management.  There are seven

24  features -- sorry.  There are seven components for that

25  feature, and five of the seven components infringe, which

609

1    would give us a value of 71.43 percent.

2    Q.    And, Doctor Cole, please explain how you performed the

3    calculation for the '010 Patent.

4    A.    So now that we have the percent, we then have to take

5    each feature and multiply it by the infringing component.  So

6    for network protocols, 11.11 percent is multiplied by 33.33

7    percent to arrive at 3.6 percent.  We then take platform,

8    which is 11.11 percent, multiply it by 62.5 percent, to arrive

9    at 6.9 percent.  And then we take quality of service and

10   traffic management, 11.11 percent, multiply it by 71.43, to

11   arrive at 7.8 percent.  We then add those three values

12   together to get an initial value of 18.3 percent.

13   Q.    What's the next step, Doctor Cole?

14   A.    Because these features are under software and software is

15   25 percent, we have to take the 18.3 percent, multiply it by

16   25 percent, to get a final value of the '010 Patent to get a

17   final value of 4.58 percent.

18   Q.    And, Doctor Cole, what is your overall opinion of the

19   technical benefit of the '010 Patent?

20   A.    For the '010 Patent, my final infringing value or the

21   percent contribution that the patents add to Nokia's product

22   is 4.58 percent.

23   Q.    Doctor Cole, did you have conversations with Mr. Stephen

24   Dell?

25   A.    Yes, I did.

1    Q.    Okay.  And what does this slide 65 represent?

2    A.    I performed the technical apportionment to look at the

3    technical contribution that the patents made to Nokia's

4    products, which is -- for the '580 Patent is 5.48 percent, the

5    '599 Patent is 5.48 percent, and the '010 Patent is 4.58

6    percent.  And then I took these numbers, gave them to Mr.

7    Dell, and then Mr. Dell is going to take them and come up with

8    a final damages number.

9    Q.    Doctor Cole, thank you for your time.

10              MR. LIDDLE:  Pass the witness.

11              THE WITNESS:  Thank you.

12              THE COURT:  Cross examination by the Defendant.

13        Do you have binders to distribute, counsel?

14              MR. FRIST:  Yes.

15              THE COURT:  All right.  Let's get that done.

16              MR. FRIST:  Thank you.

17              THE COURT:  As I often say, we grow pine trees in

18    east Texas.  Don't worry about how much paper we use.

19        All right, Mr. Frist.  You may proceed with cross

20    examination when you're ready.

21              MR. FRIST:  Thank you, Your Honor.

22                        CROSS EXAMINATION

23    BY MR. FRIST:

24    Q.    Good morning, Doctor Cole.

25    A.    Good morning.

1    Q.   It's good to see you again.

2    A.   Good seeing you.

3    Q.   Can we begin with getting a better understanding of what

4    the focus of your opinions are today?  Okay?

5    A.   Yes.

6    Q.   You agree that you're not here to offer any opinions

7    regarding infringement.  Correct?

8    A.   That is correct.

9    Q.   And you will also agree you are not here as a damages

10   expert.  Correct?

11   A.   That is also correct.

12   Q.   And you do not offer any opinions regarding what Nokia

13   should pay if it's found to infringe.  Right?

14   A.   That is also correct.

15   Q.   So you're not an infringement expert in this case and

16   you're not a damages expert.  Correct?

17   A.   In this case, that is correct.

18   Q.   That's right.  In this case Doctor Valerdi is Smart

19   Path's infringement expert and Mr. Dell, who we'll see later,

20   is Smart Path's damages expert.  Right?

21   A.   That is my understanding.

22   Q.   So your role is to sit in the middle of these experts.

23   Right?

24   A.   That's one way to put it, yes.

25   Q.   And your role was to translate Doctor Valerdi's opinions

1    into a form that Mr. Dell could use.  Right?

2    A.   I would say to come up with percent of the technical

3    apportionment based on Doctor Valerdi's infringement to pass

4    to Mr. Dell.

5    Q.   Without Doctor Valerdi's opinions, you wouldn't be able

6    to do that apportionment analysis.  Right?

7    A.   That is correct.  My apportionment analysis relies on

8    infringement, which was performed by Doctor Valerdi.

9    Q.   And Mr. Dell, it's critical to his opinion that you got

10   your apportionment analysis correct so that he can assess

11   damages in this case.  Correct?

12   A.   That is my general understanding.

13   Q.   So you agree with me it's real important that your

14   analysis not attribute value to technology that Smart Path did

15   not invent.  Correct?

16   A.   Well, it was focused on the infringement analysis, so it

17   would be based on what's in the patents and what Doctor

18   Valerdi determines infringing.

19           MR. FRIST:  Your Honor, I object as non-responsive.

20           THE COURT:  It's not technically responsive, but it

21   is substantively an effort to answer your question.  I'm not

22   going to strike this answer.  I will allow you to explore it

23   further if you want or restate the question.

24           MR. FRIST:  Thank you, Your Honor.

25   Q.   (BY MR. FRIST)  Doctor Cole, you just drew a distinction

1    between infringement and value.  Right?

2    A.   I'm not sure of the question.  Could you explain?

3    Q.   Why don't I re-ask my question.  Do you agree that it's

4    important that your analysis not attribute value to technology

5    that Smart Path did not invent?

6    A.   I would agree with that.

7    Q.   Okay.  And you agree with me, sir, that Nokia should not

8    pay Smart Path for someone else's invention.  Right?

9    A.   I would also agree with that.

10   Q.   Okay.  So we need to be clear on what was included in

11   your apportionment analysis and what was not.  Is that fair?

12   A.   Well, my analysis was based on the infringement analysis

13   of Doctor Valerdi.

14   Q.   We need to be clear on what was included in your

15   apportionment analysis and what was not.  Do you agree with

16   that?

17          MR. LIDDLE:  Asked and answered, Your Honor.

18          THE COURT:  Overruled.  I'll allow the question.

19          THE WITNESS:  My analysis was based on Doctor

20   Valerdi's infringement, so based on the infringement analysis

21   is what I used to perform my technical apportionment.

22   Q.   (BY MR. FRIST)  Now, your analysis in this case was based

23   on a brochure for the Nokia 7250.  Is that right?

24   A.   I wouldn't agree with that.

25   Q.   You don't agree that you relied on this nine-page

1    brochure to perform your apportionment analysis?

2    A.    I call that a data tech sheet, not a brochure, so that's

3    the data tech sheet in which Nokia outlines all of their

4    features.

5    Q.    You heard yesterday that Nokia provides its customers

6    user manuals and user guides that span thousands of pages,

7    didn't you?

8    A.    Yes.

9    Q.    But you chose this nine-page data sheet to do your entire

10   apportionment analysis in this case.  Correct?

11   A.    I used all of the data sheets across all of Nokia's

12   products in which they represent the features that are in

13   their products.

14   Q.    Doctor Cole, your analysis involved counting features in

15   this nine-page document.  Correct?

16   A.    That was one of the steps that I performed.

17   Q.    If there are features not listed in this nine-page

18   brochure but that are listed in the thousands of other pages

19   that Nokia provides its customers, you didn't account for

20   those other features.  Correct?

21   A.    I wouldn't agree with that because the brochure or the

22   data sheet are the high-level features.  Those features might

23   be broken down into additional features, but they're all

24   inclusive in those high-level features that Nokia puts on

25   their data sheet.

1          THE COURT:  Doctor Cole, he simply asked you if you

2     agreed with that and you said you wouldn't.  He didn't say why

3     did you not agree with that, but you volunteered the answer as

4     to why you didn't agree with it.

5          Please limit your answers to the questions asked.  Mr.

6     Liddle's going to get another chance to go to the podium and

7     follow up on anything he thinks needs to be emphasized that

8     you're not able to talk about because it's not in the question

9     that you're asked by Mr. Frist.

10         So please try to limit your answers to the questions

11    asked.

12              THE WITNESS:  Yes, Your Honor.

13              THE COURT:  Okay.  Let's continue.

14    Q.   (BY MR. FRIST)  Doctor Cole, it's your opinion that this

15    7250 data sheet is representative of all the products in

16    Nokia's portfolio.  Is that correct?

17    A.   I would not agree with that.

18    Q.   You only performed your analysis that you just walked

19    through with Mr. Liddle where you counted up features and

20    calculated percentages using this document.  Correct?

21    A.   Sir, what is this document?

22    Q.   This document is the 7250 data sheet.

23    A.   Yes.

24    Q.   All right.  So is this 7250 data sheet representative of

25    all the products in Nokia's portfolio?  Yes or no.

616

1    A.    No, based on the way the question is asked.

2    Q.    Now, in forming your opinions on the values of each

3    feature, you did not perform any investigation as to what

4    Nokia's customers believe the most valuable features were.

5    Correct?

6    A.    That is correct.

7    Q.    You understand that some of Nokia's customers may value

8    some features more than others.  Right?

9    A.    That is my understanding.

10   Q.    You heard Mr. Valley testify yesterday that no one in the

11   United States uses this P2MP feature that we talked about.

12   Correct?

13   A.    I was here for that testimony.

14   Q.    You understand that Nokia's customers in the U.S.

15   wouldn't value that P2MP feature very much since no one uses

16   it.  Correct?

17   A.    Potentially.

18   Q.    You didn't take that into account when performing your

19   apportionment analysis.  Correct?

20   A.    Not directly.

21   Q.    Okay.  Now, the start of your analysis was dividing the

22   value of the features in Nokia's products between hardware and

23   software.  Do you recall that?

24   A.    Yes, I do.

25   Q.    And you attributed 75 percent to hardware and 25 percent

617

1    to software.  Is that right?

2    A.    That's also correct.

3    Q.    Now, hardware is the physical part of the router that you

4    can touch.  Right?

5    A.    Potentially.  It's sometimes the internal components you

6    might not be able to touch, but it's the hardware.

7    Q.    It's physical, something that if you open up the box, you

8    could touch it.  Right?

9    A.    Yes.

10   Q.    And software is the programs that are running on those

11   boxes.  Right?

12   A.    That is correct.

13   Q.    And the 25 percent you allocated was to the software

14   running on the boxes.  Right?

15   A.    Yes.

16   Q.    And to figure out how to apportion the value of software,

17   you divided the software into nine categories.  Correct?

18   A.    Nine features.

19   Q.    All right.  And you've attributed equal value to each of

20   those nine features.  Correct?

21   A.    That is also correct.

22           MR. FRIST:  Mr. Carrillo, can you please bring up

23   slide 1?

24   Q.    (BY MR. FRIST)  Doctor Cole, I've taken the 7250 brochure

25   and I've displayed the three pages with the nine software

1  features.  Do you see that?

2  A.    Yes, I do.

3  Q.    And these are the nine software features you used to

4  perform your analysis.  Correct?

5  A.    Yes, that is correct.

6  Q.    Okay.  Now, it's real important to your analysis that

7  there's only nine features here.  Correct?

8  A.    Could you rephrase the question?  I'm not sure what

9  you're asking.

10  Q.    Sure.  You attributed 11.11 percent to each one of these

11  features.  Right?

12  A.    That is correct.

13  Q.    And that's because there's nine total features.  Right?

14  A.    Yes.

15  Q.    And so you divided a hundred by nine, and that's how you

16  got to 11.11.  Is that right?

17  A.    That is correct.

18  Q.    So if there were 20 features listed here, then each

19  feature would only be worth five percent.  Right?

20  A.    That would be correct.

21  Q.    So it's real important to your analysis that there's only

22  nine features listed here.  Right?

23  A.    Well, the analysis was based on that there were nine

24  features.

25  Q.    Okay.  Nine and only nine features.  Right?

619

1    A.   Right.

2    Q.   Okay.  So if we find other features in other Nokia's

3    documentation that show there are features that are identified

4    in these brochures as potentially relevant, you didn't account

5    for those other features.  Right?

6    A.   I wouldn't agree with that.

7    Q.   We'll look at that.

8         MR. FRIST:  Let's go to the next slide, please, Mr.

9    Carrillo.

10   Q.   (BY MR. FRIST)  Now, Doctor Cole, for the '010 Patent you

11   identified three software features.  Correct?

12   A.   That is correct.

13   Q.   And they're the features labeled here in blue:  No. 2,

14   network protocols; No. 5, platform; and No. 6, QoS and traffic

15   management.  Is that right?

16   A.   I believe that is correct.

17   Q.   Okay.  I'd like to focus on No. 5 in the middle here,

18   platform.  Is that okay?

19   A.   Yes.

20        MR. FRIST:  Mr. Carrillo, can we please go to Doctor

21   Cole's slide 61?

22   Q.   (BY MR. FRIST)  Doctor Cole, this is your slide related

23   to the '010 Patent for this platform category.  Correct?

24   A.   That is correct.

25   Q.   Now, on the left you've broken down the platform feature

620

1    into eight sub-features.  Correct?

2    A.    I didn't.  I took that from Nokia's documentation.

3    Q.    That's fair.  So you grabbed these eight sub-features

4    from Nokia's documentation.  Correct?

5    A.    Eight components.

6    Q.    Okay.  And you identified five of the eight components as

7    allegedly infringing the '010 Patent.  Correct?

8    A.    That is correct.

9    Q.    And that's how you got the number at the bottom here of

10   62.5 percent for the platform category for the '010 Patent.

11   Right?

12   A.    Yes.

13          MR. FRIST:  If we can please turn to Doctor Cole's

14   demonstrative as 63, Mr. Carrillo.

15   Q.    (BY MR. FRIST)  Now, Doctor Cole, this is your

16   calculations for the '010 Patent.  Right?

17   A.    Yes.

18   Q.    And we can see here that in the middle there's the

19   platform category.  Right?

20   A.    Correct.

21   Q.    And you found here 62.5 percent infringing components of

22   the platform category.  Right?

23   A.    That is correct.

24   Q.    And based on that, you came up with this number, 6.9

25   percent.  Do you see that?

1    A.   Yes.

2    Q.   That 6.9 percent is about 35 percent of the total value

3    that you attributed to the '010 Patent.  Correct?

4    A.   Trying to do the math in my head.  I think that's

5    approximately right.

6    Q.   Okay.  So you agree then that this platform category that

7    you analyzed is extremely important to your apportionment in

8    this case.  Correct?

9    A.   I would say they're all important.

10    Q.   Okay.  I want to test your theory that this platform

11    category is important to Nokia's products.  Okay?

12    A.   Okay.

13    Q.   I want to test whether this platform category has the

14    same value to all of Nokia's products.  Okay?

15    A.   Okay.

16         MR. FRIST:  Mr. Carrillo, can you please bring up JX

17    14b?

18    Q.  (BY MR. FRIST)  Doctor Cole, another product in this case

19    is the Nokia 7705.  Are you aware of that?

20    A.   Yes.

21    Q.   And the Nokia 7705 also has a data sheet.  Right?

22    A.   That is correct.

23    Q.   And you referenced it actually in your direct

24    examination.  Correct?

25    A.   That is correct.

622

1    Q.    Now, you didn't choose to use this 7705 brochure to

2    perform your analysis.  Right?

3    A.    That is correct.

4    Q.    You chose to use the 7250 that we already looked at.

5    Right?

6    A.    That is correct.

7    Q.    Did you compare the 7705 and 7250 brochures to determine

8    whether the same software features appeared in both brochures?

9    A.    I did look at both data tech sheets, yes.

10   Q.    And you concluded that you could use the 7250 brochure as

11   representative of this Nokia 7705.  Right?

12   A.    Yes.

13            MR. FRIST:  Mr. Carrillo, if we can please go to

14   slide 5.

15   Q.    (BY MR. FRIST)  Now, Doctor Cole, this is the listing of

16   software features for the 7705.  Do you see that?

17   A.    Yes.

18   Q.    If you look in the middle page where a platform category

19   was for the 7250, platform category is not there, is it?

20   A.    Not directly.

21   Q.    There is no category labeled platform here.  Correct?

22   A.    That is correct.

23   Q.    So if you performed your analysis that starts by

24   identifying the software features in the brochure, you would

25   have not identified the platform category for the 7705.

1    Correct?

2    A.    Not directly.

3    Q.    Doctor Cole --

4              MR. FRIST:  If we can go back to, Mr. Carrillo -- if

5    we can please go to slide 3, Mr. Carrillo.  Sorry.  Slide 3 of

6    our slides, Mr. Carrillo.

7    Q.    (BY MR. FRIST)  While Mr. Carrillo is pulling that up,

8    Doctor Cole, may I ask you a separate question?

9         Your identification of the platform category for the '010

10   Patent is similar to all other patents that you analyzed in

11   this case.  Correct?

12   A.    I believe that is correct.

13             MR. FRIST:  Mr. Carrillo, can you go to the next

14   slide in this slide deck?  Thank you.

15   Q.    (BY MR. FRIST)  And, Doctor Cole, I've listed your

16   analysis of the platform category across all three patents

17   here.  Is that fair?

18   A.    Yes.

19   Q.    All right.  And we see the same eight features for the

20   '010, '599, and '580 Patent.  Right?

21   A.    That is correct.

22             MR. FRIST:  And if you can pull those percentages

23   up.

24   Q.    (BY MR. FRIST)  Doctor Cole, do you see the 62.5 percent?

25   A.    I do.

1    Q.   And, now, you did not perform an analysis to figure out

2    how to combine the totals for each of the patents in this

3    lawsuit.  Correct?

4    A.   Could you rephrase the question?

5    Q.   Sure.  You individually assessed 62.5 percent for each

6    patent.  Correct?

7    A.   Yes.

8    Q.   Now, you never tried to determine what would be the total

9    value of these three patents as to the platform category.  Is

10   that correct?

11   A.   Are you asking to come up with a single value across all

12   three?

13   Q.   Correct.

14   A.   No, I did not.

15   Q.   Okay.  Let's do it together.  Do you see it's the same

16   eight features across these three patents?  Right?

17   A.   Yes.

18   Q.   And you identified the same five features as potentially

19   infringing across all three patents.  Right?

20   A.   That is correct.

21   Q.   So that's five of eight.  Correct?

22   A.   Yes.

23   Q.   So the total combined value for the platform category

24   with your apportionment analysis is 62.5 percent.  Right?

25   A.   Correct.

1    Q.    So if Mr. Dell comes behind you and just adds these

2    percentages together and gets well over 180 percent, you'd

3    agree that was a mistake.  Correct?

4    A.    I would have to see the specifics of it, but I did

5    apportionment for each specific patent.

6            MR. FRIST:  Object as non-responsive, Your Honor.

7            THE COURT:  I think I'd have to see the specifics is

8    a responsive answer.  I'll overrule the objection.

9    Q.    (BY MR. FRIST)  Doctor Cole, if a person came and wanted

10   to find the total value of the '580, '599, and '010 Patents,

11   and they just added those percentages together to get 180

12   percent, you agree with me that would be a mistake.  Correct?

13   A.    That was not something I was asked to do so I'd have to

14   go back and do that analysis.

15   Q.    You understand there's no way you can attribute 180

16   percent of the value of this category to the infringing

17   features.  Correct?

18   A.    Generally, yes.

19   Q.    Okay.  Now --

20           MR. FRIST:  If we can please go to the next slide,

21   Mr. Carrillo.  Actually the previous slide with the -- thank

22   you.

23   Q.    (BY MR. FRIST)  Do you see in the highlighted circle,

24   there's ethernet IEEE 802.1Q?  Do you see that, Doctor Cole?

25   A.    Yes, I do.

626

1    Q.    And by highlighting that IEEE standard, you're indicating

2    that Nokia products infringe the '580, '599, and '010 Patent

3    by using that standard.  Right?

4    A.    Not directly, no.

5    Q.    Okay.  Are you, based on your apportionment analysis,

6    attributing a hundred percent of the value of that ethernet

7    IEEE 802.1Q to the patents-at-suit?

8    A.    Yes, I did.

9    Q.    Okay.  You understand this IEEE 802.1Q is a prior art

10   standard.  Right?

11   A.    There are components but not the totality.

12   Q.    Doctor Cole, you understand that IEEE 8802.1Q standard

13   was published in 1998.  Correct?

14   A.    I would need to see the standard.  I don't have the dates

15   memorized.

16   Q.    If you open your cross binder and go to the first tab,

17   you should see a document that at the top is labeled IEEE

18   Standard 802.1Q-1998.  Do you see that?

19   A.    I do.

20   Q.    Do you see where it says Approved 8 December 1998?

21   A.    Yes, I do see that.

22   Q.    So you understand the IEEE 802.1Q standard was published

23   five years before these patents -- before Smart Path's

24   patents.  Correct?

25   A.    That is correct.

```
 1   Q.   Now, Doctor Cole, I'm concerned that based on your

 2   apportionment analysis you're trying to give the impression

 3   that Smart Path invented the IEEE 802.1Q standard.  Is that

 4   what you're trying to do?

 5   A.   No, it is not.

 6   Q.   Right.  Because you understand that standard was

 7   published five years before these patents.  Right?

 8   A.   That is correct.

 9   Q.   Do you agree with me Smart Path shouldn't get credit for

10   a standard that was published in 1998?  Right?

11   A.   For the standard alone.

12   Q.   Okay.  And in your work in this case, you did not perform

13   an analysis to determine what, if any, advancement the

14   asserted patents provided to this 1998 IEEE 802.1Q standard.

15   Correct?

16   A.   I did not perform that task.

17   Q.   Let's look at another example related to network

18   protocols.  Is that okay, Doctor Cole?

19   A.   Yes.

20        MR. FRIST:  Mr. Carrillo, can we please go to the

21   next demonstrative?

22   Q.   (BY MR. FRIST)  Doctor Cole, do you see on the left the

23   features you highlighted for the networks protocol category?

24   A.   Yes.

25        MR. FRIST:  Mr. Carrillo, if you can animate and
```

628

1    magnify that.

2    Q.    (BY MR. FRIST)  Do you see No. 4, Doctor Cole, that says

3    MPLS label edge router and label switching router?

4    A.    Yes.

5    Q.    And here again, you've identified this MPLS feature as

6    infringing.  Correct?

7    A.    That is correct.

8    Q.    And you attributed 100 percent of the value of that

9    feature to Smart Path's patents.  Correct?

10   A.    That is correct.

11   Q.    You understand MPLS is actually a prior art protocol to

12   the asserted patents.  Correct?

13   A.    There is an MPLS protocol standard, yes.

14   Q.    And you did not again attempt to identify what the value

15   of the patents are to Nokia's products over this older MPLS

16   technology.  Correct?

17   A.    That was not my task in this case.

18   Q.    Again, here in your apportionment analysis, you assigned

19   a hundred percent of the credit of MPLS to Smart Path.  Right?

20   A.    That is correct.

21   Q.    Do you see the sub-feature here resource reservation

22   protocol with traffic engineering RSVP-TE?

23   A.    I do.

24   Q.    Now, again, it's -- in your apportionment analysis,

25   you're crediting Smart Path with a hundred percent of that

1    feature.  Correct?

2    A.    That is correct.

3    Q.    Again, you're trying to give the impression that a

4    hundred percent of the value of this feature belongs to Smart

5    Path.  Correct?

6    A.    That was my analysis.

7         MR. FRIST:  Mr. Carrillo, can you please go to the

8    next slide.

9    Q.    (BY MR. FRIST)  Doctor Cole, on the right is an excerpt

10   from the '580 Patent.  Do you see that?

11   A.    Yes, I do.

12   Q.    And do you see a reference to RFC 3209 entitled RSVP-TE

13   Extensions to RSVP for LSP Tunnels.  Do you see that?

14   A.    Yes, I do.

15   Q.    Do you see the date December 2001?

16   A.    Yes.

17   Q.    RSVP-TE predates these patents by a couple of years.

18   Right?

19   A.    The RFC does.

20   Q.    Right.  Here you've given a hundred percent of the value

21   of RSVP-TE to Smart Path.  Correct?

22   A.    That is correct.

23   Q.    And you did not apportion the value of the Smart Path

24   patents -- what the value of the Smart Path patents are over

25   what already existed in prior art RSVP-TE standards.  Correct?

1    A.    That is also correct.

2    Q.    You understand that other companies might have patents

3    that cover RSVP-TE.  Right?

4    A.    Potentially.  There's a lot of patents out there.

5    Q.    And you made no attempt to value what the Smart Path

6    patents contributed to RSVP-TE over what patents for others

7    may have accounted for to that same feature.  Right?

8    A.    That is also true.

9    Q.    Okay.  Now, with respect to RSVP-TE, you've analyzed that

10   protocol in the context of this case.  Correct?

11   A.    In the context of the technical apportionment.  I did not

12   perform the infringement analysis.

13   Q.    You were here for Doctor Valerdi's testimony.  Correct?

14   A.    Yes, I was.

15   Q.    And did you hear him talk about how in the '580 Patent

16   there was a requirement of resource sharing between tunnels?

17   A.    Generally, yes.

18   Q.    Isn't it true, Doctor Cole, that it's your opinion that

19   the RSVP-TE protocols do not allow for resource sharing

20   between separate tunnels?

21   A.    I don't recall giving that.

22   Q.    If you can please open your notebook to your opening

23   expert report and go to paragraph 39.  Do you see that, Doctor

24   Cole?  Doctor Cole, do you see that paragraph?

25   A.    Oh, yeah.  Since you asked me to review it, I'm just

 1    reading that section.

 2    Q.    Okay.  Doctor Cole, does paragraph 39 refresh your

 3    recollection regarding your opinions of whether RSVP-TE

 4    protocols do not allow for resource sharing between separate

 5    tunnels?

 6    A.    I do not believe that's what it says.  Would you like me

 7    to read it into the record?

 8    Q.    Sure.

 9            THE COURT:  Wait a minute.  If you want to publish

10    it by way of impeachment, counsel, that's something you should

11    do.  I've never seen a witness impeach themselves by reading

12    it themselves.  So even though he offered it spontaneously,

13    that's your role, not his.

14            MR. FRIST:  Understood, Your Honor.

15        Mr. Carrillo, can we please -- or, Your Honor, may I

16    publish paragraph 39?

17            THE COURT:  You may publish paragraph 39 of this

18    witness' expert report.

19    Q.    (BY MR. FRIST)  Doctor Cole, if you see in paragraph 39,

20    it says the '580 Patent explains that utilizing the RSVP-TE

21    protocol enables some bandwidth sharing.  And there's a cite.

22    And it continues, "However, any support for bandwidth sharing

23    in existing protocols such as the RSVP-TE SE style was limited

24    to bandwidth sharing between alternative instances of the same

25    MPLS tunnel and did not disclose or enable resource sharing

1   between separate tunnels."

2       Do you see that?

3   A.   Yes, I do.

4   Q.   And I read your expert report correctly, didn't I?

5   A.   Yes, you did.

6           MR. FRIST:  All right.  You can take that down, Mr.

7   Carrillo.

8       Mr. Carrillo, if you can please bring up slide 38 of

9   Doctor Cole's analysis.

10  Q.   (BY MR. FRIST)  Now, Doctor Cole, I want to focus on this

11  last little bit about how you calculated what were the

12  infringing components in your analysis.  Okay?

13  A.   Okay.

14  Q.   Now, to calculate the infringing components, you analyzed

15  which features were allegedly infringing the asserted patents.

16  Right?

17  A.   Yes, based on conversations with Doctor Valerdi.

18  Q.   And that's what you put in this infringing components box

19  on these slides and other slides similar to it.  Right?

20  A.   Correct.

21  Q.   Now I want to focus, Doctor Cole, on what you did not do

22  when identifying infringing components.  Okay?

23  A.   Okay.

24  Q.   You agree that in identifying these infringing

25  components, you did not make any attempt to assess the value

1  of the improvement of the asserted patents over what existed

2  in the prior art.  Correct?

3  A.   That would be correct.

4  Q.   And do you agree that you did not determine the

5  incremental -- let me strike that and let me try again.

6       You did not determine the incremental improvement over

7  other alternatives that existed in the industry at the time of

8  infringement.  Correct?

9  A.   Correct.

10 Q.   And within a given feature that you identified, like MPLS

11 or RSVP-TE, you did not try to determine the relative

12 contribution of the asserted patents as compared to other

13 contributions of technology to that feature.  Correct?

14 A.   Correct.

15 Q.   And you did not try to determine the relative value of

16 the asserted patents over unpatented features that are

17 included in the components you identified.  Correct?

18 A.   Could you repeat the question again?

19 Q.   Sure.  You did not try to determine the relative value of

20 the asserted patents over unpatented features that exist

21 within the infringing components that you identified.  Right?

22 A.   Well, I believe that was done by identifying the

23 non-infringing percent.

24 Q.   Doctor Cole, let's use an example.  Take the '580 Patent.

25 You understand that that patent requires creating tunnels.

1    Right?

2    A.    Yes.

3    Q.    You understand that creating tunnels was not new by the

4    time we hit Smart Path's patents.  Right?

5    A.    Generally, yes.

6    Q.    And this RSVP-TE feature that we looked at and you

7    identified as an infringing component requires the ability to

8    create tunnels.  Right?

9    A.    Generally, yes.

10   Q.    You did not attempt to determine the relative value of

11   the asserted patents over unpatented features like the

12   creation of the tunnels within these infringing components.

13   Correct?

14   A.    Like I said, there is a value for infringing and for not

15   infringing.  So I believe I did give value to non-infringing.

16   Q.    I'm asking a different question.  My question is about

17   the value of the patents.  Okay, Doctor Cole?

18   A.    Okay.

19   Q.    Within infringing components, there are features that

20   were allegedly new for the patents and there were features

21   that already existed.  Right?

22   A.    Correct.

23   Q.    You did not attempt to value what was new for the patents

24   over what already existed and was included in this category.

25   Correct?

1    A.    Not that specifically, correct.

2    Q.    Okay.  Now, we talked earlier that you understand for

3    some of these features, others may have patents like Nokia or

4    other industry players.  Right?

5    A.    Potentially.  There's a lot of patents out there.

6    Q.    And you did not try to determine the relative value of

7    the asserted patents to these features over patented features

8    from other people's patents.  Correct?

9    A.    That is also correct.

10            MR. FRIST:  Mr. Carrillo, you can take that slide

11   down.

12   Q.    (BY MR. FRIST)  Now, I have one last question for you,

13   Doctor Cole.  Do you recall in your testimony you talked about

14   the background of Orckit-Corrigent?

15   A.    Yes.

16   Q.    And you were trying to portray them as an innovator in

17   the world of routers?

18   A.    I believe they were.

19   Q.    Okay.  And do you think they were a very innovative

20   company?

21   A.    They were definitely one of the innovators.

22   Q.    Prior to this case, you'd never heard of

23   Orckit-Corrigent, had you?

24   A.    Not directly, no.

25   Q.    Prior to this case, you had never heard of

1    Orckit-Corrigent ever.  Right?

2    A.    That is correct.

3    Q.    Thank you, Doctor Cole.

4             MR. FRIST:  I'll pass the witness.

5             THE COURT:  All right.  Redirect by the Plaintiff?

6             MR. LIDDLE:  Thank you, Your Honor.

7        Mr. Jarrett, can you access our slides, please?  Can you

8    start with slide 56, please, Mr. Jarrett?

9                      REDIRECT EXAMINATION

10   BY MR. LIDDLE:

11   Q.    Now, Doctor Cole, the questioning was about the 7250

12   router and that was your -- that was the one that you used as

13   representative.  Is that right?

14   A.    That is correct.

15   Q.    Okay.  And why did you use the 7250 as a representative

16   product?

17   A.    For several reasons.  One, it's one of their core

18   routers, it's one of their more popular routers, and I felt by

19   looking at all the data tech sheets that it was a good

20   representative sample of all the other routers.

21   Q.    Now, does Nokia make routers that have more features than

22   the 7250?

23   A.    My understanding is they do.

24   Q.    Okay.  So does this slide show different Nokia routers?

25   A.    Yes, it does.

```
1    Q.    So -- and they kind of -- what I'm seeing is they

2    increase in number as we move across the slide.  Do you see

3    that?

4    A.    Yes, I do.

5    Q.    Okay.  Is it your understanding that the 7950 has more

6    features than the 7250?

7    A.    Potentially.  And as we heard from Nokia's experts,

8    typically they also have bigger processors or more

9    capabilities to process more traffic.

10   Q.    And so you used the 7250.  So why again did you use the

11   7250 as a representative product?

12   A.    Because it was one of their core routers, it was one of

13   their very popular routers, and I felt it was a very good

14   representative sample of the core features.

15   Q.    Now, Doctor Cole, Mr. Frist made it sound like you used

16   simply a brochure to do the analysis in this case.  Do you

17   agree with that?

18   A.    No, I do not.

19   Q.    What all did you consider in your analysis of this case?

20   A.    I looked at the tech sheets.  And in my experience, a

21   tech sheet where you list the features and the breakdown is

22   quite different than just a general brochure that you might

23   give on the overall product.  So this was Nokia's

24   representation of all of their key features.

25         I also did go through all of their documentation.  In my
```

1    direct yesterday, I talked about tens of thousands of pages of

2    documents.  So I did go through and confirm those features

3    were aligned with the user guide, and I also confirmed that

4    with deposition testimony from Nokia's engineers.

5    Q.    Doctor Cole, Mr. Frist also implied that there should be

6    one combined number for the three patents.  Why did you

7    analyze each patent separately?

8    A.    Because each patent is different and each patent offers a

9    different contribution to Nokia's products.

10   Q.    There was also an indication that you were attributing

11   62.5 percent of each patent.  Do you remember that?

12   A.    I remember that number did come up.

13   Q.    And the implication was that if you added those three

14   together, it would equal over 180 percent.  Is that right?

15   A.    I do remember that question.

16   Q.    So why is that inaccurate?

17   A.    For several reasons.  First, that is a percent of

18   platform which is a percent of software.  So this is part of

19   the middle analysis.  So you can't just pull a number from the

20   middle and perform an analysis; you have to look at the

21   context in which it's used.  And this is a percent of

22   platform, which is a percent of software.

23   Q.    There was also an implication that -- implicating some

24   standard documents.  Do you remember that conversation?

25   A.    Yes, I do.

```
 1   Q.   Okay.  And one particular standard was the 802.1Q.  Do

 2   you remember that?

 3   A.   Yes, I do.

 4   Q.   And it was -- the question was because it was approved in

 5   1998, that it predated our patents.  Do you remember that?

 6   A.   I remember that question.

 7   Q.   Okay.  Are standards generally updated over time?

 8   A.   Yes, they are.

 9   Q.   Okay.  And so are they updated yearly?

10   A.   They can be updated yearly, they could be updated

11   quarterly.  It just depends on the advancements and the

12   changes.  And also there is a standard, and then when you put

13   it within a product, there's often potential enhancements or

14   other things you can do to enhance the value of that standard.

15   Q.   Would it surprise you if the 802.1Q was updated as

16   recently as 2022?

17   A.   That would not surprise me at all.

18   Q.   There was also some discussion about RSVP-TE.  Do you

19   remember that?

20   A.   Yes, I do.

21   Q.   And you were here in the courtroom when Doctor Valerdi

22   did his analysis.

23   A.   Yes, I was.

24   Q.   Did he point to that standard for infringement?

25   A.   No, he did not.
```

640

1    Q.    And what did he primarily use to establish infringement?

2    A.    He primarily used the most accurate source, which is

3    source code.

4    Q.    Okay.

5          MR. LIDDLE:  Nothing further, Your Honor.  Pass the

6    witness.

7          THE COURT:  All right.  Is there additional cross

8    examination?

9          MR. FRIST:  Yes, Your Honor.

10         THE COURT:  All right.  Proceed with additional

11   cross.

12         MR. FRIST:  Mr. Carrillo, will you please bring up

13   our slide 7?

14                   RECROSS EXAMINATION

15   BY MR. FRIST;

16   Q.    Doctor Cole, I'll begin where counsel for Smart Path just

17   left off about the RSVP-TE.  Do you see that?

18   A.    Yes.

19   Q.    And if I heard Smart Path's counsel correctly, he implied

20   that Doctor Valerdi said -- did not say that RSVP-TE

21   infringed.  Is that what I heard?

22   A.    What I thought the question was, was during his

23   infringement presentation yesterday whether he used any

24   standards to prove infringement, and I do not remember him

25   using any standards.

1   Q.    RSVP-TE is a standard.  Right?

2   A.    Correct.

3   Q.    And that's what you've identified as the infringing

4   feature of Nokia's products.  Correct?

5   A.    Well, it's based on the standard.

6   Q.    Right.  And you did not determine what the contributions

7   of the asserted patents are to what already existed in the

8   RSVP-TE standard.  Right?

9   A.    That is correct.

10  Q.    In your analysis you gave Smart Path a hundred percent

11  credit for this feature even though there's a prior art

12  standard.  Right?

13  A.    That is correct.

14  Q.    In your analysis then, you gave Smart Path credit for

15  features that Smart Path did not invent.  Isn't that true?

16  A.    I wouldn't agree with that.

17            MR. FRIST:  No further questions, Your Honor.

18            THE COURT:  You pass the witness, Mr. Frist?

19            MR. FRIST:  I pass the witness.  Sorry.  Thank you.

20            THE COURT:  Do you have additional direct, Mr.

21  Liddle?

22            MR. LIDDLE:  Nothing further, Your Honor.

23            THE COURT:  All right.  You may step down, Doctor

24  Cole.

25            THE WITNESS:  Thank you, Your Honor.

1            THE COURT:  You're welcome, sir.

2        Am I correct, Plaintiff, your next witness is by

3    deposition?

4            MR. BENNETT:  Correct, Your Honor.

5            THE COURT:  All right.  Call your next witness by

6    deposition.

7            MR. BENNETT:  Plaintiff calls Herve Deseveaux, chief

8    financial officer of the routing business division for Nokia.

9    Total run time is 12 minutes, 22 seconds, with 10 minutes, 52

10   seconds attributed to Plaintiff and 1 minute, 30 seconds

11   attributed to Defendant.

12           THE COURT:  All right.  Proceed with this witness by

13   deposition, please.

14           MR. HAYNES:  Your Honor, I believe this deposition

15   may include some Nokia confidential information that relates

16   to licensing and other issues.  We conferred, and I believe

17   they agreed we should seal the courtroom while this is

18   playing.

19           THE COURT:  All right.  Based on that information

20   and to protect confidential material, I'll order the courtroom

21   sealed.  I'll direct the Court Security Officer to ensure that

22   everyone not subject to the protective order exits the

23   courtroom and remains outside until the courtroom is reopened

24   and unsealed.

25                    (Courtroom sealed.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17            (Courtroom unsealed.)

18        And before we proceed, ladies and gentlemen, we're going

19   to take a short recess.  If you'll simply leave your notebooks

20   in your chairs, follow all my instructions, including not to

21   discuss the case with each other, and we'll be back shortly to

22   continue.  We'll try to keep this relatively brief.

23        The jury's excused for recess.

24            (Whereupon, the jury left the courtroom.)

25            THE COURT:  Court stands in recess.

1                    (Brief recess.)

2          THE COURT:  Be seated, please.

3      Counsel, are we now ready to read into the record those

4  items from the list of pre-admitted exhibits used during

5  yesterday's portion of the trial?

6          MR. BENNETT:  We are.

7          THE COURT:  Let's proceed -- excuse me.  Let's

8  proceed to do that.

9          MR. BENNETT:  All right.  For Plaintiff --

10          THE COURT:  Go to the podium, please, Mr. Bennett.

11          MR. BENNETT:  I'm sorry.  Yes.

12      For Plaintiff:  Joint Exhibit 1; Joint Exhibit 2; Joint

13  Exhibit 3; Joint Exhibit 10d, as in David; Joint Exhibit 11a;

14  Joint Exhibit 12b, as in boy;  Joint Exhibit 13; Joint Exhibit

15  17; Joint Exhibit 19c, as in cat; Joint Exhibit 23a; Joint

16  Exhibit 27c; Joint Exhibit 33; Joint Exhibit 36b, as in boy;

17  Joint Exhibit 38; Joint Exhibit 46b, as in boy; Plaintiff's

18  Exhibit 1-1; Plaintiff's Exhibit 2-3; Plaintiff's Exhibit 3;

19  Plaintiff's Exhibit 5; Plaintiff's Exhibit 8; Plaintiff's

20  Exhibit 30-2.

21          THE COURT:  Any objections from Defendant?

22          MR. DEANE:  No objection, Your Honor.

23          THE COURT:  All right.  So when he said B, he said

24  like boy.  He said C, he said like cat.  When he said D, he

25  said like David.  And he said A twice and didn't give anything

1    to describe how you spell A.  But just an observation.

2         All right.  Go ahead, Mr. Deane.

3              MR. DEANE:  Thank you, Your Honor.

4         For trial day 2, Defendants used the following exhibits I

5    would like to read into the record:  PX 5; PX 13; PX 30-2; DX

6    14; JX 10d, as in David; JX 19a, as in alpha; JX 21; JX 27c,

7    as in Charlie; JX 29; and JX 46a, as in alpha.

8              THE COURT:  All right.  Any objection from

9    Plaintiff?

10             MR. BENNETT:  No, Your Honor.

11             THE COURT:  All right.  Thank you, counsel.

12        Anything else we need to take up before we bring the jury

13   back in?

14             MR. BENNETT:  We have a deposition that will be

15   under seal.

16             THE COURT:  All right.  Let's bring the jury in,

17   please.

18             (Whereupon, the jury entered the courtroom.)

19             THE COURT:  Welcome back, ladies and gentlemen.

20   Please have a seat.

21        Plaintiff, call your next witness.

22             MR. BENNETT:  Your Honor, Plaintiff calls Dhiren

23   Patel, head of licensing at Nokia.  Total run time is 25

24   minutes, 53 seconds; 14 minutes, 20 seconds attributed to

25   Plaintiff and 11 minutes, 32 seconds attributed to Defendant.

```
1              THE COURT:  And is it my understanding it's the

2    parties' request that this be presented under seal as well?

3              MR. BENNETT:  That is correct, Your Honor.

4              THE COURT:  Then I'll order the courtroom sealed at

5    this time.  I'll direct the Court Security Officer to escort

6    anyone not subject to the protective order outside the

7    courtroom until it's reopened and unsealed.

8                         (Courtroom sealed.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15                     (Courtroom unsealed.)

16          THE COURT:  And with that, call your next witness,

17  Plaintiff.

18          MR. BENNETT:  Plaintiff calls Stephen Dell.

19          THE COURT:  All right.  Ms. Stall, you may go to the

20  podium to prepare.

21      If we have binders to distribute, let's do that, too.

22          (Whereupon, the oath was administered by the Clerk.)

23          THE COURT:  Please come around, have a seat on the

24  witness stand, Mr. Dell.

25      All right, counsel.  You may proceed with direct

1    examination.

2            MS. STAHL:  Thank you, Your Honor.

3                    STEPHEN DELL,

4    having been duly sworn, testified under oath as follows:

5                  DIRECT EXAMINATION

6    BY MS. STAHL:

7    Q.   Good morning, Mr. Dell.  Please introduce yourself to the

8    jury.

9    A.   Good morning.  My name is Stephen Dell.

10   Q.   And can you tell us a little bit about yourself?  Where

11   are you from?

12   A.   So I was born in Houston, actually just outside of

13   Houston, and I currently live in a suburb just north of

14   Houston now called the Woodlands.

15   Q.   Do you have a family?

16   A.   I do.  I've been married for 22 years, actually celebrate

17   my 22nd wedding anniversary here in a couple of weeks.  I have

18   two children, 16- and 17-year-old boys.

19   Q.   And what do you do for work?

20   A.   So I'm the founder and president of a firm called Novum

21   Consulting Group, and we provide a variety of clients

22   financial consulting and advisory services with respect to the

23   valuation or the value of intellectual property assets such as

24   patents as well as other business matters and other business

25   disputes.

1  Q.   And why are you here to testify?

2  A.   So I've been retained by Smart Path to calculate the

3  reasonable royalty damages owed as a result of Nokia's

4  infringement of the three asserted patents in this case.

5  Q.   And did you prepare any demonstratives or slides to

6  assist with your testimony here today?

7  A.   Yes, ma'am, I did.

8  Q.   Before we get down to the substance of your opinions, I

9  want to talk a little bit about your background and your

10  qualifications.  So where did you go to school?

11  A.   So I graduated from the University of Texas at Austin

12  with a degree in economics, and in that degree, an emphasis in

13  finance, and a minor in business administration.

14  Q.   Do you hold any certifications?

15  A.   Yes, ma'am, I do.  I am a certified valuation analyst.

16  Q.   So that's probably a new term to some of us.  What is a

17  CVA?

18  A.   A CVA is a credential in valuation that allows me the

19  ability to provide certified opinions of value so I can attest

20  to the value of either a business transaction or even in

21  matters such as this like a litigation matter regarding the

22  value of either patents or other assets.

23  Q.   And about how many times would you say you've been hired

24  to provide an expert damages analysis in a patent case?

25  A.   So I've been retained in more than 200 intellectual

1    property and patent engagements.

2    Q.    Is all your work related to lawsuits?

3    A.    No, ma'am, it is not.

4    Q.    How does that break down?  What percentage of your work

5    is related to litigation?

6    A.    About 70 percent of the work that I do involves

7    litigation or file litigation, and then the remainder of that

8    work that I do is actually advisory work, so advising clients

9    on the value of their intellectual property assets, and

10    assisting them in both licensing in as well as licensing out

11    technology, developing the value of the technology as well as

12    helping them negotiate license agreements themselves.

13    Q.    So focusing in on that 30 percent, how many times among

14    those engagements have you actually sat at the negotiating

15    table and negotiated a license for a patent?

16    A.    So I've probably been involved in more than 50

17    engagements where we're actually helping negotiate or involved

18    in negotiations, and I personally have dozens of times have

19    sat down to actually assist in the negotiation of a patent

20    license agreement outside of litigation.

21    Q.    In the last 20 years in the course of your work as a

22    litigation consultant, what types of clients and other

23    companies have you encountered?

24    A.    So over my 22 years, I've been involved in matters or

25    engagements with a variety of companies, including Xerox as a

```
 1    client, Palo Alto Networks as a client.  So companies involved

 2    generally in this industry as well as have been involved in

 3    engagements in a variety of industries, including smartphones,

 4    cellular technologies, semiconductors, among others.  And this

 5    is just a representative sample of some of the engagements and

 6    the companies involved in those engagements.

 7    Q.   All right.  And I see you've broken this up into two

 8    bubbles.  What's the significance of that?

 9    A.   So the top portion, as I mentioned, are some of the

10    litigation engagements I've been involved in and the companies

11    involved.  And the bottom portion, again, is just a

12    representative sample of some of the companies that I've been

13    involved in licensing engagements of valuing patent assets for

14    the licensing, and helping negotiate licenses.

15    Q.   For these engagements, how many times did you -- I'm

16    sorry.  How many times have you negotiated licenses outside

17    the litigation context on behalf of the patent owner, the

18    licensor?

19    A.   I would say in the -- in the licensing engagements

20    outside the context of litigation, it's evenly split between

21    the licensor, so the company licensing technology, as well as

22    the licensee, or the company taking in a license.  So it's

23    about equal.

24    Q.   All right.  Going back to your credentials, have you

25    received any recognitions or awards for your work in the area
```

1    of patent valuation, valuation, and damages?

2    A.    Yes, ma'am I have.

3    Q.    And what are those?

4    A.    I've been recognized by Intellectual Asset Management, or

5    IAM, as one of the leading patent damages experts in the

6    world.

7    Q.    And do you belong to any professional organizations that

8    relate to the licensing of patents?

9    A.    Yes, ma'am.  I am a member of the Licensing Executive

10   Society.

11   Q.    And what is the Licensing Executive Society?

12   A.    So we have a lot of acronyms in this business.  LES, as

13   we call it, is a group of 6500 executives and patent licensing

14   professionals that focus on the area of patent licensing and

15   patent valuation in real-world negotiations.

16   Q.    And have you given presentations or lectured on the

17   topics of patent valuation and patent damages?

18   A.    Yes, I have.  I've presented as a lecturer with the

19   University of Texas Patent Law Institute providing an

20   information or presentations with respect to patent damages.

21        I've also lectured at the Louisiana Society of Certified

22   Public Accountants on the issue of intellectual property asset

23   valuation, and I'm also a -- authored a chapter that was

24   published in a book on the -- excuse me, the valuation issues

25   with respect to intellectual property assets and how to value

666

1    patents.

2    Q.    Now, are you -- did you do all your work for us for free?

3    A.    No, ma'am, I did not.

4    Q.    And how are you being compensated?

5    A.    I get compensated at my standard hourly rate of $550 per

6    hour.

7    Q.    And is your compensation dependent in any way on the

8    substance of your opinions or the outcome of this case?

9    A.    No, it is not.

10         MS. STAHL:  Your Honor at this time, Smart Path

11   tenders Mr. Dell as an expert in the field of patent

12   valuation, licensing, and damages.

13         THE COURT:  All right.  Is there objection?

14         MR. DACUS:  No objection, Your Honor.

15         THE COURT:  Without objection, the Court will

16   recognize this witness as an expert in those designated

17   fields.

18   Q.    (BY MS. STAHL)  Mr. Dell, before we dive in, I want to

19   talk a little bit about what you did in the course of

20   developing your opinions in this case.  So tell me about the

21   information you reviewed when determining the appropriate

22   amount of royalty damages.

23   A.    Sure.  So the first thing we do is start with the patents

24   that are being valued, the three patents-at-issue in this

25   case.  However, given I'm not a technical expert, I discussed

1    the patents as well as their benefits with Doctor Valerdi as

2    well as Doctor Cole, who we've already heard from.

3    Q.   And did you also review any other information or

4    documents?

5    A.   Yes.  I reviewed a significant amount of documents,

6    documents produced by both Smart Path as well as Nokia's

7    confidential documents, including sales information and some

8    of the license agreements that we've seen, as well as other

9    information that was produced by third parties that were made

10   available to me by both sides in this case.

11   Q.   About how many hours would you estimate you have spent

12   studying the facts and preparing your opinions in this case?

13   A.   So over the past year approximately that we've been

14   working on this engagement, my team and I collectively have

15   spent more than 1400 hours, and I personally have spent more

16   200 hours working on my analysis.

17   Q.   And after reviewing all that information and spending all

18   that time, have you developed an opinion about what the

19   reasonable royalty Smart Path should receive for Nokia

20   infringing the '010, the '580, and the '599 Patents?

21   A.   Yes, ma'am, I have.

22   Q.   And what is that opinion?

23   A.   So it's my opinion that for the '580 Patent, the parties

24   would agree to a reasonable royalty rate of .30 percent.  For

25   the '599 Patent, the parties would agree to a reasonable

668

1    royalty rate of .35 percent.  And for the '010 Patent, the

2    parties would agree to a reasonable royalty rate of .25

3    percent.  That would be applied to the sales of accused

4    products, resulting in royalty damages of $48.5 million.

5    Q.   And you've listed out each patent separately.  Why is

6    that?

7    A.   Well, because, as we've heard, there is specific

8    incremental value or technical contribution for each one of

9    the patents-at-issue.  And, therefore, I've assessed the value

10   of each patent individually.

11   Q.   We're going to drill down on how you derived these

12   numbers, but I wanted to start out with kind of where do you

13   begin the analysis.

14   A.   Sure.  So the first thing we do is we turn to the law,

15   and the law provides guidance in how to calculate patent

16   damages.

17   Q.   Is this the patent damages statute we have here on the

18   screen?

19   A.   Yes, ma'am, it is.

20   Q.   And what does it tell you about the manner in which you

21   should determine patent damages?

22   A.   So the damages statute states that damages shall be

23   adequate to compensate for the infringement but in no event

24   less than a reasonable royalty for the use made of the

25   invention by the infringer.

1    Q.   And what is the significance to you of the language that

2    you've underlined in red?

3    A.   The significance of the use made of the invention by the

4    infringer is because that's what the statute guides is to

5    ensure that you're looking at the value of the patent as is

6    made or used or benefited from the infringer.  So in this case

7    Nokia.

8    Q.   And we've used the term 'royalty' quite a bit in this

9    case.  Can you tell us what that actually means?

10   A.   Sure.  Many of you may already be familiar with the term

11   'royalty'.  However, a common analogy that I use is a property

12   analogy or an apartment analogy.

13        We've already heard patents are property.  So if somebody

14   was going to rent an apartment or rent property, they would

15   sign a lease agreement and, in return for rights to use that

16   property, they would pay rent or royalty for rights to use the

17   property.

18        In -- for patents or intellectual property, if somebody

19   wants to use a patent or patented property, they sign what's

20   called a license agreement and, in return for the rights

21   granted to use that property, they pay rent or royalties, as

22   we call them.

23   Q.   Are there different types of royalties?

24   A.   Yes.  There are generally two forms of royalties.

25   Q.   And what are they?

670

1    A.   Well, the first form of royalty is running royalty.  As

2    it sounds, it's a royalty that's pay-as-you-go or pay for use.

3    So in our apartment analogy, it would be if you sign a

4    three-year lease agreement, you would pay monthly rent each

5    month for 36 months or over a three-year term.

6    Q.   What is your opinion regarding the appropriate structure

7    of royalty in this case?

8    A.   Well, I wanted to first maybe compare that to the lump

9    sum aspect of -- so the other form of royalty is a lump sum

10   agreement where in our property analogy you would pay for all

11   three years of your rent up front.  So you would make one

12   single payment, a larger payment, for rights to use that

13   property over the full term of the agreement.  However,

14   oftentimes in lump sum agreements, you may get a discount for

15   paying all of those monies up front.

16   Q.   Okay.  And then now I'll come to and did you decide or

17   make a determination as to which of these two options is

18   appropriate in this case?

19   A.   Yes, ma'am, I did.

20   Q.   And what did you determine?

21   A.   It's my opinion that a running royalty is the appropriate

22   form or structure for the royalties in this case.

23   Q.   All right.  And is there a formula that you use in order

24   to calculate a running royalty?

25   A.   Yes, there is.

1    Q.    And what is that?

2    A.    So as we see here on the slide, the formula for

3    calculating royalty damages is fairly simplistic in nature,

4    but it is the determination of a royalty base and the

5    application of a royalty rate to that royalty base which

6    results in royalty damages.

7    Q.    Okay.  And so, as we see on this slide, what is the first

8    step that you -- that you need to do in order to calculate the

9    reasonable royalty?

10   A.    So the first step is the determination of the royalty

11   base.

12   Q.    And what is a royalty base?

13   A.    Well, the royalty base is, as the statute indicates, is

14   the use made of the invention by the infringer.  And in this

15   case we know that the royalty base or the accused products in

16   this case are various routers and switches that are sold by

17   Nokia.

18   Q.    And I see here on the screen this term, smallest saleable

19   patent practicing unit.  Why did you put that on your slides

20   today?

21   A.    Well, the law instructs, in determining the royalty base,

22   that we look at the smallest saleable patent practicing unit,

23   or SSPPU.  And what we heard from Doctor Valerdi is

24   he -- because this is a technical question, he analyzed the

25   accused products in this case and determined that because of

1    the combination of the hardware and the software in those

2    products, that the smallest unit that is itself sold by Nokia

3    are the accused products or the routers that we've been

4    hearing about throughout this trial.

5    Q.   Now, you mentioned the accused routers and switches.

6    Does this slide represent the products at issue?

7    A.   Yes, ma'am, it does.

8    Q.   And so is it your opinion that these devices themselves

9    constitute the smallest saleable patent practicing unit, or

10   SSPPU?

11   A.   Yes, based on my understanding from Doctor Valerdi, that

12   is correct.

13   Q.   Okay.  So once you've determined what the SSPPU is, do

14   you look at other things to calculate an appropriate royalty

15   base?

16   A.   Yes.  Now that we know the SSPPU, we can actually look at

17   the data and information to calculate the royalty base itself.

18        MS. STAHL:  Mr. Jarrett, can you advance the slide,

19   because my clicker isn't working?

20   Q.   (BY MS. STAHL)  All right, sir.  And so does this slide

21   represent the information that or some of the information that

22   you considered in calculating the royalty base?

23   A.   Yes.  These are screenshots of the electronic data or the

24   sales data of -- that was produced to me by Nokia confidential

25   information related to the sales of the accused products.

1    So I analyzed this data in order to calculate the sales

2    of each of the respective accused products that are at issue

3    in this case that we just saw on the previous slide.

4    Q.   All right.  And this slide shows us PX 28 and JX 44a?

5    A.   Yes, ma'am, that's correct.

6    Q.   All right.  And did you take this data that's reflected

7    here on this slide and then add it all up or were there other

8    steps in your analysis?

9    A.   Well, I did take the data, but I also reviewed deposition

10   testimony.  In fact, some of the testimony that you just heard

11   with respect to what is included within this data, and my

12   understanding from Nokia's witnesses is that specifically what

13   is in this data are the sales of the accused products.

14    So I was able to analyze this data, along with their

15   testimony, to determine the specific accused products and

16   calculate what the total royalty base is for this case.

17   Q.   All right.

18        MS. STAHL:  May I have the next slide, please?

19   Q.   (BY MS. STAHL)  What is the total royalty base, in your

20   opinion, Mr. Dell?

21   A.   So based on my analysis of Nokia's sales information that

22   have been produced to me or provided to me, the total royalty

23   base for the accused products is $5,387,648,681.

24   Q.   All right.  So now if we go back to the formula for

25   calculating the royalty base, which is on the next slide, can

674

1    we consider that we have addressed the royalty base component

2    of the calculation?

3    A.    Yes, we now have the royalty base calculated and we can

4    move on to our next step.

5    Q.    All right.  And what is the next step?

6    A.    So the next step is the determination of the royalty rate

7    to apply to the royalty base.

8    Q.    And how do you go about determining what the royalty rate

9    should be?

10   A.    Well, once again we turn to the law for guidance, and

11   there's a set of factors that the law requires that damages

12   experts look at which are called the *Georgia-Pacific* factors.

13   Q.    All right.  And have you set that out on the next slide?

14   A.    Yes, I have.

15   Q.    And so are these the *Georgia-Pacific* factors that you

16   just referred to?

17   A.    Yes, they are.

18   Q.    And did you create these factors yourself?

19   A.    I created the slide, but I didn't create the factors

20   themselves.  This is a summary of the 15 factors from the

21   *Georgia-Pacific* case which is why they're called the

22   *Georgia-Pacific* factors.

23   Q.    All right.  And I see No. 15, the hypothetical

24   negotiation is highlighted.  Why is that?

25   A.    Factor 15, the hypothetical negotiation, is as it sounds;

1    it's a -- it's the 15th factor that is designed to look at all

2    of the other 14 factors.  So it is a recreation of a

3    negotiation that didn't actually take place, but it's intended

4    to look at all the 14 factors prior in order to how the

5    parties would sit down and analyze that type of information to

6    come up in a -- to come up to a royalty rate.

7    Q.    Okay.  And when you're doing the *Georgia-Pacific*

8    analysis, are there certain ground rules that you apply or are

9    required to apply when you're thinking about that hypothetical

10   negotiation?

11   A.    Yes, ma'am, there are.

12   Q.    And what are they?

13   A.    Well, the first ground rule is that the hypothetical

14   negotiation takes place on the date of first infringement.  So

15   the parties would sit down at that time, which is often back

16   in time.  And at that negotiation, the parties would

17   acknowledge and the infringer or the patent user would

18   acknowledge that the patents are valid and enforceable; they

19   would also acknowledge that their products infringe those

20   patents; and as a result, they would agree that they must pay

21   for rights to use the patents.  And in doing so, they would

22   willingly negotiate to come to an agreement.

23         One of the interesting constructs about the hypothetical

24   negotiation is they can't just get up and walk away; they have

25   to come to an agreement.  And in order to accommodate that,

1    the other part of the construct is that all information will

2    be known to both parties.  They can't hide information from

3    one another.  It's what we call all cards on the table, and

4    therefore all information would be known to both sides.

5    Q.    And does every damages expert determining patent damages

6    have to apply these assumptions?

7    A.    Yes, they do.

8    Q.    Okay.  In this case, when would the hypothetical

9    negotiation have occurred?

10   A.    In this case based on Doctor Valerdi's review of the

11   source code and the information determined as part of his

12   infringement analysis, the date of the hypothetical

13   negotiation would take place in 2013 upon the release of

14   certain code and some of the accused -- in the accused

15   products, I should say.

16   Q.    Okay.  And who do you have sitting at the negotiating

17   table here?

18   A.    So for the patent owner in 2013, it would be

19   Orckit-Corrigent; and for the patent user or the infringer, it

20   would be Alcatel Lucent.

21   Q.    And why is Orckit-Corrigent listed as the patent owner

22   who is licensing the patents?

23   A.    So it's a good question.  But because we're going back in

24   time, as we've heard from Mr. Tamir as well as Mr. Pitcock,

25   back in 2013 Orckit-Corrigent was still the owner of the

1  asserted patents in this case at that time.  Therefore, they

2  would be the party at the hypothetical negotiation.

3  Q.   And why do you have Alcatel Lucent as the patent user

4  engaging in the hypothetical negotiation?

5  A.   Again, another good question, and the reason is because,

6  as we heard, Nokia did not acquire Alcatel Lucent until 2016.

7  And, therefore, in 2013 Alcatel Lucent was the company that

8  had first sold some of the first accused products and would,

9  therefore, be the party or the infringer at the hypothetical

10  negotiation.

11  Q.   All right.  Now, there's three patents in this case.

12  Right?

13  A.   Yes, ma'am.

14  Q.   Would there be three negotiating dates?

15  A.   No.  There would only be one hypothetical negotiation

16  because in 2013 all of the patents were issued, and it's often

17  common in licensing practice that parties would sit down and

18  negotiate for rights to all patents that would be subject to a

19  license at that time.

20  Q.   All right.  So now we have the framework and the parties

21  to the hypothetical negotiation.  What's next?

22  A.   So now we get to dig into the *Georgia-Pacific* analysis

23  and start the determination of our royalty rate.

24  Q.   Okay.  Well, this looks a little different than when you

25  had all 15 listed out.  Why do you have this divided into

1    three categories?

2    A.    So the 15 factors generally fall into three categories,

3    which are the licensing factors, the benefits or the technical

4    benefits factors, and then the economic or the value factors.

5    And so I commonly look at the *Georgia-Pacific* factors under

6    those three categories, and we'll walk through each category

7    for each of the relevant factors.

8    Q.    Okay.  And what's the first category that you consider?

9    A.    So the first category, the licensing factors.

10   Q.    And I see you have *Georgia-Pacific* factor No. 2 tucked

11   under licensing factors.  Why is that?

12   A.    Well, *Georgia-Pacific* factor 2 are the rates paid by the

13   licensee for the use of other patents or comparable patents.

14   Q.    Did you engage in any analysis applying *Georgia-Pacific*

15   factor No. 1?

16   A.    I did review and analyze *Georgia-Pacific* factor 1.

17   However, as we heard, there have been no licenses to the

18   patents-at-issue in this case as of today.

19   Q.    Do you recall Nokia's attorney, Mr. Haynes, asking Mr.

20   Tamir questions about the bankruptcy of Orckit and the sale of

21   the patent portfolio of Orckit's patents?

22   A.    Yes, ma'am.

23   Q.    And is a sale like the same thing as a license?

24   A.    No, it is not.

25   Q.    And so do you think that that sale would be relevant to

1    the hypothetical negotiation?

2    A.   No, and there's a couple of reasons.  One, economically

3    as the construct is different; but, two, it's important to

4    understand the economic factors that went into that sale and

5    such that the sale for the patents-at-issue in this case were

6    not between a willing buyer and a willing seller.

7        As we heard Mr. Tamir testify, he was forced into

8    bankruptcy and forced to sell those patents through a

9    liquidation process.  Therefore, the economic value in that

10   type of scenario is completely different than what is to be

11   considered at the hypothetical negotiation.

12   Q.   Okay.  And do you recall in that questioning Mr. Haynes

13   suggested that it would be appropriate to calculate a

14   per-patent value by taking the loan amount of $900,000 or the

15   purchase price and dividing it by the number of patents to get

16   a $7500 per patent rate?

17   A.   I do remember that, yes.

18   Q.   And did you have any reaction to that?

19   A.   Yes.  My reaction was similar to what you heard from Mr.

20   Tamir's--that wasn't the value of the patents.  And for the

21   reasons why I just explained, that wasn't -- Mr. Tamir wasn't

22   willingly selling those patents.

23   Q.   Okay.  Now let's focus in on factor No. 2 since that's

24   what you did up on this slide.  Did Nokia produce any licenses

25   in this case that you analyzed when considering factor No. 2?

1    A.   Yes, ma'am, I did.

2    Q.   And what were those?

3    A.   So Nokia produced several licenses that included both

4    inbound licenses, so licenses -- they were taking a license to

5    technology, as well as outbound licenses, so licenses where

6    they were licensing their own patents, as I mentioned.

7    Q.   Okay.  And you mentioned licenses where ALU took a

8    license as well as licensed their own patents.  I think you

9    already did explain the difference between those two.

10        Now, in the hypothetical negotiation, what is ALU's role?

11   A.   So in a hypothetical, it's Alcatel licensing in patents.

12   So they would be sitting on the side of the table where they

13   would be taking a license.

14   Q.   Okay.  And so does that mean there is absolutely no

15   relevance of the inbound licenses?

16   A.   Of the inbound licenses?

17   Q.   Yeah.  Where ALU is -- oh, I'm sorry.  The outbound

18   licenses where it's licensing its own patents to a third

19   party.

20   A.   No, all licenses are relevant for consideration because

21   the *Georgia-Pacific* factors also address looking at the

22   licensing policies and the practices of both sides of the

23   negotiation table.

24        So having an understanding of how Alcatel viewed

25   licensing its patents generally and particularly with respect

1    to technologies that may be relevant to the technologies in

2    this case, you would look at that information in terms of

3    understanding the form or the structure that Alcatel has

4    viewed as being relevant or acceptable in its own licensing

5    practices.

6    Q.    Okay.

7              MS. STAHL:  And let's go to the next slide.

8    Q.    (BY MS. STAHL)  Did you consider outbound licenses?

9              THE COURT:  Just a minute.

10             MR. DACUS:  Excuse me, Your Honor.  I think if we're

11   going to show detailed licenses --

12             MS. STAHL:  Oh, sorry.

13             MR. DACUS:  -- we need to seal the courtroom.

14             MS. STAHL:  You are right.  I'm sorry about that.

15             MR. DACUS:  No problem.

16             MS. STAHL:  Okay.

17             THE COURT:  All right.  Based on that exchange, I'll

18   consider the parties' request to the Court to seal the

19   courtroom.  I'll order the courtroom sealed.

20        I'll direct that all persons not subject to the

21   protective order which has been entered in this case should

22   exit the courtroom and remain outside until it's reopened and

23   unsealed.

24                        (Courtroom sealed.)

25

702

1

2

3

4

5

6

7

8

9

10

11                            (Courtroom unsealed.)

12            THE COURT:  All right, counsel.  You may proceed

13   with cross examination.

14            MR. DACUS:  Thank you very much, Your Honor.

15                        CROSS EXAMINATION

16   BY MR. DACUS:

17   Q.    Good morning, Mr. Dell.

18   A.    Good morning.

19   Q.    I want to start with what your role is in the case and

20   what it's not.  Is that fair?

21   A.    Fair.

22   Q.    Okay.  You are not here to express any opinion on whether

23   or not Nokia infringes these patents.  Correct?

24   A.    That's correct.

25   Q.    You're not here to express any opinion on whether or not

1    these patents are valid or invalid.  Correct?

2    A.    That's correct.  I assumed that.

3    Q.    Okay.  That was my next question.  In your calculation,

4    you just assumed that the patent is both infringed and valid.

5    Correct?

6    A.    Yes, sir.  I'm required to assume it is both valid and

7    infringed.

8    Q.    And you know that Nokia's position is that they do not

9    infringe any of these patents.  Correct?

10   A.    I understand that's the position, yes.

11   Q.    And they -- Nokia's position is that two of these patents

12   are actually invalid.  You understand that?

13   A.    I believe so, yes.

14   Q.    Okay.  And you understand that if, in fact, the jury

15   finds there is no infringement, then there are no damages.

16   You understand that?

17   A.    For -- if a respective patent is found that way, yes,

18   that is correct.  There would be no damages for that patent.

19   Q.    The jury's going to make a determination on each of the

20   three patents individually.  Correct?

21   A.    I believe so, yes.

22   Q.    And if they find the patent is not infringed, then there

23   are no damages.  Correct?

24   A.    I would agree if there is no infringement, there would be

25   no damages.

1    Q.   Likewise, if they find the patent invalid, there are no

2    damages.  Correct?

3    A.   Yes, generally that's correct.

4    Q.   So the truth is, if they find either there's no

5    infringement or the patent invalid, then there's no damages.

6    True?

7    A.   That's what I understand, correct.

8    Q.   And with all due respect to you, if they don't get to

9    that question, they can ignore your testimony.  Fair?

10   A.   I think that they'll be given instructions, but I think

11   that's fair.

12   Q.   Okay.  But you understand I don't get to make that

13   decision, you don't get to make that decision.  The jury makes

14   that decision.  Right?

15   A.   That's correct.

16   Q.   So my role as a lawyer if they get to the damages

17   question, I need to make sure as best as I can that they have

18   all the evidence in front of them to make that decision.  That

19   sound fair?

20   A.   That sounds fair.

21   Q.   And that's why I need to ask you some questions.  That

22   makes sense?

23   A.   It does.

24   Q.   Okay.  Now, you were here for the judge's preliminary

25   instructions that he read to the jury.  Correct?

1    A.    Yes, I was.

2    Q.    And you told -- you heard him say to the jury that with

3    respect to each witness and particularly expert witnesses,

4    they need to determine if the witness has any particular bias

5    or leaning one way or the other.  You remember that?

6    A.    I do.

7    Q.    Okay.  And particularly for experts, we need to determine

8    if they have a propensity to fall on the side of the folks

9    that file lawsuits and sue or on the other side.  Correct?

10   A.    I'm not sure I understood that question.

11   Q.    Okay.  Let me ask a different one.  It's true, sir, that

12   plaintiffs, the people who file lawsuits, hire you because

13   you've developed a reputation for asserting unreasonably --

14        MS. STAHL:  Objection, Your Honor, lack of

15   foundation for any of this.

16        THE COURT:  Overruled.  He can ask the question.

17        MR. DACUS:  Thank you, Your Honor.

18   Q.    (BY MR. DACUS)  It's true, sir, that plaintiffs hire you

19   because you've developed -- in lawsuits and in litigation,

20   they hire you because you've developed a reputation for being

21   willing to ask for large and unreasonable amounts of money.

22   That's true, isn't it, sir?

23   A.    No, sir, that's not true.

24   Q.    Okay.  You know in this case that you have to submit a

25   written report.  Correct?

1  A.   Yes, sir.

2  Q.   And you did that in this case.  Correct?

3  A.   I did.

4  Q.   And as part of what the Court requires, you have to

5  submit what's called a CV or a resume.  Correct?

6  A.   Correct.

7  Q.   And in that CV or resume, you have to identify all of the

8  lawsuits or litigations that you've participated in.  Correct?

9  A.   No, sir, that's not true.

10  Q.   You listed in your CV or resume lawsuits or litigation

11  that you've participated in in the last 13 years.  Correct?

12  A.   Correct.  The requirement is for lawsuits or litigation

13  where you've provided testimony, not all lawsuits you've ever

14  been retained in.

15  Q.   So for the -- so what you identified in your CV or resume

16  are lawsuits where you have provided testimony.  Correct?

17  A.   One part of that CV, yes, it does contain that

18  information.

19  Q.   And it's true, sir, that you listed 90 cases where you've

20  provided testimony.  Correct?

21  A.   Under that specific section, yes.

22  Q.   And 86 out of those 90 times, you've testified on behalf

23  of the people who brought the lawsuit.  Correct?

24  A.   Generally that sounds correct, yes.

25  Q.   And we can agree that the reason is because when people

```
 1    bring lawsuits, they want you to assert an unreasonably large
 2    damage model.  Correct?
 3    A.   No, sir, I don't agree with that at all.
 4    Q.   Now, there are certain rules that you have to follow and
 5    the jury's going to be required to follow that the Court will
 6    give them.  Correct?
 7    A.   Yes.
 8    Q.   And I'd like to just cover a few ground rules, sort of
 9    create a glossary of terms so we can use them throughout your
10    testimony.  Does that sound fair?
11    A.   Sure.
12         MR. DACUS:  Your Honor, may I use the flip chart if
13    I pull it up even with the document camera?
14         THE COURT:  You may.
15         MR. DACUS:  Thank you.
16    Q.   (BY MR. DACUS)  Now, you know, sir, there's this thing
17    called the book of wisdom.  Correct?
18    A.   Yes.
19    Q.   And you know what that is.  Right?
20    A.   Yes.  It's a term of art, I guess, that we use in the
21    damages construct.
22    Q.   Right.  It's something that your understanding is that
23    you and the jury should utilize in determining what a
24    reasonable royalty is in the case.  Correct?
25    A.   Yes, sir.  It's part of the ground rules that I mentioned
```

1    earlier, all cards on the table.

2    Q.   Right.  And so to be clear, what we're trying to do here

3    is look at this negotiation that would have occurred back in

4    2013.  Correct?

5    A.   I'm sorry.  I coughed.  I missed the first part of my

6    your question.  My apologies.

7    Q.   I'm happy to repeat it.  What we're looking here is this

8    negotiation that would have occurred back in 2013.  Correct?

9    A.   Yes, sir.

10   Q.   But the unique thing about that negotiation is, as you

11   said, all cards are on the table, including the fact that

12   those people at that negotiation table, they sit there knowing

13   what will happen in the future.  Correct?

14   A.   Yes.  That's the general ground rule under the construct

15   of litigation, I would agree.

16   Q.   That's what we call the book of wisdom.  Right?

17   A.   Yes, that's correct.

18   Q.   So if I write book of wisdom, parties know future events,

19   that's true for this hypothetical negotiation.  Correct?

20   A.   Generally that's true, yes.

21   Q.   And that includes the parties at that table knowing the

22   amount of usage or lack of usage for the accused features or

23   products.  Correct?

24   A.   Including expected usage, yes, I would agree.

25   Q.   In other words, those people sitting at the table know,

1    well, did customers actually request and desire and utilize

2    these features that we're talking about here?  The parties

3    know that.  Right?

4    A.   Yes, and what is expected.  I would agree.

5    Q.   And you agree, sir, that usage is a very important part

6    of what both you and the jury should consider.  Correct?

7    A.   It depends when you're saying usage, what you're meaning

8    by that.

9    Q.   Well, you showed the jury 35 U.S.C. §284, which is the

10   damages statute which is the law that governs damages.

11   Correct?

12   A.   Yes, sir, that's correct.

13   Q.   And it says what we're supposed to consider is a royalty

14   for the use made of the invention by the infringer.  Correct?

15   A.   Yes, sir.

16   Q.   Okay.  Now, we'll talk about it in detail, sir, but it's

17   true here you did not analyze or provide any evidence to this

18   jury regarding actual use of these features by Nokia

19   customers, did you, sir?

20   A.   No, I disagree.

21   Q.   You, of course, know what a license is.  Correct?

22   A.   Yes, sir.

23   Q.   That's an agreement for the right to use the patent.

24   Right?

25   A.   In a patent license?  Yes, I would agree.

1    Q.   And I think you said that what folks pay for a license is

2    what you call a royalty.  Correct?

3    A.   In some instances, yes.

4    Q.   Okay.  And that royalty can come in the form of a lump

5    sum payment or a running royalty.  Correct?

6    A.   That's correct.

7    Q.   And for a lump sum payment, that means it's one upfront

8    payment.  Correct?

9    A.   Generally that's correct, yes.

10   Q.   It's for unlimited use of the patent or patents for which

11   the payment is made.  Correct?

12   A.   Again, depending on the terms of the agreement.  But,

13   generally speaking, a lump sum payment would pay for the

14   rights to use the patent for the entirety of the term.

15   Q.   And that was my next question.  Not only is it unlimited

16   use, but it's for the entire term of the patent.  Correct?

17   A.   To the extent that's what the parties agree to, yes.

18   Q.   I want to focus on your specific calculation of the

19   reasonable royalty here.  Is that okay?

20   A.   Sure.

21   Q.   Your opinion the reasonable royalty is a running royalty

22   of $48 million.  Fair?

23   A.   My opinion is the specific royalty rates that I

24   identified, and then you would apply those rates to the use or

25   the accused sales of the accused products.

1    Q.    Now, as you told the jury, one way to determine a

2    reasonable royalty in a case is what's called the market

3    approach or by looking at other similar or comparable

4    licenses.  Correct?

5    A.    Yes.  I think I talked about them under the licensing

6    factors.

7    Q.    Okay.  Yeah.  Whether we want to call it the market

8    approach or we want to look under the *Georgia-Pacific* factors,

9    one way to do this is look at similar or comparable licenses.

10   Fair?

11   A.    I would agree the market approach is a -- under that, you

12   would look at licenses.  I would agree with that.

13   Q.    And just to give some context here, I've heard people in

14   your business and your industry say that it's similar to when

15   you go house buying or house shopping.  Does that sound fair?

16   A.    I've heard that as a general analogy, yes.

17   Q.    In other words, if you go to buy a house, the first thing

18   you do is look to see if that house had sold in the recent

19   past.  Correct?

20   A.    You may, yes.

21   Q.    To determine whether or not what you're going to pay is a

22   fair value for the house.  That's one thing you would look at.

23   Correct?

24   A.    Yes, you can look at that information.

25   Q.    What you'd also do is look at other houses in the

1    neighborhood to see what they sell for.  Correct?

2    A.    You could, yes.

3    Q.    And if you need to make some adjustments because one is a

4    three-bedroom, one is a four-bedroom, you'd do that.  Right?

5    A.    Yes, as well as look for termite damages among other

6    things.  You can look at various factors.

7    Q.    And that's one thing the law says you can and should do

8    with respect to determining a reasonable royalty.  Correct?

9    A.    Yes.  I would agree that that is the market approach, is

10   one of the *Georgia-Pacific* factors, or an analysis under the

11   *Georgia-Pacific* factors.

12   Q.    And you agree, sir, that the law only allows for a

13   reasonable royalty.  Correct?

14   A.    That's what it is defined in the -- as I understand in

15   the law, yes.  It's called a reasonable royalty.

16   Q.    And the Plaintiff Smart Path bears the burden of proof to

17   show that the royalty they seek is reasonable.  Fair?

18   A.    I believe they -- the burden is to prove damages, and

19   then the calculation is under a reasonable royalty.

20   Q.    Now, let's talk about this house shopping that the law

21   says we're supposed to do.  So the first thing we're supposed

22   to do is look and see have these patents ever been licensed

23   before.  Correct?

24   A.    Yes, *Georgia-Pacific* factor 1.

25   Q.    And it's true, sir, that they've never been licensed.

1    Correct?

2    A.    That's correct.

3    Q.    So the '010 Patent was issued in 2008.  Correct?

4    A.    I haven't committed to memory, but I believe that sounds

5    generally correct, yes.

6    Q.    16 years ago.  Correct?

7    A.    Generally, yes.

8    Q.    '580 issued in 2008 and the '599 in 2009.  Correct?

9    A.    I believe that's correct.

10   Q.    So these patents are more than 15 years old, and no one

11   in the marketplace has ever seen the value and paid a penny to

12   license them.  Correct?

13   A.    I would disagree that no one's seen the value, but I

14   would agree that no one's paid a royalty or signed an

15   agreement to license them.  I would agree with that part of

16   it.

17   Q.    And you know, sir, no one other than the corporate

18   insider of Mr. Tamir, has ever sought to buy these patents.

19   Correct?

20   A.    I'm not sure I understand your question.

21   Q.    Well, do you remember that Orckit-Corrigent filed

22   bankruptcy?  Correct?

23   A.    Yes, sir.

24   Q.    And you remember that the testimony from Mr. Tamir was

25   that the liquidator or the bankruptcy trustee, whatever you

1    call him, he attempted to sell the patents.  Correct?

2    A.   As part of the liquidation in the bankruptcy, the forced

3    sale?  Yes.

4    Q.   And no one stepped forward to buy them other than Mr.

5    Tamir.  Correct?

6    A.   I think Mr. Tamir would have more knowledge on that

7    specifically.

8    Q.   Well, you were here when he said that he funded the

9    purchase of the patents.  Correct?

10   A.   Yes.

11   Q.   Okay.  And even before that, you remember he said, Mr.

12   Tamir said, from 2010 or '11 when they were having financial

13   difficulty up until bankruptcy, Mr. Tamir actually tried to

14   sell these patents.  You remember him saying that?

15   A.   Generally I remember his testimony, yes.

16   Q.   You remember him saying, no takers.  Right?

17   A.   I would agree that no one took a license.

18   Q.   So if we're just doing what the law says and we're house

19   shopping and we're saying, does this house have value, is

20   somebody paying for it, the truth is nobody's ever paid

21   anything for these.  Correct?

22   A.   I would agree that no one's paid anything, but it doesn't

23   mean they don't have value.

24   Q.   Mr. Tamir did pay $1.35 million for approximately 200 of

25   these patents.  Correct?

1    A.    Yes.  That's my understanding.

2    Q.    Now, the marketplace has spoken about the value of these

3    in another way.  Don't you agree?

4    A.    I'm not sure what your question is.

5    Q.    Well, you're a capitalist.  Right?

6    A.    I guess, again, I'm not sure what your question is.

7    Q.    Okay.  Well, you understand that the marketplace

8    determines what's a good product and what's not a good

9    product.  Correct?

10   A.    I think, generally speaking, yes, you can look at sales

11   of a product to see if it's successful in the marketplace.  I

12   would agree with that.

13   Q.    You've heard people say build a better mouse trap and

14   people will beat a path to your door.  Right?

15   A.    I've heard that saying, yes.

16   Q.    So Orckit-Corrigent started selling these ethernet router

17   type products 2004-ish.  Correct?

18   A.    Yes, that's my recollection.

19   Q.    Within -- they were unsuccessful.  We've seen they've

20   lost tens of millions of dollars.  Correct?

21   A.    That's not the way I heard the testimony.  I recall there

22   being hundreds of millions of dollars of sales of products by

23   Orckit-Corrigent.

24   Q.    They lost tens of millions of dollars.  You remember

25   those financial statements that Mr. Haynes went through where

1    in one year they lost 20-, the next year 21-, the next year

2    16-.  Do you remember those financial statements, sir?

3    A.   Yes, sir, I remember them.

4    Q.   Okay.  That's the marketplace saying these products

5    aren't better than what's in the marketplace and don't have

6    value.  Fair?

7    A.   No, that's not fair at all.

8    Q.   Okay.

9              MR. DACUS:  Your Honor, I do think I need to seal

10   the courtroom.  I'm going to talk about some licenses at this

11   point.

12             THE COURT:  All right.  At this juncture and based

13   on counsel's request, I'll order the courtroom sealed.

14       I'll direct that all persons present who are not subject

15   to the protective order in this case should excuse themselves

16   and remain outside the courtroom until it's reopened and

17   unsealed.

18                      (Courtroom sealed.)

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                    (Courtroom unsealed.)

20            THE COURT:  All right.  The courtroom is open and

21    unsealed.

22        Let's continue with the Plaintiff's redirect.

23                    REDIRECT EXAMINATION

24    BY MS. STALL:

25    Q.   Mr. Dell, you were asked a series of questions about your

1    past engagements and the fact that you have represented many

2    organizations seeking to license their patents.  Do you

3    remember that?

4    A.   Yes.

5    Q.   And are you -- when you assess damages in a case, are you

6    intending to bias your opinion or favor the side that you're

7    providing an analysis for?

8    A.   Absolutely not.  I follow the guidance of *Georgia-Pacific*

9    and I -- like Mr. Dacus mentioned, I look at the details of

10   all the evidence as part of my analysis to determine what is

11   relevant or economically comparable so that I can determine

12   the appropriate form or the amount of damages regardless of

13   what side of the V, if you will, either the plaintiff or the

14   defendant is on.

15   Q.   All right.  And in fact -- strike that.

16        I want to go over and talk a little bit about Mr. Dacus'

17   chart here where he discussed these licenses with you.

18        So the Implicit license, do we have any information --

19   have you seen any information that would tell you what the

20   smallest saleable patent practicing unit was for the patents

21   at issue in that license?

22   A.   No.  There's no financial information whatsoever for that

23   agreement.

24   Q.   And do you have any understanding of what benefits to the

25   products at issue, whatever they might be, with respect to the

 1    Implicit license were in that case?

 2    A.   No.  There's nothing in the agreement, or Mr. Patel

 3    cannot provide any information, either.

 4    Q.   Do you have any information about what products or

 5    product models were at issue with the respect to the Implicit

 6    license?

 7    A.   There may have been some information generally, but

 8    nothing with respect to sales.

 9    Q.   And was there any information that told you--I think you

10    anticipated--what the royalty base would be for the Implicit

11    license?

12    A.   No, none at all.

13    Q.   And, again, what kind of license was this?  Was this one

14    that was negotiated by a willing buyer and -- or a willing

15    licensor and a willing licensee?

16    A.   No.  It was a settlement of litigation, and Nokia

17    disputed that it even used those patents.

18    Q.   And was there challenge to the validity of the patents

19    with respect to the Implicit license?

20    A.   There was.

21    Q.   Let's look at the Parity license.

22         Do you have an understanding of what the royalty base was

23    underlying the Parity license?

24    A.   No.  There was no financial information provided.

25    Q.   And was there an understanding as to the value -- the

1  incremental value of the patented inventions that were at

2  issue in the Parity license?

3  A.   No, there was not.

4  Q.   And was that, again, a settlement license?

5  A.   Yes, it was a result of settlement of litigation.

6  Q.   And so was there an assumption, as required by the

7  hypothetical negotiation, that the patents were both valid and

8  infringed?

9  A.   No.  It was the opposite--they disputed validity and

10  infringement.

11  Q.   Same questions with respect to the Packet license.  Was

12  this a license where you had any information about what the

13  smallest saleable patent practicing unit was?

14  A.   We didn't have any information.

15  Q.   Did you have any information about what the royalty base

16  was?

17  A.   No; none at all.  No sales, no financial information at

18  all.

19  Q.   Did you have any information about the incremental value

20  of the patented inventions at issue with the Packet license?

21  A.   No, we did not.

22  Q.   And that's true with respect to all of the licenses.

23  Correct?

24  A.   That is correct.

25  Q.   All right.  But with the Cheetah license, there you had

1    additional negotiation on the face of the agreement.  Correct?

2    A.    That's correct.

3    Q.    Mr. Dacus asked you a little bit about how one might

4    value a house.  Do you remember that line of questioning?

5    A.    I do.

6    Q.    If I were to go in to look at sales prices for houses in

7    my neighborhood in order to determine good value, or if you

8    were going to do that, would you want to know if the purchase

9    price of the house was for a purchase out of a foreclosure?

10   A.    Certainly.  I think the seller would certainly want to

11   know that, too.  If the price was deflated because there was

12   somebody that was compulsed to sell against their will, for

13   whatever reason that may be, and the house was sold at a price

14   below market value, then that would be an important factor to

15   know or consider.

16   Q.    Would other facts, such as whether the sale was a

17   friendly sale between, say, a parent and a child, would that

18   be a relevant thing for you to know?

19   A.    Certainly.  Again, the details matter.

20   Q.    All right.  And I think you might have made reference to

21   some plumbing.  Would you want to know if the house had been

22   flooded before?

23   A.    Sure.  You may want to know if it has lead pipes.  You

24   -- there's a lot of things you'd want to know to determine if

25   it is really a good comparable or not.

1    Q.   All right.  And I want to ask you just a couple of

2    questions about the unpatented contributions.

3         Does your analysis account for the value of unpatented

4    contributions to the products that are accused?

5    A.   Absolutely.  It -- not only does Doctor Cole's analysis

6    through his apportionment account for non-patented features

7    and functionalities, my analysis takes it even steps further,

8    specifically recognizing that there are standards and other

9    technologies in the accused products.  And that's why there's

10   a further apportionment and reduction in how I determine my

11   royalty rate and what the parties would agree to to account

12   for those factors.

13             MS. STAHL:  All right.  Mr. Jarrett, can I have

14   slide 48?

15             THE COURT:  Pull the microphone a little closer to

16   you, please.

17             MS. STAHL:  I'm sorry, Your Honor.  I'm trying to

18   see the witness.

19   Q.   (BY MS. STAHL)  And just as a reminder to the jury, are

20   these economic factors that you credited towards ALU in the

21   hypothetical negotiation?

22   A.   That's correct.  This is what Alcatel would negotiate for

23   and advocate for, and the -- and as I mentioned, Orckit would

24   concede and give recognition to Alcatel for its contributions

25   and, therefore, would agree to further apportion or negotiate

1    the royalty rate downward to account for that.

2    Q.   And can you, just for the jury, read out the second

3    bullet point on this slide?

4    A.   The second bullet point is "technological contributions,

5    including standards, unrelated to the asserted patents."

6             MS. STAHL:  I pass the witness.

7             THE COURT:  Additional cross?

8             MR. DACUS:  Briefly, Your Honor.

9                      RECROSS EXAMINATION

10   BY MR. DACUS:

11   Q.   You were just asked a bunch of questions about if you

12   knew how much sales were involved in these licenses.  Correct,

13   sir?

14   A.   Yes, sir.

15   Q.   The truth is, the amount paid is for unlimited use.

16   Correct?

17   A.   The grant of the license would provide that, but there's

18   nothing to indicate that that's how the payment was made.

19   That's why it's not relevant.

20   Q.   What Nokia received in each one of these licenses for

21   these payments was the right to make as many products as they

22   want for these number of patents.  Correct?

23   A.   Yes.  Patents they said they didn't use.

24             MR. DACUS:  Thank you, Your Honor.  That's all I

25   have.  Pass the witness.

1           THE COURT:  All right.  Any further direct?

2           MS. STAHL:  No, Your Honor.

3           THE COURT:  You may step down, Mr. Dell.

4           THE WITNESS:  Thank you.

5           THE COURT:  Ladies and gentlemen, we're going to

6   break for lunch a bit late, but we're going to get there.

7       If you will, take your notebooks with you to the jury

8   room, follow all my instructions about your conduct, including

9   not to discuss the case or any of the evidence with each

10  other.  It's roughly 20 minutes until 1:00, and we'll try to

11  reconvene around 1:15.

12      With that, ladies and gentlemen of the jury, you're

13  excused for lunch.

14           (Whereupon, the jury left the courtroom.)

15           THE COURT:  Counsel, for your benefit, as of right

16  now Plaintiff has remaining 4 hours and 30 minutes of

17  designated trial time, and Defendant has 6 hours and 13

18  minutes.

19      We'll reconvene roughly in the neighborhood of 1:15, and

20  until then we stand in recess for lunch.

21                     (Lunch recess.)

22           THE COURT:  Be seated, please.

23      Am I correct, Mr. Bennett, the Plaintiff is prepared to

24  rest its case in chief.

25           MR. BENNETT:  You are correct, Your Honor.

1              THE COURT:  Let me get the jury in the room, and

2   I'll call for an announcement.  We'll get that on the record,

3   and then we'll proceed with the Defendant's case in chief.

4        Let's bring in the jury, please.

5              (Whereupon, the jury entered the courtroom.)

6              THE COURT:  Welcome back, ladies and gentlemen.

7   Please have a seat.

8        Plaintiff, call your next witness.

9              MR. BENNETT:  Your Honor, at this time Plaintiff

10   rests, subject to its rebuttal case.

11              THE COURT:  All right.  Plaintiff has rested its

12   case in chief.  We'll proceed with the Defendant's case in

13   chief at this juncture.

14        Mr. Haynes, is Defendant prepared to call its first

15   witness?

16              MR. HAYNES:  We are, Your Honor.  We call Dr. Kevin

17   Jeffay.

18              THE COURT:  All right.  Doctor Jeffay, if you'll

19   come forward and be sworn, please.

20              (Whereupon, the oath was administered by the Clerk.)

21              THE COURT:  Please come around, sir, have a seat on

22   the witness stand.

23        All right, Mr. Frist.  You may proceed with direct

24   examination.

25              MR. FRIST:  Thank you, Your Honor.

1              KEVIN JEFFAY, Ph.D.,

2    having been duly sworn, testified under oath as follows:

3                 DIRECT EXAMINATION

4    BY MR. FRIST:

5    Q.    Good afternoon, Doctor Jeffay.

6    A.    Good afternoon.

7    Q.    Can you please introduce yourself to the jury?

8    A.    Sure.  Good afternoon, ladies and gentlemen.  My name is

9    Kevin Jeffay.  I am a computer scientist and a faculty member

10   in the Department of Computer Science at the University of

11   North Carolina at Chapel Hill.

12   Q.    Were you retained by Nokia to provide opinions regarding

13   the '010 and '580 Patents in this case?

14   A.    Yes.

15   Q.    Before we discuss the details of your opinions, can we

16   discuss a little bit about your background?

17             THE COURT:  Can you both slow down and pull the

18   microphone over a little bit, please, counsel?

19             MR. FRIST:  Yes, sir.

20             THE COURT:  All right.

21             MR. FRIST:  Thank you, Your Honor.

22   Q.    (BY MR. FRIST)  Doctor Jeffay, can you briefly describe

23   your education?

24   A.    Yes.  I'm originally a midwesterner from Illinois.  And

25   when I went to college, I went to the state school at the

1    University of Illinois at Urbana Champagne.  I was a bit of a

2    math nerd in high school, and I studied mathematics as an

3    undergraduate.  And while an undergraduate, I worked to help

4    put myself through school, and I worked for the U.S. Army

5    Corps of Engineers as a software developer, and that got me

6    much more interested in computer science than mathematics.

7         And so I decided when I graduated to get some credentials

8    in computer science.  So I went to graduate school at

9    University of Toronto in Canada and got a Master's degree in

10   computer science.

11        I then worked for a little bit and decided I liked

12   research, and so I went back to graduate school and ultimately

13   got a Ph.D. in computer science from the University of

14   Washington in Seattle.

15   Q.   Doctor Jeffay, what did you do after obtaining your

16   Ph.D.?

17   A.   I was invited to join the faculty as an assistant

18   professor at the University of North Carolina.

19   Q.   And how long have you been working with the University of

20   North Carolina?

21   A.   This is my 35th year.

22   Q.   And can you explain your current roles at the University

23   of North Carolina?

24   A.   Sure.  So all faculty have three roles.  We teach, do

25   research, and provide service.  For teaching, I have the last

1    is 15-ish years, I've primarily been teaching computer

2    networking to undergraduates.

3        And in the research realm, that's -- networking has been

4    the focus of my research.  I'm an experimentalist.  So I build

5    computer networks, we build routers and generally try and

6    develop technology to allow networks to perform better than

7    they do today.

8        And in terms of service, I have an administrative

9    appointment.  I am -- I've been the chair of the department

10   for most of the last 10 years, and I also serve on the

11   advisory board for the campus networking group.

12   Q.   Doctor Jeffay, have you authored or co-authored any

13   publications related to networking?

14   A.   Yes.  With my students, we've written a number of papers

15   relating to a large number of topics in networking, but many

16   of them involve the technology that's at issue in this case.

17   And I've also written some books or co-authored some books

18   with students on some fairly advanced topics in networking.

19   Q.   Doctor Jeffay, do you have any patents?

20   A.   Yes.  The university has applied for patents for four of

21   my students' research, and so I am a named inventor on I think

22   four patents.

23   Q.   Doctor Jeffay, what's the focus of your research at the

24   University of North Carolina?

25   A.   Well, as I mentioned it's networking.  It's -- we've

1    heard this term quality of service.  I have been working for a

2    number of years in mechanisms that go into routers to improve

3    the way that they process traffic so that you can support

4    interactive applications like video conferencing.

5    Q.   Doctor Jeffay, have you received any awards for your

6    research?

7    A.    Yes.  I've been fortunate enough to work with some very

8    bright students, and we've received a number of awards for the

9    quality of our research.  And in particular in the time frame

10   of these patents, in 2003 my group won the most prestigious

11   award that exists for research in computer -- for original

12   contributions to networking in research.

13   Q.   Doctor Jeffay, can you describe how your work in research

14   has resulted in collaborations with companies in industry?

15   A.    Yes.  As I say, I'm experimentalist.  We build networks,

16   and these networks are often built in collaboration with

17   various groups from the industry.  Industry loans my group

18   equipment that we use to test and evaluate, and they sometimes

19   loan us personnel that come and hang out in the university and

20   work with us.

21           MR. FRIST:  Your Honor, at this time I move to --

22   that Doctor Jeffay be admitted as an expert in the field of

23   networking, telecommunications, and the subject matter of the

24   asserted patents.

25           THE COURT:  Is there objection?

         1              MR. BREEDLOVE:  No objection, Your Honor.

         2              THE COURT:  Without objection, the Court will

         3    recognize this witness as an expert in those designated

         4    fields.

         5          Now, Doctor Jeffay, before we go further, I have a

         6    question.

         7              THE WITNESS:  Yes, sir.

         8              THE COURT:  What is a Tar Heel?

         9              THE WITNESS:  I am not a Tar Heel by birth, and I

        10    have heard two stories.  One of them is -- relates to

        11    Revolutionary War where troops from the Carolinas fought so

        12    valiantly and they held their position, it was as if they were

        13    stuck there because they had tar on their heels.  That's the

        14    positive story.

        15          The negative story is we were all a bunch of bumpkins in

        16    the pitch industry, which I think was also big here.

        17    Harvesting of pine trees and making tar and pitch was big

        18    around when the country was founded, and people walked around

        19    with tar on them.

        20              THE COURT:  All right.  Maybe we got something out

        21    of this trial.

        22          All right.  Mr. Frist, go ahead and continue with your

        23    direct.

        24              MR. FRIST:  Thank you, Your Honor.

        25    Q.    (BY MR. FRIST)  Doctor Jeffay, did you form an opinion as

1    to the level of ordinary skill that pertains to the technology

2    we're talking about here today?

3    A.    I did.

4    Q.    What's the level of ordinary skill in the art for the

5    '010 Patent?

6    A.    So the '010 Patent is this one about a hub.  And for

7    that, my opinion is that a person of ordinary skill in this

8    art would have a Bachelor of Science degree in computer

9    science or computer engineering or related field and, say,

10   three to four years of work experience in networking.

11   Q.    And what's the level of ordinary skill in the art for the

12   '580 Patent?

13   A.    So the '580 Patent is about this technology called

14   tunnels.  It's a more complex technology, and so my opinion is

15   a person of skill would require more education.  So I've said

16   a Master's degree in computer science or related discipline

17   and one to two years of experience working with networking and

18   IETF standards.

19   Q.    Did you apply those levels of ordinary skill in your

20   analysis for this case?

21   A.    I did.

22   Q.    Did you hear Doctor Valerdi's definition of a person of

23   ordinary skill in the art yesterday?

24   A.    Yes.

25   Q.    Do any of your opinions for the '010 or '580 Patent

1    change depending on which level of ordinary skills applied?

2    A.    No.

3    Q.    Have you had an opportunity to review the Court's claim

4    constructions in this case?

5    A.    Yes, I have.

6    Q.    Did you apply those constructions in your analysis?

7    A.    I did.

8    Q.    Okay.  Doctor Jeffay, did you form opinions regarding

9    infringement related to the '010 and '580 Patents?

10   A.    I did.

11   Q.    At a very high level, what opinions did you form?

12   A.    Well, the simplest statement of my opinions is that based

13   on the analysis I've done, I believe that the accused Nokia

14   products do not infringe the '010 Patent or the '580 Patent.

15   Q.    And what materials did you consider in forming your

16   opinions?

17   A.    I considered a large body of materials.  The patents,

18   what we've heard of called the file history, all the technical

19   Nokia documents that you've heard discussed, the testimony of

20   Nokia engineers, Doctor Valerdi's reports, and the source code

21   for Nokia's products.

22   Q.    How much source code did you review in forming your

23   opinions?

24   A.    It's -- it's hard to quantify.  You look at it at a

25   computer, and it's all scrolling by, but hundreds and hundreds

```
 1    of files, and I -- I really can't quantify the actual lines of

 2    codes.

 3    Q.   Can you give the jury a sense of the volume of total

 4    materials you considered in this case?

 5    A.   It's -- it's huge.  A lot of these manuals are -- are

 6    this thick and every product has its own manual.  The source

 7    code is voluminous.  It's -- it's a large body of materials.

 8    Q.   Doctor Jeffay, can we please turn to your opinions

 9    specifically about the '010 Patent now?  Is that all right

10    with you?

11    A.   That will be fine.

12    Q.   What's the title of the patent?

13    A.   So the '010 Patent is on the screen, and you can see I've

14    highlighted the title in yellow and it's called Multiprotocol

15    Media Conversion.

16    Q.   What is a protocol?

17    A.   So protocol is a set of rules for a language that two

18    computers will use to communicate with one another.

19    Q.   And what does the title of the patent tell you about the

20    problem that the '010 Patent was trying to solve?

21    A.   The title hints at the problem.  It's about operating an

22    environment where you have computers speaking multiple

23    protocols, so multiple languages.  And the idea is to convert

24    these protocols or convert them so that the computers can talk

25    to one another.
```

1    Q.   And what was the '010 Patent's solution to that problem?

2    A.   The '010 Patent is a particular arrangement of components

3    based around a core component that's called a hub.

4    Q.   And what are the different contexts that the term 'hub'

5    can be used in?

6    A.   So hub is one of these words that has different meanings

7    in different contexts.  Hub is a device.  It's a type of

8    device that you use to connect computers together, and it can

9    also refer to a layout of computers or the layout of network

10   devices in a network.

11   Q.   Are the claims of the '010 Patent directed to a type of

12   network device or to a layout of devices?

13   A.   They're directed to a type of network device, the network

14   device being a hub.

15   Q.   Does the '010 Patent provide an explanation of the state

16   of the art in 2003?

17   A.   It does.

18   Q.   And just for the jury, what date was the '010 Patent

19   filed?

20   A.   So we can see on the lower left of the enlarged box, that

21   it was filed on June 13th of 2003.

22   Q.   Are you familiar with the use of the term 'layer'?

23   A.   Yes.

24   Q.   How does -- what does the term 'layer' refer to with

25   respect to the protocols at issue in the '010 Patent?

A.   So the software that computers use to talk to one another

is quite large.  And to get a handle on the complexity, the

software is typically organized in a series of layers.  We

often say you can think about it as a layer cake where upper

layers build on top of lower layers.

     So a layer in communications software refers to software

that implements a particular language.

Q.   Which layer of these protocols is particularly relevant

to the '010 Patent?

A.   The '010 Patent is primarily about what we call layer 2.

Q.   Doctor Jeffay, do you see an excerpt from the '010 Patent

on the screen?

A.   Yes.

Q.   What does the '010 Patent disclose about what was known

about layer 2 protocols in 2003?

A.   Well, what it discloses is what I've highlighted in

yellow, that there were various methods known for

communicating using these layer 2 protocols.

Q.   And does the '010 Patent describe known layer 2 protocols

that existed at the time?

A.   Yes.  This lower yellow highlight provides the names for

a variety of layer 2 protocols, such as frame relay; something

called asynchronous transfer mode, which gets abbreviated as

ATM; ethernet, which is maybe a protocol that some people may

have heard of; high level data link control, or HDLC; and

```
 1   something called point-to-point, or P2P.
 2   Q.   What was the most popular protocol in 2003?
 3   A.   The most popular layer 2 protocol was ethernet.
 4   Q.   And what's the current most popular protocol?
 5   A.   It is still ethernet.
 6   Q.   Did the '010 Patent invent any new layer 2 protocol?
 7   A.   No.
 8   Q.   Did the '010 Patent invent any new protocol conversion?
 9   A.   No.
10   Q.   What's your basis for that statement?
11   A.   Well, what the patent describes as constituting protocol
12   conversion is -- are sets of techniques that were known before
13   the patent.
14   Q.   Do you see in the green a reference to MPLS?
15   A.   Yes.
16   Q.   What is MPLS?
17   A.   MPLS is a bit of a mouthful.  It stands for multiprotocol
18   label switching, and it is a particular network technology
19   that the '010 Patent employs.
20   Q.   And what layer protocol is MPLS?
21   A.   MPLS really doesn't fit into the traditional layer model.
22   It's one of these neither fish nor fowl things.  And so, as a
23   result, people often say it's a layer 2.5 protocol, which just
24   means it's really not a layer 2 protocol and it's not a layer
25   3 protocol.
```

1    Q.    Was MPLS known prior to the '010 Patent?

2    A.    Yes.

3    Q.    All right.  Doctor Jeffay, did you look at figure 1 of

4    the '010 Patent to illustrate an example of its proposed

5    solution?

6    A.    I did.

7    Q.    Can we walk through that figure now together?

8    A.    That would be great.

9    Q.    All right.  On the slide in front of you is figure 1, and

10   you should see some highlighting in purple, green, and blue.

11   Do you see that?

12   A.    I do.

13   Q.    And do you see the label client node?

14   A.    I do.

15   Q.    What's a client node?

16   A.    So a client node in this context you can think about as a

17   computer, a user's computer, or maybe something like a server

18   computer.

19   Q.    And why do you have the different color coding here for

20   the different client nodes?

21   A.    I'm just trying to emphasize here that what the '010

22   Patent is describing is an environment where the clients are

23   using different layer 2 protocols.  And so I've color-coded

24   the protocols.

25         So below the purple nodes are clients using this layer 2

1   protocol called frame relay.  The green client is using a

2   layer 2 protocol called ethernet.  And the blue clients are

3   using a layer 2 protocol called ATM.

4   Q.    Do you see the additional orange highlighting on the

5   boxes labeled MMC edge device?

6   A.    Yes.

7   Q.    What is an MMC edge device?

8   A.    So MMC is going to stand for the multiprotocol media

9   converter.  So this is the box that is going to be doing the

10  conversion, and these are what are called edge devices, which

11  means they live at the edge of a network and, in particular,

12  in this case you can see the cloud in the middle of the

13  figure.  So these are edge devices that are at the edge of

14  this cloud network.

15  Q.    Doctor Jeffay, do you see box 30 that's highlighted in

16  pink or red?

17  A.    Yes.

18  Q.    What is box 30?

19  A.    Box 30 is a core component of this patent.  It is a

20  particular network device that is called a hub.

21  Q.    And what is a hub?

22  A.    A hub is what we call a layer 1 device.  I don't mean to

23  be negative about this, but in the field we say it's a dumb

24  device.  And what we mean by that is it does no protocol

25  processing.

1        You can think about it as an amplifier and a repeater.

2   What it does is it receives individual bits coming in on a

3   wire from a computer, it amplifies that signal and distributes

4   it out to all the other computers that are attached to that

5   hub?

6   Q.   Can you explain again, what does a hub do with a signal

7   that it receives?

8   A.   It amplifies it and distributes it to everybody that's

9   attached to the hub, independent of whether or not that signal

10  is actually destined to whoever's attached to the hub.

11  Q.   Can a hub perform protocol conversion?

12  A.   No.

13  Q.   Why not?

14  A.   Well, as I say, it's -- it's a dumb device, which is just

15  the way we talk about these things, and it does not -- it

16  operates at the physical layer.  It's just dealing with binary

17  digits.  It's not dealing with messages or packets or anything

18  like this, so it's not capable of protocol conversion.

19  Q.   What was an advantage of using a hub back in 2003?

20  A.   Well, the big advantage is, first, they were inexpensive

21  network devices; and, second, they were very simple to use.

22  They're what we call plug and play.  You just plug the

23  computers into it, turn it on, and it works.  There is

24  essentially no configuration you have to do.

25            MR. FRIST:  Mr. Carrillo, can you please take us to

1    slide 17?  Thank you.

2    Q.    (BY MR. FRIST)  Doctor Jeffay, do you see the animation

3    on the slide in front of you?

4    A.    Yes.

5    Q.    Can you just please explain this animation?

6    A.    Sure.  This is just a simple animation to illustrate the

7    operation of a hub.  What I'm showing here is a computer on

8    the left generates a transmission.  It's transmitting data,

9    and it's received as an electrical signal at the hub.

10          The hub amplifies the signal and sends a copy of the

11    signal or, as we say, it repeats the signal to every other

12    computer that's attached to the hub, independent of whether or

13    not the data is destined for that destination.

14    Q.    Why did you illustrate the signal as that squiggly line?

15    A.    Just to try and emphasize that it really -- that it's not

16    operating on packets or messages or anything like that.  It's

17    really operating on an electrical signal.

18    Q.    What layers operate on packets?

19    A.    Packets only exist at layer 2 and above in the protocol

20    model.

21    Q.    Does a hub perform any layer 2 or layer 3 processing of

22    data it receives?

23    A.    No.

24    Q.    Doctor Jeffay, if we can please return to figure 1, do

25    you see it on the screen?

A.    Yes.

Q.    Can you please explain the highlighting in the middle of that cloud in pink and those dark red lines that's being illustrated there?

A.    Sure.  So I've highlighted the cloud in pink and these lines in darker red to illustrate that when you're using a hub, everybody has to speak the same layer 2 protocol in order to talk to a hub.

      So these edge devices, in communicating with the hub, they're all using the same layer 2 protocol.  And to illustrate the sameness, I just colored it all in red.

Q.    Doctor Jeffay, if you look at slide 13 here, we have an excerpt from claim 1 of the '010 Patent.  Do you see that?

A.    Yes.

Q.    And do you see there's a requirement of a hub in the first element?

A.    Yes, I see that.

Q.    And then there's a requirement for a plurality of edge devices.  Do you see that?

A.    I do.

Q.    And then there's a requirement of at least one network port for communicating with the ports of the hub.  Do you see that?

A.    I do.

Q.    Did you assess whether Nokia's devices could practice

1    those elements?

2    A.    I did.

3    Q.    What was your -- what is your opinion regarding

4    infringement related to these elements?

5    A.    So for these elements, the Nokia accused products do not

6    do this.

7    Q.    Now, do you understand that Doctor Valerdi says that

8    Nokia has hubs in its product line?

9    A.    Yes, I understand that.

10   Q.    What is your response to Doctor Valerdi's testimony?

11   A.    My response is Nokia does not make hubs.  All Nokia makes

12   are routers and switches.

13   Q.    Doctor Jeffay, can you please explain what the excerpts

14   from JX 19a and JX 19e are in these slides?

15   A.    These are cutouts from this larger demonstrative that

16   we've seen from Nokia that lists all the products that they

17   sell.  And I've just come up with examples from the six

18   families of devices that are accused in this case, and I'm

19   just emphasizing that Nokia advertises them as routers and

20   switches, that they're not hubs and that Nokia does not make

21   hubs.

22   Q.    To be very clear, what types of devices does

23   Nokia -- what types of devices does Nokia make and sell?

24   A.    They make routers and they make switches; they do not

25   make hubs.

1    Q.    What is the target market for Nokia's routers and

2    switches?

3    A.    These are what are called enterprise class customers, so

4    not end consumers like me, although I do buy products like

5    this for my lab.  So think about large service providers, the

6    AT&Ts, the Verizons of the world.

7    Q.    Can a hub be used to build one of these large networks

8    that exist today?

9    A.    No.

10   Q.    Why not?

11   A.    Two reasons.  One of them is that you can't build a hub

12   -- given that a hub is a repeater, it broadcasts the signal

13   out, you can't make a repeater that's going to operate at the

14   speeds that carrier class networks operate today.

15          The other reason is that carrier class networks are huge,

16   and hubs have -- hubs limit the size of the network that you

17   can have.  And you could never have a network as big as, say,

18   AT&T's network and use a hub.

19   Q.    Doctor Jeffay, have you had any experience using hubs in

20   any of your research at North Carolina?

21   A.    Yes.

22   Q.    And do you see a couple of pictures here on slide 16?

23   A.    Yes, I do.

24   Q.    And where were these pictures taken?

25   A.    These were all taken in my lab at various points in time.

1    Q.    Can you please describe what types of devices you were

2    using in your lab in 1997?

3    A.    Sure.  So this lab was first created around 1990, about

4    35 years ago, and at that time and through much of the 1990s,

5    really the only interconnection device that existed was a hub.

6    So the networks that I built for much of the 1990s were all

7    put together using hubs.

8    Q.    What about this picture in the middle in the early 2000s?

9    What type of devices were you using in your labs in the early

10   2000s?

11   A.    The early 2000s, I'm still using hubs.  If you see these

12   four boxes in the open space above the open space in the rack

13   over my left shoulder--thank you--those are all hubs.  But

14   behind me, I was also starting to acquire switches and

15   routers, and they're just not really visible in this photo.

16   Q.    What happened in the early 2000s that caused you to

17   switch from exclusively using hubs to starting to use routers

18   and switches?

19   A.    Well, industry had developed what was called a network

20   switch, and a network switch was much faster than a hub, and

21   it allowed you to build bigger networks with a hub.  And so I

22   was at this time transitioning away from hubs and trying to

23   acquire as many switches and routers as I could.

24   Q.    And we see the last picture on the right from a couple of

25   weeks ago.  Is that right?

1    A.    Yes.

2    Q.    What types of devices do you currently use in your labs?

3    A.    So all the hubs are gone, they are long gone, and now

4    it's just routers and switches.

5    Q.    How does your experience researching in your lab reflect

6    how hubs were used in industry over the course of the last,

7    you know, two-and-a-half decades?

8    A.    Well, as I say, I work with folks in industry, and my lab

9    tends to track industry trends.  And I think what I was

10   experiencing trying to keep my lab up-to-date was exactly the

11   process that all people building large networks were facing

12   and we all had the same evolutionary path.

13   Q.    In addition to doing research, Doctor Jeffay, do you

14   teach classes regarding networking?

15   A.    I do.

16   Q.    What type of classes regarding networking do you teach?

17   A.    I'm sorry.  I missed that.

18   Q.    What types of classes regarding networking do you teach?

19   A.    I -- primarily for the last 15, 20 years, I have

20   primarily been teaching undergraduate introductory networking

21   courses.

22   Q.    What textbook do you use in that class?

23   A.    We use a great text called *Computer Networking:  A*

24   *Top-down Approach,* by Jim Kurose and Keith Ross.

25              MR. FRIST:  Mr. Carrillo, would you please bring up

1    DX 14?

2    Q.   (BY MR. FRIST)   Doctor Jeffay, do you recognize DX 14 on

3    the screen there?

4    A.   I do.

5    Q.   What is DX 14?

6    A.   This is a picture of the cover of the sixth edition of

7    Kurose-Ross.

8    Q.   Do you use this textbook in your coursework at University

9    of North Carolina?

10   A.   Yes.  This is the book I have used since the first

11   edition in 2000.

12   Q.   How many total years have you been using editions of this

13   textbook?

14   A.   I guess that's 24 years now.

15   Q.   Why did you choose this textbook for your coursework?

16   A.   Two reasons.  I happen to know professionally the

17   authors.  They are both very well-known computer researchers.

18   And so technically the book is very sharp.  And it's very

19   well-written, and in my experience the students react to it

20   well.  They find it a very readable textbook.

21   Q.   Do you consider this textbook to be a reliable authority

22   when it comes to understanding computer networking back in

23   2003?

24   A.   Yes.

25   Q.   But to be clear this sixth edition was published after

1    2003.  Is that right?

2    A.   Yes.  But it does have text talking about how the

3    internet developed and the trends in the internet over time.

4         MR. FRIST:  Can we please turn to page 470 of DX 14,

5    Mr. Carrillo?  And can we zoom in on the bottom two

6    paragraphs?  There we go.

7    Q.   (BY MR. FRIST)  Doctor Jeffay, do you see in the middle

8    of this paragraph a sentence that starts "A hub is"?

9    A.   Yes.

10   Q.   Do you see it states, "A hub is a physical-layer device

11   that acts on individual bits rather than frames"?  Do you see

12   that?

13   A.   Yes.

14   Q.   How does that definition comport with your understanding

15   of what a hub is?

16   A.   This is exactly my definition of what a hub is.  When I

17   described it, though, I was talking about packets.  The more

18   technical term is frames.  But when you see frame here, you

19   can read that as packet.

20   Q.   And what was a common problem with using a hub in the

21   1990s?

22   A.   So the biggest problem with using a hub is that because

23   it's a repeater, because it broadcasts out every interface, if

24   two machines try and transmit data at the same time, those

25   transmissions will interfere with one another and be garbled.

1    Technically, we say a collision occurs, the signals collide.

2        And then the computers will have to regenerate that

3    signal.  They have to detect that they collided and then

4    they'll have to retransmit, and that process will degrade the

5    performance of the network.

6    Q.   Do you see the last sentence in this paragraph?  It says,

7    "In particular, if a hub receives frames from two different

8    interfaces at the same time, a collision occurs and the nodes

9    that created the frames must retransmit."

10   A.   Yes, I see that.

11   Q.   What's the relevance of that statement to the problem you

12   just described?

13   A.   Well, this is saying exactly what I just said in

14   different words.

15   Q.   Thank you.

16           MR. FRIST:  Can we please go to the next paragraph

17   below?  Thank you, Mr. Carrillo.

18   Q.   (BY MR. FRIST)  Do you see the sentence at the top here,

19   Doctor Jeffay, that says, "In the early 2000s, ethernet

20   experienced yet another major evolutionary change.  Ethernet

21   installations continued to use a star topology, but the hub at

22   the center was replaced with a switch."  Do you see that?

23   A.   I do.

24   Q.   Can you explain what the major evolutionary change was

25   that happened in networking in the early 2000s?

1    A.    Sure.  So I experienced this.  I mean, I was building

2    networks at this time.  And the change was what I spoke of

3    earlier, which was the advent of network switching or LAN

4    switching, but the development of layer 2 switches.  And these

5    switches had much higher performance than hubs, and they came

6    to very quickly replace hubs in networks.

7    Q.    Doctor Jeffay, did the switches and routers that were

8    introduced in the early 2000s have that collision problem you

9    were describing that hubs have?

10   A.    No.  And that's the key reason why you could build

11   bigger, faster networks.

12   Q.    Do you see the sentence right below that that begins,

13   "For now"?  And it says, "For now, we only mention that a

14   switch is not only collision-less, but it's also a bona fide

15   store-and-forward packet switch; but unlike routers, which

16   operate up through layer 3, a switch operates only up through

17   layer 2."  Do you see that?

18   A.    I do.

19   Q.    Does that statement comport with your understanding about

20   the differences between hubs on one hand and routers and

21   switches on the other?

22   A.    Yes.  And this is the key distinction, is routers and

23   switches first are what are called store and forward, which

24   means they are not operating on individual bits.  They receive

25   an entire packet, an entire message, and process it, and

1    routers and switches do not broadcast what they receive out to

2    every computer that's attached.  And as a result of this, it's

3    not possible to have collisions in a router or a switch.

4    Q.    Thank you.

5              MR. FRIST:  Mr. Carrillo, can you please bring up

6    the slides and go to slide 17?

7    Q.    (BY MR. FRIST)  Doctor Jeffay, do you recall our

8    discussion of this animation a little earlier?

9    A.    Yes.

10   Q.    Did you create a version of this animation that shows

11   this collision problem we've been talking about?

12   A.    Yes.  So in this example, now I'm just showing two

13   computers transmitting at the same time.  The signal hits the

14   hub at the same time, and the signals override each other.

15   And we call that a collision.  So ultimately the signal is

16   garbled, it's no good, and both of these sources have to

17   detect this fact and then retransmit.  And because -- and all

18   this takes time.

19        And so during the time it takes to detect and retransmit,

20   nothing good is happening.  And so for that reason, these

21   collisions degrade the performance of the network.

22   Q.    Do routers have the collision problem that you're showing

23   here?

24   A.    No.

25   Q.    Doctor Jeffay, can you please explain the animation of a

1    router that you have on the screen here?

2    A.   Sure.  So the animation sort of looks the same, but the

3    two key differences are, is first the router doesn't operate

4    on a raw signal.  It receives fully-formed packets,

5    fully-formed messages, and it processes those messages, and it

6    determines what the destination of the message is and will

7    only send that packet to the destination.

8         So it's no longer a broadcast device, and that's the

9    reason why you don't have collisions with a router.

10         MR. FRIST:  Can we please bring back up DX 14, Mr.

11   Carrillo, and go to page 482?  Page 482.

12         Thank you, Mr. Carrillo.

13   Q.   (BY MR. FRIST)  Doctor Jeffay, do you see table 5.1 at

14   the top?

15   A.   I do.

16   Q.   What's the title of table 5.1?

17   A.   This table is titled "Comparison of the typical features

18   of popular interconnection devices."

19   Q.   How many different types of network devices does this

20   textbook describe?

21   A.   Three.  Each one of the columns here represents a type of

22   interconnection device.

23   Q.   And what are the three different types of interconnection

24   devices?

25   A.   Well, I think we can see here there's hubs, routers, and

1    switches.

2    Q.   What does that tell you about whether a hub can be a

3    router or a switch?

4    A.   Well, this is saying they are separate devices.  A hub

5    can't be a router, and a router can't be a hub.

6    Q.   What is the major difference between a router and a hub

7    that's illustrated in this table 5.1?

8    A.   Well, the simple thing to see is that for the column

9    labeled hubs and one labeled routers, they have opposite

10   answers.  And so with respect to the functions that are listed

11   on the left, the rows, it's basically saying hubs and routers

12   are opposites of one another.

13   Q.   And with respect to the traffic isolation and optimal

14   routing features, how are the hub and router devices different

15   in that respect?

16   A.   So this is obviously a little more technical than the way

17   I've been describing it, but traffic isolation refers to the

18   broadcast nature of a hub, that when it receives a signal, it

19   sends it to everybody, so nobody is isolated from a

20   transmission that's not destined for them.

21        Routers don't do that, and they only send data to

22   computers that are destined for it.  And so it isolates

23   computers from one another because they don't receive each

24   other's traffic.

25        And optimal routing just refers to the fact that hubs

1    really don't route data, they just send it to everybody, and

2    routers do route data, they only send it to the appropriate

3    destinations.

4    Q.   And do you see the reference to plug and play?

5    A.   I do.

6    Q.   What's the difference between a hub and a router as to

7    the plug-and-play functionality?

8    A.   Plug and play is -- just means you can plug it in and it

9    works.  And as I mentioned, that was the beauty of a hub--you

10   connect your devices to it, plug it in, it works.  Routers are

11   much more complicated, sophisticated devices and they require

12   a significant configuration effort.  So you can't just plug it

13   in and turn it on.  You have to essentially program it.

14   Q.   Do you recall Doctor Valerdi's testimony that a router

15   could act as a hub?

16   A.   I do.

17   Q.   What's your response to that opinion in light of this

18   textbook and the other issues we've discussed?

19   A.   That's as a technical matter that's just not correct.

20   Q.   And at the highest level, why is that?

21   A.   Because a hub cannot do routing functions and a router

22   cannot do hub functions.  As I say, if you look at these two

23   columns here, you can see that they are effectively opposites.

24        MR. FRIST:  Mr. Carrillo, if you can, please take

25   down DX 14 and bring back up the slides to slide 15?

1    Q.    (BY MR. FRIST)  Doctor Jeffay, do you see the title of

2    the slide is Nokia's VLL Services?

3    A.    I do.

4    Q.    What is a VLL?

5    A.    VLL stands for virtual leased line.  You can think about

6    it as a service that could be provided between two routers

7    where effectively you're trying to provide something that

8    looks like a wire between two lines, a dedicated connection

9    between two routers.

10   Q.    How many of these VLL services does Nokia support?

11   A.    Six.

12   Q.    And what are the names of these services?

13   A.    Well, Nokia calls them pipes, and they preface each pipe

14   with a letter that indicates a particular type of layer 2

15   protocol that the pipe is designed to carry.  So there's

16   Apipes, Cpipes, Epipes, Fpipes, Hpipes, and Ipipes.

17   Q.    So what makes each service different here?

18   A.    What makes each service different is the protocol that's

19   carried through the pipe.

20   Q.    What is the protocol for Ipipe?

21   A.    The protocol for Ipipe is actually IP.

22   Q.    And what layer is the IP protocol?

23   A.    IP is what we call a network layer protocol, so it's

24   above a layer 2 protocol.

25   Q.    Would that be a layer 3 protocol?

1    A.    Correct.

2    Q.    How does the fact that Nokia's routers -- well, actually

3    let me withdraw that.

4         Do Nokia's routers, do each of them support all of these

5    VLL services?

6    A.    No.

7    Q.    Can you briefly explain why that is?

8    A.    Well, Nokia segments its products.  They have a

9    variety -- a large number of routers they offer, and they are

10   arranged from more inexpensive to more expensive and less

11   capable to more capable.  And so some of the less capable

12   routers do not support all of these pipes.

13   Q.    What does the fact that certain Nokia products have to

14   support several of these pipe VLL services tell you about

15   whether these devices are routers or hubs?

16   A.    Well, it -- it indicates that they're clearly routers.

17   Q.    And why is that?

18   A.    These pictures that I'm drawing look very simple.  It's

19   just trying to illustrate data going through a tube.  But to

20   provide each of these services is really quite a complicated

21   feat.  There is a lot of sophisticated protocol processing

22   that goes on in these routers to implement these pipes.  And

23   this is processing that hubs are just not capable of doing.

24   Q.    Does Nokia specifically encourage any of its customers to

25   use any specific pipe on this slide?

1    A.    No.

2    Q.    Do you recall Mr. Valley's testimony yesterday regarding

3    use of ethernet in Nokia's customers' networks?

4    A.    I do.

5    Q.    Does a network that only uses ethernet infringe the '010

6    Patent?

7    A.    No.

8    Q.    And why is that?

9    A.    The patent is about conversion.  And if everybody is

10   speaking ethernet at layer 2, there is nothing to convert.

11   Q.    Doctor Jeffay, do you recall some discussion of the word

12   'topology' in this case?

13   A.    I do.

14   Q.    What's a topology?

15   A.    Topology is just a fancy word for the layout or the

16   arrangement of devices in a network.

17   Q.    Do you see several different layouts on this slide?

18   A.    I do.

19   Q.    At a super high level, what's the difference between

20   these layouts?

21   A.    These are three classical layouts that are used to

22   organize networks.  They differ in really the interconnections

23   between the routers.

24   Q.    Do you see the highlighting around the star and in

25   parentheses hub-and-spoke layout?

1    A.    I do.

2    Q.    What is a star topology?

3    A.    A star topology is the name that's given for a case where

4    you have a centralized device that's connected to other

5    devices, and you might visualize this arrangement as a star.

6    Q.    Is this arrangement also sometimes referred to as

7    hub-and-spoke?

8    A.    Yes.

9    Q.    Doctor Jeffay, if you look at slide 21, there's an

10   illustration of a star and what looks like a wheel.  Can you

11   explain what you're trying to illustrate here?

12   A.    I'm just trying to help the jury understand why these

13   topologies have the names they do, because we often analogize

14   the hub-and-spoke topology to a wheel where there is a device

15   in the center of the wheel and other devices around the rim of

16   the wheel.

17         And the same topology could also be visualized as a star,

18   and that's what I'm trying to illustrate on the right.  So

19   it's the same fundamental layout, just two different names.

20   Q.    Does the device that's in the center of these two

21   illustrations have to be a hub device?

22   A.    No.

23   Q.    Why not?

24   A.    It just has to be a device that it can interconnect.  I

25   mean you can use a switch, you can use a router, you have a

785

1    large number of choices for the device that you put at the

2    center.

3              MR. FRIST:  Mr. Carrillo, can you please bring back

4    up DX 14 and go to page 470?  And if you can go -- highlight

5    the last paragraph, please.

6    Q.    (BY MR. FRIST)  Doctor Jeffay, do you see this sentence

7    at the top that we read earlier?

8    A.    Yes.

9    Q.    And do you see the second sentence where it refers to

10   "ethernet installations continue to use a star topology, but

11   the hub at the center was replaced with a switch"?  Do you see

12   that?

13   A.    I do.

14   Q.    What does it mean that the hub at the center was replaced

15   with a switch with reference to this early 2000s trend?

16   A.    So in the early 2000s, the hub-and-spoke layout was very

17   common.  And all this is saying is that as switching

18   technology developed, you'd keep your layout, you'd keep the

19   same topology, you just go in and replace the device that's at

20   the center of your star or your hub-and-spoke.

21   Q.    Is the phrase 'hub-and-spoke' still used today?

22   A.    It is.  It's very widely used.

23   Q.    But based on your review of Nokia's documents, does a

24   reference to a hub refer to a hub-and-spoke topology or a hub

25   device?

1    A.   It refers -- it refers to the topology.  There are no hub

2    devices in Nokia's product line.

3              MR. FRIST:  Mr. Carrillo, can you please bring up

4    the slides and go to slide the 2?

5    Q.   (BY MR. FRIST)  Doctor Jeffay, can you please explain the

6    comparison that you have on slide 22?

7    A.   I'm just trying to illustrate here the two different uses

8    of the same word.  There is a network device that is called a

9    hub.  Nokia does not make hubs.

10        And there's also the notion of a hub in terms of a layout

11   or an arrangement of devices in a network, and it's something

12   that's typically in the center of something.

13   Q.   Do you recall yesterday that Doctor Valerdi testified

14   that he was not accusing Nokia of infringing for using a

15   hub-and-spoke topology?

16   A.   I did hear that.

17             MR. FRIST:  Mr. Carrillo, can you please bring up

18   Doctor Valerdi's demonstratives and go to slide 161?

19   Q.   (BY MR. FRIST)  Doctor Jeffay, do you recall the

20   testimony about this slide from Doctor Valerdi?

21   A.   Yes.

22   Q.   And do you see in this slide there's a reference to a hub

23   site?

24   A.   Yes.

25   Q.   And do you see a little further down in that sentence,

1  there's a reference to a spoke site?

2  A.   I see that.

3  Q.   What does that tell you about whether this document is

4  referring to a hub device or a hub-and-spoke topology?

5  A.   It's not referring to a hub device.  It's referring to a

6  particular arrangement that is a hub-and-spoke arrangement.

7  Q.   Doctor Jeffay, did you review the prosecution history for

8  the '010 Patent?

9  A.   I did.

10  Q.   And can you remind the jury what a prosecution history

11  is?

12  A.   Sure.  The prosecution history is the collection of all

13  of the correspondence between the Patent Office and the

14  applicant for the patent.

15  Q.   And what can a prosecution history tell you about the

16  state of technology at the time the '010 Patent was filed?

17  A.   Well, you can look at the statements that the Patent

18  Office makes and the statements that an inventor makes and

19  they will often comment on the state of affairs as of the time

20  that the patent application was filed.

21      MR. FRIST:  Mr. Carrillo, can you please bring up JX

22  5?

23  Q.   (BY MR. FRIST)  Doctor Jeffay, do you recognize JX 5?

24  A.   Yes.

25  Q.   What is JX 5?

1    A.   This is the first page of what's called the file history.

2          MR. FRIST:  And, Mr. Carrillo, can you please go to

3    page 152 of JX 5?

4    Q.   (BY MR. FRIST)  Doctor Jeffay, do you recall earlier we

5    were looking at figure 1 of the patent?

6    A.   Yes.

7    Q.   Are there any differences between the figure 1 of the

8    patent that issued and the figure 1 here?

9          MR. BREEDLOVE:  Your Honor, I object.  We may need

10   to approach under 403 with this discussion of the file history

11   and --

12          THE COURT:  Approach the bench, counsel.

13          (The following was had outside the hearing of the

14          jury.)

15          THE COURT:  What's your issue, Mr. Breedlove?

16          MR. BREEDLOVE:  They've been doing a lot of *Markman*

17   type of testimony so far, but this is really getting into the

18   issue that was addressed this morning, I think, with the slide

19   that talked about what the examiner was saying, and it could

20   open the door to the IPR issues and what was said there that's

21   favorable to us.

22       And so we think this is 403, possibility of unfair

23   prejudice and confusion with this witness testifying basically

24   like it's a *Markman* hearing.

25          THE COURT:  What's your response, Mr. Frist?

1          MR. FRIST:  Your Honor, I'm just showing in figure 1

2    of the patent the word network device was changed to hub and

3    what a person of ordinary skill would understand at the time

4    differences for devices were.

5          We're not going to get into claim construction.  We're

6    not going to talk about -- we're not going to show what the

7    examiner said.  But he's going to say the figure looked one

8    way and it was changed based on an examiner comment.

9          And we're going to show the slide that was ruled on

10   earlier, but we're not going to publish the statements per

11   Your Honor's ruling.

12         MR. BREEDLOVE:  That's exactly our concern.  This is

13   like a *Markman* hearing in the sense that's exactly what you

14   would do.

15         THE COURT:  Well, that kind of use of the

16   prosecution history does tack closely to the practice that you

17   would expect at claim construction.  I'm happy for him to be

18   shown things and comment on them as long as they're covered

19   within his report.

20         I am not happy for him to talk about because the

21   examiners made this comment, we changed that or that was

22   changed.  The comments and the input from the examiner really

23   needs to stay out of it.

24         What it was here and what it is now and what he thinks

25   about those changes are fine, but it needs to be in the first

1    person.

2              MR. FRIST:  We won't mention the examiner at all.

3              THE COURT:  Okay.  Let's proceed.

4              (The following was had in the presence and hearing

5              of the jury.)

6              THE COURT:  Let's proceed.

7    Q.    (BY MR. FRIST)  Doctor Jeffay, do you see a difference

8    between figure 1 in the prosecution history and the figure

9    that we looked at earlier from the '010 Patent?

10   A.    Yes.  There's a very important difference.

11   Q.    And what is the difference that you see in figure 1?

12   A.    If we look at figure 1 and, in particular, the box that's

13   labeled 30, network device 30, here it's just generically

14   described as network device.  It's not qualified in any way.

15             MR. FRIST:  Mr. Carrillo, can you take down JX 5 and

16   please bring up slide 11?

17   Q.    (BY MR. FRIST)  Doctor Jeffay, this is the final figure

18   that issued with the patent.  Correct?

19   A.    Correct.

20   Q.    What is the difference between the network -- the box 30

21   that we just looked at that was originally filed and the box

22   as it exists in the final patent?

23   A.    So in the final patent, the box was changed to instead of

24   being a generic device, now it's a specific type of network

25   device, namely, a hub.

1    Q.   Without getting into the history of how this changed,

2    what does the change tell you about the focus of the '010

3    Patent?

4    A.   That the focus of the '010 Patent for this element is a

5    network device that is a hub.  It's a hub network device.

6         MR. FRIST:  Mr. Carrillo, can we please go to page

7    25 or slide 25?

8    Q.   (BY MR. FRIST)  Doctor Jeffay, do you recall Doctor

9    Valerdi's testimony regarding infringement using this figure

10   yesterday?

11   A.   Yes.

12   Q.   And the highlighting here on the figure was added by

13   Doctor Valerdi yesterday.  Is that fair?

14   A.   Yes.  That's not mine.

15   Q.   And do you see the device that's outlined in green?

16   A.   I do.

17   Q.   Were you here when Doctor Valerdi called that a hub?

18   A.   I was.

19   Q.   What type of device is that?

20   A.   We can see here that it's clearly labeled a router.  This

21   is a Nokia router.

22   Q.   And do you see below that router, there's a label PE 2?

23   A.   I see that.

24   Q.   What does PE stand for?

25   A.   PE is a common acronym in networking that stands for

1    provider edge.

2    Q.    Doctor Jeffay, do you see on slide 26 where we excerpted

3    claim 1?

4    A.    Yes, I see that.

5    Q.    And do you see the highlighting of hub in pink and a

6    plurality of edge devices in orange?

7    A.    Yes.

8    Q.    What types of -- well, let me rephrase it.

9          In the diagram that Doctor Valerdi showed, what is the

10   label that's put on those two routers?

11   A.    The label that's put on the two routers is provider edge,

12   or PE.

13   Q.    Why did you label this 'corrected'?

14   A.    I label this corrected because this is what the figure

15   shows.  The figure shows that they are PE devices.  It does

16   not show that they are a hub.

17   Q.    Looking at claim 1, how many total devices does claim 1

18   require?

19   A.    It requires at least three.

20   Q.    And what are the three devices?

21   A.    You need one hub, that's the red language; and you need a

22   plurality of edge devices, so that's at least two.  So one hub

23   and at least two edge devices, or three devices total.

24   Q.    Could you have two devices where one device is a hub and

25   an edge device?

```
 1    A.    No.

 2    Q.    And why not?

 3    A.    Technically, I don't think that's possible to build, but

 4    that wouldn't satisfy the language of the claims, in my

 5    opinion.

 6    Q.    Do you see the language of the claims where it says at

 7    least one port for communicating with the ports of the hub?

 8    A.    I see that.

 9    Q.    And that port is of the edge device.  Right?

10    A.    Correct.

11    Q.    What does that tell you about whether the edge devices

12    and hubs have to be separate devices?

13    A.    Well, they have to be separate devices because otherwise

14    this arrangement of ports that's recited in the claim makes no

15    sense.

16    Q.    How many total devices are shown on the right?

17    A.    On the right there are just two PE devices.

18    Q.    And just to be clear, do you see the language 'plurality

19    of edge devices'?

20    A.    I do.

21    Q.    What does that mean?

22    A.    Plurality -- I always stumble on that word.  The

23    plurality of devices means you have to have two or more.

24    Q.    So you have to have two or more edge devices and one hub.

25    Right?
```

1    A.    Correct.

2    Q.    And Doctor Valerdi's only pointed to two edge devices.

3    Is that correct?

4    A.    Correct.

5              MR. FRIST:  Mr. Carrillo, can you please bring up

6    the '010 Patent and show claims 2 and 3?

7    Q.    (BY MR. FRIST)  Doctor Jeffay, just for completeness, do

8    you see that claims 2 and 3 depend from claim 1?

9    A.    Yes.

10   Q.    Would your opinions regarding non-infringement of claim 1

11   also apply to these two claims?

12   A.    Yes, because these two claims have to include all the

13   elements of claim 1.

14   Q.    All right.

15             MR. FRIST:  Can we please go back to the slides to

16   slide 27?

17   Q.    (BY MR. FRIST)  Doctor Jeffay, can you summarize your

18   non-infringement opinions with respect to the '010 Patent?

19   A.    Yes.  My opinion is Nokia's products do not infringe

20   because they are not hubs and that Nokia just does not make

21   hubs.

22   Q.    Thank you, Doctor Jeffay.

23         Can you please -- can we please shift topics and focus on

24   invalidity now?

25   A.    Sure.

1    Q.   What was your process for assessing whether this '010

2    Patent was invalid?

3    A.   Well, I considered all the materials that I spoke of

4    previously.  But, in addition, I also did some work to try and

5    see what was known, what was the state of the art prior to the

6    application of the '010 Patent.

7    Q.   And what was the date of the application for the '010

8    Patent?

9    A.   It's highlighted here in the bottom left in yellow that

10   it was filed on June 13th, 2003.

11   Q.   And what's the significance of that 2003 date for when

12   you're performing an invalidity analysis?

13   A.   So what I'm going to show is that the elements of the

14   '010 Patent existed before the '010 Patent, and when I say

15   before, what I mean is before June 13th, 2003.

16   Q.   Do you see the date in green on the top right, June 10th,

17   2008?

18   A.   Yes.

19   Q.   What's your understanding of what the date is?

20   A.   That's the date that the patent actually issued from the

21   Patent Office.

22   Q.   And so just to be clear, which date is the key date here,

23   2003 or 2008?

24   A.   It's 2003.

25   Q.   Okay.  Did you consider Smart Path's infringement theory

1    when forming your invalidity opinions?

2    A.    I did.

3    Q.    Why did you consider their infringement theory for

4    invalidity?

5    A.    I considered their infringement theory because it's my

6    opinion that if Smart Path is correct and the Nokia products

7    infringe, then if you take Smart Path's interpretation of the

8    patent that they use to show infringement, the elements that

9    they're pointing to in the accused products existed before the

10    '010 Patent.

11    Q.    Now, to be clear, we've spent a fair bit on your

12    non-infringement opinions already today.  Right?

13    A.    Correct.

14    Q.    Does your analysis of the prior art change your

15    non-infringement opinion in any way?

16    A.    No.

17    Q.    Can you then explain to the jury how your

18    non-infringement opinions can live in harmony with your

19    invalidity positions?

20    A.    Well, my bottom line opinion is the patent's not

21    infringed.  If the ladies and gentlemen of the jury were to

22    disagree and accept Doctor Valerdi's analysis, that if you

23    apply that same analysis and that same understanding of the

24    patent to the technology that existed before the patent, you

25    see that all the features that he's relying on to show

 1    infringement existed before the patent, and that would mean

 2    the patent is invalid, in my view.

 3    Q.    Did you rely on a specific prior art reference for your

 4    invalidity analysis?

 5    A.    I did.

 6    Q.    Which reference was that?

 7    A.    I relied on an additional patent that was to an inventor

 8    with the last name of Shah, and this is a picture of the cover

 9    page of that patent.

10    Q.    So the Shah patent is U.S. 7,386,605.  That's the patent

11    number.  Right?

12    A.    Correct.

13    Q.    And it's labeled DX 4.  That's our exhibit here in court.

14    Right?

15    A.    That is correct.

16    Q.    What was the date the Shah patent was filed?

17    A.    So, again, it's on the lower left, here highlighted in

18    yellow.  It's November 5th, 2002.

19    Q.    And what was the date this patent issued?

20    A.    On June 10th, 2008.

21    Q.    What's the significance of that June 10th, 2008 date?

22    A.    Well, I have to say this is an amazing coincidence, but

23    the Shah patent issued from the Patent Office on the exact

24    same day as the '010 Patent.

25    Q.    But who filed their patent first?

798

1   A.   Shah filed for a patent first.

2   Q.   Okay.  And how many months before the '010 Patent was the

3   Shah patent filed?

4   A.   This is almost exactly six -- eight months before.

5   Q.   Do you see the title of Shah is Methods and Apparatus for

6   Automated Edge Device Configuration in a Heterogeneous

7   Network?

8   A.   Yes.

9   Q.   What is a heterogeneous network?

10  A.   A heterogeneous network is what the '010 Patent was

11  calling a multiprotocol network.  It's just simply a network

12  where devices are speaking multiple layer 2 protocols.

13  Q.   Doctor Jeffay, if we go to slide 30, do you see on the

14  left there is the image from Nokia's documents related to that

15  Ipipe?

16  A.   Yes.

17  Q.   And why did you include that image on this slide?

18  A.   Because this was a figure of a network that Doctor

19  Valerdi was relying on to show infringement.

20  Q.   And on the right is figure 1 from Shah.  Is that right?

21  A.   Correct.

22  Q.   And why did you put these side to side?

23  A.   What I want to show is the striking similarities between

24  these two figures and ultimately to show how the elements that

25  Doctor Valerdi was relying on from the Nokia figure are

1    present in the Shah figure.

2    Q.   Can we start with the CE device?

3    A.   Sure.

4    Q.   Doctor Jeffay, do you see the color-highlighting that we

5    added to the slide?

6    A.   Yes.

7    Q.   What did you intend to show with the color-highlighting

8    between the figure on the left and the figure on the right?

9    A.   Well, there's two things.  First, notice that both

10   figures have CE devices, and the color coding is to indicate

11   the particular layer 2 protocol that is being used by the CEs

12   and to see that the same exact same layer 2 protocols are

13   being used both in the diagram from Nokia's document and in

14   Shah--ethernet, ATM, and frame relay.  Frame relay is just

15   abbreviated as FR in the Nokia document.

16            MR. FRIST:  Let's go to the next slide.

17   Q.   (BY MR. FRIST)  Can you explain this additional orange

18   highlighting you've added to both figures?

19   A.   Yes.  Both networks have PE devices.

20   Q.   What is a PE device?

21   A.   Again, PE stands for provider edge, so devices at the

22   edge of a provider's network.

23   Q.   And does Shah disclose a PE device?

24   A.   It does--the orange boxes that I've highlighted on the

25   right.

1    Q.   And for reference, the PE device in Shah, was that a

2    router?

3    A.   Yes.

4    Q.   Doctor Jeffay, can you explain the additional

5    highlighting in pink around these clouds that you've added to

6    both diagrams?

7    A.   So another similarity is both networks have a cloud in

8    it.  And in the Nokia document, the cloud is showing what's

9    called an MPLS tunnel through the cloud.  And I'm drawing an

10   MPLS tunnel through the cloud of Shah because Shah describes

11   the use of MPLS tunnels in its network.

12   Q.   So the tunnels used to connect the PE devices in Shah and

13   the PE devices -- let me ask it a different way.

14        What is the similarities between the tunnels used to

15   connect the PE devices in Shah and the tunnels used to connect

16   devices in Nokia's products?

17   A.   Both of these figures are relying on the same technology

18   of an MPLS tunnel.

19   Q.   How does this comparison inform your invalidity opinions?

20   A.   Well, if Doctor Valerdi is correct that figure 2 can be

21   used to show infringement, I'm just pointing out that all of

22   the features that he relied on in the figure on the left are

23   present in the Shah reference that came before the '010

24   Patent.

25   Q.   Doctor Jeffay, do you understand that part of our

1    invalidity analysis, we've got to go through every element of

2    the asserted claims?

3    A.    Yes.

4    Q.    And did you perform an analysis to determine whether

5    every element of claims 1 and 3 was rendered obvious by Shah?

6    A.    I did.

7    Q.    Okay.  Do you see the checkmarks on the left?

8    A.    I see --

9    Q.    The boxes.

10   A.    I see the little scorecard boxes, yes.

11   Q.    So we're going to use those boxes and put little

12   checkmarks in it as you go through your opinions.  Is that

13   okay?

14   A.    That would be fine.

15   Q.    Okay.  Let's look at the preamble.  It says, "Apparatus

16   for data communications."  Does Shah disclose an apparatus for

17   data communications?

18   A.    Yes.

19   Q.    And how does it do that?

20   A.    It discloses the apparatus in the form of this network

21   that, using Doctor Valerdi's interpretation of the claims,

22   would consist of a hub and provider edge devices.

23   Q.    Can we put a checkmark for the preamble?

24   A.    Yes.

25   Q.    Let's turn to the second element of claim 1, which is, "A

1    hub comprising a plurality of ports, which are configured to

2    receive and transmit data frames in accordance with a

3    packet-oriented layer 2 communication protocol."

4        Do you see that?

5    A.   I do.

6    Q.   Under Doctor Valerdi and Smart Path's interpretation of a

7    hub, does Shah render obvious this hub limitation of the claim

8    1?

9    A.   It does.

10   Q.   And how so?

11   A.   Well, recall Doctor Valerdi testified that in his opinion

12   a PE device that was a router could be both a PE device and a

13   hub.  So if we accept that interpretation, then a PE device in

14   Shah would satisfy the hub limitation.

15       And then regarding the plurality of ports, transmitting

16   using a layer 2 communications protocol, one of the things

17   that Doctor Valerdi relied on was the use of MPLS to show

18   that, and Shah discloses that the links in its network can be

19   MPLS links and can use MPLS tunneling.

20   Q.   Do you see in the quote from column 1, lines 21 through

21   26, of DX 4 at the top where it says, "One application for

22   multiprotocol label switching, MPLS, is the implementation of

23   layer 2 virtual private networks (VPN) using MPLS tunneling."

24       Do you see that?

25   A.   I do.

1    Q.    How does that inform your opinion regarding the types of

2    tunneling that's used between PE device one and the other PE

3    devices?

4    A.    This is showing the same -- as I say, the same elements

5    that Doctor Valerdi was relying on--the VLLs, these virtual

6    leased lines, are a form of a VPN, and Shah is disclosing a

7    form of a VPN using MPLS, which is what Doctor Valerdi was

8    relying on.

9    Q.    Can I put a checkmark for element 2 of the claim 1?

10   A.    Yes, you may.

11   Q.    Excellent.

12       Let's go to the next element, "A plurality of edge

13   devices."  Do you see that?

14   A.    I do.

15   Q.    Does Shah disclose a plurality of edge devices?

16   A.    Yes.  It shows three edge devices in this figure, so that

17   would constitute a plurality.

18   Q.    Can we put a checkmark for this edge device element?

19   A.    Yes.

20   Q.    Let's go to the fourth element of claim 1.  It requires,

21   "At least one network port for communicating with the ports of

22   the hub via a network in accordance with the packet-oriented

23   layer 2 communication protocol."  Do you see that?

24   A.    I do.

25   Q.    Does Shah render that element obvious under Smart Path's

```
 1    interpretation of the claims?

 2    A.    It does.

 3    Q.    And how so?

 4    A.    So I've highlighted here now in red these arrows that are

 5    showing connections between the PE devices.  And a person of

 6    skill in the art looking at this would understand that to

 7    effect the communications in Shah, these PE devices must have

 8    hubs -- sorry, must have a network port for communicating with

 9    the hub using the layer 2 protocol.

10    Q.    And when you're using the term 'hub' in your answer, are

11    you using that term using Smart Path's interpretation of that

12    term?

13    A.    Correct.

14    Q.    Okay.  And what would be the packet-oriented layer 2

15    communication protocol that's being used between these PE

16    devices?

17    A.    Well, Shah discloses that you can use a variety of layer

18    2 protocols, but in particular MPLS or -- MPLS layer 2 VPN

19    using MPLS would be one example.

20    Q.    Okay.  Can we add a checkmark for this fourth element?

21    A.    Yes.

22    Q.    Doctor Jeffay, moving on to the next element, do you see

23    "One or more native interfaces, for communicating with client

24    nodes in accordance with respective native layer 2 protocols,

25    at least one of which is different from the packet-oriented
```

```
 1    layer 2 communication protocol"?  Do you see that?

 2    A.    I do.

 3    Q.    Does Shah disclose that element?

 4    A.    It does.

 5    Q.    How does Shah do that?

 6    A.    So Shah is disclosing -- so native interfaces is

 7    referring to the interfaces between the PEs and the CE

 8    devices, and Shah discloses a variety of different layer 2

 9    protocols being used there.  And because Shah discloses

10    communications between the CEs and the PEs, a person of skill

11    in the art would understand that that would require a native

12    interface on both the PE device and each of the corresponding

13    CE devices.

14    Q.    And if you assume PE device 1 is a hub, again assume, how

15    does the disclosure of the ATM CE device 2 and frame relay CE

16    device 3 show that there are one or more native interfaces

17    with different respective layer 2 protocols?

18    A.    It's showing each one of these CE devices and its

19    corresponding PE device would have a native interface and they

20    would be using different layer 2 protocols.  There's ATM,

21    frame relay, and ethernet in this case.

22    Q.    Can we put a checkmark for that element?

23    A.    Yes, please.

24    Q.    All right.  Let's move to the next element which is the

25    protocol converter element.  Do you see that?
```

806

1    A.   I do.

2    Q.   I'm not going to try and read the whole thing into the

3    record, but you see it goes "protocol converter," goes all the

4    way and ends with the "one or more native interfaces" right

5    before the (unintelligible).  Do you see that?

6    A.   I do.

7    Q.   Does Shah render obvious the protocol converter required

8    in the claims for that element?

9    A.   Yes.

10   Q.   And how so?

11   A.   It renders it obvious because if we take Doctor Valerdi's

12   interpretations of the claims and what constitutes a protocol

13   converter, Shah discloses this through its form of

14   communications between the PE devices via the use of an MPLS

15   tunnel.

16   Q.   If you take as an example device CE 1 down here and take

17   CE device 2, can you describe the flow of data or packets from

18   CE device 1 to device 2 and what conversions would occur?

19   A.   Sure.  Data would arrive from CE device 1 at PE device 1.

20   PE device 1 would encapsulate the data into an MPLS structure,

21   transmit it across the cloud, which is shown in the center, to

22   PE device 2, which would decapsulate it, take the data out and

23   forward it to CE device No. 2.

24   Q.   Would there need to be a conversion that occurs in PE

25   device No. 2 since CE device No. 1 is using ethernet and CE

1    device 2 is ATM?

2    A.    Yes.

3    Q.    And can you explain that conversion?

4    A.    The details get somewhat messy.  But basically you're

5    converting an ethernet structure into an ATM structure,

6    changing the headers and the format of the actual packet.

7    Q.    When data flowed the other direction, would the

8    conversion have to reverse itself in PE 2?

9    A.    Yes.  It's symmetrical.  Everything would happen in

10   reverse order in the reverse direction.

11   Q.    And can we add a checkmark then for the protocol

12   converter element in light of Shah?

13   A.    Yes.

14   Q.    Now, this last element of claim 1 has a couple of pieces,

15   so let's try and take it one piece at a time.

16         Do you see the first piece is "Such that the edge devices

17   are configured to direct the data frames received from two or

18   more of the native interfaces to one of the ports of the hub"?

19         Do you see that?

20   A.    I do.

21   Q.    How does Shah render that element obvious?

22   A.    Well, Shah renders that element obvious under Doctor

23   Valerdi's interpretation of the claims where a PE device could

24   be a hub.  So if PE device No. 3 were the hub, this element is

25   shown in Shah because PE device 1 would receive frames from

1    two or more native interfaces, say CE device 4 and CE device

2    1, and could forward them to PE device No. 3 where they would

3    be received on a single port on that alleged hub.

4    Q.    Do you see the element at the bottom of claim 1 that

5    says, "Such that the at least one network port comprises an

6    ethernet port"?

7    A.    I do.

8    Q.    Does Shah disclose that element?

9    A.    Yes.  Shah discloses that all of the data links can be

10    any number of a variety of protocols, including ethernet.

11    Q.    And do you see the last part of that piece in yellow,

12    "Such that one or more native interfaces comprise at least one

13    of a time domain multiplexed interface and a serial

14    interface"?

15    A.    I do.

16    Q.    Does Shah disclose or render that element obvious?

17    A.    It does.

18    Q.    And how so?

19    A.    Well, again, Shah discloses that you can have a number of

20    different native interfaces, that all of these links can be

21    any number of types of using layer -- excuse me, layer 2

22    protocols.  And Shah discloses a TDM and the use of a protocol

23    that would require a serial interface.

24    Q.    And which protocol would require a serial interface?

25    A.    That would be the PPP protocol.

1   Q.   And does Shah disclose any protocols that were -- could

2   require a TDM interface?

3   A.   Yes.  Shah discloses the use of ATM.  ATM is a protocol

4   that came out of the telephone world, and ATM was most

5   commonly carried over SONET-like circuits, a particular type

6   of optical network, which would use -- which were a form of

7   TDM.

8   Q.   Do you see this last part of element claim 1 where it

9   says, "And to map the two or more of the native interfaces to

10  different, respective virtual local area networks on the

11  network"?

12  A.   I do.

13  Q.   How does Shah disclose or render that element obvious?

14  A.   It renders it obvious because Shah discloses the use of

15  VLANs.  Shah discloses the use of the IEEE standard 802.1Q,

16  which is commonly known as the VLAN standard, and it talks

17  about how this can be used in particular between the PE device

18  and the CE device, and that's where the native interfaces is.

19       So it would be obvious in light of Shah's teaching of

20  using VLANs to have each native interface be on its own VLAN

21  so that the traffic from each native interface wouldn't

22  interfere with each other.

23  Q.   If we go back to figure 1 on the prior slide, do you see

24  a reference to CE device No. 1 and CE device No. 4?

25  A.   I do.

1    Q.   How does that inform your opinion regarding whether those

2    native interfaces could be mapped to different respective

3    VLANs?

4    A.   Applying the teachings of Shah that I just went through

5    in the body of the patent, you could apply them to those two

6    native interfaces, and each one of them could then consist of

7    a -- could be mapped to a virtual local area network.

8    Q.   I want to make sure we caught one other thing.  Do you

9    see the reference to data frames?

10   A.   I do.

11   Q.   Can you explain how data frames would be transmitted in

12   between the PE devices?

13   A.   Sure.  As I mentioned earlier, you know, we are

14   discussing this at sort of a high level.  If you use more

15   precise language, the elements that come out of a layer 2

16   interface are -- in the art are called frames.  So from the

17   ethernet network, you have frames coming out.  From the frame

18   relay network, you have frames coming out.

19        So frames are disclosed in Shah at all of the layer 2

20   interfaces.

21   Q.   Now, if we go back to slide 41, I just want to make sure

22   we have this quote from the patent in the record.

23        Do you see that when you're talking about VLANs, the

24   quote from the Shah patent was, "If the PE device is connected

25   to the local CE device using gigabit ethernet with virtual

1    local area network, VLAN, tagging as described in IEEE

2    standard 802.1Q," and then it goes on, "incorporated by

3    reference," is that the part of the Shah patent you were

4    relying on related to the VLAN limitation?

5    A.    Yes.

6    Q.    Doctor Jeffay, let's touch on claims 2 and claims 3 of

7    the dependent claims.  If you see claim 2, it states, "The

8    apparatus according to claim 1 such that the packet-oriented

9    layer 2 communication protocol comprises an ethernet

10   protocol."  Do you see that?

11   A.    I do.

12   Q.    Does Shah render that claim 2 obvious?

13   A.    Yes.

14   Q.    And if you look at the excerpt from the top on the right,

15   how does that excerpt from Shah inform your opinion regarding

16   whether the layer 2 communication protocol could comprise

17   ethernet?

18   A.    The quote at the top is describing what's happening

19   across the network cloud, that you can use a layer 2 virtual

20   private network based on MPLS tunneling, and in the lower

21   passage is indicating that the actual data links themselves

22   can use protocols like ethernet.  So the tunneling could be

23   occurring over ethernet in Shah.

24   Q.    And that top quote is from column 1, lines 21 through 26.

25   Right?

```
1    A.    Correct.

2    Q.    And let -- well, does that mean we can check off claim 2?

3    A.    Yes.

4    Q.    All right.  Let's look at claim 3.  Do you see claim 3

5    requires that the native layer 2 protocols are selected from a

6    group of protocols consisting of, and it lists several

7    protocols?

8    A.    I see that.

9    Q.    Does Shah disclose selecting the protocols from a group

10   of protocols including the ones in that list?

11   A.    It does.  You can see that it shows they both list frame

12   relay, asynchronous transfer mode, point-to-point, ethernet,

13   HDLC.

14         The only one that's not explicitly in Shah is SONET.  And

15   as I mentioned, Shah would render SONET obvious because it's

16   well-known in the field that ATM most commonly would -- ATM

17   used as a layer 3 protocol most commonly rides on top of SONET

18   as a layer 2 protocol.

19   Q.    So can we check off claim 3?

20   A.    Yes.

21   Q.    Doctor Jeffay, I think we've gone through all the claims

22   for the '010 patent.  Is that fair?

23   A.    I believe you are correct.

24   Q.    All right.  So then I think that about concludes our

25   discussion right now of the '010 Patent.
```

1          Can you please just summarize your opinions with respect

2   to the '010 Patent?

3   A.    Sure.  My opinion is that the '010 Patent is either not

4   infringed, or if you believe it is infringed and accept Doctor

5   Valerdi's analysis, applying his analysis to the prior art

6   shows that the patent is invalid.

7   Q.    Thank you, Doctor Jeffay.

8          Can we please shift to a discussion about the second

9   patent you analyzed in this case?

10  A.    That would be fine.

11  Q.    And the second patent you analyzed is the '580 Patent.

12  Correct?

13  A.    Correct.

14  Q.    Doctor Jeffay, what's the title of the '580 Patent?

15  A.    The title is straightforward.  It's, "Resource Sharing

16  Among Network Tunnels."

17  Q.    And when was this patent filed?

18  A.    This one was filed in December of 2005.

19  Q.    So this patent's a little later than the '010 Patent that

20  we just looked at.  Is that fair?

21  A.    Correct.

22  Q.    All right.  Can you explain at a high level what the '580

23  Patent is all about?

24  A.    At a high level, it's straightforward.  The title pretty

25  much says it.  It's about how you share resources between two

1    or more separate tunnels.

2    Q.   And did you form an opinion regarding infringement for

3    the '580 Patent?

4    A.   I did.

5    Q.   And what's your opinion?

6    A.   My opinion is it's not infringed.  The Nokia products do

7    not do what is disclosed in the '580 Patent.

8    Q.   Why does Nokia not infringe?

9    A.   The patent, as we'll see, is all about sharing resources

10   between independent tunnels, and that's just not possible in

11   the Nokia products.

12   Q.   So what type of resource sharing does this '580 Patent

13   require?

14   A.   It's a very specific form of resource sharing, and it's a

15   sharing between two independent tunnels.

16   Q.   So the '580 Patent requires sharing between two separate

17   tunnels.  Right?

18   A.   Correct.

19   Q.   Can Nokia's products share resources between separate

20   tunnels?

21   A.   I'm sorry.  I missed that.

22   Q.   Can Nokia's products share resources between separate

23   tunnels?

24   A.   No, they cannot.

25   Q.   Doctor Jeffay, can you please summarize what's on slide

1    46?

2    A.   This just spells out my opinion in words, that it's not

3    infringed because the products just do not allow sharing of

4    resources among separate tunnels.

5    Q.   Now, Doctor Jeffay, have you heard of a group called the

6    Internet Engineering Task Force?

7    A.   Yes, I have.

8    Q.   What is the Internet Engineering Task Force?

9    A.   Well, the task force, which is abbreviated IETF, is a

10   body that develops standards for the internet.

11   Q.   And what is a standard?

12   A.   A standard is a set of -- it's a specification of a set

13   of rules or behaviors that a computer has to follow in order

14   to implement the communications that are specified in the

15   standard.

16   Q.   Before we get too far, we see Internet Engineering Task

17   Force.  How is that abbreviated?

18   A.   It's IETF.

19   Q.   Okay.  Now, who participates in the development of these

20   Internet Engineering Task Force standards?

21   A.   Well, believe it or not, anyone in this room can

22   participate.  It is an open standards body.  Anyone can

23   participate, but in practice it's mostly people like myself,

24   academic networking researchers, and people from networking

25   companies as well as large tech companies like Google and

1    Amazon and Microsoft.

2    Q.   Why do large tech companies participate in these

3    standard-setting organizations?

4    A.   Because at the end of the day, to make products that work

5    on the internet, it's in everybody's best interest if products

6    can interoperate, if they can communicate together.

7    Q.   What's the importance of interoperability specifically in

8    the context of networking?

9    A.   Well, interoperability is literally what created the

10   internet.  It's the ability for someone who's building a

11   network to pick and choose the products that they want where

12   they don't have to buy everything from the same vendor because

13   they have reason to believe that if the products support the

14   standards, they'll be able to hook those products together

15   when they're building their network.

16   Q.   And why would competitors go to these meetings together

17   if they could potentially make more just selling their own

18   products?

19   A.   Well, if you don't support the standards, people aren't

20   going to buy your products because in my lab, for example, I

21   have products from multiple vendors.  And if a new product

22   came on the market and it wouldn't work with the products that

23   were already in my network, I wouldn't buy it.

24   Q.   How long had the IETF been working on standards for the

25   internet by 2005?

1    A.    A very long time.  I'm aware at least 25 years.

2    Q.    And how long had the IETF been working on standards for

3    routers by 2005?

4    A.    Probably an equally long time; certainly to the early

5    1980s.

6    Q.    Does the '580 Patent describe any IETF standards that

7    were published before 2005?

8    A.    Yes, it describes several.

9    Q.    Doctor Jeffay, I'm calling up the next slide which

10   includes an excerpt from column 1 of the '580 Patent.  Do you

11   see several IETF standards listed in this excerpt?

12   A.    I do.

13   Q.    And when were all these IETF standards published?

14   A.    These were all published before the application for the

15   '580 Patent.

16   Q.    And were these the only four IETF standards that existed

17   prior to the '580 Patent?

18   A.    No.  The standards, the RFCs, are numbered sequentially.

19   So the largest number on this list is 3209.  So there have

20   been at least 3,209 standards issued as of December 2001.

21   Q.    So the Internet Engineering Task Force had already

22   developed over 3200 standards documents to help people connect

23   to each other through the internet?

24   A.    Correct.

25   Q.    Okay.  With respect to the specific IETF documents that

1    are on the screen, have you seen any evidence that the

2    inventors or Orckit participated in developing those

3    standards?

4    A.    No.

5    Q.    If we go to the next slide, can you please explain what

6    you're illustrating on this slide?

7    A.    This is just a cartoon illustration of what I've been

8    describing.  The IETF brings people together; they promulgate

9    standards.  Here are four standards that are specifically

10   listed in the '580 Patent, and all of this occurred before the

11   '580 Patent.

12   Q.    Doctor Jeffay, what research had the IETF already done

13   developed to setting up tunnels in networks prior to the '580

14   Patent?

15   A.    Well, the IETF had already developed standards for

16   setting up tunnels before the '580 Patent.

17   Q.    Had you heard of something called RSVP-TE?

18   A.    I have.

19   Q.    Was that developed prior to the '580 Patent?

20   A.    It was.

21   Q.    And do you see in the second -- kind of right around

22   here, do you see that RC 3209 is entitled, RSVP-TE Extensions

23   to RSVP for LSP tunnels?

24   A.    I see.

25   Q.    What is an LSP tunnel?

1    A.    An LSP stands for label switch path.  It's a construct

2    that exists within MPLS networks, and an LSP in the context of

3    this patent is the same thing as a tunnel.

4    Q.    Have there been work done on point-to-multipoint tunnels

5    prior to the '580 Patent?

6    A.    Yes.

7    Q.    What work had been done on point-to-multipoint tunnels?

8    A.    Well, the IETF was in the process, in the final steps, of

9    standardizing some additional extensions to this RSVP protocol

10   to allow you to create these things called

11   point-to-multipoint, or P2MP, tunnels.

12   Q.    Do you see excerpts from DX 35 on the screen?

13   A.    Yes.

14   Q.    What is DX 35?

15   A.    DX 35 is a draft of what became RFC 4875.

16   Q.    Did you hear discussion of RFC 4875 with respect to Smart

17   Path's infringement case yesterday?

18   A.    I did.

19   Q.    Okay.  What's the relevant -- what's the relationship

20   between this draft standard and that final standard?

21   A.    The standard gets developed through a series of drafts

22   where people can comment on it.  The RFC 4875 actually came

23   out slightly after the application for the '580 Patent, but

24   this draft, which is virtually identical to the final version,

25   was released before the '580 Patent.

1    Q.    When was this draft released?

2    A.    You can see the date here as October 2005.

3    Q.    And do you know who participated in developing this draft

4    P2MP standard?

5    A.    Yes.  You can see the authors, or they're called editors

6    because it's a jointly edited document, but they're listed on

7    the cover page of the draft.

8    Q.    Can you focus on this second editor, D. Papademitriou?

9          Do you see that?

10   A.    Yes.

11   Q.    Who did D. Papademitriou work for?

12   A.    He worked for Alcatel.

13   Q.    What is the relationship between Alcatel and Nokia?

14   A.    Today Alcatel is Nokia.

15   Q.    So did Nokia have a role in developing this P2MP

16   standard?

17   A.    They did.

18   Q.    Now, prior to the '580 Patent, do you see the discussion

19   of P2MP LSP from DX 35?

20   A.    I do.

21   Q.    Do you see it's section 4.2 there?

22   A.    Yes.

23   Q.    And the sentence says, "A P2MP LSP is identified by the

24   combination of the P2MP ID, tunnel ID, and extended tunnel

25   ID."  Do you see that?

1    A.    I do.

2    Q.    What does that tell you about the work that had been done

3    on this P2MP LSP prior to the '580 Patent?

4    A.    What this says is that, prior to the '580 Patent, they

5    had developed the concept of a P2MP LSP or a P2MP tunnel and,

6    in particular, in the standard this tunnel is going to be

7    identified by a series of data values.  And one of them is

8    something that we'll focus on that's called a tunnel ID and

9    that all of these are part of something that we'll see is

10   called a session object.

11   Q.    Now, you compared this draft RFC 4875 to the -- the final

12   version.  Right?

13   A.    I did.

14   Q.    Are there any material differences between those two

15   drafts for anything we're going to discuss today?

16   A.    No.

17   Q.    Doctor Jeffay, if we can go to the next slide, do you see

18   on the left a reference to RFC 3209 and there's an

19   illustration on the bottom?

20   A.    I do.

21   Q.    Can you explain what you're illustrating there?

22   A.    So I'm trying to help us visualize what a tunnel actually

23   is.  It's a particular type of connection between in this case

24   two routers, and this was the original conception of a tunnel

25   that was specified in RFC 3209.

1   Q.   Is that sometimes called a point-to-point tunnel?

2   A.   It is.

3   Q.   Okay.  And what are you illustrating on the right here?

4   A.   So the right is an illustration of what's called a

5   point-to-multipoint tunnel, or a P2MP tunnel, which

6   is -- which was the subject matter of RFC 4875.

7   Q.   And just to be clear, although it's a little complicated,

8   how many tunnels are you illustrating there?

9   A.   So it looks like there's lots of plumbing here, but all

10  of this plumbing is a single point-to-multipoint LSP and a

11  single point-to-multipoint tunnel.

12  Q.   And you reference a term LSP.  Is LSP the term that's

13  used in both RFC 3209 and 4875?

14  A.   Yes.

15  Q.   Does the patent provide any description about whether an

16  LSP is a tunnel?

17  A.   It does.

18  Q.   If we go to the '580 Patent to column 1, do you see the

19  highlighted language?

20  A.   I do.

21  Q.   It says, "Therefore, an LSP can be viewed as a tunnel

22  through the network, and is commonly referred to as an MPLS

23  tunnel."  Do you see that?

24  A.   I do.

25  Q.   Does that comport with your understanding of the

1    relationship between an LSP and a tunnel?

2    A.    Yes.  So anywhere we see LSP, we can think of that as a

3    single tunnel.

4    Q.    Doctor Jeffay, did you create an illustration to try and

5    explain this P2MP tunnel?

6    A.    I did.  And this illustration, this is an example of a

7    point-to-multipoint tunnel.  The first point is router A that

8    is the source of traffic, and the multipoints are E and C

9    which are the destinations of traffic.

10        And the reason for the existence of these structures is

11   for a specific application that's called multicast where a

12   single source wants to send data to multiple receivers.  And

13   the driving problem behind this was considered to be

14   transmission of live video.

15        So a source would generate a stream of packets for a live

16   video program, they would go through the network, through this

17   P2MP tunnel, and you would hit branching points where the data

18   would be replicated.

19        So I'm showing here--it's maybe a little hard to

20   see--that there's ultimately one stream of packets coming into

21   B but two streams of packets coming out of B.  Those are the

22   same packets.  B is replicating the data and sending it along

23   each path of this point-to-multipoint LSP, and they ultimately

24   go to multiple destinations so that multiple people can watch

25   the same live television program.

1    Q.   Would the replication that you just mentioned in node B

2    be possible if this were two tunnels instead of one?

3    A.   No.  That's an important point.  You cannot support the

4    driving problem behind point-to-multipoint LSPs if you have

5    two independent tunnels.

6    Q.   And why is that?

7    A.   It's technical, and it has to do with the way that MPLS

8    works, that at the end of the day these packets that are

9    leaving A carry what's called a label, but they carry a single

10   label.  And that label can't be the same as any other label

11   that's leaving router A.

12       So it's not possible to have two tunnels to implement

13   this broadcast scheme using two tunnels -- yeah.  I don't know

14   how to say it any simpler.

15   Q.   So how many tunnels are you illustrating here then?

16   A.   So the thing to note is this is a single

17   point-to-multipoint tunnel.  All of this, even though it looks

18   like it's got lots of tubes, it's one tunnel.

19   Q.   Do you see the labels primary path and secondary path?

20   A.   I do.

21   Q.   Why did you insert those labels?

22   A.   It's common in MPLS to sort of label the branches of this

23   point-to-multipoint tunnel.  You can think of this again as a

24   distribution tree, and as you branch out, it's common to label

25   the branches in terms of paths and calling one a primary path

1    and a secondary path.

2    Q.    Doctor Jeffay, do you see the excerpt from column 1 of

3    the '580 Patent at the top of this slide?

4    A.    I do.

5    Q.    And do you see where it says, "Network elements allocate

6    resources such as bandwidth to the services they provide"?

7    A.    I see that.

8    Q.    What is bandwidth?

9    A.    The common understanding of bandwidth is the number of

10   bits per second that can flow through a device.

11   Q.    Have you heard the term 'capacity' before?

12   A.    Yes.

13   Q.    What's -- what is capacity?

14   A.    Capacity is a measure of, for example, bandwidth.  It's a

15   reference to how much total traffic can go through a device

16   such as a router.

17   Q.    Is there any relevance between capacity and speed?

18   A.    Yes.  Typically the higher the capacity, the higher the

19   bandwidth.  And the higher the bandwidth, the faster data goes

20   through a routing device.

21   Q.    Do you see in the quote it says, allocate resources?

22   A.    Yes.

23   Q.    What does allocating resources mean?

24   A.    Well, resources is a term that the Court construed, and

25   you can think of it as essentially any -- any hardware or

1    software entity that exists inside the router that you can

2    allocate.  And allocate just means reserve for somebody

3    something.

4    Q.    Do you see at the bottom you have two pictures or two

5    routers' pictures?

6    A.    Yes.

7    Q.    And you see those gray tubes.  We have two on one, and

8    three on the other?

9    A.    Yes.

10   Q.    What are those intended to illustrate?

11   A.    So this is a picture of a router that I just slapped

12   these tubes on it, and I'm just trying to illustrate the point

13   of capacity.  If we think of capacity in terms of, for

14   example, the number of tunnels that a device can support, one

15   device might be able to support three tunnels.  Another device

16   might have less capacity and only be able to support two

17   tunnels.

18   Q.    So if we look at these illustrations, the router on the

19   left with two gray tubes are trying to illustrate that it can

20   support two tunnels.  Is that right?

21   A.    Correct.  It has lower capacity.

22   Q.    And on the right, you have an illustration to try and

23   show that -- a router that it could support three tunnels.

24   Correct?

25   A.    Correct.

1  Q.   Now, if we can turn to the next slide and pull up column

2  1, lines 46 through 61, of the '580 Patent, do you see a

3  discussion from the background of the '580 Patent?

4  A.   I see that.

5  Q.   So this is describing things that existed before the '580

6  Patent.  Right?

7  A.   Correct.

8  Q.   Now, if you look at the bottom paragraph, it says, "The

9  RSVP-TE protocol defines a shared explicit SE reservation

10  style that enables some bandwidth sharing."

11      Do you see that?

12  A.   I do.

13  Q.   And do you recall Doctor Valerdi talking about shared

14  explicit reservation styles yesterday?

15  A.   I do.

16  Q.   What does this passage tell you about whether shared

17  explicit reservation styles were known before the '580 Patent?

18  A.   So this is explicitly saying in the background section

19  that the shared explicit reservation style of RSVP-TE was

20  known and was known to enable bandwidth sharing.

21  Q.   Do you see the next sentence where it says, "The SE style

22  allows a receiver to explicitly specify the senders to be

23  included in a reservation message"?  Do you see that?

24  A.   I do.

25  Q.   What's the difference between a sender and a tunnel?

1   A.   They are completely different things.  The sender is

2   referring to the computer that is generating the packets, and

3   the tunnel is the structure in the network that is carrying

4   the packets.

5   Q.   Does shared explicit reservation relate to sharing of

6   tunnels or allowing different senders to share a single

7   tunnel?

8   A.   It's allowing different senders to share bandwidth in a

9   single tunnel.

10  Q.   Did the '580 Patent invent shared explicit reservations?

11  A.   No.

12  Q.   Doctor Jeffay, if we go to the next slide, you'll see an

13  excerpt from column 5 of the '580 Patent, and it's from lines

14  43 and on.

15       Do you see the statement, "Existing protocols, such as

16  the RSVP-TE SE style cited above"?  Do you see that?

17  A.   I do.

18  Q.   SE refers to shared explicit again.  Right?

19  A.   Correct.

20  Q.   So the rest of the sentence says -- well, I'll start at

21  the beginning.  "Existing protocols"--and then it goes

22  on--"provides some support for bandwidth sharing between

23  alternative instances of the same MPLS tunnel, but do not

24  enable resource sharing between separate tunnels."

25       Do you see that?

1    A.    I do.

2    Q.    What is an instance of a tunnel?

3    A.    Well, a tunnel can have multiple paths through it.  We

4    saw an example of that with the P2MP, but there are other

5    examples where you can have multiple paths through a single

6    tunnel and those paths are all still part of the same tunnel.

7    Q.    So the reference to instance is refers to paths of a

8    tunnel?

9    A.    Correct.

10   Q.    And you see here where it says, "There's some support for

11   bandwidth sharing between alternative instance of the same

12   MPLS tunnel."  What do you understand that to mean?

13   A.    That this protocol, RSVP-TE, with the SE reservation

14   style allows one to share bandwidth between paths of the same

15   tunnel.

16   Q.    And, again, this was an existing protocol from before the

17   '580 Patent.  Right?

18   A.    Correct.

19   Q.    Now, if we look at the illustration on the bottom, do you

20   see the blue tunnel -- the blue -- sorry, the blue tubes that

21   are labeled primary path and secondary path?

22   A.    Yes.

23   Q.    Can you explain what you're illustrating here?

24   A.    This is a hopefully not to too confusing attempt to

25   illustrate multiple paths of a single tunnel.

1    Q.   And what are you trying to show with the blue tube that's

2    kind of over the router with these two paths?

3    A.   So this is a tunnel that has two paths, but when they go

4    through the router, they go through the same blue tube.  And

5    what that indicates is that the data flowing on the primary

6    path and the data flowing on the secondary path would share

7    resources on the blue tube that goes through the router.

8    Q.   If we go back up to the quote on the top of this slide,

9    the end of it says, "But do not enable resource sharing

10   between separate tunnels."

11   A.   I see that.

12   Q.   What was not -- what were existing protocols not capable

13   of before the '580 Patent?

14   A.   So you could share resources between paths of a single

15   tunnel.  What you could not do is share resources between two

16   separate tunnels.

17   Q.   Doctor Jeffay, if we go to the next slide, 57, do you see

18   on the left figure 2 of the '580 Patent?

19   A.   I do.

20   Q.   And do you see the blue and yellow tube illustrations?

21   A.   Yes.

22   Q.   Does that -- are you intending to show two separate

23   tunnels there?

24   A.   Yes.

25   Q.   Prior to the '580 Patent, could two separate tunnels like

```
 1    this blue and yellow tunnel share resources?
 2    A.   No.  They each had to have their own separate allocation
 3    of resources.
 4    Q.   So if we look up for example at the top at this NE4 node,
 5    could the yellow and blue tunnels share resources in that
 6    flowed?
 7    A.    No.  And essentially I have an illustration of that to
 8    the right showing the yellow and the blue tunnels going
 9    through a router, and they each have their own separate tube
10    indicating that they each have their own independent resource
11    allocation.  They're not sharing anything.
12    Q.   What then was the problem that the '580 Patent was trying
13    to solve?
14    A.    Well, I've stated it here on this slide, but -- and we've
15    heard reference to this, that it's trying to allow you to
16    share resources more efficient -- share resources between
17    tunnels more efficiently so that you don't, for example, have
18    to increase the capacity of your router.  You can get by with
19    the router you have and possibly have more tunnels by allowing
20    sharing between tunnels.
21    Q.    If we look at the router on the bottom with two tunnel
22    capacity, is the problem trying to solve increasing it so I
23    can get more capacity or is it about being able to put more
24    tunnels in the capacity I already have?
25    A.    No, it's the latter.  It's allowing you to do more work,
```

1    if you will, without increasing the capacity of the device.

2    Q.    What was the solution of the '580 Patent?

3    A.    The solution is to share resources between separate

4    tunnels inside a device like a router.

5    Q.    Do you see the quote at the bottom?  It starts, "In

6    comparison with independent resource allocation, resource

7    sharing generally makes more efficient use of the capacity of

8    the network segments."

9         Do you see that?

10   A.    I do.

11   Q.    What does that tell you about the difference between the

12   solution of the '580 Patent and what existed before?

13   A.    Well, it's drawing a distinction.  It's saying prior to

14   the '580 Patent, you had resource allocation, but you only had

15   resource allocation that was done independently for tunnels.

16   Each tunnel had to have their own allocation.

17   Q.    And what is the illustration on the right showing?

18   A.    So this is my attempt to illustrate resource sharing

19   between what otherwise would be two separate tunnels.

20   Q.    And how were you showing that they're being shared in

21   your illustration?

22   A.    I'm showing that they're sharing -- they're sharing

23   resources because they're both using this common green

24   segment, green trying to indicate the combination of the blue

25   and the yellow.  So there's one reservation of resources here,

1    and it's being shared by the two separate tunnels, the blue

2    and the yellow tunnel.

3    Q.    Does the fact that this blue and yellow tunnel share

4    resources free up more resources in the -- in the router?

5    A.    Yes.  And that's the concept of if you can share, perhaps

6    you can make more efficient use of the resources and maybe now

7    other tunnels could be created through this router.

8    Q.    Doctor Jeffay, what are the potential problems with

9    sharing resources between two tunnels?

10   A.    Well, sharing can lead to problems.  I mean, if you have

11   to share something with your neighbor, I mean, it can lead to

12   contention.  I mean, you both want to use the shared resource

13   at the same time, so something has to arbitrate that.  So it

14   can increase resource utilization, but at the cost of some

15   contention problems.

16   Q.    Is there any additional complexity that's introduced by

17   having shared resources for separate tunnels?

18   A.    Yes.  You have to mitigate these -- you have to arbitrate

19   these contentions and that requires complexity.

20   Q.    What are the advantages of keeping tunnels separate

21   versus having them share resources?

22   A.    Well, allowing every tunnel to have their own resources

23   is simple.  Then there's no coordination that's required

24   between tunnels.  So if I can get all the resources I want and

25   have them dedicated to me, I'm going to be happy.

1  Q.   So if you have a system that needs more tunnels, what is

2  another option to increase capacity versus using shared

3  resources?

4  A.   Well, the other alternative is just to build a bigger

5  router, a device that has more capacity.

6  Q.   Doctor Jeffay, did you analyze Nokia's products in this

7  case with respect to the '580 Patent?

8  A.   I did.

9  Q.   Does Nokia -- do Nokia's products allow resource sharing

10  between tunnels?

11  A.   No, they do not.

12  Q.   How did Nokia handle the resource needs of its customers

13  if it does not allow resource sharing?

14  A.   They simply provide a range of products of varying

15  capacity.

16        MR. FRIST:  Mr. Carrillo, can we please bring up

17  JX 19a.

18  Q.   (BY MR. FRIST)  Doctor Jeffay, what is JX 19a?

19  A.   This is what I believe Mr. Valley referred to as their

20  routing portfolio poster.  It's a type of data sheet that

21  lists the routers and switches that are at issue in this case.

22  Q.   And why are there different size routers shown?

23  A.   There are certainly different size routers shown because

24  size, roughly, liquidates with capacity.  There is low

25  capacity devices and very high capacity devices.

```
1            MR. FRIST:  Mr. Carrillo, can we please bring up the

2    slides and go to slide 61?  Thank you.

3    Q.    (BY MR. FRIST)  Doctor Jeffay, does this slide include a

4    couple of the Nokia routers we saw in the prior document?

5    A.    Yes.  And here I'm just picking a sample to show the

6    spectrum of capacities that Nokia offers.

7    Q.    And what model devices are the two smaller ones on the

8    right?

9    A.    These are what are called 7705 SAR routers.

10   Q.    And what model devices are on the left?

11   A.    These are called 7950 XRS routers.

12   Q.    Just for perspective, if you look at the 7705 on the far

13   right, how big physically would that device be?

14   A.    We've heard the pizza box, and really and truly that is a

15   phrase we use in networking because the width and the height

16   of these things is about a pizza box; it's just not quite as

17   deep as a pizza box.

18   Q.    Can you pick it up and hold it in your hands?

19   A.    Oh, yeah, absolutely.

20   Q.    What about this big router on the left?  How big is that

21   guy?

22   A.    These are what are often referred to as big iron routers.

23   These are very large.  They can be six, seven feet tall, so

24   think about like a tall refrigerator.

25   Q.    How much does that router on the left weigh?
```

1   A.   They can weigh over a thousand pounds.

2   Q.   On the bottom of this demonstrative there is some bubbles

3   with 10 Gb/s all the way up to 96 Gb/s.  Do you see that?

4   A.   I do.

5   Q.   What's Gb/s stand for?

6   A.   Gb stands for gigabit per second, so it's a billion bits

7   per second.

8   Q.   What does Tb/s stand for?

9   A.   Tb stands for terabit per second, which is a trillion

10  bits per second.

11  Q.   So if we look at the 7705 10 gigabits per second and the

12  7950 96 terabits per second, what's the capacity difference

13  between those two routers?

14  A.   So make the analysis simple, it's approximately a

15  difference of 10,000.  So the 7950 on the left has about

16  10,000 times the capacity of the smaller 7705 on the right.

17  Q.   And you said 10,000.  Did I hear that correct?

18  A.   Correct.

19  Q.   So the router on the left with 10,000 times the capacity

20  of the router on the far right, what setting would you use

21  that?

22  A.   I'm sorry?

23  Q.   What setting would you the use the 7950 on the left?

24  A.   These large routers are also called metro routers, and

25  they're used in large metropolitan areas.

1    Q.    Can you give us some sense of how many people that could

2    service?

3    A.    So in terms of being able to process almost a hundred

4    terabits per second, you can do a little back-of-the-envelope

5    calculation, and if you get 10 million people together and

6    they all whip out their phones and they all watch -- they all

7    stream high definition video at the same time, a switch of a

8    router of this size has the capacity to process that volume of

9    traffic for 10 million users.

10   Q.    If we look at the smaller router on the right, what

11   context would that 7705 be used?

12   A.    These lower capacity routers have a variety of uses.

13   This is similar to the class of routers that I now have in my

14   lab and we have these in the computer science building where I

15   am.

16   Q.    Did you hear Doctor Valerdi state that the source code

17   for all of these devices is the same?

18   A.    I did.

19   Q.    And so under Doctor Valerdi's infringement opinions and

20   then later Doctor Cole's apportionment, all these devices

21   function the same, according to Doctor Valerdi and Doctor

22   Cole.  Right?

23   A.    That's my understanding of their position.

24   Q.    And you understand that all of their allegations relate

25   to those source code boxes over there.  Right?

```
 1   A.   Correct.

 2   Q.   And that source code would be in software.  Right?

 3   A.   I'm sorry?

 4   Q.   That source code would be in software.

 5   A.   Correct.

 6   Q.   And so if the software used in this device on the right

 7   is the same as the software used in the 7950, where do we get

 8   that 10,000 percent increase in performance?

 9   A.   Well, it's obviously not the software; it's all due to

10   the hardware.  The 7950 has much more sophisticated hardware

11   than the 7705 on the right.

12   Q.   Does the increase in performance have any relevance to

13   the functionality that's at issue in Smart Path's contentions?

14   A.   It does.

15   Q.   Let me ask it differently.  Does the increase from the 10

16   gigabytes per second to 96 terabits--that's 10,000 percent

17   increase--is that caused by the software or the hardware?

18   A.   It's -- just to correct the record, it's gigabit, 10

19   gigabit, and that is not due to the software.  That increase

20   is not due to the software.

21   Q.   All right.  Let's look at claim 1 -- or claim 15 of the

22   '580 Patent.

23        Do you see the claim element that requires a resource

24   sharing group of at least first and second tunnels?

25   A.   I see that.
```

1    Q.   Do Nokia products allow creation of a resource sharing

2    group of at least first and second tunnels?

3    A.   No.

4    Q.   Do you see in the bottom yellow and blue, do you see a

5    requirement to "allocate a resource associated with the

6    network element so as to share when the network element is

7    traversed by at least some of the tunnels in the

8    resource-sharing group, an allocation of the resource among

9    the at least some of the tunnels"?

10        Do you see that?

11   A.   I do.

12   Q.   Do Nokia products practice that limitation?

13   A.   No.

14   Q.   And just at a high level, why don't Nokia products

15   practice that limitation?

16   A.   We'll get into this in a little more detail, but the

17   simple statement is that Nokia does not allow you to form a

18   group of separate tunnels and share resources between separate

19   tunnels.

20        MR. FRIST:  Mr. Carrillo, can we please go to slide

21   75 really quick?

22   Q.   (BY MR. FRIST)  Doctor Jeffay, do you see on the screen

23   there's claims 8 and 12 along with claim 15?

24   A.   Yes.

25   Q.   And would your non-infringement opinions related to claim

1    15 apply equally to claim 8?

2    A.   Yes.  They carry over.

3    Q.   And do you see at the top in claim 8 there is a

4    notification of the affiliation with the resource sharing

5    group?  Do you see that?

6    A.   I do.

7    Q.   And do you have an opinion whether Nokia practices that

8    element?

9    A.   My opinion is they do not.

10   Q.   And do you see at the bottom there's the CAC module

11   element?

12   A.   I see that.

13   Q.   And it talks about being "traversed by at least some of

14   the tunnels in the resource sharing group to allocate a

15   resource associated with the network element so as to share an

16   allocation of the resource"?

17        Do you see that?

18   A.   I do.

19   Q.   Does Nokia practice that element?

20   A.   No.

21   Q.   All right.  Let's turn to Smart Path's allegations in

22   this case.

23             THE COURT:  Before you do that, we're going to take

24   a short break.  It's been two hours since we were back from

25   lunch.

1       Ladies and gentlemen of the jury, you can simply close

2  your notebooks and leave them in your chairs during this

3  recess.

4       Please remember to follow all my instructions about your

5  conduct, including, as you would expect me to remind you, not

6  to discuss the case among each other.  We'll take a short

7  break, use this opportunity to stretch your legs, and get a

8  drink of water.  We'll be back shortly to continue with this

9  examination.

10       The jury's excused for recess.

11            (Whereupon, the jury left the courtroom.)

12            THE COURT:  All right, counsel.  For your

13  information, at this moment Plaintiff has 4 hours and 30

14  minutes remaining trial time; Defendant has 4 hours and 18

15  minutes remaining trial time.

16       We'll try to make this short.

17       The Court stands in recess.

18                    (Brief recess.)

19            THE COURT:  Be seated, please.

20       Are you prepared to continue your examination, Mr. Frist?

21            MR. FRIST:  Yes, Your Honor.

22            THE COURT:  Let's bring in the jury.

23            (Whereupon, the jury entered the courtroom.)

24            THE COURT:  Please be seated.

25       Counsel, you may continue with your examination of Doctor

 1    Jeffay.

 2              MR. FRIST:  Thank you, Your Honor.

 3    Q.   (BY MR. FRIST)  Welcome back, Doctor Jeffay.

 4    A.   Thank you.

 5              MR. FRIST:  Mr. Carrillo, can you please bring up

 6    slide 61.

 7    Q.   (BY MR. FRIST)  Doctor Jeffay, do you recall us talking

 8    about the slide a little bit earlier and the different size

 9    routers Nokia provides?

10    A.   Yes.

11    Q.   Could you again let me know how Nokia makes routers to

12    fit the needs of its customers?

13    A.   They have basically different hardware platforms, ranging

14    from sort of low-end to very, very high end in terms of

15    capacity.

16    Q.   And you understand the '580 Patent is trying to address

17    this -- a capacity problem.  Right?

18    A.   Correct.

19    Q.   Did Nokia solve this capacity problem by making routers

20    bigger or by sharing resources between tunnels?

21    A.   They solved it by just having a range of routers,

22    including much, much larger routers.

23              MR. FRIST:  Mr. Carrillo, can you please go to slide

24    64?

25    Q.   (BY MR. FRIST)  Doctor Jeffay, what do you understand

1    that Smart Path is pointing to as the tunnel at issue here?

2    A.    They're pointing to, at a high level, what's called a

3    point-to-multipoint LSP.

4    Q.    And is that -- if we look kind of at the top of that Red

5    box, a point-to-multipoint P2MP?

6    A.    Yes.

7    Q.    Okay.  Now, just -- I probably should have said this

8    before, but this slide that's shown here is one of Doctor

9    Valerdi's slide, and then you added this red highlighting on

10   top.  Is that fair?

11   A.    Correct.  The red text and the red highlighting are mine.

12   Q.    Okay.  Now, is a point-to-multipoint LSP a tunnel?

13   A.    It is.

14   Q.    Okay.  What are -- at the bottom, if you look at the

15   bottom red block, there's something referred to as a set of

16   root-to-leaf sub-LSPs.  Do you see that?

17   A.    I do.

18   Q.    What are those?

19   A.    You can think of those essentially as the branches of the

20   distribution tree.

21   Q.    Are root-to-leaf sub-LSPs separate tunnels?

22   A.    No, they're not.

23   Q.    What are they, then?

24   A.    What the name says--they are sub-LSPs.  They are part of

25   an LSP, and they are part of a particular point-to-multipoint

1   or P2MP LSP.

2   Q.   Doctor Jeffay, can you please explain what you've

3   illustrated on slide 65?

4   A.   Sure.  This is the figure, again, that I used to

5   illustrate the basics of what a point-to-multipoint LSP are,

6   and, as I said, these source-to-leaf LSPs are essentially the

7   branches of the distribution tree, and they are paths within

8   the same LSP.

9   Q.   So how many tunnels are you illustrating on this slide?

10  A.   So, again, there are several tubes being shown here, but

11  this is all just one tunnel because it's one LSP.

12  Q.   What do the path and then in parentheses S2L refer to

13  with the labels here?

14  A.   With this type of LSP, you can have multiple paths

15  through the LSP through the tunnel, and I'm just illustrating

16  two sample paths.

17  Q.   Doctor Jeffay, did you review Nokia's technical

18  documentation in this case?

19  A.   I did.

20  Q.   Do you see JX 27a on slide 69?

21  A.   Yes.

22  Q.   What is JX 27a?

23  A.   This is a section that's common in hardware manuals like

24  this where the vendor lists the standards and the protocols

25  that the device supports.

1   Q.   Before we get to that section, do you see the title of

2   the document is "MPLS guide"?

3   A.   Yes.

4   Q.   What is an MPLS guide?

5   A.   You can think of it as a user manual for how you use and

6   configure MPLS within the products that are listed at the top

7   of the cover page.

8   Q.   And how big is this manual?

9   A.   It's huge.  It's -- I think it's close to 2,000 pages.

10  Q.   And is the page we're looking at here I think page 368?

11  A.   That sounds about right.

12  Q.   Okay.  Now, I think you started going there, but do you

13  see Section 5 at the top "standards and protocol support"?

14  A.   Yes.

15  Q.   What does that refer to?

16  A.   This is listing, as it says, the standards and protocols

17  that the devices listed on the cover page support.

18  Q.   Why is it important for Nokia to comply with these

19  standards?

20  A.   Because people like me, when we buy routers we want to

21  know what standards do they support, and so it's common to

22  list the standards that they support.  And again, these

23  standards are important because they enable interoperation.

24  Q.   And again, what is interoperation?

25  A.   The ability to allow you to use multiple vendors'

1   equipment in your network, basically.

2   Q.   And why is it important to be able to use multiple

3   vendors' equipment in the network?

4   A.   In my case it's so I can buy the cheapest equipment I

5   can.

6   Q.   When you consider the internet, is it common for it to be

7   just one network provider across the internet, or are you

8   going to have multiple providers?

9   A.   No, you're going to have multiple providers.  And

10  remember that devices here have to interoperate with devices

11  on the other side of the ocean.

12  Q.   What are the two standards you've highlighted in this

13  slide?

14  A.   RFC 3209, which is for RSVP-TE extensions for LSP

15  tunnels, and RFC 4875, which are additional extensions to

16  RSVP-TE but for point-to-multipoint label switch paths.

17  Q.   If we look at the standard at the bottom, RFC 4875,

18  that's the standard related to P2MP.  Correct?

19  A.   Correct.

20  Q.   Okay.  Have you reviewed Nokia's source code in this

21  case?

22  A.   I have.

23  Q.   Have you reviewed Nokia's technical documentation?

24  A.   I have.

25  Q.   Have you identified any differences between how Nokia's

1    products work from the way the standard describes the relevant

2    functionality?

3    A.    No.  I found no substantive differences.

4    Q.    Now, just quickly, on your source code review, did you

5    review the source code that Doctor Valerdi cited in this case?

6    A.    I did.

7    Q.    Did you work with anyone else in reviewing the source

8    code?

9    A.    I did.

10   Q.    Who was that?

11   A.    It was an individual by the name of Tom Brooks.

12   Q.    Who is Tom Brooks?

13   A.    He is a professional code reviewer.

14   Q.    And why did you work with Mr. Brooks?

15   A.    The code is voluminous and I used him to help orient

16   myself to the code so I could, in essence, see the forest from

17   the trees.

18   Q.    Is it common for -- in your work in research when you

19   have a large source code review project to team up to tackle

20   it?

21   A.    Yes.  It happens all the time.

22   Q.    And why does that happen all the time?

23   A.    It's just the most efficient way to get the job done.

24   Q.    Okay.

25          MR. FRIST:  Can we please bring up Doctor Valerdi's

1    slide No. 31?

2    Q.   (BY MR. FRIST)  Doctor Jeffay, do you recall Doctor

3    Valerdi testifying about this slide yesterday?

4    A.   I do.

5    Q.   And do you recall Doctor Valerdi's testimony that this

6    code relates to creating a P2MP LSP?

7              MR. HAYNES:  Your Honor, we need to seal the

8    courtroom.

9              MR. FRIST:  Sorry.  Thank you.

10             THE COURT:  All right.  You're requesting that the

11   courtroom be sealed, counsel?

12             MR. FRIST:  Yes, Your Honor.

13             THE COURT:  All right.  Then based on that request,

14   I'll order the courtroom sealed.  I'll direct that all persons

15   present who are not subject to the protective order which has

16   been entered in this case excuse themselves and remain outside

17   the courtroom until it's reopened and unsealed.

18                        (Courtroom sealed.)

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                              (Courtroom unsealed.)

1          THE COURT:  All right, counsel.  You may proceed.

2    The courtroom is open and unsealed.

3          MR. FRIST:  Thank you, Your Honor.

4    Q.   (BY MR. FRIST)  Doctor Jeffay, we were talking about the

5    path message on the left.  Let's talk about the RESV message.

6          What, if any, similarities are there between your

7    analysis between the RESV message and the path message?

8    A.   Well, the important point is that the RESV message also

9    contains a session object that is also specified by the same

10   portion of the RFC that we looked at earlier in Section

11   19.1.1.

12   Q.   Does Nokia implement its source code to use RESV messages

13   and path messages that are configured according to the

14   standard?

15   A.   Yes.

16   Q.   Doctor Jeffay, can you please summarize your position on

17   non-infringement with respect to the claims of the '580

18   Patent?

19   A.   Yes.  It's my opinion that the accused Nokia products do

20   not infringe claims 12 and 15 because they do not provide a

21   resource-sharing group of a first and second tunnel, and they

22   do not allow sharing of resources between separate first and

23   second tunnel.

24   Q.   Doctor Jeffay, I'd like to briefly talk about Nokia's

25   customers.  Okay?

1    A.    Okay.

2    Q.    Did you hear Mr. Valley testify that P2MP is not used in

3    the United States?

4    A.    I did.

5    Q.    Does that provide you any indication of whether all the

6    features that we've talked about today with P2MP LSP are ever

7    used in a Nokia product?

8    A.    It does, and it suggests that all the features we looked

9    at are never used in the U.S.

10   Q.    And do you see in the excerpt from JX 27a on the screen

11   from page 54 the statement "RSVP is not enabled by default and

12   must be explicitly enabled"?

13   A.    I see that.

14   Q.    What does that mean?

15   A.    RSVP is implemented in software, as we've seen, and

16   software can be turned on or off by other pieces of software.

17   And what this says is that the software that we've been

18   looking at for RSVP is not turned on by default, and that if

19   you want to use it, when you configure your device you have to

20   explicitly turn it on.

21   Q.    And what's the relationship, again, between RSVP and this

22   P2MP?  A lot of acronyms that we've been discussing today.

23   A.    Yes.  There are a lot of acronyms.  RSVP is the name of

24   the protocol that is used to create the P2MP LSPs or the P2MP

25   tunnels.

1    Q.    So what does the fact that RSVP is disabled in Nokia's

2    products and the P2MP is not used in the United States tell

3    you about whether Nokia encourages its customers to use the

4    features we've been talking about?

5    A.    This is telling me that Nokia is not encouraging its

6    customers to use these features.

7    Q.    All right.  Doctor Jeffay, I'd like to shift topics and

8    talk about your invalidity opinions for the '580 Patent.

9    A.    Okay.

10    Q.    Did you perform a similar process for assessing whether

11    the '580 Patent was invalid, similar to what you did for the

12    '010 Patent?

13    A.    Yes, it was very similar.

14    Q.    Can you briefly describe it again?

15    A.    So, again, I considered all the materials that I've

16    mentioned, and, in addition, I looked for documents describing

17    the state of the art prior to the '580 Patent.

18    Q.    And did you again consider Smart Path's infringement case

19    and how that may impact the issue of invalidity?

20    A.    I did.

21    Q.    And what was the results of that analysis?

22    A.    So, again, it's a bit of a nuanced opinion, but my

23    opinion is, first and foremost, that the '580 Patent is not

24    infringed.  If the jury were to disagree with me and accept

25    Doctor Valerdi's analysis, my opinion is that the patent is

 1    invalid because the features that Doctor Valerdi is relying on

 2    to show infringement are found in the art before the date of

 3    the '580 Patent.

 4    Q.   I asked you a similar question with the '010 Patent, but

 5    your opinions on invalidity don't change any of the testimony

 6    you've provided related to non-infringement.  Correct?

 7    A.   Correct.

 8    Q.   So can you explain one more time, how do your invalidity

 9    opinions live in harmony with your non-infringement opinions?

10    A.   Yes.  So I believe under the proper interpretation of the

11    '580 Patent, the patent is not infringed.  If one were to

12    disagree and accept Doctor Valerdi's interpretation of the

13    '580 Patent, then my opinion is the patent is invalid because,

14    again, the features that he's relying on to show infringement

15    existed before the date of the '580 Patent.

16              MR. FRIST:  Mr. Carrillo, can you please bring up

17    DX 35?

18    Q.   (BY MR. FRIST)  Doctor Jeffay, what is DX 35?

19    A.   This is what's colloquially referred to as an internet

20    draft.

21    Q.   And what is this an internet draft of?

22    A.   This is a draft of the document that eventually became

23    RFC 4875, which is the standard for the use of RSVP-TE to

24    establish point-to-multipoint traffic engineered LSPs or P2MP

25    LSPs.

1    Q.   Do you see the title "extensions to RSVP-TE for

2    point-to-multipoint LSPs"?

3    A.   Yes.

4    Q.   What does that tell you about the relation between this

5    document and the P2MP standard we were looking at earlier?

6    A.   This is, as I say, a predecessor document, but this is a

7    document that was along the line of drafts that led to the

8    final RFC.

9    Q.   What was the date this was published?

10   A.   We can see it here as October 2005.

11   Q.   Is that before the '580 Patent?

12   A.   Yes.

13   Q.   Okay.  How does -- is this an IETF document?

14   A.   It is.

15   Q.   How does IETF publish documents?

16   A.   IETF maintains a set of websites where these things are

17   published, when they're released, and, in addition, this is

18   coming out of a working group within the IETF, and working

19   groups also maintain websites where they distribute drafts.

20   Q.   Who are the draft documents from these working groups

21   made available to?

22   A.   Anyone who is interested.  Today you can go to the IETF's

23   website and look at current drafts.

24   Q.   And how do you know when this specific draft or DX 35 was

25   made available?

1   A.   Because it says that it was released in October 2005.

2   Q.   And what's your personal experience with the accuracy of

3   those dates?

4   A.   I have participated in several working groups within the

5   IETF over the years, and my experience is that there's demand

6   for these drafts.  So when they come out, people want them,

7   and they are released on or about the date that is listed on

8   the front page.

9   Q.   Doctor Jeffay, did you compare -- actually I have one

10  more question.

11             MR. FRIST:  Can we slide up on this document a

12  little bit so we can see the authors at the top, Mr. Carrillo?

13  Q.   (BY MR. FRIST)  Do you see the authors of this document?

14  A.   Yes.

15  Q.   Who are the three authors?

16  A.   A Mr. Aggarwal, a Mr. Papademetriou, and a Mr. Yasukawa.

17  Q.   I want to focus on Mr. Papademetriou, who we talked about

18  earlier.  Who did he work for again?

19  A.   He worked for Alcatel, which is now Nokia.

20  Q.   And what is the relationship between Alcatel and Nokia

21  again?

22  A.   As I say, Alcatel is now Nokia.

23  Q.   So did Nokia have a vital role to drafting this P2MP

24  standard?

25  A.   Yes.  One of their employees was an editor.

1    Q.   Now, did you compare this draft RFC 4875 to the final

2    standard?

3    A.   I did.

4    Q.   Did you notice any material differences to the issues

5    we've been talking about?

6    A.   No.  And generally the draft is very, very close to the

7    final RFC.

8         MR. FRIST:  If we can please bring up slide 81.

9         Thank you, Mr. Carrillo.

10   Q.   (BY MR. FRIST)  On the left do you see you have call-outs

11   from RFC 4875?

12   A.   Correct.

13   Q.   And that's what's being used for the allegations of

14   infringement against Nokia's products.  Right?

15   A.   Yes.  The features that are described in RFC 4875 are

16   what is being accused.

17   Q.   And just for the record, the call-outs here are from

18   DX 34.  And you have Section 4.4 and 5.2 on the screen.  Is

19   that right?

20   A.   That's correct.

21   Q.   On the right you've got images from DX 35, which is this

22   RFC 4875 draft.  Right?

23   A.   I believe that is correct.

24   Q.   Okay.  And you have the same sections from both standards

25   on the screen.  Right?

1   A.   Correct.

2   Q.   Does the RFC 4875 draft disclose the same type of P2MP

3   LSP that's disclosed in RFC 4875?

4   A.   Yes.  You can see here that the text is -- I believe it's

5   actually identical.

6   Q.   And if we look at the top quote in Section 5.2, and it's

7   identical in both sections, it says, "Another S2L sub-LSP

8   belonging to the same instance of this S2L sub-LSP, i.e., the

9   same P2MP LSP shares resources with this S2L sub-LSP."

10       Do you see that?

11  A.   I do.

12  Q.   And that was already in the RFC 4875 draft that predates

13  the '580 Patent.  Right?

14  A.   Correct.

15           MR. FRIST:  If we can please --

16  Q.   (BY MR. FRIST)  Well, let me ask you a question.  Do you

17  remember Mr. Aggarwal --

18           MR. FRIST:  Actually let me bring up --

19  Q.   (BY MR. FRIST)  Let me withdraw that question.

20           MR. FRIST:  Mr. Carrillo, can you please bring back

21  up DX 35?

22  Q.   Do you remember the top author here is R. Aggrawal?

23  A.   Yes.

24  Q.   Did you look for any other work related to Mr. Aggarwal

25  related to P2MP?

```
1    A.    Yes.

2    Q.    And what did you find?

3    A.    I found that Mr. Aggarwal was applying for patents

4    directly related to the technology that he was working on

5    within the IETF.

6    Q.    Did Mr. Aggarwal work for Smart Path or Orckit?

7    A.    No.

8    Q.    Who did he work for?

9    A.    He worked for Juniper Networks.

10   Q.    Who is Juniper Networks?

11   A.    Most people may not have heard of them, but they are a

12   very large major networking hardware provider.

13         MR. FRIST:  Can we please bring up DX 1,

14   Mr. Carrillo?

15   Q.    (BY MR. FRIST)  Doctor Jeffay, do you see DX 1 shown on

16   the screen?

17   A.    I do.

18   Q.    What is DX 1?

19   A.    This is the cover page of an application for a patent by

20   Mr. Aggarwal.

21   Q.    Is that the same R. Aggarwal that helped draft the RFC

22   4875 that we looked at?

23   A.    I believe it is.

24   Q.    Okay.  Now, when did this patent application get filed?

25   A.    We can see just below that it was filed in January of
```

1    2005.

2    Q.    And was that before the '580 Patent?

3    A.    It was.

4    Q.    And do you see the publication date at the top?  When was

5    that?

6    A.    It was published in August of 2005.

7    Q.    And was that before the '580 Patent?

8    A.    Yes.

9    Q.    Okay.  If you look at the title, it says "MPLS traffic

10   engineering for point-to-multipoint label switched paths."

11         Do you see that?

12   A.    Yes.

13   Q.    What's the relationship between these point-to-multipoint

14   label switched paths and the P2MP LSPs and the draft RFC

15   document we were looking at?

16   A.    They are the same.

17   Q.    Okay.  Is it okay if I refer to this patent as the

18   Aggarwal patent or Aggarwal?

19   A.    Sure, that's fine with me.

20   Q.    Okay.  At a high level, what is Aggarwal directed to?

21   A.    Well, Aggarwal, this application is about precisely what

22   the title says.  So it's MPLS, it's traffic engineering, which

23   is RESVP, and it's traffic engineering for these

24   point-to-multipoint LSPs that we've been speaking about, or

25   these point-to-multipoint tunnels.

1    Q.   And would a person of ordinary skill in the art--you

2    recall we started with that, defining that person of ordinary

3    skill--would that person have been motivated to combine the

4    Aggarwal patent with the RFC 4875 draft?

5    A.   Yes, I believe they would.

6    Q.   Can you explain what it means to combine two references

7    to the jury?

8    A.   Sure.  Combining two references means take the teachings

9    of them to combine something that's maybe greater than the sum

10   of the parts.

11   Q.   And why would a person of ordinary skill in the art be

12   motivated to combine this Aggarwal patent with the RFC 4875

13   draft?

14   A.   Well, there are several reasons.  A person of skill in

15   the art looking at this Aggarwal application, who is

16   interested in point-to-multipoint LSPs, would get a good

17   understanding of what Aggarwal is proposing, and if they

18   wanted to actually implement this, they might seek out some

19   additional details on what Aggarwal is talking about.  And

20   those additional details can be found in the RFC draft.  And

21   so -- and a person of skill, in particular, would note

22   favorably that the draft and this patent are authored -- have

23   the same primary author, so they would expect some

24   compatibility between them and they would recognize they're on

25   the same topic, and the draft simply just provides more

1    details for an implementation.

2    Q.    Did you prepare some slides to walk through your

3    invalidity opinions related to this patent and that draft --

4    A.    Yes.

5    Q.    -- RFC document?

6            MR. FRIST:  Mr. Carrillo, can you please bring up

7    slide 82?

8    Q.    (BY MR. FRIST)  Doctor Jeffay, on this screen we have

9    claim 15.  And do you see some boxes that we can use to check

10   off during our exercise?

11   A.    Yes, I see that.

12   Q.    Okay.  Let's start with the first element or preamble of

13   claim 15.

14        Do you see it requires "a computer software product used

15   in a network element, the product comprising a

16   computer-readable medium, in which program instructions are

17   stored, which instructions, when read by a computer, cause the

18   computer" and then it stops there?

19        Do you see that?

20   A.    I do.

21   Q.    Does Aggarwal and the RFC 4875 draft render obvious that

22   element?

23   A.    They do.

24   Q.    And I see you have paragraph 31, or part of paragraph 31,

25   and paragraph 108 on the screen.  Can you explain your

1    opinions with regard to those paragraphs?

2    A.   Yes.  Paragraph 108 is describing the components of a

3    network element, and, in particular, we can see the second

4    from the bottom blue line--in the blue highlight, rather--it

5    says that there's software that can rely--sorry--that can

6    reside on there.  And so that would be disclosure of a

7    computer software product in a network element.

8    Q.   What does the Aggarwal paragraph disclose in paragraph 31

9    about whether this computer software product would be able to

10   create P2MP LSPs?

11   A.   It's describing all of Aggarwal is about creating these

12   P2MP LSPs.

13   Q.   Can we put a checkmark for the preamble?

14   A.   Yes.

15   Q.   All right.  Let's turn to the next element, which is 15a.

16   You see it requires "to accept a notification, distributed

17   over a communication network, of an affiliation with a

18   resource-sharing group of at least first and second tunnels,

19   which have respective origin, network elements, and

20   termination network elements, and which traverse different

21   routes through the network."

22        Do you see that?

23   A.   I do.

24   Q.   Does the combination of Aggarwal and RFC 4875 disclose

25   that element --

1    A.    It does.  I'm sorry.

2    Q.    -- under Smart Path's interpretation of the claims?

3    A.    It does.

4    Q.    Okay.  What was Smart Path pointing to in Nokia's

5    products as this notification of this resource-sharing group?

6    A.    They were pointing to Nokia's implementation of the path

7    message as specified in RFC 4875.

8    Q.    And that's a path message for a P2MP LSP?

9    A.    Correct.

10   Q.    Does the RFC 4875 draft disclose similar features to what

11   Smart Path is pointing to in Nokia's products?

12   A.    Yes.

13   Q.    Can you explain how?

14   A.    It discloses the same features.  The path message was

15   identified as the notification, and the affiliation with a

16   resource-sharing group was identified as the list of sub-LSP

17   descriptors that are carried within a path message.

18   Q.    And would the sub-LSP descriptors that you mentioned

19   cause the P2MP to have different termination network elements

20   for the different S2Ls?

21   A.    It would.

22   Q.    Okay.  And could a path message set up multiple of these

23   S2Ls?

24   A.    Yes, it can set up -- in combination with the

25   corresponding RESV message, it can set up a whole distribution

1    tree.

2    Q.    And would those S2Ls be set up as part of a P2MP LSP?

3    A.    Yes.

4    Q.    Okay.  Now, There was also discussion of an RESV message

5    in relation to infringement.  Do you recall that?

6    A.    Yes.

7    Q.    What does the RFC 4875 draft disclose regarding this RESV

8    message?

9    A.    So this is the message that actually establishes the

10   reservation, and it also will contain a descriptor list of

11   these S2L sub-LSPs, or the branches of the distribution tree.

12   Q.    Okay.  Have we covered all of 15a in your opinion, Doctor

13   Jeffay?

14   A.    Yes, the sub-S2Ls cover the -- according to Doctor

15   Valerdi, they constitute a resource-sharing group and at least

16   a first and a second tunnel.

17   Q.    All right.  So can we put a checkmark for 15a?

18   A.    Yes.

19   Q.    All right.  Let's move to element 15b.  You see it

20   requires "to allocate a resource associated with the network

21   element so as to share, when the network element is traversed

22   by at least some of the tunnels in the resource-sharing group,

23   an allocation of the resource among the at least some of the

24   tunnels responsively to the notification."

25         Do you see that?

1    A.   I do.

2    Q.   What notification does the RFC 4875 draft disclose?

3    A.   It discloses two notifications.  There is the path

4    message which will be the notification of what Doctor Valerdi

5    alleges is the resource-sharing group of a first and second

6    tunnel, and then there is the RESV message which would be the

7    -- correspond to the allocation of resources associated with

8    the notification.

9    Q.   And just to go back two slides, we were talking about the

10   path message earlier, and I want to make sure we've

11   highlighted sections we were looking at in the path message

12   where Section 5.1 and 4.4.1 of DX 35.  Is that right?

13   A.   Yes, I believe that's correct.

14   Q.   And RESV message, that was Section 5.1 again--RFC 4875.

15   Right?

16   A.   Correct.  And we're also citing section 4.4.1.

17   Q.   Thank you.

18        And these messages, the path and RESV messages that we

19   talked about, what's their relationship to the notification

20   that's identified in element 15b?

21   A.   Doctor Valerdi has relied on these messages to be the

22   notifications of the -- of claim 15.

23   Q.   And do these notifications -- can they be used to set up

24   and share resources among S2Ls?

25   A.   They can.

1    Q.    Okay.  And under Smart Path's interpretation of the

2    claims, then --

3    A.    Yes.

4    Q.    -- would the disclosure of Section 5.2 and the sections

5    we just talked about in RFC 4875 render obvious element 15b?

6    A.    Yes.  Under Doctor Valerdi's assertion that the sub-LSPs

7    constitute separate tunnels.

8    Q.    And just to be clear, how would the S2Ls be set up or how

9    would an allocation of resources be responsive to the

10   notification?

11   A.    The allocation of resources happens in response to the

12   receipt of an RESV message.

13   Q.    Can we add a checkmark for this element?

14   A.    Yes.

15   Q.    And just to make sure we covered our bases, do you see

16   Section 6.2 and 6.4 of DX 35?

17   A.    Yes.

18   Q.    Do those -- what do those relate to?

19   A.    This is text describing the processing that occurs upon

20   the receipt of an RESV message.

21   Q.    Okay.  Can we add a checkmark for element 15b now?

22   A.    Yes.

23   Q.    All right.  Do you see the last element of 15c, "wherein

24   the tunnels meet at least one condition selected from the

25   group of conditions consisting of:" and it talks about the

1    origin and termination network elements being -- one of them

2    being different?

3        Do you see that?

4    A.    I do.

5    Q.    How does Aggarwal and the RFC 4875 draft render that

6    element obviously under Smart Path's interpretation of the

7    claims?

8    A.    They provide examples of point-to-multipoint LSPs that

9    are set up according to the path and RESV message, and the

10   examples that they show disclose what Doctor Valerdi alleges

11   are multiple tunnels, but these alleged multiple tunnels will

12   have different termination elements, terminate at different

13   points.

14   Q.    Do you see on the top of Aggarwal the points R4 and R3

15   nodes?

16   A.    I do.

17   Q.    What does that show you regarding whether there are

18   different termination network elements?

19   A.    What Aggarwal discloses is that the source is at the top

20   of the figure and the termination elements are at the bottom

21   of the figure, so this shows a point-to-multipoint LSP

22   terminating at multiple points at multiple network elements.

23   Q.    Okay.  Can we add a checkmark for the last element of

24   claim 15, element c?

25   A.    Yes.

1   Q.   Now, Doctor Jeffay, on slide 89 there is a comparison

2   between claim 8 and claim 15.

3   A.   That's correct.

4   Q.   And do you see -- you inserted some highlighting to show

5   the similarities and differences between 8 and 15.

6   A.   Correct.

7   Q.   We've got to walk through claim 8 to make sure I cover my

8   bases here, but my question for you is, do your opinions

9   regarding claim 15 apply equally to claim 8 where the colors

10  match?

11  A.   Yes.  For the color-matching, the text is substantially

12  the same and the analysis that I've done for the respective

13  colors in claim 15 applies to claim 8.

14  Q.   Let's just briefly go through claim 8.

15       Do you see "the network interface element for

16  communicating with other elements in a communication network"?

17  A.   I do.

18  Q.   And how does the RFC 4875 in combination with Aggarwal

19  render that element obvious?

20  A.   It has examples of network elements--routers, for

21  example--in the figures we've just shown, and a person of

22  skill would understand that in order to do the communications,

23  those elements have to have network interfaces.

24  Q.   Do you see the next element that starts "a processor,"

25  and see the yellow highlighting that goes all the way through

1    "which traverse different routes through the network" and then

2    there's a comma?

3    A.   Yes.

4    Q.   Does Aggarwal and the RFC 4875 render that limitation

5    obvious?

6    A.   Yes.

7    Q.   And why is that, again, briefly?

8    A.   Briefly, Aggarwal does disclose a processor to execute

9    the software of its methods.  We looked at that text and I

10   described how the path and RESV messages work in combination

11   to provide the claimed notification.

12   Q.   And what about "the alleged resource-sharing group of at

13   least first and second tunnels" under Smart Path's

14   interpretation?

15   A.   We walked through that about how that's the descriptor

16   list for the sub-LSPs, that's the affiliation, and Doctor

17   Valerdi believes that the LSPs the sub- -- the S2L sub-LSPs

18   can constitute the first and second tunnels.

19   Q.   Can you see the part in orange where it begins "wherein,

20   the tunnels meet at least one condition selected from" and

21   goes all the way down to "the termination network elements of

22   the first and second tunnels are different"?

23   A.   Yes.

24   Q.   Briefly, what is your opinion regarding whether that

25   element is rendered obvious by Aggarwal and this RFC draft, in

1    light of your comments on claim 15?

2    A.   It's rendered obvious because I showed you the examples

3    of point-to-multipoint LSPs in Aggarwal and the draft RFC that

4    meet the requirements of this claim element.

5    Q.   And do you see the last requirement starts "the processor

6    comprising a call admission control module," and goes through

7    "tunnels responsively to the notification"?

8    A.   Yes.

9    Q.   Now, you understand 'call admission control module',

10   that's been construed by the Court.  Correct?

11   A.   Correct.

12   Q.   All right.  We're going to touch on that in a second, but

13   let's focus on the green part which goes from "which is

14   arranged" all the way through "responsively to the

15   notification."

16       Why is that rendered obvious by Aggarwal plus RFC 4875?

17   A.   We've talked about how under Doctor Valerdi's

18   interpretation of what constitutes separate tunnels, the RESV

19   message will allocate resources associated with the network

20   element, the element processing the RESV message, to share

21   resources between the S2L sub-LSPs that Doctor Valerdi--excuse

22   me; I apologize--Doctor Valerdi has alleged are the at least

23   first and second tunnels.

24           MR. FRIST:  Let's go to the next slide.

25   Q.   (BY MR. FRIST)  So here, Doctor Jeffay, do you see the

1    highlighting in the call admission control module?

2    A.   Yes.

3    Q.   On the right is the Court's construction of that module

4    with a function and structure.  Do you see that?

5    A.   Yes.

6    Q.   Did you determine whether the RFC 4875 draft in

7    combination with Aggarwal would render this obvious?

8    A.   I did.

9    Q.   Do you see "the function is allocating a resource

10   associated with a network element so as to share an allocation

11   of the resource -- of the resource among the at least some of

12   the tunnels responsively to the notification"?

13   A.   I see that.

14   Q.   I think there may be a typo on the slide that I

15   apologize.  It's a dual of the resource.

16        But does that function mirror the language in green which

17   was the part we reviewed already.

18   A.   It does.  And we did walk through how this function is

19   performed under Doctor Valerdi's interpretation of the claims

20   in the RFC draft.

21   Q.   Do you see "the structure as a processor programmed to

22   allocate shared resources among tunnels having identical SGI

23   values and equivalents thereof"?

24   A.   Yes.

25   Q.   And does Aggarwal and RFC 4875 render that structure

1    obvious?

2    A.    It does.

3    Q.    And how does it do so?

4    A.    Aggarwal, again, discloses a processor configured with

5    software to perform its methods, and Aggarwal discloses the

6    actual reservation process, which under Doctor Valerdi's

7    interpretations of the claims would meet this claim element.

8    Q.    What would the alleged SGI -- or what would the SGI value

9    be in the context of RFC 4875 draft under Smart Path's

10   interpretation of the claims?

11   A.    It would be the data structure that is used to record --

12   to represent the reservation within the network element of

13   Aggarwal and RFC 4875.

14   Q.    And would that include the P2MP ID, tunnel ID, and

15   extended tunnel ID?

16   A.    Yes.

17   Q.    Okay.  Based on that, what is your opinion with respect

18   to the -- whether claim 8 is obvious in light of Aggarwal plus

19   the RFC 4875 draft?

20   A.    That those two references combined render obvious this

21   claim element under the Court's constructions applying Doctor

22   Valerdi's interpretation of that construction.

23   Q.    Doctor Jeffay, one last piece here.  Do you see the

24   additional elements of claim 12 that require "wherein, the

25   resource comprises a bandwidth on a common network segment

1    connected to the network element and traversed by the routes"?

2    A.    I see that.

3    Q.    How does Aggarwal in combination with RFC 4875 render

4    this obvious?

5    A.    Well, both of them, again, have an example of a

6    point-to-multipoint LSP tunnel, and they both show links that

7    would be shared by tunnels according and under Doctor

8    Valerdi's interpretation of the claims; so, for example, the

9    link from A to B, or B to E, or E to H in the figure from the

10    RFC draft.

11    Q.    And that's from DX 35 at pages 9 to 10.  Is that right?

12    A.    I believe that's correct.

13    Q.    And if you look at the top, there's a figure from

14    Aggarwal as well.  Do you see that?

15    A.    Yes.

16    Q.    And how does that show the common network segments?

17    A.    It shows common networks segments, for example, from PE 1

18    to--I can't actually read it--to P1 and PE 4.

19    Q.    Thank you, Doctor Jeffay.

20        Doctor Jeffay, after walking through all the elements of

21    the claims of the '580 Patent, using the RFC 4875 draft, can

22    you again summarize the premise to your invalidity opinions in

23    this case?

24    A.    So the premise to my invalidity opinions is that if

25    Doctor Valerdi's interpretation or application of the claims

1    to Nokia is correct, the specific elements and features that

2    Nokia has implemented are those that are in RFC 4875, in

3    particular the draft, and, therefore, they were in the prior

4    art and, therefore, the patent is invalid.

5    Q.    Do your conclusions show that the accused features in

6    Nokia's products were developed before the '580 Patent?

7    A.    What it was implementing was developed before the '580

8    Patent.

9    Q.    Thank you for that clarification.

10          MR. FRIST:   If we can please go to slide 100.

11    Q.    (BY MR. FRIST)  And shift topics.  Or actually let's just

12    do one last slide.  Sorry, Doctor Jeffay.

13          Can you just summarize, overall, your opinions on the

14    '580 Patent?

15    A.    Yes.  Again, it's a somewhat nuanced summary opinion.  My

16    core opinion is the '580 Patent is not infringed; but were the

17    jury to find it infringed and accept Doctor Valerdi's

18    analysis, then my opinion is it has to be invalid.

19    Q.    Doctor Jeffay, I'd like to shift topics, as I mentioned,

20    and talk about certain of Nokia's licenses.  Okay?

21    A.    Okay.

22    Q.    Did you review some of Nokia's licenses in this case?

23    A.    I did.

24    Q.    And do you understand that your review of those licenses

25    was to assist Nokia's damages expert Ms. Bennis?

```
 1    A.   Yes.

 2    Q.   At a high level, could you explain what you were doing

 3    with this technical analysis of these licenses?

 4    A.   Yes.  So I was given some licenses, which sort of look

 5    like contracts, and these licenses make reference to a series

 6    of patents.  And for each license, I took a sample of the

 7    patents in those licenses and got copies of them and reviewed

 8    them and determined that those patents were comparable to the

 9    patents-in-suit here, and that they also -- those licenses and

10    the patents in those licenses were covering the same products

11    that are at issue here.

12    Q.   What are the three agreements that you looked at in this

13    case?

14    A.   They were all with third-party companies.  And I've

15    abbreviated the names of those companies on this slide as

16    Parity, Packet, and Implicit.

17    Q.   And do you see the exhibit numbers are Exhibits 9a, 9b,

18    and 9c that are shown on this slide?

19    A.   I don't think we can see 9a, but I'll take your word for

20    it that it's there.

21         MR. FRIST:  Why don't we bring up 9a real quick.

22    Never mind.  We won't bring it.

23         Your Honor, I believe we need to seal the courtroom just

24    for that slide.

25         THE COURT:  All right.
```

885

1          MR. FRIST:  Never mind, Your Honor.  I'm told I'm

2     overreaching there.  I apologize.

3          THE COURT:  Whatever you want to do.  It's your

4     time.  I don't know who's pulling the string, but whatever you

5     want to do.

6          MR. FRIST:  Thank you, Your Honor.

7     Q.   (BY MR. FRIST)  Doctor Jeffay, what were the -- what is

8     the relationship between -- from a technical standpoint

9     between the patents you looked at for the Parity, Packet, and

10    Implicit agreements to the patents-in-suit?

11    A.   I would say at a high level they're comparable.  They all

12    involve aspects of protocol processing in a device like a

13    router.

14    Q.   Which -- what is the relationship between the products

15    covered by those licenses and the products at issue in this

16    case?

17    A.   My recollection is they're the same.  They're one and the

18    same.

19    Q.   How does that inform your opinion regarding where the

20    technology at issue in those licenses is technically

21    comparable to the patents at issue in this case?

22    A.   Well, another basis for arguing that they're comparable

23    is because they're directed to the same products.

24    Q.   Thank you, Doctor Jeffay.

25         I'd like to shift topics again and talk about your

1    analysis of Doctor Cole's apportionment.  Okay?

2    A.    Okay.

3    Q.    Were you here in the courtroom earlier today and I guess

4    part of yesterday to hear Doctor Cole testify?

5    A.    I was.

6    Q.    Do you agree with how Doctor Cole apportioned the alleged

7    value of these patents?

8    A.    No.

9    Q.    What were your -- what is your response to his process?

10   A.    I think my criticism is more with how he's applied his

11   process.  I disagree with the decisions that he's made during

12   the course of applying his process.

13   Q.    Well, do you recall that Doctor Cole separated hardware

14   and software and allocated 75 percent to hardware and 25

15   percent to software?  Do you recall that?

16   A.    Yes.  That was one of the first decisions he made.

17   Q.    And do you agree with that line he drew?

18   A.    No.

19   Q.    Why not?

20   A.    Because the Nokia products span -- as we've seen, they

21   span a wide range of capabilities, and those capabilities only

22   result -- only derive from the hardware.  So certain of the

23   products are going to drive phenomenal amount of value from

24   the hardware and other products less so, and having -- it's

25   not a one-size-fits-all scenario.

1    Q.    Do you recall that Doctor Cole used a single 7250

2    brochure in his analysis?

3    A.    Yes.

4    Q.    Do you believe that that brochure is representative of

5    all the features in Nokia's products?

6    A.    No.

7    Q.    How many thousands of pages of manuals and source code

8    have you reviewed in this case?

9    A.    It's a lot; I mean, thousands.

10   Q.    Do those brochures even touch on the scope of the

11   features that are included in Nokia's products?

12   A.    No, no.  They don't even cause a dent in it.

13            MR. FRIST:  If we can please bring up slide 109.

14   Q.    (BY MR. FRIST)  Doctor Jeffay, here you've got columns

15   labeled '010 '599, and '580 Patent.  Do you see that?

16   A.    I do.

17   Q.    What were you trying to include in each of those columns?

18   A.    So in each column I have -- if I have Doctor Cole's

19   terminology right, I have what he described as features;

20   features that he was attributing to the -- to each of the

21   patents at the top of the column.

22   Q.    And the features shown here are just the features that

23   Doctor Cole selected; they don't include the other four or

24   five features that he did not select.  Correct?

25   A.    Correct.  He ultimately considered a class of nine

1    features, and these are the ones that he believes for which

2    there is infringement.

3    Q.    And if we look at the top, there's that blue box around

4    'networks protocol'.  What does that include in that blue box?

5    A.    Well, it includes what I believe Doctor Cole referred to

6    as components.  So all of the bullet items are components that

7    he has alleged infringe the patent at the top of the column.

8    Q.    So all you've included in that box are the components

9    that Doctor Cole found infringing; you've not included the

10   other components that he found not infringing.  Correct?

11   A.    Correct.

12   Q.    Okay.  If we look at the 'networks protocol' category in

13   blue at the top, what are the similarities between the

14   features identified for each of the asserted patents?

15   A.    Despite being different patents, he has identified

16   exactly the same components.

17   Q.    Looking at the 'platform' category in green, what are the

18   similarities between the features identified for the

19   'platform' category across each of the patents?

20   A.    They are all exactly the same.

21   Q.    For the 'QoS and traffic management feature', what is the

22   overlap, if any, between the identification of features across

23   the patents?

24   A.    They're all the same.

25   Q.    For the last category, services, it's only under the '599

1    and '580 Patent.  Is that right?

2    A.    Correct.

3    Q.    What is the overlap there?

4    A.    They're a hundred percent overlap.

5    Q.    If you just take Doctor Cole's apportionment value at

6    face value, because of the overlap between these categories,

7    what is the maximum combined value for these three patents?

8    A.    It would be, for example, 5.48 percent.

9    Q.    Okay.  Now, let's look at one of these categories for a

10    minute.  Let's look at 'QoS and traffic management'.

11    A.    Okay.

12    Q.    Did Doctor Cole -- I mean -- sorry.  Did Doctor Valerdi

13    provide any infringement opinions regarding the features

14    identified in that category?

15    A.    No, there has been no mention of any of these features so

16    far in this case, that I recall.

17    Q.    Now, during Doctor Valerdi's testimony, there was a

18    reference to QoS at one point.  Right?

19    A.    Correct.

20    Q.    Why is this category not covered by that one reference?

21    A.    QoS is a big field.  I mean, I've -- one of the books

22    that was on my introductory slide is about QoS.  It's a

23    several-hundred-page book.  It's not one thing.  And these

24    patents at best would cover a tiny sliver of mechanisms for

25    QoS.

1    Q.   So did Doctor Valerdi provide infringement opinions for

2    the 'QoS and traffic management' category?

3    A.   No.  As I say, for example, if you look in here for

4    "weighted fair queuing schedulers," there's nothing that we've

5    heard about that topic.

6    Q.   Do the features identified for these patents include

7    features that were known in the art prior to the patents?

8    A.   Yes.

9    Q.   If we look at MPLS at the top as an example, was MPLS

10   known prior to the '580 Patent?

11   A.   Yes, it was well-known and well-used prior to all the

12   patents.

13   Q.   Did Doctor Cole attempt to identify the relative value of

14   these patents over what was already known in the prior art for

15   these features?

16   A.   No.  I believe he stated that he's allocating a hundred

17   percent of MPLS function to -- attributing that to these

18   patents.

19            MR. FRIST:  With that, Your Honor, I'll pass the

20   witness.

21            THE COURT:  All right.  Cross examination by the

22   Plaintiff?

23            MR. BREEDLOVE:  Yes, Your Honor.  Thank you.

24            THE COURT:  Are there cross examination binders to

25   distribute, Mr. Breedlove?

```
 1              MR. BREEDLOVE:  Yes, Your Honor.

 2              THE COURT:  Let's do that right now, please.

 3         All right.  You may proceed with cross examination when

 4    you're ready.

 5              MR. BREEDLOVE:  Thank you, Your Honor.

 6                        CROSS EXAMINATION

 7    BY MR. BREEDLOVE:

 8    Q.    Doctor Jeffay, I'm Scott Breedlove.  I represent Smart

 9    Path.  Good to meet you.

10    A.    Nice to meet you.

11    Q.    You're not a damages expert.  Correct?

12    A.    That is correct.

13    Q.    You're not a valuation expert.  Is that correct?

14    A.    Correct.

15    Q.    You understand that identifying the benefits of invention

16    is only one step in the process of determining damages in a

17    case -- in a patent case.  Correct?

18    A.    I have some understanding of that, yes.

19    Q.    Okay.  And you have provided a CV or a resume with your

20    report in this case to describe some of your background.  Is

21    that right?

22    A.    Correct.

23    Q.    And that includes disclosing cases in which you've

24    testified as an expert in the last four years.  Correct?

25    A.    Yes.
```

1    Q.    You didn't include testimony in the last 12 or 13 years,

2    but you did include the last four years.  Right?

3    A.    Correct.

4    Q.    And almost all of those were patent cases.  Correct?

5    A.    Yes, that's correct.

6    Q.    Maybe about 28 times in the last four years.  Does that

7    sound right?

8    A.    Sure.

9    Q.    And maybe around 25 of those were for the party accused

10   of patent infringement, that was challenging the validity of a

11   patent.  Is that right?

12   A.    I assume you've counted, and generally that sounds

13   correct.

14   Q.    Okay.  You were being paid by the party that was

15   challenging a patent's validity in those cases.  Correct?

16   A.    Not all these cases involved validity questions.

17   Q.    Okay.  So you're saying that -- but in all those 25 cases

18   that I mentioned, that you were representing the party that

19   was accused of infringement.  Correct?

20   A.    Correct.

21   Q.    What's that?

22   A.    That's -- for the patent cases that are on here, that is

23   correct.

24   Q.    Okay.  Just some examples, you testified for Amazon in a

25   Patent Office proceeding challenging the validity of two

1  patents.  Do you recall that?

2  A.    I do.

3  Q.    And I assume your opinion was that the patents were

4  invalid?

5  A.    Correct.

6  Q.    You testified for Amazon in a district court case where

7  AlterWAN accused Amazon of patent infringement.  Is that

8  right?

9  A.    I have not testified in a district court case for Amazon

10  yet.

11  Q.    Okay.  You testified for Facebook and Instagram in a

12  patent case.  Is that right?

13  A.    Yes, that's correct.

14  Q.    They were accused of infringement?

15  A.    Correct.

16  Q.    You testified for Cisco three times against KPN, Egenera,

17  and Monarch Networking Solutions.  Is that right?

18  A.    Either a deposition or at trial.  That's correct.

19  Q.    Right.  And you testified for Google in an ITC patent

20  infringement case.  Is that right?

21  A.    Correct.

22  Q.    And testified for Samsung in a case in Sherman, Texas.

23  Is that right?

24  A.    In Sherman, Texas?  I've never been to Sherman, Texas.

25  Q.    Might have been a deposition outside of Sherman, then.

1    A.    I have done work for Samsung in the past.  That's

2    certainly true

3    Q.    All right.  And that was in a case where they were

4    accused of infringement and challenged the patent's validity.

5    Correct?

6    A.    Yes.

7    Q.    All right.  In all these matters you were being paid by

8    one of these companies that was -- well, I've already asked

9    that.  I apologize.

10        But if we go back five years -- we were just talking

11   about the last four years.  If we go back five years, you were

12   paid by Nokia to -- for a Patent Office action or proceeding

13   and you submitted a declaration arguing that five patents

14   owned by Packet Intelligence, LLC, were invalid.  Do you

15   recall that?

16   A.    I do.

17   Q.    And I think you said you're one of the named inventors on

18   four patents.  Is that what you recall?

19   A.    Correct.

20   Q.    I assume you believe that those patents are valid.  Is

21   that right?

22   A.    I do.

23   Q.    Yeah.

24   A.    I do believe that.

25   Q.    Okay.  And in this case, of the three patents at issue,

895

1    you were assigned two of them.  Is that right?

2    A.   Correct.

3    Q.   And your opinion in this case is that two of those -- you

4    were given two of them.  Your opinion is that both of them are

5    invalid.  Correct?

6    A.   It is a nuanced position, but that's the gist of it.

7    Q.   All right.  So you were two for two on the patents that

8    you were assigned in this case finding invalidity.  Correct?

9    A.   If you mean two for two that I believe they're invalid?

10   Q.   Correct.

11   A.   Yes.  Under certain circumstances that's true.

12   Q.   All right.  Am I correct that Nokia is paying you $800 an

13   hour in this case?

14   A.   Yes.

15   Q.   All right.  I want to talk about the '010 Patent.

16        Now, at the beginning of your testimony, you said that

17   you reviewed the Court's claim construction in this case and

18   you applied that.  Right?

19   A.   Yes.

20   Q.   And immediately thereafter I believe you started

21   testifying about the word 'hub' in the '010 Patent.  Do you

22   recall that?

23   A.   I do.

24   Q.   And that understanding of the word 'hub' was critical to

25   your non-infringement opinion.  Is that fair to say?

1   A.   Yes.

2   Q.   But I want to make sure that you didn't mean to imply to

3   the ladies and gentlemen of the jury that the Court had

4   somehow defined 'hub' in this case.  You weren't trying to

5   imply that?

6   A.   No.  I hope I did not create that impression.

7   Q.   Okay.  Thank you.

8        You recall that claim 1 discusses a hub with a plurality

9   of ports.  I'm talking about claim 1 of the '010 Patent.

10  A.   Yes, I recall that.

11  Q.   All right.  And you argue that Nokia's products don't

12  qualify as a hub.  Correct?

13  A.   Yes, that is my argument.

14  Q.   In fact, your argument is that they cannot be a hub.

15  Correct?

16  A.   Correct.

17  Q.   But you will concede that they have a plurality of ports,

18  won't you?

19  A.   That the Nokia products have a plurality of ports?

20  Q.   Yes.

21  A.   Yes, I would concede that.

22  Q.   Okay.  Now, what you believe should be the definition of

23  'hub' is a device that's less sophisticated than most routers.

24  Is that right?

25  A.   That's the implication of my plain and ordinary meaning

```
 1   of 'hub'.
 2   Q.   Right.  So a router would generally have more
 3   intelligence than a hub.  Right?
 4   A.   Oh, yes.
 5   Q.   And a router can perform a lot more functions.  Am I
 6   right?
 7   A.   Correct.
 8   Q.   In fact, you said that a hub -- you used the term dumb
 9   device.  Right?
10   A.   I did.
11   Q.   And you distinguish a switch and a router and a hub, and
12   you say that a hub is the least intelligent of these devices
13   because it does no processing of the frames it receives.  Is
14   that something you've said?
15   A.   I'm sure I said words to that effect, but generally
16   that's true.
17   Q.   Okay.  I want to look at the patent itself, JX 1, '010
18   Patent.
19             MR. BREEDLOVE:  Mr. Jarrett, if you can pull that
20   up.  And go to page 10, which hopefully has claim 1 on it.
21   Oh, when you blow it up, Mr. Jarrett, could you include the
22   row numbers?  Yeah.  There we go.  It might make it easier to
23   refer to.
24   Q.   (BY MR. BREEDLOVE)  So we see the word -- and I'm sure
25   you've studied claim 1, but you recall that it uses the word
```

1    'hub' multiple times.  Right?

2    A.   Correct.

3    Q.   Lines 41 to 44 is where it introduces the hub, and we see

4    that the hub comprises a plurality of ports.  Do you see that?

5    A.   I do.

6    Q.   And those ports are configured to receive and transmit

7    data frames in accordance with a packet-oriented layer 2

8    communication protocol?

9    A.   I see that.

10            MR. BREEDLOVE:  Still on those same lines, 42 to 44,

11   Mr. Jarrett, is where that was.

12   Q.   (BY MR. BREEDLOVE)  There on lines 47 to 48 we see that

13   there's this network port on the edge device for communicating

14   with the ports of the hub via a network.  Do you see that?

15   A.   I do.

16   Q.   And I notice that it says "communicating with the ports

17   of the hub."  Right?

18   A.   Yes, that's what it says.

19   Q.   So a hub, as it's used here, is capable of communication.

20   Correct?

21   A.   Oh, yes.

22   Q.   Okay.  And then at line 65 to 67 can you see "the edge

23   devices are configured to direct the data frames received from

24   two or more of the native interfaces to one of the ports of

25   the hub"?

1        Do you see that?

2   A.   I do.

3   Q.   I'm curious, do you think -- putting aside the word

4   'hub', do you think a router could perform everything else in

5   yellow that's described about the hub?

6   A.   Oh, sorry.  I wasn't paying attention to what you're

7   highlighting.

8   Q.   Sorry.  Do you follow my question?

9   A.   Yes.

10          THE COURT:  Restate your question, counsel.

11          MR. BREEDLOVE:  Yes, Your Honor.

12  Q.   (BY MR. BREEDLOVE)  Putting aside the word 'hub', do you

13  believe a router is capable of performing all these functions

14  and what's described about a hub that we see in yellow here

15  that we've talked about?

16  A.   No.  I'm afraid a router would not be capable of

17  performing all these functions.

18  Q.   Okay.  A router would -- I think you already said could

19  comprise a plurality of ports.  Right?

20  A.   Yes, that is true.

21  Q.   And the ports could be configured to receive and transmit

22  data frames in accordance with a packet-oriented layer 2

23  communication protocol?

24  A.   Yes, that's true.

25  Q.   Could an edge device have a network port for

900

```
 1   communicating with the ports of a router via a network?
 2   A.   What are you contemplating as the edge device?
 3   Q.   An edge device such as what Smart Path has accused of
 4   being an edge device in this case.
 5   A.   Yes, an edge device could do that, could do what you've
 6   highlighted at lines 47 and 48.
 7   Q.   Okay.  And the -- a Nokia router could receive those
 8   communications.  Correct?  Where it says "at least one network
 9   port for communicating with the ports of the hub."
10   A.   I see that.
11   Q.   Okay.  And then going down to the bottom highlighting, 65
12   to -- line 65 to 67, the hub -- "edge devices are configured
13   to direct the data frames received from two or more of the
14   native interfaces to one of the ports of the router."  If that
15   were the word 'router' would that be possible?
16   A.   No.
17   Q.   Okay.  So what would not be possible about that?
18   A.   Modern switches and routers are only allowed
19   point-to-point connections between ports.  You can't plug two
20   things into one port.
21   Q.   Okay.  And so you're referring to the two or more native
22   -- of the native interfaces?
23   A.   Correct.
24   Q.   All right.  Now, let's look at the beginning of this
25   claim.  You see where it says "an apparatus for data
```

1    communications, comprising"?

2    A.    I do.

3    Q.    And then the next line says, "a hub, comprising a

4    plurality of ports."

5         Do you see that?

6    A.    I see that.

7    Q.    All right.  I know you've worked on lots of patent cases.

8    Could you explain to the ladies and gentlemen of the jury what

9    the word 'comprising' means in a patent claim?

10   A.    So I think the simple statement, and hopefully I get this

11   right, means that it includes but it's not limited to.

12   Q.    Right.  And so that means that an infringing system or an

13   infringing apparatus could have more than what's described in

14   the claim and yet still be infringing.  You agree?

15   A.    Yes, I think I agree.

16   Q.    All right.  I wanted to look at your slide 14.  And this

17   is the essence of your argument that Nokia does not infringe.

18   You're saying that Nokia does not make hubs.  Is that right?

19   A.    Well, this is the summary statement of it.

20   Q.    Right.  And so on this slide it looks like you highlight

21   in yellow the name -- a part of the name of these products.

22   For example, you highlighted the term 'router' where it

23   appears, 'routing', and 'switch'.  Is that right?

24   A.    Correct.

25   Q.    And, for example, for these routers, your argument is

1    that it's a router; therefore, it cannot be a hub.  Right?

2    A.    These routers in particular cannot be hubs.

3    Q.    Okay.  So you're saying that some routers could be hubs.

4    Is that right?

5    A.    When I first started building my lab in the very early

6    1990s, yes, you could have a router that was a hub.

7    Q.    All right.  But because routers have evolved and now are

8    more sophisticated and have more functions, your testimony is

9    that a router can no longer be a hub.  Is that right?

10   A.    No, that's not the point.

11   Q.    So a router today could potentially be a hub?

12   A.    No, I know of no router today that's a hub.

13   Q.    And that's because routers today are more sophisticated

14   and have additional functions.  Is that correct?

15   A.    Again, I think that statement misses the point.

16   Q.    All right.  Let's look at your slide 20.

17         You talked about a hub and spoke topology, and this

18   illustrates that hub and spoke topology.  Is that right?

19   The one in the middle?

20   A.    Correct.

21   Q.    So that's sometimes called a star.  Is that right?

22   A.    Correct.

23   Q.    And by the way, when you say 'topology', you're talking

24   about the way the elements are interconnected?

25   A.    The way they're interconnected and the way you sort of

1    conceptualize them if you were to draw it out on a piece of

2    paper.

3    Q.    All right.  You know that Nokia's documents about the

4    accused products in some instances refer to a Nokia router as

5    a hub.  Right?

6    A.    Yes, in terms of the layout.  Correct.

7    Q.    That's what I was going to follow up.  Your position and

8    Nokia's position in this case is that any time Nokia uses the

9    word 'hub' to refer to its accused routers, it's just talking

10   about the router being interconnected with other elements in

11   this kind of hub and spoke topology.  Is that your position?

12   A.    I think a more concise statement is when it uses the word

13   'hub', it's referring to some layout.

14   Q.    All right.  Let's go back to slide 14.  And this shows

15   -- I guess you said examples of some of the accused products.

16   Specifically, I wanted to look at some documents that relate

17   to the 7750 service router and the 7705 service aggregation

18   router.  Is that okay?

19   A.    That's fine.

20   Q.    All right.

21           MR. BREEDLOVE:  Let's pull up JX 33, please,

22   Mr. Jarrett.

23   Q.    (BY MR. BREEDLOVE)  This is the front page, it looks

24   like, a Nokia 7750 service router customer overview

25   presentation from December 2017.  Does that look right?

1   A.   That looks correct.

2   Q.   And you understand that this was a presentation used to

3   explain a Nokia product to its customers?

4   A.   Yes.

5           MR. BREEDLOVE:  All right.  Let's look at page 25.

6   There we go.  Thank you, Mr. Jarrett.

7   Q.   (BY MR. BREEDLOVE)  So in this one, in the middle of that

8   diagram on the right, we see a 7750 SR-a, which is a Nokia

9   7750 -- I mean, it's a Nokia router.  Correct?

10  A.   Yes.

11  Q.   And beneath that it says 'hub site'.  Correct?

12  A.   Yes.

13  Q.   It doesn't -- at least it doesn't use the words on this

14  page anything about hub and spokes.  Right?

15  A.   Correct.

16  Q.   And it doesn't refer to a star topology; doesn't use

17  those words.  Correct?

18  A.   Correct.

19  Q.   And it actually puts the hub -- the word 'hub' right next

20  to the router there, that 7750 SR-a?

21  A.   It puts the words 'hub site' under the router.

22  Q.   Okay.  And then let's look at JX 24a, which is the

23  7 -- Nokia 7705 service aggregation router services guide.

24  Does that sound right?

25  A.   Yes.

1          MR. BREEDLOVE:  All right.  And let's go to page

2    1,047, please, Mr. Jarrett.  And we can -- yeah, blow up the

3    figure so we can see that.  Thank you.

4    Q.   (BY MR. BREEDLOVE)  You agree that the Nokia 7705 SAR can

5    be an edge router?

6    A.   Yes.

7    Q.   It can play that role in a system.  Right?

8    A.   Yes.

9    Q.   And this figure shows on the right -- on the far right

10   there it shows a Nokia 7705 SAR hub is what it says.  Correct?

11   A.   Correct.

12   Q.   But you would say that these routers are more

13   sophisticated than what you would call a hub device.  Is that

14   your position?

15   A.   Correct.  And I would say this is not a hub device.

16   Q.   All right.  And so when Nokia uses the word 'hub' here,

17   you would say that's just referring to the topology.  Is that

18   your position?

19   A.   There's -- for this particular diagram there would be two

20   separate opinions.  One is this is referring to layout; and

21   second, this is referring to a VPRN, which is a particular

22   type of virtual private network that's actually a layer 3

23   network.  So this would be a hub in the layout of a layer 3

24   network, not a layer 2 network, so it's not -- it can't be the

25   hub of the patent, in any event.

1    Q.   All right.  But you're saying that a -- this 7705 router

2    by Nokia could be a hub in the level 3 network?

3    A.   In the topological or layout sense, yes.

4    Q.   All right.  Let's change gears a little to talk about

5    what you say about the invalidity of this same patent, the

6    '010.

7         Your argument is that the invention of the '010 was

8    obvious because of an earlier patent called Shah.  Correct?

9    A.   Correct.

10   Q.   And what you did was you compared a figure -- one of the

11   things that you did was compare a figure in Shah to an accused

12   Nokia system.  Is that right?

13   A.   No, I don't believe that's -- that's not how I would

14   characterize it.

15   Q.   I'm sorry.  Let's go to slide 32 and you can correct me.

16        So this is what I was trying to reflect is it looked like

17   you were comparing an accused Nokia system on the left with

18   the figure in the Shah patent on the right.  Is that wrong?

19   A.   I was comparing an arrangement of the accused products

20   that Doctor Valerdi was relying on to show infringement.

21   Q.   Right.  I'm not sure how that's different than what I was

22   asking.

23        On the left do we see an accused Nokia system there?

24   A.   Well, there's multiple Nokia systems is the point.

25   Q.   Okay.  Is this an example, though?

1   A.   This was an example that -- this was the example that

2   Doctor Valerdi relied on.

3   Q.   All right.  And then on the right is a figure from the

4   Shah patent.  Correct?

5   A.   Correct.

6   Q.   And you did some color-coding here to where the green

7   -- there's some green arrows that reflect an ethernet link.

8   Is that right?

9   A.   Correct.

10  Q.   Purple arrows reflecting a frame relay link.  Is that

11  right?

12  A.   Correct.

13  Q.   And then blue arrows reflecting an ATM link.  Is that

14  right?

15  A.   Yes.

16  Q.   And those would relate to what the '010 Patent claims

17  call a native interface?  Yes?

18  A.   Correct.

19  Q.   Ethernet is one type of native interface.  Did I say that

20  right?

21  A.   Yes, ethernet is one type of native interface you can

22  have.

23  Q.   ATM is another, and frame relay is another?

24  A.   Correct.

25  Q.   Now, there are some differences between the Nokia system

1    on the left and the older Shah system on the right, aren't

2    there?

3    A.    Sure.  There are differences, but there's no differences

4    that really affect my invalidity analysis.

5    Q.    All right.  Well, let's look at a couple of the

6    differences.

7          On the left we see with this PE 1, which I think stands

8    for provider edge.  Right?

9    A.    Correct.

10   Q.    It looks like we've got three different colored arrows

11   going directly to that provider edge 1.  Correct?

12   A.    Correct.

13   Q.    And in the Shah figure we don't see any provider edge

14   device that has more than one native interface type, do we?

15   A.    No, not in figure 1.

16   Q.    All right.  And then on the left with the Nokia system

17   there, I see between provider edge 1 and provider edge 2 that

18   there is this pipe that's shown in the figure connecting those

19   two directly.  Is that right?

20   A.    Correct.

21   Q.    And in this figure 1, what we see is the network cloud.

22   We don't see pipes in this figure 1.  Correct?

23   A.    Correct.

24   Q.    And what you did in your presentation was you drew a pipe

25   in?

```
 1   A.   Correct.
 2   Q.   Okay.  So when you compared Shah to claim 1 of the '010
 3   Patent, I was confused about one thing.  Were you calling the
 4   network cloud 140 the hub or one of the PE devices?
 5   A.   No, I was -- if you recall, at some point I had a red box
 6   around I think it was PE 1.
 7   Q.   Yes.
 8   A.   To illustrate that was a hub under Doctor Valerdi's
 9   interpretation of that claim element.
10   Q.   All right.  So let's look at your slide 35.  And the --
11   there was pink drawn on the text about a hub, and then there
12   was pink in the network cloud, but you weren't trying to imply
13   that the network cloud is what satisfied that hub element,
14   were you?
15   A.   No.  And you've raised an interesting point.  That was an
16   accident of coloring.  I was not trying to imply that.
17   Q.   Okay.  Thank you.
18        But you would say that that cloud is definitely not a
19   hub, as anybody's defined the term.  Correct?
20   A.   Correct.
21   Q.   And let's look at your slide 43, just to finish talking
22   about the '010.
23        You mentioned you had a nuanced opinion about that, about
24   the '010 as a whole, which I understood to be that your
25   opinion is that you think the '010 Patent claims are either
```

1    not infringed or invalid.  Is that right?

2    A.   Correct.

3    Q.   You're not testifying that they are both not infringed

4    and invalid.  Correct?

5    A.   Correct.

6    Q.   All right.  Let's move onto the '580 Patent and start

7    with your slide 64.

8         The '580 Patent uses the word 'tunnel'.  Correct?

9    A.   Yes.

10   Q.   And you agree that each LSP is a tunnel.  Or do you take

11   issue with that?

12   A.   Each LSP is a separate tunnel, yes.

13   Q.   Okay.  And this slide -- your slide 64, which relates to

14   -- it looks like it's citing JX 10d, page 1693, but you added

15   the red box, the red boxes?

16   A.   Yes.

17   Q.   And the red text at the top?

18   A.   Okay.

19   Q.   And so we have these -- and the bottom red rectangle, let

20   me direct your attention there.

21   A.   Okay.

22   Q.   It says that "a P2MP LSP is modeled as a set of

23   root-to-leaf sub-LSPs, source-to-leaf S2L."  So that's where

24   it's defining this term 'S2L'.  Right?

25   A.   Yes.

Q.   And then I don't think in your direct testimony you
mentioned the next sentence.  It says, "each S2L is modeled as
a point-to-point LSP in the control plane."

     Is that what it says?

A.   Yes.

Q.   All right.  And then let's look at slide 65.  And do you
agree that this illustration on slide 65 -- I know you said
that you believe that this whole thing is just one tunnel.
Right?

A.   Correct.

Q.   But will you agree with me at least that it's showing two
S2Ls?

A.   Yes, I'll agree.

Q.   So if we go back to slide 64, then each -- as I
understand it, each one of those S2Ls would be modeled as a
separate LSP in the control plane.  Correct?

A.   That's what it's saying; that they're just modeled, not
that they are.

Q.   But they're modeled in the control plane.  Correct?

A.   Correct.

Q.   All right.  Now let's look at -- because I want to focus
on what the claims of the '580 Patent require.  I wanted to
look at your slide 82, because it breaks claim 15 up into
chunks, so I thought it would be convenient to do that.

     You said -- I listened on your direct and you said that

1    you didn't think there was infringement because there's --

2    with the Nokia products there's no sharing of resources

3    between independent tunnels, I think is what you said one

4    time.  Another time I think you said separate tunnels.

5         Do you recall that testimony?

6    A.   Yes, I did say exactly both of those.

7    Q.   All right.  But am I right that the claim doesn't refer

8    to independent tunnels or separate tunnels?

9    A.   You are absolutely correct.

10   Q.   Okay.  It does refer to a first and second tunnels,

11   though.  Right?

12   A.   Yes.

13   Q.   And then if we look at what you've labeled as 15c in this

14   slide, in fact, the claim itself specifically contemplates

15   that the tunnels could have overlap.  Correct?

16   A.   The -- yes, the claim does contemplate that.

17   Q.   It contemplates that the first and second tunnels might

18   have the same starting point or origin.  Correct?

19   A.   Correct.

20   Q.   It contemplates that the first and second tunnels could

21   have the same ending point.  Correct?

22   A.   Yes.

23   Q.   And that even though they had maybe a common starting

24   point, or maybe a common ending point, they could still be

25   considered two tunnels for purposes of this claim.  Correct?

1   A.   Yes, they started out as two tunnels and they remained

2   two tunnels in element 15c.

3   Q.   Even though they might have the same starting point or

4   the same ending point.  Correct?

5   A.   Correct.

6   Q.   Let's look at your slide 68.  And I believe you rely on

7   this slide to support your argument that this was -- what's

8   shown here, JX 10d at page 1721, was simply one tunnel.

9   Correct?

10   A.   Correct.

11   Q.   And I think you were looking at the title where it

12   referred to P2MP LSP.  Right?

13   A.   Yes, we did call that out.

14   Q.   All right.  But the rest of the title -- well, it ends

15   with P2MP LSP, and then it's got some letters "with strict S2L

16   path toward PE-7."

17       Do you see that?

18   A.   I do.

19   Q.   And so PE-7 is just one of the destination points.

20   Correct?

21   A.   It's one of the egress points.

22   Q.   Right.  So we see that at the bottom, right near the

23   bottom right.  Correct?

24   A.   Yes.  It's with the right-going arrow coming out of it.

25   Q.   So this figure 368 is illustrating the P2MP LSP with a

1    path toward PE-7.  Correct?

2    A.    With a particular S2L path towards PE-7, yes.

3    Q.    Okay.  Now, with respect to the validity or invalidity of

4    the '580 Patent, as the case may be, for this one you rely on

5    combining two pieces of prior art.  Is that right?

6    A.    Correct.

7    Q.    And you claim that the invention of the '580 Patent was

8    obvious in light of that combination.  Is that right?

9    A.    Correct; under Smart Path's interpretations of the

10   claims.

11          MR. BREEDLOVE:  And then let's look at slide 82,

12   please, Mr. Jarrett.

13   Q.    (BY MR. BREEDLOVE)  And so we see the title here

14   "Aggarwal plus the RFC 4875 draft."  Those are the two pieces

15   of what we call prior art that you're saying once they're

16   combined it makes the invention obvious.  Right?

17   A.    Correct.

18   Q.    And for your invalidity analysis, you were informed,

19   weren't you, by Nokia's lawyers that hindsight must not be

20   used when comparing the prior art to the alleged invention for

21   obviousness?  Correct?

22   A.    Yes, I understand that.

23   Q.    All right.  And in your testimony today, we didn't hear

24   you identify any product -- before Orckit's invention that are

25   reflected in the Smart Path patents, you didn't identify any

1    product that actually made this combination that you say would

2    have been obvious.  Correct?

3    A.    I'm sorry.  I'm not completely sure I understand what you

4    you're asking.

5    Q.    It probably was my fault.  During your testimony earlier,

6    we didn't hear you identify any product that was on sale, for

7    example, before Orckit's invention that actually made this

8    combination that you say would have been obvious, this

9    combination of Aggarwal and 4875.

10   A.    That's correct.  I did not discuss any products.

11   Q.    All right.  Now, the 4875, I think you said, was a draft

12   that was underway prior to Orckit invention.

13   A.    It was a draft that was released prior to the final

14   adoption of the RFC.

15   Q.    And was that draft standard defining a protocol?  Is that

16   how you say it?

17   A.    Yes.  It was -- the protocol existed and it was extending

18   it with new functions.

19   Q.    All right.  And so extending a protocol, would that be

20   like kind of enhancing a language that devices -- so that

21   devices can speak the same language in order to communicate?

22   A.    At a high level, I think that's fine.

23   Q.    Okay.  But you'll agree with me, won't you, protocol

24   standards can generally be implemented in different ways?

25   A.    Oh, sure.

1    Q.   You could use very different hardware to implement, for

2    example.  Right?

3    A.   Sure.

4    Q.   And you've said that this draft standard eventually

5    evolved to become an actual standard called 4875.  Right?

6    A.   Correct.

7    Q.   And you agree that that standard can be implemented in

8    different ways.  Correct?

9    A.   Yes.

10   Q.   Nokia implements the standard in its own way.  Agreed?

11   A.   Yes.

12   Q.   Now, when you heard Doctor Valerdi present his analysis

13   of infringement of this '580 Patent, you heard him rely on

14   Nokia manuals and source code, didn't you?

15   A.   I did.

16   Q.   And during his direct examination, you didn't hear him

17   rely on the 4875 standard or present any slides about the 4875

18   standard, did you?

19   A.   I believe that is correct.

20   Q.   And during your direct testimony, I think you said that

21   features of RFC 4875 are what's being accused in this case.

22   Is that what you said?

23   A.   Correct.

24   Q.   All right.  Now, do you mean to suggest that Doctor

25   Valerdi mapped each element of the '580 Patent claims to the

```
 1    4875 standard?

 2    A.   No, that's not what I'm saying.

 3    Q.   All right.

 4         MR. BREEDLOVE:  That's all the questions I have,

 5    Your Honor.  Thank you so much.

 6         THE COURT:  All right.  Is there redirect,

 7    Mr. Frist?

 8         MR. FRIST:  Hopefully very brief, Your Honor.

 9         THE COURT:  All right.  Continue or proceed with

10    redirect.

11         MR. FRIST:  Mr. Carrillo, can you please bring up JX

12    24a?

13                   REDIRECT EXAMINATION

14    BY MR. FRIST:

15    Q.   And do you recall, Doctor Jeffay, some testimony or some

16    questions about the label 'hub' in some of Nokia's documents?

17    A.   Yes.

18    Q.   Do you recall it was from this document?

19    A.   Yes.

20         MR. FRIST:  Mr. Carrillo, can you please go to page

21    1223?

22    Q.   (BY MR. FRIST)  Do you see at the top of this document

23    the type and it says "syntax type hub"?

24         Do you see that?

25    A.   I do.
```

1    Q.   And the description here says, "This command designates

2    the type of VPRN instance being configured for hub and spoke

3    topologies"?

4         Do you see that?

5    A.   I do.

6    Q.   How does that inform your opinion whether this document

7    was referring to a hub device or a topology?

8    A.   It's referring to a hub topology.  I mean, this is

9    related precisely to the use of the device in a VPRN, which is

10   a particular type of private network, and the figure that I

11   was shown was the figure of a Nokia device in the VPRN.

12             MR. FRIST:  Can we please bring up Doctor Jeffay's

13   slides and go to slide 64?  Mr. Carrillo, can we please go to

14   slide 64 of Doctor Jeffay's slides from the direct?  Thank

15   you, Mr. Carrillo.

16   Q.   (BY MR. FRIST)  Doctor Jeffay, do you recall some

17   questions about this document and, in particular, some

18   language in this bottom red box?

19   A.   Yes.

20   Q.   And there was some questions about the language "each S2L

21   is modeled as a point-to-point LSP."

22        Do you recall that?

23   A.   Yes.

24   Q.   And it looked like you had an issue with the word

25   'modeled' and the way it was being portrayed in the questions.

1    Could you clarify the testimony you were trying to give?

2    A.   Yeah.  I just want to make clear that one cannot conclude

3    from this that an S2L -- a sub -- a S2L sub-LSP is an LSP.

4    This is just simply saying -- we never got into these details

5    of routers or the distinction between the control plane and

6    the data plane, but the control plane is what it sounds like;

7    it's kind of like -- it's what's controlling the routing in

8    the router, and all this is just simply saying is that for

9    purposes of forwarding and routing in the control plane, which

10   is not related -- which is not forwarding the data in the

11   control plane, it's just modeled as a point-to-point.  It's

12   not -- this is not to be interpreted as it saying that the S2L

13   sub-LSP is a LSP because that's not correct.

14              MR. FRIST:  Can we please go to slide 66,

15   Mr. Carrillo?

16   Q.   (BY MR. FRIST)  Do you see on the right-hand side, Doctor

17   Jeffay, you have an excerpt from the RFC 4875 standard?

18   A.   Yes.

19   Q.   And do you see the first quote which we talked about

20   earlier, it says, "P2MP LSP is constituted of one or more S2L

21   sub-LSPs"?

22   A.   Yes, I see that.

23   Q.   What is the relation between these sub-LSPs and the

24   sub-LSPs we just looked at?

25   A.   These are the same.  So per RFC 4875, the sub-LSPs are

1    part of the overarching P2MP LSP or P2MP tunnel.

2    Q.   And do you see the sentence that starts -- in Section

3    4.4.1 that starts "an S2L sub-LSP exists within the context of

4    a P2MP LSP"?

5         Do you see that?

6    A.   I do.

7    Q.   What does that tell you about what an S2L or sub-LSP is?

8    A.   That it's part of a P2MP tunnel or P2MP LSP.  As I said,

9    you think of these as the branches of the distribution tree.

10   Q.   And then the next sentence says, "Thus, it is identified

11   by the P2MP ID, tunnel ID, and extended tunnel ID."

12        Do you see that?

13   A.   I do.

14   Q.   What does the reference to 'tunnel ID'here tell you about

15   whether an S2L is a -- are each separate tunnels or part of

16   one tunnel?

17   A.   They are part of one tunnel and they are part of the one

18   tunnel that is identified by the one tunnel ID that's

19   specified here.

20            MR. FRIST:  Can we please go to slide 68,

21   Mr. Carrillo?

22   Q.   (BY MR. FRIST)  Doctor Jeffay, do you recall a couple of

23   questions for counsel from Smart Path about this diagram?

24   A.   Yes.

25   Q.   I just want to be clear.  This black line that goes down

1   the middle and splits and you've highlighted in blue, is that

2   one tunnel or two tunnels?

3   A.   It's just one tunnel.

4   Q.   Why is that?

5   A.   This is the definition of a tunnel--that a single P2MP

6   LSP, we just saw this in the standard, is a one tunnel, and

7   the patent explicitly says that a single LSP is a tunnel.

8   This is just one P2MP LSP, one P2MP tunnel.

9   Q.   Thank you.

10            MR. FRIST:  Your Honor, I'll pass the witness.

11            THE COURT:  All right.  Is there additional cross

12   examination, Mr. Breedlove?

13            MR. BREEDLOVE:  No further questions, Your Honor.

14            THE COURT:  You may step down, Doctor Jeffay.

15            THE WITNESS:  Thank you, Your Honor.

16            THE COURT:  You're quite welcome.

17       All right, ladies and gentlemen.  We're going to break

18   for the day at this juncture.  Thank you for your patience and

19   your attention today.  I'm going to ask you to take your

20   notebooks with you to the jury room as you leave the

21   courtroom.

22       You've done a commendable job of being here on time each

23   day so far.  I'm going to ask you to keep that up and be ready

24   to start by 8:30 in the morning.  Check the weather; plan your

25   travel accordingly.

1    As you would also expect me to do, I'm going to remind

2  you not to violate any of the instructions I've given you,

3  including, of course, not to communicate with anybody in any

4  way about the case.

5    Travel safely to your homes, have a good evening.  We

6  will see you tomorrow.  You're excused for the day.

7    (Whereupon, the jury left the courtroom.)

8    THE COURT:  Be seated, please.

9    Counsel, for your information, as of now Plaintiff has 3

10  hours and 55 minutes of designated trial time remaining;

11  Defendant has 3 hours and 7 minutes of designated trial time

12  remaining.

13    Also I am anticipating that in 28 minutes or less I will

14  see your updated submissions on the charge to the jury and the

15  verdict form.  Since I instructed to have that to us by 6:00

16  p.m. today, I assume that's the case and I will be looking at

17  it overnight.

18    Speaking of overnight, I'm going to encourage you to

19  continue your productive efforts so far in handling overnight

20  disputes through the meet and confer process.  I will say that

21  the number of surviving disputes I've had to take up with you

22  each morning has been relatively small, and that makes it much

23  more workable and makes it easier to keep the trial on track.

24  So I appreciate those efforts and I encourage your

25  continuation in that regard.

1         Is there anything else we need to talk about or take up

2    this evening before we recess for the day?

3              MR. BENNETT:  Not on Plaintiff's part, Your Honor.

4              MR. DACUS:  No, Your Honor.  Thank you.

5              THE COURT:  All right.  Defendant's going to proceed

6    with Dr. Chatterjee first thing in the morning?

7              MR. DACUS:  Yes, Your Honor.

8              THE COURT:  All right.  Very good, counsel.  I will

9    see you in the morning.  You are excused until then.

10        The Court stands in recess.

11              (The proceedings were concluded at 5:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2        CORRECT TRANSCRIPT FROM THE RECORD OF

3        PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4        I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5        FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6        COURT AND THE JUDICIAL CONFERENCE OF THE

7        UNITED STATES.

8

9        S/Shawn McRoberts              04/03/2024

10       _____DATE_____
         SHAWN McROBERTS, RMR, CRR
11       FEDERAL OFFICIAL COURT REPORTER

12            .

13

14

15

16

17

18

19

20

21

22

23

24

25