1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
2                              MARSHALL DIVISION

3   SMART PATH CONNECTIONS, LLC.,    (   CAUSE NO. 2:22-CV-296-JRG
                                     )
4            Plaintiff,              (
                                     )
5   vs.                              (
                                     )
6   NOKIA CORPORATION,               (
    et al.,                          )   MARSHALL, TEXAS
7                                    (   APRIL 4, 2024
             Defendants.            )   8:30 A.M.
8   _____

9

10                               VOLUME 4

11  _____

12                          TRIAL ON THE MERITS

13          BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE
14                          and a jury
    _____

15

16

17

18

19

20

21

22                      SHAWN McROBERTS, RMR, CRR
23                       100 E. HOUSTON STREET
                         MARSHALL, TEXAS  75670
24                          (903) 923-8546
                    shawn_mcroberts@txed.uscourts.gov
25

```
1                    A P P E A R A N C E S

2         FOR THE PLAINTIFF:    CARTER ARNETT, PLLC
                                8150 N. CENTRAL EXPRESSWAY
3                               SUITE 500
                                DALLAS, TEXAS  75206
4                               (214) 550-2112
                                BY: MR. JOSHUA BENNETT
5                                   MR. BRADLEY LIDDLE
                                    MS. LINDA STAHL
6                                   MR. MICHAEL POMEROY
                                    MS. ALEXIS RITZER
7
                                DEANS STEPP LAW, LLP
8                               325 N. ST. PAUL, SUITE 1500
                                DALLAS, TEXAS  75201-3891
9                               (214) 550-8172
                                BY:  MR. SCOTT BREEDLOVE
10
          FOR THE DEFENDANTS:   ALSTON & BIRD, LLP - ATLANTA
11                              ONE ATLANTIC CENTER
                                1201 WEST PEACHTREE STREET NW
12                              #4900
                                ATLANTA, GEORGIA  30309-3424
13                              (404) 881-7000
                                BY:  MR. JOHN HAYNES
14                                   MR. DAVID FRIST
                                     MS. SLOANE KYRAZIS
15                                   MR. MICHAEL DEANE

16                              ALSTON & BIRD, LLP - RALEIGH
                                555 FAYETTEVILLE St., STE. 600
17                              RALEIGH, NORTH CAROLINA  27601
                                (919) 862-2270
18                              BY:  MS. DARLENA SUBASHI

19                              ALSTON & BIRD LLP - WASHINGTON
                                THE ATLANTIC BUILDING
20                              950 F STREET, NW
                                WASHINGTON, DC 20004
21                              (202) 239-3933
                                BY:  MR. THOMAS DAVISON
22
                                ALSTON & BIRD
23                              1120 SOUTH TRYON STREET
                                SUITE 300
24                              CHARLOTTE, NC  28203
                                (704) 444-1316
25                              BY:  MS. ERIN BEATON
```

```
 1                                    THE DACUS FIRM, PC
                                     821 ESE LOOP 323, SUITE 430
 2                                   TYLER, TEXAS  75701
                                     (903) 705-1117
 3                                   BY:  MR. DERON DACUS

 4           OFFICIAL REPORTER:      SHAWN M. McROBERTS, RMR, CRR
                                     100 E. HOUSTON STREET
 5                                   MARSHALL, TEXAS  75670
                                     (903) 923-8546

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| SANDEEP CHATTERJEE, PH.D. | |
| Direct By MR. HAYNES | 934 |
| Cross By MR. BENNETT | 984 |
| Redirect By MR. HAYNES | 999 |
| YEHUDA BINDER | |
| BY VIDEO DEPOSITION | 1004 |
| MELISSA BENNIS | |
| Direct By MR. DACUS | 1008 |
| Cross By MS. STAHL | 1034 |
| Redirect By MR. DACUS | 1066 |
| Recross By MS. STAHL | 1069 |
| ERIC COLE, PH.D. | |
| Direct By MR. LIDDLE | 1073 |
| Cross By MR. FRIST | 1085 |
| RICARDO VALERDI, PH.D. | |
| Direct By MR. BENNETT | 1100 |
| Cross By MR. HAYNES | 1118 |
| Redirect By MR. BENNETT | 1137 |

1                THE COURT:  Be seated, please.

2          Are the parties prepared to read into the record those

3      items from the list of pre-admitted exhibits used during

4      yesterday's portion of the trial?

5                MR. BENNETT:  We are, Your Honor.

6                THE COURT:  All right.  Please go to the podium and

7      offer that rendition into the record.

8                MR. BENNETT:  Yesterday in trial plaintiffs used the

9      following exhibits:  Defense Exhibit 4; Defendant's Exhibit

10     9a; Defendant's Exhibit 9b; Defendant's Exhibit 9c; Joint

11     Exhibit 1; Joint Exhibit 2; Joint Exhibit 3; Joint Exhibit

12     10d, as in dog; Joint Exhibit 17; Joint Exhibit 24a; Joint

13     Exhibit 33; Joint Exhibit 44a; Plaintiff's Exhibit 5;

14     Plaintiff's Exhibit 8; Plaintiff's Exhibit 17; Plaintiff's

15     Exhibit 18; Plaintiff's Exhibit 21; Plaintiff's Exhibit 24;

16     Plaintiff's Exhibit 28.

17               THE COURT:  All right.  Is there any objection to

18     that from Defendant?

19               MR. HAYNES:  No objection, Your Honor.

20               THE COURT:  All right.  Does Defendant have a

21     similar rendition to offer.

22               MS. KYRAZIS:  Yes, Your Honor.  Defendants offer for

23     entry:  Joint Exhibit 5, Joint Exhibit 14b, Joint Exhibit 19e,

24     Joint Exhibit 27a, Defendant's Exhibit 1, Defendant's Exhibit

25     4, Defendant's Exhibit 34, Defendant's Exhibit 35.

1              THE COURT:  All right.  And would you identify

2    yourself for the record, counsel.

3              MS. KYRAZIS:  Apologies, Your Honor.  Sloane

4    Kyrazis.

5              THE COURT:  Any objection to that offered by the

6    Defendant?

7              MR. BENNETT:  No objection, Your Honor.

8              THE COURT:  All right.  Mr. Haynes, are you prepared

9    or is Defendant prepared to call its next witness?

10             MR. HAYNES:  We are, Your Honor.

11             THE COURT:  All right.  Let's bring in the jury

12   then.

13             (Whereupon, the jury entered the courtroom.)

14             THE COURT:  Good morning, ladies and gentlemen.

15   Welcome back.  It's good to see you.  Please have a seat.

16        We'll continue with the Defendant's case in chief.

17        Defendant, call your next witness.

18             MR. HAYNES:  Defendant calls Dr. Sandeep Chatterjee.

19             THE COURT:  All right.  Doctor Chatterjee, if you'll

20   come forward and be sworn, please.

21             (Whereupon, the oath was administered by the Clerk.)

22             THE COURT:  Please have a seat on the witness stand,

23   sir.

24             MR. HAYNES:  Your Honor, may I approach and pass out

25   the binders?

```
1              THE COURT:  Yes, you may.

2              MR. HAYNES:  May I proceed, Your Honor?

3              THE COURT:  Yes.  Have we got -- the witness got the

4    microphone where we can hear him?  Okay.  I guess we'll find

5    out.

6         Yes, proceed.

7                      SANDEEP CHATTERJEE, Ph.D.

8    having been duly sworn, testified under oath as follows:

9                         DIRECT EXAMINATION

10   BY MR. HAYNES:

11   Q.   Good morning, Doctor Chatterjee.

12   A.   Good morning.

13   Q.   Could you please introduce yourself to the jury?

14   A.   Good morning.  My name is Sandeep Chatterjee.  I am an

15   independent technology expert and consultant.

16   Q.   Doctor Chatterjee, were you retained by Nokia to assess

17   Smart Path's allegations of infringement in this case?

18   A.   I was.

19             THE COURT:  And, Mr. Haynes, why don't you adjust

20   the microphone a little bit.  It's been pointed downward.

21   Thank you.

22   Q.   (BY MR. HAYNES)  And did you form an opinion regarding

23   whether Nokia's accused products infringe the '599 Patent?

24   A.   I did.

25   Q.   And what did you conclude after forming that opinion?
```

1    A.    So what I concluded after my investigation is that Nokia

2    does not infringe and, in fact, as I'll explain, Nokia cannot

3    infringe the asserted claim of the '599 Patent.

4    Q.    Before we get into the details of your opinion, I'd like

5    to explore a little bit of your background.  Is that all

6    right?

7    A.    Yes.

8    Q.    Does the demonstrative that we've displayed here

9    accurately summarize a few of your qualifications in

10   education?

11   A.    Yes.

12   Q.    Can you please explain to the jury what you've listed at

13   the top relating to the Massachusetts Institute of Technology?

14   A.    So I have a Ph.D. in computer science from MIT as well as

15   master's in electrical engineering and computer science.

16   Q.    Doctor Chatterjee, what is the highest degree that you

17   hold?

18   A.    A Ph.D.

19   Q.    And where did you obtain that degree?

20   A.    MIT.

21   Q.    Did you do a doctoral thesis at MIT?

22   A.    I did.

23   Q.    And what was the subject matter of your doctoral thesis?

24   A.    So my thesis was about adding intelligence and network

25   communications to standard home and office devices.  For

1    example -- and this was back in 2000, 1999 time frame, and the

2    concept was how do you add intelligence in communication so

3    that, for example, your refrigerator can communicate with your

4    television, your children's toys can communicate with your

5    television, and they can coordinate and offer value.

6        So, for example, if your children are playing with their

7    toys while you're watching TV, it will automatically increase

8    the volume so you're able to keep on enjoying the television

9    program.

10   Q.   Did your doctoral thesis work win any awards?

11   A.   It did.

12   Q.   And what awards did it win?

13   A.   So I'm very honored that my Ph.D. dissertation was

14   selected as one of the top inventions in computing at MIT, and

15   it's preserved in a time capsule at the Museum of Science in

16   Boston.

17   Q.   Are you aware of anyone else that has received that same

18   honor?

19   A.   Yes.  I share that honor with some other people,

20   including Bill Gates, who founded Microsoft, as well as Tim

21   Berners-Lee, who invented the worldwide web.

22   Q.   Doctor Chatterjee, do you have any other degrees?

23   A.   I do.

24   Q.   And what are those?

25   A.   Like I mentioned, I have a Master's from MIT as well as a

1    Bachelor's from UC-Berkeley.

2    Q.    Did you do a master's thesis at MIT?

3    A.    I did.

4    Q.    And what was the subject of your master's thesis?

5    A.    So my master's was on communications within mesh networks

6    for massively parallel computing.

7              MR. HAYNES:  Can we go to the next demonstrative, 3?

8    Q.    (BY MR. HAYNES)  What have you illustrated here, Doctor

9    Chatterjee?

10   A.    Here I'm showing the computer on which my master's thesis

11   was performed.  On the left-hand side, I'm showing the M

12   machine which is the -- the massively parallel computer I was

13   talking about.  And each of those black circles represents a

14   node which are connected in a 3D mesh network to each other.

15   And my master's thesis was on how do you optimize the

16   communications between each of those nodes.

17   Q.    Doctor Chatterjee, where are you currently employed?

18   A.    Experantis.

19   Q.    And what do you do there?

20   A.    Well, Experantis is my own consulting -- technology

21   consulting company.

22             MR. HAYNES:  If we could go to the next

23   demonstrative, please.

24   Q.    (BY MR. HAYNES)  What have you illustrated on this slide,

25   Doctor Chatterjee?

1   A.   So here I am showing a number of images, screenshots,

2   from a television news program on the Bloomberg TV channel,

3   and the Bloomberg news program is called Innovators.  And I,

4   together with the company that I co-founded, was featured on

5   this program.

6        The reason we were featured is that I had invented one of

7   the first, if not the first, mobile banking technology in the

8   world.  And so the concept there was that even though there

9   may not be a bank branch anywhere nearby your house, maybe the

10  closest bank branch is 500 miles away, but how do you actually

11  enable people to perform banking transactions with that bank.

12       So a lot of the people -- if you see in the background on

13  the top right photo, these are in rural villages, and these

14  are all of the women who -- they're living 500, 600 miles away

15  from the big cities where the banks are, and they earn $1, $2

16  a day.  How do you enable them to deposit that 1 or $2 a day

17  that they're earning into the bank so they are able to earn

18  interest from that and they are able to take loans and other

19  transactions from the bank.

20  Q.   In the middle of that slide, there is a device, a

21  person's holding it.  What is that?

22  A.   So that is the device -- the hardware, together with the

23  software that we wrote, that enabled these secure transactions

24  to happen with the banks.  That device would communicate over

25  a wireless network all the way to a bank's computer system and

1    enable secure transactions to happen from anywhere in the

2    world back to that bank.

3    Q.    Okay.

4              MR. HAYNES:  Could we go to the next slide, please?

5    Q.    (BY MR. HAYNES)  Doctor Chatterjee, what have you

6    illustrated here?

7    A.    These are a couple of my awards and industry recognition.

8    Q.    At the very top there's an entry for the World Economic

9    Forum.  What is that referencing?

10   A.    So I'm very -- I'm very happy and honored to be

11   recognized or to have been recognized by the World Economic

12   Forum as what they call a Young Global Leader.  And they

13   provide this honor or they provided this honor based on my

14   professional accomplishments, commitment to society, and

15   potential to contribute to shaping the future of the world.

16        And one of the reasons they gave me this recognition is

17   because I have been and I continue to develop innovative

18   technologies to really positively impact the lives of people.

19   Like I talked about with the mobile banking system, the

20   purpose there was to enable people to have a bank account, to

21   perform these banking transactions, and then financially

22   empower themselves, financially empower their families.

23        Many of them came out of poverty.  Because they were able

24   to build a relationship with a bank, they were able to take

25   loans, and because of that, they were able to come out of

1    poverty, build a better life for themselves, as well as for

2    their families.

3    Q.   Doctor Chatterjee, do you yourself have any patents?

4    A.   I do.

5    Q.   How many patents do you have?

6    A.   I believe the latest count is 10 U.S. patents and seven

7    international patents.

8    Q.   And what's the general subject matter of the patents that

9    you have?

10   A.   So my patents came out of the research I did in

11   developing that mobile banking system we talked about, and

12   they are directed to optimized communications over low

13   bandwidth wireless networks.

14   Q.   The next entry on your slide references IAM 1000.  Why

15   have you listed that?

16   A.   So the IAM organization, every year they publish a list

17   or a ranking of patent professionals, and I'm very privileged

18   to have been listed in the IAM Patent 1000 as one of the top

19   expert witnesses.

20   Q.   The next entry on this slide references a book entitled

21   *Developing Enterprise Web Services, An Architect's Guide.*

22       What is that referring to?

23   A.   So I co-authored a book with that title, and web services

24   is an industry standard technology for how two computers, or

25   more than two computers, how they communicate with each other

1    over different types of communications networks.

2    Q.   And then the very final entry on this slide is a

3    reference to the JSR 172 Expert Group.  Can you explain to the

4    jury what that is?

5    A.   The JSR 172 Expert Group is an industry standards expert

6    group.  And what we did, we got together and we defined the

7    worldwide standard for mobile web services, so how mobile

8    devices communicate, how mobile computers communicate over

9    communications networks.

10   Q.   Doctor Chatterjee, about when did you start working on

11   computer networking and computer networks?

12   A.   Probably around 1995 time frame.

13   Q.   So for about how many years have you been working in that

14   industry?

15   A.   Almost 30 years.

16   Q.   Okay.  In the context of your work in that industry, are

17   you familiar with industry standards that relate to computer

18   networking?

19   A.   I am.

20   Q.   Okay.  We've heard a fair bit of testimony in the trial

21   about something called the OSI model.  Are you familiar with

22   that?

23   A.   I am.

24   Q.   And is that something that you have worked with in the

25   context of the projects that you've already described?

1    A.   Yes.

2         MR. HAYNES:  At this point, Your Honor, I would move

3    that Doctor Chatterjee be admitted as an expert in the field

4    of computer networking and routing and the subject matter of

5    the asserted patents.

6         THE COURT:  Is there objection?

7         MR. BENNETT:  No objection, Your Honor.

8         THE COURT:  Without objection, the Court will

9    recognize this witness as an expert in those designated fields

10   and areas.

11        Please continue.

12        MR. HAYNES:  If we could bring up the next

13   demonstrative, 8.6.

14   Q.   (BY MR. HAYNES)  What have you illustrated here, Doctor

15   Chatterjee?

16   A.   This is the cover page of the '599 Patent.

17   Q.   I take it you're familiar with that patent?

18   A.   Yes.

19   Q.   Have you read that patent?

20   A.   Many, many times.

21   Q.   Did you conduct any investigation regarding the

22   technology that is described in that patent?

23   A.   I did.

24   Q.   And can you describe to the jury the investigation that

25   you conducted?

1   A.    So in addition to reading the actual patent many, many

2   times, like I mentioned, I also reviewed the prosecution file

3   history for the '599 Patent.  I reviewed technical documents

4   that demonstrate the state of the art, like what technologies

5   were existing and used at the time that the '599 Patent was

6   filed.

7         I've also reviewed technical documents produced by Nokia

8   in this case.  I've also reviewed source code that has been

9   produced by Nokia with regards to the Nokia routers that are

10  accused.

11  Q.    Okay.  Did you review the documents that were considered

12  by Doctor Valerdi and Doctor Cole in this case?

13  A.    I did.

14  Q.    Okay.  About how many hours would you say you spent

15  considering the materials that you just described?

16  A.    Several hundred hours.

17  Q.    Now, we've heard a lot of testimony in this case about

18  source code in Nokia's products.  Is that something you

19  reviewed?

20  A.    I did.

21  Q.    And for the features that are supported by a particular

22  Nokia router, were you able to determine any material

23  differences between the source code that you reviewed and how

24  the accused functionality is described in Nokia's technical

25  documents?

1  A.  No.

2       MR. HAYNES:  If we could bring up the next

3  demonstrative, 8.7.

4  Q.  (BY MR. HAYNES)  What have you illustrated here?

5  A.  Here I'm showing the definition of level of ordinary

6  skill in the art that was provided by Nokia.

7  Q.  So the level of ordinary skill that is listed here is a

8  Bachelor's degree in electrical engineering, computer

9  engineering, computer science, or a related technical field,

10  and three to four years of experience in the design and

11  development of telecommunication networks, systems, equipment,

12  and components.  Someone with less technical education but

13  more professional experience, or more technical education but

14  less experience, could also have met this standard.

15       Is that the standard for a person of ordinary skill in

16  the art that you applied in this case?

17  A.  Yes.

18  Q.  At the time of the filing of the '599 Patent, were you,

19  yourself, a person of ordinary skill in the art?

20  A.  Yes, I met this definition.

21  Q.  You were in the courtroom when Doctor Valerdi testified?

22  A.  I was.

23  Q.  And did you hear his definition of what a person of

24  ordinary skill in the art was?

25  A.  I did.

1    Q.   Would any of the opinions that you provided in this case

2    change at all if you were to have applied the exact definition

3    that he used versus your definition?

4    A.   Doctor Valerdi's definition was slightly different than

5    mine, but none of my opinions would change whether this

6    definition or the definition that Doctor Valerdi applied.

7    Q.   Okay.  Doctor Chatterjee, did you get an opportunity to

8    review the claim constructions provided by the Court in this

9    case?

10   A.   I did.

11   Q.   And in performing your analysis in this case, did you

12   apply that analysis using the definitions of the claim terms

13   for the '599 Patent that were provided by the Court?

14   A.   I did.

15        MR. HAYNES:  If we can go to slide 8.8, back to the

16   '599 Patent.

17   Q.   (BY MR. HAYNES)  What's the title of this patent, Doctor

18   Chatterjee?

19   A.   Layer 3 Network Routing with RPR Layer 2 Visibility.

20   Q.   Okay.  At a very high level, what's the '599 Patent

21   about?

22   A.   So the '599 Patent is about that there are two networks,

23   one layer 2 ring network and one external layer 3 network, and

24   the '599 Patent is about being able to gain visibility into

25   each other.

1    Q.    Okay.

2              MR. HAYNES:    If we could go to slide 8.9.

3    Q.    (BY MR. HAYNES)    What have you illustrated here, Doctor

4    Chatterjee?

5    A.    That based on my analysis, my investigation, and as I

6    will show you today, I've determined that the '599 Patent, the

7    asserted claim of the '599 Patent, is not infringed and, as I

8    explained, cannot be infringed by the accused Nokia products.

9    Q.    Okay.

10             MR. HAYNES:    If we could go to the next slide, 10.

11   Q.    (BY MR. HAYNES)    What have you illustrated here, Doctor

12   Chatterjee?

13   A.    Here I'm showing that, with regards to my

14   non-infringement opinion, there are at least two independent

15   reasons why Nokia does not and cannot infringe.

16   Q.    And what are those reasons?

17   A.    The first one is that there is no layer 2 ring network,

18   and the second one is that there is no defining paths to

19   external layer 3 network elements.

20   Q.    Okay.  You've mentioned layer 2 ring networks and

21   external layer 3 networks.  What are the layer 2 and layer 3

22   referring to there?

23   A.    So those are in reference to the OSI model that we

24   touched on earlier.

25   Q.    Okay.  I know we've heard a little bit about that, but I

1   just want to refresh our memory.

2            MR. HAYNES:  If we could go to the next

3   demonstrative, slide 11.

4   Q.   (BY MR. HAYNES)  What have you shown here, Doctor

5   Chatterjee?

6   A.   Here I'm showing the bottommost three layers of the OSI

7   model.

8   Q.   Okay.  On the left, you've illustrated layer 1 physical

9   layer.  What is layer 1 in the OSMO?

10  A.   So layer 1 is called the physical layer.  And one way to

11  think about it is that layer 1 is essentially the physical

12  wire.  So the cable that is used to connect different

13  computers within your home, that's layer 1.

14  Q.   Okay.  And the middle of your demonstrative, you

15  identified layer 2, the data link layer.  Can you explain to

16  the jury what that is?

17  A.   So layer 2 is the layer that allows communications within

18  a local area network.  For example, within your home, you may

19  have multiple computers, you -- they may -- you may have a

20  printer.  But even though your computers may not directly

21  connect to your printer using a wire, layer 2 is what allows

22  you to print documents from your computer to that printer even

23  though there's not a direct wire between your computer and

24  that printer.

25  Q.   Okay.  And then on the right, you've illustrated layer 3,

1    the network layer.  What is that?

2    A.    The network layer essentially allows interconnection

3    between different local area networks.  So here in the diagram

4    I'm showing the home local area network on the bottom, there

5    may be an office local area network, there may even be a

6    coffee shop that provides a local area network.

7         Layer 3 is the layer in the OSI model that allows them

8    all to interconnect and communicate with each other.

9    Q.    Doctor Chatterjee, were you in the courtroom during

10   Doctor Jeffay's testimony?

11   A.    For part of it, yes.

12   Q.    Did you -- were you here for the part where Doctor Jeffay

13   talked about topologies?

14   A.    Yes.

15   Q.    What's your understanding of what network topologies

16   refers to?

17   A.    So network topology is essentially a layout, and it's

18   about the arrangement of nodes, computers, routers within a

19   network.

20   Q.    What kind of topology is at issue in the '599 Patent?

21   A.    The '599 Patent specifically requires a layer 2 ring

22   network.

23   Q.    Okay.  And what is a layer 2 ring network?

24   A.    So a layer 2 ring network is a network which is a closed

25   loop, and each node within that layer 2 ring network has one

1    layer 2 connection going into it and one layer 2 connection

2    coming out of it.

3    Q.    Okay.

4            MR. HAYNES:  If we could go to the next

5    demonstrative, slide 12 --

6    Q.    (BY MR. HAYNES)  -- which is a call-out of figure 1 from

7    the '599 Patent.  Do you see that, sir?

8    A.    I do.

9    Q.    What is illustrated in figure 1 of the '599 Patent?

10    A.    So figure 1 is providing an example of the teachings of

11    the '599 Patent.

12    Q.    Okay.

13            MR. HAYNES:  Can we go to the next demonstrative?

14    Q.    (BY MR. HAYNES)  On slide 13, there's some blue

15    highlighting.  What does that represent?

16    A.    So what I've done here is I've taken figure 1 and added

17    the blue highlighting to show the layer 2 ring network.

18            MR. HAYNES:  Go to the next demonstrative.

19    Q.    (BY MR. HAYNES)  Now you've added some red to that.  What

20    is that illustrating?

21    A.    So I've used the red highlighting to identify the

22    external layer 3 network, which is also taught in the '599

23    Patent.

24    Q.    What do you mean when you say it's an external layer 3

25    network?

950

1    A.   It's external to the layer 2 ring network.  So you have

2    the layer 2 ring network.  The layer 3 network is separate,

3    external to that layer 2 network.

4    Q.   Okay.

5              MR. HAYNES:  If we can go to the next demonstrative.

6    Q.   (BY MR. HAYNES)  Now you've highlighted in red some of

7    the lines between what you identified as the layer 2 ring

8    network and the external layer 3 network.

9        What are the red lines that you've highlighted here now?

10   A.   So those are connections between the layer 2 ring network

11   and that external layer 3 network that we talked about.

12   Q.   Okay.  Now, prior to the '599 Patent, would the devices

13   in the layer 2 ring network have had visibility into the

14   structure of the external layer 3 network?

15   A.   So as explained in the '599 Patent, no, it would not.

16             MR. HAYNES:  If we could go to the next

17   demonstrative.

18   Q.   (BY MR. HAYNES)  Doctor Chatterjee, what have you

19   illustrated here?

20   A.   So I've taken the same figure 1 that we were just looking

21   at on the last slide, and I've removed some of the labels to

22   make the picture more clear and for us to have a cleaner

23   illustration diagram for us to discuss what's happening.

24   Q.   Okay.  You've added some labels on the connections coming

25   out of node E, node D, and node C.  What do those labels

1    represent?

2    A.    The labels state egress, and egress is another word for

3    exit.  And as you can see, those nodes, nodes E, D, and C, are

4    the exit points through which you're able to exit that layer 2

5    ring network.

6              MR. HAYNES:  Okay.  If we could go to the next

7    demonstrative.

8    Q.   (BY MR. HAYNES)  I notice we've added some more boxes in

9    the cloud on the left.  What is that illustrating?

10   A.    So like we talked about, the '599 Patent talks about this

11   external layer 3 network.  As we know, in a network you have

12   more than simply one box.  You have multiple routers, multiple

13   computers.  So, again, just to make a picture that's easy to

14   understand then for me to explain what we're talking about, I

15   put in these four boxes within that layer 3 network.

16             MR. HAYNES:  Okay.  If we could go to the next

17   slide.

18   Q.   (BY MR. HAYNES)  Doctor Chatterjee, what have you

19   illustrated here?

20   A.    Here I am trying to graphically illustrate the problems

21   that the '599 identifies that it's trying to solve.

22   Q.    Okay.  In the lower left, there's some text that is

23   excerpted from column 8, line 42 to 47, of the '599 Patent.

24   What is that describing?

25   A.    So that is from the specification of the '599 Patent.

1    And what it's stating there is that the first of the two

2    problems that the '599 Patent is trying to solve is that

3    because -- and you see that brick wall in the middle between

4    the layer 2 ring network on the right and the external layer 3

5    network.

6         What the '599 Patent is saying is because the two

7    networks cannot see into each other, and that's why I've

8    depicted that brick wall, because they cannot see into each

9    other, that's why they're not able to take good decisions on

10   which node, which one of -- for example, which one of the

11   three egress nodes to use.

12        And so what it's saying at the bottom there of the text

13   from the specification is that the first problem that the '599

14   Patent identifies that it's trying to solve is because you --

15   because the nodes within the layer 2 ring network on the

16   right-hand side don't have any visibility into the external

17   layer 3 network, they always use the same egress node.  And

18   I've shown that here with node D.

19        So every time there is exit from that layer 2 ring

20   network, it's going through that same egress node even though

21   there are three potential egress nodes.

22   Q.   Why is it a problem that it always goes through the same

23   egress node?

24   A.   Well, the problem is that you're not able to pick which

25   is the best exit for me to take to get to where I'm going.

1              MR. HAYNES:  Okay.  If we can go to your next

2    demonstrative.

3    Q.   (BY MR. HAYNES)  I notice now we've changed the text on

4    the bottom, and it's a different passage from column 8, lines

5    48 through 49, of the '599 Patent.  Is that right?

6    A.   Yes.

7    Q.   And what are you illustrating in this slide?

8    A.   Here I'm talking about the second of the two problems

9    that the '599 Patent is attempting to solve.  And what it's

10   explaining here is, again, because there is a brick wall,

11   because there is no visibility from the layer 2 ring network

12   on the right-hand side into the external layer 3 network,

13   you're not able to -- the nodes within the layer 2 ring

14   network are not able to define paths from the nodes within the

15   layer 2 ring network to the external layer 3 network nodes,

16   which minimize, for example, the number of hops.

17   Q.   Okay.  There's a reference in the text to a minimum hop

18   ring entry awareness.  What is that referring to?

19   A.   So a hop in networking is that if you're trying to send

20   data, it doesn't go directly; it will go through different

21   routers.  And so each one of those is called a hop.  So

22   clearly if you're trying to optimize when you're sending data,

23   you want to minimize the number of hops to get to wherever

24   you're going.

25   Q.   Okay.  So prior to the invention of the '599 Patent,

1    would the nodes inside the layer 2 network know the best way

2    to get out of the ring network to elements within the external

3    network?

4    A.   It would not because, again, of that brick wall in the

5    middle that prevents visibility between the layer 2 ring

6    network on the right and the external layer 3 network.

7    Q.   Okay.

8         MR. HAYNES:  If we could go to the next slide.

9    Q.   (BY MR. HAYNES)  Now, I notice we've now -- the title is

10   now Proposed Solution.  Do you see that?

11   A.   I do.

12   Q.   Can you explain to the jury what the proposed solution of

13   the '599 Patent was?

14   A.   So the proposed solution of the '599 Patent is to take

15   the host table, which is shown on the left-hand side, the host

16   table from the external layer 3 network, and simply share it

17   with the nodes of the layer 2 ring network on the right-hand

18   side, and, thus, giving visibility to the layer 2 ring network

19   on the right-hand side into the layer 3 -- external layer 3

20   network on the left.

21   Q.   Okay.  Did you prepare an animation to try to illustrate

22   sort of what that looks like?

23   A.   Yes.  I've tried to illustrate what that looks like.

24        MR. HAYNES:  Mr. Carrillo, can we try to play that?

25   Q.   (BY MR. HAYNES)  Okay.  So what the animation showed was

 1    that the host table moved across into the layer 2 network and

 2    then our wall disappeared.  Why did you -- what are you

 3    illustrating there?

 4    A.    So, as I explained, by sharing the host table from the

 5    layer 3 network with the nodes of the layer 2 network -- layer

 6    2 ring network on the right-hand side, now the layer 2 ring

 7    network has visibility into that external layer 3 network, and

 8    that's why I removed that brick wall that was in the middle.

 9    Q.    Okay.  What kind of information is contained in the host

10    table?

11    A.    The host table typically contains information about the

12    nodes and their connections within the network.

13              MR. HAYNES:  Okay.  Let's go to the next slide.

14    Q.    (BY MR. HAYNES)  Okay.  Now we've -- I see

15    we've -- there's a path that's going from node A, also 18,

16    going around through node B, through node C to node D, and

17    then out to the external layer 3 network.

18         What is -- what are you illustrating there?

19    A.    So what I'm trying to animate and -- and illustrate here

20    is that now that the nodes within the layer 2 ring network on

21    the right-hand side, now that they have visibility into that

22    external layer 3 network, it can define different paths from

23    that node.  For example, in this illustration, I'm showing a

24    path from node A within the layer 2 ring network, through node

25    B, through node C, to the egress node D, out to the -- oh, I'm

1    sorry.  I touched the screen.

2    Q.    I'll clear it for you.

3    A.    Okay.  And then to the external layer 3 network elements

4    on the left-hand side.

5    Q.    Okay.

6              MR. HAYNES:  If we can go to the next slide.

7    Q.    (BY MR. HAYNES)  Okay.  Now, there is another path going

8    from node A, through node E labeled 16, out to the external

9    elements.  What are you illustrating here?

10   A.    So, again, I'm simply showing a different path, another

11   path from that same node, node A, inside the layer 2 ring

12   network to that same node in the external layer 3 network.

13   Q.    In the proposed solution of the '599 Patent, now that you

14   have two paths that you can choose from, how would you go

15   about getting from node A out to the external element?

16   A.    Well, one example would be if you look at the two paths,

17   the red path, it requires five hops.  You would have to go

18   through B, C, D, and then within the two nodes in the external

19   layer 3 network, whereas the blue path would be two hops.

20        So one proposed solution that the '599 says is that now

21   that you have these two paths, the red path and the blue path,

22   to go from node A to that external layer 3 network node, you

23   can pick, for example, the blue one because it's shorter.

24   Q.    Okay.

25             MR. HAYNES:  If we could go to the next slide.

1    Q.    (BY MR. HAYNES)  Okay.  Slide 22 is an illustration of

2    claim 59.  You understand that that is the claim that Smart

3    Path has asserted in this case?

4    A.    Yes.

5    Q.    And do you understand that what Smart Path has accused of

6    infringing claim 59 in this case is a configuration of Nokia

7    routers and something called the triple play services delivery

8    architecture?

9    A.    Yes.

10    Q.    Okay.  And did you in your investigation compare the

11    elements of this claim to Nokia's triple play architecture to

12    assess whether or not that architecture met the elements of

13    the claims?

14    A.    Yes, as construed by this Court.

15    Q.    Okay.

16         MR. HAYNES:  If we can go to the next slide.

17    Q.    (BY MR. HAYNES)  What did you conclude regarding whether

18    or not Nokia's triple play architecture could infringe the

19    '599 Patent?

20    A.    So as I explained, based on my investigation and

21    analysis, I concluded, and I'll explain some of the reasons to

22    all of you this morning, that the accused Nokia products

23    cannot -- do not and cannot infringe.

24    Q.    Okay.  And I see, you know, you've got two red circles

25    with lines through them on certain parts of the claim.  What

1    are those indicating?

2    A.    So what I'm trying to show here is that I've talked about

3    these two independent reasons on the left-hand side.  And as

4    we know, in order to infringe, you have to infringe the actual

5    claim.

6        So what I've done on the right-hand side is that I've put

7    up claim 59, and I'm showing you that as the first bullet I'm

8    stating as no layer 2 ring network, there is within the claim

9    a layer 2 ring network.  It's hard to see because it's behind

10   that red X.

11       And similarly for that second bullet, that second

12   independent reason why Nokia does not and cannot infringe, I'm

13   showing the corresponding claim limitations which are not met.

14   Q.    The lower most red circle is going through claim language

15   on the right.  How does that relate to your infringement

16   opinions?

17   A.    That because that cannot be met, that there cannot be

18   infringement.

19   Q.    Okay.  And Nokia's triple play architecture, can nodes

20   within the triple play architecture create paths through an

21   egress node out to elements of an external network?

22   A.    No.  It's impossible.

23           MR. HAYNES:  All right.  Let's pull up your next

24   slide, 8.24.

25   Q.    (BY MR. HAYNES)  This is an excerpt from JX 46a at page

41.  Can you explain what we're looking at here, Doctor

Chatterjee?

A.   This is a figure from this document.  On the left-hand

side is the cover page of that document.  The document is

called the triple play service delivery architecture guide,

and this is one of the figures, figure 2, from that document.

Q.   Okay.  For which Nokia products is this guide?

A.   Well, it's talking about the 7450 and the 7750.

Q.   Okay.  Can you explain to the jury at a high level what

Nokia's triple play architecture is used for?

A.   So triple play is the -- the triple play architecture is

to allow the delivery of three things--high speed internet,

video, and voice over networks to residential subscribers.  So

essentially providing internet, video, and voice to homes.

Q.   Okay.

        MR. HAYNES:  If we could go to the next slide.

Q.   (BY MR. HAYNES)  This is an excerpt from page 37 of JX

46a.  What have you highlighted at the bottom here, Doctor

Chatterjee?

A.   I've simply highlighted that, consistent with what I

explained what triple play is, that it's stating that this

bundling of video, voice, and data services to residential

subscribers is now commonly known as triple play services.

Q.   Okay.

        MR. HAYNES:  If we could go to your next

1    demonstrative.

2    Q.   (BY MR. HAYNES)  We're back at figure 2 on page 41 of JX

3    46a, except now there's some blue highlighting.  Can you

4    explain what the blue highlighting is there for?

5    A.   The document talks about that within Nokia's triple play

6    architecture, there are two components.  One is called a BSA,

7    and I've highlighted in this blue color the BSAs in this

8    figure 2.

9    Q.   Doctor Chatterjee, what is a BSA?

10   A.   A BSA is a broadband service aggregator.

11   Q.   And what does the BSA, the broadband service aggregator,

12   do in the triple play architecture?

13   A.   So consistent with the name, broadband service

14   aggregator, it aggregates traffic from different homes.

15   Remember, we talked about the triple play is about delivering

16   video, voice, and high speed internet to homes.  So the BSA

17   aggregates traffic from different homes, puts it all together,

18   and then sends it off to what's called the BSR in the Nokia

19   architecture.

20        MR. HAYNES:  Okay.  If we can go to the next slide.

21   Q.   (BY MR. HAYNES)  Is what you've highlighted in yellow the

22   BSR?

23   A.   Yes.

24   Q.   Okay.  What does -- what is a BSR?

25   A.   BSR is a broadband service router.

961

1    Q.   And what does the broadband service router, BSR, do in

2    the Nokia's triple play architecture?

3    A.   The job of the BSR is to essentially take the traffic

4    that is coming from the BSAs, figure out where it should go,

5    and then the BSR sends it off to the internet.

6    Q.   What types of network device are the BSAs and BSR?

7    A.   They're routers.

8    Q.   Okay.  Doctor Chatterjee, you've been in the courtroom

9    when Doctor Valerdi was testifying.  Right?

10   A.   I was.

11   Q.   And you understand that there's been a lot of talk about

12   this red circle in this picture.  Do you recall that?

13   A.   Yes.

14   Q.   Can you explain to the jury what that red circle

15   represents?

16   A.   The red circle is showing the secure VPLS infrastructure,

17   and you can see the red font in the middle which states,

18   secure VPLS infrastructure.  And if you read the actual text

19   within this document, this triple play service delivery

20   architecture guide, it explains that that secure VPLS

21   infrastructure that is shown in this figure is a secure area

22   where things like denial of service attacks and those kind of

23   malicious acts cannot happen.  So it's a secure area, a secure

24   infrastructure.

25   Q.   Okay.  Does that red circle represent any sort of

962

1   connection between the BSAs and the BSR?

2   A.    No.

3   Q.    And how do you know that?

4   A.    Because it's -- the actual connections are shown in the

5   figure and further explained in the actual text accompanying

6   this figure.

7   Q.    Okay.  What are the actual connections between the BSAs

8   and the BSR?

9   A.    The dotted lines that are -- that are shown in this

10  figure.

11  Q.    Okay.

12          MR. HAYNES:  If we could go to the next slide.

13  Q.    (BY MR. HAYNES)  Are the dotted lines you're referring to

14  what you've highlighted in blue here?

15  A.    Yes.

16  Q.    Now, what type of topology is shown here between the BSAs

17  and the BSR?

18  A.    The network topology is a mesh.

19  Q.    Okay.  And at what layer is that mesh operating at?

20  A.    At layer 2.

21  Q.    Now, in Nokia's triple play architecture, are those BSAs

22  connected to each other at layer 2?

23  A.    No.

24  Q.    What type of layer 2 connection exists between the BSAs

25  and the BSR?

1    A.   The layer 2 connection at layer 2 is, like I explained, a

2    mesh.

3    Q.   Okay.  Have you heard that -- what type of layer 2

4    protocol is that connection?

5    A.   Oh, okay.  It's a VPLS.

6    Q.   Okay.  Can you just at a very high level explain what

7    VPLS is?

8    A.   So VPLS is virtual private LAN service.  And like I

9    mentioned, it's creating this secure bubble in some ways, if

10   you think about it, where bad things cannot happen.  It's a

11   secure infrastructure.

12   Q.   Okay.

13           MR. HAYNES:  If we could to the next slide, please.

14   Q.   (BY MR. HAYNES)  On this slide, Doctor Chatterjee, you

15   called out some text from the bottom of page 41, rolling over

16   to 42.  Can you explain to the jury what this text is

17   describing?

18   A.   Yes.  So as I explained, this document is something like

19   a thousand pages or over a thousand pages long.  It's not only

20   that figure 2.  There is a lot of writing, there's a lot of

21   text that accompanies that figure, and this is some of that

22   text that explains that figure.

23       And what I've done on the top there is I've highlighted

24   this first sentence, "The connectivity between BSAs and BSRs

25   is a layer 2 forwarding model," and that's consistent with

1    what I explained to you that the BSAs aggregate traffic and

2    simply forwards it to the BSR at layer 2.

3    Q.    Okay.  You've also highlighted in yellow a sentence that

4    states, "One of the advantages of using VPLS for this

5    application is that VPLS instances can be automatically

6    established over both hub-and-spoke and ring topologies

7    providing sub-50 milliseconds resilience."  Do you see that?

8    A.    I do.

9    Q.    Can you explain to the jury what that is describing?

10    A.    So like we talked about VPLS is a layer 2 technology, and

11    this is saying that you're able to automatically establish

12    VPLS.  And one of the key words to -- to notice is it saying

13    automatically established over both hub-and-spoke and ring

14    topologies.

15         And so because VPLS is a layer 2 technology, when it's

16    saying it can be established over hub-and-spoke and ring, that

17    means that the hub-and-spoke and ring topologies must be the

18    layer below it, which is layer 1.

19    Q.    Now, those references to hub-and-spoke and ring

20    topologies, what's that referring to?

21    A.    Again, like I explained, that it's simply stating that

22    the physical connections--remember we talked about with

23    regards to the OSI model, that the layer 1 is the physical

24    connections, the actual wire that -- that you have in your

25    home?  This is simply stating that that physical layer, that

1    layer 1, can be hub-and-spoke or ring, but the layer 2 above

2    that, which is the VPLS, it explains in the next sentence that

3    it's always a full mesh.

4    Q.    Okay.  You referenced the next sentence which you've

5    highlighted in blue here.  That sentence states, "Regardless

6    of the fiber plant layout, VPLS enables a full mesh to be

7    created between BSA and BSR nodes, ensuring efficient traffic

8    distribution and resilience to node or fiber failure."

9         Do you see that?

10   A.    I do.

11   Q.    Can you explain what you're referring to with regard to

12   that sentence?

13   A.    Yes.  So, again, the yellow highlighted sentence, as I

14   explained, it's talking about that hub-and-spoke and ring can

15   be done at layer 1, which is the physical layer.  That first

16   part of that -- that blue sentence, regardless of the fiber

17   plant layout, we all know fiber which is the -- the cable on

18   which optical communications happen, that's the physical wire.

19        So it's saying regardless of what's happening at the

20   physical layer, which is layer 1, regardless of what's

21   happening there, VPLS enables a full mesh to be created.  So

22   again, it's confirming and corroborating what I've explained

23   to you, that regardless of whether layer 1 is a ring topology

24   or a hub-and-spoke, at layer 2 it's stating that VPLS enables

25   a full mesh.

1      So there is always a full mesh at layer 2 regardless of

2  what's happening at layer 1.

3  Q.   So, Doctor Chatterjee, if the physical fiber were in a

4  ring, would that make the network a layer 2 ring network?

5  A.   No.

6  Q.   You were in the courtroom when Mr. Valley testified about

7  this document and actually some of these same sentences you

8  just described?

9  A.   Yes.

10 Q.   And did Mr. Valley agree or disagree with the explanation

11 that -- well, let me rephrase that.  Did -- do you agree or

12 disagree with Mr. Valley's explanation of what the connections

13 are in the triple play architecture?

14 A.   Yes.  We're both on the same page, and I believe it's

15 very clear from reading the text what's going on.

16 Q.   Okay.

17      MR. HAYNES:  Let's go to your next demonstrative.

18 Q.   (BY MR. HAYNES)  What have you illustrated here, Doctor

19 Chatterjee?

20 A.   So here what I've done is I've taken that same figure 2

21 that we were looking at, and I've simply simplified it to

22 remove some of the labels so that we have a simple, clear

23 document or a simple, clear diagram that we can look at while

24 I explain what's happening.

25 Q.   Okay.  And you've labeled, above the collection of BSAs

1  and BSRs, layer 2 mesh network.  What's that referring to?

2  A.   So as we saw in the text that I showed you on the last

3  slide, the documentation explains that at layer 2, the Nokia

4  triple play architecture is always a full mesh.  So I'm simply

5  stating again that at layer 2, it's a mesh network, and I'm

6  showing the connections between the BSA and the BSRs that also

7  demonstrate they are a mesh.

8            MR. HAYNES:  If we could go to the next slide.

9  Q.   (BY MR. HAYNES)  Doctor Chatterjee, were you in the

10 courtroom when I asked Doctor Valerdi about these definitions

11 of a ring network and a mesh network?

12 A.   Yes.

13 Q.   Do you agree with Doctor Valerdi that a ring network is a

14 local area network in which device nodes are connected in a

15 closed loop or ring?

16 A.   Yes.  Like I explained, in a ring network it's a closed

17 loop, and then there is a single layer 2 connection -- or for

18 a layer 2 ring network, a single connection going in and a

19 single connection going out.

20 Q.   In Nokia's triple play architecture, is there a layer 2

21 ring network under Doctor Valerdi's definition?

22 A.   No.

23            MR. HAYNES:  If we can go to the next demonstrative.

24 Q.   (BY MR. HAYNES)  What have you illustrated here, Doctor

25 Chatterjee?

1    A.    So, again, I've come back to the claim, the asserted

2    claim 59, and I'm showing that the asserted claim 59 requires

3    that there be a layer 2 ring network.  And as I've explained

4    to you, it is simply not possible and the documentation

5    confirms this with very clear language that it's always a

6    layer 2 mesh in the Nokia accused products.

7    Q.    Okay.

8            MR. HAYNES:  If we can go to your next

9    demonstrative.

10   Q.    (BY MR. HAYNES)  Okay.  We've talked about the first

11   independent reason why you believe Nokia does not infringe.

12   Now I'd like to shift and talk about the second reason that

13   supports your opinion of non-infringement.

14       And can you just remind us what that reason is at a high

15   level?

16   A.    The second independent reason why Nokia does not infringe

17   is that Nokia does not define paths to external layer 3

18   network elements.

19           MR. HAYNES:  Okay.  If we can go to the next

20   demonstrative.

21   Q.    (BY MR. HAYNES)  Doctor Chatterjee, do you understand

22   that the Court has provided certain definitions of some of the

23   terms in claim 59 as it relates to the limitation of defining

24   paths from said nodes through egress nodes of said ring

25   network?

1    A.    Yes.

2    Q.    And there's three different colors here so I'm going to

3    walk through those one by one.

4         In claim 59 on the left, you've highlighted in green the

5    preamble of that claim, which is the first lines that

6    introduce the claimed elements.  And then on the right, you've

7    highlighted "Preamble is limiting."  What are you illustrating

8    there?

9    A.    So the Court has determined that the preamble is limiting

10   for this asserted claim 59.  And my understanding of what that

11   means is that the preamble is a limitation that has to be met

12   for infringement to happen.

13   Q.    So just to be clear, Doctor Chatterjee, if there is no

14   layer 2 ring network, can there be infringement?

15   A.    No.

16   Q.    Now, you've highlighted in yellow the element that

17   requires defining paths from said nodes through egress nodes

18   of said ring network.  And then on the right you have some

19   yellow highlighting as well.  What are you illustrating there?

20   A.    So in the yellow highlighting on the right-hand side,

21   I've put in what the Court has construed that claim limitation

22   to mean.  And the Court has construed -- and this is very

23   important for my analysis that I'll go through with you-all.

24   The Court has construed that limitation to mean "Defining

25   paths to external elements of said layer 3 network from said

 1    nodes through egress nodes of said ring network."

 2         And so like I mentioned, this is going to be important

 3    because it's saying the path has to be to the external

 4    elements of the layer 3 network from the nodes through egress

 5    nodes.  So there are three of these elements within this

 6    construction.

 7    Q.   Okay.  Under the Court's construction, how many paths do

 8    you need to define in order to meet the claim limitation?

 9    A.   More than one.

10    Q.   And how many external elements do you need to reach with

11    those paths?

12    A.   More than one.

13    Q.   And how many nodes within the layer 2 network must those

14    paths be defined from?

15    A.   More than one.

16    Q.   Okay.  Moving down to the element you've highlighted in

17    blue, the claim term is "elements that are external to said

18    ring network."  And then on the, right you've again

19    highlighted it in blue part of the Court's construction.  Can

20    you explain what you're illustrating there?

21    A.   So, again, on the right-hand side with the blue

22    highlighting, I've set forth what this Court has construed

23    that limitation to mean, and the Court's construction is

24    "External elements of a layer 3 data network."

25    Q.   Okay.

1          MR. HAYNES:  If we could go to the next slide,

2    please.

3    Q.   (BY MR. HAYNES)  Doctor Chatterjee, what have you

4    illustrated here?

5    A.   So on the left-hand side I'm showing the original claim

6    59, and then on the right-hand side I'm showing what the Court

7    has construed that claim to be saying.  So on the right-hand

8    side, I'm showing the claim 59 as construed by this Court.

9    Q.   And when forming your infringement opinions, did you

10   apply the Court's construction of claim 59 as reflected on the

11   right-hand side of the slide 35?

12   A.   Yes, I did.

13          MR. HAYNES:  Okay.  Let's look at the next slide,

14   please.

15   Q.   (BY MR. HAYNES)  And I want to focus now on the claim

16   limitations that relate to defining paths to external

17   elements, selecting one of those paths, and then transmitting

18   data from said nodes.

19        On the right-hand side of slide 36, you have put your

20   picture back up there.  Why did you put the picture back up?

21   A.   Again, just to provide an example so we can see what's

22   happening.  That's why I put the picture up.

23   Q.   Okay.  So just to be clear, we're going talk about what

24   you've labeled here in a little bit, but are you suggesting

25   that this is the only possible way that the claim elements

1    could be met in this figure?

2    A.    No.    This is simply an example to illustrate what's

3    happening in the claims.

4    Q.    Okay.    So I just want to talk about some of the labels

5    that are on this diagram.    Do you see on the right there are

6    some nodes that are labeled "said nodes"?    What do those

7    labels represent?

8    A.    So this is coming back to what I explained a few moments

9    ago, that the Court's construction has words in there that are

10   very important to my innovations.    And as I read, if you look

11   at the claim limitation on the left-hand side where it's

12   saying "defining paths to external elements of said layer 3

13   network from said nodes through egress nodes," so there on

14   the -- coming back to that exemplary figure on the right-hand

15   side, I've labeled what said nodes are.    So, for example, said

16   nodes would be node A and node B.

17   Q.    Okay.    And that corresponds to node 18 and node 20 from

18   figure 1 of the '599 Patent?

19   A.    Yes.

20   Q.    Okay.    You've also added some labels for egress nodes.

21   Remind us again what those represent.

22   A.    So egress nodes, like I explained, egress is another word

23   for exit, and so egress nodes are the exit nodes.    And, again,

24   this is very important to my knowledge.    If you again look

25   back on the left-hand side where that limitation starting

1    "Defining paths," it says, "Defining paths, the external

2    elements of said layer 3 network from said nodes through

3    egress nodes."  So that path has to go through an egress node.

4    Q.    Okay.  And then the final thing that you've labeled here

5    are external elements.  What does that label represent?

6    A.    So the external elements, again it goes back to

7    that -- back to the Court's construction that I've shown on

8    the left-hand side.  The paths have to be defined to external

9    elements of said layer 3 network, and that's what I'm showing

10   in that diagram.  The path is going to the external elements

11   in that external layer 3 network.

12   Q.    Doctor Chatterjee --

13          MR. HAYNES:  I'm going to pause just for a second if

14   it's okay with Your Honor.

15          THE COURT:  That's fine.  No problem.  Let's

16   continue.

17   Q.    (BY MR. HAYNES)  Okay.  Doctor Chatterjee, I want you to

18   keep claim 59 and the elements we've been talking about in

19   your mind, but I want to go back and look at the triple play

20   architecture again.  All right?

21   A.    Okay.

22          MR. HAYNES:  So if we can go to your next slide,

23   8.37.

24   Q.    (BY MR. HAYNES)  And, again, this is from JX 46a at page

25   41.

1        In the triple play architecture, is it possible to define

2    paths from the nodes of the triple play network through an

3    egress node to an external layer 3 network?

4    A.    No it's impossible.

5    Q.    Why?

6    A.    Well, because in the triple play architecture, remember I

7    explained that the BSAs, they aggregate traffic and they

8    simply send it to the BSR, and then the -- what I'm

9    highlighting here in the yellow highlighting, it states very

10   clearly the BSR terminates the layer 2 access.  So it's

11   terminating whatever is coming over, so that that path is

12   terminated at the BSR.

13        And remember the claim language we talked about, it's

14   saying it has to go through an egress node.  So this is

15   confirming that it's simply not possible within the Nokia

16   triple play architecture to meet that claim language as

17   construed by the Court because it's terminating.

18   Q.    Okay.

19        MR. HAYNES:  If we can go to your next

20   demonstrative.  Go one more, Mr. Carrillo.

21   Q.    (BY MR. HAYNES)  What have you illustrated here, Doctor

22   Chatterjee?

23   A.    So consistent with what I explained and consistent with

24   what the text of the Nokia triple play document states, the

25   path, if there is a path from the BSA, it terminates at the

1    BSR, and so I've put that no thru traffic sign just to

2    graphically illustrate that point.  The path ends, the path

3    terminates.  The documentation confirms that it ends and

4    terminates.

5    Q.   Doctor Chatterjee, are you suggesting that there's no way

6    for data to get from inside the triple play architecture out

7    to the internet?

8    A.   No, that's not what I'm saying.

9    Q.   Well, the paths terminate from the BSA and they end at

10   the BSR, how does data get out?

11   A.   The BSR can send data out.  What I'm trying to state is

12   that with regards to my infringement analysis, the Nokia

13   triple play architecture can never meet the claim 59 as

14   construed by this Court because the claim requires that it

15   goes through the BSR.

16   Q.   And what is it that must go through the BSR out to the

17   external elements?

18   A.   The path that is defined.

19   Q.   Okay.  Is there any way in Nokia's triple play

20   architecture to define paths that start at the BSA node, go

21   through the BSR node to external elements of the layer 3

22   network?

23   A.   No.  It is impossible, and it is confirmed by the Nokia

24   documentation.

25   Q.   Now, Doctor Valerdi, you heard him testify about

1    something called OSPF.  Do you recall that?

2    A.    Yes.

3    Q.    What is OSPF?

4    A.    OSPF is a standard technology called open shortest path

5    first.

6    Q.    And you recall Doctor Valerdi suggested that if these

7    nodes in Nokia's triple play architecture were using this open

8    shortest path first technology, that could define paths from a

9    BSA through a BSR to an external element?  Do you recall that?

10   A.    I do.

11   Q.    Is it possible using OSPF to define a path in Nokia's

12   triple play architecture that goes from the BSA through the

13   BSR out to the internet?

14   A.    No, it's impossible.

15   Q.    And why is that?

16   A.    Well, like I explained, that any path is terminated at

17   the BSR.  And so there is -- it's simply impossible to have a

18   path using OSPF or -- using OSPF or anything else that will go

19   through the BSR to the external elements.

20   Q.    And with respect to the OSI model, at what layer does

21   OSPF operate?

22   A.    OSPF operates at layer 3.

23   Q.    Does OSPF operate at layer 2?

24   A.    No.  It operates at layer 3.

25            MR. HAYNES:  Okay.  Let's go to your next slide, 39.

977

1    Q.    (BY MR. HAYNES)  Can you summarize for us where that

2    leaves us with respect to your opinions on non-infringement?

3    A.    So, again, like I explained, the Court's construction of

4    that defining limitation and the other limitations at the

5    bottom that are highlighted in yellow are critical to my

6    analysis.  And as I explained that it requires that defining

7    paths to external elements of said layer 3 network from said

8    nodes through egress nodes.  And as I've explained, it's

9    simply not possible to meet that claim language as construed

10   by the Court.

11   Q.    Okay.

12          MR. HAYNES:  If we can go to the next slide.

13   Q.    (BY MR. HAYNES)  Doctor Chatterjee, in Nokia's triple

14   play architecture, have you seen any evidence in this case

15   that that architecture can be configured in a layer 2 ring

16   network?

17   A.    No.

18   Q.    Have you seen any evidence in this case to suggest that

19   Nokia's triple play architecture is capable of defining paths

20   to external elements of said layer 3 network from said nodes

21   through egress nodes of said ring network?

22   A.    No.

23   Q.    Now, I see you've drawn four red circles, and we've been

24   talking about two limitations.  Why do you have four circles

25   there?

1    A.    So the top circle is talking about that a layer 2 ring

2    network can never be met.

3         And then for my -- that second independent reason why

4    Nokia can never infringe claim 59, I'm simply stating that

5    those three limitations, the ones starting with "defining

6    paths," the second limitation starting with "selecting one of

7    said paths," and that third limitation starting with

8    "transmitting data from", none of those can be met.  That's

9    all I'm saying.

10   Q.    Now, we talked a lot at the beginning about the fiber and

11   how you can, you know, you could in theory connect at the

12   physical connection level at layer 1 the BSAs into a ring

13   topology.  Do you recall that?

14   A.    I do.

15   Q.    Even with respect to that theoretical possibility at

16   layer 1, have you seen any evidence in this case of an actual

17   Nokia customer that has configured the triple play

18   architecture at layer 1 in a ring network?

19              MR. BENNETT:  Objection; relevance.

20              THE COURT:  Do you have a response?

21              MR. HAYNES:  Your Honor, Doctor Valerdi has pointed

22   to the physical connections at layer 1 as support for his

23   infringement theory.  I'm merely saying that even if Doctor

24   Valerdi's theory that layer 1 was a ring, I'm asking Mr.

25   Chatterjee has he seen any evidence even at layer 1 whether

1    such a thing exists.

2            THE COURT:  It seems to me to clear the low bar of

3    relevance.  I'm going to overrule the objection.

4    Q.   (BY MR. HAYNES)  Let me restate any question Doctor

5    Chatterjee.

6        Doctor Chatterjee, do you agree -- well, let me rephrase.

7        Doctor Chatterjee, in your review of the evidence in this

8    case, including in Doctor Valerdi's testimony, have you seen

9    any evidence of an actual customer network that is configured

10   in a layer 1 ring network.

11   A.   No, I have not.

12   Q.   Now, claim 59 refers to a computer software product.  Do

13   you see that?

14   A.   I do.

15   Q.   And that requires -- or do you understand that that

16   requires that there be instructions on that computer that

17   would cause the computer to perform these method steps that

18   we've just been talking about?

19   A.   Yes.  The preamble states, "Instructions when read by a

20   computer cause the computer to perform a method for."

21   Q.   And so in order for a computer to cause or to execute

22   instructions that could cause these steps to be performed,

23   what would a Nokia customer have to do?

24   A.   Well, they would have to take a number of steps, but one

25   of the steps would be to configure the routers in a layer 2

1    ring network.

2    Q.   And, again, is that possible?

3    A.   Not with the Nokia triple play services architecture, no,

4    it's not.

5    Q.   Doctor Chatterjee, we also have heard from Doctor Cole in

6    this case.  Were you here for his testimony?

7    A.   I was.

8    Q.   Do you recall that Doctor Cole used a single brochure for

9    the 7250 router product in order to attempt to apportion

10   amongst various features of the product to try to show value

11   of the alleged patents?  Do you recall that generally?

12   A.   I do.

13   Q.   Did you review that brochure that Doctor Cole used?

14   A.   I did.

15            MR. BENNETT:  Objection, Your Honor.  May we

16   approach?

17            THE COURT:  State your objection.

18            MR. BENNETT:  I believe this is outside the scope of

19   Doctor Chatterjee's report.

20            THE COURT:  All right.  Mr. Haynes, you believe it's

21   within the scope?

22            MR. HAYNES:  Absolutely, Your Honor.  He directly

23   addressed with respect to the '599 Patent Doctor Coles' --

24            THE COURT:  I'm not asking you how it is.  I'm just

25   asking, do you believe it is.

1          MR. HAYNES:  I believe it is, Your Honor.

2          THE COURT:  Well, ladies and gentlemen, this is a

3     matter I will need to take up with counsel outside your

4     presence.  I'm going to ask you to retire to the jury room

5     briefly.  You can simply leave your notebooks in your chairs,

6     follow all my instructions, including not to discuss the case

7     among each other.  I will work this out with counsel and get

8     you back in here as soon as possible.

9          The jury should retire to the jury room.

10          (Whereupon, the jury left the courtroom.)

11          THE COURT:  All right.  Be seated, please.

12     I've got Doctor Chatterjee's report in front of me, or

13     his reports.  It's your objection, Mr. Bennett.  Why don't you

14     tell me why you believe the substance of it is outside the

15     scope of this expert's report, and then I'll hear a response

16     from Mr. Haynes.

17          MR. BENNETT:  Your Honor, I don't recall Doctor

18     Chatterjee responding to Doctor Cole's specific apportionment

19     analysis that the 11 percent and the testimony that he

20     provided on whether the accused features of the '599 or even

21     the other patent wasn't addressed today.  So I don't recall it

22     being in the report specifically, that particular -- at least

23     what was invoked by the scope of the question.  I know Doctor

24     Cole is mentioned in the report, but...

25          THE COURT:  All right.  Mr. Haynes, what do you have

1    to say?

2            MR. HAYNES:  May I have the elmo, please?

3        I'm going to walk through this if you'd like me to, Your

4    Honor, but there's an entire section of Doctor Chatterjee's

5    report where he responds to Doctor Cole and his apportionment

6    analysis.

7            THE COURT:  Is this his initial report or his

8    rebuttal --

9            MR. HAYNES:  It's the rebuttal report, Your Honor.

10           THE COURT:  Let me get to it.  I have it in front of

11   me.  308, is that the right paragraph?

12           MR. HAYNES:  Page 148, paragraph 380.  And if it

13   helps --

14           THE COURT:  Specifically where in this section do

15   you believe it's referenced or discussed?

16           MR. HAYNES:  This whole section, Your Honor, is

17   about this.  My question is actually going to be very simple.

18   It's just going to ask him if he's aware of the triple play

19   architecture being mentioned at all in any of the brochures,

20   but he is talking about the fact that Doctor Cole's features

21   he's identified do not -- are not used by triple play

22   architecture.

23           MR. BENNETT:  Okay.  If that's the question,

24   then --

25           MR. HAYNES:  I'm not going to get into the

1    percentages.

2             MR. BENNETT:  If that's the question, then that's

3    fairly within the report.

4             THE COURT:  Given that clarification, you withdraw

5    your objection?

6             MR. BENNETT:  I do.

7             THE COURT:  All right.  Let's bring the jury back

8    in, please.  And I'll charge this time to the Plaintiff.

9             (Whereupon, the jury entered the courtroom.)

10            THE COURT:  Thank you for your cooperation, ladies

11   and gentlemen.  Please be seated.

12       With some clarification, the objection's been withdrawn

13   so we'll proceed.

14       Go ahead, Mr. Haynes.

15   Q.   (BY MR. HAYNES)  Doctor Chatterjee, we were discussing

16   the brochure that Doctor Cole used in his apportionment

17   analysis.  Do you recall that?

18   A.   I do.

19   Q.   My question to you, sir, is in that brochure that Doctor

20   Cole pointed to and identified a whole bunch of features that

21   he claimed were relevant to the '599 Patent, does that

22   brochure mention the triple play architecture at all?

23   A.   No.

24            MR. HAYNES:  I'll pass the witness, Your Honor.

25            THE COURT:  All right.  Cross examination?

                        CROSS EXAMINATION

BY MR. BENNETT:

Q.    Good morning, Doctor Chatterjee.

A.    Good morning.

Q.    I wanted to spend some time with your -- a little more

time with your background and your resume, or CV as it's

known.  Do you have that there on the podium with you if you

need it for your reference?

      Looking over your CV, I mean, you've been deposed over 50

times as an expert?

A.    I believe so.

Q.    And you'll agree with me that most of the engagements

that you've had, at least the ones listed on your CV, are for

the party defending patent infringement or trying to

invalidate patents.  Right?

A.    I don't believe so.  I believe it's roughly 50/50,

perhaps a little bit different than that.

Q.    Why don't we flip to is it -- it's Exhibit 1 to your

report, and page 12 of your report -- or, sorry, page 12 of

that document.

A.    My opening report?

Q.    Or your rebuttal report.  I think it's Exhibit 1 in

either.

A.    Okay.  You said page 12?

Q.    Correct.

1    A.   Page 12 or paragraph 12?

2    Q.   Page 12 of Exhibit 1 to your report, which is your CV.

3    A.   Oh.  I don't think the exhibit is here.

4    Q.   All right.

5              MR. BENNETT:  Your Honor, may I approach?

6              THE COURT:  You may.

7    Q.   (BY MR. BENNETT)  You should see Exhibit 1 under one of

8    the tabs of that binder.

9    A.   Okay.  I found it.

10   Q.   All right.  And please flip to page 12.

11   A.   Okay.

12   Q.   Now, as I read your CV or your resume, it goes from -- on

13   page 12, it starts with the most recent engagement you've had

14   as an expert, and it goes backward in time so that the earlier

15   part of your CV contains the engagements you've had that have

16   been the longest -- you know, that were a long time ago.  Is

17   that right?  Reverse chronological order.

18   A.   Yes.

19   Q.   Okay.  So starting with the expert engagement, case name

20   Apple Inc. v. Spire or Speir Technologies, do you see that?

21   A.   I do.

22   Q.   You were hired by Apple in that case?

23   A.   Yes.

24   Q.   And that case was -- Apple had been sued by Speir?

25   A.   Yes.

986

1    Q.    And you were working for Apple to invalidate those

2    patents.

3    A.    That if I remember correctly was an IPR.

4    Q.    All right.  An IPR is a proceeding that companies like

5    Apple file when they're accused of patent infringement to try

6    to invalidate the patent they're accused of infringing.

7    Right?

8    A.    Yes, if they believe the patent is invalid.

9    Q.    And then the case prior to that Consumeron, LLC, v.

10   MapleBear, Inc.  You were hired by the Defendant in that case.

11   A.    Yes.

12   Q.    And they not only denied infringement but also sought to

13   invalidate the patents in that case.  Right?

14   A.    Yes.

15   Q.    And then prior to that, you were hired by Jam City in

16   Groove Digital v. Jam City.  Right?

17   A.    Yes.

18   Q.    And you worked with Jam City, Inc.  Right?

19   A.    Yes.

20   Q.    And they were defending patent infringement?

21   A.    Yes.

22   Q.    And you were trying to help them invalidate the patents

23   they were accused of infringing.  Right?

24   A.    I was not helping them.  I was providing my opinions.

25   Q.    To assist them in invalidating the patents.

1   A.   Because my analysis showed that they were invalid.

2   Q.   And the reason you provided your analysis was to help Jam

3   City invalidate those patents.

4   A.   I wasn't helping them.  Like I said, I provide

5   independent opinions; and, yes, based on my analysis, I

6   believed that the patents were invalid.

7   Q.   Okay.  Prior to that, you worked with Lyft, Inc., in

8   Lyft, Inc. v. AGIS Software.  Do you see that?

9   A.   I do.

10   Q.   And that was another -- another situation where Lyft had

11   been accused of infringing patents.  Right?

12   A.   Yes.

13   Q.   And you were assisting Lyft in providing opinions that

14   went toward not only non-infringement but invalidating

15   patents.  Right?

16   A.   No, that's not correct.

17   Q.   Okay.  How about the case before that, Fintiv v. PayPal

18   Holdings?

19   A.   Yes, Fintiv.

20   Q.   Fintiv.  All right.  You were hired by PayPal in that

21   case?

22   A.   Yes.

23   Q.   And you were helping them defend claims of infringement

24   and pursuing invalidity defenses.  Right?

25   A.   Again, I provided my opinions, yes.

1  Q.   And maybe I'll phrase it this way.  And then PayPal was

2  taking your opinions to use to invalidate patents.

3  A.   Yes.  That one I believe was also an IPR.

4  Q.   Okay.  I mean, I can keep going.  There is lots, but I

5  mean, looking at the first page 12, page 11, all of those, 1,

6  2, 3, 4, 5, 6 -- I mean, almost two dozen you represented the

7  defense.  Right?

8  A.   Yes, and these are only the public listings.

9  Q.   Well, that's all we're talking about.  Right?  Public

10 listings?

11 A.   Well, I'm just making the clarification that what's on my

12 public CV are public cases.

13 Q.   All right.  And if you'll turn to page 10 of your CV,

14 there's another dozen where you were hired by the party

15 defending against patent infringement or asserting invalidity

16 defenses.  Right?  With maybe one exception at the top.

17 A.   No, I disagree.  Some of these are not patent cases.

18 Q.   Okay.  Dolby Laboratories v. Intertrust was a patent

19 case?

20 A.   Yes, that one was.

21 Q.   And you represented the party opposing infringement and

22 trying to invalidate the patent.  Right?

23 A.   For that one, I was retained by Dolby.

24 Q.   And Dolby was trying to invalidate a patent.  Right?  One

25 or more.

1    A.    Yeah -- yes.  There were -- I -- again, I provided my

2    opinions on patent validity.

3    Q.    Which Dolby then used to try to invalidate a patent.

4    A.    Again, I believe those were IPRs, yes.

5    Q.    Okay.  You mentioned earlier that you had obtained 10

6    U.S. patents.  Right?

7    A.    Yes.

8    Q.    And when you obtained those patents, you assigned them to

9    a company also listed on your CV.  Right?

10    A.    Yes.

11    Q.    And that would be S3G Technology, LLC.  Correct?

12    A.    Yes.

13    Q.    And, in fact, the 10 U.S. patents that you've obtained,

14    each one of those have been assigned to S3G Technology.

15    Right?

16    A.    Ultimately, yes.

17    Q.    All right.  And S3G Technology, LLC, has asserted patent

18    infringement actions against other companies in connection

19    with those 10 patents.  Right?

20    A.    It has.

21    Q.    And that's because, as a patent holder, you'll agree that

22    when you feel like someone is infringing on your technology,

23    you need to protect that technology.  Right?

24    A.    I agree.  I strongly believe in the patent system.  And

25    if a patent is valid and if it's actually being infringed, I

1    strongly believe with that.

2    Q.   And companies that seek to use their patents to license

3    them to others, that's a legitimate form of protecting

4    property.  Right?

5    A.   Again, yes.  If it's a valid patent that's being

6    infringed, a hundred percent agree.

7    Q.   And I'm glad you said that.  During the course of your

8    examination, you did not challenge the validity of the '599

9    Patent.  Correct?

10   A.   I did not to the jury offer opinions related to validity.

11   Q.   Correct.  And you -- so let me just rephrase that or ask

12   it one more time and get a clean answer.

13        You have said nothing today as we sit here now about the

14   '599 Patent being invalid.  Right?

15   A.   I don't believe so, no.

16   Q.   All right.  And in rendering your opinions today and

17   maybe I -- there was no discussion about source code.

18   Correct?

19   A.   I disagree.

20   Q.   Well, your analysis of source code.  Mr. Haynes didn't

21   put up a slide and you walked through Nokia's source code or

22   anything like that.  That didn't happen today.  Right?

23   A.   No, but I did review source code.

24   Q.   I understand.

25        Mr. Haynes mentioned some standards, and you've been in

1    trial as we've discussed standards throughout the trial.

2    Right?

3    A.    I have been attending the trial every day.

4    Q.    And you've heard the discussion of standards?

5    A.    I have.

6    Q.    Okay.  The RFC standards.  We've seen a lot of those.

7    Right?

8    A.    Yes.  I believe those are the IETF standards.

9    Q.    All right.  And you agree that it is possible for an

10   infringer to practice a standard and still infringe the claims

11   of a patent.

12   A.    If the standard is practicing the patent, yes.

13   Q.    Well, there's many ways to implement a standard.  Right?

14   A.    It depends on the standard, but I would generally agree

15   with you.

16   Q.    As a general matter.

17   A.    As a general matter, it could be implemented in software,

18   it could be implemented in hardware, yes.

19   Q.    And one company may implement a standard in a way that

20   doesn't infringe.  Right?

21   A.    I -- that's a hard question to answer.  It's unlikely.

22   Q.    It's unlikely that a company can implement a standard in

23   a way that doesn't infringe?  That's your testimony?

24   A.    My testimony is that typically standards define protocols

25   that are used within the industry.  And so what happens with

1    standards is that both sides have to implement it the same

2    way; otherwise, they can't talk to each other.

3         It's like if you and I are speaking in English, we both

4    have to speak the same English; otherwise, we can't

5    communicate.

6    Q.   Right.  But the language doesn't necessarily determine

7    implementation.  Right?  As you said, there's lots of ways

8    that a standard may be implemented--software or hardware?

9    A.   I agree.  So if it's about software or hardware, yes, I

10   agree.

11   Q.   Okay.  Doctor Chatterjee, you spoke this morning or

12   testified this morning about ring networks.  A ring network is

13   a network where each node or where a node is connected to two

14   other network nodes such that there is no beginning and end.

15   Correct?

16   A.   Yes, that -- it's a closed loop, like I mentioned.

17   Q.   Okay.  Let me show you Exhibit -- Joint Exhibit 46a.

18        MR. BENNETT:  Mr. Jarrett, at page 39.

19   Q.   (BY MR. BENNETT)  So this is the triple play architecture

20   manual that's been discussed some.  I just want to spend some

21   time looking at figure 1 here.

22        MR. BENNETT:  If you'll enlarge the first half of

23   that screen, Mr. Jarrett.

24   Q.   (BY MR. BENNETT)  I want to focus just on this piece

25   here.

1          So we've got a BSR which you've mentioned before.  Right?

2    A.   Yes.

3    Q.   All right.  And it's connected to a BSA to its left and

4    right, or top and bottom, however you like it.  Correct?

5    A.   Where are you looking?  There are three BSAs in this --

6    Q.   Right.

7    A.   Yes.

8    Q.   And those would be connected together.  Do you agree with

9    that?

10   A.   The BSAs are not connected together.

11   Q.   In this diagram, your testimony is that BSAs are not

12   connected together?

13   A.   This is showing, consistent with that other diagram

14   figure 2 that we looked at, it's simply showing the VPLS --

15          THE COURT:  Doctor Chatterjee, he simply asked you

16   do you agree they are or are not connected.  He didn't ask you

17   to explain why you don't think they are connected.  You need

18   to limit your answer to the question asked, please.

19          THE WITNESS:  Okay.

20          THE COURT:  Either restate the question or move on,

21   Mr. Bennett.

22          MR. BENNETT:  I'll move on, Your Honor.

23   Q.   (BY MR. BENNETT)  You mentioned figure 2 --

24          MR. BENNETT:  -- which is, Mr. Jarrett, page 41 of

25   Joint Exhibit 46a.

1    Q.   (BY MR. BENNETT)  And we discussed this some already.

2    The jury's seen it a bunch of times.  I just want to ask you a

3    couple of quick questions.

4         Would you agree with me, Doctor Chatterjee, that VPLS

5    allows automatic configuration regardless of whether fiber

6    is -- the fiber connections or hub or spoke are a ring

7    configuration?

8    A.   It may.

9    Q.   Okay.  And figure 41 or, excuse me, figure 2 on page 41

10   of Joint Exhibit 46a, we're discussing a VPLS.  Right?

11             THE COURT:  Could you slow down a little bit, Mr.

12   Bennett?

13             MR. BENNETT:  Yes, Your Honor.

14             THE WITNESS:  It is showing secure VPLS

15   infrastructure.

16             MR. BENNETT:  And will you turn the page, Mr.

17   Jarrett?

18   Q.   (BY MR. BENNETT)  And, again, I don't want to spend too

19   much time.  We've seen this plenty during the trial.

20             THE COURT:  Counsel, there's no need to tell us how

21   many times we've seen things.  Sidebar comments are not

22   appropriate.  Ask a question of the witness, please.

23             MR. BENNETT:  I will.

24        Mr. Jarrett, the top paragraph, if you'll zoom in there,

25   please, and highlight the language "one of the advantages" and

1    that sentence.

2    Q.    (BY MR. BENNETT)  All right.  So during your testimony,

3    you focused on this word 'over' and its meaning.  Right?

4    A.    Yes, I did.

5    Q.    All right.  "One of the advantages of using VPLS for this

6    application is that VPLS instances can be automatically

7    established over both hub-and-spoke and ring topologies

8    providing sub-50 millisecond resilience."  Right?

9    A.    Yes.

10   Q.    Okay.  And you'll agree with me that two people can read

11   the same language and reach a different conclusion about what

12   it means, as a general matter.

13   A.    As a general matter, I agree with you.

14   Q.    All right.  And to know what conclusion or what the

15   language means, we might look to other sources or other

16   evidence to see which meaning applies to that particular

17   language.  Right?

18   A.    In general, yes.

19   Q.    Now, you talked some about fiber networks.

20          MR. BENNETT:  You can take it down, Mr. Jarrett.

21   Q.    (BY MR. BENNETT)  Would you agree that the fiber

22   networks -- establishing a fiber network can be cost

23   prohibitive depending on the distance of the network lines you

24   have to establish?

25   A.    It may be.

1    Q.   Well, let me ask it this way.  Fiber connections have

2    been around for a very long time.  Right?

3    A.   Yes, fiber technology has been around.

4    Q.   But even still, not every area in, let's say, Texas has

5    fiber connections.  Right?

6    A.   Yes.  I believe it's not only limited to Texas.  I

7    believe there are many places that don't have it.

8    Q.   But there are places--again, we'll just stick with

9    Texas--within Texas that do have fiberoptic cable that runs

10   the internet at their businesses or their homes.  Right?

11   A.   I would assume so, yes.

12   Q.   All right.  And part of the reason why fiber hasn't been

13   proliferated is because it is expensive to lay over great

14   distances.  Right?

15   A.   Again, it can be.

16   Q.   All right.  And so if you're a business that has an

17   expansive campus or a business like cable operators whose

18   businesses and the lines they have to stretch can go for

19   hundreds, if not thousands, of miles, establishing fiber may

20   be something to consider when you're deciding upon a topology.

21   Right?

22   A.   I don't think I understood your question.

23   Q.   Let me re-ask it.

24        MR. BENNETT:  And let's go to figure 2, please, Mr.

25   Jarrett, in JX 46a at 41?

1    Q.    (BY MR. BENNETT)  All right.  If I heard correctly or

2    noted it correctly, I think what I heard you say is the

3    connections in this particular diagram were fiber.  Right?

4    A.    Yes.

5    Q.    Okay.  So my question is, if a business operator that's

6    using Nokia equipment elects to use something other than

7    fiber, they can still establish a network through another

8    means.  Right?

9    A.    Yes.  Fiber is not the only physical connection.

10   Q.    And they could use a hub-and-spoke topology.  Right?

11   A.    That's where you're losing me.

12   Q.    Okay.

13   A.    We're talking about a physical wire.

14   Q.    Right.  So you don't -- let me ask it this way.  You can

15   establish a hub-and-spoke topology, network, without a fiber

16   requirement.

17   A.    Hub-and-spoke can be used with different physical layers,

18   yes.

19   Q.    And that's true of a mesh network, too.  Right?

20   A.    Yes.

21   Q.    And that's true of a ring network.  Right?

22   A.    Yes.

23   Q.    You can also have networks where the nodes are connected

24   some with fiber -- in the same network, same topology, some

25   with fiber and some with other kinds of connections, too.

1    Right?

2    A.   Typically not within the same network, but yes, there can

3    be different networks that have different physical layers.

4    Q.   I want to just briefly touch on one issue you mentioned.

5         MR. BENNETT:  Mr. Jarrett, please go to Joint

6    Exhibit 11, please, page 36.

7    Q.   (BY MR. BENNETT)  All right.  You mentioned OSPF with Mr.

8    Haynes in your discussion with him.  Do you remember that?

9    A.   I do.

10   Q.   Okay.  I want to focus --

11        MR. BENNETT:  Mr. Jarrett, highlight in the second

12   paragraph, "The routing in the AS takes place on two levels,

13   depending on whether the source and destination of a packet

14   reside in the same area (intra-area routing) or different

15   areas (inter-area routing)."

16        Do you see that?

17   A.   I do.

18   Q.   Sending data to the same area is known as intra-area

19   routing.  True?

20   A.   Yes, routing data within the same area, yes.

21   Q.   All right.  And sending data to a different area is known

22   as inter-area routing.  Correct?

23   A.   That is one name, yes.

24   Q.   And this particular portion of the Nokia's manual is

25   discussing routing data in both of those fashions--intra-area

1    and inter-area.  Correct?

2    A.   Yes.  It's providing a high-level summary.

3    Q.   And an area border -- excuse me, an area border router is

4    a router that exists between two areas.

5    A.   Yes.

6    Q.   And those areas are based on topology.

7    A.   I'm not sure what you mean by based on, but they can have

8    different topologies, yes.

9    Q.   So in other words -- okay.

10           MR. BENNETT:  I'll pass.

11           THE COURT:  Further direct?

12           MR. HAYNES:  Yes, Your Honor.

13                     REDIRECT EXAMINATION

14   BY MR. HAYNES:

15   Q.   Doctor Chatterjee, you were asked about a few of the

16   cases that are on your CV.  Do you recall that testimony?

17   A.   I do.

18   Q.   There were a lot more cases on your CV than you were

19   asked about.  Is that fair?

20   A.   Yes.

21   Q.   In the cases you weren't asked about, did you represent

22   the plaintiff in any of those cases?

23   A.   Many, many cases.

24   Q.   If somebody comes to you and says, Doctor Chatterjee,

25   I've got a problem, somebody has made an allegation against

1  me, I'd like you to help me, does it matter to you whether

2  that person is a plaintiff or defendant?

3  A.    No.  The facts are what matters to me.

4  Q.    And regardless of who you're representing, a plaintiff or

5  a defendant, does that have an impact on the opinions that you

6  provide?

7  A.    No.  I simply analyze the facts and set forth my

8  opinions.

9         MR. HAYNES:  Can we bring up JX 46a at page 39?  Can

10 we highlight the right-hand side or just bring up the whole

11 figure?  That's fine.

12 Q.    (BY MR. HAYNES)  Do you recall Mr. Bennett asked you some

13 questions about this figure?

14 A.    Yes.

15 Q.    And specifically I think he asked you about what's shown

16 right over here.  Do you see that?

17 A.    I do.

18 Q.    Do you see here there is a circle drawn inside?  It's

19 labeled VPLS.  Do you see that?

20 A.    I do.

21 Q.    Can you explain to the jury what that represents?

22 A.    That is similar to the other figure that we saw where

23 it's simply identifying the secure VPLS infrastructure.  And

24 like I explained, the secure VPLS infrastructure is that

25 secure area where things like denial-of-service attacks and

1    things like that cannot happen.

2    Q.    You understand that this figure 1 is coming from the same

3    document as the figure 2 that we've been talking about earlier

4    today?

5    A.    Yes.

6    Q.    Is this describing the same triple play service delivery

7    architecture or a different triple play service delivery

8    architecture?

9    A.    The same Nokia triple play services delivery

10    architecture.

11    Q.    Doctor Chatterjee, in Nokia's triple play services

12    delivery architecture based on your review of the --

13                THE COURT:  Mr. Haynes, slow down, please?

14                MR. HAYNES:  Sorry, Your Honor.

15    Q.    (BY MR. HAYNES)  Doctor Chatterjee, in your analysis in

16    this case in your review of the entirety of the document, what

17    is your understanding of what the connections between the BSAs

18    and the BSR in this figure actually are?

19    A.    Between the BSAs and the BSRs, they are layer 2 mesh.

20    Q.    Does the circle in this figure illustrate a layer 2

21    connection of any kind?

22    A.    No, it does not.

23                MR. HAYNES:  If we could go to JX 11 at page 36.

24    Q.    (BY MR. HAYNES)  Do you recall being asked some questions

25    about this document?

 1    A.    Yes.

 2    Q.    There was a mention of something called an ABR, an area

 3    border router.  Do you see that?

 4    A.    I do.

 5    Q.    In your review of the documentation of Nokia's triple

 6    play architecture, have you seen any -- either the BSA or the

 7    BSR referred to as an area border router?

 8    A.    No.

 9    Q.    Is the BSR an area border router?

10    A.    No.

11    Q.    In OSPF, when we're talking about areas, what are we

12    talking about?

13    A.    Basically networks, portions of networks.

14    Q.    And if you're going to have this inter-area routing, do

15    you need to have an area border router that is common to those

16    two networks?

17    A.    Yes.

18    Q.    You were also asked a lot of questions about hypothetical

19    networks.  Do you recall that?

20    A.    I do.

21    Q.    In the actual triple play architecture, is there a layer

22    2 ring network?

23    A.    No.  It's a layer 2 mesh.

24          MR. HAYNES:  I'll pass the witness, Your Honor.

25          THE COURT:  Further cross examination?

1       MR. BENNETT:  No, Your Honor.

2       THE COURT:  You may step down, Doctor Chatterjee.

3       THE WITNESS:  Thank you.

4       THE COURT:  Ladies and gentlemen of the jury, you

5    got a brief recess a few minutes ago, but none of the rest of

6    us did so we're going to take another recess at this time

7    before we proceed with the next witness.

8        If you'll simply leave your notebooks in your chairs,

9    follow all my instructions, and we'll be back to continue with

10   the next Defense witness shortly.

11       The jury's excused for recess.

12          (Whereupon, the jury left the courtroom.)

13       THE COURT:  Mr. Haynes, you still have a short

14   deposition before Ms. Bennis.  Is that correct?

15       MR. HAYNES:  We do, Your Honor.  It's only four

16   minutes.

17       MR. DACUS:  Your Honor, also may Doctor Chatterjee

18   be excused?  And, in addition, I don't think we formally asked

19   that Doctor Jeffay be excused yesterday.

20       THE COURT:  All right.  I assume without objection,

21   both of those witnesses are excused.

22       MR. DACUS:  Thank you, Your Honor.

23       THE COURT:  We'll keep this recess relatively short,

24   counsel.

25       We stand in recess.

1004

 1                    (Brief recess.)

 2            THE COURT:  Be seated, please.

 3        Counsel, before I bring the jury back in, let me update

 4    you.  Plaintiff at this juncture has 3 hours and 23 minutes

 5    remaining; Defendant has 1 hour and 51 minutes remaining.

 6        All right.  Are you prepared to continue with the

 7    Defendant's case in chief, Mr. Haynes?

 8            MR. DACUS:  Yes, Your Honor.

 9            THE COURT:  And Mr. Dacus?

10            MR. DACUS:  Yes, Your Honor.

11            THE COURT:  All right.  Let's bring in the jury.

12            MR. DACUS:  I aspire to be Mr. Haynes.

13            (Whereupon, the jury entered the courtroom.)

14            THE COURT:  Please be seated.

15        All right.  Defendant, call your next witness.

16            MR. DACUS:  Thank you, Your Honor.

17        Nokia calls by video deposition Yehuda Binder.  Mr.

18    Binder is the managing principal owner of Orckit IP.  And the

19    time of the deposition, Your Honor, is 4 minutes and 43

20    seconds, all of that time is allotted to Defendant, Your

21    Honor.

22            THE COURT:  All right.  Proceed with this witness by

23    deposition.

24                    YEHUDA BINDER,

25                  BY VIDEO DEPOSITION

1   Q.   Can you please state your full name for the record:

2   A.   Yehuda Binder, Y-E-H-U-D-A, last name Binder,

3   B-I-N-D-E-R.

4   Q.   Okay.  And you understand that you're here today to

5   testify related to a litigation in which Smart Path has

6   asserted certain patents against Nokia?

7   A.   This is my understanding.

8   Q.   And you're here today to testify as the corporate

9   representative for Orckit IP?

10  A.   Correct.

11  Q.   And Orckit -- excuse me.  Orckit IP is the entity that

12  sold the asserted patents to Smart Path.  Correct?

13  A.   Correct.

14  Q.   And Orckit IP obtained the patents originally from an

15  entity named Orckit-Corrigent.  Is that correct?

16  A.   I am not sure.  I think it was Orckit communication and

17  Orckit-Corrigent.

18  Q.   What would you say is the business of Orckit IP?

19  A.   To make money.

20  Q.   Is the business of Orckit IP to monetize patents?

21  A.   Generally, yes.

22  Q.   Does Orckit IP sell any products?

23  A.   No.

24  Q.   I think the question was:  Did Mr. Tamir contribute any

25  money towards the purchase price for the patents to -- from

```
 1    Orckit Communications to Orckit IP?

 2    A.   Yes.  Mr. Tamir put the $1.35 million, paid this money to

 3    the liquidator.  This is true.

 4    Q.   I think we can go to Exhibit 14, if the technician was

 5    able to.

 6         Are you familiar with this document?

 7    A.   Again, I didn't check it word by word, but it looks like

 8    the sale agreement by Orckit IP from the liquidator.

 9    Q.   If you flip to the last page, page 12, do you see that

10    you signed this document?

11    A.   Yes.

12    Q.   Okay.  And is this the agreement for Orckit IP to

13    purchase the Orckit Communications patents?

14    A.   Probably.

15    Q.   Do you understand that this agreement covered the Smart

16    Path patents?

17    A.   If this is the agreement, then -- if this is the

18    agreement for the sale of the patent, the Smart Path, I

19    believe, my understanding is, at least, that the Smart Path

20    patents are part of this deal, yes.

21    Q.   Okay.  Let's go to Section 6.  Do you see section 6.1?

22    A.   Yes.

23    Q.   Do you see how it refers to $1.35 million?

24    A.   I do.

25    Q.   Is that $1.35 million that is referred to there the money
```

1    that Mr. Tamir contributed to the purchase of the patents?

2    A.    That's my understanding.

3    Q.    But what is your general understanding as to whether Mr.

4    Tamir receives -- receives proceeds from litigation with

5    Nokia?

6    A.    What is a general understanding that personally

7    me -- I -- I and him, we split the revenues received from

8    Nokia or from any other stock, from Orckit IP and other.

9    Q.    So is there an informal agreement that you will split any

10   proceeds from the Nokia litigations with Mr. Tamir?

11   A.    On a personal level, yes.

12   Q.    I didn't quite catch that.  Can you repeat it?

13   A.    I said the agreement is on a personal level.  It's not

14   agreement with Orckit IP.

15   Q.    What is the personal agreement between you and Mr. Tamir

16   regarding sharing of proceeds from any Nokia litigation?

17   A.    80/20.  On the personal agreement, again.

18   Q.    As of today, has Orckit IP received any compensation for

19   litigation proceeds from the Smart Path patents?

20   A.    No.

21   Q.    As of today, have you personally received any

22   compensation for any litigation proceeds from the Smart Path

23   patents?

24   A.    No.

25              THE COURT:  Does that complete this witness by

1  deposition?

2         MR. DACUS:  It does, Your Honor.

3         THE COURT:  All right.  Call your next witness,

4  please, Defendant.

5         MR. DACUS:  Thank you, Your Honor.  At this time we

6  call Melissa Bennis.

7         THE COURT:  All right.  Ms. Bennis, if you'll come

8  forward and be sworn by the Courtroom Deputy, please.

9         (Whereupon, the oath was administered by the Clerk.)

10         THE COURT:  Please come around, have a seat on the

11  witness stand.

12         MR. DACUS:  Mr. Carrillo, can we pull up the slides?

13  Thank you.

14         THE COURT:  Are there binders to distribute?

15         MR. DACUS:  We've already distributed them, Your

16  Honor.  Thank you very much.

17         THE COURT:  All right.  Counsel, you may proceed

18  with direct examination.

19         MR. DACUS:  Thank you, Your Honor.

20                        MELISSA BENNIS,

21  having been duly sworn, testified under oath as follows:

22                      DIRECT EXAMINATION

23  BY MR. DACUS:

24  Q.   Ms. Bennis, would you introduce yourself to the jury,

25  please?

1    A.    Yes, of course.  Good morning.  My name is Melissa

2    Bennis, and I live and work in Chicago.

3    Q.    Before we get to the details of your testimony today, can

4    you tell the jury at a high level what you've been asked to do

5    in this case and what you're here to testify about, please?

6    A.    Yes.  So I have been asked by Nokia to assess the amount

7    of damages, if any, that would be appropriate to award if and

8    only if the patents are found to be valid and infringed by

9    Nokia.

10   Q.    Have you also been asked to review and analyze the

11   royalty or damages amount that Mr. Dell put forward?

12   A.    Yes, I have, and I have done that.

13   Q.    Okay.  Before we cover those opinions, I'd like to get

14   some background from you.  Is that okay?

15   A.    Yes.

16   Q.    Tell the jury where you work.

17   A.    I work at a firm called Stout.  I'm a managing director

18   there in the Chicago office.

19   Q.    Okay.  And what kind of work do you do at Stout?

20   A.    Stout itself provides a variety of financial advisory

21   services, things like business valuations, assistance with

22   mergers and acquisitions.  That's with companies.

23         There's various individuals like myself that help in the

24   context of litigation, as an example, assessing the financial

25   aspects.

1    THE COURT:  Ms. Bennis, if you don't mind, pull the

2    microphone a little closer to you, please.

3    THE WITNESS:  Yes.

4    THE COURT:  Thank you.

5    Let's continue counsel.

6    MR. DACUS:  Thank you, Your Honor.

7    Q.    (BY MR. DACUS)  Tell the jury a little bit about where

8    you grew up and your educational background, where you went to

9    college.

10   A.    Sure.  So I moved around the Midwest growing up in

11   several states.  Eventually my family landed in the Chicago

12   area.  So after high school, I attended the University of

13   Illinois where I earned a Bachelor of Science in finance with

14   an emphasis in accounting, with honors.

15   Q.    What did you do after college?

16   A.    So while I was still at the University of Illinois, I was

17   recruited to join Arthur Andersen, which at the point in time

18   was one of the big public accounting firms in our country in

19   their specialty consulting practice.

20   Q.    Do you have any degrees beyond the Bachelor's that you

21   got at the University of Illinois?

22   A.    Yes.  So while I was pursuing my career at Andersen, I

23   applied for and was accepted into the graduate program at

24   Northwestern University, which is another Big 10 university in

25   the Chicago area.  And there I earned my MBA, or my Master's

1    in Business Administration, with majors in accounting and

2    marketing and management and strategy while I was still

3    pursuing my career at an Andersen.

4    Q.    Do you have any personal professional certifications?

5    A.    Yes.  I am a licensed certified public accountant, or

6    CPA, as it's often called.

7    Q.    Can you give the jury some sense or indication of your

8    experience in calculating patent damages or reasonable

9    royalties in the litigation context that we're here in today?

10   A.    So I have been doing this type of work for 25 years now.

11   And throughout the course of my career, I have been involved

12   in the computation and the assessment of damages in nearly 200

13   cases.

14   Q.    Okay.  We've talked about professional certifications.

15   Are you a member of any professional associations or

16   organizations?

17   A.    I am.  I'm a member of the Licensing Executive

18   Society--we've heard a lot of acronyms--often referred to as

19   LES.  I'm also a member as a CPA of the American Institute of

20   Certified Public Accountants.  I also am a member of the

21   Illinois CPA Society.

22       And I also am an associate member of the American Bar

23   Association, which is a legal association, but as a

24   non-lawyer.  I like to keep up with the reading and the case

25   law damages that affects what I do on a day-to-day basis.

1    Q.    Have you been recognized or received any awards

2    for -- during your professional career?

3    A.    I have.  We've heard mention of the IAM Patent 1000,

4    which is a group within the legal arena.  And by them, I have

5    been honored for the last six years running as a recommended

6    economic expert.

7          I also was honored several years ago by the Illinois CPA

8    Society as a woman to watch in the CPA industry.

9               MR. DACUS:  Your Honor, at this time we would offer

10   Ms. Bennis, based on her education, training, and experience,

11   as an expert in patent valuation and damages.

12              THE COURT:  Is there objection?

13              MS. STAHL:  No objection, Your Honor.

14              THE COURT:  Without objection, the Court will

15   recognize this witness as an expert in those designated

16   fields.

17         Please continue.

18              MR. DACUS:  Thank you, Your Honor.

19   Q.    (BY MR. DACUS)  Ms. Bennis, before we dig into the

20   details of your opinion, can you tell the jury whether or not

21   you've reached any opinions and conclusions in this case if

22   they were to get to the damages question as to what a

23   reasonable royalty would be?

24   A.    Yes.  So I have -- I have developed a number of opinions,

25   but it really boils down to the one primary opinion.  So by

1    now we've heard Mr. Dell testify as to his opinion on damages,

2    and that would be that there should be a running royalty

3    percentage, different for each patent, applied to all of the

4    accused products over a long period of time.

5         But I think, given what we are asked to consider here and

6    the evidence in the case, that the parties would have come

7    together and negotiated just a single upfront lump-sum

8    agreement of no more than $1 million.

9    Q.   To be clear, because you and I are talking about damages

10   and evidence, does that mean that Nokia believes that it owes

11   anything to the Plaintiff Smart Path?

12   A.   No.  And this is an important distinction because I

13   understand it seems like a bit of a dichotomy.  I don't

14   understand Nokia to believe that it is infringed or that the

15   patents are valid.  However, for the purposes of the

16   consideration of damages, I simply assume that there could be

17   a finding of that since that's the only instance in which this

18   question would need to be answered.

19   Q.   You heard me ask Mr. Dell that if this jury were to reach

20   damages, the lawyers on the Nokia side want to make sure that

21   the jury has all the evidence in order to make that

22   determination.  Is that what we're doing here right now?

23   A.   Yes.

24   Q.   Okay.  Let's turn to your analysis.  What -- tell us at a

25   high level what the process is you went through to make a

1    determination of what a reasonable royalty would be in this

2    case?

3    A.    So recall that the reasonable royalty is what the parties

4    would have come to and agreed upon in the form of a license or

5    a license agreement for rights for Nokia to practice the

6    patents.

7         And in order to do that, both I and the jury are asked to

8    assume that there would be this hypothetical negotiation.  So

9    it didn't really happen, but what it would have looked like

10   had these parties come together, what pieces of evidence or

11   what data points would they have had at their fingertips that

12   would have helped inform them as to what the reasonable

13   conclusion would have been.

14   Q.    You were here when Mr. Dell testified.  Correct?

15   A.    I was.

16   Q.    You heard him say that this hypothetical negotiation

17   would have taken place in 2013?

18   A.    Yes.

19   Q.    Do you disagree with that?

20   A.    No.

21   Q.    Okay.

22        MR. DACUS:  Your Honor, may I pull the flip chart

23   forward even with the document camera?

24        THE COURT:  You may.

25        MR. DACUS:  Thank you.

1           THE COURT:  Can you see that, Ms. Bennis?

2           THE WITNESS:  I'm going to scooch over just a touch

3      so I can see it a little better.

4           MR. DACUS:  I don't think we're going to go through

5      much detail, Your Honor, but --

6           THE COURT:  You're the one that wanted to use it.

7           MR. DACUS:  Understood.  Thank you for helping me.

8      Q.   (BY MR. DACUS)  Let's do this Ms. Bennis.  Let's

9      start -- do you understand in determining a reasonable royalty

10     that there are two different types?

11     A.   Generally speaking, there are two types that are very

12     common.

13     Q.   And remind us what those two types are?

14     A.   One type would be a running royalty where you would take

15     something like what Mr. Dell suggested, a running element,

16     whether it's a percentage of sales or a dollar amount applied

17     to a royalty base to come up with a royalty amount.

18          The other very common element that we're going to talk a

19     lot about is a lump sum.  The parties can come together, they

20     can talk about the value and other data points and come up

21     with a single payment that would be fair compensation.

22     Q.   Did you in the course of your work look into whether or

23     not it is more appropriate in this circumstance to award a

24     lump sum or a reasonable royalty if the jury were to get to

25     that question?

1    A.    Given the evidence in this particular case, I believe

2    that the parties would have agreed on a lump-sum structure.

3    Q.    And why --

4            THE COURT:  Let me interrupt, counsel.  You said a

5    lump sum or a reasonable royalty.  You mean a lump sum or a

6    running royalty, did you not?

7            MR. DACUS:  I did, Your Honor.  Let me --

8            THE COURT:  Again, I'm just trying to keep any

9    confusion out of the case.

10            MR. DACUS:  I appreciate the help very much, Your

11    Honor.

12            THE COURT:  Go ahead.

13    Q.    (BY MR. DACUS)  Let me be clear on my question.  Did you

14    investigate and look into whether or not a lump sum or a

15    running royalty is more appropriate in this circumstance?

16    A.    Yes.  Thank you.  And exactly I have determined that the

17    lump sum would be the most appropriate format here to consider

18    as opposed to a running royalty.

19    Q.    And why do you believe that the evidence leads to a lump

20    sum being more appropriate?

21    A.    I'm aware of the evidence in this case that suggests that

22    Nokia has a preference for paying lump-sum amounts when they

23    are licensing patents.  The agreements, some of which have

24    been discussed this week, many of which, are all formatted as

25    a lump-sum structure.

1    And, last, there's administrative benefits to a one-time

2  lump-sum payment.  We heard a little bit about this from Mr.

3  Patel's video deposition testimony, that with any sort of

4  running royalty setup, there is ongoing tracking, I believe he

5  said, that's required of the parties.

6    It would also be required of Nokia to produce sensitive

7  information on a regular increment to a third party outside of

8  its own walls.  So there's some administrative benefits with

9  coming together and agreeing on a fair payment and moving on.

10    MR. DACUS:  Your Honor, at this time we may need to

11  discuss some particulars of the licenses.  We would ask that

12  the Court seal the courtroom.

13    THE COURT:  Based on that request of counsel and to

14  protect confidential information, the Court will order the

15  courtroom sealed.

16    As a part thereof, if you are present and not subject to

17  the protective order that's been entered, you should exit the

18  courtroom until it's reopened and unsealed.

19    (Courtroom sealed.)

20

21

22

23

24

25

1071

1

2

3

4

5

6                              (Courtroom unsealed.)

7              THE COURT:  And, ladies and gentlemen, we're going

8    to recess for lunch.  If you will carry your notebooks with

9    you to the jury room, follow all my instructions, including

10   not to discuss the case in any way among yourselves, we'll be

11   back after lunch and proceed at that time.

12       It's about 10 minutes after 12:00.  We'll try to

13   reconvene shortly before 1:00.

14       The jury's excused for lunch at this time.

15              (Whereupon, the jury left the courtroom.)

16              THE COURT:  Counsel, is there anything we need to

17   take up before we break for lunch?

18              MR. DACUS:  Your Honor, may Ms. Bennis be excused?

19              THE COURT:  She may.

20              MR. DACUS:  Thank you.

21              THE COURT:  We stand in recess for lunch.

22                         (Lunch recess.)

23              THE COURT:  Be seated, please.

24       Am I correct, Mr. Haynes, that Defendant is ready to rest

25   its case in chief?

1           MR. HAYNES:  That's correct, Your Honor.

2           THE COURT:  All right.  We'll get that announcement

3    on the record when the jury comes in.

4       And then am I correct, Mr. Bennett, you have two rebuttal

5    witnesses to call?

6           MR. BENNETT:  Yes.

7           THE COURT:  All right.  Let's bring the jury in,

8    please.

9           (Whereupon, the jury entered the courtroom.)

10          THE COURT:  Please be seated.  Welcome back from

11   lunch, ladies and gentlemen.

12      Defendant, call your next witness.

13          MR. HAYNES:  The Defendant rests, Your Honor.

14          THE COURT:  All right.  The Plaintiff has rested its

15   case in chief.  The Defendant has rested its case in chief.

16      Does the Plaintiff have a rebuttal case to present?

17          MR. BENNETT:  We do, Your Honor.

18          THE COURT:  Call your first rebuttal witness,

19   please, Mr. Bennett.

20          MR. BENNETT:  Plaintiff calls Dr. Eric Cole.

21          THE COURT:  Doctor Cole, if you'll come forward and

22   return to the witness stand.  I'll remind you you remain under

23   oath.

24          MR. BENNETT:  Your Honor, may I approach?

25          THE COURT:  You may.

1       Mr. Liddle, you may proceed with direct examination.

2           MR. LIDDLE:  Thank you, Your Honor.

3                   ERIC COLE, Ph.D.,

4    having been previously sworn, testified further under oath as

5    follows:

6                   DIRECT EXAMINATION

7    BY MR. LIDDLE:

8    Q.   Doctor Cole, welcome back.

9    A.   Thank you.

10   Q.   Would you please remind the jury what you testified

11   earlier this week?

12   A.   Earlier this week, I testified on technical apportionment

13   for the three patents.

14   Q.   And did you present technical apportionment with respect

15   to the asserted patents?

16   A.   Yes, I did.

17   Q.   And which patents are those?

18   A.   Those are -- boy, you are going to test my memory -- the

19   '010, '599, and '524.

20   Q.   '580.

21   A.   '580.

22   Q.   And did you perform another task in this case?

23   A.   Yes, I did.

24   Q.   Okay.  And what did you do in this case?

25   A.   The second task was to read Doctor Jeffay's report on

1    invalidity and provide a rebuttal opinion to that.

2    Q.    And were you in the courtroom yesterday when Doctor

3    Jeffay testified?

4    A.    Yes, I was.

5    Q.    Now, Doctor Cole, what are the asserted invalidity

6    defenses that Nokia presented yesterday?

7    A.    They presented for '580 that claims 8, 12, and 15 was

8    obvious using Aggarwal '266 and RFC 4875, and they also said

9    that claims 1 and 3 of '010 was obvious based on Shah.

10    Q.    And, Doctor Cole, what about the '599 Patent?

11    A.    They did not present any case on invalidity for the '599.

12    Q.    Okay.  And, Doctor Cole, again, please explain what prior

13    art Nokia is alleging invalidates the '580 Patent?

14    A.    So there's two pieces that need to be combined for the

15    '580.  The first is a patent application written by Aggarwal

16    ending in '266, and also in RFC internet draft 4875.

17    Q.    And does it appear that these two documents are written

18    by the same person?

19    A.    They are actually written by the same person, Aggarwal,

20    and they are also written within six months of each other.

21    Q.    Now, Doctor Cole, were you here during the opening

22    presentations of the parties?

23    A.    Yes, I was.  I was here all week.

24    Q.    And do you recognize this as a slide from Nokia's opening

25    presentation?

1    A.    Yes, I do.

2    Q.    And did Nokia allege that if the '580 Patent is

3    infringed, then it is invalid?

4    A.    Yes, they did.

5    Q.    And did Nokia tell the jury that Smart Path would point

6    to the RFC 4875 for infringement?

7    A.    Yes, they did.

8    Q.    And during the trial, did Smart Path rely on RFC 4875 for

9    infringement purposes?

10   A.    I did not see that from Doctor Valerdi who was the

11   infringement expert.  He did not rely on 4875 during his

12   direct testimony.

13   Q.    And, similarly, did Nokia say that the '580 Patent was

14   invalid over the RFC 4875 reference?

15   A.    Yes, they did.

16   Q.    And is Nokia alleging that the RFC invalidates now the

17   '580 on its own?

18   A.    No, they are not.

19   Q.    And so how is Nokia trying to invalidate the '580 Patent?

20   A.    They are saying that you have to take the Aggarwal draft

21   and then combine that with pieces of RFC 4875 and that the

22   combining of those two pieces would have been obvious to

23   somebody skilled in the art.

24   Q.    Now, Doctor Cole, in your opinion, does the combination

25   of Aggarwal and the RFC invalidate the '580 Patent?

1    A.    No, it would not.  And also to me it would not be obvious

2    to combine those two.  But even if you did combine those two,

3    it would still not invalidate the '580.

4    Q.    Now, Doctor Cole, in your opinion, why would a person of

5    ordinary skill in the art not want to combine RFC with

6    Aggarwal?

7    A.    First, when you're combining two different pieces of art,

8    there needs to be some motivation or reason or a gap or a

9    problem you're trying to solve.  And if you go through

10   Aggarwal '266, there's nothing in there that would motivate

11   you to want to expand, change, or combine it with RFC 4875.

12        And also, Doctor Jeffay, he did not mention any specific

13   improvements that RFC 4875 would add to Aggarwal.

14   Q.    And was -- did Doctor Jeffay ever testify that there was

15   one single product out there that combined these two

16   references?

17   A.    No.  He could not identify a single product that worked

18   in this way during this time period or any system that he knew

19   of that actually combined these two pieces of art together.

20   Q.    Doctor Cole, did you analyze all of the asserted claims

21   of the '580 Patent?

22   A.    Yes.  I looked at claims 8, claims 12, and claims 15.

23   Q.    And, Doctor Cole, what is your opinion on whether

24   Aggarwal in combination with the RFC renders obvious the '580

25   Patent claim 8?

1    A.   It does not render obvious the claims of the '580, and

2    for claim 8, while there are several reasons, there's two main

3    reasons I'm going to cover today.

4    Q.   And just can you give us a summary of what are those two

5    reasons?

6    A.   The first is there's no resource-sharing group for a

7    first and second tunnel.  So you both need a resource-sharing

8    group and first and second tunnels.  And also, according to

9    the Court's claim construction of call admission control, it's

10   missing several key components that Doctor Jeffay did not

11   identify that's required to be in a CAC.

12   Q.   And, Doctor Cole, please remind the jury what the '580

13   Patent is about.

14   A.   I believe it was in opening this analogy was used that

15   the '580 is like if you have a single highway and there's

16   congestion, you provide a second road that cars can go on to

17   be able to alleviate the congestion.  So '580 is about having

18   two tunnels, two different tunnels, so if one of the tunnels

19   is congested, you can then go to the second tunnel.

20   Q.   And, Doctor Cole, how would you differentiate that

21   between the Aggarwal '266 and RFC combination?

22   A.   This combination uses a single road.  Now, it might add

23   lanes to the road to make the road wider, but it's still a

24   single road.  It's a single tunnel.  They do not go in and

25   disclose two tunnels, and they do not disclose any resource

1  sharing for allocating the resources across those two tunnels.

2  Q.   Now, Doctor Cole, let's focus on the claim language.

3  What does claim 8B require?

4  A.   It requires several things, but what I focused on was the

5  area in pink.  It requires resource sharing group of at least

6  a first and second tunnels.  So you need to have two tunnels

7  and a resource-sharing group across them.

8  Q.   Now, does the Aggarwal reference have a resource-sharing

9  group with a first and second tunnel?

10  A.   No, it does not.

11  Q.   And how do you know that?

12  A.   Because if we start off by looking at Aggarwal, it does

13  not share resources between tunnels, and if you even look at

14  paragraph 0076, it says that they belong to the same P2MP LSP

15  tunnel, and they're also talking about the sharing resources

16  across a single tunnel, not multiple tunnels.

17  Q.   And, Doctor Cole, did you hear any testimony from Doctor

18  Jeffay about combining Aggarwal '266 with the 4875 to come up

19  with the '580 Patent?

20  A.   He talked about combining them, but he didn't go in and

21  provide any specific details of how by combining them would

22  have been obvious that there would have been a motivation and

23  that, even if you do, they do fail to meet the element of the

24  '580 Patent.

25  Q.   And, Doctor Cole, just to remind the jury, whose burden

1    is it to prove invalidity of the patents?

2    A.    With invalidity, the burden is on the Defendant.  So

3    Doctor Jeffay had the burden to prove that each and every

4    element was met by prior art to prove it invalid.  That's why

5    in my testimony today, I'm just rebutting and providing some

6    key points that are missing.  But the burden of proving was on

7    the Defendant.

8    Q.    Doctor Cole, let's go to the next claim element that you

9    analyzed.

10        Did you also analyze the '580 Patent claim 8D?

11    A.    Yes, I did.

12    Q.    And what is your opinion on claim 8D?

13    A.    That Aggarwal '266 and RFC 4875 fails to render claim 8

14    obvious.

15    Q.    Okay.  And did the Court construe the CAC module?

16    A.    Yes.  So that's what I'm going to focus on, the call

17    admission control, sometimes called CAC module.  And what's

18    important here is that the Court construed this term to have a

19    very specific meaning which needs to be followed in proving

20    the claim.

21    Q.    And so in the construction of CAC module, what is the

22    structure that is required for -- to show invalidity?

23    A.    A processor programmed to allocate shared resources among

24    tunnels having identical SGI values and equivalents thereof,

25    and what I really want to focus in on is identical.  They have

1    to be identical SGI values.

2    Q.   And, Doctor Cole, did you hear any testimony from Doctor

3    Jeffay that there was any evidence of identical SGI values?

4    A.   No, he did not mention or cover anything in Aggarwal or

5    RFC 4875 that talked about identical SGI values.

6    Q.   What did -- what did Doctor Jeffay actually point to?

7    A.   He pointed to the RFC 4875 draft that has some generic

8    language, but that language is not sufficient to cover

9    identical SGI values.  And if you remember, one of the themes

10   in this case is details matter, and if there's a court's claim

11   construction, you have to meet each and every element in order

12   to prove invalidity.

13   Q.   Doctor Cole, what's your overall opinion whether claim 8

14   is rendered obvious by Aggarwal in combination with the RFC?

15   A.   Claim 8 is not rendered obvious for all of the reasons

16   that we've discussed this afternoon.

17   Q.   And, Doctor Cole, did you also analyze claim 12?

18   A.   Yes, I did.

19   Q.   And do you think -- in your opinion is this claim valid

20   over the combination of Aggarwal and the RFC?

21   A.   Yes.  So claim 12, as was discussed, is a dependent

22   claim, so it's dependent on claim 8.  And what Doctor Jeffay

23   said was because he thought claim 8 was invalid, that would

24   make claim 12 invalid.  But what I just showed you is that

25   claim 8 is actually valid, which means that claim 12 would

 1   also be valid.

 2   Q.   Now, what is the difference between claim 8 and claim 15?

 3   A.   So they are essentially the same.  There is a couple of

 4   different pieces.  For example, claim 8 has a processor.  But,

 5   overall, the language as you saw this week is very, very

 6   similar.

 7   Q.   And so do your reasons on -- that you just opined apply

 8   also apply to claim 15 with regard to the invalidity of the

 9   patent?

10   A.   Yes, because all of the points that Doctor Jeffay made on

11   why claim 8 was invalid are the same exact arguments for claim

12   15.  So based on my discussion of why those were not obvious

13   and why claim 8 is valid would also apply to why claim 15 is,

14   indeed, valid.

15   Q.   Doctor Cole, did you also analyze the '010 Patent?

16   A.   Yes, I did.

17   Q.   And what is Nokia's theory of invalidity with respect to

18   the '010 Patent?

19   A.   Nokia's opinion is that the '010 is invalid because it's

20   obvious in light of Shah.

21   Q.   And, Doctor Cole, what is your opinion of this?

22   A.   That the '010 Patent is valid over Shah because Shah

23   teaches something different and there is several key elements

24   of the '010 that are not covered by Shah.

25   Q.   Okay.  Let's look at those.

1    And so why did Defendant fail to meet their burden here?

2    A.    Because there are several elements, in particular B, D,

3    and H, that are not covered by Shah and wouldn't be rendered

4    obvious by Shah.  And as we said, in order to prove

5    invalidity, you have to meet each and every element and each

6    and every element of the claim language, and the Defendant

7    failed to do that.

8    Q.    Now, what was Doctor Jeffay's theory about a hub and how

9    Shah met this element?

10   A.    So Doctor Jeffay's general theory was any PE device could

11   be a hub or, more specifically, he said any PE device is a

12   hub.

13   Q.    Now, do you agree that a PE device can be a hub?

14   A.    I agree that a PE could be a hub, but not all PE devices

15   are actually hubs, according to the language of the claims.

16   Q.    And did you see yesterday Nokia's routers configured as a

17   hub?

18   A.    Yes, I did.

19   Q.    Okay.  And so what is the next part of your analysis on

20   claim 1 of the '010 Patent?

21   A.    So I went in and looked at the specific claim language,

22   and what Doctor Jeffay was pointing to as edge devices and

23   hubs had to meet each and every element of the claim.  So I

24   know yesterday you heard differences in the sides of what the

25   devices were, but ultimately you have to look at the claim

1  language and make sure that each and every element of what's

2  in the claim are met by the device that is being pointed to.

3  Q.    Thank you.

4      And do you remember when Nokia said yesterday that if

5  claim 1 is infringed, then claim 1 is invalid?

6  A.    Yes, I did.

7  Q.    And can you have it both ways, Doctor Cole?

8  A.    In my opinion, you cannot.

9  Q.    Okay.  And why does that not make any sense?

10  A.    Because when you're looking at a patent, either it's

11  valid or it's invalid.  Either there is prior art that shows

12  that it's valid or there's prior art that shows that it's

13  invalid, but in my experience it's not conditional.

14      So what they're saying here is that if it turns out claim

15  1 is not infringed, then the patent's valid, but if it turns

16  out that claim 1 is infringed, then all of the sudden it

17  becomes invalid.  So it's conditional based on certain

18  outcomes that are decided in the case which, to me, is not how

19  you do invalidity.  Either it's valid or it's not.  It's not

20  conditional.

21  Q.    And, Doctor Cole, did you also analyze claim 1A to the

22  '010 Patent?

23  A.    Yes, I did.

24  Q.    And what was your finding on this?

25  A.    That there is several key components that are missing

1    from the claim language.  So Doctor Jeffay was pointing to one

2    of the PE devices as the edge device.  But if we go through

3    and look, it has to map to two or more of the native

4    interfaces.

5         Well, what Doctor Jeffay on the right-hand side is

6    pointing to as an edge device, it only is one native

7    interface.  So if you look at PE device 1, that's only

8    ethernet.  That's only one.  If you look at PE device 2,

9    that's ATM.  That's only one.  If you look at PE device 3,

10   frame relay, that's only one.

11        You can see the claim language says two or more.  One is

12   not two or more.  So he failed to meet that.

13        Then he points to the green arrow as the interface to a

14   respective VLAN.  But, once again, the claim says that native

15   interfaces are to different respective VLANs.  So the native

16   interface ethernet needs to be different than the VLAN, and

17   clearly you can see he's pointing to the same one.

18        So there's multiple pieces of the claim language that are

19   not being met by Doctor Jeffay's read of Shah.

20   Q.   So, Doctor Cole, is it your opinion that Nokia has failed

21   to meet its burden on the '010 Patent?

22   A.   Yes, that is my opinion.

23   Q.   Doctor Cole, did you also analyze claims 2 and 3 of the

24   '010 Patent?

25   A.   Yes, I did.

```
 1   Q.   And what was your conclusion?

 2   A.   That what Doctor Jeffay pointed to for why claims 2 and 3

 3   were invalid were all in claim 1 because these are dependent

 4   claims.  So the same issues on why Doctor Jeffay said claims 2

 5   and 3 were invalid was exactly what I just covered previously.

 6        So because I showed you that they were missing key

 7   elements and claim 1 is valid, that means that claim 2 and 3

 8   would also be valid for those same reasons.

 9   Q.   So what is your overall opinion on whether the '010

10   Patent is valid or invalid?

11   A.   The '010 Patent is valid over Shah.

12   Q.   Thank you, Doctor Cole.

13             MR. LIDDLE:  Pass the witness.

14             THE COURT:  All right.  Cross examination by the

15   Defendant.

16        Mr. Frist, you may proceed.

17             MR. FRIST:  Thank you, Your Honor.

18                      CROSS EXAMINATION

19   BY MR. FRIST:

20   Q.   Doctor Cole, I want to touch on the nuance of Nokia's

21   position regarding invalidity that you mentioned in your

22   direct examination.  Okay?

23   A.   Yes.

24   Q.   Do you understand that Nokia's position on invalidity is

25   that the patent is invalid only if Nokia's found to infringe.
```

1  You understand that?

2  A.    That is my understanding.

3  Q.    And you said that was impossible based on your

4  understanding of invalidity.  Right?

5  A.    I don't believe I used those words.

6  Q.    You said there's no way for a patent not to be -- it's

7  either valid or invalid, infringement plays no role.  That's

8  what you said.  Right, Doctor Cole?

9  A.    I said in my experience that a patent is valid or invalid

10  independent and not conditional.

11  Q.    All right.  So you understand that when approaching

12  invalidity and infringement, we have to use the same

13  interpretation of the claims?

14  A.    Well, you use the Court's claim construction or plain and

15  ordinary meaning.

16  Q.    But you have to use the same construction, the same plain

17  and ordinary meaning, when you're reading the claims whether

18  it's for infringement or invalidity.  Right?

19  A.    That is generally my understanding.

20  Q.    Right.  So if you have a feature that infringes the

21  claims but that feature was well-known way before the patent,

22  then the patent's invalid.  Right?

23  A.    Generally -- once again, I want to make sure there's no

24  other specifics in there.  Generally, that would be the bar

25  that we use.

1    Q.    Okay.  I'd like to shift and talk about the combination

2    of Aggarwal and RFC 4875 draft that you talked about.  Do you

3    recall that?

4    A.    Yes, I do.

5    Q.    All right.  And you said a person of ordinary skill

6    wouldn't combine those two documents.  Right?

7    A.    That's correct.

8    Q.    You understand Aggarwal is one of the primary authors of

9    RFC 4875 draft.  Right?

10   A.    Yes.

11   Q.    And Aggarwal is the primary inventor on the Aggarwal

12   patent.  Right?

13   A.    Yes.  That was my point--he's the author of both.

14   Q.    Right.  And he wrote those within six months of each

15   other, you said.

16   A.    Correct.

17   Q.    Right?  And both of those documents relate to this P2MP

18   that we've been discussing this week.  Right?

19   A.    Right.  And he put them in separate documents.  So if it

20   was obvious, he would have known to be able to put them

21   together and he didn't.

22   Q.    Doctor Cole, Aggarwal is a patent.  Right?

23   A.    Yes.

24   Q.    Mr. Aggarwal filed for patent protection because he had a

25   good idea that he came up with and he wanted the protection of

1088

1    the United States over that idea.  Right?

2              MR. LIDDLE:  Calls for speculation.

3              THE COURT:  Sustained.

4    Q.  (BY MR. FRIST)  Doctor Aggarwal filed for a patent to

5    protect his idea.  Right?

6              MR. LIDDLE:  Same objection.

7              THE COURT:  I don't know that anybody ever files for

8    a patent not to protect their invention, so I'll overrule that

9    as not being something that calls for much speculation.

10             THE WITNESS:  It was a draft.  But, yes, generally

11   that's why you would file for a patent.

12   Q.  (BY MR. FRIST)  Right.  So Aggarwal got a patent, but

13   then he also went and worked with the industry to share his

14   ideas and make sure that industry standard included his ideas

15   about P2MP.  Right?

16   A.   Once again, you're asking me to speculate on Aggarwal's

17   intention, but an RFC is public.

18   Q.   Right.  And Mr. Aggarwal drafted the RFC 4875 draft and

19   his patent, and they both cover the same subject matter, the

20   P2MP.  Right?

21   A.   The same high-level technology.

22   Q.   Right.  And in the Aggarwal patent, he discusses some of

23   the details of P2MP.  Right?

24   A.   I believe that is true.

25   Q.   For example, he discusses path and RESV messages.  Right?

1    A.   I would ultimately refer back to what's in the patent,

2    but I believe that is correct.

3    Q.   Right.  But Doctor Aggarwal does not provide the details

4    of the format of the path and RESV messages in his patent.

5    Right?

6    A.   Generally, I think that's correct.  I don't have both of

7    them memorized but I believe at a high level that's -- that

8    could be correct.

9    Q.   The RFC 4875 draft includes all the details of the format

10   of those messages.  Right?

11   A.   I'm always careful with the word 'all', but it does have

12   some details for extensions for some of those messages.

13            MR. FRIST:  Can I please use the elmo?

14   Q.   (BY MR. FRIST)  Doctor Cole, this is RFC 4875 draft.  Do

15   you see section 6.1 that's entitled RESV Message Format?

16   A.   I do.

17   Q.   Yeah.  So RFC 4875 draft includes the message formats for

18   RESV and a bunch of other messages.  Right?

19   A.   That is correct.

20   Q.   Okay.  So a person of ordinary skill reading Aggarwal who

21   wanted to know how to implement path and RESV messages, they

22   would look to the other work by Mr. Aggarwal that describes

23   those same messages, wouldn't they?

24   A.   You have to be a little careful because some of what's in

25   Aggarwal's patents is different than what's in the RFC.

1    Q.    With respect to the path and RESV messages, if a person

2    of ordinary skill wanted to know the details of those

3    messages, they would look to the RFC 4875 draft.  Correct?

4    A.    That would be correct.

5    Q.    Now, I'd like to talk a little more about your opinions

6    about the '580 Patent and validity.  Okay?

7    A.    Yes.

8    Q.    Now, you understand that it's Nokia's position for

9    infringement that it implements the RFC 4875.  Right?

10             MR. LIDDLE:  Objection, Your Honor.  Outside the

11   scope.

12             THE COURT:  Overruled.

13             THE WITNESS:  Could you repeat the question?

14   Q.    (BY MR. FRIST)  You understand that Nokia says it

15   implements RFC 4875.  Right?

16   A.    I would have to go back and check.  I think those are

17   areas that are more covered by Doctor Valerdi, but I'd have to

18   go back and check that.

19   Q.    Okay.  You understand that Nokia says that RFC 4875

20   doesn't allow sharing of resources between tunnels.  You

21   understand that.  Right?

22   A.    If there's specific evidence you'd like to show me on

23   that, but I don't know -- I remember exactly the details of

24   all the documents.

25   Q.    You've sat through this whole week of trial.  Right,

1    Doctor Cole?

2    A.   Yes, and I would emphasize I sat through the whole week

3    of trial in which a lot of information was presented.

4    Q.   Right.  And you know the key issue for the '580 Patent is

5    whether RFC 4875 allows sharing of resources between tunnels.

6    Right?

7            MR. LIDDLE:  Objection, Your Honor.  Outside the

8    scope.  Talking about infringement, not validity.

9            THE COURT:  I'll overrule the objection.

10           THE WITNESS:  Generally.  But it's been a long week

11   and you're starting to ask me very specific questions about

12   documents.  So I would just ask for that document if you want

13   me to quote what's specifically within a document.

14   Q.   (BY MR. FRIST)  Doctor Cole, I was asking about Nokia's

15   contentions in this case.  Were you paying attention to

16   Nokia's contentions during the course of this week?

17   A.   Yes, I was.

18   Q.   Okay.  And you understand that Nokia's contention is that

19   RFC 4875 doesn't allow sharing of resources between tunnels.

20   Right?

21   A.   Generally I believe that's correct.  Like I said, it's

22   been a long week, so I want to be careful of what I say under

23   oath.

24   Q.   For your invalidity analysis, you looked at this RFC 4875

25   draft.  Right?

1    A.   That is correct.

2    Q.   Okay.  And you understand that it's Nokia's position that

3    there's no difference between the relevant parts of that RFC

4    draft and the final RFC document.  Right?

5    A.   I believe that was the testimony of Doctor Jeffay.

6    Q.   And, Doctor Cole, as of your deposition in this case, you

7    were not aware of any differences between RFC 4875 as it

8    published in its final form and this RFC draft that you looked

9    at for invalidity.  Correct?

10   A.   Generally that is correct.

11   Q.   Okay.  Now, despite the importance of the similarities of

12   RFC draft and this final RFC document, the focus of your

13   testimony on direct was on Aggarwal.  Correct?

14   A.   I believe I covered both of those.  It was to rebut

15   Doctor Jeffay's opinions.

16   Q.   You recall Doctor Jeffay focused in his direct

17   examination for invalidity on the RFC 4875 draft and his walk

18   through the elements.  Right?

19   A.   I believe he covered both.

20   Q.   Okay.  Let's talk about the details of the RFC 4875

21   draft.  Okay?

22   A.   Sure.

23   Q.   You understand that the RFC 4875 draft describes setting

24   up P2MP LSPs.  Right?

25   A.   That is generally my understanding.

1          MR. FRIST:  Mr. Carrillo, can we please bring up DX

2    35 and go to page 8?

3    Q.   (BY MR. FRIST)  Doctor Cole, do you see section 4.4 where

4    it says a P2MP LSP is constituted of one or more S2L sub-LSPs?

5    A.   Yes, I do.

6    Q.   So you agree the RFC draft discloses a P2MP LSP includes

7    one or maybe many of these S2L sub-LSPs.  Right?

8    A.   You changed the language a little, but I believe that's

9    still aligned with what's in the RFC.

10   Q.   Okay.

11         MR. FRIST:  Mr. Carrillo, can you please go to page

12   12 through 13 and to section 5.2 at the bottom?  Kind of going

13   across to the next page, please.  Thank you.

14   Q.   (BY MR. FRIST)  Do you see the sentence that begins,

15   "another S2L sub-LSP"?  It's starting kind of around there.

16   Do you see it says, "Another S2L sub-LSP belonging to the same

17   instance of this S2L sub-LSP (i.e., the same P2MP LSP) shares

18   resources with this S2L sub-LSP."  Do you see that?

19   A.   I do.

20   Q.   You understand that S2L sub-LSPs of the same P2MP LSP can

21   share resources.  Right?

22   A.   That's what the RFC says.

23   Q.   All right.  So we got two facts.  First fact is that a

24   P2MP LSP includes multiple S2L sub-LSPs, and those sub-LSPs

25   can share resources.  Right?

 1    A.    That is correct.

 2    Q.    Now, you understand that Doctor Jeffay's infringement

 3    opinion in this case is that the S2L sub-LSPs in Nokia's

 4    products are separate tunnels.  Right?

 5              MR. LIDDLE:  Objection, Your Honor.  He's asking

 6    about Doctor Valerdi's infringement opinions.  Outside the

 7    scope.

 8              MR. FRIST:  Your Honor, if I may?

 9              THE COURT:  What's your response?

10              MR. FRIST:  He mentioned Doctor Valerdi's

11    infringement opinion in his direct examination as he

12    considered -- considered invalidity.

13              THE COURT:  Well, I'll allow this question, but we

14    need to focus on this witness' opinions regarding validity and

15    invalidity.

16              MR. FRIST:  That's my intention with the next

17    question, Your Honor.

18              THE COURT:  All right.  Then let's have the next

19    question and then move on.

20              MR. FRIST:  Can I ask that same question and then

21    the next one, Your Honor, just to make sure?

22              THE COURT:  Restate your question.

23              MR. FRIST:  Thank you, Your Honor.

24    Q.    (BY MR. FRIST)  You understand, Doctor Cole, that it's

25    Doctor Valerdi's opinion for infringement that the S2L

1    sub-LSPs in Nokia products are separate tunnels even though

2    they're part of the same P2MP LSP?

3    A.    I know Doctor Valerdi talks about two tunnels, but for

4    questions on infringement you would have to ask Doctor

5    Valerdi.  I didn't form opinions on infringement.

6    Q.    Let me ask you your opinion, Doctor Cole.  It's your

7    opinion that S2L sub-LSPs of the same P2MP LSP are not

8    separate tunnels.  Correct?

9    A.    For what Doctor Jeffay pointed to in his direct

10   yesterday, I believe those are referring to the same tunnel

11   and there's no resource sharing or resource manager.  So he

12   failed to meet the obligations of invalidity.

13              MR. FRIST:  I'm going to object as non-responsive,

14   Your Honor.

15              THE COURT:  Overruled.

16   Q.    (BY MR. FRIST)  Doctor Cole, I want to focus on what you

17   understand the RFC 4875 draft to disclose.  Okay?

18   A.    Okay.

19   Q.    You understand, as we've discussed, that RFC 4875 draft

20   discloses multiple S2L sub-LSPs that are part of this same

21   P2MP LSP.  Right?

22   A.    I believe we just looked at that.  That's one of the

23   pieces.  The RFC is a pretty -- pretty thick document, but

24   that is one thing that's covered.

25   Q.    And we already discussed that S2Ls of the same P2MP can

```
 1    share resources.  Right?

 2    A.   That is also correct.

 3    Q.   It's your opinion, sir, that the RFC 4875 draft disclosed

 4    multiple paths within the same tunnel but not multiple tunnels

 5    as contemplated within the '580 Patent.  Correct?

 6    A.   It's a little different.  My opinion is there's no

 7    resource manager across multiple tunnels and that there are

 8    not multiple tunnels within that RFC.

 9    Q.   Doctor Cole, do you have your rebuttal expert report up

10    there?

11    A.   I do not believe so.

12            MR. FRIST:  Your Honor, may I go grab some binders?

13            THE COURT:  You may.

14            MR. FRIST:  Thank you.

15        May I approach, Your Honor?

16            THE COURT:  You may.

17            MR. FRIST:  Thank you.  May I proceed, Your Honor?

18            THE COURT:  Yes.

19    Q.   (By MR. FRIST)  Doctor Cole, if you can please turn in

20    your rebuttal report to paragraph 266.  I want you to look at

21    the last sentence in that paragraph.

22    A.   Last sentence in paragraph 266?

23    Q.   Yes.

24    A.   Okay.

25    Q.   And, Doctor Cole, does that paragraph refresh your
```

1    recollection as to whether it's your opinion that the RFC 4875

2    internet draft discloses multiple paths within the same tunnel

3    but not multiple tunnels as contemplated within the '580

4    Patent?

5    A.    Yes, that does.  Thank you.

6    Q.    Okay.  So you agree with me then.  Right?  That's your

7    opinion.

8    A.    Yes, it is.

9    Q.    Okay.  Now, you provided that opinion with full knowledge

10   that RFC 4875 describes that multiple S2L sub-LSPs can be part

11   of the same P2MP LSP.  Right?

12   A.    I gave that opinion in reading and going through the

13   whole RFC.

14   Q.    Okay.  And you understand that there's resource sharing

15   disclosed in RFC 4875 draft between those S2L sub-LSPs.

16   Right?

17   A.    Yes, there is.

18   Q.    So even though there's resource sharing between S2L

19   sub-LSPs within the same P2MP LSP, it's your opinion that that

20   resource sharing doesn't satisfy the claims of the '580

21   Patent.  Right?

22   A.    That is correct.

23   Q.    Okay.  And the reason that you don't believe it's

24   sharing -- resource sharing between tunnels is because there's

25   only a single P2MP LSP.  Correct?

1    A.    That is correct.

2    Q.    And the sub-LSPs, these S2L sub-LSPs, in your opinion,

3    that are within one P2MP LSP, are not separate tunnels.

4    A.    It's -- I just want to make sure we get the language

5    correct.  It's multiple paths within the same tunnel.  You're

6    meaning multiple tunnels within tunnels, but my opinion is

7    multiple paths within the same tunnel is not multiple tunnels.

8    Q.    Right.  It's your opinion that a sub-LSP is a path of a

9    tunnel, not a separate tunnel.  Correct?

10   A.    That is correct.

11   Q.    Okay.  And it's your opinion that these S2L LSPs that are

12   paths of a tunnel are combined to make up a single tunnel

13   that's the P2MP LSP.  Right?

14   A.    In the context of rebutting Doctor Jeffay's opinion of

15   what he presented, that would be correct.

16   Q.    I'm asking in the context of the RFC 4875 draft.  It's

17   your opinion that because the S2L sub-LSPs are paths of a

18   single P2MP LSP, that they are part of the same tunnel.

19   Correct?

20   A.    Once again, in the context of Doctor Jeffay's opinion,

21   that would be correct.

22   Q.    Doctor Cole, you understand that in building a P2MP LSP,

23   S2L LSPs, these paths, are merged together.  Right?

24   A.    Generally that's correct.

25   Q.    Right.  So in building a P2MP LSP, the standard described

1    in RFC 4875 discloses merging S2L sub-LSPs.  Right?

2    A.    I believe that's also correct.

3    Q.    And it's your opinion, Doctor Cole, that the '580 Patent

4    is directed to separate tunnels within a network that share

5    resources as opposed to separate tunnels that merge into a

6    single tunnel.  That's correct.  Right?

7    A.    I wouldn't agree with that.  You're mixing the words

8    paths and tunnels.

9    Q.    Can you please go to paragraph 269 of your rebuttal

10   report in front of you?  Let me know when you're there, Doctor

11   Cole.

12   A.    I'm there.

13   Q.    Doctor Cole, after reading paragraph 269, does that

14   refresh your recollection as to whether it's your opinion in

15   this case that the '580 Patent is directed to separate tunnels

16   within a network that share resources as opposed to separate

17   tunnels that merge into a single tunnel?

18   A.    Yes, that does.  Thank you.

19   Q.    All right.  So you agree that's your opinion in this

20   case.  Right, Doctor Cole?

21   A.    Yes, I do.

22           MR. FRIST:  I'll pass the witness, Your Honor.

23           THE COURT:  Is there redirect?

24           MR. LIDDLE:  Nothing further, Your Honor.

25           THE COURT:  All right.  You may step down, Doctor

1    Cole.

2                THE WITNESS:  Thank you, Your Honor.

3                THE COURT:  You're welcome.

4         Plaintiff, call your next rebuttal witness.

5                MR. BENNETT:  Plaintiff calls Dr. Ricardo Valerdi.

6                THE COURT:  All right.  Doctor Valerdi, if you'll

7    come forward and return to the witness stand, sir.  And I'll

8    remind you, sir, you remain under oath.

9         Mr. Bennett, you may proceed with direct.

10               MR. BENNETT:  Thank you, Your Honor.

11                     RICARDO VALERDI, Ph.D.,

12   having been previously sworn, testified further under oath as

13   follows:

14                      DIRECT EXAMINATION

15   BY MR. BENNETT:

16   Q.   Good afternoon, Doctor Valerdi.

17   A.   Good afternoon.

18   Q.   As we get started, maybe let's start with this question.

19   What are you here not to testify about?

20   A.   I will not be going through all the infringement opinions

21   that I covered the other day.

22   Q.   Okay.  What are you here to testify about?

23   A.   I'm here to respond to some of the testimony given by

24   Doctor Jeffay and Doctor Chatterjee.

25   Q.   Okay.  Let's start with the latter that you just

1    mentioned since he was here today, Doctor Chatterjee.

2        You heard him testify -- you were in the courtroom when

3    he testified that Nokia's infringement of the '599 was

4    impossible.  Did you hear that?

5    A.   Yes.

6    Q.   All right.  Having heard that testimony, are you able to

7    make what Doctor Chatterjee declared impossible possible?

8    A.   Yes.

9    Q.   Okay.  Explain how.

10   A.   Well, he made -- gave some opinions about the visibility

11   between layer 2 networks and layer 3 networks not being

12   possible, and he also made some comments about certain

13   connections between certain network elements not being

14   possible.

15       But I think the evidence that I reviewed suggests

16   otherwise, figures and source code.  I believe that the things

17   he said are impossible are actually quite possible.

18   Q.   Okay.  Let's look at one of those figures.

19           MR. BENNETT:  Mr. Jarrett, Joint Exhibit 46a, page

20   41, please.  I'll just use the overhead.  Can you switch me

21   over, please?

22   Q.   (BY MR. BENNETT)  Is this one of the figures you

23   mentioned, Doctor Valerdi, that -- in your discussion of the

24   '599?

25   A.   Yes.

1    Q.    Okay.  Doctor Chatterjee discussed this earlier today as

2    well.  And what was it that you heard with which you

3    disagreed?

4    A.    One of the things that Doctor Chatterjee said is that

5    there is only one egress node or -- in terms of what this

6    diagram shows, one broadband service router.

7    Q.    Okay.  Can you indicate on the screen there where the

8    broadband service router is in case we've forgotten?

9    A.    Yes.

10   Q.    Okay.  What is it that Doctor Chatterjee got wrong about

11   this figure?

12   A.    His statement was that there was only one BSR.  But as

13   you can see from the network elements that he has are circled,

14   there are two network elements there.  And to further confirm

15   that there are two network elements, you'll see that there are

16   two connections coming in from each of the corresponding BSAs.

17   So that just summarizes that he didn't describe the diagram

18   correctly.

19   Q.    Okay.  And, more importantly, why does his incorrect

20   description of the diagram not disprove your infringement

21   opinion?

22   A.    Because what I described is that there are egress nodes,

23   nodes being plural, there is more than one node, meaning that

24   there is more than one broadband service router that is

25   possible to connect the layer 2 network on the left with the

1   layer 3 network on the right.

2   Q.   Okay.  We also discussed the following page of joint

3   Exhibit 46a where we had this discussion of the advantages of

4   using VPLS.  Do you remember that?

5   A.   Yes.

6   Q.   All right.  Did you hear anything this morning from

7   Doctor Chatterjee that he also got wrong there?

8   A.   Yes.  Doctor Chatterjee also said that the Nokia products

9   cannot be configured as a layer 2 network.

10  Q.   Can it be configured as a layer 2 network despite what he

11  said?

12  A.   Yes.

13  Q.   And how do you know that?

14  A.   Well, as you can see, this is Nokia's triple play service

15  delivery architecture document, and they explicitly mention

16  VPLS, which stands for virtual private LAN service, which by

17  definition a private LAN is a layer 2 network.

18  Q.   Okay.  Now, we're not going back through all the claim

19  analysis, but how does -- how do these two documents, the

20  figure and the commentary, reinforce what you said about the

21  claim language of the '599 Patent?

22  A.   What I said about the infringement of Nokia's product

23  relative to that claim language is there are multiple egress

24  nodes, we saw there are multiple BSRs, and that this is a

25  layer 2 network because it supports virtual private LAN

1    service, which is by definition a layer 2 protocol.

2    Q.   And if all those facts that you just mentioned are

3    present, what does that mean for the claim in the '599 Patent?

4    A.   That Nokia's products infringe.

5    Q.   All right.  There was some discussion also of the OSPF.

6    You heard Doctor Chatterjee speak about that.  Correct?

7    A.   Yes.

8    Q.   All right.  What is it that he said about is OSPF that

9    you found incorrect?

10   A.   Doctor Chatterjee said that the OSPF algorithm is a layer

11   3 protocol.

12   Q.   And why was that wrong?

13   A.   Because OSPF is an algorithm that processes information

14   from a layer 2 packet.  It sits on top of layer 2, so it

15   actually is very relevant for layer 2, even though it might be

16   described as a layer 3 algorithm.

17   Q.   Okay.  Why is it very relevant, the distinction

18   between -- the idea of where it sits between layers 2 and 3?

19   A.   Because in the patent, the selection of the routes and

20   the decisions that are made with the various metrics and

21   addresses have to occur in the layer 2 network.

22   Q.   And do Nokia's products support ethernet ring networks?

23   A.   Yes.

24   Q.   And how do you know that?

25   A.   Because ethernet is a layer 2 protocol and we've shown

1    that the diagram of Nokia's product supports layer 2

2    protocols.  And we also know that the ring topology is

3    referenced and pointed to, both graphically and in the text of

4    Nokia's technical documentation.

5    Q.   And so tying that back to the claims, the claim terms

6    of -- of the patent, what does what you just described, what

7    does that -- how does that impact your infringement analysis?

8    A.   It doesn't change my opinion, and it supports the fact

9    that Nokia's -- that I believe Nokia's products infringe that

10   patent.

11   Q.   Is there anything else you needed to respond to from

12   Doctor Chatterjee's discussion this morning of the '599 Patent

13   that you wish to respond to as it impacts infringement?

14   A.   I just wanted to point out that he showed a lot of

15   technical documentation, but he didn't show any source code to

16   support his opinions.  And I think that's critical to remember

17   because the source code literally describes how the product

18   operates.  And I think that's an important thing to consider.

19   Q.   And, in fact, within the context of the '599 Patent and

20   its preamble, why does source code matter so much?

21   A.   Because it's essentially a computer, a network element

22   that's built to process information in the context of the

23   computer network, and that processing is performed by the

24   source code.

25   Q.   And you heard Nokia's counsel ask Doctor Chatterjee about

1    customer use.  Do you remember that?

2    A.    Yes.

3    Q.    Given the context of the claims in -- the claim we're

4    looking at in the '599 Patent, does use matter?

5    A.    Well, if the routers are designed to do a certain

6    function, that to me is use.  Regardless of whether it's a

7    hundred percent of the time or one percent of the time, it's

8    available for somebody to use.

9    Q.    Any final thoughts as to what Doctor Chatterjee said as

10   applied to the '599 Patent?

11   A.    No.

12   Q.    Okay.  Let's move on to the '010 Patent, which was Doctor

13   Jeffay from yesterday.  Okay?

14        There's a lot of discussion about the hub.  Do you

15   remember that?

16   A.    Yes.

17   Q.    All right.  What distinguishes your testimony about a hub

18   from Doctor Jeffay's testimony about the hub?

19   A.    There are two main things that are different.  One of

20   them is that Doctor Jeffay's definition of a hub doesn't

21   consider the claim language of that patent of what that hub is

22   supposed to do.

23   Q.    In what way?

24   A.    If we think about what the claim language says is the

25   hub's supposed to have certain capabilities like to process

1  information in a network, that's the intent of what the hub is

2  supposed to do in light of that claim language.  And Doctor

3  Jeffay did not interpret hub in that light.

4  Q.  That brings up a point which is this:  Could you make

5  sense of Doctor Jeffay's testimony about hubs as being dumb

6  devices at layer 1 but also being a layer 3 device?

7  A.  That was a little bit confusing for me because when -- in

8  one part of his testimony, Doctor Jeffay said that a hub is a

9  layer 1 is dumb device, and in another part of his testimony

10  he said, well, it could be a layer 3 device.  That's two

11  different answers to the question.  In fact, when the Judge

12  asked him what a Tar Heel was, he also gave two answers to

13  that question.

14  Q.  Going back to hubs at layer 1 and layer 3, he talked

15  about the node -- or we talked about routers as hubs, and he

16  dismissed that.  You heard his testimony?

17  A.  Yes.

18  Q.  What in your view did he get wrong about routers as hubs?

19  A.  Doctor Jeffay didn't consider that routers can operate as

20  routers and hubs, and that was actually the intent of the use

21  of the term 'hub' in the claim language of that patent.

22  Q.  And which claim language are you referring to when you

23  said as to this issue of hub?

24  A.  The -- I believe it was in claim 1 and others in the '010

25  Patent.

1    Q.   So let's --

2           MR. BENNETT:  Mr. Jarrett, maybe we can get ID No.

3    2176.  That's it.

4    Q.  (BY MR. BENNETT)  So coming back to the claim language

5    versus what Doctor Jeffay testified to and hubs, what is it

6    based on what we're seeing here that -- that Doctor Jeffay got

7    wrong?

8    A.   Well, I think what Doctor Jeffay was suggesting is that

9    the use of the term 'hub' in element B here shown on the

10   screen -- at the top of the screen, which is a hub, he didn't

11   consider the text that comes immediately after that comma,

12   that the inventor wrote that the hub has to comprise of these

13   things such as ports, such as the ability to receive and

14   transmit data frames, the ability to operate in layer 2

15   communication protocol.

16       Those are the things that matter when you're interpreting

17   the term 'hub' in the context of this specific claim of this

18   specific patent.

19   Q.   Okay.  And that specific claim language that you just

20   pointed out, how does it apply to, say, a 7750 service router?

21   A.   When you consider what the functionalities are of a 7750

22   service router, it performs precisely these things described

23   in element B of claim 1 of the '010 Patent.

24   Q.   Does it have a -- does it comprise a plurality of ports?

25   A.   Yes.

1    Q.    Can it be configured to receive and transmit data frames?

2    A.    Yes.

3    Q.    And can it be -- can it receive and transmit data frames

4    in accordance with a packet-oriented level [sic] 2 protocol?

5    A.    Layer 2, yes.

6    Q.    Sorry.  Layer 2 protocol.

7          What else about what Doctor Jeffay said about a hub

8    comprising a plurality of ports for purposes of claim 1 did

9    you disagree with?

10   A.    What I also disagreed with is that there was confusion

11   about the topology of hub-and-spoke and the role -- compared

12   to the role of the hub in the context of this claim language.

13   What I noticed and is important to point out is that the

14   topology is not mentioned in this claim.

15   Q.    Explain why is that significant for purposes of

16   infringement.

17   A.    It means what the inventor was intending is for a

18   broader, more versatile application of the term 'hub', so it's

19   not constrained to a certain network topology.

20   Q.    And how did Doctor Jeffay get that particular piece wrong

21   when he testified yesterday?

22   A.    He suggested that the hub can only exist in a

23   hub-and-spoke topology.

24   Q.    And --

25              MR. HAYNES:  Objection, Your Honor; lacks

1  foundation.  He's characterizing the witness' testimony

2  incorrectly, I believe.  And if he's going to do that, I think

3  he ought to at least show him the testimony we're talking

4  about.

5         THE COURT:  He's entitled to testify as to how he

6  understood the witness' testimony, and you can certainly cross

7  examine him on that.  I'm going to overrule the objection.

8         MR. HAYNES:  Thank you.

9  Q.   (BY MR. BENNETT)  You may answer.

10 A.   The way that I understood what Doctor Jeffay was

11 suggesting is that the application of the term 'hub' in this

12 case was more about the topology of the network and not what

13 function it was performing in light of the claim language.

14 Q.   But what is the reality of the claim language?

15 A.   The reality is that a hub is supposed to do the things

16 that are described after the comma that's written here in

17 claim element B of claim 1.

18 Q.   And do Nokia's products satisfy those elements of that

19 claim?

20 A.   Yes.

21 Q.   Let's go now to the '580.

22        MR. BENNETT:  Your Honor, at this time I will need

23 to seal the courtroom because we're going to get -- or I will

24 ask that we seal the courtroom because we are going to need to

25 look at some source code.

```
 1            THE COURT:  All right.  Based on counsel's request

 2   and to protect confidential information, I'll order the

 3   courtroom sealed at this time.  This will also seal this

 4   portion of the record.

 5        All persons present who are not subject to the protective

 6   order should exit the courtroom and remain outside until it's

 7   reopened and unsealed.

 8                       (Courtroom sealed.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5                       (Courtroom unsealed.)

6          THE COURT:  All right, Mr. Bennett.  The courtroom

7    is unsealed.  You may continue.

8          MR. BENNETT:  Thank you, Your Honor.

9    Q.   (BY MR. BENNETT)  Doctor Valerdi, I guess I'll end with

10   one last question.  Is there anything that you heard from

11   Nokia's two separate experts that, in your view, did anything

12   to diminish your infringement opinions?

13   A.   No.

14         MR. BENNETT:  I'll pass.

15         THE COURT:  All right.  Cross examination by the

16   Defendant.

17       Proceed when you're ready, Mr. Haynes.

18         MR. HAYNES:  Thank you, Your Honor.

19       Before I get started, Doctor Valerdi, do you have a copy

20   of your expert reports in front of you already or do I need to

21   get you one of those?

22         THE WITNESS:  I don't have anything.

23         MR. HAYNES:  Let me get that passed out before we

24   get started here.

25       Your Honor, do you have a copy from before?  Would you

1    like a new one as well?

2              THE COURT:  I do.

3              MR. HAYNES:  May I proceed, Your Honor?

4              THE COURT:  You may proceed.

5                        CROSS EXAMINATION

6    BY MR. HAYNES:

7    Q.   Doctor Chatterjee -- Chatterjee.  Excuse me.

8    A.   It's okay.

9    Q.   Still stuck in this morning.

10        Doctor Valerdi, you just gave a lot of testimony

11   regarding what you understood that Doctor Jeffay and Doctor

12   Chatterjee had testified about in this case.  Right?

13   A.   Correct.

14   Q.   And you weren't actually shown their actual testimony.

15   You were just asked to dry to draw from your memory and

16   recount as best as you could remember what they actually said.

17   Right?

18   A.   That was based on my recollection sitting here for the

19   past few days.

20   Q.   Now, you wouldn't intentionally mischaracterize something

21   that they said in your testimony, would you?

22   A.   No, I would not.

23   Q.   Now, there were a few points, and I'm going to try to

24   track them, you probably saw me trying to track these as you

25   were going through them, but I believe one of the points you

1    made was that Doctor Chatterjee said that OSPF is not a -- or

2    is a layer 3 protocol, and you disagree with that.  Right?

3    A.    I disagreed with it only being a layer 3 protocol.

4    Q.    But you testified here two days ago.  Right?

5    A.    Yes.

6    Q.    And do you recall that I asked you that exact same

7    question, that is OSPF a layer 3 protocol?  Do you recall

8    that?

9    A.    Yes.

10   Q.    Do you recall that the answer you gave was yes?

11   A.    Yes, it's still -- yes.

12   Q.    And that's exactly what Doctor Chatterjee said, isn't it?

13   A.    Yes.  But you didn't ask me about layer 2 so I only

14   responded to what you asked me.

15   Q.    Didn't he ask you whether or not you thought Doctor

16   Chatterjee was wrong when he said that?

17   A.    Yes.

18   Q.    And you said he was.  Right?

19   A.    I still think so.

20   Q.    Even though you used the exact same words yourself two

21   days ago.

22   A.    I'm not sure I only limited it to layer 3.  If I recall,

23   when you asked me the OSPF question, there was a follow-up

24   question related to layer 2, and I think I said I wasn't sure

25   when you asked me on Tuesday.  So it's not apples-to-apples

1120

1    here.  He was only asked about layer 3 or he only provided

2    opinion about layer 3.  I was asked about layer 3 and layer 2.

3              MR. HAYNES:  Can we bring up -- I'm sorry.  Can we

4    display for --

5    Q.   (BY MR. HAYNES)  Well, actually let me just show you your

6    testimony from two days ago.

7              MR. HAYNES:  If we can bring up the trial transcript

8    at 562, line 6 to 11.

9              MR. BENNETT:  I object until we have an inconsistent

10   statement or proof of one.  We probably -- yeah, I object to

11   the --

12             THE COURT:  He hasn't testified that he doesn't

13   recall.  This is not for refreshment.  If he testifies

14   inconsistently today with what he did earlier, then you

15   perhaps can impeach him with his prior testimony.

16   Q.   (BY MR. HAYNES)  Doctor Valerdi, do you agree that OSPF

17   is a layer 3 protocol?

18   A.   Yes.

19   Q.   The testimony that you criticized from Doctor Chatterjee

20   was Doctor Chatterjee said OSPF was a layer 3 protocol.

21   Correct?

22   A.   He testified it was only a layer 3 protocol.  Correct.

23   Q.   Now, you also criticized Doctor Chatterjee because you

24   said that he represented to the jury or testified that in the

25   triple play architecture there was only one BSR.  Do you

1    recall that testimony?

2    A.    Yes.

3              MR. HAYNES:  Can we bring up JX 48a?  Sorry.  46a.

4    Apologies.

5    Q.    (BY MR. HAYNES)  Doctor Valerdi, you recognize this

6    document.  Right?

7    A.    Yes.

8              MR. HAYNES:  And if we can go to page 41.

9    Q.    (BY MR. HAYNES)  And this was the document that Doctor

10   Chatterjee testified about at length today?

11   A.    Yes.

12   Q.    And you see this document actually shows two BSRs.

13   Right?

14   A.    Yes.

15   Q.    Do you recall that Doctor Chatterjee also created his own

16   simplified illustration of this figure?

17   A.    Yes.  I remember a version of this being shown.

18             MR. HAYNES:  May I have the elmo, please?

19   Q.    (BY MR. HAYNES)  How many BSRs are shown in that figure,

20   sir?

21   A.    There are two in that one.

22   Q.    Now, you also -- I believe you also testified that Doctor

23   Chatterjee said that in triple play, there could be no layer 2

24   network.  Do you recall giving that testimony today?

25   A.    Yes.

1    Q.    Do you see the title, Object Figure from Doctor

2    Chatterjee's Diagram?

3    A.    Yes.

4    Q.    Can you read it?

5    A.    Nokia's triple play services delivery architecture.

6    Q.    And right below that, it says layer 2 mesh network.

7    Correct?

8    A.    Correct.

9    Q.    So you agree with me that Doctor Chatterjee did not say

10   that Nokia's triple play architecture could not be a layer 2

11   network.  Right?

12   A.    That's not what I remember because when he was referring

13   to the previous version of the diagram, the one that shows the

14   ring network, he testified that that was not a layer 2

15   network.

16   Q.    Sir, you see the title of this is Layer 2 Mesh Network?

17   A.    I do.

18   Q.    And a layer 2 mesh network is a layer 2 network.  Right?

19   A.    Yes.  I'm just repeating what I remember him testifying

20   this morning in relation to the other diagram.

21   Q.    Do you think that maybe what Doctor Chatterjee actually

22   said is that there was no layer 2 ring network?

23   A.    Yes, that's right.  That's what he said.

24   Q.    That is what he said.

25   A.    Yes.

1    Q.   Okay.  I'm glad we can agree.

2         Okay.  You've given a lot of testimony about how you

3    looked at source code.  Is that --

4    A.   That's correct.

5    Q.   You also looked at Nokia's technical documents.  Right?

6    A.   That's correct.

7    Q.   You would agree with me that Nokia's technical documents

8    are accurate with respect to the functionalities that you've

9    accused of infringement here, wouldn't you, sir?

10   A.   Yes.

11   Q.   And you yourself rely on those same documents.  Correct?

12   A.   I do.

13   Q.   Okay.  Now, I believe with respect to the '010 Patent you

14   also offered some criticisms of Doctor Jeffay.  Do you recall

15   that?

16   A.   Yes.

17   Q.   And you certainly wouldn't have attempted intentionally

18   to mischaracterize Doctor Jeffay's testimony.  Right?

19   A.   That's correct.

20   Q.   And one of the things you said is that Doctor Jeffay said

21   that a hub is a layer 3 device.  Do you recall that?

22   A.   That's correct.

23   Q.   But you know, don't you, that what Doctor Jeffay actually

24   said was that a hub operates at layer 1 and does not operate

25   at layer 2 or 3?  Correct?

1  A.  He also said that.

2  Q.  You understand that Doctor Jeffay's opinion in this case

3  is that the hub operates at layer 1?

4  A.  That's one of his opinions, yes.

5  Q.  Okay.  And you understand that he testified that that hub

6  does not have layer 2 and layer 3 functionality.  Correct?

7  A.  That's where it was a bit fuzzy because he did say layer

8  3 in the context of a hub when he was answering questions in

9  his cross examination.

10 Q.  Would you like me to refresh your memory as to what

11 Doctor Jeffay actually said about layer 2 and layer 3

12 functionality?

13 A.  Sure.

14     MR. HAYNES:  If we can bring up the trial transcript

15 at page 774, lines 21 through 23?

16     THE COURT:  Yes, Mr. Bennett?

17     MR. BENNETT:  It's improper refreshment.  He can

18 hand the witness the transcript and let him refresh, but it

19 usually doesn't warrant publication.

20     THE COURT:  I agree with that.

21     MR. HAYNES:  Is it possible for me to display that

22 to him directly, Your Honor?  I have a hard copy.  I can go

23 pull it out if we need to do that, but --

24     THE COURT:  I don't think we can put it on just one

25 monitor.  I think if it goes on the monitor, it goes on all

1    the monitors.  If you've got a hard copy, let's hand that up.

2        Do you want to direct him where to review?

3    Q.   (BY MR. HAYNES)  If you'll go to page 774.

4    A.   I'm there.

5    Q.   At line 21 to 23.

6    A.   Okay.  I see that.

7    Q.   Does that refresh your memory as to whether or not Doctor

8    Jeffay testified that a hub does not have layer 2 or layer 3

9    functionality?

10   A.   This is one of the times he was asked about layer 2 or 3,

11   but I know he was -- he responded in different -- in the

12   context of different questions.  So I might want to look at

13   this a little bit further to find the part that I was

14   remembering him talking about layer 3 context.

15           THE COURT:  We're not going to review the entire

16   transcript of his testimony.  If your answer is this is one

17   time, I recall other times that may or may not be consistent,

18   then that's your answer.  But there's no way we can go down

19   this path too much further.

20   Q.   (BY MR. HAYNES)  Can you answer the question, sir?

21   A.   Thank you.  To clarify, I do see the lines and the page

22   that you pointed out, but I do recollect him speaking about

23   hubs in the context of layer 3 in other instances during his

24   testimony.

25   Q.   Okay.  You agree that Doctor Jeffay told this jury at

```
 1    least once with what you just read that a hub doesn't have

 2    layer 2 or layer 3 functionality.  Right?

 3              MR. BENNETT:  Objection, asked and answered.

 4              THE COURT:  I'll allow it.

 5              THE WITNESS:  I do remember that.

 6    Q.   (BY MR. HAYNES)  Now, you also testified that you thought

 7    Doctor Jeffay focused on hub-and-spoke topology as opposed to

 8    hub devices.  Do you recall that testimony this afternoon?

 9    A.   That's correct.

10    Q.   And is it your testimony today that you understood Doctor

11    Jeffay to be saying that the hub of the claims referred to a

12    hub-and-spoke topology?

13    A.   No.

14    Q.   You know that Doctor Jeffay, when he was talking about a

15    hub, was talking about a hub device.  Right?

16    A.   Yes.

17    Q.   Okay.  And you know that it's Doctor Jeffay's opinion

18    that if I have a network device that is configured in a

19    hub-and-spoke topology, that device doesn't magically become a

20    hub just because it's in that topology.  Right?

21    A.   He did say something of that effect.

22    Q.   And you, sir, agree with me that when the patent refers

23    to hub, that hub is a hub network device.  Right?

24    A.   My understanding is that it performs the functions that

25    are described in that claim patent.  There were at least three
```

1    things in that claim element.

2              MR. HAYNES:  Move to strike as non-responsive, Your

3    Honor.

4              THE COURT:  Overruled.  I think he's attempting to

5    respond to your question.

6    Q.  (BY MR. HAYNES)  I understand that there are other

7    limitations in the claim as to what the hub must do, but you

8    would agree with me that the functions are functions, but the

9    hub is referring to a device.  Right?

10   A.  I agree that functions and device are both important in

11   interpreting what is meant here, yes.

12   Q.  Fair enough.

13        And when it references a hub, it is referring to a hub

14   network device.  Correct?

15   A.  Partially correct.  It's hub device that is comprised of

16   certain functionality.

17   Q.  Fair enough.

18        Were you here when Doctor Cole testified?

19   A.  Both times.

20   Q.  And you heard Doctor Cole just a few minutes ago testify

21   about point-to-multipoint LSPs?

22   A.  Yes.

23   Q.  And did you hear Doctor Cole testify that a

24   point-to-multipoint LSP was one tunnel, not two tunnels?

25   A.  Yes.

1   Q.   And you agree with him that a point-to-multipoint LSP is

2   one tunnel, not two tunnels.  Correct?

3   A.   In the context of responding to the technical standard, I

4   believe that's how he was answering the question.

5   Q.   Sorry.  I wasn't talking about Doctor Cole anymore.  I'm

6   talking about your testimony.

7   A.   Okay.  I apologize.  Re-ask the question, please.

8   Q.   Sir, you agree with me that a point-to-multipoint LSP is

9   one tunnel, not two tunnels.

10  A.   I'm not sure I'm willing to sign on to the exact wording

11  of that question.  I think it could be two tunnels.  I think

12  it could be one.

13  Q.   Sir, would you look at trial transcript on page 544?

14           MR. BENNETT:  Objection, Your Honor.  Why are we

15  looking at trial transcripts again?  There's no refreshing or

16  recollection or impeachment going on.

17           THE COURT:  I'm assuming there's impeachment about

18  to go on or about to be tried.

19  Q.   (BY MR. HAYNES)  Doctor Chatterjee -- sorry.  I did it

20  again.

21       Doctor Valerdi, if you would turn to page 544.

22  A.   I'm there.

23  Q.   At line 21?

24  A.   Could you remind me what part of the trial am I reading a

25  transcript from?

1    Q.   Sure.  Sure.  This is actually a portion of your trial

2    testimony from two days ago.

3    A.   Thank you.

4    Q.   And actually you can actually go to page 545 and begin

5    reading at line 4.  And if you would read down to line 17.

6    A.   Okay.

7    Q.   Sir, does that refresh your recollection as to whether or

8    not a P2MP LSP is one tunnel, not two tunnels?

9    A.   In the context of the RFC 4875, which is what the

10   question was bounded by of the part of the transcript that I

11   just read, yes.

12   Q.   Now, you agree that the RFC 4875 standard is the industry

13   standard that defines how to create point-to-multipoint

14   tunnels.  Right?

15   A.   Yes.

16   Q.   So in the context of the industry standard that defines

17   how to create point-to-multipoint LSPs, you agree with me that

18   a point-to-multipoint LSP is one tunnel, not two tunnels.

19   Correct?

20   A.   In the context of the standard, yes.

21   Q.   Okay.  And you also agree with me that what you have

22   accused of infringement in this case as being two tunnels is a

23   point-to-multipoint LSP.  Correct, sir?

24   A.   Among other things, yes.

25   Q.   At the beginning of Doctor Cole's testimony, there were

1    some questions to him actually characterizing I think what you

2    talked about, and the question -- do you recall the question

3    being something like, did you see Doctor Valerdi talk about

4    the RFC 4875 standard?  Do you recall that testimony

5    generally?

6    A.   Yes.  I agree that he was asked about what I was opining

7    about.

8    Q.   And his -- do you recall that Doctor Cole said that he

9    didn't recall you having pointed to the RFC 4875 standard for

10   infringement purposes.  Do you recall that?

11   A.   Yes.

12   Q.   And you actually -- you seem to be trying really hard to

13   allege infringement in this case without specifically

14   referencing the industry standard that defines how Nokia

15   builds its tunnels.  Is that fair?

16   A.   I don't know if I'm trying really hard.  I don't know

17   what that means.  I can just tell you what my intent was in

18   the direct, and I remember that I didn't mention in my direct

19   that particular standard.

20   Q.   Right.  You intentionally did not mention the RFC 4875

21   standard that Nokia implements in its products to build

22   point-to-multipoint tunnels because you know that standard in

23   draft form was published before the '580 Patent.  Correct?

24   A.   Yes.  That's actually written in the specification of the

25   standard.

1    Q.   So you know that if you had told the jury that the

2    functionality that you say infringes is exactly the same

3    functionality in the RFC 4875 standard, that would mean that

4    if you are correct that it infringes, the patent would be

5    invalid.  Correct, sir?

6    A.   Incorrect.  You use the word 'exactly', and I disagree

7    with that characterization.

8    Q.   Let me try it this way.  If Nokia implements the RFC 4875

9    standard that you have accused of infringement, and that

10   standard was published before the '580 Patent, that means the

11   '580 Patent is not valid.  Correct, sir?

12   A.   I agree.  That's why that standard is mentioned in the

13   face of the patent.  It's known to be in existence already.

14   Q.   Now, sir, you did prepare an expert report.  We talked

15   about that a couple of days ago.  Right?

16   A.   Yes.

17   Q.   And you spent hundreds and hundreds of hours analyzing

18   everything in this case, forming your opinions, and writing

19   those opinions down in that report.  Correct?

20   A.   Correct.

21   Q.   You would agree with me, sir, that in that report, you

22   referenced the RFC 4875 standard to support your infringement

23   positions extensively.  Correct?

24   A.   I think that's fair.

25   Q.   Do you recall that you had an appendix to your report?

```
 1   A.   Yes.

 2   Q.   Do you recall that that appendix was 103 pages long?

 3   A.   I had multiple -- which one are you talking about?

 4   Q.   Fair enough.  With respect to the '580 Patent, you had

 5   several appendices that were separate for each product.  Do

 6   you recall that?

 7   A.   Yes.  That's why I'm not sure which one you're referring

 8   to.

 9   Q.   It's a fair qualification.  With respect to the appendix

10   you put together for the 7250 product, for example, you recall

11   that was just over a hundred pages?

12   A.   Sure.

13   Q.   Do you recall that in that appendix, out of those 103

14   pages, 47 of those pages cited the RFC 4875 standard?

15   A.   I did not do that kind of analysis, but I'm sure -- I'll

16   trust you that that's true.

17   Q.   And so in forming your opinions on infringement in this

18   case and disclosing them to Nokia before we got to this

19   courtroom, you agree with me that you relied heavily on the

20   RFC 4875 standard.  Correct?

21   A.   I think that's fair, yes.

22   Q.   Okay.

23             MR. HAYNES:  Let's take a very quick look at DX 34.

24             THE COURT:  Counsel, approach the bench while that's

25   coming up.
```

```
 1              (The following was had outside the hearing of the

 2              jury.)

 3              THE COURT:  Mr. Haynes, you've got about 20 minutes

 4    before your trial time runs out.  I just want you to be a

 5    aware.

 6              MR. HAYNES:  Thank you.  I appreciate it, Your

 7    Honor.

 8              THE COURT:  Let's proceed.

 9              (The following was had in the presence and hearing

10              of the jury.)

11              THE COURT:  Let's proceed.

12    Q.  (BY MR. HAYNES)  Doctor Valerdi, do you see DX 34 on the

13    screen?

14    A.  Yes.

15    Q.  And you recognize this to be the RFC 4875 standard that

16    we've been talking about?

17    A.  Yes.

18    Q.  And you know that this standard was co-authored by an

19    individual who worked at Alcatel that is now part of Nokia?

20    A.  Yes.

21    Q.  And you were here for Doctor Cole's testimony when he was

22    talking about the standard in terms -- the draft version of

23    the standard in terms of his validity opinions.  Do you recall

24    that?

25    A.  Yes.
```

1    MR. HAYNES:  If we could go to DX 34 on page 8.

2    Q.  (BY MR. HAYNES)  Do you see this figure 1 in the

3    standard?

4    A.  Yes.

5    Q.  And that's illustrating a point-to-multipoint LSP in

6    accordance with the 4875 standard?

7    A.  Yes.

8    Q.  And you see I've got -- start out at point A and I go

9    down and then I branch out into a bunch of different paths

10   that go a bunch of different ways?

11   A.  Multipoints, yes.

12   Q.  Multipoints.  Thank you, sir.

13       What's being shown on this figure, sir, that's one

14   tunnel.  Right?

15   A.  According to the standard, yes.

16   Q.  And this exact same picture is the picture that Doctor

17   Cole used when he was talking about the draft standard that he

18   said did not practice the '580 Patent.  Do you recall that?

19   A.  I'll take your word for it.  I don't remember

20   this -- that particular analysis, but...

21   Q.  Okay.

22   A.  That's just my memory, not being focused on this thing.

23   Q.  Okay.  And you recall that you actually used this exact

24   figure in your appendix in your expert report and you

25   color-coded it to show in this figure there were multiple

1135

1    different tunnels in your opinion.  Do you recall that?

2    A.    I remember using it for my report, yes.

3    Q.    Right.  And so in your expert report you said that figure

4    1 was multiple tunnels.

5              MR. BENNETT:  Objection, Your Honor.  We're talking

6    about reports versus as opposed to what's been said in trial.

7    I think we're far afield.

8              THE COURT:  I agree.  Let's focus on what his live

9    testimony is unless you're going to try to use some prior

10   inconsistent statement.

11   Q.    (BY MR. HAYNES)  Doctor Valerdi, in this case what you

12   have accused is a point-to-multipoint tunnel just like what's

13   shown in figure 1.  Right?

14   A.    Well, to be more complete, the accused products follow

15   the standard, but they also do a lot more than that.  That's

16   been my opinion the entire time.  I don't think you've

17   challenged that or questioned that.  So just to be fair, it's

18   this standard plus other things that the product does.

19   Q.    Sir, you understand that one of the things that the jury

20   is about to do is determine credibility of witnesses in this

21   case.

22   A.    Yes, I understand that.

23   Q.    And you understand that one of the things the Court

24   instructed at the beginning of this case that the jurors

25   should do is in assessing credibility is to look at whether a

1    particular witness' statements were consistent or

2    inconsistent.  Do you recall that?

3    A.    Yes.

4    Q.    And you agree that looking at the consistency of a

5    person's testimony is something that helps judge credibility.

6    Right?

7    A.    I agree.

8    Q.    Okay.  You agree, sir, that it's not my job to do that,

9    not your job to do that; it's actually their job to look at

10   the consistency of a witness' testimony and evaluate whether

11   that consistency or inconsistency shows that the witness is

12   credible or not credible.

13              MR. BENNETT:  Your Honor, objection.  The Court will

14   instruct on how to judge credibility.

15              THE COURT:  The Court has and the Court will again,

16   but this is not an improper question.  I'll overrule any

17   objection.

18        You may answer the question.

19              THE WITNESS:  Yes, I understand.

20              MR. HAYNES:  Okay.  I have no further questions,

21   Your Honor.  I pass the witness.

22              THE COURT:  All right.  Is there redirect,

23   Mr. Bennett?

24              MR. BENNETT:  Briefly, Your Honor.

25              THE COURT:  All right.  Proceed with redirect.

                          REDIRECT EXAMINATION

 1

 2    BY MR. BENNETT:

 3    Q.    All right.  Doctor Valerdi, just really quickly, no one

 4    except the lawyers have an insight into the difference between

 5    reports and trial testimony, and Mr. Haynes brought up your

 6    report several times, so please help the jury understand

 7    what's the difference between what you have to do in an expert

 8    report and the trial -- the testimony you may present at

 9    trial?

10    A.    Yeah.  I think the easiest way to think about it is that

11    the reports are this big, long, drawn-out written opinion,

12    much of which never even gets mentioned in trial.  So what

13    matters in terms of what we intend to say is what we base our

14    opinion on, what we reviewed, who we talked to, et cetera, but

15    it doesn't mention every page of every detail that we've

16    written about in the past.

17    Q.    Okay.  Mr. Haynes asked you several questions about the

18    standard RFC 4875 and your infringement opinion just now, and

19    I want to give you the chance to respond or explain.

20          Why isn't it inconsistent for you to cite the RFC 4875 in

21    your report but testify here that following that standard has

22    nothing to do or little to do with infringement?

23    A.    The relevance of that standard is that it does instruct

24    how to do certain things, and the patent acknowledges that.  I

25    acknowledge that.  What I did in my direct was build above and

1    beyond what the standard already teaches to show you what

2    Nokia's products do to infringe on the claim patents.  So it's

3    not inconsistent to build upon what already exists to show --

4    look at the improvement.  It's above and beyond.  It's quite

5    simple.

6    Q.   All right.  And let me ask it this way.  Earlier Doctor

7    Chatterjee testified that merely practicing a standard isn't a

8    guarantee against infringement.  Do you remember that?

9    A.   Yes.

10   Q.   Did you agree with Doctor Chatterjee about that?

11   A.   I agree that just practicing the standard is not the

12   whole story.

13   Q.   Right.  And does practicing a standard render a company

14   immune from infringement?

15   A.   No.

16   Q.   What determines whether a company's products infringe a

17   patent?

18   A.   If they practice the teachings of the claim elements that

19   are accused.

20   Q.   Okay.  I want to clear up some confusion.

21           MR. BENNETT:  Mr. Jarrett, Joint Exhibit 46a,

22   please, one more time.  Go to page 41.  Joint Exhibit 46a,

23   page 41.  That's it.  Okay.  Yeah; please.

24   Q.   (BY MR. BENNETT)  So I want to clear up I think some

25   confusion about what Doctor Chatterjee said and about your

1    infringement opinions, and it has to do with what we're seeing

2    there, the configuration of the BSA nodes and the BSR.

3         Are you with me?

4    A.    Yes.

5    Q.    Okay.  So there's been a lot of discussion about mesh and

6    ring.  Now, which one matters for purposes of infringement?

7    A.    Ring.

8    Q.    Okay.  And what was it Doctor Chatterjee said today about

9    those two topologies that mattered for purposes of

10   infringement?

11   A.    He suggested that the configuration here was mesh only

12   and not ring, and that the ring was only a layer 1 concept and

13   could not be considered as a layer 2 concept.

14   Q.    All right.  And so when you testified just a moment ago

15   about what you were disagreeing with in Doctor Chatterjee's

16   analysis, what were you focused on?

17   A.    That the network shown here is a layer 2 network.

18   Q.    Okay.  And going back to the two BSRs, why did -- why

19   does Doctor Chatterjee's discussion about the BSRs different

20   from yours?

21   A.    Because what Chatterjee said is that there was only one

22   egress node, meaning that there was only one BSR, and as you

23   can see in this figure there are two BSRs in the infringing

24   product.

25   Q.    And what does that mean for purposes of whether Nokia

1140

1    infringes?

2    A.   That it meets the elements of the claim that requires

3    egress nodes, plural, which is exactly what's shown in Nokia's

4    technical documentation.

5    Q.   Thank you.

6              MR. BENNETT:  I'll pass, Your Honor.

7              THE COURT:  All right.  Any further cross

8    examination?

9              MR. HAYNES:  Nothing further, Your Honor.

10             THE COURT:  You may step down, Doctor Valerdi.

11             THE WITNESS:  Thank you, Your Honor.

12             THE COURT:  You're welcome.

13        Plaintiff, call your next rebuttal witness.

14             MR. BENNETT:  At this time, Your Honor, Plaintiff

15   rests its rebuttal case.

16             THE COURT:  All right.  Subject to the Court's final

17   instructions to the jury and closing arguments, do both

18   Plaintiff and Defendant rest and close?

19             MR. BENNETT:  Yes, Your Honor.

20             MR. HAYNES:  Yes, Your Honor.

21             THE COURT:  All right.  Mr. Bennett, Mr. Haynes,

22   approach the bench just briefly.

23             (The following was had outside the hearing of the

24             jury.)

25             THE COURT:  We talked earlier about this stipulation

1    that you-all had agreed to.  I talked with you about the

2    possibility of giving it in the final jury instructions or

3    giving it separately.  And looking at it again, I was

4    concerned with regard to the possibility of including it in

5    the final jury instructions that it might need to be under

6    seal; and if it does, I don't want to have to seal the

7    courtroom in the middle of my final jury instructions.

8        Do you-all agree that it should be given while the

9    courtroom is under seal?

10            MR. HAYNES:  I think we've been working on that

11   exact issue, Your Honor, and we have a version that can be

12   read into the public record that will not require sealing.

13   I believe it's ready.

14            THE COURT:  Do you want me to do it now or do it in

15   the final jury instructions?

16            MR. HAYNES:  The final jury instructions is fine.

17            THE COURT:  You're both in agreement on that?

18            MR. BENNETT:  Yes, Your Honor.

19            THE COURT:  I just didn't want to send the jury home

20   and then have a problem with doing it in the charge tomorrow.

21            MR. HAYNES:  I understand.  I'll get that handed up

22   to your clerks as soon --

23            THE COURT:  We'll get it in just a minute.  Thank

24   you.

25                (The following was had in the presence and hearing

1    of the jury.)

2        THE COURT:  All right, ladies and gentlemen of the

3    jury, you've now heard all the evidence in this case.

4        There are certain procedural matters that I need to

5    take up with the parties and their counsel outside of your

6    presence, and I am about to send you home for the rest of the

7    day.  And what you do with the rest of the day is completely

8    up to you, so long as you continue to follow all my

9    instructions, including not to discuss the case among

10   yourselves or with anyone else in any way.

11       We are getting close to being finished, and it would be

12   an absolute travesty if any one of you were to disregard those

13   instructions and jeopardize the entirety of this process.  So

14   please let me remind you again, don't discuss or communicate

15   with anyone in any way about the case, including the eight of

16   yourselves.

17       With regard to the matters that I have to take up outside

18   your presence, I expect to work through those with counsel

19   over the rest of the afternoon, perhaps into the early

20   evening.  Long story short, I expect to be finished with that

21   today, so I am going to need you back in the morning.  I'm

22   going to ask you to be here at 8:30 in the morning, as is

23   typical.

24       Now, without giving you more information than you need,

25   let me just say that those things I have yet to take up with

1    counsel may take more time than I think, they may go quicker

2    than I think.  It is possible I could be finishing up with

3    them tomorrow morning.  So all of that is to say, I've done a

4    pretty good job of being ready to start at 8:30 when you were

5    here at 8:30 during the trial.  We're going to have to be

6    flexible tomorrow morning.

7        I'm going to ask you to be here at 8:30.  It is entirely

8    possible I'll have everything done and wait on 8:30 to get

9    here to start right on the dot.  It is also equally possible I

10   may still be involved in finishing up these other matters and

11   it might be 8:45 or even 9:00 before we can start, and you may

12   have to wait on me.  So I just want to be honest with you and

13   let you know that this part of the process is harder to

14   quantify than what we've gone through so far.

15       So enjoy the rest of the afternoon.  Please be back in

16   the jury room assembled at 8:30.  I will hope that we are

17   ready to start thereabouts, but if you need to be flexible

18   with the Court I'll trust that you'll be flexible with the

19   Court.

20       When we start tomorrow, I will give you my final

21   instructions on the law that you are to apply to the evidence

22   that you've heard.  These final instructions are, as I

23   mentioned earlier, often referred to as the Court's charge to

24   the jury.  These final jury instructions are going to be given

25   to you by me orally, but it's my practice to also have

1    available for you each your own printed copy of those

2    instructions.  So you'll get them in writing; you'll also get

3    them from me orally.

4         The reason I give them to you in writing is I want you to

5    listen to me when I give them to you orally and not feel like

6    you've got to write things down or take notes, understanding

7    that you'll be able to go back to the printed copy to refresh

8    or review anything once you retired to the jury room.  So you

9    will get your own printed copy of these final jury

10   instructions when you retire to the jury room, but I'm going

11   to give them to you orally and then I'm going to send you back

12   your own individual written copies when you retire to the jury

13   room.  Again, my hope is that you will focus and listen to me

14   carefully as I give you these instructions.

15        I take a lot of time with these instructions and I try to

16   give them as clearly as I can, so it's important that you

17   follow me orally, and then you'll have the ability to refresh

18   your recollection or review anything in writing further once

19   you deliberate.

20        After I've given you my final instructions, the Court's

21   charge to the jury, then counsel for the competing parties

22   will present their closing arguments to you.  And once you've

23   heard those closing arguments and both sides have finished

24   that presentation to you, then I will instruct you to retire

25   to the jury room and deliberate on your verdict, and I will

1145

1    send back with you not only your own printed copies of the

2    final jury instructions, but I will send you one clean copy of

3    the verdict form.  And as I've told you, that's a document

4    containing several questions that you are to answer.  That is

5    also the time once you retire to the jury room that things

6    change and you go from being prohibited to discussing the

7    evidence over the course of this trial to being required to

8    discuss the evidence among yourselves that has been produced

9    and presented over the course of this trial.  And your

10   requirement to discuss the evidence is so that you can reach a

11   unanimous decision as to how to answer those questions in that

12   verdict form.

13        One of the things you will do as soon as you retire to

14   the jury room to deliberate is choose your foreperson, and

15   then you will deliberate and come to hopefully unanimous

16   decisions how to answer the questions in the verdict form.

17        And when you've reached unanimous decisions about all the

18   questions in the verdict form, then your foreperson will sign

19   the verdict form and will mark the answers to those questions

20   reflecting your unanimous agreements.  And when that's done

21   and the foreperson you've selected has signed it and dated it,

22   you'll tell the Court Security Officer that you've reached a

23   verdict.

24        So that's what you can look forward to tomorrow once you

25   get back.

1    Again, please follow all my instructions scrupulously,

2    and we'll look forward to seeing you in the morning.  I will

3    do my best to be ready to start right at or very close to

4    8:30.  But again, I may have to ask your indulgence with a

5    little flexibility because, without me going into more detail

6    than you need to know, some of what I need to do today and

7    perhaps carry over into tomorrow morning is just hard to

8    quantify.

9    All right.  With that, ladies and gentlemen, please take

10   your notebooks with you, leave them on the table in the jury

11   room, travel safely to your homes, travel safely back in the

12   morning, and with that you're excused until tomorrow morning.

13          (Whereupon, the jury left the courtroom.)

14          THE COURT:  Be seated, please.

15   Counsel, just for your information, we ended the evidence

16   with the Plaintiff having an hour and 42 minutes of unused and

17   remaining trial time and the Defendant having 15 minutes of

18   unused and remaining trial time.

19   It is a few minutes until 3:00.  My inclination is to

20   take about a 10-minute recess and then return to the bench, at

21   which time I will hear from either or both parties with regard

22   to any motions either or both care to offer pursuant to Rule

23   50(a) of the Federal Rules of Civil Procedure.

24   Those of you that are going to be presenting closing

25   arguments tomorrow are not required to be here for Rule 50(a)

1  practice or the informal charge conference that will follow.

2  You're entitled to and welcome to be here, but I suspect you

3  can use the time to better effect if you are starting your

4  preparations for your closing arguments tomorrow.

5       Mr. Bennett, can you inform me at this point, do you know

6  who will be presenting closings for the Plaintiff?

7            MR. BENNETT:  I will be, Your Honor.

8            THE COURT:  All right.  And how about Defendant,

9  Mr. Dacus?

10            MR. DACUS:  I don't think we know yet.  I'll be

11  participating; I don't know if Mr. Haynes will split with me

12  or not.

13            THE COURT:  All right.  Mr. Bennett, as you know,

14  you're entitled to divide your time between the first and

15  second closing, but you are required to use at least 50

16  percent or 20 minutes of your time in your first closing

17  argument.

18            MR. BENNETT:  Yes, Your Honor.

19            THE COURT:  Also, after I take up and hear and rule

20  on motions under Rule 50(a), I will conduct an informal charge

21  conference in chambers where I can review with both sides the

22  current version and iteration of the final jury instructions

23  and verdict form.

24       I've looked at your most recent submission.  It is much

25  cleaner than the earlier one, and there really are not too

1    many points of disagreement that we need to go over, so I hope

2    that the informal charge conference can be effective without

3    taking too terribly much time.

4         Again, those of you that have appeared in the case,

5    you're welcome to participate in the informal charge

6    conference; however, as long as each side has adequate counsel

7    staffing it, you don't have to have anybody here.  In other

8    words, if you've got one person that's going to carry the

9    load, the rest of you don't have to be here.  If all of you

10   want to be here, that's fine; I'll leave that up to you.

11        All right.  Any questions at this point?

12        MR. BENNETT:  Your Honor, Plaintiff asks that its

13   witnesses be excused.

14        THE COURT:  All right.  Without objection,

15   Plaintiff's witnesses are excused.  And without objection and

16   *sua sponte*, any remaining Defendant's witnesses are excused.

17        Anything else we need to cover?

18        MR. BENNETT:  Not for Plaintiff, Your Honor.

19        MR. HAYNES:  Nothing further for the Defendant, Your

20   Honor.

21        THE COURT:  All right.  Let's take about 10 minutes,

22   and I'll be back and hear rules under Rule 50(a).

23        I will say this, counsel.  Mr. Dacus has heard me say

24   this before.  This is a point in the process where it's not

25   uncommon to have some of the junior members of the trial team

1    present arguments.  I welcome that.  One of the things I along

2    with many of my colleagues worry about are opportunities for

3    young lawyers to learn how to present in open court and on the

4    record.

5         That being said, please remember I have been here

6    throughout the entire process.  Please do not go to the podium

7    and look at me with earnest young eyes and say, "Your Honor,

8    this is a patent case."  Try to get to the nub of the matter;

9    not the hub, but the nub of the matter, as soon as you can.

10              MR. BENNETT:  What is a hub?

11              THE COURT:  All right, counsel.  We stand in recess.

12                   (Brief recess.)

13              THE COURT:  Be seated, please.

14         Counsel, the Court will now turn to and take up motions

15   either party may wish to offer pursuant to Rule 50(a) of the

16   Federal Rules of Civil Procedure.

17         What I would like to do is have each party identify for

18   me by subject matter what they care to move for relief on as a

19   matter of law pursuant to Rule 50(a), and once I've heard from

20   both sides as to what matters they substantively seek relief

21   on under Rule 50(a), then I'll hear argument related to those

22   matters.  It is often the case, in my experience, that there

23   are competing motions where simultaneous argument can cover

24   both sides of the issue, and that's why I like to identify the

25   subject matter first.

1     So whoever's going to speak for the Plaintiff, please go

2  to the podium and identify topically for me any matters that

3  Plaintiff wishes to seek relief on pursuant to Rule 50(a).

4          MR. BREEDLOVE:  Your Honor, we have no such motions.

5          THE COURT:  All right.  Then I'll ask Defendant to

6  send counsel to the podium and identify for me any motions

7  under Rule 50(a) the Defendant may care to seek relief upon.

8          MS. DEANE:  Thank you, Your Honor.  Michael Deane on

9  behalf of Nokia.

10     We move under Rule 50(a) for a couple of different

11  reasons.  Our first motion under Rule 50(a) will be for no

12  direct literal infringement.  We will, likewise, move under

13  Rule 50(a) for no indirect infringement, and specifically no

14  induced infringement.  We understand that Plaintiffs have

15  dropped their claims of contributory infringement, but to the

16  extent we need to move under Rule 50(a) for non-infringement

17  under a contributory infringement theory, we do that as well.

18  But our understanding is that it won't be presented to the

19  jury.

20          THE COURT:  Plaintiffs have dropped their claims

21  under contributory infringement?

22          MR. BREEDLOVE:  That's correct.

23          THE COURT:  All right.  What else, Mr. Deane?

24          MS. DEANE:  Yes, Your Honor.

25     On the topic of invalidity, we move under Rule 50(a) that

1    the claims are invalid for two of the three patents, and

2    specifically we move on the following:  Claim 12 of the '580

3    Patent under obviousness, claim 15 of the '580 Patent under

4    obviousness, claim 1 of the '010 Patent under obviousness, and

5    claim 3 of the '010 under obviousness.

6            THE COURT:  All right.  And there are no invalidity

7    challenges to the '599 Patent.  Correct?

8            MS. DEANE:  That's my understanding, yes, Your

9    Honor.

10           THE COURT:  All right.

11           MS. DEANE:  We also move under Rule 50(a) that

12   NOikia has not willfully infringed any of the claims of the

13   patents at issue.

14           THE COURT:  Let me ask Plaintiff.  It was my

15   understanding that, similar to contributory infringement,

16   Plaintiff had abandoned the willfulness claim --

17           MR. BREEDLOVE:  Correct.

18           THE COURT:  -- through the course of the trial.

19           MR. BREEDLOVE:  Correct.

20           THE COURT:  Do you believe you need relief on it

21   under Rule 50(a) given that Plaintiffs have abandoned it on

22   the record?

23           MS. DEANE:  I think with that representation we

24   don't.

25           THE COURT:  It's certainly not going to be in the

 1    verdict form.

 2              MS. DEANE:  Yes, Your Honor.  Thank you.

 3              THE COURT:  Okay.

 4              MS. DEANE:  And we also move under Rule 50(a) that

 5    Plaintiff has failed to mark their products.

 6         And we move under Rule 50(a) that Smart Path is not

 7    entitled to damages.

 8         And we have a more detailed recitation of each of these

 9    for Your Honor's benefit that my colleagues would like to

10    present.

11              THE COURT:  All right.  Well, given that only

12    Defendant has -- let me make sure.  Is that everything

13    Defendant seeks relief on under Rule 50(a), Mr. Deane?

14              MS. DEANE:  Yes, Your Honor.

15              THE COURT:  Okay.  Given that Plaintiff doesn't have

16    corresponding motions for relief under Rule 50(a), we'll hear

17    argument on these matters urged by Defendant.

18         It seems to me we can take them up efficiently in four

19    discreet categories the motions as relate to the issue of

20    infringement; the motion as relates to the issue of

21    invalidity, more particularly obviousness; the motion as

22    relates to marking, and the marking statute; and then as

23    relates to the issue of damages.

24         Let me hear Defendant's argument seeking relief under

25    Rule 50(a) with regard to any of the theories related to the

1     topic of infringement.

2              THE COURT:  Thank you, Your Honor.

3              MS. BEATON:  Good afternoon.

4              THE COURT:  Good afternoon.

5          Would you identify yourself for the record, please?

6              MS. BEATON:  My name is Erin Beaton representing the

7     Nokia Defendants.

8              THE COURT:  All right.  Let me hear your arguments,

9     Ms. Beaton.

10              MS. BEATON:  Sure.

11          Nokia asks the Court to grant the Defendant's Rule 50(a)

12     motion of no direct literal infringement.  Nokia asks the

13     Court to grant as a matter of law of no direct literal

14     infringement of claims 12 and 15 of U.S. Patent No. 7,463,580,

15     claims 1 and 3 of U.S. Patent No. 7,386,010, and claim 59 of

16     U.S. Patent No. 7,551,599 as to each of the accused products

17     in this case.

18          Starting with claims 12 and 15 of the '580 Patent, no

19     reasonable juror could conclude that Nokia's products

20     infringe.  Doctor Jeffay, Nokia's expert, demonstrated that

21     Nokia's products do not meet the elements requiring

22     resource-sharing groups or an allocation of a resource among

23     multiple tunnels.  Based on that evidence alone, no reasonable

24     juror could conclude that Nokia's products literally infringe

25     claims 12 and 15 of the '580 Patent.

1       Additionally, Smart Path failed to meet its burden to

2  prove infringement of these claims.

3       For claims 1 and 3 of the '010 Patent, no reasonable

4  juror could conclude that Nokia's products infringe because

5  the evidence that was presented at trial demonstrated that

6  Nokia's products are not hubs.  Doctor Jeffay, Nokia's expert,

7  demonstrated that Nokia's products do not include one network

8  port for communicating with the ports of the hub via a network

9  in accordance with the packet-oriented layer 2 communication

10  protocol.  The evidence further demonstrates that Nokia's

11  products do not direct the data frames received from two or

12  more native interfaces to one of the ports of the hub.

13       The evidence demonstrates that Nokia's routers and

14  switches are not an apparatus for data communications

15  comprising a hub and a plurality of edge devices.  For

16  example, the evidence presented at trial does not suggest

17  that a single router or switch can be three devices.  For

18  example, the evidence demonstrates that Nokia's products are

19  routers and switches, not hubs.  Smart Path's expert Doctor

20  Valerdi agreed that hubs, routers, and switches are different

21  devices.

22       Further, claim 1 requires a hub and at least two edge

23  devices, a plurality of edge devices.  Smart Path has only

24  identified one alleged hub and one alleged edge device, which

25  cannot meet the requirements of a hub.

1       The evidence that was presented at trial also

2   demonstrated that Nokia's products do not map the two or more

3   native interfaces to different respective virtual local area

4   networks, VLANs, on the network.  The evidence presented at

5   trial also demonstrates that Nokia's products do not include a

6   protocol consider converter, which, for example, the evidence

7   demonstrates that certain accused products, such as the Nokia

8   7950, enables only ethernet protocol.

9       In addition, Nokia's products are configured in networks

10  that use a single ethernet layer 2 protocol.  The evidence

11  does not suggest that Nokia's products are configured in a

12  network with more than one layer 2 protocol.

13      Based on that evidence alone, no reasonable juror could

14  conclude that Nokia's products literally infringe claims 1 and

15  3 of the '010 Patent.  Additionally, Smart Path failed to meet

16  its burden to prove infringement of these claims.

17      For claim 59 of the '599 Patent, no reasonable juror

18  could conclude that Nokia's products infringe.  Doctor

19  Chatterjee, Nokia's expert, presented evidence that

20  demonstrated that Nokia's products operating in accordance

21  with a triple play delivery services architecture do not

22  include a layer 2 ring network and an external layer 3 network

23  and cannot be configured to operate in a layer 2 ring network.

24  Nokia's products also do not operate such that the nodes of

25  the layer 2 ring network define paths to external elements of

1156

1    said layer 3 network through egress nodes of the layer 2 ring

2    network.  Nokia's products also do not operate such that the

3    nodes of the layer 2 ring network transmit data via selected

4    paths to external elements of a layer 3 data network.

5        Based on that evidence alone, no reasonable juror could

6    conclude that Nokia's products literally infringe claim 59 of

7    the '599 Patent.

8        Additionally, Smart Path failed to meet its burden to

9    prove infringement of these claims because it adduced no

10   evidence that any accused products have been configured in a

11   layer 2 ring network connected to an external layer 3 network,

12   nor did it adduce any evidence of a layer 2 ring network being

13   used in the accused triple play architecture.

14       The accused computer readable medium is not capable of

15   causing the performance of the functions accused of infringing

16   the recited method steps unless the router is configured by a

17   customer in the layer 2 ring network.

18       Finally, Nokia moves for judgment as a matter of law

19   under Rule 50(a) that there has been no infringement under the

20   doctrine of equivalents as no evidence on this point has been

21   made in this case.

22       I will continue to indirect infringement.

23           THE COURT:  All right.  Please do.

24           MS. BEATON:  Nokia moves for judgment as a matter of

25   law under Rule 50(a) that there has been no inducement.  Our

1    motion should be granted on inducement.  Nokia has not

2    actively induced infringement, and no reasonable jury could

3    find otherwise.  Thus, Nokia is entitled to judgment as a

4    matter of law as to no inducement for all the asserted claims

5    of the asserted patents.

6        For the jury to render a verdict of induced infringement,

7    they would have to find that there's an underlying act of

8    direct infringement that Nokia knew of the patents and that

9    Nokia knowingly induced the infringing acts, and Nokia

10   possessed a specific intent to encourage another's

11   infringement of the patents, such as Nokia's customers.  At

12   least three of those requirements have not been shown and no

13   reasonable jury could find otherwise.

14       First, Smart Path has not proved an underlying act of

15   direct infringement by a Nokia customer.  There is no evidence

16   of any customer configuration in this case.

17       Second, there's no evidence that Nokia had knowledge of

18   the patents to induce infringement.

19       Third, Nokia did not knowingly induce any infringing

20   acts.

21       Fourth, there is no evidence at all that Nokia possessed

22   a specific intent to encourage another's infringement of the

23   patents.  Multiple witnesses testified that there are multiple

24   ways to configure the products, and for each of those reasons,

25   Nokia is entitled to judgment as a matter of law of no

1    inducement.

2        Finally, to the extent Smart Path has not voluntarily

3    withdrawn allegations of -- skip that part.

4            THE COURT:  What else?

5            MS. BEATON:  Nokia moves for judgment as a matter of

6    law as to indirect infringement of no indirect infringement.

7            THE COURT:  All right.  Anything else related to the

8    issue of infringement, counsel?

9            MS. BEATON:  No, Your Honor.

10           THE COURT:  All right.  I'd like to hear a response

11   from the Defendant, please--excuse me--from the Plaintiff.

12           MR. BREEDLOVE:  Your Honor, can we divide up between

13   patents?

14           THE COURT:  You can split the duties any way you'd

15   like to as long as it's covered.

16           MS. RITZER:  Good afternoon.  Alexis Ritzer on

17   behalf of Plaintiff Smart Path.

18           THE COURT:  Please proceed.

19           MS. RITZER:  Thank you.

20       So our position is that a reasonable jury could find in

21   Smart Path's favor on infringement.  Specifically, I'm up here

22   to talk about the a '599.

23       We heard today that though Nokia disputes that the

24   accused products are computer software products able to

25   receive egress from a layer 2 network, and that Nokia does not

1    define paths to layer 3 network elements, they presented

2    little to no source code rebuttal.  And this is a computer

3    software product, so source code is pretty important.  Neither

4    of Nokia's experts were able to rebut Doctor Valerdi's

5    analysis of the source code that shows that the accused

6    products meet these claim elements.

7        As we've discussed throughout the case, again, the source

8    code is what determines how the accused products function and

9    what they are capable of accomplishing, and there's nothing in

10   the source code that has been put into evidence that

11   contradicts those assertions.  Instead, Nokia just attempts on

12   -- to rely on product guides to prove their case; but again,

13   product guides only describe the product and they are not the

14   actual products.  So I believe that both Nokia's experts

15   testified that they reviewed the source code, but still

16   provide an analysis of that source code to show that they do

17   not infringe on the '599 Patent.

18       So I think it's misleading at best to rely on those

19   guides as definitive proof that the product works in the way

20   that Nokia interprets the guides, so in regards to that, a

21   reasonable jury could easily find in favor of Smart Path.

22       With regard to the assertion that the accused products do

23   not receive egress from a layer 2 ring network, we know that,

24   as Doctor Valerdi explained several times, that the VPLS is a

25   layer 2 infrastructure.  The figure that both parties rely on

1    in JX 46a on page 41 with the red ring specifically says that

2    the red ring is a secure VPLS infrastructure, and that's not

3    in dispute.  Both Doctor Chatterjee and Doctor Valerdi admit

4    that VPLS is a layer 2 infrastructure and it is in a ring

5    structure on that figure.

6        The products are well-understood to support ethernet

7    rings, which are layer 2 ring networks, so even though Doctor

8    Chatterjee attempts to say that there are no connections

9    between the different nodes of the rings, as a ring is set up

10   in a hub and spoke topology, to the extent that that is true

11   for that specific figure, JX 46a also describes that the

12   topology will work with a -- the ring -- a layer 2 ring

13   topology and a hub and spoke topology will either -- either

14   will work with a VPLS infrastructure.  And Doctor Chatterjee

15   admitted that both topologies work with a VPLS infrastructure.

16       And, in fact, looking at the figure, there are dotted

17   lines for the quoted hub and spoke representation.  That

18   indicates that that's different from the solid lines of the

19   ring indicating that either topology is possible.

20       If the ring did not indicate connections between the

21   different nodes, but, instead, indicated that everything

22   within the ring orientation was part of the VPLS network, why

23   wouldn't you just put a circle around all of the products?

24   Why connect them individually?

25       So for that reason, we also believe that a reasonable

1    juror could find in favor of Smart Path for infringement.

2        Lastly, the paths to the layer 3 network elements, the

3    products wouldn't have a reason to exist without the paths to

4    the layer 3 network elements.  There's no point to connect

5    just on the layer 2 or layer 1 network -- or protocol.  Nokia

6    takes advantage of the fact that the paths are not explicitly

7    indicated on the figures, and so that is a bit of a

8    misrepresentation of what their products are capable of

9    accomplishing.

10        And Doctor Chatterjee had mentioned this morning about

11    what it means for the BSR specifically to terminate layer 2

12    networks.  And it's been taken out of context.  When you

13    terminate a layer 2 network, it means that the data is being

14    taken out at the layer 2 frames and repackaged into layer 3

15    frames.  So it's going from an internal layer 2 network into

16    an external layer 3 network.  So layer 2 paths are terminated

17    because data is moving from layer 2 network to layer 3

18    network, which is the whole purpose of having a BSR in Nokia's

19    products to begin with.

20        So with that, Smart Path opposes Nokia's motion with

21    respect to the '599.

22            THE COURT:  All right.  Other argument with regard

23    to the topic of infringement from Plaintiff?

24            MR. BREEDLOVE:  Yes, Your Honor.

25        I'll start with the '580 Patent.

1    THE COURT:  Go ahead, Mr. Breedlove.

2    MR. BREEDLOVE:  We believe that there's a jury

3 question on infringement, both direct and indirect, based on

4 the Nokia documents -- Nokia manuals and the source code and

5 the testimony of Doctor Valerdi alone creates enough of a fact

6 issue.  Their rebuttal to that through Doctor Jeffay had to do

7 with no sharing of resources among tunnels, I believe was the

8 summary of his position, and that argument depends entirely on

9 their argument that Smart Path's identification of a first and

10 second tunnel is actually the same tunnel.  But there was

11 evidence from Joint Exhibit 10d at page 1,693 that shows these

12 S2Ls each called a sub-LSP, they are modeled as a

13 point-to-point LSP in the control plane, and we heard some

14 today about the significance of what that means.

15    I think there's a fundamental error in the rebuttal

16 argument from Nokia which in a sense assumes that

17 implementation of a standard--recall this is the patent that

18 has something to do with the 4875 standard--that the

19 implementation of a standard necessarily dictates everything

20 about the product that incorporates that standard.  But, in

21 fact, there are numerous ways to incorporate a standard.

22    In this case we have plenty of evidence about how Nokia

23 implemented that standard, the source code being extremely

24 useful and we would even say dispositive, and Doctor Valerdi

25 presented evidence about that and showed how they do, indeed,

1    have first and second tunnels, and the sharing of resources

2    between those.

3        As far as -- well, let me grab the patents real quick.

4            THE COURT:  All right.

5            MR. BREEDLOVE:  With respect to the '580, Your

6    Honor, those claims are about -- claim 12 is one of the

7    asserted claims.  That's a network element.  Claim 15 is a

8    computer software product used in a network element.  These

9    are things that are infringed as soon as the product is

10   completed by Nokia.  They do not need to be put into use, they

11   do not need to be flipped on before they infringed, nor do

12   they need to be -- nor do you need to select this

13   configuration or that configuration; they infringe from the

14   word go once they are programmed with the source code

15   according to the claims.

16       So indirect infringement for the '580 we believe is

17   a -- is easily established and certainly a question that the

18   jury should address.

19       I want to move onto the '010, which is a different issue

20   in that regard.  That -- this one the claims do -- are talking

21   about an apparatus that comprises a hub and then a plurality

22   of edge devices.  Most of the claim is talking about the

23   plurality of edge devices.  And we have shown in the Nokia

24   manuals where it's described how to set up an apparatus just

25   like this, and those types of manuals that encourage and teach

1    these kinds of setups support indirect infringement through

2    inducement.

3         As far as the direct infringement, their case came down

4    to a very restrictive claim construction that they proposed

5    through their expert of the word 'hub', and that is overly

6    restrictive.  Doctor Jeffay's presentation really relied on

7    names of products; overly relied on names of products.  The

8    name of a product does not dictate whether it is a certain

9    type of device as claimed in the '010.

10        For example, if the routers that we saw in the Nokia

11   documentation, if those were called hubs, that would not

12   suddenly make them hubs under the claim.  What matters is how

13   they function.  And in this case this is an apparatus or a

14   system claim, it's how they function in the system.  So that's

15   why Doctor Valerdi, walking through their systems as they're

16   described, is so critical.

17        The products that they call routers are, indeed, exactly

18   what the claim is referring to as a hub when they're in the

19   system, as the Nokia documents describe it.  They have the

20   plurality of ports, which are configured to receive and

21   transmit data frames in accordance with a packet-oriented

22   layer 2 communication protocol.  See, this hub is contemplated

23   by the claim itself to be part of this layer 2 system.  We

24   heard from Doctor Jeffay that the type of hub he was talking

25   ability, like a dumb hub, is really not involved in

1    communication and is a layer 1 type of device, which really

2    isn't consistent with this claim talking about layer 2

3    communication.

4         We see a little bit later in the claim it talks about at

5    least one network port on these edge devices for communicating

6    with the ports of the hub, so there's actually communication

7    going on here, and that's via a network in accordance with the

8    packet orient layer 2 communication protocol.  So there's

9    communication going on.

10        Closer to the end of the claim it talks about the edge

11   devices are configured to direct the data frames received from

12   two or more of the native interfaces to one of the ports of

13   the hub, and that's the way the routers work, according to

14   Doctor Valerdi.  That's the way a router can work in a system

15   that's displayed in Nokia manuals.

16        So these things called routers in the Nokia documents

17   perform and constitute a hub, as that term is used in the

18   claim.

19        And so for this reason, Doctor Valerdi's evidence and

20   the manuals and the source code that was discussed support

21   direct literal infringement of the '010 Patent through the

22   accused products.

23             THE COURT:  Anything further?

24             MR. BREEDLOVE:  Nothing further, Your Honor.

25             THE COURT:  Anything further from Defendants on the

1    topic of infringement?

2        If not, we'll move on--excue me--from Plaintiff on the

3    topic of infringement.

4            MR. BREEDLOVE:  No, Your Honor.

5            THE COURT:  Okay.  Then let's move onto the topic of

6    invalidity with regard specifically to the '580 and the '010

7    Patents.

8        Let me hear argument from the moving Defendant first.

9            MS. KYRAZIS:  Good afternoon, Your Honor.  Sloane

10   Kyrazis for Nokia.

11           THE COURT:  Good afternoon.  Please proceed.

12           MS. KYRAZIS:  Nokia moves for judgment as a matter

13   of law as to invalidity of claims 12 and 15 of the '580 Patent

14   and claims 1 and 3 of the '010 Patent.  Specifically, Nokia

15   moves for judgment as a matter of law that claims 12 and 15 of

16   the '580 Patent and claims 1 and 3 of the '010 Patent are

17   invalid as obvious under 35 U.S.C. § 103.

18       The evidence presented by Nokia demonstrated that each of

19   the elements of the asserted claims of the '580 Patent were

20   rendered obvious by the Aggarwal reference alone or in

21   combination with the RFC 4875 internet draft, which are DX 1

22   and DX 35 respectively.  No reasonable jury could find

23   otherwise.

24       Dr. Kevin Jeffay testified that each element of claims 12

25   and 15 were well-known prior to the priority date of December

1   15th, 2005 for the '580 Patent.  Doctor Cole admitted that key

2   elements of the '580 Patent were well-known and failed to

3   distinguish how these conventional components in combination

4   were not old.

5        For example, Doctor Cole admitted that the RFC 4875 draft

6   teaches that S2L, or source-to-leaf, sub-LSPs can share

7   resources if they are part of the same P2MP, or

8   point-to-multipoint, LSP, which supports Doctor Jeffay's

9   conclusion that the asserted claims of the '580 Patent are

10  obvious under Smart Path's interpretation of the claims.

11       No reasonable jury could find that each of the elements

12  of the claim were not met by the Aggarwal reference alone or

13  in combination with the RFC 4875 internet draft.

14       Further, Doctor Jeffay testified that a person of

15  ordinary skill in the art would have been motivated to combine

16  Aggarwal with the RFC 4875 internet draft because, for

17  example, the first named inventor of Aggarwal is Raul

18  Aggarwal, who was also the first named editor on the RFC 4875

19  draft.

20       The evidence presented by Nokia demonstrated that each of

21  the elements of the asserted claims of the '010 Patent were

22  rendered obvious by the Shah reference, which is DX 4.  No

23  reasonable jury could find otherwise.

24       Dr. Kevin Jeffay also testified that each element of

25  claims 1 and 3 were well-known prior to the priority date of

1    June 13, 2003, for the '010 patent.  Doctor Cole admitted that

2    key elements of the '0101 Patent were well-known and failed to

3    distinguish how these conventional components in combination

4    were not old.  For example, Doctor Cole admitted that Shah

5    teaches an edge device and a hub under Smart Path's

6    interpretation of the claims, which supports Doctor Jeffay's

7    conclusion that the asserted claims of the '010 Patent are

8    obvious under Smart Path's interpretation of the claims.

9         No reasonable jury could find that each of the elements

10   of the claim were not met by the Shah reference.  Accordingly,

11   Nokia moves for judgment as a matter of law as to these issues

12   regarding invalidity.

13              THE COURT:  All right.  Thank you, counsel.

14              MS. KYRAZIS:  Thank you, Your Honor.

15              THE COURT:  What's the response from Plaintiff?

16              MR. BREEDLOVE:  With respect to the '010 Patent and

17   the Shah reference, Doctor Cole presented evidence for the

18   jury that's missing elements B, D, and H, which relate to the

19   edge device, especially the edge devices configured to direct

20   data frames received from two or more of these native

21   interfaces.

22              THE COURT:  Is something funny going on at the

23   Defendant's table?  All three of you all seem to be on the

24   verge of laughing out loud.

25              MS. DEANE:  No, Your Honor.  We apologize.

1          THE COURT:  All right.  Let's continue.

2          MR. BREEDLOVE:  And this is the one where there was

3     a comparison of figures.  And there were some differences

4     called out between the figures of Shah versus what the claims

5     require, and we believe that the jury will be able to sort

6     through those differences and determine that the Defendant

7     Nokia has not carried their burden of proof by clear and

8     convincing evidence that those elements were present in Shah.

9          With respect to the '580 Patent and -- sorry.  That was

10    the '010.  Sorry.  I'm trying to get my notes here.

11         The '580 Patent -- oh, I think I put that under the wrong

12    patent.  That's what it was.

13         So the testimony about Shah missing B, D, and H related

14    to the hub and the edge devices.  That's, of course, relating

15    to the '010 Patent.

16         So with respect to the '580 --

17         THE COURT:  '580 were the combination of two

18    references; the '010 was a single reference theory.

19         MR. BREEDLOVE:  Right.  I'm trying to find my notes

20    on that.

21         But with respect to the combination of those references,

22    there was testimony about why it would not have been obvious

23    to combine them, Aggarwal and the RFC, and the fact that they

24    both have a primary author of Aggarwal I don't think is

25    particularly relevant to whether a person of ordinary skill

1  would combine them.  If it is relevant, I would think it would

2  be more for the reason that Doctor Cole described, which is

3  here you have the same author that did not combine them prior

4  to the invention of Orckit reflected in the patent.  And so

5  the jury should be entitled to consider whether there would

6  have been a motivation to combine the references and whether

7  that combination would have disclosed all of the claim

8  elements.

9      And I think that concludes our argument on the

10  obviousness issues.

11          THE COURT:  All right.  Thank you, counsel.

12          MR. BREEDLOVE:  Uh-huh.

13          THE COURT:  Let's turn to the marking defense.

14      And let me hear argument from the moving Defendant first.

15          MS. SUBASHI:  Good afternoon, Your Honor.  Darlena

16  Subashi for Nokia.

17          THE COURT:  Good afternoon.

18          MS. SUBASHI:  Nokia moves for judgment as a matter

19  of law under Rule 50(a) that Smart Path has failed to show

20  compliance with 35 U.S.C. § 287.

21      Pursuant to 35 U.S.C. § 287(a), a patentee who makes or

22  sells a patented article must mark his articles or notify

23  infringers of his patent in order to recover pre-suit damages.

24  If a patentee who makes, sells, offers for sales, or imports

25  his patented articles, has not given notice of his rights by

1  marking his articles pursuant to the marking statute, he is

2  not entitled to damages before the date of actual notice.

3        THE COURT:  Counsel, I've read the marking statute

4  many, many times.  You don't need to recite it to me.  Give me

5  your argument on why it applies or doesn't apply.

6        MS. SUBASHI:  Thank you, Your Honor.

7        Regarding marking, this Court determined that Nokia met

8  its initial burden to identify products that it believes

9  should have been marked.  These products included

10 Orckit-Corrigent's CM-100 and CM-4000 product lines.  Thus,

11 Smart Path bears the burden to establish that the CM-100 and

12 CM-4000 products complied with the marking statute.  Smart

13 Path failed to meet their burden.  For example, Smart Path

14 failed to show a single document demonstrating that the CM-100

15 or CM-401x was marked with the asserted patent numbers.

16       Regarding actual notice, § 287 requires an affirmative

17 act on the part of the patentee which informs the Defendant of

18 his infringement.  The affirmative communication must include

19 a specific charge of infringement by a specific accused

20 product or device.  Smart Path has failed to identify any

21 notice that contained a specific charge of infringement.

22       For these reasons and others, no reasonable jury could

23 award damages--excuse me--could determine that Smart Path has

24 shown that the prior owners of the asserted patents complied

25 with 35 U.S.C. § 287(a).

1172

1          THE COURT:  All right.  Let me hear a responsive

2     argument from the Plaintiff, please.

3          MS. RITZER:  Hello, again.  Alexis Ritzer on behalf

4     of Smart Path.

5          THE COURT:  Go ahead, counsel.

6          MS. RITZER:  So we believe that Smart Path has met

7     its burden such that a reasonable jury could find that Smart

8     Path has adequately marked their products.

9          For instance, the CM-100 and CM-4000 product lines are

10    the only product lines accused of non-compliance with the

11    marking statute, and we don't necessarily need documents to

12    prove that we complied to meet our burden.  We have the

13    testimony of Mr. Izhak Tamir who, first of all, offered into

14    evidence that there is -- he -- there was no sales of the

15    CM-100 product line in the U.S.  I'm sorry.  That the CM-4000

16    product line was sold in the U.S, there is no evidence that an

17    unmarked embodying product was offered for sale in the United

18    States, and that the patents also, in order to fall within the

19    marking statute, they either have to practice the patents--I'm

20    sorry--they have to practice the patents or be sold in the

21    United States.  And so Mr. Tamir offered testimony that -- as

22    president of Orckit-Corrigent that only the CM-100 was sold in

23    the U.S.

24         So there's also no disputing facts that the CM-4000

25    products were labeled, and there's no dispute that the CM-100

1    products, they did not practice the patent.  Doctor Valerdi

2    offered extensive testimony as to whether he believed the

3    CM-100 products practiced, and there was no rebuttal testimony

4    from either of Nokia's experts despite the fact that they also

5    had access to the same documents that could indicate whether

6    or not the CM-100 practiced.

7        So in addition to all of that, Mr. Tamir offered

8    testimony that he had implemented a policy that all of his

9    products used marking labels, and Doctor Valerdi testified

10   that the CM-4000 was adequately marked.

11       In terms of the product that was brought in by Nokia's

12   counsel that did not have a marking label, Mr. Tamir offered

13   testimony that said that that was a testing device and had

14   never been sold in the U.S., and, in fact, that device had

15   been purchased from counsel outside of Israel.

16       So with that, Smart Path opposes Nokia's motion for

17   judgment as a matter of law.

18             THE COURT:  All right.  Thank you.

19             MS. RITZER:  Thank you.

20             THE COURT:  Let's turn to the issue of damages.  Let

21   me hear from the moving Defendant, please.

22             MS. SUBASHI:  Thank you, Your Honor.  Darlena

23   Subashi again.

24       Nokia moves for judgment as a matter of law under Rule

25   50(a) that no damages should be awarded against Nokia.

1      No reasonable jury could award damages to Smart Path

2  under 35 U.S.C. § 284.  There are numerous flaws in the

3  methodology applied that would prevent a reasonable jury from

4  awarding damages to Smart Path.

5      First, Mr. Dell failed to present evidence regarding

6  several comparable licenses.  Ms. Bennis testified as to

7  several comparable licenses for technologically similar

8  patents, and Mr. Dell failed to analyze these licenses in

9  his testimony.

10      Second, Mr. Dell's incremental profit premium analysis

11  relies on Doctor Cole's apportionment opinions, which are

12  flawed for numerous reasons.

13      First, Doctor Cole identified a percentage of allegedly

14  infringing features in Nokia's products without apportioning

15  the value of those features to the asserted patents.  Doctor

16  Cole did not apportion between the patented features and the

17  unpatented features, contrary to controlling Federal Circuit

18  precedent.

19      Doctor Cole explicitly admitted that he did not make any

20  attempt to assess the value of the improvement of the asserted

21  patents over what existed in the prior art.  Doctor Cole also

22  admitted that he did not determine the incremental improvement

23  over other alternatives that existed in the industry at the

24  time of infringement.

25      Doctor Cole also admitted that within a given feature

1    that he identified, like MPLS or RSVP-TE, he did not try to

2    determine the relative contribution of the asserted patents as

3    compared to other contributions of technology to that feature.

4    Thus, Doctor Cole's apportionment analysis did not determine

5    the incremental improvement of the asserted patents over the

6    prior art.

7         Third, Doctor Cole did not perform his own infringement

8    analysis, and Doctor Cole attributed value to the asserted

9    patents for features that Doctor Valerdi did not opine

10   infringe.  For example, Doctor Cole attributed value to the

11   asserted patents for features such as jumbo frames.  The

12   record is devoid of any analysis of how that feature infringes

13   any of the asserted patents.

14        Further, Mr. Dell's opinions relying on Doctor Cole are

15   improper.  For example, Doctor Cole accused the same features

16   in the infringing two or more of the asserted patents,

17   effectively double- and triple-counting the accused features

18   in his analysis, while he also admitted that there is no way

19   to attribute more than 100 percent of the value of the

20   category to an infringing feature.

21        Because Doctor Cole did not separately account for the

22   respective contributions of each asserted patent, Mr. Dell's

23   reliance on Doctor Cole results in an aggregated alleged

24   apportionment that attributes more than 100 percent of the

25   feature value to the asserted patents.

1    Because Mr. Dell did not perform his own technological

2  apportionment, all of his opinions regarding the incremental

3  profit premiums which rely entirely on Doctor Cole's flawed

4  analysis are unreliable.  Therefore, because Mr. Dell's

5  incremental profit premium analysis is not proper, no

6  reasonable jury could award Smart Path damages, and the Court

7  should grant Nokia's motion under Rule 50(a) as to damages.

8    A final flaw in Mr. Dell's methodology is that he failed

9  to account for the extent of use of the accused features.  For

10  example, Mr. Valley, Nokia's corporate representative,

11  testified that the software for three of the accused products,

12  the 7250, the 7210, and the 7705, do not even support the

13  accused P2MP LSP feature under RFC 4875.  Mr. Valley also

14  testified that Nokia is unaware of any U.S. customer using the

15  accused P2MP LSP feature.

16    Similarly, Mr. Valley testified that less than 20 percent

17  of Nokia's routers that are deployed used the accused triple

18  play service delivery architecture.

19    Finally, Mr. Valley testified that certain products do

20  not have serial or TDM interfaces, as required by the asserted

21  claims of the '010 Patent.

22    For this additional reason, because Mr. Dell's analysis

23  is improper, no reasonable jury could award Smart Path

24  damages, and because his royalty base is also improper, no

25  reasonable jury could award Smart Path damages, and the Court

1177

1    should grant Nokia's motion under Rule 50(a) as to damages.

2        Thank you.

3            THE COURT:  Thank you, counsel.

4        What's the response from Plaintiff?

5            MS. STAHL:  Thank you, Your Honor.

6            THE COURT:  Go ahead, Ms. Stahl.

7            MS. STAHL:  Plaintiffs have presented sufficient

8    evidence to have the issue of damages presented to the jury

9    for a number of reasons.

10        With respect to the four arguments asserted by the

11   Defendants, Mr. Dell clearly reviewed and considered

12   comparable licenses and he explained why they were not

13   economically comparable and, therefore, were excluded from

14   his analysis.  This is simply a disagreement about whether

15   Ms. Bennis' opinion, when she finally admitted was not -- that

16   she had performed no economic analysis to have comparability,

17   but, in any event, both of them have a disagreement about what

18   are comparable licenses.  That is an issue that can be

19   resolved by the jury.  It is not a fundamental flaw in

20   Mr. Dell's analysis.

21        There are two approaches to the calculation of

22   damages--the market approach, which does rely on licenses, and

23   the analytical approach.  And Ms. Bennis admitted on the stand

24   that the analytical approach is a well-accepted methodology.

25   They have a disagreement about the inputs to that methodology.

1    Doctor Cole did rely in part on -- I'm sorry.  Doctor

2    Dell did rely on Doctor Cole's assessment or apportionment

3    analysis, but as the *Xmark* case teaches, apportionment can be

4    addressed in a variety of ways, including careful selection of

5    the royalty base to reflect the value added by the patented

6    feature or by adjustment of the royalty rate so as to discount

7    the value of the product's non-patented features or through a

8    combination of both, and that is what has happened in this

9    case.

10    Doctor Cole performed his technological apportionment

11    analysis, and then through the analytical approach Mr. Dell

12    performed a further apportionment because he only attributed

13    value to the excess profit premium above the aspirational 60

14    percent profit rate that Nokia testified was its expectation.

15    He then further apportioned that to divide the value of the

16    invention and the value of the product as between Nokia and

17    Smart Path in a 70/30 split based upon Nokia's financial

18    statements, which called for return on capital investment, and

19    then through the hypothetical negotiation sliced it an

20    additional time.

21    So we have apportionment by Doctor Cole and then three

22    additional apportionments by Mr. Dell which, under *Xmark,* is

23    an acceptable apportionment analysis and sufficient for this

24    issue to reach the jury.

25    With respect to infringement, we believe the evidence is

1    clear that Doctor Cole relied on Doctor Valerdi and that there

2    is no disconnect between those two opinions.  The double

3    counting argument is -- it ignores a fundamental aspect of

4    Doctor Cole's analysis, frankly.  So he is attributing a

5    feature to only 25 percent of that feature, and so this notion

6    that more than a hundred percent has been issued I think is

7    not an accurate assessment of what Doctor Cole did in his

8    analysis.  But in any event, the additional apportionments

9    by Mr. Dell have adequately addressed any criticism in that

10   regard.

11        With respect to the extent of use, as we established with

12   Ms. Bennis, and through Doctor Valerdi who testified very

13   clearly that the operating system is present and installed on

14   all of the accused products, the use by the customer doesn't

15   relate to royalty base; it may be relevant to the value of the

16   benefits of the accused products, but it isn't a royalty base

17   issue because Doctor--sorry--Ms. Bennis admitted that the use

18   here and the party whose use matters is Nokia's use, not use

19   by their customers.

20        And so there's no violation of the entire market value or

21   inflation of the royalty base, and the evidence is sufficient,

22   there's disagreement, as there often is in a trial, but the

23   evidence is sufficient to allow that issue to go to the jury.

24             THE COURT:  All right.  Thank you.

25             MS. STAHL:  Thank you, Your Honor.

1180

 1    THE COURT:  All right.  Have I failed to hear from

 2  anyone on any of the raised issues pursuant to Rule 50(a)?

 3    Anything further from the Defendant?

 4    MS. DEANE:  No, Your Honor.

 5    THE COURT:  Anything further from the Plaintiff?

 6    MR. BREEDLOVE:  No, Your Honor.

 7    THE COURT:  All right.  With regard to the various

 8  matters for which Defendant seeks relief under Rule 50(a),

 9  including the general issues of infringement, invalidity,

10  marking, and damages, those matters are denied.

11    Plaintiff has not moved for relief under Rule 50(a).

12    This completes the Court's consideration of Rule 50(a).

13    Counsel, it is 4:15.  In about 10 or 12 minutes, I

14  would like to meet with you in chambers where we can turn

15  our attention to the most current draft of the final jury

16  instructions and verdict form.  This is an informal charge

17  conference.  It's off the record.  It's meant to be

18  free-flowing and informative.  And I'll reserve the right to

19  not only talk to you about the areas where you're in

20  disagreement, but any other areas where you may be in

21  agreement that I want to talk to you about.

22    After I've received fulsome input from you through this

23  informal charge conference as to both the final jury

24  instruction and the verdict form, then I will take that

25  information and that input into account, I'll review again

1    those documents, and I'll prepare what I believe to be the

2    final and appropriate charge to the jury and verdict form.  I

3    will -- it's my intention to work on that this evening, and it

4    is also my intention to have what I believe to be the

5    appropriate form of those matters delivered to you by email

6    early tomorrow morning.

7        I'd like you to be here at 8:00 to go on the record, and

8    I will then conduct a formal charge conference where we will

9    walk through both the charge and the verdict form page by

10   page, and at any point through that process if either party

11   feels there is a matter that they should object to formally

12   and on the record in regard to the interest of their clients,

13   then they'll be given a full opportunity to do that.

14       Once we've reviewed both documents on a page-by-page

15   basis and I've heard and ruled on any objections, that will

16   complete the formal charge conference.

17       Any questions?

18           MS. DEANE:  No, Your Honor.

19           MR. BREEDLOVE:  No, Your Honor.

20           THE COURT:  All right.  Why don't we take about 10

21   minutes or less, and whenever you're ready, come find me in

22   chambers and we'll conduct the informal charge conference.

23       The Court stands in recess.

24           (The proceedings were concluded at 4:15 p.m.)

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts            04/04/2024

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25