IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
                            MARSHALL DIVISION

SMART PATH CONNECTIONS, LLC.,    (  CAUSE NO. 2:22-CV-296-JRG
                                 )
            Plaintiff,           (
                                 )
vs.                              (
                                 )
NOKIA CORPORATION,               (
et al.,                          )  MARSHALL, TEXAS
                                 (  APRIL 5, 2024
            Defendants.          )  8:00 A.M.
_____


                            VOLUME 5


_____

                       TRIAL ON THE MERITS


                BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE
                          and a jury
_____


                    SHAWN McROBERTS, RMR, CRR
                      100 E. HOUSTON STREET
                    MARSHALL, TEXAS  75670
                        (903) 923-8546
                shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:      CARTER ARNETT, PLLC
                        8150 N. CENTRAL EXPRESSWAY
                        SUITE 500
                        DALLAS, TEXAS  75206
                        (214) 550-2112
                        BY: MR. JOSHUA BENNETT
                            MR. BRADLEY LIDDLE
                            MS. LINDA STAHL
                            MR. MICHAEL POMEROY
                            MS. ALEXIS RITZER

                        DEANS STEPP LAW, LLP
                        325 N. ST. PAUL, SUITE 1500
                        DALLAS, TEXAS  75201-3891
                        (214) 550-8172
                        BY:  MR. SCOTT BREEDLOVE

FOR THE DEFENDANTS:     ALSTON & BIRD, LLP - ATLANTA
                        ONE ATLANTIC CENTER
                        1201 WEST PEACHTREE STREET NW
                        #4900
                        ATLANTA, GEORGIA  30309-3424
                        (404) 881-7000
                        BY:  MR. JOHN HAYNES
                             MR. DAVID FRIST
                             MS. SLOANE KYRAZIS
                             MR. MICHAEL DEANE

                        ALSTON & BIRD, LLP - RALEIGH
                        555 FAYETTEVILLE St., STE. 600
                        RALEIGH, NORTH CAROLINA  27601
                        (919) 862-2270
                        BY:  MS. DARLENA SUBASHI

                        ALSTON & BIRD LLP - WASHINGTON
                        THE ATLANTIC BUILDING
                        950 F STREET, NW
                        WASHINGTON, DC 20004
                        (202) 239-3933
                        BY:  MR. THOMAS DAVISON

                        ALSTON & BIRD
                        1120 SOUTH TRYON STREET
                        SUITE 300
                        CHARLOTTE, NC  28203
                        (704) 444-1316
                        BY:  MS. ERIN BEATON



```
                                    THE DACUS FIRM, PC
                                    821 ESE LOOP 323, SUITE 430
                                    TYLER, TEXAS  75701
                                    (903) 705-1117
                                    BY:  MR. DERON DACUS

        OFFICIAL REPORTER:          SHAWN M. McROBERTS, RMR, CRR
                                    100 E. HOUSTON STREET
                                    MARSHALL, TEXAS  75670
                                    (903) 923-8546
```

THE COURT:  Be seated, please.

Before we proceed to take up the formal charge conference, counsel, let me inquire, are the parties ready at this time to read into the record the items on the list of pre-admitted exhibits used during yesterday's portion of the trial or are you not prepared to do that at this time?

MR. HAYNES:  Your Honor, we're prepared to do so.

THE COURT:  How about the Plaintiff?

MS. STAHL:  Your Honor, I need two minutes to just find the email.

THE COURT:  All right.  Let's do this then.  Let's proceed to take up the formal charge conference.  And then after that, we'll get the exhibits from yesterday's portion of the trial read into the record.

After the close of the evidence yesterday and after the Court took up, considered, and ruled on motions offered pursuant to Rule 50(a), the Court met with counsel in chambers informally to conduct an informal charge conference, at which time the latest submitted version of the proposed final jury instructions and verdict form were discussed in detail with both parties, through their counsel, having an opportunity to provide fulsome comments and discussions with the Court not only about those areas where the parties may not have been in agreement but various other areas as well.

After a lengthy and fulsome discussion informally, the

Court thanked the parties, excused them, and then proceeded to consider and input their comments together with the Court's own view of the various issues involved such that the Court generated last evening what it believes to be the correct and proper final jury instruction and verdict form for use and submission in this case.

Those documents were furnished to counsel earlier this morning with an opportunity to review and consider the same, and the Court's now prepared to go forward with a formal charge conference where either party may lodge such objections to either the final jury instruction or verdict form as they feel the interests of their client require.

Counsel, my typical approach to handling this is to ask that a spokesman for Plaintiff and a spokesman for Defendant both go to the podium, remain there together.  We'll begin with the final jury instructions.  I'll go through it page by page, and at each page I'll ask if either party has any objections.

If an objection is raised as to either something included or something omitted, at that juncture I'll hear the objection and rule on it.  If there are no objections at that page, then please indicate so into the record and then we'll move on to the next page.  And by going through both the final jury instruction and the verdict form on a page-by-page basis, we minimize the possibility that any issue will be overlooked or

not taken up.

So whoever's going to speak for Plaintiff, whoever's going to speak for Defendant with regard to the formal charge conference, please go to te podium and we'll begin the process with the final jury instructions.

All right.  Turning to the final jury instructions beginning on the cover sheet or page 1, are there objections here from either Plaintiff or Defendant?

MR. LIDDLE:  Nothing for Plaintiff, Your Honor.

MR. DAVISON:  Good morning, Your Honor.  Tom Davison for Alston & Bird.  No objections for Nokia.

THE COURT:  All right.  Turning then to page 2 of the final jury instructions, are there any objections here?

MR. LIDDLE:  Nothing from the Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 3, are there objections here?

MR. LIDDLE:  No objection from the Plaintiff, Your Honor?

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning then to page 4, are there objections here?

MR. LIDDLE:  No objections from the Plaintiff, Your

Honor?

MR. DAVISON:  No objections from the Defendant, Your Honor.

THE COURT:  Turning to page 5, are there objections?

MR. LIDDLE:  No objections from the Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning then to page 6, are there any objections here?

MR. LIDDLE:  No objections from the Plaintiff, Your Honor.

MR. DAVISON:  And no objections from Defendant, Your Honor.

THE COURT:  All right.  Turning to page 7, are there any objections here, counsel?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 8, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  And, again, no objections from

Defendant, Your Honor.

THE COURT:  Turning to page 9, are there any objections here?

MR. LIDDLE:  No objection from Plaintiff, Your Honor.

MR. DAVISON:  And no objections from Defendant, Your Honor.

THE COURT:  Turning to page 10, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 11, are there any objections here?

MR. LIDDLE:  No objection from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning next then to page 12, are there any objections here?

MR. LIDDLE:  No objection from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 13, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 14, are there any objections here?

MR. LIDDLE:  No objections for Plaintiff, Your Honor.

MR. DAVISON:  And no objections from Defendant, Your Honor.

THE COURT:  All right.  Next is page 15.  Any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 16, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 17, are there any

objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Next is page 18.  Are there any objections here, counsel?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 19, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 20, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 21, are there any objections here, counsel?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 22, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Next is page 23.  Are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 24, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  All right.  Turning to page 25, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your

Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning then to page 26, are there any objections here?

MR. LIDDLE:  No objection from Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  And turning to page 27, which appears to be the last page of the final jury instructions, are there any objections here?

MR. LIDDLE:  No objections from Plaintiff, Your Honor.

MR. DAVISON:  And no objections from Defendant, Your Honor.

THE COURT:  All right, counsel.  Let's turn our attention next to the verdict form.  We'll approach this in the same manner.

Beginning with the first page or the cover page, page 1, are there any objections here from either party?

MR. LIDDLE:  No objections from the Plaintiff, Your Honor.

MR. DAVISON:  No objections from Defendant, Your Honor.

THE COURT:  Turning to page 2, are there any objections?

MR. LIDDLE:  No objections from the Plaintiff, Your Honor.

MR. DAVISON:  Your Honor, from Defendant, our objection is not so much to page 2, but as we will get to when we get to the marking question on Question No. 3, Defendants do object to breaking marking out.  And we can explain that. So if Your Honor would agree with us, we would propose removing the Orckit-Corrigent definition on page 2.  I just don't want to take the questions out of turn.

THE COURT:  All right.  Well, let's go forward and we'll see what your objections are when we get to the marking question.

MR. DAVISON:  Yes, Your Honor.

THE COURT:  Otherwise, I gather there are no other objections as to page 2.

MR. DAVISON:  Yes, Your Honor, that is correct.

THE COURT:  Let's turn then to page 3 where instructions are included.  Are there any objections here?

MR. LIDDLE:  No objections from the Plaintiff, Your Honor.

MR. DAVISON:  And no objections from Defendant, Your Honor.

THE COURT:  All right.  Turning then to page 4 of

1193

the verdict form where Question 1 is found, are there objections here?

MR. LIDDLE:  No objection from the Plaintiff, Your Honor.

MR. DAVISON:  And, Your Honor, Nokia does object to Question No. 1.  We believe that the questions on infringement should be broken out by claim.  So we have claims 12 and 15 of the '580 lumped together.  We object to that.

We also object to lumping the question of infringement for claims 1 and 3 of the '010 Patent together.  Again, we would propose that those be broken out on a claim basis.

THE COURT:  All right.  That objection's overruled. Anything further on page 4?

MR. DAVISON:  No, Your Honor.

THE COURT:  Turning then to page 5 where Question 2 is found, any objections here by either party?

MR. LIDDLE:  No objections from the Plaintiff, Your Honor.

MR. DAVISON:  And no objections from Defendant, Your Honor.

THE COURT:  All right.  Turning to page 6 of the verdict form where Question 3 together with some instructions are located, are there any objections here?

MR. LIDDLE:  No objection from the Plaintiff, Your Honor.

1194

MR. DAVISON:  And, yes, Your Honor, as I mentioned, Nokia does object to breaking out the marking question in Question No. 3.  After the informal conference, we went back to reflect on what would be the most -- least confusing way to structure the question of damages for the jury.  The marking question can be lumped into the overall damages question just in terms of what are the numbers that the jury should plug in.

What I see here on page 6, the second instruction where it says, For any asserted patent that is both infringed, proceed to answer the following questions No. 3, 4, and 5, we are Concerned that we are instructing the jury to answer Questions 3, 4, and 5, and that implies almost going through answering all the questions in Question No. 4 -- or on damages.

Thus, we think that the most straightforward way for the jury is two simple questions:  One, what's the ultimate number for damages, writing just a single line item where they can put in the potential theories that would be Plaintiff's theory, Defendant's theory, and then whether it's a lump sum or running royalty.

THE COURT:  All right.  Well, in light of the other instructions that follow and in light of considering what you've suggested, I'm going to overrule that objection and we're going to maintain Question No. 3 as it is.

We'll turn then to page 7 of the verdict form where

Question 4a is found.  Any objections in light of those rulings to Question 4a or anything on page 7 of the verdict form?

MR. LIDDLE:  No objection from the Plaintiff, Your Honor.

MR. DAVISON:  And, again, Your Honor, our objection would be the same, and we understand it's overruled.

THE COURT:  All right.  Then we'll turn to page 8 of the verdict form where Question 4b is found.  Any objection here?

MR. LIDDLE:  No objection from the Defendant.

THE COURT:  Same objection from Defendant?

MR. DAVISON:  Yes, Your Honor.

THE COURT:  Same ruling from the Court, overruled.

We'll turn to page 9 where Question 4c and 4d are found.  Any objections here?

MR. LIDDLE:  No objection from the Plaintiff, Your Honor.

MR. DAVISON:  And same objection for Nokia.  We understand it's overruled.

THE COURT:  All right.  And then turning to page 10 where Question 5 is found, any objections here?

MR. LIDDLE:  No objection from the Plaintiff, Your Honor.

MR. DAVISON:  Same objection that we raised earlier,

Your Honor.

THE COURT: All right. That, too, is overruled.

Turning then to page 11, which is the final page of the verdict form, are there objections here from either party?

MR. LIDDLE: No objection from the Plaintiff, Your Honor.

MR. DAVISON: No objections from Defendant, Your Honor.

THE COURT: All right. That will complete the formal charge conference, counsel.

I will take a little time to produce and print individual copies of the final jury instructions for each member of the jury. And at that time, which should put us slightly past 8:30, I'll be prepared to bring in the jury, give my final instructions to them, followed by closing arguments from counsel.

It's my understanding -- and I'd like to confirm this with everybody. It's my understanding that during Plaintiff's closing argument, they wish for the monitors in the gallery to be turned off such that only the monitors inside the Bar will be on and will show any demonstratives that may be used during the closing because the Plaintiffs have indicated or Plaintiff has indicated it may include some confidential information in its closing demonstratives.

And the Court has the ability to turn off the three

monitors in the gallery but leave all the other monitors inside the Bar on.

Is that an accurate review of what Plaintiff's actually asking me to do?

MR. BENNETT:  Yes, Your Honor, it is.

THE COURT:  Okay.  I will simply -- I will certainly do that.  I will simply remind both sides that the monitors on counsel table will be working and eliminated.  And if you're concerned about anyone behind the Bar having a view of those monitors, you may want to turn them or adjust them such that only people at counsel table can see them.

And this will take place during Plaintiff's first closing argument and second closing argument.  Correct, Mr. Bennett?

MR. BENNETT:  It's first.

THE COURT:  First only?  Not during the second one.

MR. BENNETT:  Correct.

THE COURT:  Then I'll make that change, and we'll turn off the gallery monitors during Plaintiff's first closing only.

Let me ask Defendant.  Yesterday when I inquired, there was some question about who was going to actually close for the Defendant.  Have we resolved that issue?

MR. DACUS:  We have, Your Honor.  I'll do it with the Court's permission.

THE COURT:  All right.  Is there anything else that

I need to hear from the parties on before I reproduce the copies of the final jury instructions for the jury and then return to begin the process?

Ms. Stahl?

MS. STAHL:  If the Court pleases, we're ready to announce exhibits.

THE COURT:  All right.  Let's do that now then.

If whoever's going to make those announcements will go to the podium and then read into the record those items from the list of pre-admitted exhibits used during yesterday's portion of the trial.

Please proceed.

MS. STAHL:  Your Honor, Plaintiffs offered Plaintiff's Exhibit 3; Defendant's Exhibit 1; Defendant's Exhibit 4; Defendant's Exhibit 9a; Defendant's Exhibit 9b, as in bravo; Defendant's Exhibit 9c, as in Charlie; Defendant's Exhibit 35; Joint Exhibit 1; Joint Exhibit 2; Joint Exhibit 11; and Joint Exhibit 46a, as in Alpha.

THE COURT:  All right.  Is there any objection to that rendition from the Defendant?

MS. BEATON:  No objection, Your Honor, but I'd like to clarify that the parties discussed last night and it is Joint Exhibit 11a.

MS. STAHL:  You are correct, yes.

MS. BEATON:  Thank you.

THE COURT:  So rather than Joint Exhibit 11, it should be noted to be Joint Exhibit 11a.  Is that correct?

MS. BEATON:  Yes, Your Honor.

THE COURT:  All right.  Without any further objection, does Defendant have a rendition to read into the record regarding pre-admitted exhibits used yesterday?

MS. BEATON:  Yes, Your Honor.

THE COURT:  Please proceed, Ms. Beaton.

MS. BEATON:  Yesterday Defendants read into the record Joint Exhibit 31a, as in alpha; Joint Exhibit 31b, as in bravo; Joint Exhibit 31c, as in Charlie; Plaintiff's Exhibit 17; Defendant's Exhibit 30a, as in alpha; and Defendant's Exhibit 30b, as in bravo.

THE COURT:  All right.  Any objections from Plaintiff to that rendition?

MS. STAHL:  No objection, Your Honor.

THE COURT:  All right.  Thank you, counsel.

All right.  While the Court produces or reproduces the copies for each member of the jury of the final jury instructions, the Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

Counsel, I'm about to bring in the jury and proceed with the Court's final instructions, followed then by closing arguments from counsel for the parties.

1200

The Court considers this process the most serious part of a very serious undertaking.  Accordingly, once I start my final instructions to the jury, I don't want any disruptions or interruptions of any kind.  So if you have something to do, do it before I bring the jury in.

Once the jury's in, I don't want people getting up, walking around, bringing in boxes, whispering to each other, passing papers.  I want you to be still, quiet, and respectful throughout the process.  If you have a device that could possibly sound, make double sure it's off or silenced before I bring the jury in.

Is there anything I need to take up from either Plaintiff or Defendant before I bring in the jury and proceed to give the Court's final instructions?

MR. BENNETT:  Not for Plaintiff, Your Honor.

MR. DACUS:  No, Your Honor.  Thank you.

THE COURT:  All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  Welcome back.  Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I'll now instruct you on the law that you must apply.

As I told you yesterday, I'm about to give you these

instructions orally, but I want you to understand you'll each have a printed hard copy of these final jury instructions to take with you and to review in the jury room during your deliberations.  So it would be my hope that you would not feel compelled to take notes or otherwise write down anything, but listen carefully and attentively as I give you these instructions orally.

It's your duty to follow the law as I give it to you.  On the other hand, and as I've said, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or may make in the course of these instructions as an indication that the Court has any opinion about the facts in this case.

Now, you're about to hear closing arguments from the attorneys for both of the parties.  Statements and arguments of the attorneys, ladies and gentlemen, are not evidence, and they are not instructions on the law.  They are intended only to assist the jury in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you, and you will take this verdict form with you to the jury room when you retire to deliberate.  And when you have reached a unanimous agreement as to your verdict, you'll have your foreperson fill in the blanks in the verdict form reflecting that unanimous verdict, sign it and date it, and then advise the Court

1202

Security Officer that the jury's reached a verdict.

Answer the questions in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case and then answer the questions to reach that result.  Your answers and your verdict, again, must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, the stipulations of the parties, and you may consider all the exhibits received and admitted into evidence, regardless of who may have introduced them.

You, the jurors, are the sole judges of the credibility of all the witnesses and the weight and effect to give to all the evidence.  In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You alone are to determine questions of credibility or truthfulness of the witnesses.

In weighing the testimony of the witnesses, you may consider a witness' manner and demeanor on the witness stand, any feelings or interest they may have in the case, any prejudice or bias about the case that the witness may have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances.

Has the witness been contradicted by other evidence?  Has

he or she made statements at other times and in other places contrary to what they said on the witness stand?  You must give the testimony of each witness, ladies and gentlemen, the amount of credibility and weight that you think it deserves.

You must also keep in mind that a simple mistake does not mean that a witness is not telling the truth.  You must consider whether any misstatement was an intentional falsehood or simply a lapse in memory and what significance, if any, should be attached to that testimony.

As I've told you previously, the attorneys in this case are advocates for their competing parties -- their competing clients, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court.

When the Court sustained an objection to a question addressed to a witness, you must disregard that question entirely, and you may draw no inference from its wording or speculate about what the witness would have said if the Court would have allowed them to answer the question.

On the other hand, if the objection was overruled, then you must treat the answer to the question just as you would treat any other answer to any other question and as if the objection had not been made.  Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court in doing so did not indicate any opinion

as to the weight or effect of such evidence.  That decision is yours and yours alone as the jury.

Now, at various times during the trial, it was necessary for the Court to talk to the lawyers outside of your hearing either by talking to them here at the bench or by calling a recess and talking to them when you were outside of the courtroom.  This happened because during trials there are things that come up that do not directly involve the jury.  You should not speculate, ladies and gentlemen, about what was said during such discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the evidence of an eyewitness.  The other is indirect or circumstantial evidence, that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts.  As a general rule, the law makes no distinction between direct evidence or circumstantial evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Now, the parties in this case, ladies and gentlemen, have stipulated or agreed to some of the facts in this case.  And when the lawyers on both sides stipulate or agree as to the existence of a fact, then you must, unless otherwise

instructed by me, accept that stipulation as evidence and regard that fact as having been proven.

One of the stipulations the parties entered into relates to source code presented during the trial.  Specifically, for this trial the parties stipulated as follows:

This stipulation is for purposes of Case No. 2:22-CV-296 only and may not be used in any other matter for any other purpose.

For the purposes of U.S. Patent No. 7,368,010, 7,463,580, and 7,551,599, the parties stipulate that for accused products that use CSA software, release CSA_9_0_R12 is representative, only with respect to the accused functionalities of all prior CSA software releases that contained the accused functionalities and were released from August the 3rd, 2016, to August [sic] the 30th, 2023.

For purposes of U.S. Patent No. 7,368,010, 7,463,580, and 7,551,599, the parties stipulate that for the accused products that use TiMOS_SAS software release TiMOS, that's TiMOS_SAS_22_9_R3, is representative only with respect to the accused functionalities of all prior TiMOS_SAS software releases that contained the accused functionalities and were released from August the 3rd, 2016 to October the 30th, 2023.

For purposes of U.S. Patent No. 7,368,010, 7,463,580, and 7,551,599, the parties stipulate for the accused products that use TiMOS software release TiMOS_22_2_R2 is representative

only with respect to the accused functionalities of all prior TiMOS software releases that contain the accused functionalities and were released from August the 3rd, 2016 to October the 30th, 2023.

Now, as I have previously explained to you, the parties have also stipulated that Nokia acquired DX 0036, that's Defendant's Exhibit 0036, in 2024 from a reseller in Israel, not the United States, and that no witness in this trial testified whether DX 0036 did or did not include a patent marking label when originally sold by Orckit-Corrigent.

Now, certain testimony given to you and presented to you during this trial, ladies and gentlemen, was presented to you through what are known as depositions.  A deposition is the sworn, recorded answers to questions asked to a witness in advance of the trial.  If the witness cannot be present in person to testify in open court, then the witness' testimony can be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the parties questioned these deposition witnesses under oath.  At that time, a court reporter was present and recorded both the questions and the answers.  The deposition testimony that's been presented to you, ladies and gentlemen, is entitled to the same consideration by you as testimony given by a witness in person from the witness stand in open court.  Accordingly, you should judge the credibility and the importance of

deposition testimony to the best of your ability, just as if the witness had testified in person in open court from the witness stand.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, said another way, you may make deductions, ladies and gentlemen, and you may reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in this case.  However, you should not base your decision on any evidence not presented by the parties during the trial, including your own personal experiences with any particular products that are at issue in this case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the evidence you believe that single witness.

Also, when knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field--we call them an expert witness--is permitted to state his or her opinions on those technical matters.  However, you're not required to accept

those opinions.  As with any other witness, ladies and gentlemen, it is solely up to you to decide whether or not to rely on those opinions.

Now, certain exhibits have been shown to you during the trial that were simply illustrations.  We call these types of exhibits demonstrative exhibits.  Sometimes they're referred to for short simply as demonstratives.

Demonstrative exhibits are a party's description, picture, or model to describe something involved in the trial. If your recollection of the evidence differs from the demonstratives, then you should rely on your recollection. Demonstrative exhibits are sometimes called jury aids.  And demonstrative exhibits themselves are not evidence, but a witness' testimony concerning and using a demonstrative is evidence.

Demonstrative exhibits are not going to be available to you to review or considering during your deliberations in the jury room.

In any legal action, the facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiff for some issues and on the Defendant for other issues.  There are two burdens of proof that you will apply in this case.  They are the preponderance of the evidence and clear and convincing evidence.

The Plaintiff in this case, Smart Path Connections, LLC, which you've heard referred to throughout the trial as either the Plaintiff or simply as Smart Path, sometimes they were even called SPC, the Plaintiff has the burden of proving patent infringement by a preponderance of the evidence.  The Plaintiff Smart Path also has the burden of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence, ladies and gentlemen, means evidence that persuades you, the jury, that a claim is more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, the Defendant in this case, Nokia of America Corporation, which you've heard referred to throughout the trial as either the Defendant or simply as Nokia, has the burden of proving invalidity of any of the Smart Path patent claims by clear and convincing evidence.

Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.  Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard.  If the proof establishes in your mind,

1210

ladies and gentlemen, an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as I've previously told you, these two burdens of proof are not to be confused with a third and different burden of proof known as beyond a reasonable doubt, which is the burden of proof applied in a criminal case and which has no application whatsoever in a civil case such as this one. Beyond a reasonable doubt is a higher standard or burden of proof than either the preponderance of the evidence or clear and convincing evidence.

Now, as I did at the beginning of the case, I'll first give you a summary of each side's contentions.  I'll then provide you with detailed instructions on what each side must prove in order to win on each of its contentions.

As I previously told you, this is an action for patent infringement.  Remember, there are three separate patents-in-suit:  United States Patent No. 7,551,599, which you've heard referred to consistently throughout the trial as the '599 Patent; United States Patent No. 7,463,580, which you've heard referred to throughout the trial as the '580 Patent; and U.S. Patent No. 7,386,010, which you've heard referred to consistently throughout the trial as the '010 Patent.

The Plaintiff, Smart Path, contends that the Defendant,

Nokia, infringes the following claims of these patents-in-suit:  Claim 59 of the '599 Patent, claims 12 and 15 of the '580 patent, and claims 1 and 3 of the '010 Patent.  These are the asserted claims, and Smart Path contends that Nokia has infringed each of these asserted claims by making, using, importing, selling, or offering to sell in the United States routing equipment.  And I will refer to these as Nokia's accused products or the accused products.

Smart Path, the Plaintiff, contends that it is entitled to money damages in the form of a reasonable royalty for Nokia's infringement.  Smart Path has the burden to prove these issues by a preponderance of the evidence.

However, Nokia denies that the accused products infringe any of the asserted claims.  Nokia contends that during the terms of these patents, it did not make, use, sell, or offer for sale within the United States or import into the United States any products that infringe any of the asserted claims of the asserted patents.

Nokia also denies that it owes Smart Path any money damages in this case.  Nokia also contends that if damages are awarded, they should be limited because Nokia contends that the prior owners of the asserted patents, Orckit-Corrigent, did not comply with the marking requirements.

Nokia further contends that the accused claims of the '580 Patent and the '010 Patent are invalid as being obvious

in view of prior art that existed before Smart Path's alleged inventions.  Nokia has the burden to prove invalidity by clear and convincing evidence.

Invalidity, ladies and gentlemen, is a defense to infringement.  Invalidity and infringement, however, are separate and distinct issues.  Your job is to decide whether Nokia has infringed the asserted claims and whether the asserted claims of the '580 and the '010 Patents are invalid. If you decide that any of the asserted claims have been infringed and are not invalid, then you will need to decide the amount of money damages, if any, to be awarded to Smart Path to compensate it for that infringement.

Now, before you can decide many of the issues in this case, you'll need to understand the role of the patent claims. The patent claims are those numbered sentences at the end of each patent.  And as I've told you, you have a complete copy of each of the three asserted patents in your juror notebooks which you can refer to throughout your deliberations if you wish to.

The claims in the patents, ladies and gentlemen, are important because it's the words of the claims that define what a patent covers.  The figures and the text in the rest of the patent provide a description and/or examples of the invention and they provide a context for the claims, but it is the claims themselves that define the breadth of the patent's

coverage.

Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim.  Accordingly, what a patent covers in turn depends upon what each of its claims cover.

Now, you'll first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.  Now, the law says it's my role to define the terms of the claims and it's your role to apply my definitions or constructions to the issues that you're asked to decide in this case.

As I explained at the beginning of the trial, I've already determined the meaning of some of the language from the asserted claims, and I have provided my definitions or constructions of this claim language to you, and they're set forth in your juror notebooks.  These definitions can be referred to from your juror notebooks throughout your deliberations if you choose to.

Now, you must accept my definitions of these words in the claims as being correct, and it's your job to take these definitions that I have provided and apply them to the issues that you are deciding, including the issues of infringement and the issue of invalidity.  You should disregard any evidence presented during the trial that contradicts or is

inconsistent with these definitions or constructions that the Court has given to you.

Now, for claim language that I have not construed, that is, elements or limitations of the claims that I have not interpreted or defined, you're to use the plain and ordinary meaning of that language as understood by a person of ordinary skill in the art, which is to say, in the field of the technology of the patent at the time of the alleged invention. The meaning of the words of the patent claims must be the same when deciding both infringement and when deciding invalidity.

You've been provided with copies of the asserted patents, as I've noted, and they're available to you to consider during your deliberations from within your juror notebooks.  It's the claims in the patents, ladies and gentlemen, that are intended to define in words the boundaries of the inventor's rights. Only the claims of the patent can be infringed.  Neither the written description nor the drawings of the patent can be infringed.  Each of the claims must be considered individually.

Now, several times in these instructions I have or I will refer to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art.  In deciding the level of ordinary skill in the field, you should consider all the evidence introduced during the trial, including but not limited to, (1) the levels of education and

experience of the inventors and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) and the sophistication of the technology.  A person of ordinary skill in the art is a hypothetical person who is presumed to be aware of all the relevant prior art at the time of the claimed invention.

I'll now explain to you how a claim defines what it covers.  A claim sets forth, in words, a set of requirements.  Each claim sets forth its requirements in a single sentence.  If a device or method satisfies each of these requirements, then it is covered by and infringes the claim.  There can be several claims in a patent, and each claim may be narrower or broader than another claim by setting forth more or fewer requirements.  Therefore, the coverage of a patent must be and is assessed on a claim-by-claim basis.

In patent law, the requirements of a claim are often called or referred to as the claim elements or as the claim limitations.

When a product, apparatus, or system meets all the requirements of a claim, the claim is said to cover that product, apparatus, or system, and that product, apparatus, or system, is said to fall within the scope of that claim.  In other words, a claim covers a product, apparatus, or system

where each of the claim elements or limitations is present in that product, apparatus, or system.  A claim covers a product, apparatus, or system even if there are additional features or components that are not covered by the claim.

If a product, apparatus, or system is missing even one limitation or element of a claim, the product, apparatus, or system is not covered by the claim.  And if it is not covered by the claim, it cannot infringe the claim.

Now, by understanding the meaning of the words in a claim and by understanding that the words in the claim set forth the requirements that a product, apparatus, or system must meet in order to be covered by that claim, you'll be able to understand the scope of the coverage for each claim.  Once you understand what each claim covers, then you're prepared to decide the issues that you'll be asked to decide in this case, including the issue of infringement.

Now, the beginning portion or preamble of a claim often uses the word 'comprising'.  The word 'comprising' when used in the preamble of a claim means including but not limited to, or containing but not limited to.  When comprising is used in a preamble, if you decide that an accused product includes all of the requirements of that claim, the claim is infringed, and this is true even if the product contains additional elements.

For example, a claim to a table comprising a tabletop, legs, and glue, would be satisfied by any table that includes

a tabletop, legs, and glue, even if the table also contains additional or other structures, such as leaves to expand the size of the tabletop or wheels that would go on the ends of the legs.  That's a simple example, but it's one that you should consider.

Now, this case involves two types of patent claims: independent claims and dependent claims.  In this case, claim 1 of the '010 Patent, claim 15 of the '580 Patent, and claim 59 of the '599 patent are independent claims.  Claim 3 of the '010 Patent and claim 12 of the '580 Patent are dependent claims.

An independent claim sets forth all the requirements that must be met in order to be covered by that claim.  It is not necessary to look to any other claim to determine what an independent claim covers.

However, a dependent claim does not itself recite all the requirements of the claim, but refers to another claim for some of its requirements.  In this way, the claim depends from another claim.  A dependent claim incorporates all the requirements of the claim to which it refers, or as we say, from which it depends, as well as the elements of the claim itself.  A dependent claim adds these additional elements from the claim to which it refers or depends to its own requirements.

So to determine what a dependent claim covers, it's

necessary to look at both the dependent claim itself and any other claim to which it refers or from it depends.  Now, a product that meets all the requirements of both the dependent claim and the claim to which it refers or from which it depends is covered by that dependent claim.

Let me now instruct you on infringement in more detail. If a person or a corporation makes, uses, sells, or offers to sell within the United States, or imports into the United States what is covered by a patent claim without the patent owner's permission, that person or corporation is said to infringe the patent.

In reaching your decision on infringement, keep in mind, ladies and gentlemen, that only the claims of a patent can be infringed.  You must compare the asserted patent claims, as I have construed them for you, to the accused Nokia products, and determine from that comparison whether or not there is infringement.  This is the only correct comparison.  You should not compare the accused product with any specific examples set out in the patent or the prior art in reaching your decision on infringement.  You must reach your decision on each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you over the course of this trial by the parties.

I'll now instruct you on the specific rules that you must

follow to determine whether Smart Path has proven that Nokia has infringed one or more of the patent claims involved in this case by a preponderance of the evidence.  The type of infringement alleged in this case is called literal infringement.  In order to infringe a patent claim literally, the accused device must include each and every element of the claim literally.  I'll explain the requirements for this type of infringement to you.

Now, in order to prove direct infringement of a patent claim, the Plaintiff Smart Path must show by a preponderance of the evidence that the Defendant Nokia made, used, sold, offered for sale within, or imported into, the United States a product that meets all the requirements of a claim literally.

A claim requirement is literally present if it exists in an accused product just as it is described in the claim language, either as I have explained or defined that language for you, or if I did not explain or define it, as would be understood by its plain and ordinary meaning by one of ordinary skill in the art.  If an accused product, ladies and gentlemen, omits any element recited in the claim, then you must find that the product in question does not literally infringe that claim.

An accused product infringes a claim if it satisfies the claim elements, even though it may also be capable of non-infringing modes of operation.  So long as an accused

product has each and every one of the claim requirements, infringement of that claim is shown, even if the product contains additional features or elements not required by the claim.

You must determine separately for each asserted claim whether or not there is infringement.  However, if you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.

On the other hand, if you find that an independent claim has been infringed, you must then go on and still decide, separately, whether the product meets the additional requirements of any claim that depend from that independent claim; that is, whether those claims have also been infringed.

A dependent claim includes all the requirements of any of the claims to which it refers or from which it depends plus the additional requirements of its own.

Now, claim 8 of the '580 Patent includes a limitation in a special form called means-plus-function format. Specifically, the call admissions control module term in asserted claim 8 of the '580 Patent is a so-called means-plus-function claim limitation.

This claim does not cover all the structures that could perform the function set forth in the claim.  Instead, it covers a structure or set of structures that performs that

function and that is either identical or equivalent to the structures described in the patent for performing the function.  The issue of whether two structures are identical or equivalent is an issue for you to decide.

To demonstrate that these limitations are literally met, Smart Path, the Plaintiff, must prove by a preponderance of the evidence, that is, that it's more likely than not, that the Defendant Nokia's products contain a structure that (1) performs the recited function; and (2) is identical or equivalent to the structure that is disclosed in the patent specification and drawings for performing that recited function.

Now, I've set forth in my claim construction definitions provided to you, both the recited function that is performed by the structure and the structure that is to be disclosed or that is disclosed in the patent specification that performs the recited function.  As I say, these constructions are included in your juror notebooks.

A structure may be found to be equivalent to one of the structures I've defined as being described in the '580 Patent if a person having ordinary skill in the field of the technology of the '580 Patent would have considered the differences between them to be insubstantial at the time the '580 Patent issued.  One way to show this is to demonstrate that the structure in the accused product performs the

identical function in substantially the same way to achieve substantially the same result that would have been achieved by the element that is disclosed in the patent specification.

In deciding whether the differences would be insubstantial, you may consider whether persons having ordinary skill in the field of the technology of the '580 Patent would have known that the interchangeability of the two structures -- would have known of the interchangeability of the two structures at the time the patent issued.

The fact that the structure in the accused product may perform additional functions not disclosed in the patent specification does not mean that the structure is not identical or equivalent to the structure that I've identified in my claim construction order.  This is the case even if the accused structure achieves better performance than is disclosed in the patent specification.

Further, even though the two structures would not have been considered equivalent structures in other contexts, for example, if performing structures -- performing functions other than the claimed function, they may, nevertheless, be equivalent for the means-plus-function term when performing the same function.

I'll now instruct you, ladies and gentlemen, on indirect infringement.

In this case, Smart Path has alleged that Nokia is liable

for indirect infringement by actively inducing end users to directly infringe the asserted claims of the asserted patents. As with infringement, you must determine whether there has been indirect -- as with direct infringement, you must determine whether there has been indirect infringement by active inducement on a claim-by-claim basis.

The Defendant Nokia is liable for indirect infringement of a claim only if the Plaintiff Smart Path proves by a preponderance of the evidence:

1.  That the acts actually carried out by end users of Nokia's accused products directly infringe that claim;

2.  That Nokia took action during the time the accused -- the asserted patent was in force that was intended to cause and led to the infringing acts by end users of the Nokia accused products; and

3.  That Nokia was aware of the asserted patent and knew or was willfully blind to the fact that the acts, if taken, would constitute infringement of that patent.

Willful blindness, ladies and gentlemen, is established if Nokia believed there was a high probability that the acts, if taken, would constitute infringement of the asserted claims, but deliberately avoided confirming that belief.

Now, to establish indirect infringement by active inducement, it is not sufficient that someone else directly infringes a claim.  Nor is it sufficient that the company

1224

accused of inducing another's direct infringement merely had knowledge or notice of an asserted patent or had been aware of the acts by another that allegedly constitute direct infringement.  And the mere fact that the company accused of inducing another's direct infringement had knowledge -- excuse me, had known or should have known that there was a substantial risk that someone else's acts would infringe is not sufficient.  Rather, in order to find inducement, you must find that Nokia specifically intended or was willfully blind to that infringement.

I'll now instruct you on the rules that you must follow in deciding whether or not Nokia has proven that any asserted claims of the asserted patents are invalid.  Invalidity and infringement are separate and distinct issues and must be decided by you, the jury, separately.

Now, an issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to throughout the trial simply as the PTO, or the Patent Office, acted correctly in issuing the patent.  This presumption of validity extends to all issued United States patents.

Now, in order to overcome this presumption, Nokia must establish by clear and convincing evidence that a claim is invalid.  Like infringement, invalidity is determined on a

claim-by-claim basis, and you must determine separately for each claim whether that claim is invalid.  If one claim of a patent is invalid, this does not mean that any other claim is necessarily invalid.

Claims are construed in the same way for determining infringement as for determining invalidity, and you must apply the claim language that I have given to you consistently and in the same manner for the issues of infringement and for the issues of invalidity.  In making your determination as to invalidity, you must consider each claim separately.

Now, a previous device, system, method, publication, or patent that predates the claimed invention is generally called prior art, and may include items that were publicly known or that had been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.  Prior art also includes the knowledge or use of an invention by a person of ordinary skill in the art in the United States at the time of the invention.

In deciding validity, the only correct comparison is between the prior art and the limitations or elements of the asserted claims.  It is improper to consider the prior art as to the accused products.

In this case, Nokia contends that claims 12 and 15 of the '580 Patent are obvious in light of U.S. Patent Application

Publication No. 2005/0169266, which you heard referred to as the Aggarwal-266 item, in combination RFC 4875 internet draft.

Nokia also contends that claims 1 and 3 of the '010 Patent are obvious in light of United States Patent No. 7,386,605, which you've heard referred to as Shah, or the Shah reference.

I'll refer to claims 12 and 15 of the '580 Patent and claims 1 and 3 of the '010 Patent as the challenged claims.

I'll now instruct you on how to determine whether any of the challenged claims are invalid as obvious.

Even though a claimed invention may not have been identically disclosed or identically described in a single prior art reference before it was made by an inventor, in order to be patentable, the invention must not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

Nokia, the Defendant, has the burden of establishing obviousness by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art in the field of network communications at the time the invention was made.

Keep in mind, ladies and gentlemen, that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on the building blocks of prior art.  In

determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.  In determining the level of ordinary skill in the art, you should consider the person of ordinary skill as one who is presumed to be aware of all the pertinent prior art.

The scope and content of the prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention.  It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Further, teachings, suggestions, and motivations may be found within the knowledge of a person of ordinary skill in the art, including inferences and creative steps that a person of ordinary skill in the art would employ.  A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together like the pieces of a puzzle.  The person of ordinary skill in the art would have the capability of understanding the scientific and engineering principles applicable to the pertinent art.

In considering whether a claimed invention is obvious, you may but you are not required to find obviousness if you

1228

find that at the time of the claimed invention there was a reason that would have prompted the person having ordinary skill in the field to combine the known elements in the way the claimed invention does, taking into account such factors as:

1.   Whether the claimed invention was merely the predictable result of using prior art elements according to their known function;

2.   Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3.   Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention;

4.   Whether the prior art teaches away from combining elements in the claimed invention;

5.   Whether it would have been obvious to try the combination of elements in the claimed invention, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified, predictable solutions; and

6.   Whether the change resulted more from design incentives or other market forces.

To find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of success in combining the teachings of the prior art to result in the claimed invention.

In determining whether the claimed invention was obvious, consider each claim separately.  Do not use hindsight; consider only what was known at the time of the invention.  In other words, you should not consider what a person of ordinary skill in the art would know now or what was learned from the teachings of the asserted patent.

In making these assessments, you should take into account any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention, and afterwards, and that may shed light on the obviousness or not of the claimed invention.  The following are possible secondary considerations, but it's up to you, ladies and gentlemen, to decide whether secondary considerations of non-obviousness exist at all.  These are:

1.  Whether the invention was commercially successful as the result of the merits of the claimed invention, rather than the result of design needs or market pressure, advertising, or similar activities;

2.  Whether the invention satisfied a long-felt need;

3.  Whether others had tried but failed to make the claimed invention;

4.  Whether the claimed invention achieved unexpected results;

5.  Whether others in the field praised the claimed invention;

1230

6.  Whether persons having ordinary skill in the art at the time of the invention expressed surprise or disbelief regarding the invention; and

7.  Whether others sought or obtained rights to the patent from the patent owner.

These factors are relevant only if there is a connection or a nexus between the factors and what differentiates the claimed invention from the prior art.  Smart Path has the burden of establishing this connection or nexus.  Moreover, even if you conclude that some of the above indicators of objective evidence have been established, those factors should be considered along with all the other evidence in the case in determining whether Nokia has proven that the claimed invention would have been obvious.

In making these determinations, a person of ordinary skill uses simple common sense, and can rely on the inferences and creative steps that a person of ordinary skill in the art would employ.  Also, Nokia does not need to show that one of ordinary skill would have actually made -- would have combined the physical structures of two references; one need only combine the teachings.

Remember, as stated earlier, that prior art is not limited to patents and published materials, but includes the general knowledge that would have been available at the time to one of ordinary skill in the field of the invention.  If

1231

you find that Nokia has proven the obviousness of a claim by clear and convincing evidence, then you must find that the claim is invalid.

If you find that Nokia has infringed any valid claim of the asserted patents, you must then consider what amount of damages to award to Smart Path for that infringement.

I'll now instruct you about the measure of damages.  But by instructing you on damages, ladies and gentlemen, I am not suggesting which party should win this case on any issue.  If you find that Nokia has not infringed any valid claim of the patents-in-suit, then Smart Path is not entitled to any patent damages.

The damages you award, if any, must be adequate to compensate Smart Path for any infringement you may find.  You must not award Smart Path more damages than are adequate to compensate for the infringement.  You must also not include any additional amount for the purposes of punishing Nokia or setting an example.

Now, Smart Path has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Smart Path establishes that it more likely than not suffered as a result of Nokia's infringement.  While Smart Path is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty.  You may

approximate, if necessary, the amount to which the patent owner is entitled.  However, Smart Path is not entitled to damages that are remote or that are only speculative.

Now, Smart Path seeks damages in the form of a reasonable royalty.  A reasonable royalty is the amount of royalty payment that a patent owner and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time immediately prior to when the infringement first began.

You've heard references throughout the trial as to whether a reasonable royalty is to be structured as a running royalty or a lump-sum royalty.  If you find Smart Path is entitled to damages in the form of a reasonable royalty, you must go further and decide whether the parties would have agreed to either a running royalty or a fully paid-up lump-sum royalty, at the time of the hypothetical negotiation.

A running royalty, ladies and gentlemen, is a fee paid for the right to use the patent that is paid for each unit of the infringing products that have been sold.  If there are additional units sold in the future, any damages for these sales will not be addressed by you but they may be pursued in the future.  If you decide that a running royalty is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Smart Path for Nokia's past infringement.

However, as noted, Smart Path may recover for future use

of its technology from Nokia at a later day, depending and based on how many sales of infringing products are sold by Nokia in the future.

However, and on the other hand, a lump sum royalty is when the infringer pays a one-time single price for what is effectively a license covering both past and future infringing sales. If you decide that a lump sum is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Smart Path for Nokia's past and future infringement during the remaining life of the infringed patents.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent owner and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed that the asserted claims were valid and infringed and that both parties were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred. In the context of the hypothetical negotiation, it is not necessary -- it is not necessarily the case that each valid and infringed patent in the hypothetical negotiation

contributes equally to the amount that Nokia would pay for that license, or that each patent covered by other licenses that were presented contributes equally to the amount that was paid for those licenses.

The law requires that any damages awarded to Smart Path correspond to the value of the alleged inventions within the accused products, as distinct from other, unpatented features of the accused products, or other factors such as marketing or advertising, or either parties' size or marketing position. This is especially true where accused products have multiple features and multiple components not covered by the patents, or where the accused products work in conjunction with other non-patented items.  Therefore, the amount you find as damages must be based on the value attributable to the patented technology.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are:

The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty;

The rates paid by the licensee for the use of other patents comparable to the license in suit;

The nature and scope of the license, as exclusive or

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

The duration of the patent and the term of the license;

The established profitability of the product made under the patents, its commercial success, and its current popularity;

The extent to which the infringer made use of the invention and any evidence probative of the value of that use;

The portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

The opinion and testimony of qualified experts; and the amount that a licensor (such as the patent owner) and a licensee (such as Nokia) would have agreed upon (at the time the infringement began) if both had been trying to reasonably and voluntarily reach an agreement; that is, the amount which a prudent licensee--who desired as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention--would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patent owner who was willing to grant a license.

Now, you may have heard these factors, ladies and

gentlemen, referred to during the trial as the *Georgia-Pacific* factors.  No one of these factors is dispositive, and you can and should consider all the evidence that has been presented to you in this case on each of these factors.  You may also consider any other factors which, in your mind, would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent owner would have been willing to accept, acting as normally prudent businesspeople.

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for the rights to the asserted patents or for rights to similar technologies.  Comparable license agreements are one factor that may inform your decision as to the proper amount and form of the reasonable royalty award, similar to the way in which the value of a house is determined relative to comparable houses sold in the same neighborhood.

If a license agreement is not sufficiently comparable, you may not rely on it in determining damages.  Whether a license agreement is comparable to the license under the hypothetical license scenario depends on many factors, such as whether they involve comparable technologies, comparable economic circumstances, comparable structure, and comparable scope.  If there are differences between a license agreement and the hypothetical license, you must take those into account when you make your reasonable royalty determination.

In determining the amount of damages, you must determine when damages began.  The parties do not agree on that date, and it's up to you to determine what the date is.  If you find that the previous owners of the asserted patents, Orckit-Corrigent, sold a patented article that includes the claimed invention within the United States, you must determine whether that product was marked with the patent number.

Marking, ladies and gentlemen, is placing either the word 'patent' or the abbreviation 'pat.' with the patent owner's number on substantially all the products that include the patented invention.  Under such circumstances, Smart Path has the burden of establishing that the previous patent owners substantially complied with the marking requirement by a preponderance of the evidence.  This means Smart Path must show that substantially all of the products made, offered for sale, or sold by Orckit-Corrigent in the United States that practice the asserted patents were marked.

If you find that the previous patent owners, Orckit-Corrigent, did not mark that article with the patent number, you must determine the date that Nokia received actual notice of the asserted patents and the specific product alleged to infringe.  Actual notice means that the patent owner or its agent communicated to the alleged infringer a specific charge of infringement of the asserted patents by a specific accused product or device or group of products.  The

filing of the complaint in this case qualified as actual notice, so the damages period begins no later than the date the complaint was filed, which is August 3rd, 2022.

If you find that the previous patent owners did not sell a patented article that includes the claimed invention in the United States or that those products were properly marked, damages for any infringement begins six years before this lawsuit was brought against Nokia.  That date is August the 3rd, 2016.

Now, with these instructions, ladies and gentlemen, we're ready to proceed to hear closing arguments for the attorneys for the competing parties in this case.

The Plaintiff may now present its first closing argument to the jury.

Would you like a warning on your time, Mr. Bennett?

MR. BENNETT:  I would, Your Honor.  Five minutes, please.

THE COURT:  Five minutes --

MR. BENNETT:  With five minutes left in my initial presentation.

THE COURT:  All right.  You have a total of 40 minutes.  Do you want me to warn you when you have used 35 minutes or --

MR. BENNETT:  Correct.

THE COURT:  All right.  I'll warn you when you've

used 35 minutes.

You may proceed to present Plaintiff's closing argument at this time.

MR. BENNETT:  Thank you, Your Honor, counsel.  May it please the Court.

It's the big moments like this that make me think sometimes of the little moments.  One in particular in preparing for this argument was a long time ago.  I was young, long before I understood the intricacies of intellectual property or any property for that matter.  I couldn't have been more than four.  I had a need for bubble gum at the store, didn't understand property rules well but I did understand that need and I reached for that gum and I took a piece, put it in my mouth while my mother's back was turned, and walked out this door with her as she walked away.

She noticed, turned around on her heel, and took me back inside.  Nothing happened except for I learned an important lesson that when you use property without permission, you must account for that use.

And that is more or less the principle that's being applied in this courtroom today.  The only difference is large corporations don't have mothers to help them account for that lesson.  What they do have is juries, and that has been your purpose this week.

And let me say right at the outset that we appreciate all

of the work that you have put in.  Smart Path and Mr. Pitcock, my entire team, we want to express our gratitude and thanks to you for enduring long sessions with lots of letters and new technology, I'm sure.  But we appreciate your service in helping us resolve this dispute, the one we outlined early this week.

We have a burden of proof.  You must determine under the greater weight and degree of credible testimony that we have met that burden, and I will summarize for you and we have shown to you this week why we have met that burden.  We embrace that burden.  That is a burden we have borne for a long time.  You saw the filing date or heard the filing date from the Judge's instructions, and we are eager to discharge that burden to you so that you may make the findings of infringement.

You're going to be given a verdict form, and that verdict form will have questions.  The first question you'll be asked is, did Smart Path prove by a preponderance of the evidence that Nokia infringed any of the following asserted claims of the asserted patents.  And the first -- and one of the patents at issue, as the Court instructed, was claim 12 and 15 of the '580 Patent.

Now, I want to say right off the bat right from the start, there was a lot of confusion about this during the trial.  We are not accusing a standard.  Nokia infringes the

'580 Patent, not the standard, and even Nokia's expert, Doctor Jeffay, admitted that.  Nokia is the infringer.

You've seen this before.  I'm not going to go through all of this again.  I do not have time to do that.  I have 20 minutes at this initial stage to take you through our entire case and their invalidity case.  I will not focus on all the proof.  I can't do that.  You have your notes, your memory, and the evidence that came in.  I will focus on certain pieces.

This is claim 8 and claim 12.  12 is the claim that will be on the form.  8, as the Court instructed a moment ago -- claim 12 is a dependent claim that hinges on claim 8, and we spoke a lot about that claim, especially element B.

Claim 15 is also infringed, and we proved that to you by two main ways or three main ways.  One is the source code.  We put up analysis to you.  This is one that you looked at, Plaintiff's Exhibit 3, that came up several times during trial, about the two tunnels.  The first and second tunnel requirement of claim 8 and 12, the source code revealed it.  That's Nokia's own source code that function creates two tunnels.

There was no response to that evidence at this trial except excuses which we'll address.

Doctor Valerdi took you claim by claim, element by element, as to the source code and technical materials that

satisfied each of those elements.  You'll recall looking at this particular piece of technical material.  That's Joint Exhibit 10d that discusses the control plane.  We heard testimony from Doctor Valerdi about that yesterday, about how that model -- how modeling S2L as a point-to-point LSP in the control plane signals to the source code that enables the infringement.

We talked about notifications distributed over the communication network.  We looked at their technical materials--that's Joint Exhibit 27c--and how that shows infringement of that limitation.

So we would submit, based on all of that evidence, that we have proven by a preponderance of the evidence, by the credible -- by the greater weight of the credible testimony that Nokia has infringed claims 12 and 15.

You'll next be deciding claim 59 of the '599 Patent.  Both the '580 Patent and the '599 Patent are product apparatus or systems claims.  The Court instructed you about those.  You'll see instructions in the charge when you receive it about how to weigh the evidence as applied to those claims.

We saw this schematic several times at trial and why that schematic, among the other things, the testimony and the source code from Doctor Valerdi, shows Nokia infringed each of those elements of that product apparatus or system.

We start with the schematics and comparing Joint Exhibit

3, the patent, the '599 Patent, figure 1 on the right, and on the left figure 2 from Joint Exhibit 46b, it's also in Joint Exhibit 46a, to show the ring network at layer 2 that the claim limitations require.

Now, there's also discussion about those very kinds of layouts, those -- those topologies of ring or hub -- or the hub topology in their technical materials, and Doctor Valerdi walked you through that. He then walked you through the OSPF functions in the source code that show how the egress nodes operate to infringe. The metric requirement, all of this source code in Plaintiff's Exhibit 3, he walked you through, analyzed, and showed how Nokia infringes.

So when you get to claim 59 of the '599 Patent in Question 1, you should answer yes.

As to claim 1 and 3 of the '010 Patent, this is an inducement claim. You'll get -- you will see the instructions about inducement, and I'll talk a bit about that special requirement in a second. That was the nine elements of the '010 Patent. Most of the discussion focused on element B, which I've highlighted there, and that's where I'll focus my presentation now.

First, Doctor Valerdi walked you through the source code and looking at the various functions that show use of the technology in Nokia's source code. All of this was reviewed in detail and with testimony, the ATM, or asynchronous

transfer mode, right from the -- right from the code.

Now, Nokia adopted a different approach. Rather than looking to the plain and ordinary meaning of hub and the claim language, a hub comprising, and then the additional details, it took a different position. And it took different positions at different times during the case.

At the start of the case what they told you was Nokia does not make a hub, and, therefore, does not infringe that limitation, but that story soon changed as the proof came in and they said, well, it's a layout issue, where the hub is in the layout, the topology.

But more evidence came in and it changed again. Even as we pointed out from their own schematic such as figure 105 from Joint Exhibit 24a that their own documentation shows the use of routers as hubs, exactly what we'd argued. And, again, they said a hub is not a hub. It's a dumb device, said Doctor Jeffay. It's a layer 1 device, he said differently. Then it was a device on a layer 3 network. The weight of the credible evidence, the source code, the plain and ordinary meaning, a hub comprising a plurality of ports configured to receive and transmit data frames, Doctor Valerdi provided you, and it is what we've said it is--a router that acts as a hub. That is the greater weight of the credible evidence. That is the plain language of the claim. To side with Nokia is to alter that claim and should be rejected.

1245

So the answer to the blank on claim 1 or claim 3 of the '010 Patent should be yes.

Now, like I said, there is a special reason for that with the inducement.  There's some special requirements for that, for inducement.  You have to show some knowledge of the patent.  The Court's instructed on that already.

We'd refer you to Plaintiff's Exhibit 8.  That is where Nokia was purchasing Orckit-Corrigent product, the CM-4000 series that was marked with the product at the time.  You can look at the service contract that shows that services were performed where they actually had to unpack or install.  Mr. Tamir testified about that.

We would refer you to Mr. Patel's deposition testimony which you heard by video where they talked about willful blindness.  That's in your instructions.  No product clearance.  Right?  That principle of product clearance, Mr. Patel said when Nokia is about to release a new product, it doesn't make any effort to see if that new use will infringe.  We would submit to you that that satisfies the inducement requirement.

Now let's talk invalidity.  Now the burden shifts.  We no longer bear the burden of proof; Nokia does.  And that burden is much, much greater, an abiding conviction that the truth of the party's or Nokia's factual contentions are highly probable.  There is nothing highly probable about the proof

they brought you about the two patents they challenged on validity grounds.

Now, the '599 Patent, which we've already discussed, they did not challenge. They did challenge the '580 Patent, but it is valid. The Aggarwal and RFC 4875 reference or combination does not -- the evidence they provided does not provide an abiding conviction of obviousness for the most part because if it's so obvious, Doctor Jeffay should have been able to produce at least one real-life time when those two references were combined, when someone combined the two things that those two separate pieces of what we call prior art taught in reality and did what Doctor Jeffay says was obvious. They gave you nothing. In all of the time that that prior art exists, prior to the patent, they could not provide a single instance where it had happened.

The other is they are too different. Aggarwal talks about how to increase rate on one tunnel. Ours adds another tunnel. That makes them different and, therefore, our patent is invalid [sic]. And even if you think it might be close, if you think it's close, they haven't met their burden because close isn't clear and convincing.

No motivation to combine; the '580 is -- is valid.

Quickly on the Shah reference, we've color-coded this. Doctor Cole talked about this with you. I'm sure it's in your notes. But the differences here are too great to ever

1247

be -- for the reference on the right, that's the interface, the one with the cloud in the center, for that to ever invalidate our patent.

You'll notice that the edge devices, which is the focus of our patent, is attached to two different kinds of interfaces.  So on the bottom of the center diagram, one is purple, one is green.  If you look on the right on the edge devices such as the one in the bottom left corner, they're both green.  That means that's one interface, not two.  Ours taught two interfaces.  They're different.  Therefore, the Shah reference cannot invalidate our patent.  There is no clear and convincing evidence that Shah renders our patent invalid.  So when you reach that portion of the jury charge, you should answer no on each one.

"Question 3.  Has Smart Path proven by a preponderance of the evidence that the previous owners of the asserted patents, Orckit-Corrigent, satisfied the marking requirements?"  Now, marking is something that we have to show, we bear the burden of, to acquire all of the damages we seek in this case.  You heard testimony from Mr. Tamir on this.  The Court's instruction is only products that practice the patents, only products sold in the United States qualify, and Orckit marked those qualifying products as required by law.

Well, first we have Mr. Tamir's testimony that back in 2000 when he learned a lesson about a dispute that he had, he

1248

instituted at Orckit-Corrigent a firm policy of marking, that all products that practiced any patents be marked.

THE COURT:  You've used 15 minutes, counsel.

MR. BENNETT:  Thank you.

We showed you the label, the label that was applied to the CM-4000, a series of products that came from Orckit-Corrigent's records.  We showed an example of an implementation of Mr. Tamir's policy.  Even Mr. Valley confirmed that in purchasing products around 2009 from Orckit-Corrigent itself, it would have been buying products at a time from Orckit-Corrigent when it was marking.  And there's -- they've brought you no evidence that that didn't happen.

What they tried to bring you was that box, the CM-401x, and Mr. Tamir clearly explained that the particular box they had never made it out of a laboratory in Israel, much less the United States.

Finally, the CM-100, Doctor Valerdi's testimony was that it didn't practice.  So the CM-100 doesn't apply in any of that.  All the proof is in, and Smart Path has proven marking.

So has Smart Path proven by a preponderance of the evidence marking?  Yes.

Now, damages.  What we seek as compensation for Nokia's proven infringement is less than a penny per dollar sold. Now, the numbers, they're big.  We understand that.  But what

drove the number, the big number, wasn't us as much as the sales from a large company of infringing product.  And we're not asking for a penny more than what we're entitled to under the *Georgia-Pacific* factors or a penny less.  A penny more would be a windfall for us and a penny less would be a windfall for Nokia.

We're asking for fair compensation for the '599 Patent, $13,469,122; for the '580 Patent, $16,162,000 -- or $16,162,946; and for the '010, $16,162,946.

The weight of the credible evidence is in, Doctor Valerdi, even some of the Defense witnesses have shown their own documents, their own source code, the technical materials, and the credible testimony have proven infringement.  And the time for Nokia to account for that infringement has arrived.

We ask that you find yes on each question of patent infringement, no on each claim of each patent for invalidity, and the full amount of our damages on the last question because we marked.

Thank you, Your Honor.

THE COURT:  Defendant may now present its closing argument to the jury.

Would you like a warning on your time, Mr. Dacus?

MR. DACUS:  Yes, Your Honor.  If you would let me know when I have 10 minutes and 2 minutes left, please?

THE COURT:  I will warn you with 10 minutes

remaining and 2 minutes remaining.  You may proceed.

MR. DACUS:  Thank you very much, Your Honor.

Good morning.  I'm going to start this morning where I started with you on Monday morning, and that is to say on behalf of myself, Jeff Valley as vice president of Nokia, all the men and women who work at Nokia, the other lawyers at our table, a very sincere thank you.

I started with you on Monday and told you that this case is very important to Nokia, and I told you that this case had at least from our perspective broader implications and broader ramifications.

Our U.S. patent system starts with our U.S. Constitution, and the basis for our founders putting a patent system in there was to promote the progress of science.  And I asked you, and I know you did, as we went through this case to ask yourself periodically whether or not what's going on here is about the promotion of the progress of science.

It's important to Nokia because, as you know, and you probably know a little bit more now, Nokia's been around for more than a century, since the 1800s.  They've been an innovator in this country.  Some of the most important inventions to our country have come from Nokia and its organizations under it.  Nokia itself has thousands of patents.  Nokia's not mad at the patent system.  Nokia absolutely wants to protect the purpose of the patent system

and the integrity of the patent system.

And fundamental to that patent system is the agreement that the patent owner makes with the government when they get a patent. And that is, you get a very specific, very well-defined piece of property, and you don't get to expand it. If you get 21.413 acres, that's what you get. You don't get to go say, oh, I got 25 in an effort to try to go get tens of millions of dollars. When we make bargains and agreements, even with the government, we need to keep them.

Now, we talked a little bit about the history of these patents and how we get to this courthouse. And you remember this slide, but we have a few more facts now that the evidence is in, and I want to cover these because I think it's important. When jurors decide cases, you decide cases, at least from my perspective, on two bases. One is you use your brain. Right? You use your intellect.

Remember on Monday, we talked about we need folks and we want folks who will listen to details. You probably really believe what I said now. And, you know, there are people who are detail-oriented, people who are in the middle, and people who aren't detailed. But all of you agreed that you would listen to the details in this case and make a decision. And I know you've done that.

The details are not the only thing. Common sense plays a role. When you walked through those doors on Monday, you

brought with you your common sense, and you should take it back to the jury room with you.  And it plays a big role, and here's why.  When we look at the history of these patents, they come from a company, as you know, called Orckit-Corrigent.  Orckit was a modem, a DSL business founded in 1990.  By 2000, by Mr. Tamir's own words and admission, it needed to reinvent itself from scratch.  That's what he said--from scratch.  And that's what it attempted to do.

But it attempted to get into a business, this router business, that had existed for the better part of a decade.  And I know they take exception with that, but you heard Mr. Jeffay say that U.S. companies Like Cisco, Juniper, Nokia of America, and others had been making routers for the better part of a decade.  The industry was well-developed.  Some of the best and brightest engineers had participated not only in building routers for their own companies but in these standard-setting organizations where they got together and brought together the best ideas for industry standards and how these things should operate.

Now, Orckit, between 2000 and 2014, as we know, attempted to make it in this business, and they didn't.  And, look, we don't derive any pleasure by saying they didn't, but it's a fact.  They simply were not successful.  You saw the financials.  They lost tens of millions of dollars.

By Mr. Tamir's only -- or by his own admission, they were

1253

attempting to sell their products in countries like Guatemala and Paraguay, which I had to go Google that to even know where it is in South America, and in India.

Think about what's going on in this lawsuit. Sometimes we get lost in the forest and we're bumping into the trees and we need to step back and look at the forest. Think about what's going on here. The folks at this table for Smart Path want you to believe that they came up with these inventions that were revolutionary, that people in the router business need to use, and that they're worth tens of millions of dollars. That's what they want you to believe at a high level.

There's a couple of things that happened in this trial and they relate to that time period between 2000 and 2014 that I think are important. You've probably already thought about this. Mr. Tamir said to you, when we asked him, and their experts confirmed, well, these patents that you claim are so important, did you put them in your own products?

Mr. Tamir said, I don't know. Other of their expert witnesses said, no, they're not in there. They refused to even say that these patents that they claim are valuable, they put in their own products. If they were valuable patents, wouldn't you put them in your own product?

In addition to that, Mr. Tamir said he's never even read these patents. Maybe I'm the only one in the courtroom that

scratched my head at that, but here we are asking for $50 million on three patents that we claim were revolutionary and important, and Mr. Tamir has never even read them. You read them before he did, apparently.

By 2011, Orckit was in financial trouble, as Mr. Tamir told you. Between 2011 and 2014, he tried to license or tried to sell the patents. No takers in the marketplace. Nobody offered anything; none.

Again, we're using our common sense here. They're here telling you that these are very valuable patents worth tens of millions of dollars, they tried to sell them, tried to license, no takers. By 2014, they filed bankruptcy. We know for almost three years the bankruptcy trustee or liquidator tried to license or sell these patents. No takers. No takers.

Mr. Tamir tried to buy the patents out of bankruptcy. We know from his own words that the bankruptcy liquidator or trustee said, no, you can't do that, that's self-dealing, can't do that. So he put up his friend, Mr. Yehuda Binder, who you heard from yesterday, they formed this Orckit IP company, which by Mr. Binder's own admission yesterday out of his own mouth he said was for the sole purpose of trying to make a bunch of money, and then Mr. Tamir funded the purchase of these patents in 2016. And he got -- and as he said, he bought out the residual so that he got the money on the back

1255

end of any proceeds from these patents.

From 2016 to 2020, Orckit IP--Mr. Binder and Mr. Tamir--tried to sell these patents, tried to license these patents. No takers. So literally from 2011 through 2020, there was a continuous effort to license these patents or sell these patents. No takers, none. Just at a common sense level that's not Nokia saying that these patents weren't valuable; that's others in the marketplace saying it.

In 2020, you know that Orckit IP joined forces with Mr. Pitcock. Mr. Pitcock agreed that for 15 percent of any proceeds from this lawsuit, he'd start filing lawsuits, and that's what he did. And that's how we get here. And you know that Orckit IP gets 42 percent of anything that may be awarded.

What you also know, although you didn't learn it from Mr. Tamir, he told you that he gets up to $4 million based on the residual. But we now know, based on the deposition testimony from Mr. Binder yesterday, that he and Mr. Tamir actually have a handshake agreement where Mr. Tamir is going to get 80 percent of that 42 percent.

Now, now that Nokia finds itself here, we need to ask for your help. And you know from the Court's video that he played on Monday and from what the Court's told you, the way that we ask for your help is to ask you to answer these questions.

This question -- first question in the Court's verdict

form to you when you go back to the jury room is this:  "Did Smart Path prove, did these folks, prove by a preponderance of the evidence that Nokia infringed any of the following asserted claims and asserted patents?"

And then it's going to have a question for each patent, it's going to ask you yes and no.

What I want to do is take just a few minutes to review the evidence with you.  It's your decision to make.  You know what we think the answer is, but the reason we have trials is for you to make these decisions.

I want to review with you what we think the evidence shows.

Let's start with the '010 Patent.  This is the patent that unequivocally requires a hub.  And I've highlighted the first portion of the claim.  And remember what we're doing for infringement.  They have to show you that every word in that claim is found in our product, every one.  It's just like soccer ball and football.  Remember where we started?  Every word.

This claim requires a hub.  It requires it in three different places.  I've only highlighted one.  There it is in their patent--network device hub.  There it is in the claim--hub.  That's what's required.  Nokia does not make hubs.  You heard Mr. Valley testify we've never made hubs.  We make routers and switches.  That's not the end of it, though.

1257

Mr. Jeffay testified that -- or Doctor Jeffay testified that a hub and a router are two very different things.  Now, in my experience, jurors look for someone without a dog in the fight, some third party to give them evidence, and in this case on this issue of whether or not there's a hub, you have it.

Think about what the evidence is.  Here's a textbook by these two gentlemen who are experts in this industry, Mr. Kurose and Mr. Ross, and they covered this issue of whether or not a hub is a router.  This is a textbook that's used by tens of thousands of students across the United States when they are learning about computer networking.  And what these two gentlemen say -- by the way, they have no dog in this fight.  They wrote this textbook long before this lawsuit, six editions' worth, by the way.

And they say a hub is a physical layer device that acts on individual bits rather than frames.  So remember that for physical layer, that's cable, physical connecting cables, that can only be layer 1.  And remember that the claim here requires that the hub be layer 2.

So are hubs and routers the same?  That's what the Plaintiffs want you to believe.  But in the textbook hubs and routers are opposites.  Here is hubs, here is routers, they do the opposite of each other.  Think about what the Plaintiff has to get you to believe to answer this question yes.  They

1258

have to get you to believe that when they wrote hub in the patent claim, that's the same as a router.

Mr. Jeffay said, Look, I've been doing this for more than 30 years in my laboratory.  He showed you pictures where in '97, yeah, they were using hubs.  By the early 2000s, hubs were being removed, replaced by switches and routers.

The textbook confirms that.  In the early 2000s, ethernet experienced yet another major evolutionary change.  Ethernet installations continued to use a star topology, but the hub at the center was replaced with a switch.  Switch and routers replaced hubs.  They're not the same thing.

Based on that, the evidence is that there is no infringement because there's not a hub.

But there's another reason there's not infringement with respect to the '010 Patent, and it's this:  The claim requires a plurality of edge devices.  So, remember, plurality means two or more.  It means more than one, so two or more.  So for this claim you have to have three devices.  You have to have a hub and two edge devices for a total of three.  That's what the claim requires.

Over here is the figure that Smart Path pointed you to, and you remember that their expert Doctor Valerdi said that this edge device, this is what he wants you to believe is a hub.  He said, Oh, it's a router.  But believe me, it's actually a hub.  Well, if that's true, and it's not, but if

it's true, then there are only two devices here, and only one edge device.  This would be the hub, according to the Plaintiff.  This would be the edge device.  They need two edge devices according to the claim.  They have to have a plurality.  That's the second reason that that '010 claim is not infringed.

Let's turn to the '580 Patent.  This is the patent that requires sharing of resources between tunnels.  And by the way, it doesn't just require the creation of a second tunnel; the two tunnels actually have to share resources.  And you remember that the purpose, the Orckit engineers when they invented this, the purpose was to try to create more capacity, more capacity in these devices.

But what you know from listening to Mr. Valley and to Doctor Jeffay, that when you combine resources and tunnels, there's actually problems with that.  The primary problem is it affects security in an adverse way.  It creates all these other collisions that you heard Doctor Jeffay testify about, but security is a big issue.

Think about the computer networks that Nokia's equipment goes into.  You think security is important?  Absolutely.  Of the utmost importance.  So what did Nokia do about this capacity problem?  They solved in a very different way.

Mr. Valley told you this, Doctor Jeffay told you this.  They just make their routers bigger.  They don't have tunnels

combining resources.  The router on the left here, they said, was six feet tall, over six feet tall, weighed more than a thousand pounds.  So to the extent Orckit has a valid patent solving a legitimate problem, Nokia solved that issue in a very different way and for a very good reason:  because they need to preserve security.

Now, this tunnel issue, Nokia's products operate according to the RFC 4875 standard.  And you don't need to take my word on that.  You can look through all the Nokia documents, including JX 27, 171, 174, 368, on and on.  Nokia, with respect to this issue, this P2MP, which is what the Plaintiff says infringes, we follow the industry standard RFC 4875.

And it's important that we follow the standard because, remember, our products go into computer networks that have to interoperate with other manufacturers like Juniper, Cisco, and on and on.  So we can't deviate from the standard because then our products would not interoperate and customers wouldn't buy our products.

I know counsel said a second ago they're not accusing the standard.  Well, I think it depends on when you ask them.  You remember when Mr. Haynes cross-examined their expert witness and said, sir, didn't you create a report that was hundreds and hundreds of pages and didn't you point to the standard 4875 for infringement?

And you remember the expert said, yes, I did.

But you didn't tell the jury about that.

And he said, no, I didn't.  I kind of hid that from the jury.

MR. BENNETT:  Objection, Your Honor.  That's not the evidence.

THE COURT:  Overruled.

MR. DACUS:  And you know --

THE COURT:  It's closing argument.

MR. DACUS:  And you know why they didn't want you to know about 4875?  Because after he wrote that report, we sent them a report that said, you know what, there was a draft 4875 that came two months before your patent.  The patent wouldn't even be valid if 4875 infringes, your patent's not going to be valid.  So you know what he came to the courthouse and he did? He shoved that 4875 standard to the side, didn't he?

But make no mistake about it--our products operate according to the standard, and the standard does not infringe. The standard of 4875 creates one tunnel, one tunnel.  It's confirmed in our source code.  Doctor Jeffay showed you the source code.

We asked him, "How many tunnels can this tunnel ID identify?"  In our source code -- they're fond of source code. Our source code says you have a single tunnel ID.

We even asked Doctor Valerdi.  Mr. Haynes -- and by the

1262

way, the Judge has told you twice now, both in his preliminary instructions and again today, watch out for folks who say one thing when their lawyer's asking questions and then another thing when the other side asks questions.

And you saw that happen many times here.  Their experts would say one thing on -- when their lawyer was asking questions, and then really pressed on it, would change their tune.

And it happened here.  This is the trial transcript.  Remember, we get that every day.  So this is Doctor Valerdi's testimony:  In the context of the industry standard that defines how to create this point-to-point LSP, you agree with me that a point-to-multipoint LSP is one tunnel, not two.  Correct?

And he said, "In the context of the standard, yes."

Well, folks, we use the standard.  That's an admission that it's one tunnel, not two.

"You also agree with me that what you have accused of infringement in this case as being two tunnels is a point-to-multipoint LSP.  Correct, sir?

"Among other things, yes."

That's their own expert, when pressed, having to admit it's one tunnel, not two.

And they got a second expert.  He can't deny it, either, Doctor Cole.  "So even though there's resource sharing between

S2L sub-LSPs --"  Remember what this fight is about.  There's these sub-LSPs that are actually paths.  These folks want to say they are separate tunnels, they are actually two paths within one tunnel.  That's where the fight is.

When pressed by Mr. Frist, "Doctor Cole, it's your opinion that the resource sharing does not satisfy the claims of the '580 Patent.  Right?

"That is correct.

"The reason that you don't believe it's sharing -- resource sharing between tunnels is because there's only a single P2MP LSP.  Correct?

"That is correct."

One tunnel.  Has to be sharing among two tunnels, and there is not.  And for good reason--because we don't solve the problem that way.  We solve the problem by just building a bigger router.

Third patent.

So the answer to the question of infringement we believe the evidence says is a no.

Third patent, the '599 Patent.  This is the patent where layer 2 has to have visibility into layer 3.  You've seen this.  You'll probably dream about this figure this weekend.  You've seen this a bunch.  This is where the device over here has to have visibility to the external layer 3.

This is the claim.  The claim requires a layer 2 ring

1264

network, and then it requires a path from that layer 2 to the external layer 3 network.  If either one of those is true, there is no infringement.  If either one of them is true, there is no infringement.  So let's look at whether or not there is a layer 2 ring network.  You've seen this a bunch.

Let's be clear on this.  This red ring is secure VPLS infrastructure.  That's just a boundary for showing that what's within it is secure.  It's not connections.  Mr. Valley took the stand, vice president at Nokia over these products, and he told you what's going on here is a mesh network, not a ring network.

By the way, there was -- I didn't understand.  Doctor Valerdi said yesterday that perhaps Doctor Jeffay or others said there was only one BSR?  There's always been two BSRs on this diagram.  But this is a mesh network.  Doctor Jeffay explained it, Mr. Valley explained it, and you know what?  Nokia's own documents explain it.

And I noticed that counsel showed you this document just a few minutes ago, but he zoomed over it pretty quick.  I want to stop and let's take the time.  By the way, this is JX 46a at page 41 to 42.  That's where this is.  These are Nokia's own documents.  One of the advantages of using VPLS for this application is that VPLS instances can be automatically established over both hub-and-spoke and ring topologies providing sub-ms resilience.  Regardless of the fiber

plant -- now, remember, fiber is layer 1.  Right?  Fiber is the connection.  That's layer 1.  This claim requires layer 2.

So what this is saying is regardless whether you have hub or ring in layer 1.  Well, if the ring is in layer 1, that doesn't meet the claim limitation.  This requires a ring in layer 2.  It enables a full mesh.  So what do we have in layer 2?  VPLS enables a full mesh, not a ring.  So our documents make absolutely clear that in layer 2, just as Mr. Valley explained, there is a mesh network and not a ring network.

When pressed on this, Doctor Valerdi, Smart Path's own expert -- keep in mind who has the burden here--Smart Path.  So let's talk about what the evidence is on this ring issue.

Mr. Valley, the vice president, told you it's a mesh.  Doctor Jeffay, who studied all the documents, said it's a mesh.  Plaintiff wants you to believe it's a ring.  So we asked him, "You see right there in that document, sir, there where it says VPLS enables a full mesh to be created between the BSA and the BSR?"

And he said, "Yeah, that's kind of confusing to me."

Well, they have the burden.  Shouldn't he have said, Well, no, that's a ring?

And look at the question below:  "You understand that a full mesh connection is not a ring connection.  Correct?

"I absolutely agree with that."

So all the evidence except for one expert who's confused

is that this is a mesh network, not a ring network.

What about this issue of whether or not there is a path to the external layer 3 network that's required by the claim? Well, remember this blow-up. This is that same diagram blown up where we have the BSAs and the BSRs and out here sits the layer 3 external. So to meet this claim to infringe, these BSAs have to have visibility and communicate out here. Do they do that? Absolutely not. Absolutely not.

You remember that the BSAs, when they communicate with the BSR, it terminates. All of our documents say it terminates. And you know who else agrees with that? The Plaintiff's own expert, Smart Path's own expert. When Mr. Haynes pressed him on this issue, he said, "These BSAs" -- right here -- "that are over here on the left, do they have visibility out here to the network structure of the networks that are on the right side of the BSRs?

"No, they do not."

So that's all that the BSA can do--this is Doctor Valerdi, the Plaintiff's expert--is forward that traffic inside the VPLS service directly to the BSR and that's it. They don't communicate to the external third layer like is required by the patent. And that's a second reason that there's not infringement --

We pressed Mr. Valerdi on it -- Doctor Valerdi on it. "You would agree with me, sir, that these two nodes are not

1267

connected to the external network.  Correct?

"Yes, I agree.

"You would also agree with me, sir, that these BSA nodes do not have visibility"--remember the patent requires visibility--"beyond the BSR into the layer 3 external.

"Correct."

Now, they tried to talk about this OSPF routing, at least he did when he was questioned by his lawyer, to say that gives visibility.  But then when Mr. Haynes pressed him on it, here's what he said:  "These BSAs, if they are using OSPF routing, they would only define paths at most from the BSA to the BSR.

"Not beyond.  Correct?"

In that example, yes.

Well, that limited example is how our products work. That example is how our products work.  So there is no visibility.

And so, again, we believe that the evidence strongly says there's no infringement of any of these patents.  You don't get to take your grant from the government of 21.413 acres and grow that into 25, 50, or a hundred acres.  You don't get to do it.

THE COURT:  Ten minutes remaining.

MR. DACUS:  Thank you, Your Honor.

Let's switch topics and talk about this invalidity issue.

For the '580 Patent, the one related to the tunnel issue, our products follow RFC 4875, which I think, as I've just shown you, does not infringe. But if it does, if you buy their argument that RFC 4875, the standard, does infringe, well, the draft of that standard was in October of 2005, two full months before the '580 Patent.

And you know what? The same gentleman, see his name right there, Mr. Aggarwal, who helped author this standard, got him a patent several months before also. And everything that's in this RFC 4875, everything, was in these two things right here. Just like the Judge said--if it's obvious and it came before, then it's invalid.

So if you believe that 4875 infringes, that there actually are two tunnels sharing resources, that patent is absolutely invalid.

Doctor Valerdi even admitted it to Mr. Haynes. "Let me try it this way," is what Mr. Haynes said. "If Nokia implements RFC 4875 standard that you have accused of infringement, and that standard was published before the '580 Patent"--which we know it was--"that means the '580 Patent is not valid. Correct, sir?

"I agree."

Because he had to.

Let's talk about '010. This is the hub patent. You know we think there's no infringement because hub is different from

a router.  These people got a deed on a hub; now they want to expand their property and say a hub is a router.  If they can convince you of that, if they can convince you that a hub is actually a router, then there was a gentleman by the name of Shah who had a patent that included routers that had every single element, and you saw Doctor Jeffay walk through it with you, of the '010 patent, and it included routers.  So if they can convince you that a hub is the same as a router, which I don't think they should be able to, then that patent is, likewise, invalid.

Let me talk about damages.  What I said to you about damages when we started was we don't think we owe anything.  Still don't think we owe anything.  But what I asked you to do, if you remember, is listen to their damages evidence and the methods and the processes that they go through to get to this $48 million.  Because what you can often learn about a lawsuit if you listen to how people get to these real big numbers, you can learn what a lawsuit's really about.  And never is that more true than what happened in this courtroom; never.

They put up Doctor Cole.  What you're supposed to be doing is identifying the features in these products.  And remember these routers have thousands of features.  These patents, to the extent they apply, are tiny, tiny portions of these routers.  So they're supposed to identify what value can

1270

be assigned to these patents.

Doctor Cole said, Well, I'm going to assume there are nine features.

Nine?  The product manual for this thing is 2,000 pages long, and you're going to assume nine?

Yeah, that's what I did.

Well, why did he do that?  You know why.  If you assume nine instead of 2,000, you can get to a big number.

And then let's just say this about Doctor Cole.  From that decision and that assumption that he made, everything he did was wrong because everything flows from there.  But it goes further than that.  He's supposed to apportion out of that.  And you can read, I was reading along with the Judge, you can look on page 22 of his instructions when you go back there, you are supposed to apportion.

Did Doctor Cole do it?  Nope.  Asked him three different times three different ways, did you deduct out all this old stuff?  Remember, he said he was giving credit to Smart Path for standards that existed long before these patents.  You're not supposed to take credit for other people's work.  You're supposed to deduct that out in taking an evaluation.

Worse yet, he did a separate evaluation for all three patents for one product.  Remember, we're just looking at the -- he was looking at the 7250.  He assigned, you know, 71 percent for all three patents, and neither he nor Mr. Dell

said, well, look, we can't -- if the pie is a hundred percent, we can't for these three patents assign more than a hundred percent.  He and Mr. Dell just added it up.  I mean, if you did that, that's 214 percent.

What did Mr. Dell do?  Again, when you go back there, if you get to the question of damages, and I hope you do not, but this tells you a lot about overreaching and overstretching, look at page 22 and look at the first and second factor that the Judge just told you to look at for damages.  He said look at licenses.  That's what the law requires--look at licenses of what other people paid for those patents, which was zero, by the way, which tells you a lot about the value, and what Nokia paid in similar circumstances for similar technology, for similar patents.

This is a picture of that flip chart that I went through with Mr. Dell.  All of these -- like these are all licenses that Nokia paid for, for patents that were similar technology on the very same products, and here is in general what was paid--somewhere between $350,000 and $1.2 million.  Same products, same types of patents.

And remember that we talked to Mr. Dell about is this like house shopping?  The Judge actually just read to you in his instructions that that's exactly what you're supposed to do.  This is like house shopping.  And what these folks want you to believe is that we should pay $48 million for a house

1272

in a neighborhood of houses that's hundreds of thousands of dollars.  I don't know what to say about that.  I do know what to say about that, but I'm not going to say it.  It's unreasonable.  It's completely unreasonable.

And for fewer patents, only three compared to 60, 40, 13. It tells you a lot about what's going on here.

The Judge also said that you're going to get a question about whether or not a royalty, if you get to the question, it should be a lump sum or a running royalty.  And, of course, you should base that on the evidence.

What these folks at the Smart Path table want you to award is this running royalty.  That's what they want.  But look at what the evidence says happens every time in this industry--lump sum.  Nokia pays a lump sum.  So if you get to that question, the answer should be lump sum.  That's what people pay in the industry, not a running royalty.  And people don't pay $48 million for three patents.

Ms. Bennis explained to you that if you --

THE COURT:  Two minutes remaining.

MR. DACUS:  Thank you, Your Honor.

If you look at this reasonably, a million dollars lump sum, if all three patents are infringed, is what would be awarded.

I'm going to conclude here, and I'm just going to kind of talk candidly with you.

The route to the courthouse and the things that are going on in this lawsuit and this trial are not what our U.S. Constitution is about and our patent system.  This is not about the promotion of science, and that's what we're supposed to be doing here in our patent system is promoting science.

What's going on here does not serve that purpose.  And you know what?  It needs to stop.  It needs to stop.  I cannot stop it.  Mr. Valley cannot stop it.  Mr. Haynes, Mr. Frist, and none of the men and women at Nokia can stop it.  You know who can?  Just like that video said that you watched, just like the Judge has told you, when somebody gets accused falsely, you have the opportunity to come talk to eight folks and let them stop it.

And at the base, if we're just talking in plain terms, that's why Nokia's here--to ask you to please stop it, because if you don't, it will not stop.  You know that.  You've heard what this is about, and that's bottom line what we ask you to do.

Now, let me say this.  I'm going to say thanks one more time, and I'm going to tell you this:  It's not conditional. No matter what you write down on that verdict form, you have come to the courthouse, you've taken your time, that's all the folks at Nokia ever wanted to do is present the facts to eight folks and let them make a decision.

So at the end of the day, thank you.  Regardless of what

your verdict is, thank you very much for your time.

That's all I have, Your Honor.  Thank you.

THE COURT:  Plaintiff may now present its final closing argument.  You have 20 minutes remaining, Mr. Bennett. Would you like a warning on your time?

MR. BENNETT:  Yes, Your Honor.  Five minutes, please.

THE COURT:  I'll warn you with five minutes remaining.  You may proceed.

MR. BENNETT:  I hope you understand what it means to bear the burden of proof.  On hearing Mr. Dacus' presentation, how much speeding through the record he just did, the many, many false statements about what the record shows, the mischaracterizations, the taking statements out of context, their own documents out of context, saying things are mesh network even though on their face and by their own definitions show they're not, and they want to bring those things up and they think if they just say them enough, you might believe them.

But you'll follow the evidence and the proof, what your memory about what the witnesses actually said in context, and we're going to be okay.  We're going to be okay.

I want to start with one part of the jury charge that you're going to receive in a minute when you go back to deliberate, and that is there is a stipulation about source

code.

And I want you to step back and appreciate this for just a minute. Most of our claims, most of our lawsuit has been based on source code. And whose source code? Theirs. Their source code. We didn't write it; they did. But what we did have is an expert go through it and pull out the pieces of it that prove indelibly infringement. We called it earlier in the case the DNA of the case, and DNA can make you innocent or it can show you did wrong.

How much source code of their source code did they bring you this entire trial to show they're innocent? One piece. One piece. Doctor Jeffay tried his hardest and he reached in there for that tunnel ID and he said, there it is, that's the piece of source code. Out of three patents and several claims, they brought you one piece of their own source code, and it was nothing.

Doctor Valerdi took that stand and showed you exactly why even the source code Doctor Jeffay cited proved our case, the tunnel ID in their own source code shows multiple tunnels. And what does the patent require? A first and a second.

And what does the quote language say? A primary and a secondary. That DNA evidence that runs throughout this case that they rebutted one time with a weak effort should be all the proof that you need to know the game that's afoot here.

I don't know why they keep trying to insult the now

1276

bankrupt Orckit-Corrigent, but they spent about the first 10 minutes of their presentation doing it. Mr. Tamir, yes, it is his baby. He wants to hang onto the one thing, the one thing that remains of his company after what happened. Mr. Dacus got up again, telling you about the tens of millions of dollars that they lost.

Who isn't listening to the evidence? What did Mr. Tamir tell you from that witness stand? Why did they lose tens of millions of dollars? Because big companies started using their technology, and it started that vicious cycle he testified to. And that vicious cycle is happening in this courtroom and it just happened in that presentation.

Yes, they sold products in Guatemala when they got closed out of the U.S. market. But you know what isn't the United States or America like they tried to show you when they put those materials in front of Mr. Tamir? Guatemala.

Marking, they haven't shown you a shred of proof that any product Orckit-Corrigent sold that went into the United States wasn't marked. The best evidence they could bring you was Guatemala.

The patents aren't valid or are somehow worth less because no one wanted to buy them. Somebody wanted to buy them. He forgot that. Hudson Bay. You heard about that. And the deal fell apart because of personal differences between the two proprietors. Mr. Dacus wants to be about

forthright discussions of the evidence.  Why didn't he mention that?  Because it's bad for his case.

And Mr. Tamir did pursue and has pursued.  He's not party to this case, but who could blame him?  The man built a company from nothing, he was proud of it, it was one of the most important companies in his nation.  And, yes, he's affectionate about it, the only thing that remains.  I don't know why a size of -- a company of Nokia's size thinks it's fitting to spend time criticizing, but I guess that's where we are.

The '580 Patent.  I want to be real clear.  There's instructions in your charge about how you're supposed to apply claim terms, and Mr. Dacus just tried to misdirect you.  He tried to use the patent's purpose to try to get you to apply less than the claim language requires.  That is wrong.  The jury instruction tells you that.  The patent's purpose, its embodiment, doesn't matter for purposes of the claim limitations.

Why he tried to get you to do that, I don't know.  But you shouldn't because the instructions tell you what you should do.  You should follow your instructions.

Questioning about in the context of the standard, this is them speeding again.  I told you we're not accusing the standard.  They tried to act like we were.  You'll remember Mr. Haynes' examination of Doctor Valerdi at the end of the

1278

case when Doctor Valerdi showed unequivocally that they infringe the '580 Patent, why the source code proved it, they had yet another crack at Doctor Valerdi, couldn't produce a shred of source code to disprove what he said, and so they started asking questions about the standard.

It's not the standard.  It's what they do beyond the standard that infringes.  Go back and look at the evidence.  Doctor Valerdi showed you all of it.  It proves infringement emphatically, including resource sharing at the -- at the tunnel level.

So layer 2.

Can we go to Joint Exhibit 46a at 41?

We did not run from this document.  We were the first ones to show it to you.  You recall it's the chart.  At the center of the chart is the red ring.  There it is.

Now, Mr. Dacus told you that this is a mesh.  You'll recall that for it to be a mesh, all of the nodes have to be connected.  That's a mesh network.  Notice how the BSA at the top and the BSA to the right, there's no connection lines if you make their assumption that the red ring isn't connection.  That makes it not a mesh.  That's a hub-and-spoke, and they're speeding.

If you turn the page, Mr. Jarrett.

This is why it proves our read and not theirs of this technical document combined with the source code correct.

What it says is in the --

Blow up that first top paragraph.

What the figure shows is consistent with what we say it is. One advantage of using VPLS for this application is that VPLS instances can be automatically established over both hub-and-spoke--the gray lines--and ring topologies--the red one. And we're the ones that are speeding. That's their own document. They could have brought you some source code. They didn't.

You can take it down, Mr. Jarrett.

On the '599 Patent, we have shown a layer 2 ring network. Their technical materials show a layer 2 ring network. And we've shown you the part of the technical materials that talk about the OSPF, that talk about ingress and egress nodes. And Doctor Valerdi taught you all you needed to know about that yesterday, that the two BSRs that sit there, not one like Doctor Chatterjee said, allow for that ingress and egress. That meets all the elements of the claim, and you should find infringement.

In terms of the '010 Patent, let's be real clear here. Yes, the first word is hub, but there are more words that follow what a hub is and define what a hub is. A hub, including, meaning taking in, comprising, all of the rest of the claim language.

Mr. Dacus put up the word hub. I hope you saw it. He

highlighted a single word when there are eight words that follow, and all eight of those words under the Court's instructions must be taken into account to understand what hub means.

And the only person who's provided a real construction of that term from that witness stand, not the word hub, all of the words as the claim language requires, was Doctor Valerdi, and he showed you through their own technical documents that a node, a router in their own schematics, is labeled a hub. I pointed them out to you today. That is because what Nokia wants you to believe is a hub is not a hub or a router is not a hub, a hub is not a hub in their own documents, a circle's not a ring, two tunnels are one. That's their case. That's what they brought you.

If we go to the slides, Mr. Jarrett. I can't see it on my monitor. Can you -- oh, there we go.

This is the source code stipulation. This is Nokia telling you that the source code that we talked about is theirs just as we said it was. It's there for your review. It is the ground truth. Doctor Valerdi said it, their employee Phillip Bergeon said it: The features in the source code are developed based on customer-end demand. They're not removed based on customer demand. That's the source code.

None of them -- they didn't bring -- not a single witness that testified to you had reviewed it. Not Phillip Bergeon,

not Alfred Nothaft, and not Mr. Valley who took the stand live.  It's not his expertise.  Why didn't they bring somebody who could read the code to you?

They talk about their respect for patents.  We just heard it again.  Really?  There's no department within Nokia that would give that kind of clearance analysis, product clearance.  Let's make sure we don't infringe other people's intellectual property.  No.

Even if Nokia doesn't receive a demand or an assertion of infringement, does Nokia have a process by which it analyzes its own products, say, new products coming to market to determine whether they infringe?  No.

They -- the number of things that they've done in this trial, misstatements -- remember when they tried to say Orckit-Corrigent didn't participate in the IETF?  Remember that moment in trial when Mr. Valley was forced to admit that what they've been saying the first two days of trial was totally false?  That's their case.

Ms. Bennis, the damages, we asked her about where did you get the million-dollar number from.  Did you do a calculation?  No.  No calculation.  An economist came in, took the stand to testify for this company to give you a number that was based on nothing except her whimsy, I guess.

The comparable licenses that Mr. Dacus pointed to, she could have pried into the details of any one of those to find

out how comparable they were, what the product was, what the

unit price was, how many were sold, any of the economic

realities of any of those licenses.  And you heard Ms. Stahl

ask her, Did you do that?  Eventually she answered no.

Well, why not?  Why wouldn't you ask those questions?

Because those questions are not ones you want answered.

That's a conclusion you can draw from the evidence.  Just like

the source code, they have it at their full disposal.  Ms.

Bennis had Nokia at her full disposal.  She could have asked

them for all the information she wanted, and she didn't ask

for any.  She took those licenses they gave her, and she gave

them what they wanted--the million-dollar number that's based

on nothing.

Compare that with Stephen Dell, what he gave you.  Yeah,

they don't like Doctor Cole's analysis.  They want to say that

Doctor Cole took too much of the market because of his

percentages.  But they're not telling you the whole story.

They don't follow it through, which is what the patent laws

and the instructions you will receive actually direct.  You

have to take it to the next step, which is what Mr. Dell did.

He apportioned for the things that Mr. Dacus just said we

didn't apportion for, and that is, the small incremental

improvement that we provided to Nokia's technology was very

low, five or so percent, less than that in some cases.  And

then Mr. Dell took that and extrapolated it down further,

accounting for all kinds of other economic realities, including the existence of other products, and got it down to a smaller number such that, as I said in my opening presentation, it's less than one cent per dollar.

Why is it so big?  Because they sell a lot of products. That's not anything to do with Smart Path.  And why Mr. Dacus kept pointing across the courtroom like it's our fault they sell a lot of products and therefore the number goes up, I don't know.  But that's the economic reality.

THE COURT:  Five minutes remaining.

MR. BENNETT:  Thank you, Your Honor.

Mr. Dell did a principled economic review of the evidence and reached the best conclusion with the information that he had.

And I find it fascinating on two points about the economics here.  Number one, Mr. Dacus was really critical of Mr. Cole about how he couldn't come up with a percentage that he liked, Mr. Dacus liked and Nokia liked.  But if you'll remember we asked questions of their witnesses that got played in video deposition, hey, how would you apportion these features.  They couldn't answer it, either.  They couldn't answer it, either, or wouldn't.  Not sure which.

But why should Doctor Cole be expected to apportion a product that the seller of the product can't do a better job of apportioning?  That's what happened just now.  That's the

burden we've been dealing with in this case.

And so we're here at the end now.  We have proven our case.  They have not proven by clear and convincing evidence their case.

Last thing I'll say on that.  Clear and convincing evidence that's defined in the charge, that's the standard they apply when they're going to take someone's kids away.  It's the same standard they apply before you take a patent claim away.  And they haven't come close in this case to meeting that standard.

You'll go back into the room, you'll have all the evidence at your disposal, but I think it's clear by now what the conclusions we hope will be, and what they should be based on the credible testimony, and that is:  infringement of each patent, no on each claim for invalidity, a running royalty when you get to that portion where you can choose, and our full damages based on the full effect of their infringement.

Thank you.

THE COURT:  Ladies and gentlemen, I'd like to provide you with a few final instructions before you begin your deliberations.

You must perform your duty as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or public opinion.  All parties expect that you will carefully and impartially

consider all the evidence, and follow the law as I have given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be, following the instructions the Court has given you on the law. Again, ladies and gentlemen, do not decide who you think should win this case and then answer the questions to reach that result. Also, I'll remind you one more time, your answers and your verdict in this case must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, equal worth, and holding the same or similar stations in life. This is true in patent cases between corporations, partnerships, or individuals. A patent owner is entitled to protect his rights under the laws of the United States, and this includes bringing a suit in a United States District Court seeking money damages for infringement.

The law recognizes no distinctions between parties. All corporations, partnerships, or other organizations stand equal before the law, regardless of their size, regardless of who owns them, and are to be treated as equals.

Now, when you retire to the jury room in just a few minutes to deliberate on your verdict, you're each going to have a written copy of the Court's final jury instructions to

consider and to review.

If during your deliberations you desire to review any of the exhibits which the Court has admitted into evidence and which have been shown to you during the trial, then in that case you should advise me by written note delivered to the Court Security Officer, signed by your foreperson, requesting one or more specific exhibits, and in that case I will send those exhibits to you.

Once you retire, you should first select your foreperson and then conduct your deliberations.  And if during your deliberations you recess for any reason, follow -- continue to follow all the instructions I've given you about your conduct during the trial.

After you've reached a verdict, your foreperson is to fill in your unanimous answers to those questions in the verdict form, sign it, date it, and advise the Court Security Officer that the jury has reached a verdict.  Do not reveal your answers until such time as you're discharged, unless otherwise directed by me.  And you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes that you've taken over the course of the trial are aids to your memory only.  If your memory should differ from your notes, then rely on your memory and not your notes. Notes are not evidence, and a juror who has not taken notes

1287

must rely on their own memory of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression that each juror has of the testimony.

Now, if you want to communicate with me during your deliberations, you should give a message or a question written by your foreperson, signed and dated, to the Court Security Officer, who will bring it to me.  I will then respond to you as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.  And I will always disclose to the attorneys in the case your question and my proposed response before I answer any question.

Now, after you have reached a verdict, I have accepted your verdict and discharged you as jurors, I want you to understand, ladies and gentlemen, at that point you are not required to talk with anyone about your service in this case.  However, at that point when I have accepted your verdict and discharged you as jurors, at that point you will be completely free to discuss your service in this case with anyone of your choosing, but that decision is yours 100 percent.  No one can force you to talk about the case, no one can keep you from talking about the case.  It is strictly up to you at that point.

I'm now going to hand eight printed copies of the Court's

final instructions and one clean copy of the verdict form to the Court Security Officer to deliver to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to conduct your deliberations.  We await your verdict.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, you are welcome to wait here in the courtroom or to have a representative wait here if you choose.  You're also welcome to retire to your respective war rooms.

I have a cell phone number for each trial team.  If we get a verdict or a question or a note, I will call you and have you back here promptly.  Don't go any further than what will allow you to get back to the courtroom quickly if we get a note from the jury.

Awaiting either the jury's return of a verdict or a note from them, we stand in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following message from the jury dated today's date and signed by Ms. Ollive, Juror No. 8 as the apparent foreperson:  "We have a verdict."

I will hand the original note from the jury to the Courtroom Deputy to be included in the papers of this case.

And let me ask if either side is aware of anything the

1289

Court needs to consider before I bring in the jury and receive the verdict.

Plaintiff?

MR. BENNETT:  No, Your Honor.

THE COURT:  Defendant?

MR. HAYNES:  No, Your Honor.

THE COURT:  All right.  Let me say one thing before I do bring the jury in.  This has been a well-tried case.  I have no idea what the result is, but it's been tried professionally by both sides and both trial teams, and I want to recognize and commend both sides for their professionalism in the way this case was presented and tried, both in front of the jury -- in the courtroom in front of the jury as well as working with the Court behind the scenes.  So I don't say that lightly, but I want to say it on the record.

All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated.

Ms. Ollive, I understand you're the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Would you hand the completed form to the Court Security Officer who will bring it to me?

Ladies and gentlemen of the jury, I'm going to announce the verdict into the record.  I'd like you each to listen very carefully, because after I have announced the verdict into the record I'm going to poll the members of the jury to ensure that this is, in fact, the unanimous verdict of all eight members of our jury.

Turning to the verdict form and beginning on page 4 where Question 1 is found, "Did Smart Path prove by a preponderance of the evidence that Nokia infringed any of the following asserted claims of the asserted patents?"

For claim 55 of the '599 Patent, the jury's answer is "No."

For claims 1 and/or 15 of the '580 Patent, the jury's answer is "Yes."

For claims 1 and/or 3 of the '010 Patent, the jury's answer is "No."

Turning to Question 2 found on page 5 of the verdict form, "Did Nokia prove by clear and convincing evidence that any of the following Smart Path asserted claims are invalid as obvious?"

For claim 12 of the '850 [sic] Patent, the jury's answer is "Yes."

For claim 15 of the '850 Patent, the jury's answer is "Yes."

For claim 1 of the '010 Patent, the jury's answer is

"Yes."

And for claim 3 of the '010 Patent, the jury's answer is "Yes."

Turning to page 6 and following of the verdict form, the remaining questions, being Questions 3, 4a, 4b, 4c, 4d, and Question 5 are left unanswered, which comports with the instructions contained within the verdict form.

Turning to page 11, which is the last page of the verdict form, I find that it is dated with today's date, April the 5th, 2014, and it is signed by Ms. Ollive as foreperson of the jury.

Ladies and gentlemen of the jury, let me poll you at this time to make sure that this verdict as I have announced into the record unanimously reflects the entire decision of all eight members of the jury.

If this is your verdict as I have read it, would you please stand up?  Thank you, ladies and gentlemen.  Please be seated.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury.

This confirms that this is the unanimous verdict of all eight members of the jury.  The Court accepts the jury's verdict, and I'll hand the original verdict to the Courtroom Deputy.

Ladies and gentlemen, this now completes the trial of this case. From the very beginning, I have instructed you repeatedly about your conduct, who you could talk to, what you could say, and all kinds of things. I am releasing you as jurors in this case and I am, thereby, releasing you from all the instructions that I have given you earlier.

This means, ladies and gentlemen, that on that first evening when you walked in the door and somebody said, Tell me what happened in federal court in Marshall, you can tell them now, if you want to tell them. I want you to understand also, you are not required to speak with anyone about your service in this case. That is strictly and totally up to you.

Also, I need to update you on one other matter, ladies and gentlemen. This is a small courthouse with one set of steps coming in and one set of steps going out, and it has been the custom and practice in the Marshall Division of the Eastern District of Texas, at least since I began practicing law here, and that's been a long time ago, that when a jury returns a verdict and leaves this courthouse, do not be surprised if several, if not many, of the lawyers in this case are standing on the sidewalk near the bottom of those steps. They are hoping you will want to stop and have a conversation with them about your service as jurors in this case. And I expect there will be representatives from both sides there. They're very interested in what you thought about the trial,

and they would hope that you would talk to them.

Now, you're not required to talk to them at all, and they are not permitted to initiate a conversation with you.  They are not going to get in your way, they are not going to make it difficult for you to walk, but they're going to be very conveniently positioned in case you want to stop and talk to be available to talk to you.  That's the way it's been since 1981 when I got to Marshall, Texas, out of Baylor Law School.  It's been that way every month and every week and every day since.

Now, I want you to also know that they have provided me with a representative phone number for each trial team, and I'm going to make those available to you before you leave.  If you want to take a phone number for Plaintiff and Defendant with the idea that maybe next week or next month or sometime in the future you might want to call and make yourself available to talk about your thoughts on this trial, then you can certainly do that.  You're not required to take a set of cell phone numbers, you're not required to make any phone calls at all; the whole decision about what to do with regard to discussing your observations and your experience in this trial is 100 percent up to you.  You don't have to do anything.

But I have initiated the practice the last couple of years of making these cell phone numbers available to you so

that you're not left to decide, I either stop and talk today on a Friday afternoon when I really would rather go on about my business or you don't talk to them at all.  At least the cell phone numbers will give you an option, if you want it to call at a later time.

Again, both sides are interested in what you thought, but both sides are prohibited from initiating or trying to initiate a conversation with you.  They're not going to bother you, they're not going to bug you, but they're hoping you will make yourself available to them or at some other time.  And that's the way it works here in the Marshall Division.  I want you to be aware of that.

Also, ladies and gentlemen, I want to thank you publicly on the record for your service in this case.  It's been a hard week.  We've started early, we've gone late, you've done everything that the Court's asked you to do, you've been on time.  I could not ask more of a group of good American citizens like you are who served as the jury in this case.

Before you leave the building, I'm going to ask you to do me a personal favor.  In a minute when you get up out of those seats and leave the jury box, I'm going to ask you to go back in the jury room and let me come into the jury room for just a minute because I would like to shake each one of your hands and look each one of you in the eye and tell you personally face-to-face thank you for your service as good citizens in

this trial.  I think what you've done warrants that.  Now that the trial is over and the verdict's been accepted, there's no reason I can't do that, if you will afford me that opportunity.  I promise you I have things to do on Friday evening, too, and I will not keep you but just a couple of minutes, but if you would do me that honor, I would certainly appreciate it.

The Court accepts the jury's verdict.

Counsel, this completes the trial in this matter, and you are excused.

Ladies and gentlemen, I'll meet you in the jury room.

(The proceedings were concluded at 3:00 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.


S/Shawn McRoberts                04/05/2024

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER